CADWALADER WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800

Attorneys for Plaintiffs,
Seaton Insurance Company and
Stonewall Insurance Company

07 CV 7032

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEATON INSURANCE COMPANY and STONEWALL INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>vs.<br><br>CAVELL USA INC. f/k/a KEN RANDALL AMERICA, INC. f/k/a EASTGATE, INC. and KEN RANDALL, individually,<br><br>Defendants. | Civil Action<br><br>**COMPLAINT<br>AND JURY DEMAND**<br><br>Civil Action No. |

Plaintiffs, Seaton Insurance Company ("Seaton") and Stonewall Insurance Company ("Stonewall"), by and through their attorneys, for their complaint against defendants Cavell USA Inc. f/k/a Ken Randall America, Inc. and, earlier still, as Eastgate, Inc. ("Cavell") and Ken Randall, individually ("Randall"), allege as follows:

I.  **Nature of Action**

1.   This action seeks to redress frauds perpetrated by Cavell and Randall upon Seaton and Stonewall in connection with the negotiation, amendment and operation of

1

Agreements Relating to Administration of Run-Off Business (the "Administration Agreements") pursuant to which Cavell was to provide run-off services, including claim administration, to Seaton and Stonewall. During negotiations of the Administration Agreements, Cavell represented that it would exercise independence in its role as claim administrator and, at all times, would safeguard Seaton's and Stonewall's economic and other interests. The Seaton and Stonewall Administration Agreements were executed in or about March 1999 and September 2000, respectively. Seaton and Stonewall now know that Cavell's and Randall's representations were false and that, at all material times, Cavell and its principal, Randall, intended to cede control over the administration of Seaton's and Stonewall's claims to National Indemnity Company ("NICO"), a reinsurer whose interests were adverse to those of Seaton and Stonewall.

2. While the Administration Agreements were in effect, Cavell and Randall periodically represented to Seaton and Stonewall (collectively, the "Companies") that Cavell was zealously safeguarding the Companies' interests and faithfully fulfilling Cavell's fiduciary duties, as well as its duty of undivided loyalty. Based, in part, upon these representations, Seaton and Stonewall each agreed in 2004 to amend the Administration Agreements between them and Cavell (respectively, the "Seaton Administration Agreement" and the "Stonewall Administration Agreement") and to extend the period during which Cavell would act as run-off manager.

3. Until late 2005, Seaton and Stonewall relied upon Cavell's and Randall's representations and believed that Cavell was discharging its duties faithfully and professionally. In late 2005, Seaton and Stonewall discovered that Cavell's and Randall's periodic representations during the term of the Administration Agreements, as well as those that preceded the Administration Agreements' initial and renewal

negotiations, were false and that no later than August 2001, when Cavell and NICO entered into a so-called "Collaboration Agreement," Cavell wholly abdicated its fiduciary duties and responsibilities and delegated to NICO unfettered discretion to handle the Companies' claims and to collect reinsurance recoveries on the Companies' behalf.

4. Upon discovery of the import of the Collaboration Agreement and the falsity of Cavell's and Randall's representations concerning the faithfulness of Cavell's performance, Seaton and Stonewall terminated the Seaton and Stonewall Administration Agreements and Cavell's services as run-off manager. Here, Seaton and Stonewall are seeking to recover damages for Cavell's and Randall's fraud, including a return of the more than $27 million paid to Cavell as fees under the Administration Agreements.

**II.   The Parties**

5. Seaton, formerly known as Unigard Security Insurance Company, is an insurance company organized and existing under the laws of the State of Rhode Island, with its principal place of business located in Warwick, Rhode Island.

6. Stonewall is an insurance company organized and existing under the laws of the State of Rhode Island, with its principal place of business located in Warwick, Rhode Island.

7. Cavell, formerly known as Ken Randall America, Inc. and, earlier still, as Eastgate, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Cambridge, Massachusetts.

8. Ken Randall is a natural person who, upon information and belief, is a citizen of the United Kingdom.

### III. Jurisdiction and Venue

9. Jurisdiction is based upon 28 U.S.C. § 1332(a). The citizenship of the parties is diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

10. Venue is based upon 28 U.S.C. § 1391. Defendants are subject to service in this district. Further, in the Seaton Administration Agreement, Seaton and Cavell agreed that any action between them could be brought in the United States District Court for the Southern District of New York.

