Vincent J. Vitkowsky (VV 0210)
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendants
750 Lexington Avenue, 8th Floor
New York, New York 10022
(212) 308-4411

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SEATON INSURANCE COMPANY and
STONEWALL INSURANCE COMPANY,

                            Plaintiffs,

vs.

CAVELL USA INC. f/k/a KEN RANDALL
AMERICA, INC. f/k/a EASTGATE, INC. and
KEN RANDALL, individually,

                            Defendants.

Case No. 1:07-CV-07032 (RMB)

**DECLARATION OF PAMELA
S. HOELSKEN
IN CONNECTION WITH
DEFENDANTS' MOTION TO
DISMISS**

---

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )

PAMELA S. HOELSKEN declares as follows:

1.    I am Chief Operating Officer of Cavell USA Inc. f/k/a Ken Randall America, Inc. f/k/a Eastgate, Inc. ("Cavell US"). I am fully familiar with the facts set forth herein. I submit this declaration in connection with Cavell US and Ken Randall's motion to dismiss the complaint and to provide the Court with certain reinsurance contracts expressly referred to by the complaint.

2.    Attached as Exhibit A is a true and correct copy of the Aggregate Retrocession of Loss Portfolio Agreement No. RA 1321 between National Indemnity Company

and Seaton Insurance Company (then Unigard Security Insurance Company), which was signed on or about November 20, 1998.

3.    Attached as Exhibit B is a true and correct copy of the Aggregate Reinsurance Agreement between National Indemnity Company and Stonewall Insurance Company that was signed during the period of May 5-9, 2000.

4.    Attached as Exhibit C is a true and correct copy of the First Aggregate Excess Retrocession of Loss Portfolio Agreement No. RA 1322 between National Indemnity Company and Seaton Insurance Company (then Unigard Security Insurance Company) signed on or about March 30-31, 1999.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the
19th day of October, 2007.

PAMELA S. HOELSKEN

- 2 -

## CERTIFICATION

A copy of the foregoing motion, defendant's memorandum of law in support of

their motion to dismiss, the Declaration of Pamela S. Hoelsken, dated October 19, 2007

and a Rule 7.1 Statement are being served upon counsel for the plaintiffs via federal

express this 19th day of October, 2007:

<table>
<tr><td>John F. Finnegan, Esq.<br>Cadwalader Wickersham &<br>Taft LLP<br>One World Financial Center<br>New York, NY 10281</td><td>Shawn L. Kelly, Esq.<br>Riker, Danzig, Scherer, Hyland & Perretti<br>LLP<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, New Jersey 07962</td></tr>
</table>

Vincent J. Vitkowsky

# EXHIBIT A

UNIGARD SECURITY INSURANCE COMPANY

of Seattle, Washington

AGGREGATE RETROCESSION OF LOSS PORTFOLIO AGREEMENT

NO. RA 1321

This Aggregate Retrocession Loss Portfolio Agreement ("Retrocession") is made between UNIGARD SECURITY INSURANCE COMPANY, Seattle, Washington (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Retrocession shall incept on the Effective Date. This Retrocession shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Retrocession ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts.  The Retrocession shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

ARTICLE 2.  AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $327,000,000 (Three Hundred Twenty-Seven Million United States Dollars).  UNDER NO CIRCUMSTANCE WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $327,000,000 (THREE HUNDRED TWENTY-SEVEN MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS RETROCESSION.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Retrocession follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Retrocession.

ARTICLE 3.  EXCLUSIONS

A.  This Retrocession shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

B.  This Retrocession shall not cover any liability (a) in respect of the fraud of a director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts, not reinsured hereunder.

C.  This Retrocession shall not cover any Unallocated Loss Adjustment Expense.

D.  This Retrocession shall not cover any policyholder dividends or return premiums except to the extent Reinsured receives a full and final release from the Insured in consideration of such return premium.

E.  This Retrocession shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

F.  This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the FASR Book which relate to an occurrence on or after January 1, 1978 or, for claims made coverage, a claim made on or after January 1, 1978.  With respect to the FASR Book, this Retrocession excludes any

G.   liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1977.

G.   This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the RA Book which relate to an occurrence on or after January 1, 1987 or, for claims made coverage, a claim made on or after January 1, 1987.  With respect to the RA Book, this Retrocession excludes any liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1987.

H.   This Retrocession shall not cover any liability excluded in the Insurance Policies/Reinsurance Contracts or as otherwise agreed between the Reinsured and Reinsurer.

## ARTICLE 4.   DEFINITIONS

A.   Wherever used in this Retrocession, the term "Insurance Policy/ Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was included in the FASR Book prior to or on December 31, 1977, or in the RA Book prior to or on December 31, 1986. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the FASR Book or the RA Book (subject to the terms, exclusions and conditions hereof), and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured in this regard.

B.   Wherever used in this Retrocession, the term "FASR Book" shall mean any and all binders, policies of insurance and contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured insures or reinsures any portion of the risk written and which are included within the Facultative and Special Risks ("Allen Miller") Book.

C.   Wherever used in this Retrocession, the term "RA Book" shall mean any and all binders, contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured reinsures any portion of the risk written and which are included in the Reinsurance Assumed Book.

D.   Wherever used in this Retrocession, the term "Ultimate Net Loss" shall mean that sum which has in fact been paid by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured. Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 3(B). Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs

incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

E.  Wherever used in this Retrocession, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Servicer and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession. Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

F.  Wherever used in this Retrocession, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

G.  Whenever used in this Retrocession, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

H.  Whenever used in this Retrocession, the term "Claims Servicer" shall mean Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, or such other person as Reinsurer approves in writing to manage Underlying Claims on behalf of Reinsured.

I.  Whenever used in this Retrocession, "Effective Date" shall mean 12:01 a.m. Eastern Standard Time on the later of the 1) day of the closing of the acquisition of Reinsured by Dukes Place Holdings, L.P., and 2) the day Reinsurer receives the premium due under Article 6.

## ARTICLE 5.   SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Retrocession is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or Insured in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any salvage or subrogation to which Reinsured would be entitled under the Insurance Policies/ Reinsurance Contracts.    The whole of any receipts of Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer, net of justifiable external expenses of collection. Reinsured shall timely file and pursue to collection, to the extent possible, all claims against financially impaired or insolvent reinsurers, and shall aggressively take all steps reasonably necessary to collect from solvent reinsurers.    Reinsured shall promptly draw down all letters of credit, withdraw funds from trusts or charge collections against funds held to collect promptly amounts due Reinsured.

## ARTICLE 6.   PREMIUM

As the consideration for the rights and obligations set forth in this Retrocession, Reinsurer agrees to accept and the Reinsured agrees to pay a premium of U.S. $191,000,000 (One Hundred Ninety-One Million United States Dollars).    Payment shall be made in immediately available U.S. funds by wire transfer to:

> Norwest Bank Nebraska, N.A.
> Omaha, Nebraska
> ABA #104000058

Account No. 1150-001-492

It is understood and agreed that the premium stated in this Retrocession
is net to the Reinsurer of any taxes, expenses, brokerages or other charges
(with the exception of Reinsurer's income taxes) in connection with this
Retrocession as such charges are the responsibility of the Reinsured.   The
premium is non-refundable.

## ARTICLE 7.  CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by
Reinsurer hereunder in currencies other than U.S. dollars shall be converted
into U.S. dollars at the rate of exchange used in Reinsurer's books on the date
the reinsurance payment is made by the Reinsurer.

## ARTICLE 8.  ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the
Reinsurer shall not relieve the other party hereto from any liability which
would have attached hereunder, provided that such error or omission is
rectified as soon as possible after discovery.   Payment by the Reinsurer does
not constitute a waiver of any rights or remedies it may have under this
Retrocession to rectify any incorrect payment or any payment which is found not
to be due.   Reports submitted by one party hereto to the others in the course
of the Retrocession do not constitute a waiver of any rights or remedies that
the party has under this Retrocession to rectify any incorrect reports.
Nevertheless, nothing contained in this Article shall be held to override the
terms and conditions of this Retrocession, and no liability shall be imposed on
either party hereto greater than would have attached had such error or omission
not occurred.

The terms of this Retrocession shall not be waived, modified or changed
except by written amendment executed by a duly authorized officer of the
Reinsured and the Reinsurer.   This Retrocession may not be assigned by
Reinsured or the Reinsurer without the prior written consent of the other party
hereto.

