UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SEATON INSURANCE COMPANY and STONEWALL
INSURANCE COMPANY,

                                        Plaintiffs,

        vs.

CAVELL USA INC. f/k/a KEN RANDALL AMERICA, INC.
f/k/a EASTGATE, INC. and KEN RANDALL, individually,

                                        Defendants.

Case No. 1:07-CV-07032
(RMB)

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000

RIKER, DANZIG, SCHERER, HYLAND &
PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800

Attorneys for Plaintiffs Seaton Insurance Company
and Stonewall Insurance Company

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND.....................................................................................3

      A.     Overview...................................................................................................3

      B.     The Purchase of Seaton and the Seaton Covers...........................................4

      C.     The Seaton Administration Agreement .......................................................5

      D.     The Purchase of Stonewall and the Stonewall Cover ..................................6

      E.     The Stonewall Administration Agreement ..................................................6

      F.     Cavell Enters Into a Collaboration Agreement with NICO ..........................7

      G.     The Renegotiation of the Administration Agreements .................................8

      H.     Termination of the Administration Agreements ...........................................9

ARGUMENT............................................................................................................11

POINT I     THE FORUM SELECTION CLAUSE IN THE TERM SHEET IS
             INAPPLICABLE TO PLAINTIFFS' FRAUD CLAIMS......................................11

      A.     The Forum Selection Clause In The Term Sheet Is Narrow And
            Does Not Encompass Fraud Claims ..........................................................12

      B.     Plaintiffs' Fraud Claims Are Separate And Distinct From The
            Term Sheet Or Any Other Contract Between The Parties.........................15

POINT II    DEFENDANTS' DELEGATION ARGUMENT IS FACTUALLY AND
             LEGALLY SPECIOUS .......................................................................................17

CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,
968 F.2d 196 (2d Cir. 1992)................................................................3

Bon Jour Grp., Ltd. v. Elan Polo, Inc.,
No. 96 CIV. 6705, 1997 WL 401814 (S.D.N.Y. July 16, 1997) .......................................12, 13

Cleveland v. Caplaw Enters.,
448 F.3d 518 (2d Cir. 2006)................................................................3

Damigos v. Flanders Compania Naviera, S.A.,
716 F. Supp. 104 (S.D.N.Y. 1989) ................................................................15

Doughterty v. Town of N. Hempstead Bd. of Zoning Apps.,
282 F.3d 83 (2d Cir. 2002)................................................................19

EED Holdings v. Palmer Johnson Acq. Corp.,
387 F. Supp. 2d 265 (S.D.N.Y. 2004)................................................................16

First Bank of Ams. v. Motor Car Funding, Inc.,
690 N.Y.S.2d 17 (1st Dep't 1999) ................................................................17

Fonte v. Board of Mgrs. of Condo. Towers,
848 F.2d 24 (2d Cir. 1988)................................................................19

GMAC Comm'l Mortg. Corp. v. LaSalle Bank Nat'l Ass'n,
242 F. Supp. 2d 279 (S.D.N.Y. 2002)................................................................15

Grandon v. Merrill Lynch & Co.,
147 F.3d 184 (2d Cir. 1998)................................................................3

Greenberg v. Chrust,
198 F. Supp. 2d 578 (S.D.N.Y. 2002)................................................................17

Gross v. NYP Holdings, Inc.,
No. 06 CIV. 7863, 2007 WL 1040033 (S.D.N.Y Apr. 4, 2007)................................................................19

In re Estate of Spanier,
266 N.Y.S. 541 (Surr. Ct. Kings Co. 1933), aff'd,
269 N.Y.S. 916 (2d Dep't 1934)................................................................18

John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.,
119 F.3d 1070 (3d Cir. 1997)................................................................12

**PAGE(S)**

Kingsway Fin. Servs. v. Pricewaterhousecoopers LLP,
    420 F. Supp. 2d 228 (S.D.N.Y. 2005) ..................................................................15

Krock v. Lipsay,
    97 F.3d 640 (2d Cir. 1996) ...............................................................................13

LaBounty v. Adler,
    933 F.2d 121 (2d Cir. 1991) ........................................................................ 18-19

Liberty USA Corp. v. Buyer's Choice Insurance Agency LLC,
    386 F. Supp. 2d 421 (S.D.N.Y. 2005) ..............................................................15

Light v. Taylor,
    No. 05 CIV. 5003 WHP, 2007 WL 274798 (S.D.N.Y. Jan. 29, 2007) ....... 12, 13-14

Lombardozzi v. Debroux,
    No. 91-CV-1001, 1992 WL 24687 (N.D.N.Y. Sept. 23, 1992) ............................14

Merrill Lynch & Co. v. Allegheny Energy, Inc.,
    500 F.3d 171 (2d Cir. 2007) ........................................................................16, 17

MGN Pension Trustees v. Morgan Stanley Trust Co.,
    947 F. Supp. 611 (E.D.N.Y. 1996) ....................................................................18

New Moon Shipping Co. v. MAN B & W Diesel AG,
    121 F.3d 24 (2d Cir. 1997) ...............................................................................12

Phillips v. Audio Active Ltd.,
    494 F.3d 378 (2d Cir. 2007) ..............................................................................12

