UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEATON INSURANCE COMPANY and STONEWALL INSURANCE COMPANY,<br><br>          Plaintiffs,<br>vs.<br><br>CAVELL USA INC. f/k/a KEN RANDALL AMERICA, INC. f/k/a EASTGATE, INC. and KEN RANDALL, individually,<br><br>          Defendants. | Case No. 1:07-CV-07032 (RMB) |

## STATEMENT OF ANDREW LYDIARD QC

**Introduction**

1 I have been asked to prepare this statement of my opinions on the law of England for Seaton Insurance Company and Stonewall Insurance Company, who are the plaintiffs in proceedings pending in the United States District Court for the Southern District of New York against Cavell USA Inc and Ken Randall. The defendants have applied to dismiss the complaint inter alia on the grounds that the pending proceedings have been commenced in breach of a contractual term by which the parties submitted to the exclusive jurisdiction of the English Courts.

2 In particular I have been asked to give my opinion as to

  (1) the principles of English law that govern the interpretation of contracts

1

(2) how an English court would apply those principles in order to determine whether the exclusive jurisdiction clause mentioned above applies to the pending proceedings.

3     I am a barrister in independent practice in London, practising from Brick Court Chambers, 7-8 Essex Street, London WC2R 3LD. I read law at University College Oxford and in 1978 was awarded a BA in Jurisprudence (first class honours) by the University of Oxford. From 1978 to 1979 I attended Harvard Law School on a Frank Knox Fellowship. In 1979 I was awarded an LLM by Harvard University. I was called to the Bar in 1980 and have been in independent practice continuously since then. I was appointed Queen's Counsel in 2003. I specialise in commercial litigation, and in particular insurance, reinsurance and aviation.

**(1) Principles of interpretation**

4     The principles that govern interpretation of contracts governed by English law were authoritatively set out by Lord Hoffmann in *Investors Compensation Service v West Bromwich Building Society* [1998] 1 WLR 896, a decision of the House of Lords. A copy of the official law report is attached as Appendix 1. The House of Lords is the highest appellate court in England. Although the House of Lords forms part of the UK legislature its judicial decisions are made by a panel of salaried career judges of the highest eminence (Lords of Appeal, or more colloquially "law lords") who do not have political affiliations. The law lords who participated in this decision are listed at the beginning of the report.

5     At p.912F-G of the official law report, Lord Hoffmann observed that as a result of judicial decisions in the 1970s the principles governing the interpretation of contracts, with one important exception, had been assimilated to the common sense principles by which any serious utterance would be interpreted in ordinary life. His statement of the relevant principles is set out from p.912H to 913F and reads as follows:

2

(1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as the "matrix of fact," but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear. But this is not the occasion on which to explore them.

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax: see _Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd._ [1997] A.C. 749.

(5) The "rule" that words should be given their "natural and ordinary meaning" reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point more vigorously when he said in _Antaios Compania Naviera S.A. v. Salen Rederierna A.B._ [1985] A.C. 191, 201:

> "if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense."

3

6     The reference to Lord Wilberforce at (2) above is a reference to that judge's speech in *Reardon Smith Line v Hansen-Tangen* [1976] 1 WLR 989, a copy of which is attached as Appendix 2. At p.995-6 Lord Wilberforce said this:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

7     In *ICS v West Bromwich* three of the other law lords agreed with Lord Hoffmann's speech and there was one dissent. Lord Hoffmann's summary has become by far the most cited judicial pronouncement on the applicable principles. It has been applied in such subsequent decisions as *Bank of Credit and Commerce International SA v Ali* [2002] 1 AC 251 (HL), *Sirius General Insurance Co v FAI General Insurance Ltd* [2004] 1 WLR 3251 (HL) and *Absalom v TCRU Ltd* [2006] 2 Lloyd's Rep 129 (Court of Appeal) 1. For present purposes it cannot be improved on as a summary of the applicable principles.

