1

The Weekly Law Reports 22 May 1998

896

[1998]

A

[HOUSE OF LORDS]

\*INVESTORS COMPENSATION SCHEME LTD. . . APPELLANTS

AND

WEST BROMWICH BUILDING SOCIETY . . . RESPONDENTS

AND

B

SAME . . . . . . . . . APPELLANTS

AND

HOPKIN & SONS (A FIRM) AND OTHERS . . . . RESPONDENTS

1997   April 21, 22, 23;        Lord Goff of Chieveley, Lord Lloyd of Berwick,
        June 19                  Lord Hoffmann, Lord Hope of Craighead
                                                    and Lord Clyde        C

*Financial Services—Compensation—Statutory scheme—Investors' rights
assigned to scheme—Whether right of rescission chose in action—
Whether misuse of language or syntax to be taken into account in
construing assignment—Whether assignment valid*

D

On the advice of independent financial advisers, investors entered into home income plans under which they took out mortgages on their homes with certain building societies to secure advances which were then invested in equity-linked bonds. They suffered heavy losses as a result of a fall in equities and rise in interest rates. The financial advisers having become insolvent, the investors lodged claims for compensation with the Investors Compensation Scheme Ltd., the body established pursuant to section 54 of the Financial Services Act 1986[1] to provide a compensation fund for persons with unsatisfied claims against persons authorised to carry on investment business. The scheme's claim form required the investor to assign to the scheme all rights arising out of the transaction against the financial advisers and anyone else, subject to a reservation of certain rights against the building society which provided the mortgage. Section 3(b) of the form excepted from the assignment the benefits of any claim (whether sounding in rescission for undue influence or otherwise) that the investor might have against the building society in which he claimed an abatement of sums he would otherwise have to pay the building society in respect of the mortgage loan or interest on that loan. The scheme declined to compensate investors for moneys which they had given away or spent on themselves, or professional fees or damages for illness, anxiety and stress and the decision not to do so was upheld by the House of Lords. The scheme then brought proceedings against various building societies and firms of solicitors for compensation for breach of statutory duty under the Act of 1986 and damages for breach of duty at common law, claiming to sue as assignee of the investors. The question arose whether section 3(b) meant there had not been a valid assignment of investors' rights against the building society. The judge decided as a preliminary issue that section 3(b) had only reserved to the investor the right to an adjustment of the mortgage debt in the event of rescission as part of a mutual restoration of benefits but that the purported assignment, being an assignment of part of the remedy attaching to a chose in action, was void. The Court of Appeal held that the words of section 3(b) could not bear the judge's construction.

E

F

G

H

[1] Financial Services Act 1986, s. 54: see post, pp. 907G–908B.

1 W.L.R.                    I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))

A    On appeal by the scheme to the House of Lords:—
        *Held,* allowing the appeal (Lord Lloyd of Berwick dissenting),
    that in construing contractual documents the aim was to find the
    meaning which the document would convey to a reasonable person
    having all the background knowledge reasonably available to the
    parties, including anything which would have affected the way a
    reasonable man would have understood it, but excluding previous
    negotiations and declarations of subjective intent; that the meaning
B    which a document would convey to a reasonable man was what
    the parties using its words against the relevant background would
    reasonably have been supposed to mean and included the
    possibility of ambiguity and even misuse of words or syntax; that
    the court was not obliged to ascribe to the parties an intention
    which plainly they could not have had, and in choosing between
    competing unnatural meanings was entitled to decide that the
C    parties must have made mistakes of meaning or syntax; that a
    claim to rescission could be made only by the owner of the
    mortgaged property and was not a separately assignable chose in
    action but was simply part of the process of rescission; and that
    in reserving to the investor any claim to abatement of the
    mortgage debt consequent on rescission section 3(b) was not
    cutting down the scope of the chose in action assigned to the
    scheme but was merely intended to make clear that the investor
D    would not be accountable to the scheme for any abatement of the
    debt as a result of an action for rescission of the mortgage; that
    the claim form was effective to assign to the scheme the whole of
    the investors' claim to compensation and damages, although they
    retained the right to claim rescission of their mortgages on such
    terms as the court might consider just; and that, accordingly, the
    scheme could maintain the actions against the building societies
    and the solicitors (post, pp. 898H, 912H–913E, 914E–F, 916D–917A,
E    918A–G).
        Decision of the Court of Appeal reversed.

The following cases are referred to in their Lordship's opinions:
*Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191;
    [1984] 3 W.L.R. 592; [1984] 3 All E.R. 229, H.L.(E.)
*Barclays Bank Plc. v. O'Brien* [1994] 1 A.C. 180; [1993] 3 W.L.R. 786; [1993]
F        4 All E.R. 417, H.L.(E.)
*Charter Reinsurance Co. Ltd. v. Fagan* [1997] A.C. 313; [1996] 2 W.L.R. 726;
    [1996] 3 All E.R. 46, H.L.(E.)
*Investors Compensation Scheme Ltd. v. Cheltenham and Gloucester Building
    Society* (unreported), 1 November 1995, Evans-Lombe J.
*Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] A.C.
    749; [1997] 2 W.L.R. 945; [1997] 3 All E.R. 352, H.L.(E.)
*Porter v. National Union of Journalists* [1980] I.R.L.R. 404, H.L.(E.)
G    *Prenn v. Simmonds* [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237, H.L.(E.)
*Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989; [1976]
    3 All E.R. 570, H.L.(E.)
*Reg. v. Investors Compensation Scheme Ltd., Ex parte Bowden* [1996] A.C. 261;
    [1995] 3 W.L.R. 289; [1995] 3 All E.R. 605, H.L.(E.)
*Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.* [1974] A.C. 235; [1973]
    2 W.L.R. 683; [1973] 2 All E.R. 39, H.L.(E.)
H    *Wilson v. United Counties Bank Ltd.* [1920] A.C. 102, H.L.(E.)

The following additional cases were cited in argument:
*Archer v. Brown* [1985] Q.B. 401; [1984] 3 W.L.R. 350; [1984] 2 All E.R. 267
*Barings Plc. v. Coopers & Lybrand,* The Times, 6 December 1996; Court of
    Appeal (Civil Division) Transcript No. 1557 of 1996, C.A.
*Bechervaise v. Lewis* (1872) L.R. 7 C.P. 372
*Bristol and West Building Society v. May May & Merrimans* [1998] 1 W.L.R.
    336; [1997] 3 All E.R. 206

The Weekly Law Reports 22 May 1998

898

I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))                    [1998]

*Cheese v. Thomas* [1994] 1 W.L.R. 129; [1994] 1 All E.R. 35, C.A.                    A
*Christensen v. Scott* [1996] 1 N.Z.L.R. 273
*Derry v. Peek* (1889) 14 App.Cas. 337, H.L.(E.)
*Durham Brothers v. Robertson* [1898] 1 Q.B. 765, C.A.
*Erlanger v. New Sombrero Phosphate Co.* (1878) 3 App.Cas. 1218, H.L.(E.)
*F. & B. Entertainments Ltd. v. Leisure Enterprises Ltd.* (1976) 240 E.G. 455
*Federal Commerce & Navigation Co. Ltd. v. Molena Alpha Inc.* [1978] Q.B. 927;
    [1978] 3 W.L.R. 309; [1978] 3 All E.R. 1066, Kerr J. and C.A.                    B
*Forster v. Baker* [1910] 2 K.B. 636, Bray J. and C.A.
*Hanak v. Green* [1958] 2 Q.B. 9; [1958] 2 W.L.R. 755; [1958] 2 All E.R. 141,
    C.A.
*Kleiss v. Captain Snooze Pty. Ltd.* (unreported), 18 January 1996, Federal
    Court of Australia
*Morris (B.O.) Ltd. v. Perrott and Bolton* [1945] 1 All E.R. 576, C.A.
*Newbigging v. Adam* (1886) 34 Ch.D. 582, C.A.
*O'Sullivan v. Management Agency and Music Ltd.* [1985] Q.B. 428; [1984]    C
    3 W.L.R. 448; [1985] 3 All E.R. 351, C.A.
*Redgrave v. Hurd* (1881) 20 Ch.D. 1, C.A.
*Steel Wing Co. Ltd., In re* [1921] 1 Ch. 349
*T.S.B. Bank Plc. v. Camfield* [1995] 1 W.L.R. 430; [1995] 1 All E.R. 951, C.A.
*Unsworth Trusts, In re* (1865) 2 Dr. & Sm. 337
*Whittington v. Seale-Hayne* (1900) 82 L.T. 49
*Wilson v. United Counties Bank Ltd.* [1920] A.C. 102, H.L.(E.)                    D

APPEAL from the Court of Appeal.