### IV. Factual Background

#### A. The Sale of Seaton and the Negotiation of the Seaton Covers

11. In or about 1996, John Hancock Property & Casualty Holding Company ("John Hancock"), the then owner of Seaton, concluded that Seaton would no longer write any new business and, going forward, would run-off its existing obligations to policyholders and cedents. Ever since, Seaton has remained in run-off.

12. In or about 1997, John Hancock decided to sell its interest in Seaton. In November 1998, it and Dukes Place Holdings, L.P. ("Dukes Place") entered into a Stock Purchase Agreement pursuant to which Dukes Place agreed to purchase, and John Hancock agreed to sell, all of the issued and outstanding shares of Seaton.

13. In connection with its acquisition of Seaton, Dukes Place purchased two finite reinsurance contracts (the "Seaton Covers") from NICO, an insurer in the Berkshire Hathaway group of insurance companies. Under the Seaton Covers, NICO agreed to reinsure Seaton's liabilities up to an aggregate limit of $343 million in exchange for a premium (paid by Seaton) of $192 million. This premium represented a

4

substantial portion of Seaton's assets. (The limit of the Seaton Covers was later increased to $350 million.)

14. The control of Seaton's claims was a significant issue during the negotiation of the Seaton Covers. NICO sought to obtain control over the handling of Seaton's claims but was unable to do so. Seaton insisted that it retain control.

15. The Seaton Covers were subject to regulatory review and approval. Regulatory approval was an express condition precedent to the Covers' effectiveness. One topic of regulatory concern was claims control. The regulators wanted to ensure that under the Seaton Covers, Seaton retained control over the handling of its claims.

16. Under the Seaton Covers, Seaton retained responsibility for handling claims made against its insurance policies and reinsurance contracts. The Seaton Covers authorized Seaton, which no longer had any staff of its own, to use a third-party claims administrator to provide claim administration.

**B.     Cavell is Appointed Seaton's Run-Off Manager**

17. Effective March 31, 1999, Seaton retained Cavell to provide comprehensive run-off management services to it. Under the Seaton Administration Agreement, which set forth the services Cavell agreed to provide to Seaton, Cavell was entitled to a substantial annual fee, ranging from $2.75 million for the year ending March 31, 2000 to $2.55 million for the year ending March 31, 2004. In January 2004, Seaton and Cavell amended the Seaton Administration Agreement to provide additional annual, multi-million dollar fees for Cavell – for the years ending March 31, 2005, March 31, 2006, March 31, 2007 and March 31, 2008. (During the term of the Seaton Administration Agreement, Seaton paid Cavell more than $16 million in fees.)

18. Under the Seaton Administration Agreement, Seaton entrusted Cavell to manage virtually all of Seaton's affairs, including claims administration, reinsurance collections, accounting and other services. The Seaton Administration Agreement required Cavell to perform its services "with reasonable care and skill in a professional and efficient manner." (A copy of the Seaton Administration Agreement, as amended, is attached hereto as Exhibit 1 and incorporated herein by reference.)

19. To induce Seaton to retain Cavell's services, Cavell and Randall represented to Seaton – as later reflected in the Seaton Administration Agreement itself – that Cavell would "at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith." As discussed more fully below, both prior and subsequent to the execution of the Seaton Administration Agreement, Cavell and Randall fraudulently failed to disclose to and concealed from Seaton that they intended to cede and did in fact cede control of the administration of Seaton's claims to NICO.

20. As a result of the Seaton Administration Agreement, Cavell became Seaton's agent and, in this capacity, owed Seaton fiduciary duties, including but not limited to, duties of complete candor, undivided loyalty and full disclosure.

21. Upon information and belief, prior to the time Cavell entered into the Seaton Administration Agreement, Cavell and Randall had determined that Cavell would cede claims control to NICO, by subdelegating to NICO Cavell's claim functions under the Seaton Administration Agreement. Cavell and Randall never informed Seaton that Cavell intended to cede claims control to NICO. Had Cavell or Randall done so, Seaton would not have entered into the Seaton Administration Agreement.

22. Shortly after the Seaton Administration Agreement was signed, Cavell and NICO made an oral pre-funding agreement, the effect of which was to cede control of

claims to NICO. Cavell failed to disclose to – and, upon information and belief, actively concealed from – Seaton the existence of this oral agreement, which came to Seaton's attention only recently (within the past several weeks). Had Cavell or Randall disclosed the oral pre-funding agreement and Cavell's concomitant cession of claims control to NICO in 1999, when the pre-funding agreement was made, or at anytime thereafter, Seaton would have immediately terminated the Seaton Administration Agreement.