## ARTICLE 9.  ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for
inspection, and place at the disposal of the Reinsurer at all reasonable times,
all records of the Reinsured and Claims Servicer relating to this Retrocession.
The Reinsured and Claims Servicer shall also make available for inspection and
place at the disposal of the Reinsurer at all reasonable times, all records to
which the Reinsured or Claims Servicer may have access, by terms of any
reinsurance agreement, insurance policy or otherwise.   The Reinsurer shall have
the right to examine and copy at any reasonable time all papers, books,
accounts, documents, and other records of the Reinsured and Claims Servicer and
records to which the Reinsured may have access, relating to the business
covered by this Retrocession.   It is agreed that Reinsurer's right of access to
records shall continue as long as either party hereto has a claim against the
other arising out of this Retrocession.   The Reinsured's contract with the
Claims Servicer shall secure to Reinsurer the inspection rights provided in
this Article.

## ARTICLE 10. WARRANTIES

Reinsured warrants and represents that it will not voluntarily undertake
any material change in corporate structure, administrative practices in respect
of the Insurance Policies/Reinsured Contracts which are reinsured under this
Retrocession or its domicile, without prior written consent of the Reinsurer
which consent will not be unreasonably withheld or delayed.

Reinsured warrants and represents that it will not buy any additional reinsurance protection in respect of any Insurance Policy/Reinsurance Contract either above or below this Retrocession without prior written consent of the Reinsurer which will not be unreasonably withheld or delayed.

ARTICLE 11. CONDITIONS

A. Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B. In addition to the Reinsurer's general right to associate as set forth in A. above, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any gross claim settlements or other payments covered by this Retrocession in excess of U.S. $250,000; (2) any payments not in settlement of specific claims, including insurance policy buy-backs, return premiums or commutations of assumed reinsurance obligations, in excess of U.S. $250,000; and (3) any commutations or assignments of ceded reinsurance regardless of value. With respect to items (1) and (2) herein, Reinsurer's approval shall not be unreasonably withheld or delayed.

C. No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsured does not change in any manner that affects the interest of Reinsurer under this Retrocession, (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Retrocession and shall continue to comply with such terms, and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been reasonably satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the Claims Servicer until this Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer. Moreover, in the event Reinsurer's consent is so given, Reinsurer shall still have the right to become the Claim Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Retrocession in a manner reasonably acceptable to Reinsurer.

In the event that, on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons, then Reinsurer shall have the right to become the Claims Servicer until this

Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer.

In the event Reinsurer becomes the Claims Servicer, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expense it incurs as Claims Servicer.

For purposes of this Article 11, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 11, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 12.  OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party. This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Retrocession or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer. This right of offset shall apply regardless of whether either party was acting as assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance.

## ARTICLE 13. INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this Retrocession shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor. Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency. In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Retrocession shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/ Reinsurance Contracts. It is agreed, that the Liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the Reinsured indicating the Insured, which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Reinsured or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Reinsured as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

## ARTICLE 14.  ARBITRATION

All matters in difference between the Reinsured and the Reinsurer in relation to this Retrocession, including its formation and validity, and whether arising during or after the period of this Retrocession, shall be referred to an Arbitration Tribunal in the manner hereinafter set out. If a trustee, receiver, rehabilitator, liquidator or conservator (including any insurance regulatory agency or authority acting in such a capacity) is appointed for either Reinsured or Reinsurer, the parties shall continue to be obligated to resolve any claim, dispute or cause of action subject to this Article 14 by arbitration.

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the Claimant (the party requesting Arbitration) shall appoint his arbitrator and give written notice thereof to the Respondent (the other party to this Retrocession). The Respondent shall appoint his arbitrator and give written notice thereof to the Claimant. The two arbitrators shall agree upon the selection of an Umpire.

If the two arbitrators are unable to agree upon an umpire, each party shall select three nominees for umpire within thirty days after receipt of a joint notice from the arbitrators that they are unable to agree upon an umpire. Each party shall have the right to strike two of the umpire nominees selected by the other party within thirty days of receipt of the nominations. The umpire shall be selected between the remaining nominee of each party by lot.

The Claimant shall submit its initial brief within 20 days from appointment of the Umpire. The respondent shall submit its brief within 20 days after receipt of the Claimant's brief and the Claimant shall submit a reply brief within 10 days after receipt of the respondent's brief. The Arbitration Tribunal shall make its decision solely as to the issue presented in the notice of arbitration within 60 days following the termination of the hearings. All deadlines set forth in this paragraph may be extended by the Arbitration Tribunal in any manner that it may deem just and proper upon the application of either party.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons who are disinterested, active or retired senior executives of insurance or reinsurance companies.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire. All other costs of the arbitration shall be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Retrocession. The arbitration shall be conducted in the English language. This Retrocession shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other

may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

ARTICLE 15.  NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Retrocession upon exhaustion of the Aggregate Limit or for any other reason.

ARTICLE 16.  NO RIGHTS OF THIRD PARTIES

Nothing in this Retrocession, express or implied, is intended, or shall be construed to confer upon or give to any person, firm or corporation, (other than the parties hereto and their permitted assigns or successors) any rights or remedies under or by reason of this Retrocession.

ARTICLE 17.  NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

> National Indemnity Company
> 3024 Harney Street
> Omaha, Nebraska  68131
> Attn: General Counsel
> Telecopy:   (402) 536-3265
>
> Unigard Security Insurance Company
> c/o Eastgate, Inc.
>   44 Wall Street
>   New York, NY  10005
>   Attention: Mr. David Wallis
>   Chief Executive Officer
>   Telecopy:  (212) 425-4564

Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties.   Notice shall be deemed effective:

1.  if communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2.  if sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

Article 18.  STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

ARTICLE 19.  ENTIRE AGREEMENT

    The parties hereto agree that this Retrocession is not cancelable or voidable.  This Retrocession is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

ARTICLE 20.  REPORTS AND REMITTANCES

    A.  Reports.  The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Retrocession within 45 days of the close of each calendar quarter (the "Quarterly Reports").  The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Retrocession and estimating receipts and disbursements for the following month.  The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Retrocession.

    B.  Annual Statement.  As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

    C.  Claims Account.  The Reinsurer shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account").  The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time, in an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Retrocession.  In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 11 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Retrocession. Interest on funds in the Claims Account shall be the property of the Reinsurer.

ARTICLE 21.  RESERVES

    For insurance regulatory accounting purposes, (1) the Reinsured shall determine the amount of its reserves on the Underlying Claims and may change those reserves from time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the Reinsurer shall determine the amount of its reserves on its liability hereunder and may change those reserves from time to time as its, in its sole discretion, deems necessary or appropriate.

ARTICLE 22.  CREDIT FOR REINSURANCE

    If at any time (other than pursuant to any change in domicile for which Reinsurer's consent has not been obtained under Article 10) the Reinsured is advised by a state insurance regulatory authority in which it is licensed or is an accredited reinsurer that, during the term of this Retrocession, it will not be able, due to the licensing status or the lack of appropriate accreditation (or other qualification similarly required by an applicable state insurance regulatory authority in the United States of America to assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance recoverables

hereunder (whether paid or unpaid) in its then current financial statements required by appropriate state insurance regulatory authorities in the United States, and the Reinsured gives the Reinsurer written notice to such effect, the Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for such reinsurance recoverables in such then current financial statements, which may include any one or combination of the following: providing funds withheld, cash advances, a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate insurance regulatory authorities, amending this Retrocession in form but not in substance or such other action acceptable to Reinsurer and applicable insurance regulatory authorities. The Reinsurer has sole discretion in which necessary steps to take, and the Reinsured will fully cooperate in implementing the steps so chosen, so long as the steps the Reinsurer chooses and takes enable the Reinsured to receive such full credit. Interest and all other investment income on any funds posted as security pursuant to Article 22 shall be sole property of Reinsurer. In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California.

## ARTICLE 23.   TERRITORY

The Retrocession shall apply to Insurance Policies/Reinsurance Contracts covering risks wherever situated.

## ARTICLE 24.   INTERMEDIARY

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Retrocession.

## ARTICLE 25.   COUNTERPARTS

This Retrocession may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

ARTICLE 26.   HEADINGS

   The headings of the Articles and the paragraphs herein are inserted for
convenience of reference only, and are not intended to be a part of or to
affect the meaning or interpretation of this Retrocession.

Executed at ___BOSTON___, ___MASS.___ on this _20th_ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title:

and at _____, _____ on this _____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.

By _____        By _____
Title:                              Dukes Place Holdings Ltd.
                                    as General Partner of
                                    Dukes Place Holdings L.P.

026

11/18/98   13:52   ☎203

ARTICLE 26.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____, _____ on this _____ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By_____
Title:

and at _Stamford_ , _Connecticut_ on this _20th_ day of November, 1998. _(not originally executed)_

NATIONAL INDEMNITY COMPANY

By_____
Title: _VICE PRESIDENT_

Acknowledged and Accepted:

Eastgate Group Limited                     Dukes Place Holdings L.P.