Sicari v. J.C. Penney Corp.,
    No. 05 CIV 5392, 2005 WL 3440693 (S.D.N.Y. Dec. 14, 2005) .....................14, 17

Speciner v. Reynolds Metals Co.,
    177 F. Supp. 291 (S.D.N.Y. 1959), aff'd,
    279 F.2d 337 (2d Cir. 1960) ..............................................................................19

U.S. Information Sys., Inc. v.
    International Bhd. of Elec. Workers Local Union No. 3, AFL-CIO,
    No. 00 CIV. 4763, 2007 WL 2219513 (S.D.N.Y. Aug. 3), adopted by,
    2007 WL 2746902 (S.D.N.Y. Sept. 18, 2007) ....................................................19

United States v. Miller,
    997 F.2d 1010 (2d Cir. 1993) .............................................................................19

**PAGE(S)**

Vermont Teddy Bear Co. v. 1-800 Beargram Co.,
  373 F.3d 241 (2d Cir. 2004)......................................................................................19

Williams v. Deutsche Bank Sec., Inc.,
  No. 04 CIV. 7588, 2005 WL 1414435 (S.D.N.Y. June 13, 2005)...........................13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEATON INSURANCE COMPANY and STONEWALL
INSURANCE COMPANY,

Case No. 1:07-CV-07032
(RMB)

                                                    Plaintiffs,

                         vs.

CAVELL USA INC. f/k/a KEN RANDALL AMERICA, INC.
f/k/a EASTGATE, INC. and KEN RANDALL, individually,

                                                    Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Plaintiffs Stonewall Insurance Company ("Stonewall") and Seaton Insurance Company ("Seaton") (collectively, "Plaintiffs" or the "Companies") submit this Memorandum of Law in opposition to Defendants' Motion to Dismiss the Complaint.

### PRELIMINARY STATEMENT

Defendants move to dismiss the Complaint on three grounds: (1) improper venue; (2) lack of subject matter jurisdiction; and (3) failure to state a claim upon which relief can be granted. As discussed below, each of defendants' arguments is factually and legally baseless. Defendants' motion therefore should be denied.

Defendants' venue and jurisdictional arguments are each predicated on a forum selection clause contained in a term sheet (the "Term Sheet") between the parties. The forum selection clause, however, is a narrow one and applies only to claims for breach of the Term Sheet or otherwise arising out of the Term Sheet. This intent is crystal clear from the Term Sheet's language as well as the wording of the forum selection clause itself. The clause reads:

> This Term Sheet shall be governed by and construed in accordance
> with English law and the parties submit to the exclusive
> jurisdiction of the English Courts.

(Compl., Ex. 4 art. 29; emphasis added).

Plaintiffs' common law fraud claims have nothing whatsoever to do with the Term Sheet, were extant at the time the Term Sheet was drafted, which may explain why fraud claims are expressly carved out of the Term Sheet's broad release (Compl., Ex. 4 art. 13), and are entirely independent of the Term Sheet. For this reason, plaintiffs' causes of action are not within the ambit of the Term Sheet's forum selection clause and are properly brought in this Court, rather than in an English court. See Point I below.

Defendants' other argument, i.e., that the Complaint fails to state a claim upon which relief can be granted, fares no better. It is based upon the erroneous notion that Cavell had an unfettered right to transfer responsibility for claims handling to any one Cavell might choose. The contract language that defendants themselves rely upon in support of their argument proves the futility of defendants' position. The Agreements Relating to Administration of Run-Off Business (the "Administration Agreements"), under which the Companies appointed Cavell as run-off manager, generally prohibit Cavell from delegating or assigning its obligations without the Companies' prior written consent. (Compl., Exs. 1 & 2 § 8.1). An exception allowed Cavell to delegate to third parties those "functions as it [Cavell] deem[ed] necessary for the performance of its obligations under th[e] Agreement[s]." (Id.; emphasis added). Thus, at a minimum, factual issues will exist as to whether Cavell's delegation of claims handling was genuinely "necessary," whether this question was even considered by Cavell at the time and whether the contractual language that defendants now tout can reasonably be read to allow Cavell to abdicate in toto the core obligations that the Companies retained Cavell to perform. See Point II below.

The Administration Agreements also require that Cavell "properly perform[] in good faith." (Compl., Exs. 1 & 2 § 14.1)  Where, as here, Cavell transferred claims control to National Indemnity Company ("NICO"), the Companies' reinsurer, a question arises as to whether the delegation was done in good faith.  Unlike the Companies, NICO had little or no interest in extinguishing policy exposures as expeditiously as possible. (Compl. ¶¶ 53, 61).  To the contrary, NICO's interests were better served by delaying payments for as long as possible (id.) -- a dynamic Cavell and Randall had to have understood.

In any event, defendants' contract defense is a red-herring.  Plaintiffs' fraud claims are primarily founded upon defendants' misrepresentations and concealment of material facts, which are independent of the Administration Agreements.  See Point II below.  Consequently, plaintiffs' claims would survive even if (contrary to the facts) Cavell could properly delegate claims handling to NICO.

In short, defendants' motion to dismiss is specious and should be denied.