**(2) Application of the principles**

8     Among other documents, I have been shown the Complaint and the Term Sheet.

9     The Term Sheet is a written agreement which contains the contractual term relied on by the Defendants. That term is clause 29. It reads as follows:

> This Term Sheet shall be governed by and construed in accordance with English law and the parties submit to the exclusive jurisdiction of the English Courts.

10     Consistently with the above principles, it is necessary to consider the background.

4

*The Complaint*

11   I refer first to the Complaint. I note that it is there alleged that Seaton and Stonewall each entered into Administration Agreements with Cavell pursuant to which Cavell was to provide run-off services, including claim administration, to Seaton and Stonewall. The Seaton agreement was executed in March 1999. The Stonewall agreement was executed in September 2000. The plaintiffs allege fraud on the part of Cavell and Randall in connection with the negotiation, amendment and operation of those Administration Agreements. I need not deal with the details of those allegations.

12   Paragraph 51 of the Complaint refers to the Term Sheet and avers that it provided for the orderly termination of the contractual and other commercial relationships between Seaton and Stonewall on the one hand and Cavell on the other effective 31 March 2006, and the orderly handover of run-off management.

*The Term Sheet*

13   The Term Sheet is an agreement between three groups of parties. The first group "Dukes Place" include Seaton and Stonewall. The second group "Randall" includes Cavell. I understand that it also includes Randall personally. The third group (the Individual Partners) is not relevant for present purposes.

14   The Term Sheet refers to the Administration Agreements at clause 12, where they are described as "run-off management agreements". Clause 12 provides for the termination of those agreements on 31 March 2006, which is consistent with what is alleged in the Complaint.

15   Clause 13 is important. So far as relevant it provides as follows:

>   Dukes Place hereby releases and forever discharges Randall of and from all actions, causes of action, suits, claims and demands whatsoever, whether at law or equity, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, fixed or contingent, accrued or

5

unaccrued, asserted or unasserted, which Dukes Place ever had, now has or hereafter can, shall or may have against Randall for, upon, or by reason of any matter, cause or thing whatsoever arising out of or in connection with any business, commercial, contractual, or other arrangements between or involving either of them as at the date of this Term Sheet, save (i) in respect of any obligations expressly set out in this Term Sheet, (ii) in respect of any actions, causes of action, suits, claims and demands arising from any breach by Randall of any provision of this Term Sheet, and (iii) in the case of fraud on the part of Randall ...

16   The effect of this clause, inter alia, is to release the defendants from any claim that the plaintiffs may have or have had against them arising out of the Administration Agreements that are referred to in the Complaint, subject to the saving effected by sub-clause (iii), namely "in the case of fraud". I have referred above to the fact that the Complaint makes allegations of fraud. For present purposes I am asked to assume that this is a case of fraud.

17   On that assumption, the question arises whether clause 29 of the Term Sheet, which is set out above, applies so that the English Courts have exclusive jurisdiction.

*The two types of claim*

18   It has been seen that Clause 29 simply states that "the parties submit to the exclusive jurisdiction of the English Courts". Those words do not contain any express identification of the claims or disputes in respect of which the submission to English jurisdiction is to apply. However, the first part of clause 29, dealing with applicable law, refers to the Term Sheet, and this assists in understanding which claims and disputes are subject to English jurisdiction.

19   In my opinion an English court would be likely to make a distinction for these purposes between two types of claim.

20   First there are claims arising from the Term Sheet itself, including the claims identified at clause 13(i) and (ii), namely claims "in respect of any obligations

6

expressly set out in this Term Sheet" and claims "in respect of any actions, causes of action, suits, claims and demands arising from any breach of this Term Sheet".

21   In my opinion an English court would construe clause 29 as being a submission to the exclusive jurisdiction of the English Courts in relation to claims arising from the Term Sheet, including those identified in clause 13(i) and (ii).