This was an appeal by the Investors Compensation Scheme Ltd. ("I.C.S.") with leave of the House of Lords (Lord Mustill, Lord Steyn and Lord Hope of Craighead) given on 27 February 1997 from the decision of the Court of Appeal (Leggatt, Swinton Thomas and Mummery L.JJ.) delivered on 1 November 1996 dismissing the appeal of I.C.S. from a    E decision of Evans-Lombe J. delivered on 3 October 1996 on a trial of preliminary issues in actions against the defendant, the West Bromwich Building Society ("W.B.B.S."), by Eric John Alford, Gladys Armitage and others ("the investors") and the I.C.S., and against Hopkin & Sons and other firms of solicitors, by the I.C.S., that the investors' claims had not been validly assigned to I.C.S. Philip Haring, one of the investors,    F intervened on their behalf.

The facts are stated in the opinion of Lord Hoffmann.

*Geoffrey Vos Q.C.*, Denis Brock, solicitor, and *Guy Morpuss* for the I.C.S.
*David Oliver Q.C.*, *Andrew Hochhauser Q.C.* and *Vernon Flynn* for the    G
W.B.B.S.
*Jonathan Sumption Q.C.* and *Mark Cannon* for Hopkin & Sons.
*Nicholas Strauss Q.C.* and *Neil Kitchener* for Mr. Haring.

Their Lordships took time for consideration.

19 June. LORD GOFF OF CHIEVELEY. My Lords, I have had the    H opportunity of reading in draft the speech of my noble and learned friend, Lord Hoffmann. I agree with the conclusion which he has reached as to the construction to be placed upon section 3(b) of the Investors Compensation Scheme claim form and, for the reasons given by him, I would answer the questions directed by Evans-Lombe J. to be tried as preliminary issues in the manner proposed by my noble and learned friend. I would therefore allow the appeal.

The Weekly Law Reports 22 May 1998

899

1 W.L.R.                I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))

A    LORD LLOYD OF BERWICK.    My Lords.

*Background*

This is the second occasion on which the House has had to consider the scheme for compensating investors set up under section 54 of the Financial Services Act 1986. On the first occasion I described the Rules made by the Securities and Investment Board under section 54(6) of the
B    Act as being needlessly confusing and obscure. On this occasion it is not the Rules that are primarily in issue, but a single clause in the claim form which investors are required to sign when making a claim for compensation; and the problem arises not from any obscurity of the language (the meaning is, I think, tolerably clear) but from slovenly drafting.

The general background to the home income plans, and the reasons
C    why so many investors have come to grief, have already been described in the judgments in the earlier appeal, and need not be repeated here. The particular background to the present appeals are proceedings brought by two groups of investors against West Bromwich Building Society ("W.B.B.S.") for damages for negligence at common law and under section 2(1) of the Misrepresentation Act 1967. They also claim rescission of their mortgages on the ground of misrepresentation and undue influence,
D    equitable compensation, damages in lieu of rescission under section 2(2) of the Act of 1967, and a variety of other remedies. Some of these remedies overlap.

The Investors Compensation Scheme Ltd. ("I.C.S.") have also commenced proceedings against W.B.B.S. in which they claim as assignees of the Investors' rights against W.B.B.S. They assert that all the investors'
E    claims against W.B.B.S. have been validly assigned to I.C.S., with the exception of the investors' claim for rescission. It follows that there are competing claims against W.B.B.S. for the same damages, by the investors on the one hand and I.C.S. on the other. The resolution of the issue which thus arises indirectly between I.C.S. and the investors depends on the true construction of the claim form, and in particular on the scope of the provisions relating to the assignment of the investors' rights against third
F    parties.

As between I.C.S. and W.B.B.S. there is a further issue. For W.B.B.S. allege in the alternative that if the question of construction is resolved in favour of I.C.S., and the investors have purported to assign their claims for damages against W.B.B.S., then the assignment is void or unenforceable on grounds of public policy.

G    In addition to their claim against W.B.B.S., I.C.S. have brought proceedings against numerous firms of solicitors, in which they claim damages for negligence in advising their clients in relation to the home income plans. These proceedings are also brought as assignees under the claim form. But there are two important differences. In the first place, there is no issue as to the meaning or scope of the assignment in the case of claims against the solicitors. Secondly (and no doubt for the same
H    reason) none of the investors have brought their own proceedings against the solicitors. So there is no underlying conflict between I.C.S. and the investors in relation to the I.C.S. claim against the solicitors. The solicitors' defence is the same as the alternative argument advanced by W.B.B.S., namely, that the assignment is void or unenforceable on grounds of public policy.

Before turning to the question of construction, it is convenient to set out the main provisions of the claim form. The form is addressed to the

The Weekly Law Reports 22 May 1998

900

Lord Lloyd of Berwick  I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))                [1998]

individual investor. In section 2 it sets out the amount of the compensation    A
to which the recipient is entitled under the scheme. Section 3(a) sets out
the claimants' declaration. It provides (in a typical case) as follows:

> "I/we hereby claim compensation for losses amounting to £20,345 as
> a result of the default of Fisher Prew-Smith ... I/we believe ... that
> I/we have a claim against the firm in respect of negligent acts and/or
> advice given by Fisher Prew-Smith on or after 28 August 1988 ...    B
> I/we confirm that I/we have received no compensation of any kind in
> respect of amounts owed to me/us at the date of default by Fisher
> Prew-Smith or any other person. I/we also confirm that I/we do not
> expect to receive any such compensation in the future ... I/we
> understand that subject to section 3(b) below: 1. I/we are not obliged
> to make a claim under this scheme. 2. Investors' Compensation
> Scheme Ltd. ... will take over my/our rights and claims against Fisher    C
> Prew-Smith and other third parties on the payment of any
> compensation as described in the transfer of rights at section 4 of this
> form."

The claimants' declaration is then signed by the investor.
    Section 3(b), on which the present appeal turns, sets out a counter-
declaration by I.C.S. It provides:    D

> "I.C.S. agrees that the following claims shall not be treated as a 'third
> party claim' (as defined in section 4 of this form) for the purposes of
> this agreement and that the benefits of such claims shall enure to you
> absolutely: Any claim (whether sounding in rescission for undue
> influence or otherwise) that you have or may have against the West
> Bromwich Building Society in which you claim an abatement of sums    E
> which you would otherwise have to repay to that society in respect of
> sums borrowed by you from that society in connection with the
> transaction and dealings giving rise to the claim (including interest on
> any such sums)."

    Section 4 is headed "Investor's agreement and acknowledgement (rights
against participant firm)." It provides as follows:    F

> "1. I/we agree that my/our rights against the participant firm in
> respect of the claim shall pass to Investors Compensation Scheme
> Ltd. ('I.C.S.') on payment of compensation pursuant to the Financial
> Services (Compensation of Investors) Rules 1990 ('the rules') ...
> 3. I/we acknowledge that under the rules on payment of the amount
> of £20,345·15 I/we will no longer have the right to make a claim    G
> against the participant firm in respect of the claim and that any such
> right will be vested in I.C.S. pursuant to the rules, and I/we further
> acknowledge that any sums which would otherwise be payable to me/
> us in respect of the claim by the participant firm, or by any trustee
> appointed under the Financial Services Act 1986, shall be paid instead
> to I.C.S. . . . . 5. I/we agree that in the event of my/our receiving any
> moneys or assets in respect of the claim from the participant firm or    H
> from any trustee appointed under the Financial Services Act 1986
> I/we will forthwith pay or transfer them to I.C.S. 6. I/we hereby
> assign absolutely to I.C.S. each and every third party claim and the
> benefit thereof . . . 12. In this document, 'third party claim' means
> any right, claim or cause of action which the claimant has or may
> have against any person other than the participant firm or against any
> fund or property in the hands of any person other than the participant

The Weekly Law Reports 22 May 1998

901

1 W.L.R.          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))    Lord Lloyd of Berwick

A    firm and arising out of the circumstances giving rise to the claim or otherwise relating to the claim whether such claims shall arise in debt, breach of contract, tort, breach of trust or in any other manner whatsoever (and including all sums to which I/we may become entitled under sections 6 and 61 of the Financial Services Act 1986)."