**C.     The Sale of Stonewall and the Negotiation of the Stonewall Cover**

23.     In or about 1990, Great American Insurance Group Inc. ("Great American"), the then owner of Stonewall, concluded that Stonewall would no longer write any new business and, going forward, would run-off its exiting obligations to policyholders and cedents. Ever since, Stonewall has remained in run-off.

24.     In or about 1999, Great American decided to sell its interest in Stonewall. In May 1999, it and Dukes Place entered into a Stock Purchase Agreement pursuant to which Dukes Place agreed to purchase, and Great American agreed to sell, all of the issued and outstanding shares of Stonewall.

25.     In connection with its acquisition of Stonewall, Dukes Place purchased a finite reinsurance contract (the "Stonewall Cover") from NICO. Under the Stonewall Cover, NICO agreed to reinsure Stonewall's liabilities up to an aggregate limit of $240 million in exchange for a premium (paid by Stonewall) of $126 million. This premium represented a substantial portion of Stonewall's assets.

26.     The Seaton Covers served as the template for the Stonewall Cover, thus streamlining negotiations.

27.     The Stonewall Cover, like the Seaton Covers, vested claims control in Stonewall and bound NICO to Stonewall's reasonable, good faith disposition of claims.

28. At no time prior to the inception of the Stonewall Cover did Cavell, Randall, NICO or, for that matter, any one disclose to Stonewall (or Dukes Place) or any insurance regulator the oral, pre-funding side agreement that Randall and NICO had negotiated concerning Seaton and that would be applied prospectively to Stonewall.

29. Under the Stonewall Cover, Stonewall retained responsibility for handling claims made against its insurance policies and reinsurance contracts. The Stonewall Cover authorized Stonewall, which no longer had any staff of its own, to use a third-party claims administrator to provide claim administration.

### D. Cavell is Appointed Stonewall's Run-Off Manager

30. Effective September 30, 2000, Stonewall retained Cavell to provide comprehensive run-off management services to it. Under the Stonewall Administration Agreement, which set forth the services Cavell agreed to provide to Stonewall, Cavell was entitled to a substantial annual fee, ranging from $2.3 million for the year ending September 30, 2001 to $1.65 million for the year ending September 30, 2005. In January 2004, Stonewall and Cavell amended the Stonewall Administration Agreement to provide additional annual, multi-million dollar fees for Cavell – for the years or partial year ending December 31, 2005, December 31, 2006, December 31, 2007 and December 31, 2008. (During the term of the Stonewall Administration Agreement, Stonewall paid Cavell more than $11 million in fees.)

31. Under the Stonewall Administration Agreement, Stonewall entrusted Cavell to manage virtually all of Stonewall's affairs, including claims administration, reinsurance collections, accounting and other services. The Stonewall Administration Agreement required Cavell to perform its services "with reasonable care and skill in a professional and efficient manner." (A copy of the Stonewall Administration

Agreement, as amended, is attached hereto as Exhibit 2 and incorporated herein reference.)

32. To induce Stonewall to retain Cavell's services, Cavell and Randall represented to Stonewall – as later reflected in the Stonewall Administration Agreement itself – that Cavell would "at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith." As discussed more fully below, both prior and subsequent to the execution of the Stonewall Administration Agreement, Cavell and Randall fraudulently failed to disclose to and concealed from Stonewall that they intended to cede and in fact had agreed to cede control of the administration of Stonewall's claims to NICO.

33. As a result of the Stonewall Administration Agreement, Cavell became Seaton's agent and, in this capacity, owed Stonewall fiduciary duties, including but not limited to, duties of complete candor, undivided loyalty and full disclosure.

34. Upon information and belief, prior to the time Cavell entered into the Stonewall Administration Agreement, Cavell and Randall, had determined that Cavell would cede claims control to NICO, by subdelegating to NICO Cavell's claim functions under the Stonewall Administration Agreement. Cavell and Randall never informed Stonewall that Cavell intended to cede claims control to NICO. Had Cavell or Randall done so, Stonewall would not have entered into the Stonewall Administration Agreement.