By_____        By_____
Title:                                             Dukes Place Holdings Ltd.
                                                   as General Partner of
                                                   Dukes Place Holdings L.P.

ARTICLE 26.  HEADINGS

    The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____, _____ on this \_\_\_\_\_ day of November, 1998.

                        UNIGARD SECURITY INSURANCE COMPANY

                        By_____
                        Title:

and at _____, _____ on this \_\_\_\_\_ day of November, 1998.

                        NATIONAL INDEMNITY COMPANY

                        By_____
                        Title:

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.

By_____        By_____
Title:                                    Dukes Place Holdings Ltd.
                                       as General Partner of
                                       Dukes Place Holdings L.P.

ARTICLE 26.   HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____, _____ on this 20ᵗʰ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY .

By_____
Title:

and at _____, _____ on this _____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By_____
Title:

Acknowledged and Accepted:

Eastgate Group Limited

By_____
Title:
    DIRECTOR

Dukes Place Holdings L.P.

By_____
Dukes Place Holdings Ltd.
as General Partner of
Dukes Place Holdings L.P.

12 of 12

Amendment No. 1

Unigard Security Insurance Company
of Seattle, Washington

Aggregate Retrocession of Loss Portfolio Agreement

No. RA 1321

This Agreement is hereby amended as follows:

Article 12

The last sentence of Article 12, which states "This right of offset shall apply regardless of whether either party was acting as assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance" is deleted in its entirety.

Article 13

The second sentence of Article 13, which states "Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency" is deleted in its entirety. This deletion shall not be construed to create any right to accelerate or otherwise alter the timing or amount of Reinsurer's liabilities.

Article 20

The following is added as the last sentence of Article 20(c): "Reinsurer will settle its liabilities as due no less frequently than quarterly and payments will be made in cash."

Article 21

The following is added as the last sentence of Article 21, "Notwithstanding the foregoing, Reinsurer's reserves shall be no less than Reinsured's reserves on the Underlying Claims."

Article 22

The last sentence of Article 22, which states "In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California" is deleted in its entirety.

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date set forth in the Agreement.

Executed at _New York_ , _New York_ on this _31st_ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title: _Vice President_

and at _Stanford_ , _Connecticut_ on this _29th_ day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____
Title: _BRIAN E. SNOVER_
       _VICE PRESIDENT_

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.

By_____              By_____
Title:                                 Dukes Place Holdings Ltd.
                                       as General Partner of
                                       Dukes Place Holdings L.P.

03/29/99   16:33   ☎203                                              ☑00.

Executed at _____ on this _____ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title: _VICE PRESIDENT_

and at _Stamford_ , _Connecticut_ on this _29ᵗʰ_ day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____
Title: _BRIAN SNOVER_
       _VICE PRESIDENT_

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.

By _____                      By _____
Title: _____                      Dukes Place Holdings Ltd.
_DIRECTOR_                                 as General Partner of
                                           Dukes Place Holdings L.P.

Page 2 of 2

03/29/99   16:33   ☎203                                                              ☑003

Executed at New York, New York on this 31ˢᵗ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title: Vice President

and at Stamford, Connecticut on this 29ᵗʰ day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____
Title: Brian Snyder
       Vice President

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.

By _____            By _____
Title:                                    Dukes Place Holdings Ltd.
                                          as General Partner of
                                          Dukes Place Holdings L.P.

10/13/00  FRI 09:32 FAX 402 536 3265

05/10 '00 17:04 FAX 08701624538          EASTGATE GROUP LTD

☒002

☒004/007

## AGGREGATE RETROCESSION OF LOSS PORTFOLIO AGREEMENT

### No. RA 1321

Between

### SEATON INSURANCE COMPANY

And

### NATIONAL INDEMNITY COMPANY

AMENDMENT NO. 2

## AMENDMENT NO. 2

This is Amendment No. 2 to the Aggregate Retrocession of Loss Portfolio Agreement (the "Retrocession") executed by Unigard Security Insurance Company of Seattle, Washington, on 20 November 1998.

Terms used in this Amendment have the same meaning as in the Retrocession unless the context otherwise requires.

The parties to the Retrocession agree to amend the Retrocession as follows:

1.    The Reinsured, formerly Unigard Security Insurance Company, has been renamed Seaton Insurance Company with effect from 9 July 1999.

2.    Each reference to "Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof" shall be replaced by a reference to "Eastgate Inc. or any wholly-owned affiliate or subsidiary thereof".

All other terms and conditions shall remain unaltered by this Amendment.

Executed at _____ on this _____ day of _____ 2000.

SEATON INSURANCE COMPANY

By _____

Title: _President_

and at _Omaha, NE USA_

on this _13th_ day of _October_ 2000

NATIONAL INDEMNITY COMPANY

By _____

Title: _Senior Vice President_

Acknowledged and Accepted:

Eastgate Group Limited

By _____

Title:
Date:

Dukes Place Holdings LP

By _____

Title:
Date:

AMENDMENT NO. 2

This is Amendment No. 2 to the Aggregate Retrocession of Loss Portfolio Agreement (the "Retrocession") executed by Unigard Security Insurance Company of Seattle, Washington, on 20 November 1998.

Terms used in this Amendment have the same meaning as in the Retrocession unless the context otherwise requires.

The parties to the Retrocession agree to amend the Retrocession as follows:

1.    The Reinsured, formerly Unigard Security Insurance Company, has been renamed Seaton Insurance Company with effect from 9 July 1999.

2.    Each reference to "Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof" shall be replaced by a reference to "Eastgate Inc. or any wholly-owned affiliate or subsidiary thereof".

All other terms and conditions shall remain unaltered by this Amendment.

Executed at _____ on this _____ day of _____ 2000.

 

SEATON INSURANCE COMPANY

By _____

Title:    *President*

and at *Omaha, NE, USA*

on this *8th* day of *October* 2000

NATIONAL INDEMNITY COMPANY

By _____

Title:    *Senior Vice President*

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings LP

By _____                    By _____

Title:                                    Title:
Date:                                     Date:

# EXHIBIT B

DEBEVOISE & PLIMPTON
FAX NO.

/04/2000 17:39 FAX 212 909 6836
MAY-05-2000 FRI 02:04 PM

RA-1385

# AGGREGATE REINSURANCE AGREEMENT

between

## STONEWALL INSURANCE COMPANY,

Cincinnati, Ohio

and

## NATIONAL INDEMNITY COMPANY

Omaha, Nebraska

Contract No. RA 1385

0/04/2000 17:39 FAX 212 909 6836          DEBEVOISE & PLIMPTON                          ☎006
MAY-05-2000 FRI 02:04 PM                              FAX NO.                          P. 03

This Aggregate Reinsurance Agreement ("Reinsurance") is made between Stonewall Insurance Company, Cincinnati, Ohio (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

## ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Reinsurance shall take effect on the Effective Date. This Reinsurance shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Reinsurance ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts. The Reinsurance shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

## ARTICLE 2.  AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $240,000,000.  **UNDER NO CIRCUMSTANCE WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $240,000,000 (TWO HUNDRED AND FORTY MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS REINSURANCE.**

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Reinsurance follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Reinsurance.

## ARTICLE 3.  EXCLUSIONS

A.  This Reinsurance shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

B.  In addition to Article 3(A) above, this Reinsurance shall not cover any sums which, after application of best practice procedures for the adjustment and settlement of claims in accordance with the terms and conditions of an Insurance Policy/Reinsurance Contract, should have been paid or which should have been booked as paid in the books and records of Reinsured prior to the Effective Date. This Article 3(B) shall be capped at $4,000,000 net of applicable reinsurance (other than this Reinsurance) and shall expire two years from the date of Reinsurer's receipt of Premium under Article 6 of this Reinsurance.

C.  This Reinsurance shall not cover any liability (a) in respect of the fraud of a

**Page 2**

director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts not reinsured hereunder.

D. This Reinsurance shall not cover any Unallocated Loss Adjustment Expense.

E. This Reinsurance shall not cover any policyholder dividends, return premiums and retrospective or loss sensitive premiums (except reinstatement or adjustment premiums (1) paid in connection with reinsurance inuring to the benefit of the Reinsurer with respect to risks reinsured under this Reinsurance or (2) where the payment of such amounts benefits the Reinsurer either by way of reduction in the net present value of the liabilities of the Reinsurer with respect to risks reinsured under this Reinsurance or by increasing reinsurance recoverables or coverage available to the Reinsurer hereunder in an amount greater than the dividend or premium.

F. This Reinsurance shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

G. This Reinsurance shall not cover any liability incurred by the Reinsured under insurance or reinsurance contracts, policies or binders which incepted after January 1, 1992.