## FACTUAL BACKGROUND

A.    Overview

The Complaint alleges several frauds perpetrated by Cavell and Randall upon the Companies in connection with the negotiation, and still later, the amendment of the Administration Agreements.  (Compl. ¶ 1).[1]  During the negotiations of the Administration Agreements, Randall and Cavell represented that Cavell would exercise independence in its roles as run-off manager and claims administrator and that Cavell would safeguard the Companies'

---

[1]    On a motion to dismiss, the "court must 'accept . . . as true the complaint's factual allegations and draw . . . all inferences in the plaintiffs' favor.'"  Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006) (citation omitted); see also Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998); Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd. 968 F.2d 196, 198 (2d Cir. 1992).  For this reason, plaintiffs have not submitted evidentiary proof in support of the allegations in the Complaint, but are prepared to do so if requested by the Court.

economic and other interests. (Compl. ¶ 2). Unbeknownst to the Companies, Cavell's and

Randall's representations were false. Cavell and its principal, Randall, intended to cede -- and

ultimately did cede -- control over the administration of the Companies' claims to NICO, a

reinsurer whose interests were adverse to those of the Companies. (Id. ¶ 1).

   While the Administration Agreements were in effect, Cavell and Randall

periodically represented to the Companies that Cavell was performing the Companies' claims

handling services and, in addition, was zealously protecting the Companies' interests, including

the Companies' interests under reinsurance agreements between them and NICO. (Compl. ¶ 2).

In late 2005, the Companies discovered that Cavell's and Randall's representations during the

term of the Administration Agreements, as well as those that preceded the Administration

Agreements' execution, were false and that Cavell had transferred to NICO unfettered discretion

to handle the Companies' claims and to collect reinsurance recoveries on the Companies' behalf

(as Cavell had surreptitiously planned to do almost from the outset of the Agreements, if not

from the outset of negotiations). (Id. ¶ 3). Upon discovering the falsity of Cavell's and

Randall's earlier representations and Cavell's and Randall's concealment of facts, the Companies

terminated the Administration Agreements and Cavell's services as run-off manager. (Id. ¶ 4).

In this action, the Companies are seeking to recover damages for Cavell's and Randall's

fraudulent misconduct, including a return of the millions of dollars paid to Cavell as fees under

the Administration Agreements. (Id.).

**B.**  <u>**The Purchase of Seaton and the Seaton Covers**</u>

   In November 1998, Dukes Place Holdings, L.P. ("Dukes Place") agreed to

purchase Seaton, which was in run-off, from John Hancock Property & Casualty Holdings

Company, Seaton's then owner. (Compl. ¶ 12). In connection with its acquisition of Seaton,

Dukes Place purchased two finite reinsurance contracts (the "Seaton Covers") from NICO.

(Id. ¶ 13).   Under the Seaton Covers, NICO agreed to reinsure Seaton's liabilities up to an aggregate limit of $350 million in exchange for a premium of $192 million.  (Id.).  The control of Seaton's claims was a significant issue during the negotiation of the Seaton Covers.  (Id. ¶ 14). NICO sought to acquire control over Seaton's claims but Seaton steadfastly refused.  (Id.). Under the Seaton Covers, Seaton retained responsibility for handling all claims made against its insurance policies and reinsurance contracts  (Id. ¶ 16).  The Seaton Covers authorized Seaton, which no longer had any staff of its own, to use a third-party claims administrator to provide claim administration.  (Id.).

## C.    The Seaton Administration Agreement

In March 1999, Seaton and Cavell entered into an Agreement Relating to the Administration of Run-Off Business (the "Seaton Administration Agreement"), pursuant to which Cavell was to provide comprehensive run-off services, including claim administration, to Seaton.  (Compl. ¶ 17).  Pursuant to the Seaton Administration Agreement, Seaton entrusted Cavell to manage virtually all of Seaton's affairs, including claims, reinsurance collections and accounting services.  For an insurer in run-off, like Seaton, claims handling is the predominate activity of the company.  The Seaton Administration Agreement required Cavell to perform its services "with reasonable care and skill in a professional and efficient manner." (Compl., Ex. 1 ¶ 2.1).

To induce Seaton to retain Cavell's services, Cavell and Randall represented to Seaton that Cavell would "at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith." (Compl. ¶ 19).  This representation was expressly incorporated into the Seaton Administration Agreement.  (Id.).  Both prior and subsequent to the execution of the Seaton Administration Agreement, Cavell and Randall fraudulently failed to disclose to and concealed from Seaton that they intended to cede and did in

fact cede control over the administration of Seaton's claims to NICO. (Id.). Indeed, shortly after the Seaton Administration Agreement was signed, Cavell and NICO made an oral pre-funding agreement, the effect of which was to cede control of claims to NICO. (Id. ¶ 22). Seaton only became aware of the existence of this oral agreement after the Seaton Administration Agreement had been terminated. (Id.).

**D.    The Purchase of Stonewall and the Stonewall Cover**

In May 1999, Dukes Place agreed to purchase all of the issued and outstanding shares of Stonewall, which was in run-off, from Great American Insurance Group Inc., Stonewall's then owner. (Compl. ¶ 24). In connection with its acquisition of Stonewall, Dukes Place purchased a finite reinsurance contract (the "Stonewall Cover") from NICO. (Id. ¶ 25). The Stonewall Cover, like the Seaton Covers, vested claims control in Stonewall and bound NICO to Stonewall's reasonable, good faith disposition of claims. (Id. ¶ 27). Under the Stonewall Cover, Stonewall retained responsibility for handling claims made against its insurance policies and reinsurance contracts. (Id. ¶ 29). The Stonewall Cover authorized Stonewall, which no longer had any staff of its own, to use a third-party claims administrator to provide claim administration. (Id.).