22   However the Term Sheet contemplates a second type of claim, not arising from the Term Sheet itself. As has been seen, clause 13 preserves and does not waive claims based on fraud. The claims so preserved (if based on fraud) are, in the language of clause 13, "all actions, causes of action, suits, claims … which Dukes Place ever had, now has or hereafter can, shall or may have against Randall … arising out of or in connection with any business, commercial, contractual, or other arrangements between or involving either of them as at the date of this Term Sheet". This is the second type of claim contemplated by the Term Sheet. They are not claims arising from the Term Sheet. They are claims (based on fraud) which relate to business dealings, contracts and/or arrangements pre-dating the Term Sheet. They include claims arising from the Administration Agreements, if based on fraud.

*The position before the Term Sheet*

23   Prior to the execution of the Term Sheet the second type of claim would be governed by applicable law as determined by conflicts of law principles applicable in the relevant forum, which may involve reference to contractual terms dealing with governing law contained in any relevant contract pre-dating the Term Sheet.

24   Likewise, prior to the execution of the Term Sheet, questions of jurisdiction would fall to be determined in accordance with applicable principles of the relevant forum, which might involve reference to contractual terms dealing with jurisdiction contained in any relevant contract pre-dating the Term Sheet.

25   I note that the Complaint alleges at paragraph 10 that one of the Administration Agreements provided that any action could be brought in the United States District Court for the Southern District of New York. The plaintiffs therefore found the jurisdiction of that Court, at least in part, on the provisions of that Administration Agreement, which is a contract pre-dating the Term Sheet.

*The effect of the Term Sheet*

26   The question therefore arises whether the execution of the Term Sheet has changed the position so that claims of the second type, including the claims made in the Complaint, are now subject to English law and/or jurisdiction by reason of clause 29.

27   If the defendants' application were well founded that would imply that clause 29 is inconsistent with contracts pre-dating the Term Sheet in so far as such contracts made different provision in relation to jurisdiction. For example, if paragraph 51 of the Complaint is correct, there is an inconsistency between the jurisdiction provisions of the Administration Agreements and clause 29. Presumably the defendants would contend that clause 29 has the implied effect of varying all relevant pre-Term Sheet contracts, including the Administration Agreements, so as to replace whatever were the original jurisdiction provisions.

*Conclusion*

28   In my opinion an English court would conclude that clause 29 of the Term Sheet applied only to the first type of claim (claims arising from the Term Sheet), and not to the second (claims not arising from the Term Sheet, including claims arising from pre-existing agreements and arrangements).

29   Clause 29 makes perfect sense as applied to the first type of claim only. Since clause 29 applies English law to the Term Sheet, it is appropriate and not surprising that claims arising from the Term Sheet should be subject to English jurisdiction. Construing clause 29 as applying to the first type of claim makes perfect sense both

as a matter of the ordinary meaning of the words used and as regards factual matrix and commercial purpose.

30  But it seems very unlikely that the parties intended that the second type of claim should also be subject to English jurisdiction. Such claims are unlikely to be governed by English law, which means that an English forum is much less appropriate. Moreover, as has been seen, there is an inconsistency between clause 29 and jurisdiction clauses in pre-existing contracts, such as that in one of the Administration Agreements, referred to above, and the Term Sheet would have to be read as impliedly varying such clauses. But the Term Sheet has obviously been prepared with care and skill and one would have expected it to provide expressly and in detail for the variation of jurisdiction clauses in pre-existing contracts if that was what the parties intended.

31  The Term Sheet makes much better sense if read as preserving (by clause 13) all claims arising from pre-existing contracts (if based on fraud), and leaving such claims to be pursued subject to the law and jurisdiction that would have applied prior to the execution of the Term Sheet. The language used and the apparent commercial purpose both point to that conclusion.

32  Accordingly in my opinion an English court would conclude that the present proceedings were not brought in breach of clause 29. It would conclude, rather, that the claims advanced in the present proceedings continued to be subject to the same law and jurisdiction as applied prior to the execution of the Term Sheet.

*Andrew Lydiard*

Andrew Lydiard QC
Brick Court Chambers
7-8 Essex Street
London WC2R 3LD
20 November 2007