B    Section 4 is then signed by the investor. There follows an explanatory note. Paragraphs 1, 2 and 3 are all concerned with the assignment of claims against the participant firm, in this case Fisher Prew-Smith. Paragraph 4 is concerned with the assignment of third party claims. It provides:

"4. You also agree that I.C.S. should be able to use any rights which you now have against anyone else in relation to the claim. Examples might be directors of the firm or other persons also C    responsible for causing the loss for which you are being compensated. You give up all those rights and transfer them to I.C.S. (paragraph 6)."

So much for the general shape of the claim form. I now return to section 3(b). It provides for an exception in respect of third party claims assigned under paragraph 6 of section 4. Mr. Vos on behalf of I.C.S. D    submits that the exception is confined to claims against W.B.B.S. for rescission. Mr. Oliver on behalf of W.B.B.S. and Mr. Strauss on behalf of the investors submit that the exception covers all claims against W.B.B.S. whether for rescission or not, in which the investor claims a reduction in the amount due under the mortgage loan.

This is not the first time the court has had to consider the meaning of section 3(b). The same question arose in proceedings brought by I.C.S. E    against Cheltenham and Gloucester Plc., formerly known as Cheltenham and Gloucester Building Society. In that case Evans-Lombe J., who has had overall charge of the litigation, ordered, and subsequently tried, a preliminary issue as to the construction of section 3(b). He held that the more natural meaning of the words was that for which the investors contend; in other words that the exception covers all possible claims F    against Cheltenham and Gloucester, and is not limited to claims for rescission. However, he went on to reject what he regarded as the more natural meaning of the words on the ground that it produced a "ridiculous" result, contrary to the "demonstrable purpose of the parties in entering into the claim forms." He thus upheld I.C.S.'s construction even though it meant, in his view, doing violence to the language of the claim form.

G    When the present proceedings were before Evans-Lombe J., he repeated his view that the investors' construction was the more natural meaning of the words, but held once again that such meaning was displaced by a consideration of the surrounding circumstances, and in particular by the need for an "efficient system" to enable I.C.S. to recover its outlay. However, the learned judge went on to hold that the purported assignment in favour of I.C.S. was invalid, on the grounds that the assignment of H    some but not all the remedies available against W.B.B.S. in respect of a single cause of action is ineffective in law. Since the assignment was invalid, it followed that the investors were free to pursue their claims for damages against W.B.B.S.

I.C.S. appealed to the Court of Appeal. The Court of Appeal agreed with Evans-Lombe J. that the investors' construction accords with the natural meaning of the words. But unlike the judge they did not regard the result as commercially ridiculous. Leggatt L.J. who gave the leading

902

Lord Lloyd of Berwick   I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          [1998]

judgment said: "There is simply no warrant for limiting the rights retained      A
to claims for or consequent upon rescission." I find myself in complete
agreement with the Court of Appeal.

*The question of construction*

    A useful starting point for ascertaining the meaning of section 3(b) of
the claim form is to put oneself in the position of the ordinary investor to
whom the claim form is addressed. This was the approach adopted by the      B
House in *Porter v. National Union of Journalists* [1980] I.R.L.R. 404. They
question in that case concerned the proper construction of the rules of the
N.U.J. Lord Diplock said, at p. 407:

        "I turn then to the interpretation of the relevant rules, bearing in
    mind that their purpose is to inform the members of the N.U.J. of
    what rights they acquire and obligations they assume vis-à-vis the       C
    union and their fellow members, by becoming and remaining members
    of it. The readership to which the rules are addressed consists of
    ordinary working journalists, not judges or lawyers versed in the
    semantic technicalities of statutory draftsmanship."

    The purpose of the claim form was to inform the investor in relatively
non-technical language what his rights and liabilities were to be on receipt      D
of compensation under the scheme. No doubt the investor would start by
reading the explanatory note, as he is invited to do before signing
section 4. He would notice that the first three paragraphs of the
explanatory note are all dealing with his right to claim against the
defaulting firm, Fisher Prew-Smith. This would not surprise him. For it
was the firm of Fisher Prew-Smith which led him into his disastrous      E
investment. He would well understand that I.C.S. might wish to recover
some or all of its outlay from that firm: see paragraph 2 of the explanatory
note. He might then turn to section 4 itself. He would at once notice that
the heading of section 4 refers specifically to "rights against participant
firm." Next he would find that the first five paragraphs of section 4 are all
dealing with the claim against Fisher Prew-Smith. He would infer that the
claim against Fisher Prew-Smith was of primary importance to I.C.S.;      F
otherwise it would hardly have been given such prominence.

    Next he would read paragraph 4 of the explanatory note. He would
note that he was to give up his rights against "anyone else" in relation to
the claim (i.e. the claim against Fisher Prew-Smith). The examples given
are any rights he might have against a director of Fisher Prew-Smith "or
any persons also responsible" for causing his loss. He might or might not      G
at that stage envisage a claim against W.B.B.S.; probably not. Certainly the
reference to "other persons" in the context of the directors of Fisher Prew-
Smith does not serve to highlight a possible claim against W.B.B.S. If he
were in doubt, he would turn to paragraph 6 of section 4, note the
definition of third party claim in paragraph 12, and so come to
section 3(b).

    On a quick reading of section 3(b) our hypothetical reasonable investor      H
would notice that it excludes from the definition of third party claim any
claim which he might have against W.B.B.S. for an "abatement" of sums
due under his mortgage. The benefit of any such claim was to enure to
him absolutely. In other words it was *not* to pass to I.C.S. under any
circumstances. He would probably not pause over the words in brackets,
recognising that words in brackets do not ordinarily govern the meaning
of the rest of the sentence, especially if the parenthesis starts with the word

A  "whether" and ends with the words "or otherwise." He might well, in passing, understand the words in brackets as being the equivalent of "whether or not sounding in rescission for undue influence." He would then come to "abatement." This would strike him as an unusual word in the context. So he would turn to his lawyer (who is assumed to be at his elbow) and ask him whether abatement has some special meaning in law.

B  His lawyer would reply that abatement has a technical meaning in the law of nuisance, and in connection with contracts for the sale of goods and the provision of services. But otherwise it simply means reduction. It has no technical meaning in relation to rescission. Counsel were unable to point to a single case in which the word had been used in that connection. So the investor would understand that if he still owed money on his mortgage, as would almost always be the case, he would retain the right to sue W.B.B.S. in order to reduce his outstanding debt. Again, this would

C  not surprise him. For in most cases he would not have recovered full compensation from I.C.S., and in some cases nothing like full compensation. Certainly he would wish to have all defences available should W.B.B.S. start proceedings against him for recovery of the loan.

So the position would be that he, the investor, would retain his right to sue W.B.B.S. for a reduction of the mortgage debt, but I.C.S. would obtain

D  the right to sue Fisher Prew-Smith and "third parties" other than W.B.B.S., on the understanding that I.C.S. would reassign those rights on request, should they not be needed: see paragraph 5 of the explanatory note. This would strike the investor as fair and reasonable. At this stage our hypothetical investor would feel that he understood his rights and obligations well enough and would sign section 4.

E  Is there, then, any reason why the courts should not give section 3(b), and the claim form as a whole, the same meaning as the investor? (I shall refer to this as "the plain meaning." ) The objections fall into two groups. The first group of objections relate to the language of section 3(b); the second group of objections relate to the legal and commercial consequences of adopting the plain meaning. I suspect that none of these objections would occur to anyone other than a lawyer.

F
*The meaning of the language*

The objection to the plain meaning is the inclusion of the words "for undue influence" after "rescission;" for any lawyer would know that there are other grounds on which the investor might claim rescission, for example, on the ground of misrepresentation. Why, therefore, should the

G  draftsman have specifically included one of the grounds on which the investor might claim rescission, but not others?

We do not know the answer to this question. It may be that if one had access to the preliminary drafts of the claim form, or to the mind of the draftsman himself, the answer would emerge clearly enough. It may be that a claim for rescission on the ground of undue influence was, for some reason, uppermost in the draftsman's mind; so he put the words in. But

H  we cannot go into the draftsman's mind. We having nothing to go on but the words he has used. The inclusion of undue influence is odd, but not so odd as to obscure the meaning. "Or otherwise" must relate back to "whether sounding in rescission." Any other construction would leave "whether" hanging in the air. So "or otherwise" covers claims in contract and tort. It is not limited to other grounds for claiming rescission. The drafting is slovenly. But I do not have any great difficulty with the meaning.

The Weekly Law Reports 22 May 1998

904

Lord Lloyd of Berwick  I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))    [1998]

It is said that the plain meaning would make the words in brackets    A
otiose. So indeed it would. But words in brackets are often otiose,
especially brackets in the format "(whether ... or otherwise)." They show
that the general words which precede the parenthesis are not limited to
any particular kind of claim, but cover all claims so long as they are
claims for reduction of sums due.