35. Several months before the Stonewall Administration Agreement was signed, Cavell and NICO made an oral pre-funding agreement, the effect of which was to transfer control over Stonewall's claims to NICO upon the sale of Stonewall to Dukes Place. Cavell failed to disclose to – and, upon information and belief, actively

concealed from – Stonewall (and Dukes Place) the existence of this oral agreement, which came to Stonewall's attention only recently (within the past several weeks). Had Cavell or Randall disclosed the oral pre-funding agreement and Cavell's concomitant intention to transfer claims control to NICO in 2000, when the Stonewall Administration Agreement was being negotiated, Stonewall would not have agreed to the Stonewall Administration Agreement.

### E. Cavell Enters Into a Collaboration Agreement with NICO

36. In or about June 2001, Cavell and NICO negotiated a contract entitled "Collaboration Agreement." Under this contract, which took effect on August 8, 2001, Cavell subdelegated to NICO all of the claims handling and reinsurance collection responsibilities Cavell was retained to perform pursuant to the Seaton and Stonewall Administration Agreements. The practical effect of the Collaboration Agreement was to substitute NICO in place of Cavell as the provider of claim and reinsurance collection services.

37. Neither Seaton nor Stonewall were privy to the negotiations that led up to the Collaboration Agreement; nor were Seaton and Stonewall a party to the contract itself. Seaton and Stonewall were not asked to consent and did not consent to Cavell's wholesale abdication of its claims and reinsurance collection responsibilities. If Seaton or Stonewall had been asked to consent, neither Company would not have done so and, instead, each Company would have terminated its Administration Agreement with Cavell.

38. The Collaboration Agreement (a copy of which, as amended, is attached as Exhibit 3 and incorporated herein by reference) provides, in part: "For the avoidance of doubt, NIC[O] retains all authorities to supervise and control claims handling and

reinsurance collections;" "[Cavell] authorizes and requires NIC[O] to direct the Claims Handling Staff in the performance of their duties;" and "the salary and bonus of all Claims Handling Staff shall be set by NIC[O]."

39. The Collaboration Agreement solidified NICO's control over claims and insured that Seaton's and Stonewall's objective to complete an orderly and speedy run-off, extinguishing liabilities as promptly as possible, would be subjugated – and subordinate – to NICO's competing interest in deferring claim payments for as long as possible.

40. Following the Collaboration Agreement's effective date, Cavell employees reported to NICO and took instructions directly from NICO, which not only set their salaries and determined their bonuses but paid both as well.

41. Following the Collaboration Agreement's effective date, NICO reimbursed Cavell for 100% of the salaries and employment-related benefits of those Cavell employees who handled Seaton and Stonewall claims. NICO also paid a substantial portion of Cavell's overhead (for example, office rent and supplies).

42. Stonewall and Seaton, which were unaware of the terms of the Collaboration Agreement, continued to pay Cavell pursuant to the Administration Agreements. These payments totaled $4-5 million per year during the time that the Collaboration Agreement was in effect. In other words, while the Collaboration Agreement was in force, Cavell and Randall were paid twice – once by Stonewall and Seaton and once by NICO – to perform the same claims handling functions. This arrangement resulted in a substantial windfall for Cavell which was now being paid by NICO to do the very job the Companies had already paid Cavell to do.

F.   **The Renegotiation of the Administration Agreements**

43. The Administration Agreements, as originally written, set forth Cavell's compensation for a period of five years. In January 2004, as the fifth anniversary of the Seaton Administration Agreement approached, Cavell on the one hand and Seaton and Stonewall on the other entered into negotiations to set compensation for years six and onward.

44. In connection with those discussions, the Administration Agreements were amended in writing (the "Amendments"). Randall negotiated the Amendments. At no time during those negotiations did Randall or Cavell inform Seaton or Stonewall that the entire claim handling function had been transferred to NICO and that all claims handling was done under "the supervision, direction and control" of NICO.

45. Randall's and Cavell's failure to disclose the change in control over claims handling materially misled Seaton and Stonewall, each of which continued to believe that Cavell handled claims and was safeguarding their interests.

46. If Randall or Cavell had made full and adequate disclosure of either the oral pre-funding agreement or the Collaboration Agreement during the time the Amendments were being negotiated, the Companies would not have agreed to the Amendments and, instead, would have immediately terminated the Administration Agreements.