H. This Reinsurance shall not cover any liability with respect to occurrences or, for claims-made exposures, claims made, which are property allocated to insurance or reinsurance contracts, policies or binders which incepted after January 1, 1992.

## ARTICLE 4. DEFINITIONS

A. Wherever used in this Reinsurance, the term "Insurance Policy/ Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was issued on or prior to January 1, 1992. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgment of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under

10/04/2000 17:39 FAX 212 909 6836        DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:05 PM                 FAX NO.                              P.05

this Reinsurance, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the scope of business covered hereunder (subject always to the terms, exclusions and conditions hereof), and the Reinsurer shall be bound by the reasonable, good faith judgment of the Reinsured in this regard.

B.  Wherever used in this Reinsurance, the term "Ultimate Net Loss" shall mean (1) that sum which is paid or payable by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured; and (2) the amounts excepted from the exclusion in Article 3(E). Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 3(C). Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

C.  Wherever used in this Reinsurance, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Servicer and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance. Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

D.  Wherever used in this Reinsurance, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

E.  Whenever used in this Reinsurance, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

F.  Whenever used in this Reinsurance, the term "Claims Servicer" shall mean (1) the Reinsured; (2) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof; or (3) such other person as Reinsurer approves in writing to manage Underlying Claims on behalf of the Reinsured.

**Page 4**

0/04/2000 17:40 FAX 212 909 6836          DEBEVOISE & PLIMPTON
. MAY-05-2000 FRI 02:05 PM                                  FAX NO.                          P. 06

G.  Whenever used in this Reinsurance, "Effective Date" shall mean 12:01 a.m.
Eastern Standard Time on May 1, 2000.

H.  Whenever used in this Reinsurance, "Acquisition" shall mean the acquisition of
the Reinsured by Dukes Place Holdings, L.P. pursuant to the Stock Purchase
Agreement entered into between Great American Insurance Company and
Dukes Place Holdings, L.P.

I.  Whenever used in this Reinsurance, "Closing" shall mean the closing of the
Acquisition.

J.  Whenever used in this Reinsurance, "Closing Date" shall mean the date of the
Closing.

## ARTICLE 5.  SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Reinsurance is in effect and thereafter as provided herein, the
Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or
entity liable to the Reinsured or Insured in respect of the Ultimate Net Loss and Reinsurer
shall be entitled to any reinsurance recoverables, salvage or subrogation to which
Reinsured would be entitled under the Insurance Policies/ Reinsurance Contracts with
respect to claims paid or reimbursed by Reinsurer to Reinsured under this Reinsurance.
It is understood and agreed that reinsurance recoverables, salvage and subrogation in
respect of claims paid by the Reinsured prior to the Effective Date (as determined by the
books and records of the Reinsured or which should have been booked as paid prior to
the Effective Date) shall be the property of the Reinsured, up to the amount recorded in
Reinsured's closing balance sheet delivered following the Closing in accordance with the
Stock Purchase Agreement.  All sums in excess of such cap shall be solely for the
account of the Reinsurer.  The whole of any receipts for the account of the Reinsurer
under this Article shall be credited for the sole benefit of the Reinsurer, net of justifiable
external expenses of collection. Reinsured shall timely file and pursue to collection, to the
extent possible, all claims against financially impaired or insolvent reinsurers, and shall
take all steps reasonably necessary to collect from solvent reinsurers; including drawing
down all letters of credit, withdrawing funds from trusts or charging collections against
funds held to collect amounts due Reinsured.

## ARTICLE 6.  PREMIUM

As the consideration for the rights and obligations set forth in this Reinsurance,
Reinsurer agrees to accept and the Reinsured agrees to pay (i) a minimum base
premium of U.S. $126 million (one hundred and twenty-six million United States Dollars);
plus, in addition thereto, an amount equal to 7.5% of the base premium calculated on a
per annum basis from the Effective Date through the date of receipt of the full amount of
the premium by Reinsurer.  Payment shall be made in immediately available U.S. funds

by wire transfer to:

> Norwest Bank Nebraska, N.A.
> Omaha, Nebraska
> ABA #104000058
> Account No. 1150-001-492

It is understood and agreed that the premium stated in this Reinsurance is net to the Reinsurer of any taxes, expenses, brokerages or other charges (with the exception of Reinsurer's income taxes) in connection with this Reinsurance as such charges are the responsibility of the Reinsured, and further that the premium shall not be subject to any offsets or other reductions. The premium is non-refundable. The premium will be paid to the Reinsurer on or before the Closing Date, subject to a December 31, 2000 termination date.

Upon Reinsurer's receipt of the premium, Reinsurer will immediately reimburse Reinsured for Ultimate Net Loss paid by Reinsured on and after the Effective Date, for and only to the extent that reinsurance is otherwise provided hereunder, less all reinsurance recoveries, salvage and subrogation received by Reinsured arising out of the payment of such Ultimate Net Loss for the period from and including the Effective Date to and including the Closing Date.

## ARTICLE 7. CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurer hereunder in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange used in Reinsurer's books on the date the reinsurance payment is made by the Reinsurer.

## ARTICLE 8. ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery. Payment by the Reinsurer does not constitute a waiver of any rights or remedies it may have under this Reinsurance to rectify any incorrect payment or any payment which is found not to be due. Reports submitted by one party hereto to the others in the course of the Reinsurance do not constitute a waiver of any rights or remedies that the party has under this Reinsurance to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Reinsurance, and no liability shall be imposed on either party hereto greater than would have attached had such error or omission not occurred.

The terms of this Reinsurance shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsured and the

10/04/2000 17:40 FAX 212 909 6836    DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:06 PM                FAX NO.                        P. 08

Reinsurer. This Reinsurance may not be assigned by Reinsured or the Reinsurer without the prior written consent of the other party hereto.

## ARTICLE 9. ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for inspection, and place at the disposal of the Reinsurer during normal business hours, all records of the Reinsured and Claims Servicer relating to this Reinsurance. The Reinsured and Claims Servicer shall also make available for inspection and place at the disposal of the Reinsurer during normal business hours, all records to which the Reinsured or Claims Servicer may have access, by terms of any reinsurance agreement, insurance policy or otherwise. The Reinsurer shall have the right to examine and copy during normal business hours all papers, books, accounts, documents, and other records of the Reinsured and Claims Servicer and records to which the Reinsured may have access, relating to the business covered by this Reinsurance. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Reinsurance. The Reinsured's contract with the Claims Servicer shall secure to Reinsurer the inspection rights provided in this Article.

## ARTICLE 10. WARRANTIES

Reinsured warrants and represents that it will not voluntarily change its domicile without prior written consent of the Reinsurer, which consent will not be unreasonably withheld or delayed.

In the event that, following the Effective Date, the Reinsured buys any additional reinsurance or retrocessional protection in respect of any Insurance Policy/Reinsurance Contract reinsured under this Reinsurance, this Reinsurance will automatically become excess of such additional reinsurance or retrocessional protection.

## ARTICLE 11. CONDITIONS

A. With effect from the Effective Date, Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B. In addition to the Reinsurer's general right to associate as set forth in A. above, and with effect from the Effective Date, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any individual gross claim settlement, quarterly account settlements or other payments in respect of the adjustment of Underlying Claims covered by this Reinsurance in excess of U.S. $150,000; (2) any insurance policy buy-back, return premium, commutation or like payment in excess of U.S. $250,000; and (3) any commutations or assignment of ceded reinsurance regardless of value. With respect to items (1) and (2) herein,

Reinsurer's approval shall not be unreasonably withheld or delayed.

C. If Reinsurer fails to approve any payment or settlement of an Underlying Claim for which Reinsurer's approval is required, and has in fact been sought, within a reasonable period of time following submission for approval to the Reinsurer, despite Reinsured's reasonable efforts to obtain such approval, during the period from the Effective Date to the Closing Date, Reinsurer agrees to indemnify and defend Reinsured from any and all losses, liabilities or reasonable expenses directly arising out of Reinsurer's failure to so approve the payment or settlement. It shall be a condition precedent of Reinsurer's obligation in this regard that Reinsured shall give Reinsurer immediate notice of any facts or circumstances likely to give rise to an indemnification or defense obligation of the Reinsurer, and Reinsurer shall furthermore have the right but not the obligation to assume direct control of negotiation, litigation, or settlement of any such loss or liability. Reinsured shall be obligated to cooperate with Reinsurer in this regard. This Article 11(C) shall survive termination hereof for any reason including the failure to consummate the Closing.