**E.    The Stonewall Administration Agreement**

In September 2000, Stonewall and Cavell entered into an Agreement Relating to the Administration of Run-Off Business (the "Stonewall Administration Agreement"), pursuant to which Cavell was to provide comprehensive run-off management services to Stonewall. (Compl. ¶ 30). Under the Stonewall Administration Agreement, Stonewall entrusted Cavell to manage virtually all of Stonewall's affairs, including claims, reinsurance collections and accounting services. (Id. ¶ 31). Claims handling was the predominate activity that Stonewall retained Cavell to perform. The Stonewall Administration Agreement required Cavell to

perform its services "with reasonable care and skill in a professional and efficient manner." (Compl., Ex. 2 § 2.1).

To induce Stonewall to retain Cavell's services, Cavell and Randall represented to Stonewall – as later reflected in the Stonewall Administration Agreement itself – that Cavell would "at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith." (Compl. ¶ 32). Both prior and subsequent to the execution of the Stonewall Administration Agreement, Cavell and Randall fraudulently failed to disclose to and concealed from Stonewall that they intended to cede and in fact had ceded control over the administration of Stonewall's claims to NICO. (Id.).

Several months before the Stonewall Administration Agreement was signed, Cavell and NICO (as noted above) had entered into an oral pre-funding agreement, the effect of which, when later applied to Stonewall, was to transfer control over Stonewall's claims to NICO. (Compl. ¶ 35). Stonewall only learned of the existence of this oral agreement after the termination of the Stonewall Administration Agreement. (Id.).

F.     **Cavell Enters Into a Collaboration Agreement with NICO**

In June 2001, while the Administration Agreements were in force and at a time when the Companies believed that Cavell was faithfully fulfilling its fiduciary obligations, Cavell and NICO negotiated a contract entitled the "Collaboration Agreement." (Compl. ¶ 36). Pursuant to this agreement, Cavell formally transferred to NICO all of the claims handling and reinsurance collection responsibilities Cavell was retained to perform pursuant to the Administration Agreements. (Id.). The practical effect of the Collaboration Agreement was to substitute NICO in place of Cavell as the provider of claim and reinsurance collection services. (Id.).

The Collaboration Agreement provides, in part: "For the avoidance of doubt, NIC[O] retains all authorities to supervise and control claims handling and reinsurance collections;" "[Cavell] authorizes and requires NIC[O] to direct the Claims Handling Staff in the performance of their duties;" and "the salary and bonus of all Claims Handling Staff shall be set by NIC[O]." (Compl. ¶ 38). The Collaboration Agreement further provides that "NIC[O] will be responsible for the management of all Schedule 4 Services [the claims handling services that Cavell agreed to perform on the Companies' behalf]." (Compl., Ex. 3 ¶ G & Sch. 4; emphasis added). The Collaboration Agreement solidified NICO's control over the Companies' claims and insured that Seaton's and Stonewall's objective to complete an orderly and speedy run-off, extinguishing liabilities as promptly as possible, would be subjugated – and subordinate – to NICO's competing interest in deferring claim payments for as long as possible. (Compl. ¶ 39).

Under the Collaboration Agreement, NICO agreed to pay the salaries of Cavell's employees and to defer Cavell expenses. (Compl. ¶ 41). In effect, the Companies were paying Cavell to handle claims which Cavell wasn't, and NICO was paying Cavell to do the same.

**G.    The Renegotiation of the Administration Agreements**

The Administration Agreements, as originally written, set forth Cavell's compensation for a period of five years. (Compl. ¶ 43). In January 2004, as the fifth anniversary of the Seaton Administration Agreement approached, Cavell on the one hand and the Companies on the other entered into negotiations to extend the Administration Agreements and to set Cavell's compensation for several additional years. (Id.).

During those discussions, Randall and Cavell each represented that Cavell continued to handle claims and otherwise to act as the Companies' run-off manager in good faith. (Compl. ¶ 2). The Companies relied upon those representations and believed then, and for the better part of the next two years, that Cavell, the Companies' trusted agent, was discharging

its fiduciary obligations faithfully and that Cavell was zealously safeguarding the Companies' interests. (Id.).

Based upon this understanding, and lacking knowledge at the time that Cavell had abdicated its claim responsibilities to NICO wholesale, the Companies, in January 2004, agreed to extend Cavell's role as run-off manager/claims servicer. The extension was reflected in writing as an amendment to the Administration Agreements (the "Amendments"). (Compl. ¶ 44). At no time during those negotiations did Randall or Cavell inform Seaton or Stonewall that the entire claims handling role had been transferred to NICO and that all claims handling was done under "the supervision, direction and control" of NICO. (Id.). If Randall or Cavell had made full and adequate disclosure of either the oral pre-funding agreement or the Collaboration Agreement during the time the Amendments were being negotiated (or beforehand), the Companies would not have agreed to the Amendments and, instead, would have immediately terminated the Administration Agreements. (Id. ¶ 46).