What are the alternatives? Mr. Vos submits that section 3(b) means    B
"any claims sounding in rescission (whether for undue influence or
otherwise) in which you claim an abatement ..." I agree with Evans-
Lombe J. that such a construction does violence to the language. I know
of no principle of construction (whether by reference to what Lord
Wilberforce said in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381, 1384–1386 or
otherwise) which would enable the court to take words from within the
brackets, where they are clearly intended to underline the width of "any    C
claim," and place them outside the brackets where they have the exact
opposite effect. As Leggatt L.J. said in the Court of Appeal, such a
construction is simply not an available meaning of the words used; and it
is, after all, from the words used that one must ascertain what the parties
meant. Purposive interpretation of a contract is a useful tool where the
purpose can be identified with reasonable certainty. But creative
interpretation is another thing altogether. The one must not be allowed to    D
shade into the other.

So with great respect to those taking a different view, I do not regard
the present case as raising any question of ambiguity, or of choosing
between two possible interpretations. The construction advocated by the
investors, though it gives rise to the oddity which I have mentioned, is a
permissible construction of the words used. The I.C.S.'s construction is
not.    E

Nor does the I.C.S. construction avoid one of the main objections
which is raised against the investors' construction. If "whether sounding in
rescission for undue influence or otherwise" is otiose on the investors'
construction, so also is "whether for undue influence or otherwise" on the
I.C.S.'s construction. Indeed the objection is all the greater, since a claim
for rescission would necessarily result in an abatement, if by abatement is    F
meant the financial adjustment which takes place in any event on rescission
of a contract, and which would in this case be limited (if Mr. Vos's
argument is correct) to repayment of W.B.B.S.'s charges and an adjustment
in the rate of interest on the loan. On that view, section 3(b) would be an
elaborate way of saying very little indeed.

*The legal and commercial consequences*    G

If Evans-Lombe J. is right that the investors' construction is the more
natural meaning of section 3(b) and if, a fortiori, the Court of Appeal is
right that the I.C.S.'s construction is not even a possible meaning of the
language used, then it would take a very strong case indeed before
I would reject the former meaning in favour of the latter. As Lord Mustill
said in *Charter Reinsurance Co. Ltd. v. Fagan* [1997] A.C. 313, 387:    H

"If ... the words 'actually paid' can only as a matter of language and
context mean what the syndicates maintain, I would hesitate long
before giving them any other meaning, just because the result would
be extraordinary."

What then are the consequences of the investors' construction which
are said to be so extraordinary, or so "very unreasonable" (the expression

905

1 W.L.R.          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))    Lord Lloyd of Berwick

A   used by Lord Reid in *Wickman Machine Tool Sales Ltd. v. L. Schuler A.G.* [1974] A.C. 235, 251), and which Evans-Lombe J. described as producing a ridiculous result? I start with the commercial consequences. It is said that I.C.S. would have wanted to take over the investors' claim against W.B.B.S., as well as their claim against Fisher Prew-Smith, since W.B.B.S. would be worth suing, whereas Fisher Prew-Smith, being insolvent, would not. Secondly it is said that the investors would have little incentive to sue

B   W.B.B.S., once they had received compensation from I.C.S. A third objection was that the investors would not be entitled to claim on their own behalf, once they had accepted compensation. This third objection is now accepted as being wrong in law, and is no longer relied on.

  By way of answer to the second objection, Mr. Strauss pointed out that since, in the generality of cases, investors had received only between half and three-quarters of their losses by way of compensation, they would

C   have every incentive to look elsewhere for a remedy. Over 500 investors have in fact done so, by bringing claims against Cheltenham and Gloucester, W.B.B.S. and other building societies. So it does not look as if the investors have been shy or backward in pursuing their rights.

  As to the first objection, the structure and language of the claim form, and the express provisions of section 54(2)(*e*) of the Act, do not suggest

D   that claims against participant firms were expected to be valueless. (It is common ground that "person" in section 54(2)(*e*) means, and means only, the participant firm.) It is true that Fisher Prew-Smith are in liquidation. But other participant firms are not. Moreover the building societies are not the only third parties likely to be worth suing. It must not be forgotten that I.C.S. has brought proceedings against 197 firms of solvent solicitors.

E   In any event it is not for the court to speculate on what the parties would have wanted. I accept, of course, as Mr. Vos observed, that I.C.S. is not a charity. But it is far from being an ordinary commercial organisation. Its raison d'être is the compensation of investors.

  Even so, if I.C.S. had undertaken to compensate the investors in full then one might perhaps have expected I.C.S. to insist on a transfer of all third party rights. But that is not what has happened. It is common

F   ground that investors have retained rights of some kind against W.B.B.S. That being so it would seem to me as likely as not, commercially, that the agreement would provide for the investors to retain the whole of their rights against W.B.B.S., including the right to claim damages in reduction of their loans. Such a consequence cannot be regarded as "ridiculous" or "extraordinary" or "very unreasonable."

G   Various other so-called anomalies are mentioned in Mr. Vos's written submissions by way of reply. For example, a conscientious investor who had used his compensation to pay off his mortgage would lose his rights against W.B.B.S., since there would then be no sum to be abated, whereas a less conscientious investor who had spent his compensation on a holiday would retain his rights in full. I agree with Mr. Vos that there are theoretical anomalies on the investors' construction, though how likely

H   they would be to arise in practice is another question. Where I disagree with him is in his evaluation of these anomalies. In my judgment they fall far short of the sort of absurdity which would justify the rejection of what I have called the plain meaning of section 3(b). They do not prompt the comment "whatever else the parties may have had in mind, they cannot have meant *that*."

  As for the legal consequences, the difficulties are all on the other side. Both Evans-Lombe J. and the Court of Appeal were of the view that the

906

Lord Lloyd of Berwick   I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))    [1998]

splitting of mutually inconsistent remedies in respect of a single cause of    A
action against W.B.B.S. meant that the purported assignment was void for
uncertainty, as well as being contrary to public policy. My noble and
learned friend, Lord Hoffmann has found a way round that difficulty. But
the difficulty does not arise at all on the investors' construction. If the
whole of the investors' rights against W.B.B.S. are retained, the question of
splitting remedies, and "dividing the indivisible" simply does not arise.

For the above reasons I would hold that on the true construction of    B
the claim form the investors' claims against W.B.B.S. have been retained
by the investors, and have not been assigned to I.C.S. It follows that the
question whether if there had been an assignment, it would have been
valid or invalid does not call for an answer. In the result, therefore,
I would uphold the reasoning of the Court of Appeal and dismiss the
main appeal.    C

*The claim against the solicitors*

I can deal with the remaining point quite briefly, since I agree with
your Lordships that the investors' claims against their solicitors have been
validly assigned to I.C.S., and that this part of the appeal should therefore
be allowed. There can be no doubt that paragraph 6 of section 4 purports    D
to transfer to I.C.S. the investors' rights against the solicitors. There is no
issue as to the meaning of paragraph 6 in that connection. The only
question is whether the assignment is effective in law. Evans-Lombe J.
dealt with the point briefly at the end of his judgment. Having held that it
was not possible in law to assign some but not all remedies in respect of a
single cause of action, he went on to conclude that the same reasoning
must also apply, logically, to the claim against the solicitors, since the    E
solicitors might wish to bring in W.B.B.S. as third parties.

Mr. Sumption supports the judge's conclusion. He submitted that the
purported assignment is void, because it is legally impossible for the
investors to assign their right to claim against the solicitors while retaining
the right to claim against W.B.B.S. in respect of the same loss. Mr.
Sumption was not able to point to any authority in support of this
submission. He relies instead on the traditional antipathy of the courts to    F
the assignment of bare rights to litigate. Alternatively he submits that if
there can be an assignment at all in such circumstances, it will only be
effective in law if the parties have agreed as to their respective priority. In
the absence of agreement, the court has no means for deciding between
competing claimants in regard to the same loss.