G. **Seaton's and Stonewall's Termination of the Administration Agreements**

47. Upon entering into the Administration Agreements with Cavell, Seaton and Stonewall each reasonably believed and expected that Cavell, Seaton's and Stonewall's fiduciary, would zealously represent Seaton's and Stonewall's interests and faithfully handle Seaton's and Stonewall's claims and reinsurance collections. Seaton

and Stonewall paid substantial fees, more than $16 million and $11 million, respectively, to Cavell for Cavell to do so.

48. Cavell and Randall knew that NICO's interests would be and often were completely adverse to Seaton's and Stonewall's interests. Nonetheless, Cavell and Randall entered into the oral pre-funding agreement and, thereafter, the Collaboration Agreement, allowing NICO to take control over Seaton's and Stonewall's claims handling and reinsurance collections, all the while falsely representing to Seaton and Stonewall that Cavell remained steadfast in protecting Seaton's and Stonewall's interests.

49. As a result of discovering aspects of Cavell's fraudulent misconduct in November 2005, Seaton and Stonewall notified Cavell in January 2006 that Seaton and Stonewall were terminating Cavell's services.

50. On or about February 17, 2006, Dukes Place (for itself and on behalf of its partners, shareholders, directors, officers, subsidiaries, associated companies and affiliates, including, but not limited to, Seaton and Stonewall) and Randall & Quilter Investment Holdings Limited (for itself and on behalf of its partners, shareholders, directors, officers, subsidiaries, associated companies and affiliates, including, but not limited to, Cavell) terminated the Administration Agreements by executing a document titled the Term Sheet ("Term Sheet").

51. The Term Sheet (a copy of which is attached hereto as Exhibit 4 and incorporated herein by reference) called for: (i) the orderly termination of the contractual and other commercial relationships between Seaton and Stonewall on the one hand and Cavell on the other effective March 31, 2006; and (ii) Cavell's orderly handover of run-off management to the Companies. The Term Sheet also released

certain claims by Seaton and Stonewall against Cavell, but expressly preserved the Companies' right to pursue claims sounding in fraud.

### FIRST COUNT
### (Cavell's and Randall's Fraud Upon Seaton)

52. Plaintiffs repeat and reallege paragraphs 1 to 51 as if set forth here at length.

53. Both prior and subsequent to the execution of the Seaton Administration Agreement, Cavell and Randall falsely represented to Seaton that Cavell would perform claims handling services during the term of the Seaton Administration Agreement and zealously protect Seaton's interests. All along (or, at the very latest, shortly after the inception of the Administration Agreement), Cavell and Randall intended to cede and, in fact, did cede claims control to NICO, an entity whose interests conflicted with Seaton's leaving Seaton vulnerable to having its claims handled in a less than optimum manner.

54. Cavell and Randall failed to disclose and, upon information and belief, actively concealed from Seaton both their intention to cede claims control to NICO and the fact that they had done so.

55. Through their words and conduct, Cavell and Randall intentionally misrepresented to Seaton that Cavell was acting in good faith and in furtherance of Seaton's best interests. For more than five years prior to discovery, Cavell and Randall fraudulently subverted Seaton's rights to NICO's and other NICO-reinsured companies' interests.

56. Cavell and Randall had a duty to disclose the fact that they had ceded claims control to NICO but each failed to make such disclosure in order to further their own interests, including keeping the Seaton Administration Agreement in force and, still later, extending its term.

57. Cavell's and Randall's misrepresentations and nondisclosures were intentional, material and knowingly false; likewise, Cavell's and Randall's concealments of material fact were intentional and deliberate; Cavell and Randall understood or reasonably should have known that Seaton would rely upon, and that Seaton had relied upon, the accuracy and completeness of the representations made to it. Seaton reasonably and justifiably relied on Cavell's and Randall's representations, and has been damaged thereby – in an amount to be proven at trial.

58. Cavell's and Randall's nondisclosures and concealments were intentional and material and Cavell and Randall intended its nondisclosures and concealments to induce Seaton's reliance thereon. Cavell and Randall knew or reasonably should have known that Seaton would so rely. Seaton reasonably and justifiably relied that Cavell and Randall would disclose the concealed and non-disclosed information and has been damaged thereby – in an amount to be proven at trial.

59. Seaton's damages include paying Cavell more than $16 million to perform services that either were not performed or were performed in a manner never contemplated by Seaton. Seaton's damages also include the diminished value of the company which, had it been run-off properly, would today be worth $65 million (or more). Instead, Seaton, is virtually valueless.