D. No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than the Reinsured or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsured does not change in any manner that affects the interest of Reinsurer under this Reinsurance, (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Reinsurance and shall continue to comply with such terms, and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been reasonably satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the Claims Servicer until this Reinsurance is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer. Moreover, in the event Reinsurer's consent is so given,

'/04/2000 17:40 FAX 212 909 6836          DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:07 PM                              FAX NO.                                    P. 10

Reinsurer shall still have the right to become the Claim Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Reinsurance in a manner reasonably acceptable to Reinsurer.

In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer.

If at any time after the Effective Date, Reinsurer becomes the Claims Servicer and the Run-Off Agreement is no longer in force, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expenses it incurs as Claims Servicer.

For purposes of this Article 11, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 11, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 12.  OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party. This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Reinsurance or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer.

## ARTICLE 13.  INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this

Reinsurance shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor. In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Reinsurance shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/ Reinsurance Contracts. It is agreed, that the liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the Reinsured indicating the Insured, which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Reinsured or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Reinsured as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

## ARTICLE 14. ARBITRATION

All matters in difference between the Reinsured and the Reinsurer in relation to this Reinsurance, including its formation and validity, and whether arising during or after the period of this Reinsurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out. If a trustee, receiver, rehabilitator, liquidator or conservator (including any insurance regulatory agency or authority acting in such a capacity) is appointed for either Reinsured or Reinsurer, the parties shall continue to be obligated to resolve any claim, dispute or cause of action subject to this Article 14 by arbitration.

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the Claimant (the party requesting Arbitration) shall appoint his arbitrator and give written notice thereof to the Respondent (the other party to this Reinsurance). The Respondent shall appoint his arbitrator and give written notice thereof to the Claimant. The two arbitrators shall agree upon the selection of an Umpire.

If the two arbitrators are unable to agree upon an umpire, each party shall select three nominees for umpire within thirty days after receipt of a joint notice from the arbitrators that they are unable to agree upon an umpire. Each party shall have the right to strike two of the umpire nominees selected by the other party within thirty days of receipt of the nominations. The umpire shall be selected between the remaining nominee of each party by lot.

The Claimant shall submit its initial brief within 20 days from appointment of the Umpire. The respondent shall submit its brief within 20 days after receipt of the Claimant's brief and the Claimant shall submit a reply brief within 10 days after receipt

10/04/2000 17:41 FAX 212 909 6836    DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:08 PM                FAX NO.                    P. 12

of the respondent's brief. The Arbitration Tribunal shall make its decision solely as to the issue presented in the notice of arbitration within 60 days following the termination of the hearings. All deadlines set forth in this paragraph may be extended by the Arbitration Tribunal in any manner that it may deem just and proper upon the application of either party.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons who are disinterested, active or retired senior executives of insurance or reinsurance companies.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire. All other costs of the arbitration shall be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Reinsurance. The arbitration shall be conducted in the English language. This Reinsurance shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

## ARTICLE 15.  NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Reinsurance upon exhaustion of the Aggregate Limit or for any other reason.

## ARTICLE 16.  NO RIGHTS OF THIRD PARTIES

Nothing in this Reinsurance, express or implied, is intended, or shall be construed

10/04/2000  17:41  FAX 212  909  6836                    DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:08 PM                                  FAX NO.                                        P. 13

to confer upon or give to any person, firm or corporation (other than the parties hereto and their permitted assigns or successors), any rights or remedies under or by reason of this Reinsurance.

## ARTICLE 17.  NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

National Indemnity Company
3024 Harney Street
Omaha, Nebraska  68131
Attn: General Counsel
Telecopy:   (402) 536-3265


To the Reinsured (1) from the Effective Date to (but not including) the Closing Date, and (2) anytime if there is no Closing:

Great American Insurance Company
580 Walnut Street
Cincinnati, Ohio  45202
Attn:  Eve Cutler Rosen, Esq.
Telecopy:  (513) 369-3655

To the Reinsured on and after the Closing Date:

Stonewall Insurance Company
c/o Eastgate, Inc.
P.O. Box 9510
Boston, Massachusetts  02114-8510
(street address:  7 Bulfinch Place)
Attn:  Bryan Klinck
Telecopy:  (617) 725-1599


Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties.  Notice shall be deemed effective:

1.  If communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2.  If sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

## ARTICLE 18.  STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

## ARTICLE 19.  ENTIRE AGREEMENT

The parties hereto agree that this Reinsurance is not cancelable or voidable.  This Reinsurance is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

## ARTICLE 20.  REPORTS AND REMITTANCES

Reports.  The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Reinsurance within 45 days of the close of each calendar quarter (the "Quarterly Reports").  The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Reinsurance and estimating receipts and disbursements for the following month.  The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Reinsurance.

Annual Statement.  As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

Claims Account.  The Reinsurer shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account").  The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time. In an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Reinsurance. In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 11 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Reinsurance. Interest on funds in the Claims Account shall be the property of the Reinsurer.  Subject

10/04/2000 17:41 FAX 212 909 6836          DEBEVOISE & PLIMPTON                    @016
  MAY-05-2000 FRI 02:09 PM                            FAX NO.                        P. 15

to all other terms of this Agreement and following receipt of Premium, Reinsurer will settle its liabilities as due no less frequently than quarterly and payments will be made in cash.

## ARTICLE 21.  RESERVES

For insurance regulatory accounting purposes, (1) the Reinsured shall determine the amount of its reserves on the Underlying Claims and may change those reserves from time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the Reinsurer shall determine the amount of its reserves on its liability hereunder and may change those reserves from time to time as its, in its sole discretion, deems necessary or appropriate.  Notwithstanding the foregoing, Reinsurer's reserves shall be no less than Reinsured's reserves on the Underlying Claims.

## ARTICLE 22.  CREDIT FOR REINSURANCE

If at any time (other than pursuant to any change in domicile for which Reinsurer's consent has not been obtained under Article 10) the Reinsured is advised by an insurance regulatory authority in which it is licensed or is an accredited reinsurer that, during the term of this Reinsurance, it will not be able, due to the licensing status or the lack of appropriate accreditation (or other qualification similarly required by an applicable insurance regulatory authority in any jurisdiction within the United States of America to assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance recoverables hereunder (whether paid or unpaid) in its then current financial statements required by appropriate state insurance regulatory authorities in any jurisdiction within the United States, and the Reinsured gives the Reinsurer written notice to such effect, the Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for such reinsurance recoverables in such then current financial statements, which may include any one or combination of the following: providing funds withheld, cash advances, a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate insurance regulatory authorities, amending this Reinsurance in form but not in substance or such other action acceptable to Reinsurer and applicable insurance regulatory authorities.  The Reinsurer has sole discretion in its then necessary steps to take, and the Reinsured will fully cooperate in implementing the steps so chosen, so long as the steps the Reinsurer chooses and takes enable the Reinsured to receive such full credit.  Interest and all other investment income on any funds posted as security pursuant to Article 22 shall be sole property of Reinsurer.

## ARTICLE 23.  TERRITORY

The Reinsurance shall apply to Insurance Policies/Reinsurance Contracts covering risks wherever situated.

## ARTICLE 24.  INTERMEDIARY

10/04/2000 17:42 FAX 212 909 ˉ¹³⁶      DEBEVOISE & PLIMPTON
    MAY-05-2000 FRI 02:09 PM                        FAX NO.                                P. 1B

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Reinsurance.

## ARTICLE 25.  COUNTERPARTS

This Reinsurance may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

## ARTICLE 26.  DUE DILIGENCE

Reinsurer acknowledges that it has conducted its own due diligence review of Reinsured's business and operations and that it is relying on its own independent investigation in making its decision to enter into this Agreement. Reinsurer is not relying upon any representation or warranty made on or prior to the Effective Date by Reinsured or any of its affiliates, subsidiaries or parent which is not expressly set forth in this Agreement.

1/04/2000 17:42 FAX 212 909 6836        DEBEVOISE & PLIMPTON                    ☑017

8.    2000 10:48 FAX 212 909 6863        DEBEVOISE & PLIMPTON              ☑003/003
MAY-03-2000 WED 03:09 PM                        FAX NO.                      P. 18/26

## ARTICLE 27. HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at __Cincinnati, OHIO__ on this __9th__ day of __May____, 2000,

STONEWALL INSURANCE COMPANY

By __[signature]_____

Title:    Gary J. Gruber
          Chairman & Vice President

and at _____ on this _____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY

By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED                  DUKES PLACE HOLDINGS L.P., by
                                        its General Partner Dukes Place
                                        Holdings Ltd.

By_____               By_____
Title:                                  Title:

0/04/2000 17:42 FAX 212 909 6836    DEBEVOISE & PLIMPTON    🗹018
MAY-05-2000 FRI 02:09 PM                           FAX NO.                    P. 17

## ARTICLE 27.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____, _____ on this _____ day of _____, 2000.

STONEWALL INSURANCE COMPANY


By_____

Title:


and at Stafd, Conn. on this 5th day of May, 2000.