**H.    Termination of the Administration Agreements**

In November 2005, Robert Burns, an individual whose employment at Cavell had recently been terminated by Cavell, wrote a memo critical of Cavell. At or around the same time, Randall disclosed the Collaboration Agreement to a potential acquirer of the Companies, in connection with acquirer's due diligence. An investigation followed during which the Companies began to learn that Cavell's and Randall's earlier representations were false. For example, the Companies learned that contrary to their understanding, NICO, rather than Cavell, was supervising, directing and controlling their claims. As a result, in January 2006, the Companies terminated the Administration Agreements. (Compl. ¶ 49).

On or about February 17, 2006, Cavell and Dukes Place, the Companies' owner, executed the Term Sheet. Two purposes of the document were to effect: (i) an "orderly

termination of the contractual and other commercial relationships" between the Companies on the one hand and Cavell on the other effective March 31, 2006; and (ii) Cavell's orderly handover -- return -- of run-off management to the Companies. (Compl., Ex. 4 at 1).

Significantly, the Term Sheet was not limited solely to Cavell's relationship with the Companies. Cavell also had a relationship with two other insurers owned by Dukes Place, Unione Italiana (UK) Reinsurance Company Limited ("Unione") and Cavell Insurance Company Limited ("CIC"). The Term Sheet addressed those interests as well and contemplated that there would be an ongoing relationship between Cavell on the one hand and Unione and CIC on the other. (Compl., Ex. 4 at 1).

The Term Sheet set forth protocols that would apply to Cavell's ongoing relationship with Unione and CIC. For example, Article 10 of the Term Sheet provides that "Cavell UK will accept an additional layer of management oversight." (Compl., Ex. 4 art. 10).

Dukes Place expressly preserved its right to sue Cavell in the event Cavell were to breach the Term Sheet. (Compl., Ex. 4 art. 13). The parties also agreed where such a suit would proceed, in England. Article 29 of the Term Sheet provides:

> This Term Sheet shall be governed by and construed in accordance with English law and the parties submit to the exclusive jurisdiction of the English Court.

(Id., art. 29). The selection of English law and an English forum made perfect sense. With the exception of fraud claims, which were expressly carved out of the Term Sheet, the most likely claims that might arise in the future dealt with Cavell's ongoing dealings with Unione and CIC, both of which were UK entities, to which English law otherwise applied.[2]

---

[2]    Article 13 of the Term Sheet, a broad release, carves out fraud claims, preserving the Companies' right to seek redress against Cavell and Randall. The article states in relevant part:

> Dukes Place hereby releases and forever discharges Randall of and from all actions, causes of action, suits, claims and demands whatsoever,

# ARGUMENT

## POINT I

### THE FORUM SELECTION CLAUSE IN THE TERM SHEET IS INAPPLICABLE TO PLAINTIFFS' FRAUD CLAIMS

Defendants argue that the Complaint should be dismissed for improper venue and lack of subject matter jurisdiction based on the conclusory assertion that the Companies' fraud claims "relate to contracts governed by the Term Sheet" and thus those claims "are subject to the mandatory forum selection clause contained in the [Term Sheet]." (Init. Br. at 6). Defendants are wrong. As discussed below, plaintiffs' common law fraud claims are independent of the Administration Agreements, as well as the Term Sheet. Plaintiffs are not seeking redress for breach of any contract but rather for defendants' tortious conduct.

In any event, the forum selection clause in the Term Sheet is a narrow provision that applies solely to claims for breach of the Term Sheet. It has no application to other claims, including plaintiffs' fraud claims, which arise entirely from conduct that occurred long before the Term Sheet was drafted.

---

whether at law or equity, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, fixed or contingent, accrued or unaccrued, asserted or unasserted, which Dukes Place ever had, now has or hereafter can, shall or may have against Randall for, upon, or by reason of any matter, cause or thing whatsoever arising out of or in connection with any business, commercial, contractual or other arrangements between or involving either of them as at the date of this Term Sheet, *save* (i) in respect of any obligations expressly set out in this Term Sheet, (ii) in respect of any actions, causes of action, suits, claims, and demands arising from any breach by Randall of any provision of this Term Sheet, and (iii) *in the case of fraud on the part of Randall.* . . .

(Compl., Ex. 4 art. 13; emphasis added).

A.    **The Forum Selection Clause In The Term Sheet Is Narrow And Does Not Encompass Fraud Claims**

"The determination of whether a forum selection clause encompasses specific claims depends on the language of the clause." Light v. Taylor, No. 05 CIV. 5003 WHP, 2007 WL 274798, at *5 (S.D.N.Y. Jan. 29, 2007). "'Whether or not a forum selection clause applies depends on what the specific clause at issue says.'" Phillips v. Audio Active Ltd., 494 F.3d 378, 389 (2d Cir. 2007) (quoting John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1075 (3d Cir. 1997)) (emphasis in original). A court asked to dismiss a claim based upon a forum selection clause must "examine the substance of [the plaintiffs'] claims as they relate to the precise language of the clause." Phillips, 494 F.3d at 389. If a forum selection clause is found to be ambiguous, the court then -- as it would do in any contract dispute -- must "consider the intent of the parties." New Moon Shipping Co. v. MAN B & W Diesel AG, 121 F.3d 24, 33 (2d Cir. 1997).