Since the claims against W.B.B.S. and the solicitors give rise to separate    G
causes of action, the problem of splitting remedies in respect of the *same*
cause of action, which Evans-Lombe J. and the Court of Appeal regarded
as insoluble, does not arise in so acute a form. I believe it could be solved
satisfactorily by sensible case management. But I need not develop the
matter further. For Mr. Sumption concedes that if the main appeal is
allowed, as your Lordships propose, then the appeal in the solicitor's
action must also be allowed.    H

LORD HOFFMANN.   My Lords, The Investors Compensation Scheme
was set up pursuant to section 54 of the Financial Services Act 1986 to
provide a compensation fund for people who have unsatisfied claims
against persons authorised under the Act to carry on investment business.
The rules under which the scheme is administered provide that, on paying
compensation, the company managing the scheme is to take over the

907

1 W.L.R.                     I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))            Lord Hoffmann

A  applicant's rights against the authorised person and also, if the management company so determines, any rights he may have against other persons relating to the subject matter of his claim.

In 1992 the management company, called Investors Compensation Scheme Ltd. ("I.C.S."), began to receive a large number of claims from home owners, mainly elderly retired people, who had been advised by authorised persons, independent financial advisers belonging to the Financial Intermediaries, Managers and Brokers Regulatory Association, to enter into schemes called "home income plans." These schemes had been marketed by the financial advisers in conjunction with certain building societies during the late 1980s and involved the owners mortgaging their homes to secure advances at enhanced rates of interest which they mainly invested in equity-linked bonds. The subsequent fall in equities and house prices and the rise in interest rates had caused the owners severe losses. They had claims against the financial advisers for negligence. and breach of their statutory duties under the Act of 1986 as well as possible claims against the building societies and the solicitors who had acted in connection with the mortgages.

I.C.S. drafted a claim form for the home owner claimants (whom I shall call "the investors") to sign. We shall have to examine it later in some detail. For the moment it is enough to say that it contained an assignment to I.C.S. of all the investor's rights arising out of the transaction against the financial advisers and anyone else, subject to a reservation of certain rights against the building society. This reservation, in section 3(b) of the form, has given rise to this litigation. Evans-Lombe J., who had to determine its meaning as a preliminary issue, thought that it was trying to reserve to the investor a part of his rights against the building society but that an assignment to I.C.S. of his remaining rights was legally impossible and invalid. An assignment of the investor's rights in respect of the same losses against the solicitors was also legally impossible and the whole assignment was therefore a failure. The Court of Appeal disagreed with the judge about the meaning of section 3(b). They thought it was intended to reserve to the investor the whole of his rights against the building society. But they agreed that if it had been intended to assign part, it would have been ineffective. They also agreed that the assignment of rights against the solicitors was invalid. The unanimous view of the judge and the Court of Appeal was therefore that I.C.S. had no title to claim against either the building societies or the solicitors. Against this decision I.C.S. appeals to your Lordships' House.

My Lords, I must start by setting out the material provisions of section 54 of the Act of 1986, the Rules under which the Scheme is operated and the claim form which the investors signed. First, the Act:

"54(1) The Secretary of State may by rules establish a scheme for compensating investors in cases where persons who are or have been authorised persons are unable, or likely to be unable, to satisfy claims in respect of any description of civil liability incurred by them in connection with their investment business. (2) Without prejudice to the generality of subsection · (1) above, rules under this section may—(a) provide for the administration of the scheme and, subject to the Rules, the determination and regulation of any matter relating to its operation by a body appearing to the Secretary of State to be representative of, or of any class of, authorised persons; (b) establish a fund out of which compensation is to be paid; (c) provide for the

The Weekly Law Reports 22 May 1998

908

Lord Hoffmann          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          [1998]

levying of contributions from, or from any class of, authorised persons    A
and otherwise for financing the scheme and for the payment of
contributions and other money into the fund; (*d*) specify the terms
and conditions on which, and to the extent to which, compensation is
to be payable and in any circumstances in which the right to
compensation is to be excluded or modified; (*e*) provide for treating
compensation payable under the scheme in respect of a claim against
any person as extinguishing or reducing the liability of that person in    B
respect of the claim and for conferring on the body administering the
scheme a right of recovery against that person, being, in the event of
his insolvency, a right not exceeding such right, if any, as the claimant
would have had in that event; and (*f*) contain incidental and
supplementary provisions."

Next, the rules. They are called the Financial Services (Compensation    C
of Investors) Rules 1990 and were made by the Securities and Investment
Board, exercising the powers under section 54 delegated by the Secretary
of State. In these Rules, I.C.S. is called "the management company" and
the financial advisers and other authorised persons are called "the
participant firms." For present purposes it is necessary to refer only to the
following rules:
    "2.02 Payment of compensation    D
    "1. The management company is responsible for paying compensa-
tion to investors in accordance with these rules.
    "2. The management company may pay compensation where it is
satisfied, on the basis of evidence provided by an investor or which is
available to it from other sources, that: (a) an eligible investor has
duly applied for compensation; (b) the investor has a claim against a    E
participant firm in default ... (c) the participant firm is unable or
unlikely to be able to meet the claim within a reasonable period; and
(d) the investor has agreed, to the satisfaction of the management
company, that the whole or any part of his rights in the claim and, if
the management company so determines, any rights of his in a claim
against any other person which relate to the subject matter of the
claim, should pass to it."    F
    "2.10 Recoveries
    "1. Where, in connection with the payment of compensation, an
investor agrees that the whole or any part of his rights in a claim
against any person are to pass to the management company, the
payment of compensation extinguishes the liability of that person to
the investor in respect of that claim or part and confers on the
management company a right of recovery against that person which    G
is otherwise identical to the investor's former rights in the claim or
part thereof."

Finally we must look at the claim form. Various editions were produced
in 1992 but for present purposes nothing turns on the differences. This
case concerns a form used for claims in respect of a financial adviser called
Fisher Prew-Smith Financial Services Ltd. ("F.P.S.") which had marketed    H
its home income plan in conjunction with the West Bromwich Building
Society ("W.B.B.S."). I shall refer to the one which was in use in July 1993.
    Sections 1 and 2 dealt with the personal details of the claimants and
the amount of compensation payable. Section 3(a) was called "claimant's
declaration" and contained the following statements:
    "I/we confirm that we have received no compensation of any kind in
respect of the amounts owed to us at the date of default by [F.P.S.] or

A    any other person. I/we also confirm that I/we do not expect to receive any such compensation in the future. Any such compensation received by me/us, I/we will pay to [I.C.S.] in accordance with section 4 attached hereto. I/we understand that, subject to section 3(b) below ... 2. [I.C.S.] in its capacity as administrator of the scheme will take over my rights and claims against [F.P.S.] and other third parties on the payment of any compensation as described in the transfer of
B    rights at section 4 of this form. Any amount received will be paid direct to [I.C.S.] and any amounts (less costs and interest) which exceed the compensation payment will be paid to me/us."

Section 3(b), which has given rise to all the difficulty, read, as follows:

"I.C.S. agrees that the following claims shall not be treated as a 'third party claim' (as defined in section 4 of this form) for the purposes of
C    this agreement and that the benefits of such claim shall enure to you absolutely: Any claim (whether sounding in rescission for undue influence or otherwise) that you have or may have against the [W.B.B.S.] in which you claim an abatement of sums which you would otherwise have to pay to that society in respect of sums borrowed by you from that society in connection with the transaction and dealings
D    giving rise to the claim (including interest on any such sums)."

Finally, section 4 contained a statement that:

"I/we, the claimant, agree and acknowledge as follows: 1. I/we agree that my/our rights against [F.P.S.] in respect of the claim shall pass to [I.C.S.] on payment of compensation ... 2. I/we agree that we will
E    accept the sum of ... from I.C.S. in satisfaction of my/our entitlement to compensation under the rules in respect of the claim. 3. I/we acknowledge that under the rules on payment of the amount of ... I/we will no longer have the right to make a claim against [F.P.S.] in respect of the claim and that any such right will be vested in I.C.S. pursuant to the rules, and I/we further acknowledge that any sums which would otherwise be payable to me/us in respect of the claim by
F    [F.P.S.] ... shall be paid instead to I.C.S. 4. So far as any rights in respect of the claim would otherwise remain vested in me/us, I/we agree that I/we assign those rights to I.C.S. to the extent of the amount of the said compensation and scheme interest paid. 5. I/we agree that in the event of my/our receiving any moneys or assets in respect of the claim from [F.P.S.] ... I/we will forthwith pay or transfer
G    them to I.C.S. 6. I/we hereby assign absolutely to I.C.S. each and every third party claim and the benefit thereof. 7. I.C.S. agrees and acknowledges that in the event that it recovers any moneys in respect of a third party claim, it will pay to you a sum equivalent to the aggregate of:—(a) the moneys which I.C.S. has recovered in respect of the third party claim; and (b) any moneys which I.C.S. has recovered in respect of the claim; and (c) any moneys which I.C.S. has recovered
H    pursuant to clause 5 or 6 above; *less* (i) the amount of compensation which I.C.S. had paid to you; (ii) such amount in respect of interest as I.C.S. considers just; and (iii) the costs which I.C.S. has incurred in effecting, or in attempting to effect, any such recovery. 8. I/we agree that I/we will provide all reasonable co-operation and assistance that I.C.S. asks me/us to give in connection with any pursuit by I.C.S. of claims corresponding to the claim and of any third party claim, including the provision of documents, the provision