## SECOND COUNT
(Cavell's and Randall's Fraud Upon Stonewall)

60. Plaintiffs repeat and reallege paragraphs 1 to 51 as if set forth here at length.

61. Both prior and subsequent to the execution of the Stonewall Administration Agreement, Cavell and Randall falsely represented to Stonewall that Cavell would perform claims handling services during the term of the Stonewall Administration Agreement and

zealously protect Stonewall's interests. All along Cavell and Randall intended to cede and upon execution of the Stonewall Administration Agreement did cede claims control to NICO, an entity whose interests conflicted with Stonewall's leaving Stonewall vulnerable to having its claims handled in a less than optimum manner.

62.  Cavell and Randall failed to disclose and, upon information and belief, actively concealed from Stonewall both their intention to cede claims control to NICO and the fact that they had done so.

63.  Through their words and conduct, Cavell and Randall intentionally misrepresented to Stonewall that Cavell was acting in good faith and in furtherance of Stonewall's best interests. For more than five years prior to discovery, Cavell and Randall fraudulently subverted Stonewall's rights to NICO's and other NICO-reinsured companies' interests.

64.  Cavell and Randall had a duty to disclose the fact that they had ceded claims control to NICO but each failed to make such disclosure in order to further their own interests, including keeping the Stonewall Administration Agreement in force and, still later, extending its term.

65.  Cavell's and Randall's misrepresentations and nondisclosures were intentional, material and knowingly false; likewise, Cavell's and Randall's concealments of material fact were intentional and deliberate; Cavell and Randall understood or reasonably should have known that Stonewall would rely upon, and that Stonewall had relied upon, the accuracy and completeness of the representations made to it. Stonewall reasonably and justifiably relied on Cavell's and Randall's representations, and has been damaged thereby – in an amount to be proven at trial.

66. Cavell's and Randall's nondisclosures and concealments were intentional and material and Cavell and Randall intended its nondisclosures and concealments to induce Stonewall's reliance thereon. Cavell and Randall knew or reasonably should have known that Stonewall would so rely. Stonewall reasonably and justifiably relied that Cavell and Randall would disclose the concealed and non-disclosed information and has been damaged thereby – in an amount to be proven at trial.

67. Stonewall's damages include paying Cavell $11 million to perform services that either were not performed or were performed in a manner never contemplated by Stonewall. Stonewall's damages also include the diminished value of the company which, had it been run-off properly, would be worth more today than its current value.

### THIRD COUNT
(Violations of M.G.L. c. 93A)

68. Plaintiffs repeat and reallege paragraphs 1 to 51 as if set forth here at length.

69. Cavell's and Randall's concealment of and failure to disclose material information to Seaton and Stonewall that Cavell and Randall were obligated to disclose to the Companies and Cavell's and Randall's material misrepresentations to Seaton and Stonewall through Cavell's and Randall's words and conduct occurred largely within Massachusetts and comprise unfair and deceptive acts and practices in the conduct of a trade or commerce in violation of Massachusetts General Laws (M.G.L.) c. 93A. Cavell's and Randall's unfair and deceptive acts and practices include their fraudulent concealment and nondisclosure to Seaton and Stonewall of the oral pre-funding agreement and, still later, the Collaboration Agreement, each of which wrested claims

control from Seaton and Stonewall without Seaton's and Stonewall's knowledge or consent and gave control to NICO.

70. Seaton and Stonewall, which engage in commerce, suffered damages as a consequence of Cavell's and Randall's unfair and deceptive acts and practices.

71. Cavell's violations of M.G.L. c. 93A and the rules and regulations issued thereunder caused damage to Seaton and Stonewall in an amount to be proven at trial, entitling the Companies to treble damages, attorneys' fees, costs and expenses.

WHEREFORE, plaintiffs, Seaton Insurance Company and Stonewall Insurance Company, respectfully request that judgment be entered against defendants, jointly and severally, and in plaintiffs' favor awarding plaintiffs compensatory damages in an amount to be proven at trial which, then, would be trebled pursuant to M.G.L. c. 93A and its associated rules and regulations, together with punitive damages of $75 million and such other and further relief as to the Court seems just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure.

DATED: August 6, 2007

                                      CADWALADER, WICKERSHAM & TAFT LLP

                                      By: _____
                                           John F. Finnegan (JFF-3336)
                                           Attorneys for SEATON INSURANCE COMPANY
                                               and STONEWALL INSURANCE COMPANY

Of Counsel:

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP

Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800