NATIONAL INDEMNITY COMPANY


By_____

Title: VICE PRESIDENT

Acknowledged and Accepted:

EASTGATE GROUP LIMITED                    DUKES PLACE HOLDINGS L.P., by
                                          its General Partner Dukes Place
                                          Holdings Ltd.


By_____        By_____
Title:                                   Title:

)/04/2000 17:42 FAX 212 909 6A36          DEBEVOISE & PLIMPTON                    ☒019

## ARTICLE 27. HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____, _____ on this _____ day of _____, 2000.

STONEWALL INSURANCE COMPANY


By_____

Title:


and at _____, _____ on this _____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY


By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED                    DUKES PLACE HOLDINGS L.P., by
                                          its General Partner Dukes Place
                                          Holdings Ltd.

By_____ K.E. Randall                      By_____
Title:   Chief Executive                  Title:

**Page 17**

04/2000 17:42 FAX 212 909 6836          DEBEVOISE & PLIMPTON
MAY. 5. 2000 4:04PM      WICH ST. CAPITAL                                    NO. 3591      P. 2
MAY-05-2000 WED 09:48 PM                             FAX NO.                              P. 18/24

## ARTICLE 27.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____, _____ on this 5th day of May, 2000.

STONEWALL INSURANCE COMPANY


By_____
Title:


and at _____, _____ on this ____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY


By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED                    DUKES PLACE HOLDINGS L.P., by
                                          its General Partner Dukes Place
                                          Holdings Ltd.


By_____              By_____
Title:                                    Title:

Page 17

## Amendment No. 1
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

### Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _Cincinnati, Ohio_
on this 29 day of September, 2000.

STONEWALL INSURANCE
COMPANY

By: _K. Au plonell_
Name:  Karen Holley Horrell
Title:   Vice President

Executed at _____.
on this __ day of September, 2000.

NATIONAL INDEMNITY COMPANY

By:_____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited

By:_____
Name:
Title:

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General
Partner

By:_____
Name:
Title:

### Amendment No. 1
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____, _____          Acknowledged and Accepted:
on this __ day of September, 2000.
                                             Eastgate Group Limited
STONEWALL INSURANCE
COMPANY

                                             By:_____
                                             Name:
By:_____                 Title:
Name:
Title:                                       Dukes Place Holdings, L.P.
                                             By: Dukes Place Holdings Ltd, General
Executed at _____, _____           Partner
on this __ day of September, 2000.

NATIONAL INDEMNITY COMPANY                   By: _____
                                             Name:
                                             Title:

By:_____
Name:
Title:

**Amendment No. 1**
**Stonewall Insurance Company**
**of Cincinnati, Ohio**
**Aggregate Reinsurance Agreement**
**No. RA 1385**

This Agreement is hereby amended as follows:

**Article 11**

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____, _____          Acknowledged and Accepted:
on this \_\_ day of September, 2000.

                                                        Eastgate Group Limited
STONEWALL INSURANCE
COMPANY

                                                        By:_____
                                                        Name:
By:_____          Title:
Name:
Title:                                                  Dukes Place Holdings, L.P.
                                                        By: Dukes Place Holdings Ltd, General
Executed at *Stafford*, *Connl*              Partner
on this 28 day of September, 2000.

NATIONAL INDEMNITY COMPANY                              By:_____
                                                        Name:
                                                        Title:
By:_____
Name: *Brian Snover*
Title: *vice president*

## Amendment No. 1
### Stonewall Insurance Company
### of Cincinnati, Ohio
### Aggregate Reinsurance Agreement
### No. RA 1385

This Agreement is hereby amended as follows:

### Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer; provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____, _____
on this __ day of September, 2000.

STONEWALL INSURANCE
COMPANY


By:_____
Name:
Title:

Executed at _____, _____
on this __ day of September, 2000.

NATIONAL INDEMNITY COMPANY


By:_____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited


By:_____
Name: V. LAWSON
Title: CHIEF EXECUTIVE OFFICER

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General Partner


By:_____
Name:
Title:

21033638-v1

.0/13/00  FRI 09:33 FAX 402 536 3265                                    ☑0

/10 ·00 17:04 FAX 08701824538          EASTGATE GROUP LTD              ☑008/007

AGGREGATE REINSURANCE AGREEMENT

No. RA 1385


Between


STONEWALL INSURANCE COMPANY

And

NATIONAL INDEMNITY COMPANY


AMENDMENT NO. 2

3/13/00  FRI 09:33 FAX 402 536 3265                                               ☒007

0 '00 17:05 FAX 08701624508        EASTGATE GROUP LTD                      ☒007/007

AMENDMENT NO. 2

This is Amendment No. 2 to the Aggregate Reinsurance Agreement (the
"Reinsurance") executed by Stonewall Insurance Company of Cincinnati, Ohio.

Terms used in this Amendment have the same meaning as in the Reinsurance
unless the context otherwise requires.

The parties to the Reinsurance agree to amend the Reinsurance so that each
reference to "Eastgate Group Limited, or any wholly-owned affiliate or subsidiary
thereof" shall be replaced by a reference to "Eastgate Inc. or any wholly-owned
affiliate or subsidiary thereof".

All other terms and conditions shall remain unaltered by this Amendment.

Executed at _____ on this _____ day of _____ 2000.

                                          STONEWALL INSURANCE COMPANY

                                          By _____

                                          Title:    *President*

and at _Omaha, NE USA_                    on this _13th_ day of _October_ 2000

                                          NATIONAL INDEMNITY COMPANY

                                          By _____

                                          Title:    *Senior Vice President*

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings LP

By _____               By _____

Title:                                    Title:
Date:                                     Date:

AMENDMENT NO. 2

This is Amendment No. 2 to the Aggregate Reinsurance Agreement (the "Reinsurance") executed by Stonewall Insurance Company of Cincinnati, Ohio.

Terms used in this Amendment have the same meaning as in the Reinsurance unless the context otherwise requires.

The parties to the Reinsurance agree to amend the Reinsurance so that each reference to "Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof" shall be replaced by a reference to "Eastgate Inc. or any wholly-owned affiliate or subsidiary thereof".

All other terms and conditions shall remain unaltered by this Amendment.

Executed at _____ on this _____ day of _____ 2000.

STONEWALL INSURANCE COMPANY

By _____

Title: *President*

and at *Omaha, NE USA*

on this *13th* day of *October* 2000

NATIONAL INDEMNITY COMPANY

By _____

Title: *Senior Vice President*

Acknowledged and Accepted:

Eastgate Group Limited

Dukes Place Holdings LP

By _____

By _____

Title:
Date:

Title:
Date:

**EXHIBIT C**

UNIGARD SECURITY INSURANCE COMPANY

of Seattle, Washington

FIRST AGGREGATE EXCESS RETROCESSION OF LOSS PORTFOLIO AGREEMENT

NO. RA - 1322

This First Aggregate Excess Retrocession Loss Portfolio Agreement ("Retrocession") is made between UNIGARD SECURITY INSURANCE COMPANY, Seattle, Washington (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

ARTICLE 1.   EFFECTIVE DATE AND TERMS OF AGREEMENT

The Retrocession shall incept on the Effective Date.  This Retrocession shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Retrocession ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts. The Retrocession shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

ARTICLE 2.   AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $16,000,000 (Sixteen Million United States Dollars).  **UNDER NO CIRCUMSTANCE WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $16,000,000 (SIXTEEN MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS RETROCESSION.**

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Retrocession follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Retrocession.

ARTICLE 3.   RETENTION

The Reinsurer shall have no liability under this Retrocession with respect to any losses incurred by the Reinsured and otherwise covered hereunder until (1) Ultimate Net Loss actually paid by the Reinsured exceeds U.S. $327,000,000 (Three Hundred Twenty-Seven Million United States Dollars) in the aggregate (hereinafter referred to as the "Retention"); and (2) the reinsurance agreement by and between the Reinsured and the Reinsurer effective as of the Effective Date with an aggregate limit of $327,000,000 (the "Underlying Retrocession") has been fully exhausted and the Reinsurer has no further liability in respect of such Underlying Retrocession.

ARTICLE 4.   EXCLUSIONS

A.   This Retrocession shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

B.   This Retrocession shall not cover any liability (a) in respect of the fraud of a director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts, not reinsured hereunder.

C.   This Retrocession shall not cover any Unallocated Loss Adjustment Expense.

D.  This Retrocession shall not cover any policyholder dividends or return premiums except to the extent Reinsured receives a full and final release from the Insured in consideration of such return premium.