When a forum selection clause is worded broadly, the clause may apply to actions not directly related to the breach of the underlying contract containing the clause. Light, 2007 WL 274798, at *5. Conversely, where a "clause is worded narrowly, the forum selection clause applies only to disputes directly concerning the underlying contract." Id.; see Bon Jour Grp., Ltd. v. Elan Polo, Inc., No. 96 CIV. 6705, 1997 WL 401814, at *2 (S.D.N.Y. July 16, 1997).[3]

The forum selection clause at issue here reads:

_____

[3]    Defendants rely on federal substantive law in their moving papers. However, English law presumably governs the interpretation of the forum selection clause, as English law applies to the contract in which the forum selection clause is contained. E.g., Phillips, 494 F.3d at 386-87. Nonetheless, plaintiffs, like defendants, shall discuss only federal precedent. Plaintiffs do so because there is no genuine conflict between US and UK law as respects the application of the Term Sheet's forum selection clause. Under both, the result is the same. The clause is inapplicable to plaintiffs' fraud claims and does not act as a bar to prosecution of those claims in this Court. See Statement of Andrew Lydiard, Queen's Counsel, Brick Court Chambers, dated November 20, 2007.

> This Term Sheet shall be governed by and construed in accordance
> with English law and the parties submit to the exclusive
> jurisdiction of the English Courts.

(Compl., Ex. 4 art. 29). This clause could not be clearer – or narrower. By its express terms, the choice of law and forum selection provisions apply only to claims arising from "[t]his Term Sheet." (Id.). Nothing in Article 29 or elsewhere in the Term Sheet expands the forum selection clause to apply to unrelated, non-contractual claims. To the contrary, fraud claims are expressly excluded from the ambit of the Term Sheet. (Id., art. 13).

Any doubt that the Term Sheet's forum selection clause is a narrow provision inapplicable to plaintiffs' fraud claims is dispelled by a review of the case law, including several of the cases cited by defendants. Courts have considered comparable and virtually identical language, and have regularly found those provisions to be narrow in scope and limited to contract claims concerning the agreement in which the forum selection clause is contained. Light, 2007 WL 274798, at *5; see also Bon Jour Grp., 1997 WL 401814, at *2 (narrow forum selection clause encompassed only plaintiff's breach of contract claim and not related fraud claim); Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) ("in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties"); Williams v. Deutsche Bank Sec., Inc., No. 04 CIV. 7588, 2005 WL 1414435, at *4 n.3 (S.D.N.Y. June 13, 2005) (same).

Light is instructive. There, the parties' choice of law and forum selection provision read:

> "Any dispute regarding this Agreement shall be governed by the
> laws of the State of New York. . . . The parties agree to accept the
> exclusive jurisdiction of the state and federal courts located in New
> York, USA."

2007 WL 274798, at *6 (citation omitted). Judge Pauley concluded that the provisions were "narrow in focus" and applied only to litigations concerning the parties' agreement and not to claims independent of the contract containing the clause.

Sicari -- a case cited by defendants -- is also illustrative. The parties' forum selection clause provided:

> "The parties hereby submit to the exclusive jurisdiction and venue in the United States District Court for the Northern District of Texas, Dallas Division, or the District Courts of Collin County, Texas."

Sicari v. J.C. Penney Corp., No. 05 CIV. 5392, 2005 WL 3440693, at *4 (S.D.N.Y. Dec. 14, 2005) (citation omitted). Despite this clause, plaintiffs commenced suit in New York alleging fraud. The defendant -- as Randall and Cavell do here -- moved to dismiss.

Judge McKenna's analysis was straightforward:

> The forum selection provisions on which defendant relies do not cover all disputes between the signatories (as in e.g., Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 587-88 (1991)) but, fairly read, rather relate to the particular agreements in which they appear.

Id. at *5. The court then went on to observe that plaintiffs did not seek to enforce the parties' contract but rather, as here, plaintiffs sought to recover damages for fraudulent inducement of the contract, a claim not governed by the forum selection clause.

In Lombardozzi -- still another of the cases cited by defendants -- Senior District Judge Munson articulated a common sense test for determining whether a claim is subject to a contract's forum selection clause. Lombardozzi v. Debroux, No. 91-CV-1001, 1992 WL 24687, at **3-4 (N.D.N.Y. Sept. 23, 1992). He concluded that if a claim required an analysis of the contact containing the forum selection clause, the claim was subject to the clause. Id. Here, plaintiffs' fraud claims are entirely independent of the Term Sheet. Plaintiffs need not adduce

any evidence concerning the Term Sheet to prevail. Indeed, the focus of plaintiffs' claim is defendants' concealment and false representations, tortious conduct which occurred long before the Term Sheet was negotiated and, as importantly, which has nothing whatsoever to do with the Term Sheet.[4]

In short, the forum selection clause in the Term Sheet only applies to claims arising out of the Term Sheet and has no bearing on plaintiffs' fraud claims.

## B.    Plaintiffs' Fraud Claims Are Separate And Distinct From The Term Sheet Or Any Other Contract Between The Parties

Defendants apparently recognize that the Term Sheet's forum selection clause is limited in scope and governs only contract claims. We so conclude because in their brief, defendants assert that "the forum selection clause in the Term Sheet mandat[es] that England is the exclusive forum for any and all disputes arising from the parties' contractual relationships." (Init. Br. at 5; emphasis added). Assuming (as we do) that defendants are including the Administration Agreements, as well as the Term Sheet, within the phrase "contractual relationships," defendants' position is still unavailing. The claims at issue here do not arise from the Administration Agreements (or the Term Sheet), but rather are distinct and separate from any contract. Plaintiffs' claims sound in fraud.