The Weekly Law Reports 22 May 1998

910

Lord Hoffmann        I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))                    [1998]

of statements, the swearing of affidavits and the attendance at court    A
to give oral evidence. 9. I.C.S. may give a good receipt to any person
in respect of any third party claim the benefit of which is assigned by
this document. 10. I.C.S. will conduct all proceedings and settlement
negotiations regarding claims assigned by you reasonably and with
due regard to your interests as well as its own. 11. I.C.S. will reassign
to you at your request any claim which it and, if relevant its insurers
decide at any time not to pursue or to pursue further.    B
12. In this document, 'third party claim' means any right, claim or
cause of action which the claimant has or may have against any
person other than [F.P.S.] or against any fund or property in the
hands of any person other than [F.P.S.] and arising out of the
circumstances giving rise to the claim or otherwise relating to
the claim, whether such claims shall arise in debt, breach of contract,
tort, breach of trust or in any other manner whatsoever ..."    C

    Although the form was obviously trying not to use too much legalese,
it could not have been easy for the ordinary retired home owner to
understand. It referred to technical concepts like "sounding in rescission"
and "in debt, breach of contract, tort, breach of trust or in any other
manner whatsoever." I.C.S. therefore also provided an explanatory note    D
which was a model of clarity:

        "1. Under this document, once you have received your compensa-
    tion from I.C.S., you will not be able to sue the 'participant firm'
    mentioned above in relation to the claim which led to that
    compensation. This is because your claim is being met by I.C.S.
    instead (paragraphs 2 and 3). 2. But I.C.S. in turn may wish to
    recover some or all of its outlay to you by suing the firm, and you    E
    promise to help I.C.S. if I.C.S. decides to do so (paragraph 8).
    3. Further, since you are being compensated in relation to this claim,
    you should not expect any more money for it from the firm (or
    liquidator) (second half of paragraph 3); and any money sent to you
    because of it (e.g. by the liquidator) is really due to I.C.S. instead
    of to you, so you must pay the money to I.C.S. (paragraph 5). 4. You    F
    also agree that I.C.S. should be able to use any rights which you now
    have against anyone else in relation to the claim. Examples might be
    directors of the firm or other persons also responsible for causing the
    loss for which you are being compensated. You give up all those rights
    and transfer them to I.C.S. (paragraph 6)."

    Before I turn to the question of construction, I must provide some of    G
the background to how this litigation has come about. A number of the
home owners instructed a firm of solicitors called Barnett Sampson to
negotiate their claims. The rules provided that claims were to be met "only
where the management company considers that it is essential in order to
provide fair compensation to the investor." I.C.S. decided that it would
not pay compensation in respect of various heads of claim: in particular,
that it would not reimburse money which the homeowners had given away    H
or spent on themselves, or fees paid to lawyers and other professionals, or
damages for illness, anxiety and stress. Barnett Sampson's clients challenged
this decision in proceedings for judicial review but this House decided in
*Reg. v. Investors Compensation Scheme Ltd., Ex parte Bowden* [1996] A.C.
261 that I.C.S. had acted within its powers.

    I.C.S. then commenced proceedings against various building societies
for compensation for breach of statutory duty under the Act of 1986 and

911

1 W.L.R.          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          Lord Hoffmann

A  damages for breach of duty at common law, claiming to sue as assignee of the investors. In proceedings against Cheltenham and Gloucester Plc. (previously the Cheltenham & Gloucester Building Society) the society took the point that section 3(b) of the claim form reserved to the investor all claims against the society and that I.C.S. therefore had no title to sue. Evans-Lombe J. ordered this question to be tried as a preliminary issue and on 1 November 1995 gave a judgment in which he held that the only

B  right reserved by section 3(b) was the right of the mortgagor, on rescission of the mortgage, to an adjustment of the mortgage debt as part of the mutual restoration of benefits consequent upon rescission. The assignment of the investor's right to damages for misrepresentation or breach of duty was unaffected. A year later the same point came before Evans-Lombe J. in proceedings by I.C.S. against W.B.B.S. By this time, I.C.S. had also

C  commenced proceedings against a large number of firms of solicitors who had acted for investors in connection with the home income plans. A number of investors represented by Barnett Sampson ("the Alford plaintiffs") and another firm of solicitors ("the Armitage plaintiffs") had also commenced separate proceedings against W.B.B.S. for rescission of their mortgages and damages. Evans-Lombe J. therefore directed preliminary issues on the question of who, as between I.C.S. and the

D  investors, had the title to sue W.B.B.S. for damages. These are the proceedings which are the subject of this appeal to your Lordships' House.

   My Lords, I start with the construction of section 3(b). Evans-Lombe J. followed his own decision in the earlier *Cheltenham and Gloucester* case and I shall first summarise his reasoning and then that of Leggatt L.J. in the Court of Appeal. Evans-Lombe J. focused on the words

E  "any claim (whether sounding in rescission for undue influence or otherwise) that you have … against the … society in which you claim an abatement of sums which you would otherwise have to repay to that society …" According to ordinary rules of syntax, "any claim" is the antecedent of "that you have" and the words "or otherwise" in the adjectival parenthesis mean that it does not limit the breadth of "any claim." It follows that claims of any description are reserved as long as they amount to claims for an "abatement" of what is owing to the Society.

F  There are various ways in which the amount owing might be abated but one would be on account of a set-off against the society's liability for damages. Thus the syntax of the words following "any claim" points to a wide meaning of "abatement" which includes the effect of cross-claims.

   Evans-Lombe J. then turned to the background against which the language in the claim form had been used. Two features seemed to him

G  odd. First, the building society and the solicitors were the only solvent parties against which the investors were likely to have any claim. As between the building society and the solicitors, the former would certainly be the prime target. It had profited from the home income plans by lending money at enhanced rates of interest on safe security (maximum of 50 per cent. of value) at a time when lenders were falling over themselves

H  to lend as much money as possible. One might expect that I.C.S., having paid compensation to the investor, would take over his claim against the building society. If not, the investor might well be overcompensated. Other provisions of the form, like clause 7, seemed to assume that I.C.S. would do the suing and account to the investor for the net recovery in excess of the compensation paid. But there was no provision for the investor having to pay anything back to I.C.S. This pointed to I.C.S. being entitled to any recoverable damages.

The Weekly Law Reports 22 May 1998

912

Lord Hoffmann          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))                    [1998]

Secondly, the parenthesis seemed very strange against the background
of the law. If it was exhaustive, why was "sounding in rescission for undue
influence" singled out? What about rescission on other grounds, or claims
for breach of statutory or common law duty? It was rather like providing
in a lease of a flat that the tenant should not keep "any pets (whether
neutered Persian cats or otherwise)." Something seemed to have gone
wrong.

Considerations of this kind led the judge to conclude in the *Cheltenham
and Gloucester* case that the wider construction of "any claim" and
"abatement" led to a "ridiculous commercial result which the parties to
the claim forms were quite unlikely to have intended" and that it was clear
that "the drafting of the second paragraph of section 3(b) was mistaken."
He therefore concluded that the meaning intended by the parties was that
the investor should retain any claim for an abatement of his debt which
arose out of a claim for rescission, whether for undue influence or
otherwise. This could be fitted easily into the scheme of the law because
the old equitable remedy of rescission included, as part of the restitutio in
integrum, an accounting for benefits and indemnity against liabilities which
could result in an abatement of the mortgage debt. Such a remedy was
quite separate from a common law action for misrepresentation or breach
of statutory duty. But the judge seems to have had some misgivings about
his interpretation: he said that was doing violence to the natural meaning
of the words and altering the drafting of the paragraph in a way "more
appropriate to rectification than the process of construction." In the
present case, however, the judge adhered to his construction and gave some
additional reasons.

In the Court of Appeal, Leggatt L.J. said, on the authority of *Through
the Looking-Glass*, that the judge's interpretation was "not an
available meaning of the words." "Any claim (whether sounding in
rescission for undue influence or otherwise)" could not mean "Any claim
sounding in rescission (whether for undue influence or otherwise)" and
that was that. He was unimpressed by the alleged commercial nonsense of
the alternative construction.