E.  This Retrocession shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

F.  This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the FASR Book which relate to an occurrence on or after January 1, 1978 or, for claims made coverage, a claim made on or after January 1, 1978.  With respect to the FASR Book, this Retrocession excludes any liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1977.

G.  This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the RA Book which relate to an occurrence on or after January 1, 1987 or, for claims made coverage, a claim made on or after January 1, 1987.  With respect to the RA Book, this Retrocession excludes any liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1987.

H.  This Retrocession shall not cover any liability excluded in the Insurance Policies/Reinsurance Contracts or as otherwise agreed between the Reinsured and Reinsurer.

## ARTICLE 5.  DEFINITIONS

A.  Wherever used in this Retrocession, the term "Insurance Policy/ Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was included in the FASR Book prior to or on December 31, 1977, or in the RA Book prior to or on December 31, 1986. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the FASR Book or the RA Book (subject to the terms, exclusions and conditions hereof), and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured in this regard.

B.  Wherever used in this Retrocession, the term "FASR Book" shall mean any and all binders, policies of insurance and contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured insures or reinsures any portion of the risk written and which are included within the Facultative and Special Risks ("Allen Miller") Book.

C.  Wherever used in this Retrocession, the term "RA Book" shall mean any and all binders, contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured reinsures any portion of the risk written and which are

included in the Reinsurance Assumed Book.

D. Wherever used in this Retrocession, the term "Ultimate Net Loss" shall mean that sum which has in fact been paid by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured. Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 4(B). Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

E. Wherever used in this Retrocession, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Servicer and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession. Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

F. Wherever used in this Retrocession, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

G. Whenever used in this Retrocession, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

H. Whenever used in this Retrocession, the term "Claims Servicer" shall mean Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, or such other person as Reinsured approves in writing to manage Underlying Claims on behalf of Reinsured.

I. Whenever used in this Retrocession, "Effective Date" shall mean 12:01 a.m. Eastern Standard Time on the later of the 1) day of the closing of the acquisition of Reinsured by Dukes Place Holdings, L.P., and 2) the day Reinsurer receives the premium due under Article 6.

ARTICLE 6. SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Retrocession is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or Insured in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any salvage or subrogation to which Reinsured would be entitled under the Insurance Policies/Reinsurance Contracts. The whole of any receipts of Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer, net of justifiable external expenses of collection. Reinsured shall timely file and pursue to collection, to the extent possible, all claims against financially impaired or insolvent reinsurers, and shall aggressively take all steps reasonably necessary to collect from solvent reinsurers. Reinsured shall promptly draw down all letters of credit, withdraw funds from trusts or charge collections against funds held to collect promptly amounts due Reinsured.

ARTICLE 7.  PREMIUM

As the consideration for the rights and obligations set forth in this Retrocession, Reinsurer agrees to accept and the Reinsured agrees to pay a premium of U.S. $1,000,000 (One Million United States Dollars) which is to be received by Reinsurer in five annual installments of U.S. $200,000 (Two Hundred Thousand United States Dollars).  The first U.S. $200,000 shall be received by Reinsurer no later than March 31, 1999 and each annual U.S. $200,000 payment shall be received by Reinsurer thereafter on each successive March 31.  Payment shall be made in immediately available U.S. funds by wire transfer to:

> Norwest Bank Nebraska, N.A.
> Omaha, Nebraska
> ABA #104000058
> Account No. 1150-001-492

It is understood and agreed that the premium stated in this Retrocession is net to the Reinsurer of any taxes, expenses, brokerages or other charges (with the exception of Reinsurer's income taxes) in connection with this Retrocession as such charges are the responsibility of the Reinsured.  The premium is non-refundable.

ARTICLE 8.  CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurer hereunder in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange used in Reinsurer's books on the date the reinsurance payment is made by the Reinsurer.

ARTICLE 9.  ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery.  Payment by the Reinsurer does not constitute a waiver of any rights or remedies it may have under this Retrocession to rectify any incorrect payment or any payment which is found not to be due.  Reports submitted by one party hereto to the others in the course of the Retrocession do not constitute a waiver of any rights or remedies that the party has under this Retrocession to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Retrocession; and no liability shall be imposed on either party hereto greater than would have attached had such error or omission not occurred.

The terms of this Retrocession shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsured and the Reinsurer.  This Retrocession may not be assigned by Reinsured or the Reinsurer without the prior written consent of the other party hereto.

ARTICLE 10.  ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for inspection, and place at the disposal of the Reinsurer at all reasonable times, all records of the Reinsured and Claims Servicer relating to this Retrocession. The Reinsured and Claims Servicer shall also make available for inspection and place at the disposal of the Reinsurer at all reasonable times, all records to which the Reinsured or Claims Servicer may have access, by terms of any reinsurance agreement, insurance policy or otherwise.  The Reinsurer shall have the right to examine and copy at any reasonable time all papers, books,

accounts, documents, and other records of the Reinsured and Claims Servicer and records to which the Reinsured may have access, relating to the business covered by this Retrocession. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Retrocession. The Reinsured's contract with the Claims Servicer shall secure to Reinsurer the inspection rights provided in this Article.

ARTICLE 11. WARRANTIES

Reinsured warrants and represents that it will not voluntarily undertake any material change in corporate structure, administrative practices in respect of the Insurance Policies/Reinsured Contracts which are reinsured under this Retrocession or its domicile, without prior written consent of the Reinsurer which consent will not be unreasonably withheld or delayed.

Reinsured warrants and represents that it will not buy any additional reinsurance protection in respect of any Insurance Policy/Reinsurance Contract either above or below this Retrocession without prior written consent of the Reinsurer which will not be unreasonably withheld or delayed.

ARTICLE 12. CONDITIONS

A.  Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B.  In addition to the Reinsurer's general right to associate as set forth in A. above, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any gross claim settlements or other payments covered by this Retrocession in excess of U.S. $250,000; (2) any payments not in settlement of specific claims, including insurance policy buy-backs, return premiums or commutations of assumed reinsurance obligations, in excess of U.S. $250,000; and (3) any commutations or assignments of ceded reinsurance regardless of value. With respect to items (1) and (2) herein, Reinsurer's approval shall not be unreasonably withheld or delayed.

C.  No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsured does not change in any manner that affects the interest of Reinsurer under this Retrocession, (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Retrocession and shall continue to comply with such terms, and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been reasonably satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the Claims Servicer until this Retrocession is exhausted under the same terms and conditions as

Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer. Moreover, in the event Reinsurer's consent is so given, Reinsurer shall still have the right to become the Claim Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Retrocession in a manner reasonably acceptable to Reinsurer.

In the event that, on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons, then Reinsurer shall have the right to become the Claims Servicer until this Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer.

In the event Reinsurer becomes the Claims Servicer, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expense it incurs as Claims Servicer.

For purposes of this Article 12, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event, Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 12, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 13.  OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party. This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Retrocession or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer. This right of offset shall apply regardless of whether either party was acting as assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance.

## ARTICLE 14. INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this Retrocession shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor. Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency. In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Retrocession shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/ Reinsurance Contracts. It is agreed, that the Liquidator, receiver, conservator, or statutory successor of the Reinsured shall give

written notice to the Reinsurer of the pendency of a claim against the Reinsured indicating the Insured, which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Reinsured or its liquidator, receiver, conservator or statutory successor.  The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Reinsured as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

## ARTICLE 15.  ARBITRATION

All matters in difference between the Reinsured and the Reinsurer in relation to this Retrocession, including its formation and validity, and whether arising during or after the period of this Retrocession, shall be referred to an Arbitration Tribunal in the manner hereinafter set out.  If a trustee, receiver, rehabilitator, liquidator or conservator (including any insurance regulatory agency or authority acting in such a capacity) is appointed for either Reinsured or Reinsurer, the parties shall continue to be obligated to resolve any claim, dispute or cause of action subject to this Article 14 by arbitration.

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the Claimant (the party requesting Arbitration) shall appoint his arbitrator and give written notice thereof to the Respondent (the other party to this Retrocession).  The Respondent shall appoint his arbitrator and give written notice thereof to the Claimant. The two arbitrators shall agree upon the selection of an Umpire.

If the two arbitrators are unable to agree upon an umpire, each party shall select three nominees for umpire within thirty days after receipt of a joint notice from the arbitrators that they are unable to agree upon an umpire. Each party shall have the right to strike two of the umpire nominees selected by the other party within thirty days of receipt of the nominations.  The umpire shall be selected between the remaining nominee of each party by lot.