---

[4]    The other cases cited by defendants are completely inapposite. For example, in Liberty USA Corp. v. Buyer's Choice Insurance Agency LLC, 386 F. Supp. 2d 421 (S.D.N.Y. 2005), the issue was not whether the forum selection clause was a broad or narrow one but which of two disparate clauses applied. In Damigos v. Flanders Compania Naviera, S.A., 716 F. Supp. 104 (S.D.N.Y. 1989), the issue was whether enforcement of the forum selection clause was unreasonable, not whether the claims in dispute were governed by it. In still other of defendants' cases, the issue was whether the forum selection clause was "mandatory" or "permissive," an issue not present here. E.g., GMAC Comm'l Mortg. Corp. v. LaSalle Bank Nat'l Ass'n, 242 F. Supp. 2d 279 (S.D.N.Y. 2002); Kingsway Fin. Servs. v. Pricewaterhousecoopers LLP, 420 F. Supp. 2d 228 (S.D.N.Y. 2005).

We do not catalog here the reasons why each of defendants other cases do not support their position. It is readily apparent on reading those cases why they do not.

It is black letter law that "'a party who has breached a contract may be charged with separate tort liability for fraud arising from breach of duty that is distinct from, or in addition to, the breach of contract.'" <u>EED Holdings v. Palmer Johnson Acq. Corp.</u>, 387 F. Supp. 2d 265, 278-79 (S.D.N.Y. 2004) (citation omitted); <u>Merrill Lynch & Co. v. Allegheny Energy, Inc.</u>, 500 F.3d 171, 184 (2d Cir. 2007) (a party may "sue in fraud on the basis of representations" that constitute a breach of contract). Furthermore, fraudulent misrepresentations and omissions "which [are] the inducement for a contract [are] collateral to said contract, and can support a separate fraud claim." <u>EED Holdings</u>, 387 F. Supp. 2d at 279. Put differently, "a claim based on fraudulent inducement of a contract is separate and distinct from a breach of contract claim." <u>Merrill Lynch</u>, 500 F.3d at 184.

During the negotiations of the Administration Agreements, defendants represented to the Companies that Cavell would exercise independence in its role as claim administrator, that Cavell would safeguard the Companies' interests and that Cavell would "perform [its obligations] in good faith." (Compl.¶¶ 1-2 & Exs. 1 & 2 § 14.1). Still later, when the Administration Agreements were in force and as an inducement to obtain the Companies' agreement to extend the term of the Administration Agreements, Cavell and Randall represented that Cavell had been performing its fiduciary obligations faithfully and that Cavell was zealously protecting the Companies' interests in all respects, including the handling of claims. (<u>Id.</u> ¶¶ 2-3). Unbeknownst to the Companies, Cavell's and Randall's pre-contractual and post-contractual representations were false. (<u>Id.</u>). Cavell and its principal, Randall, all along intended to cede and by the time the Stonewall Administration Agreement was negotiated had in fact ceded control over the administration of the Companies' claims to NICO, a reinsurer whose interests were adverse to those of the Companies.

These misrepresentations serve as the basis for fraud claims separate and distinct from the Administration Agreements. <u>E.g.</u>, <u>Merrill Lynch</u>, 500 F.3d at 184; <u>see also</u> <u>Greenberg v. Chrust</u>, 198 F. Supp. 2d 578, 583 (S.D.N.Y. 2002) ("the failure to perform future acts can serve as the basis for a fraud claim where there 'existed an intent not to perform at the time the promise was made'") (citation omitted); <u>Sicari</u>, 2005 WL 3440693, at *2 ("'a specific representation regarding future conduct, made with the undisclosed intention not to perform, is actionable'") (citation omitted). Indeed, "'a misrepresentation of present facts [as occurred here both pre-contractually as well as post-contractually] is collateral to the contract . . . and therefore involves a separate breach of duty.'" <u>See</u>, <u>e.g.</u>, <u>Merrill Lynch</u>, 500 F.3d at 184 (<u>quoting</u> <u>First Bank of Ams. v. Motor Car Funding, Inc.</u>, 690 N.Y.S.2d 17, 21 (1st Dep't 1999)).

In short, plaintiffs' fraud claims are distinct from any of the contractual arrangements between them and Cavell, including the Administration Agreements and Term Sheet. Defendants' conclusory assertion to the contrary is misguided.

**POINT II**

### DEFENDANTS'  DELEGATION  ARGUMENT  IS FACTUALLY AND LEGALLY SPECIOUS

Defendants next argue that the Complaint fails to state a claim upon which relief can be granted because, in their view, Cavell had an unfettered right to transfer responsibility and authority for claim handling to NICO. Defendants' argument is factually untenable and logically infirm.

First, the language of the Administration Agreements upon which defendants rely establishes the futility of their position. Section 8.1 of the Administration Agreements provides:

> Neither party shall assign or deal in any [] manner with any of their rights or obligations under this Agreement without the prior written consent of the other, such consent not to be unreasonably

withheld or delayed, provided that, subject to clause 10.2, [an indemnification provision] [Cavell] shall have the authority to delegate to any person such functions as it deems necessary for the performance of its obligations under this Agreement.

(Compl., Exs. 1 & 2 § 8.1). Cavell thus was generally prohibited from transferring any of its rights or obligations to a third party without the Companies' prior written consent. While a narrow exception existed -- allowing Cavell to retain a third party to perform "functions" "deemed necessary for [Cavell's] performance of its obligations," this exception has no application here. By its terms, Section 8.1 does not contemplate Cavell retaining another to perform the core obligations of the Administration Agreements, i.e., claims handling. To the contrary, the provision contemplates that at all times, Cavell would perform its "obligations," at times, perhaps, retaining others to perform limited, presumably ministerial, "functions." Any other construction would run afoul of the maxim *delegatus non protest delegare*, a fundamental precept of agency law: "'[A] delegated power cannot be delegated without the consent of the person originally conferring the power.'" In re Estate of Spanier, 266 N.Y.S. 541, 546 (Surr. Ct. Kings Co. 1933) (citation omitted), aff'd, 269 N.Y.S. 916 (2d Dep't 1934); see also MGN Pension Trustees v. Morgan Stanley Trust Co., 947 F. Supp. 611, 620 (E.D.N.Y. 1996).

In any event, in its moving papers, Cavell made no effort to establish that its transfer of claims handling to NICO was "necessary." Thus, an unresolved factual issue exists on the record now before the Court, namely, whether Cavell's abdication of its claims role was truly "necessary" or was even considered by Cavell at the time. The existence of this issue standing alone is enough to defeat defendants' motion to dismiss – where matters outside the pleadings cannot properly be considered by the Court.[5] See LaBounty v. Adler, 933 F.2d 121,

---

[5]    Several other factual issues exist, among them, whether Cavell's transfer was done in good faith as required by the Administration Agreements, particularly where, as here, claims responsibility was handed to a party whose interests were adverse to the Companies. This unresolved factual issues too defeats defendant's motion.

123 (2d Cir. 1991) ("Rule 12(b)(6) does not give the district court authority to consider matters outside the pleadings"); Fonte v. Board of Mgrs. of Condo. Towers, 848 F.2d 24, 25 (2d Cir. 1988); see also Doughterty v. Town of N. Hempstead Bd. of Zoning Apps., 282 F.3d 83, 87-88 (2d Cir. 2002); Gross v. NYP Holdings, Inc., No. 06 CIV. 7863, 2007 WL 1040033, at *1 (S.D.N.Y Apr. 4, 2007); Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (requiring movant to "show that no genuine factual dispute exists"); U.S. Information Sys., Inc. v. International Bhd. of Elec. Workers Local Union No. 3, AFL-CIO, No. 00 CIV. 4763, 2007 WL 2219513, at *7 (S.D.N.Y. Aug. 3) (same), adopted by, 2007 WL 2746902 (S.D.N.Y. Sept. 18, 2007).

There is a second reason why defendants' argument is fatally flawed. As discussed above (at 15-16), plaintiffs' fraud claims are distinct from the parties' contracts. The gravamen of plaintiffs' claims is that plaintiffs were misled and deceived by defendants' false representations and concealment of material facts. Even assuming that Cavell had unfettered discretion to subdelegate wholesale its obligation to handle claims to another, this circumstance would not excuse Cavell and Randall from liability for their tortious misconduct. Put differently, even assuming Cavell had authority to do what it did, Cavell and Randall had no right to deceive plaintiffs.

But, of course, Cavell had no authority to delegate any responsibility to NICO, whose interests were adverse to the Companies'. An agent owes an undivided duty of loyalty to its principal. See United States v. Miller, 997 F.2d 1010, 1018 (2d Cir. 1993); Speciner v. Reynolds Metals Co., 177 F. Supp. 291, 292 (S.D.N.Y. 1959) ("an agent owes a high duty of loyalty to [its] principal"), aff'd, 279 F.2d 337 (2d Cir. 1960). NICO could never fulfill this duty, as its interests were not aligned with the Companies'. For this reason, NICO could never qualify as an entity to which any authority could be delegated. And the Companies would never

have approved the delegation that Cavell made without disclosure to them. The deal struck by Cavell made no commercial sense for the Companies. Why would the Companies continue to pay Cavell to handle claims when Cavell was no longer doing so and when NICO was paying Cavell to do the same thing?

In short, Cavell's contention that the Complaint fails to state a claim upon which relief can be granted is misguided. The fraud claims are well plead. At best, Cavell's assertion that it was entitled to subdelegate "functions" to NICO is an affirmative defense which does not affect the efficiency of the pleading; an affirmative defense, in any event, that cannot be decided in defendants' favor as it is riddled with unresolved factual issues.

## CONCLUSION

For the reasons set forth above, this Court should deny Defendants' motion to dismiss the Complaint.

Dated: New York, New York
       November 21, 2007

CADWALADER, WICKERSHAM & TAFT LLP

By: _Richard M. Appel_
      Richard M. Appel (RMA-9497)

One World Financial Center
New York, NY 10281
(212) 504-6000

Attorneys for Plaintiffs Seaton Insurance Company
and Stonewall Insurance Company

Of Counsel:

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800