My Lords, I will say at once that I prefer the approach of the judge.
But I think I should preface my explanation of my reasons with some
general remarks about the principles by which contractual documents are
nowadays construed. I do not think that the fundamental change which
has overtaken this branch of the law, particularly as a result of the
speeches of Lord Wilberforce in *Prenn v. Simmonds* [1971] 1 W.L.R. 1381,
1384–1386 and *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen* [1976]
1 W.L.R. 989, is always sufficiently appreciated. The result has been,
subject to one important exception, to assimilate the way in which such
documents are interpreted by judges to the common sense principles by
which any serious utterance would be interpreted in ordinary life. Almost
all the old intellectual baggage of "legal" interpretation has been discarded.
The principles may be summarised as follows.

(1) Interpretation is the ascertainment of the meaning which the
document would convey to a reasonable person having all the background
knowledge which would reasonably have been available to the parties in
the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as
the "matrix of fact," but this phrase is, if anything, an understated
description of what the background may include. Subject to the requirement
that it should have been reasonably available to the parties and to the

A  exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal

B  interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear. But this is not the occasion on which to explore them.

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars;

C  the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax: see *Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] A.C. 749.

D  (5) The "rule" that words should be given their "natural and ordinary meaning" reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point

E  more vigorously when he said in *Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191, 201:

"if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense."

F  If one applies these principles, it seems to me that, the judge must be right and, as we are dealing with one badly drafted clause which is happily no longer in use, there is little advantage in my repeating his reasons at greater length. The only remark of his which I would respectfully question is when he said that he was "doing violence" to the natural meaning of the words. This is an over-energetic way to describe the process of interpretation. Many people, including politicians, celebrities and

G  Mrs. Malaprop, mangle meanings and syntax but nevertheless communicate tolerably clearly what they are using the words to mean. If anyone is doing violence to natural meanings, it is they rather than their listeners.

I shall, however, make four points supplemental to those of the judge. First, the claim form was obviously intended to be read by lawyers and the explanatory note by laymen. It is the terms of the claim form which

H  govern the legal relationship between the parties. But in construing the form, I think that one should start with the assumption that a layman who read the explanatory note and did not venture into the claim form itself was being given an accurate account of the effect of the transaction. It is therefore significant that paragraph 4 of the note says categorically and without qualification that the investor gives up all his rights against anyone else and transfers them to I.C.S. If the effect of the claim form was that the investor retained his claim against the building society,

The Weekly Law Reports 29 May 1998

914

Lord Hoffmann          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))                    [1998]

A

paragraph 4 of the note was very misleading. Secondly, this leads to the conclusion that section 3(b) was intended only to deal with the possibility that a lawyer might argue that some right was a "claim" when it would not be regarded as a claim by a layman. This is a fair description of the possibility of a reduction of the mortgage debt as part of the equitable taking of accounts upon rescission, which would not result in the investor receiving any money but merely having to pay less to W.B.B.S. Thirdly, any lawyer would think it extremely odd for I.C.S. to take an assignment of the investor's claim for damages against the solicitors and leave the investor with a claim for the same damages against W.B.B.S. He would be likely to wonder whether this was conceptually possible and, as I shall explain, I think that his doubts would be well founded. The investor and I.C.S. could not between them recover more than the loss which the investor had actually suffered. As a matter of common sense, one would therefore expect that I.C.S. either had a right to the damages or it did not. It would seem eccentric to leave this question to be decided (if such a thing were possible) by a race to judgment. Fourthly, no lawyer in his right mind who intended simply to say that all claims against the W.B.B.S. were reserved to the investor would have used the parenthesis. Nor, unless he intended to limit the reservation to the amount, if any, which happened to be outstanding on the mortgage, would he have described them as claims "in which you claim an abatement of the sums which you would otherwise have to repay." And it is difficult to think of any reason for such an arbitrary limitation.

B

C

D

Finally, on this part of the case, I must make some comments upon the judgment of the Court of Appeal. Leggatt L.J. said that his construction was "the natural and ordinary meaning of the words used." I do not think that the concept of natural and ordinary meaning is very helpful when, on any view, the words have not been used in a natural and ordinary way. In a case like this, the court is inevitably engaged in chosing between competing unnatural meanings. Secondly, Leggatt L.J. said that the judge's construction was not an "available meaning" of the words. If this means that judges cannot, short of rectification, decide that the parties must have made mistakes of meaning or syntax, I respectfully think he was wrong. The proposition is not, I would suggest, borne out by his citation from *Through the Looking-Glass.* Alice and Humpty-Dumpty were agreed that the word "glory" did not mean "a nice knock-down argument." Anyone with a dictionary could see that. Humpty-Dumpty's point was that "a nice knock-down argument" was what *he* meant by using the word "glory." He very fairly acknowledged that Alice, as a reasonable young woman, could not have realised this until he told her, but once he had told her, or if, without being expressly told, she could have inferred it from the background, she would have had no difficulty in understanding what he meant.

E

F

G

The next question is whether, given the reservation of rights in section 3(b), the assignment of claims to compensation and damages against W.B.B.S. was valid. As we have seen, the judge and the Court of Appeal thought that they were not. Evans-Lombe J. said that the "fundamental problem" was that one could assign a chose in action but not a particular remedy by which that chose in action was enforced. He said:

H

"However what was here sought to be assigned was not the chose in action but part of the remedies which the original holder of the chose

I W.L.R.          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          Lord Hoffmann

A     in action, the investor, held prior to the purported assignment. It follows ... that what was purportedly assigned was not a chose in action and accordingly any attempted assignment is void."

In the Court of Appeal Leggatt L.J. accepted the submission of Mr. Oliver that:

B     "the assignment for which the I.C.S. contends attempts to divide the indivisible. Whatever else can be assigned, one remedy cannot be assigned whilst retaining a potentially alternative remedy. Since the purpose of section 3(b) is to procure a reduction in sums payable in respect of a mortgage, it is capable of constituting an alternative to rescission."

C     (I should say that, as a matter of construction of the judgment, I think that by using the word "rescission" Leggatt L.J. meant "damages.")

My Lords, I agree that a chose in action is property, something capable of being turned into money. *Snell's Equity*, 29th ed. (1990), p. 71 defines choses in action as "all personal rights of property which can only be claimed or enforced by action, and not by taking physical possession." At common law, for reasons into which it is unnecessary to discuss, choses in

D     action could not be assigned. In equity, they could. Assignment of a "debt or other legal thing in action" was made possible at law by section 136 of the Law of Property Act 1925. In each case, however, what is assignable is the debt or other personal right of property. It is recoverable by action, but what is assigned is the *chose*, the thing, the debt or damages to which the assignor is entitled. The existence of a remedy or remedies is an essential condition for the existence of the chose in action but that does

E     not mean that the remedies are property in themselves, capable of assignment separately from the *chose*. So, for example, there may be joint and several liability; a remedy for the recovery of a debt or damages may be available against more than one person. But this does not mean that there is more than one chose in action. The assignee either acquires the right to the money (or part of the money) or he does not. If he does, he

F     necessarily acquires whatever remedies are available to recover the money or the part which has been assigned to him. So far, therefore, I am in complete agreement with the judge and the Court of Appeal.

It is in applying these principles to the agreement constituted by the claim form that I respectfully differ. Let us consider what rights the investor might have had when he signed the form. He may have had a claim for damages in respect of the loss which he had suffered on account

G     of entering into the transaction. This may have included money which he had lost on the ill-advised investment in an equity-linked bond, fees which he paid to advisers to extricate himself from his predicament, high rates of interest paid to the building society, possibly even money spent under the impression that he could afford to do so. The persons liable for this loss might have been the financial adviser, the building society and his solicitor.

H     The building society, for example, might have been liable for participating in misrepresentations made by the financial adviser in the course of a joint scheme for marketing Home Improvement Plans, or in breach of its duties under the Act of 1986. I am not suggesting that any building society was actually liable on this basis, but only that the claim form contemplates this as a possibility. This right of damages would have been a chose in action, a right to recover money, which was capable of assignment in equity and under section 136 of the Law of Property Act 1925.

916

**Lord Hoffmann**          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          [1998]

The investor might in addition have had a right against the building   A
society to rescission of his mortgage. Or he might have such a right
without having any claim for damages. For example, he might have been
able to show that the building society had actual or constructive knowledge
of undue influence exercised by the financial adviser: compare *Barclays
Bank Plc. v. O'Brien* [1994] 1 A.C. 180. This would entitle him to rescission
but not damages. By itself, the right to rescission would have done little to   B
solve the investor's problems because it would have been a condition of
rescission that the investor should restore the benefits which he had
received in return for the mortgage: the building society's advance and a
reasonable rate of interest for having the use of the money. His real
complaint was not merely that his house was mortgaged but that he no
longer had the money to pay back to the building society. Until he had
obtained compensation or damages, he would usually be unable to do so.   C
Nevertheless, one can imagine reasons why it would be more advantageous
to the investor, even after obtaining his compensation, to claim rescission
of the mortgage rather than simply paying it off. For example, the
reasonable rate of interest which a court might fix as a condition of
rescission might be less than the higher rate due under the contract (some
of which he had already paid) and so, on the taking of accounts for the
purposes of rescission, there might be an abatement of what he would   D
otherwise have to repay.

Now it is important to notice that a claim to rescission is a right of
action but can in no way be described as a chose in action or part of a
chose in action. It is a claim to be relieved of a mortgage, and such a
claim can be made only by the owner of the mortgaged property. The
owner cannot assign a right to rescission separately from his property   E
because it would make no sense to acquire a right to have someone else's
property relieved of a mortgage. Likewise, the possibility of an abatement
of the debt as part of the process of rescission is not a chose in action
which can be assigned. It is simply part of the process of rescission, which
is a right attached to the ownership of the house itself.

It can therefore be seen that in reserving to the investor any claim to
an abatement of the mortgage debt consequent upon rescission,   F
section 3(b) was not cutting down the scope of the chose in action which
was assigned to I.C.S. The possibility of an abatement could never have
formed part of that chose in action and could never have been assigned
separately from the house itself. One might therefore ask: what was the
point of section 3(b)? The answer, I would suggest, is lawyerly caution.
The draftsman wanted to make it clear that if, for example, the investor
brought an action for rescission, any abatement of the debt which he   G
secured was not something for which he would be accountable to the
I.C.S. In my view, it was a mistake. The draftsman muddled up two
separate questions. One is the extent of the assignment to I.C.S. and the
other is the extent to which the investor is accountable to I.C.S. for any
benefit he may receive. The two are not necessarily the same.

As this case shows, a right of action such as a claim for rescission of a   H
mortgage may be unassignable as a chose in action, but there is no reason
why the parties cannot agree that the investor is to be accountable to
I.C.S. for all or part of the improvement in his financial position as a
result of exercising his right to rescission. The words "the benefits of such
claim shall enure to you absolutely" in section 3(b) show that the
draftsman's concern was with accountability for benefits. He wanted to
make it clear that the investor would not be accountable for benefits

A    derived from a claim for rescission. But the language he used referred to the extent of the assignment, for which purpose the exception in section 3(b) was unnecessary. Hence all the litigation: if you say something which is unnecessary, people suspect that you must mean something else. However, there was one thing which section 3(b) was not and could not be, and that was a reservation of a remedy which would ordinarily form part of the chose in action assigned by I.C.S.

B    It is of course true that there are other links between the claim for damages and the claim for rescission. The facts giving rise to liability would have a great deal in common, so that if both claims were being made, by I.C.S. in the one case and the investor in the other, it would be sensible to try both cases together. But this can often happen when the same facts give rise to claims by different people and there are procedural means for dealing with the possibility of duplicated evidence and conflicting

C    decisions. For example, in *Wilson v. United Counties Bank Ltd.* [1920] A.C. 102 the breach by a bank of its contract to supervise Major Wilson's business while he was fighting in France gave rise to a claim for financial loss to the business and to general damages for injury to his credit and reputation. The House of Lords held that upon his bankruptcy the former claim was statutorily assigned to his trustee while the latter remained

D    vested in him. He and the trustee joined as plaintiffs in the action and, if they had not done so, the bank would have been entitled to have their actions consolidated.

In addition, the damages recoverable by I.C.S. as assignee may be affected by whether or not the mortgage has been rescinded. If there has been no rescission, the damages may be calculated on the basis that the transaction has involved the investor in liability to pay a high rate of

E    interest. If there has been rescission, the damages will be on the footing that the investor has only had to pay a reasonable rate. If the building society is to pay on the former basis, it is entitled to require that the investor affirm the mortgage and if I.C.S. cannot procure this, it may be necessary to assess damages on the footing that rescission will take place. If there is a dispute over the matter, the investor may have to be joined as a plaintiff, to avoid a situation in which the building society both resists a

F    claim to rescission and has damages assessed on the basis that rescission has taken place. But these again are problems capable of solution by procedural means.

The fact that the exercise by the investor of a right to rescission may affect the quantum of the damages recoverable by virtue of the assignment to I.C.S. does not, however, mean that the investor has attempted to assign different remedies in respect of the same chose in action. What was

G    assigned was the right to damages, whatever the quantum might be. It is not unusual for the quantum of damages to be affected by other proceedings which the person injured may bring, whether against a person liable for damages or someone else. For example, if one assumes that the financial adviser was solvent and that the investor had no cause of action whatever against the building society for damages but the possibility of rescission of the mortgage on the basis of constructive notice, the quantum

H    of damages recoverable from the financial adviser by the investor, or by I.C.S. as his assignee, would be affected by whether or not the investor took successful proceedings for rescission. No one would think this an odd state of affairs and in principle I do not see that it makes any difference that the claim for damages and the claim for rescission are both against the building society.

My Lords, I think that if the rights of the investor are properly analysed, it will become clear that clause 6 of section 4 of the claim form

The Weekly Law Reports 29 May 1998

918

Lord Hoffmann          I.C.S. Ltd. v. West Bromwich B.S. (H.L.(E.))          [1998]

is a complete and effectual assignment of the whole of the investor's claim     A
to compensation and damages to I.C.S. Section 3(b) may well have been
unnecessary, but this conclusion seems to me preferable to attributing to
the parties an intention, as, in their different ways, the judge and the Court
of Appeal have done, to do six impossible things before breakfast and then
regretfully saying that they could not be done. I would therefore allow the
appeal. The first two questions which the judge directed to be tried as
preliminary issues and the answers I suggest your Lordships should give      B
are as follows.

    *Question 1(a).* Whether, upon the true construction of the express and
(if any) implied terms of the I.C.S. claim form, any (and if so which and
to what extent) of the claims which the Alford and Armitage investors
advance in the actions numbered Ch. 1995 A. Nos. 2266 and 3129 have
been assigned to the I.C.S. and *(b)* if so, whether such assignment is valid      C
and effective and what consequences (if any) does it have as to the ability
of those investors to maintain the actions?

    *Answer.* Upon the true construction of the I.C.S. claim form, all claims
for damages and compensation have been validly assigned to I.C.S. and
such claims cannot be maintained by the investors in their actions. The
investors retain the right to claim rescission of their mortgages upon such
terms as the court may consider just.      D

    *Question 2(a).* Whether, upon the true construction of the express and
(if any) implied terms of the I.C.S. claim form and in the light of the
answer to issue 1, any (and if so which and which parts thereof) of the
claims which the I.C.S. advances in the actions numbered Ch. 1995 I.
Nos. 7087 and 8106 have been assigned to the I.C.S. and *(b)* if so, is such
assignment valid and effective and does it enable I.C.S. to maintain the
actions?      E

    *Answer. (a)* All. *(b)* Yes.

    The remaining questions do not arise.

    LORD HOPE OF CRAIGHEAD. My Lords, I have had the advantage of
reading in draft the speech prepared by my noble and learned friend, Lord
Hoffmann. For the reasons he gives I also would allow the appeal and
would answer the questions which the judge directed to be tried as      F
preliminary issues in the way he has suggested.

    LORD CLYDE. My Lords, I have had the advantage of reading a draft
of the speech of my noble and learned friend, Lord Hoffmann. For the
reasons he has given, I too would allow the appeal.

                                                     G

                               *Appeal allowed with costs.*
                               *Questions certified by Evans-Lombe J.*
                                 *answered as proposed by Lord*
                               *Hoffmann.*
                               *I.C.S.'s costs in House of Lords arising*
                               *from Mr. Haring's intervention to be*
                               *paid out of legal aid fund under*      H
                               *section 18 of Legal Aid Act 1988,*
                               *such order suspended for four weeks*
                               *to allow Legal Aid Board to object.*

    *Solicitors: Clifford Chance; Eversheds, Birmingham; Reynolds Porter
Chamberlain; Barnett Sampson and J. Keith Park & Co., St. Helens.*

        [Reported by JOHN SPENCER ESQ., Barrister]