The Claimant shall submit its initial brief within 20 days from appointment of the Umpire.  The respondent shall submit its brief within 20 days after receipt of the Claimant's brief and the Claimant shall submit a reply brief within 10 days after receipt of the respondent's brief.  The Arbitration Tribunal shall make its decision solely as to the issue presented in the notice of arbitration within 60 days following the termination of the hearings.  All deadlines set forth in this paragraph may be extended by the Arbitration Tribunal in any manner that it may deem just and proper upon the application of either party.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons who are disinterested, active or retired senior executives of insurance or reinsurance companies.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire.  All other costs of the arbitration shall

be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Retrocession. The arbitration shall be conducted in the English language. This Retrocession shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

### ARTICLE 16.    NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Retrocession upon exhaustion of the Aggregate Limit or for any other reason.

### ARTICLE 17.    NO RIGHTS OF THIRD PARTIES

Nothing in this Retrocession, express or implied, is intended, or shall be construed to confer upon or give to any person, firm or corporation, (other than the parties hereto and their permitted assigns or successors) any rights or remedies under or by reason of this Retrocession.

### ARTICLE 18.    NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

> National Indemnity Company
> 3024 Harney Street
> Omaha, Nebraska  68131
> Attn: General Counsel
> Telecopy:   (402) 536-3265

> Unigard Security Insurance Company
> c/o Eastgate,Inc.
>    44 Wall Street
>    New York, NY  10005
>    Attn: David Wallis
>    Chief Executive Officer
>    Telecopy:   212-425-4564

Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties.  Notice shall be deemed effective:

1. if communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2.  if sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

Article 19.  STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

ARTICLE 20.  ENTIRE AGREEMENT

The parties hereto agree that this Retrocession is not cancelable or voidable.  This Retrocession is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

ARTICLE 21.  REPORTS AND REMITTANCES

A.  Reports.  The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Retrocession within 45 days of the close of each calendar quarter (the "Quarterly Reports").  The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Retrocession and estimating receipts and disbursements for the following month.  The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Retrocession.

B.  Annual Statement.  As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

C.  Claims Account.  The Reinsurer shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account").  The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time, in an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Retrocession.  In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 11 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Retrocession. Interest on funds in the Claims Account shall be the property of the Reinsurer.

ARTICLE 22.  RESERVES

For insurance regulatory accounting purposes, (1) the Reinsured shall determine the amount of its reserves on the Underlying Claims and may change those reserves from time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the Reinsurer shall determine the amount of its reserves on its liability hereunder and may change those reserves from time to time as its, in its sole discretion, deems necessary or appropriate.

ARTICLE 23.    CREDIT FOR REINSURANCE

If at any time (other than pursuant to any change in domicile for which Reinsurer's consent has not been obtained under Article 11) the Reinsured firm is advised by a state insurance regulatory authority in which it is licensed or an accredited reinsurer that, during the term of this Retrocession, it will not be able, due to the licensing status or the lack of appropriate accreditation (or other qualification similarly required by an applicable state insurance regulatory authority in the United States of America to assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance recoverables hereunder (whether paid or unpaid) in its then current financial statements required by appropriate state insurance regulatory authorities in the United States, and the Reinsured gives the Reinsurer written notice to such effect, the Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for such reinsurance recoverables in such then current financial statements, which may include any one or combination of the following: providing funds withheld, cash advances, a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate insurance regulatory authorities, amending this Retrocession in form but not in substance or such other action acceptable to Reinsurer and applicable insurance regulatory authorities.    The Reinsurer has sole discretion in which necessary steps to take, and the Reinsured will fully cooperate in implementing the steps so chosen, so long as the steps the Reinsurer chooses and takes enable the Reinsured to receive such full credit.    Interest and all other investment income on any funds posted as security pursuant to Article 23 shall be sole property of Reinsurer.    In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California.

ARTICLE 24.    TERRITORY

The Retrocession shall apply to Insurance Policies/Reinsurance Contracts covering risks wherever situated.

ARTICLE 25.    INTERMEDIARY

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Retrocession.

ARTICLE 26.    COUNTERPARTS

This Retrocession may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

ARTICLE 27.  HEADINGS

    The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at <u>New York</u> , <u>New York</u> on this 31<u>st</u> day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title:      President

and at <u>Hartford</u> , <u>CT</u> on this 30<u>th</u> day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____
Title: Assistant Vice President

Acknowledged and Accepted:


Eastgate Group Limited                    Dukes Place Holdings L.P.


By:_____              By:_____
Title:                                    Dukes Place Holdings Ltd.
                                          as General Partner of
                                          Dukes Place Holdings L.P.

## ARTICLE 27.   HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____, _____ on this _____ day of March, 1999.

                                        UNIGARD SECURITY INSURANCE COMPANY


                                        By_____
                                        Title:

and at _Stanford_. _CT_ on this _30th_ day of March, 1999.

                                        NATIONAL INDEMNITY COMPANY


                                        By_____
                                        Title: _____ __ _____


Acknowledged and Accepted:


Eastgate Group Limited                  Dukes Place Holdings L.P.


By:_____             By:_____
Title:                                  Dukes Place Holdings Ltd.
                                        as General Partner of
                                        Dukes Place Holdings L.P.

+1   BARGER & WOLEN LLP                    772 P17   NOV 20 '98  12:47

## ARTICLE 27.   HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____, _____ on this _____ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY


By_____
Title:

and at _____, _____ on this _____ day of November, 1998.

NATIONAL INDEMNITY COMPANY


By_____
Title:


Acknowledged and Accepted:


Eastgate Group Limited                     Dukes Place Holdings L.P.


By:_____              By:_____
Title:_____              Dukes Place Holdings Ltd.
      DIRECTOR                           as General Partner of
                                         Dukes Place Holdings L.P.

12 of 12

10/13/00  FRI 09:33 FAX 402 536 3285                                    ☒004
_05/10 '00 17:04 FAX 08701824538          EASTGATE GROUP LTD          ☒002/007

FIRST AGGREGATE EXCESS RETROCESSION OF
LOSS PORTFOLIO AGREEMENT

No. RA 1322

Between

SEATON INSURANCE COMPANY

And

NATIONAL INDEMNITY COMPANY

AMENDMENT NO. 1

10/13/00  FRI 09:33 FAX 402 536 3265
_05/13 '00 17:04 FAX 08701824538          EASTGATE GROUP LTD                              Ø 005
                                                                                         Ø 003/007

## AMENDMENT NO. 1

This is Amendment No. 1 to the First Aggregate Excess Retrocession of Loss Portfolio Agreement (the "Excess Retrocession") executed by Unigard Security Insurance Company of Seattle, Washington, on 20 November 1998.

Terms used in this Amendment have the same meaning as in the Excess Retrocession unless the context otherwise requires.

The parties to the Excess Retrocession agree to amend the Excess Retrocession as follows:

1.    The Reinsured, formerly Unigard Security Insurance Company, has been renamed Seaton Insurance Company with effect from 9 July 1999.

2.    Each reference to "Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof" shall be replaced by a reference to "Eastgate Inc. or any wholly-owned affiliate or subsidiary thereof".

All other terms and conditions shall remain unaltered by this Amendment.

Executed at _____ on this _____ day of _____ 2000.

SEATON INSURANCE COMPANY

By _____

Title:    President

and at _Omaha, NE, USA_          on this _13th_ day of _October_ 2000

NATIONAL INDEMNITY COMPANY

By _____

Title:    Senior Vice President

Acknowledged and Accepted:

Eastgate Group Limited                    Dukas Place Holdings LP

By _____          By _____

Title:                                    Title:
Date:                                     Date:

AMENDMENT NO. 1

This is Amendment No. 1 to the First Aggregate Excess Retrocession of Loss Portfolio Agreement (the "Excess Retrocession") executed by Unigard Security Insurance Company of Seattle, Washington, on 20 November 1998.

Terms used in this Amendment have the same meaning as in the Excess Retrocession unless the context otherwise requires.

The parties to the Excess Retrocession agree to amend the Excess Retrocession as follows:

1.    The Reinsured, formerly Unigard Security Insurance Company, has been renamed Seaton Insurance Company with effect from 9 July 1999.

2.    Each reference to "Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof" shall be replaced by a reference to "Eastgate Inc. or any wholly-owned affiliate or subsidiary thereof".

All other terms and conditions shall remain unaltered by this Amendment.

Executed at_____ on this _____ day of _____ 2000.

SEATON INSURANCE COMPANY

By _____

Title:  *President*

and at *Omaha, NE, USA*          on this *13th* day of *October* 2000

NATIONAL INDEMNITY COMPANY

By _____

Title:  *Senior Vice President*

Acknowledged and Accepted:

Eastgate Group Limited

Dukes Place Holdings LP

By _____          By _____

Title:                                   Title:
Date:                                    Date: