**2**

A

[HOUSE OF LORDS]

| | | |
|---|---|---|
| *MURPHY | . . . . . . . | PETITIONER |
| | AND | |
| CULHANE | . . . . . . . | RESPONDENT |

B  1976 July 26           Lord Diplock, Lord Morris of Borth-y-Gest
                          and Lord Hailsham of St. Marylebone

Petition by the plaintiff for leave to appeal to the House of Lords from the decision of the Court of Appeal [1976] 3 W.L.R. 458.
The Appeal Committee dismissed the petition.

C                                                                M. G.

---

[HOUSE OF LORDS]

| | | |
|---|---|---|
| *REARDON SMITH LINE LTD. | . . . . | APPELLANTS |
| D | AND | |
| YNGVAR HANSEN-TANGEN (TRADING AS H. E. HANSEN-TANGEN) | . . . . . . | APPELLANTS |
| YNGVAR HANSEN-TANGEN (TRADING AS H. E. HANSEN-TANGEN) | . . . . . . | RESPONDENTS |
| E | AND | |
| SANKO STEAMSHIP CO. | . . . . . . | RESPONDENTS |

[CONJOINED APPEALS]

1976 July 14, 15, 19, 20, 21, 22;      Lord Wilberforce, Viscount Dilhorne,
F      Oct. 7                          Lord Simon of Glaisdale, Lord Kilbrandon
                                       and Lord Russell of Killowen

*Shipping—Charterparty—Description of vessel—Time charter of newbuilding motor tank vessel—Identification by owners' declaration of yard and hull number—Yard and hull number confirmed in addendum to charter—Sub-charter on "back-to-back" terms identifying vessel in similar terms—Vessel built*
G  *at different yard with different hull number—Both charters governed by English law—Construction of charters—Whether charterers entitled to refuse to take delivery of vessel*

In order to help finance the building of a Japanese motor tank vessel of some 88,000 tons it was arranged for the vessel to be chartered on completion even before work on it was started. The two charterparties in question were on the form
H  Shelltime 3 and provided, inter alia, that they were to be construed according to English law. The charterparties referred to the vessel as one to be built at Osaka with the yard or hull number 354, but eventually because of its size the vessel was built at Oshima where it bore the yard or hull number Oshima 004 although in all external documents it was "known" as, or "called," Osaka 354. For the purpose of the proceedings it was assumed that the physical attributes of the vessel corresponded with those required under the respective charters. By the time the vessel was ready for delivery in 1974 the mar-

**Reardon Smith Line v. Hansen-Tangen (H.L.(E.))** [1976]

ket had collapsed owing to the oil crisis of that year, and the charterers sought to escape from their obligation by rejecting the vessel on the ground, by analogy with contracts for the sale of goods, that the vessel tendered did not correspond with the contractual description in that it was Oshima 004 and not Osaka 354. Mocatta J. (in proceedings commenced by originating summons) found against the charterers on the ground that although the vessel tendered did not comply with the description nevertheless in the circumstances the charterers were not entitled to refuse to take delivery. On appeal, the Court of Appeal, dismissing the appeal, held that the vessel in question did comply with the description set out in the respective charters.

On appeal: —

*Held*, dismissing the appeal, (1) (*per* Lord Wilberforce, Lord Simon of Glaisdale and Lord Kilbrandon) that the authorities as to " description " in sale of goods cases were not to be extended, or applied to contracts of the present nature (post, pp. 998c, 1001A–D).

*Per* Lord Wilberforce, Lord Simon of Glaisdale and Lord Kilbrandon. Some of the cases as to " description " in sale of goods are excessively technical and due for fresh examination in this House (post, pp. 998c–D, 1001A–D).

(2) (*Per* Lord Wilberforce, Lord Simon of Glaisdale and Lord Kilbrandon) that even if a strict and technical view had to be taken as regards the description of unascertained future goods (e.g. commodities) as to which each detail of the description must be assumed to be vital, it was right to treat other contracts of sale of goods in a similar manner to other contracts generally so as to ask whether a particular item in a description constituted a substantial ingredient of the " identity " of the thing sold, and, only if it did, to treat it as a condition; and that in the present case it was plain that the hull or yard number of the vessel had no special significance for the parties so as to raise it to a matter of fundamental obligation (post, pp. 998D–F, 1001A–D).

Dictum of Roskill L.J. in *Cehave N.V.* v. *Bremer Handelgesellshaft m.b.H.* [1976] Q.B. 44, 71, C.A. approved.

(3) That in any event the charterers failed to bring the present case within the strictest rules as to " description " since the words " yard 354 " were not and were never intended to be part of the description of the vessel but only a means of identifying it, and that the vessel tendered was the vessel that was contracted for (post, pp. 998H—999D, F. H, 1000D–E, 1001A–D, G–H, 1002c–E).

Observations on the correct approach to the construction of commercial contracts (post, pp. 995D—997D).

Decision of the Court of Appeal [1976] 2 Lloyd's Rep. 60 affirmed.

The following cases are referred to in their Lordships' opinions:

*Behn* v. *Burness* (1863) 3 B. & S. 751.
*Cargo Ships " El-Yam " Ltd.* v. *Invoer-en Transport Onderneming " Invotra " N.V.* [1958] 1 Lloyd's Rep. 39.
*Cehave N.V.* v. *Bremer Handelgesellschaft m.b.H.* [1976] Q.B. 44; [1975] 3 W.L.R. 447; [1975] 3 All E.R. 739, C.A.
*Charrington & Co. Ltd.* v. *Wooder* [1914] A.C. 71, H.L.(E.).
*Couchman* v. *Hill* [1947] K.B. 554; [1947] 1 All E.R. 103, C.A.
*Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2 Q.B. 26; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 474, C.A.
*Hvalfangerselskapet Polaris Aktieselskap Ltd.* v. *Unilever Ltd.* (1933) 39 Com.Cas. 1, H.L.(E.).
*Lewis* v. *Great Western Railway Co.* (1877) 3 Q.B.D. 195, C.A.

A  *Moore and Co. and Landauer and Co., In re* [1921] 2 K.B. 519, C.A.
*Prenn* v. *Simmonds* [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237, H.L.(E.).
*Utica City National Bank* v. *Gunn* (1918) 118 N.E. 607.
*Wickman Machine Tool Sales Ltd.* v. *L. Schuler A.G.* [1974] A.C. 235; [1973] 2 W.L.R. 683; [1973] 2 All E.R. 39, H.L.(E.).

B  The following additional cases were cited in argument:
*Andrews Brothers (Bournemouth) Ltd.* v. *Singer and Co. Ltd.* [1934] 1 K.B. 17, C.A.
*Arcos Ltd.* v. *E. A. Ronaasen and Son* [1933] A.C. 470, H.L.(E.).
*Astley Industrial Trust Ltd.* v. *Grimley* [1963] 1 W.L.R. 584; [1963] 2 All E.R. 33, C.A.
*Barker* v. *Windle* (1856) 6 E. & B. 675.
C  *Bowes* v. *Shand* (1877) 2 App.Cas. 455, H.L.(E.).
*Bradford* v. *Williams* (1872) L.R. 7 Ex. 259.
*Flight* v. *Booth* (1834) 1 Bing.N.C. 370.
*Hardwick* v. *Hardwick* (1873) L.R. 16 Eq. 168.
*Hillas (W. N.) & Co. Ltd.* v. *Rederi Aktiebolaget Aeolus* (1926) 32 Com. Cas. 69.
*Hill (Christopher) Ltd.* v. *Ashington Piggeries Ltd.* [1972] A.C. 441; [1971]
D  2 W.L.R. 1051; [1971] 1 All E.R. 847, H.L.(E.).
*Madeleine, The* [1967] 2 Lloyd's Rep. 224.
*Manbre Saccharine Co. Ltd.* v. *Corn Products Co. Ltd.* [1919] 1 K.B. 198.
*Rapalli* v. *K. L. Take Ltd.* [1958] 2 Lloyd's Rep. 469, C.A.
*Smyth (Ross T.) and Co. Ltd.* v. *T. D. Bailey, Son and Co.* (1940) 45 Com.Cas. 292, H.L.(E.).
*United Dominions Trust (Commercial) Ltd.* v. *Eagle Aircraft Services Ltd.* [1968] 1 W.L.R. 74; [1968] 1 All E.R. 104, C.A.
E  *Universal Cargo Carriers Corporation* v. *Citati* [1957] 2 Q.B. 401; [1957] 2 W.L.R. 713; [1957] 2 All E.R. 70.
*Varley* v. *Whipp* [1900] 1 Q.B. 513, D.C.
*Whitworth Street Estates (Manchester) Ltd.* v. *James Miller and Partners Ltd.* [1970] A.C. 583; [1970] 2 W.L.R. 728; [1970] 1 All E.R. 796, H.L.(E.).

F  APPEALS from the Court of Appeal.
These appeals were conjoined appeals by the respective appellants from an order of the Court of Appeal (Lord Denning M.R., Stephenson and Bridge L.JJ.) dated March 29, 1976, dismissing their respective appeals from the judgment of Mocatta J. dated March 15, 1976, whereby it was declared upon the true construction of the relevant charterparties (a) the
G  appellants in the first appeal, Reardon Smith Line Ltd., were not entitled to refuse to take delivery from the respondents in the first appeal, Yngvar Hansen-Tangen (trading as H. E. Hansen-Tangen); and (b) the appellants in the second appeal, H. E. Hansen-Tangen, were not entitled to refuse to take delivery from the respondents in the second appeal, Sanko Steamship Co., of the tank vessel now known as *Diana Prosperity.*
These appeals arose out of two time charterparties, each in the Shell-
H  time form, viz.: (a) A charterparty dated August 15, 1972, with addenda thereto dated August 10, 1973, concluded between Sanko (a Japanese company) and Hansen-Tangen (a Norwegian partnership), under which Sanko obliged themselves to deliver to Hansen-Tangen to perform that charter a newbuilding motor tank vessel " to be built by the Osaka Shipbuilding Co. Ltd. and known as Hull No. 354 "; (b) a sub-charter-party dated October 12, 1973, concluded between Hansen-Tangen and Reardon Smith (a Cardiff company) for the specific purpose of sub-

chartering that vessel, under which Hansen-Tangen obliged themselves to   A
deliver to Reardon Smith to perform that charter a "newbuilding motor
tank vessel called Yard No. 354 at Osaka Zosen."

Each of those charterparties (which were, in substance, on "back-to-
back" terms save as to hire rate and length of charter term) expressly
provided, by clause 40, that it should be construed, and that the relations
between the parties should be determined, in accordance with the law of
England. The Sanko/Hansen-Tangen charter was referred to in the pro-   B
ceedings as the "intermediate charter," Sanko being in turn charterers
under a head charter between themselves and Sculptor Shipping Co. Ltd.
The Hansen-Tangen/Reardon Smith charter was referred to as the "sub-
charter." It was common ground that the expression "Osaka Zosen," as
used in the sub-charter, was equivalent to "Osaka Shipbuilding Co. Ltd.,"
"Zosen" being the Japanese word for "Shipbuilding."                      C

The matter came before Mocatta J. upon (a) an originating summons
taken out on behalf of Reardon Smith and dated November 13, 1975,
whereby Reardon Smith requested determination of the question whether,
upon the true construction of the sub-charter, Reardon Smith were entitled
to refuse to take delivery from Hansen-Tangen of a tank vessel which
Sanko proposed to tender upon its completion in early 1976 for delivery
to Hansen-Tangen under the intermediate charter; and (b) a third part   D
notice issued on behalf of Hansen-Tangen and dated November 27, 1975,
whereby Hansen-Tangen requested determination as between themselves
and Sanko of a similar question in relation to the intermediate charter.

The issues (common to both disputes) between the respective parties
were: (i) Was it the contractual obligation of the respective disponent
owners to deliver a motor tank vessel which had been built by the Osaka   E
Shipbuilding Co. Ltd. ("the Osaka company") at a yard of that company
under the yard serial number 354? (ii) If that was the contractual obliga-
tion of the respective disponent owners, were the respective charterers
entitled to refuse to take delivery of the tendered vessel, being a vessel
built by Oshima Shipbuilding Co. Ltd. ("the Oshima company") at the
new yard of that company at Oshima?

For the purpose of the proceedings the courts had been invited to   F
assume, and had assumed, that the physical attributes of the vessel in
question would correspond with those required under Form B of the
respective charters.

Mocatta J. held that, although the first of the foregoing issues had to be
decided in favour of the respective charterers (Reardon Smith and Hansen-
Tangen), the resulting breach of obligation on the part of the respective   G
disponent owners was not such as to entitle the charterers to refuse delivery
of the vessel. He declined accordingly to grant declarations as requested
by Reardon Smith and Hansen-Tangen and declared that Reardon Smith
and Hansen-Tangen were not entitled to refuse to take delivery of the
vessel.

The Court of Appeal upheld the decision of Mocatta J., but upon
different grounds. The Court of Appeal unanimously disagreed with the   H
conclusion reached by the judge on the first issue, holding that the vessel
which it was proposed to tender complied with the description set out in
the respective charters. Lord Denning M.R. further indicated his con-
currence with the conclusion at which Mocatta J. had arrived on the
second issue. Stephenson and Bridge L.JJ. found it unnecessary to express
any view as to the correctness or otherwise of the reasoning on the second
issue which had led Mocatta J. to decide the case against the appellants.

A    Shortly after the institution of the present proceedings the vessel proposed to be tendered was launched at Oshima, at the shipyard of the Oshima company, and named *Diana Prosperity*. She was due for delivery from that shipyard between April 1–21, 1976, and she was in fact so delivered on April 1. It was agreed between the parties, prior to delivery of the judgments in the Court of Appeal, that the *Diana Prosperity* should, pending the outcome of any appeal to the House of Lords,
B  be traded on a without prejudice basis for account of whomsoever might ultimately be concerned; and the vessel was presently being so traded by Reardon Smith.

The facts are set out in the opinion of Lord Wilberforce.

R. A. MacCrindle Q.C., Basil Eckersley and Alan Pardoe for Reardon
C  Smith, appellants in the first appeal.

J. S. Hobhouse Q.C. and Michael Dean for Hansen-Tangen, respondents in the first appeal, appellants in the second appeal.

R. S. Alexander Q.C., Nicholas Phillips and Timothy Charlton for Sanko, respondents in the second appeal.

D    Their Lordships took time for consideration.

October 7, 1976. LORD WILBERFORCE. My Lords, these appeals arise out of a charterparty and sub-charterparty both relating to a medium size newbuilding tanker to be constructed in Japan. By the time the tanker was ready for delivery the market had collapsed, owing to the oil crisis of 1974, so that the charterers' interest was to escape from their
E  contracts by rejecting the vessel. The ground on which they hoped to do so was that the vessel tendered did not correspond with the contractual description.

Both charterparties were on the well known form Shelltime 3. The result of the appeal depends primarily upon the view taken of the sub-charterparty between the appellants in the first appeal ("Reardon Smith") and
F  the respondents in that appeal ("Hansen-Tangen"), but, for the issue to be understood, it is necessary first to state some dates.

In 1972 the respondents in the second appeal ("Sanko"), a Japanese company, formed the "Sanko plan" which was a project for the construction in Japanese yards of some 50 tankers of about 80,000 tons each which would be placed on charter by Sanko. At this time the market was strong. Before any vessels were actually built or even started Sanko
G  arranged a number of charters—called "fixtures"—defining the contractual terms of hire, the actual ships covered by each of them to be nominated later by Sanko. One such charter was that between Sanko and Hansen-Tangen (referred to in these proceedings as the "intermediate charter"). It was dated August 15, 1972. Clause 41 contained the following (emphasis supplied):

H    "This charter party, subject to what is hereinafter stated, is for a motor tank vessel *to be built at a yard in Japan to be declared by owners (s.c. Sanko) together with the applicable Hull number for the vessel* within June 30, 1973. . . ."

Clause 42 conferred an option (not exercised) to nominate a slightly smaller vessel . . . "owners to declare name of shipyard and Hull number . . . at the time such option . . . is exercised."

The description of the vessel—warranted by the owners—was (as provided by clause 24) set out in Form B which is a standard form giving very detailed particulars about the ship, its equipment and performance. It is to be assumed for the purposes of these appeals that the vessel tendered complied in all respects with these requirements, and that therefore the charterers got precisely the kind of ship they wanted of precisely the description stipulated.

On March 28, 1973, by which time progress had been made with the plan, Sanko as charterers entered into a charterparty with a Liberian company called Sculptor as "owners" for "the good newbuilding tank vessel called Osaka Shipbuilding Co. Ltd. Hull No. 354 until named." This charterparty also contained a Form B in the same form as in the intermediate charter. Osaka Shipbuilding Co. Ltd. is a substantial and reputable Japanese shipbuilding company with a yard at Osaka, which, however, could not build ships exceeding 45,000 tons. (The vessel contracted for was of about 88,000 tons.) So at this point, as the document shows, the vessel to be taken to Sanko, and passed on by Sanko to charterers from Sanko had gained an identity, not a physical identity, since construction had not yet started, but an identity in contracts and in order books.

Following on this, Sanko nominated the vessel to perform the intermediate charter. This was done by an addendum to that charterparty dated August 10, 1973, which also altered the duration of the intermediate charter and the hire payments to be made under it. The nomination was made in the following terms:

"With reference to clause[s] 41 and 42 of [the intermediate charter] the vessel to perform this charter is to be built by Osaka Shipbuilding Co. Ltd. and known as Hull No. 354 until named and shall have a deadweight of about 87,600 . . . (other details follow)."

Soon after this, on October 12, 1973, the sub-charter between Hansen-Tangen and Reardon Smith was signed. I set out the preamble having italicised the words which were added to the printed form:

"It is this day agreed between H. E. Hansen-Tangen of Kristiansands, Norway (hereinafter referred to as 'Owners') being *disponent* owners of the good *Japanese flag (subject to clause 41) Newbuilding motor tank vessel called Yard No. 354 at Osaka Zosen* [Zosen = shipbuilding] (hereinafter described as 'the vessel') described as per clause 24 hereof and Reardon Smith Line Limited of Cardiff *(Sir William Reardon Smith and Sons Ltd. of Cardiff—Managers)* (hereinafter referred to as 'charterers')."

The charterparty contained a clause 24 and Form B similar to the intermediate charter.

Parallel with these charter agreements were a number of contracts and arrangements concerning the building of the vessel. It is not necessary to specify these in detail. Osaka Shipbuilding Co. Ltd. ("Osaka") was, as I have mentioned, unable to build a vessel of 80,000 tons in its Osaka yard so it set about arranging for a new yard to be built at Oshima, which is on the island of Kyushu about 300 miles from Osaka. The method chosen was for Osaka to enter into a joint venture with two companies of the powerful Sumitomo Group followed by the formation of a new company called Oshima Shipbuilding Co. Ltd. ("Oshima") in which Osaka had a 50 per cent. interest and two Sumitomo companies the other 50 per cent.

A  Oshima took over responsibility for building the new yard. A series of contracts was entered into by which the Liberian company Sculptor ordered the vessel from a Sumitomo company, which agreed to build it by sub-contract with Osaka; the Sumitomo company placed a shipbuilding contract with Osaka; and Osaka placed a shipbuilding (sub-) contract with Oshima. As mentioned above it was Sculptor from whom Sanko chartered the vessel on March 28, 1973. As regards Oshima, a large part of its work force
B  and a preponderant part of its expert managerial staff was provided on secondment from Osaka. The vessel to be constructed was to be numbered 004 in Oshima's books but also 354 in Osaka's books and in export documents. The chain, therefore, was (1) Oshima agreed to construct the vessel under contract with Osaka, (2) Osaka contracted with a Sumitomo company to build and deliver the vessel, (3) the Sumitomo company
C  agreed to build the vessel by Osaka and to sell it to Sculptor, (4) Sculptor agreed to hire it to Sanko, (5) Sanko agreed to hire it to Hansen-Tangen, (6) Hansen-Tangen agreed to hire it to Reardon Smith. In all these contracts the vessel was described as No. 354 in connection with Osaka.

These being the background facts, the whole case, as regards the first appeal, turns, in my opinion, upon the long italicised passage in the sub-charter set out above which, for convenience of reference I repeat:
D
"(the good) Japanese flag (subject to Clause 41) Newbuilding motor tank vessel called Yard No. 354 at Osaka Zosen"

I shall refer to this as the "box" since it appears enclosed in a typed box on the document.

The contract is in the English language and (clause 40) is to be
E  construed in accordance with English law. But it has been sought to introduce, as an aid to construction, a considerable amount of evidence as to Japanese usages and practice, some of which was in fact taken into account by the Court of Appeal. To decide how far this is legitimate one must make a distinction. When it comes to ascertaining whether particular words apply to a factual situation or, if one prefers, whether a factual situation comes within particular words, it is undoubtedly proper, and necessary, to
F  take evidence as to the factual situation. Thus once one has decided what is meant by "Yard No. 354," or "to be built at a Yard" it is proper by evidence to establish the characteristics of particular yards, the numbering used at those yards, and the "building" which may have been done, in order to answer, yes or no, the question whether the contractual requirements have been met. There is no difficulty, in law, about this part of the case.
G
It is less easy to define what evidence may be used in order to enable a term to be construed. To argue that practices adopted in the shipbuilding industry in Japan, for example as to sub-contracting, are relevant in the interpretation of a charterparty contract between two foreign shipping companies, whether or not these practices are known to the parties, is in my opinion to exceed what is permissible. But it does not follow that, renounc-
H  ing this evidence, one must be confined within the four corners of the document. No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which

the parties are operating. I give a few illustrations. In *Utica City National Bank* v. *Gunn* (1918) 118 N.E., 607; 222 N.Y. 204 the New York Court of Appeals had to consider the meaning of "loans and discounts" in a contract of guaranty. The judgment of Cardozo J. contains this passage, at p. 608:

> "The proper legal meaning, however, is not always the meaning of the parties. Surrounding circumstances may stamp upon a contract a popular or looser meaning. The words 'loans and discounts' are not so clear and certain that circumstances may not broaden them to include renewals. They often have that meaning in the language of business life. To take the primary or strict meaning is to make the whole transaction futile. To take the secondary or loose meaning, is to give it efficacy and purpose. In such a situation, the genesis and aim of the transaction may rightly guide our choice. *Wigmore on Evidence*, vol. IV, para. 2470, *Stephen, Digest of Law of Evidence*, art. 91, subds. 5 and 6."

In *Prenn* v. *Simmons* [1971] 1 W.L.R. 1381 it was necessary to construe "profits available for dividend." The judgment in that case, following Cardozo J., relied upon the commercial background of the objective aim of the transaction to give meaning to that phrase.

In *Wickman Machine Tool Sales Ltd.* v. *L. Schuler A.G.* ([1974] A.C. 235) the critical word was "condition." Their Lordships interpreted this word (unusually) in the light of a special business situation.

It is often said that, in order to be admissible in aid of construction, these extrinsic facts must be within the knowledge of both parties to the contract, but this requirement should not be stated in too narrow a sense. When one speaks of the intention of the parties to the contract, one is speaking objectively—the parties cannot themselves give direct evidence of what their intention was—and what must be ascertained is what is to be taken as the intention which reasonable people would have had if placed in the situation of the parties. Similarly when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties. It is in this sense and not in the sense of constructive notice or of estopping fact that judges are found using words like "knew or must be taken to have known" (see, for example, the well-known judgment of Brett L.J. in *Lewis* v. *Great Western Railway Co.* (1877) 3 Q.B.D. 195.

This proposition can be illustrated by some authoritative judgments. In *Hvalfangerselskapet Polaris Aktieselskap Ltd.* v. *Unilever Ltd.* (1933) 39 Com.Cas. 1 the different emphasis placed by individual members of this House on knowledge, Lord Atkin not referring to it (p. 3), Lord Russell of Killowen mentioning it as an element (p. 19), Lord Macmillan distinguishing between objective and subjective elements (p. 25), seems to show that mutual knowledge of extrinsic circumstances, while relevant, is not an essential condition of the admissibility of factual evidence.

Particularly interesting are the speeches in *Charrington & Co. Ltd.* v. *Wooder* [1914] A.C. 71, the question being what was meant by "fair market price." Viscount Haldane L.C. uses once more the expression "circumstances which the parties must be taken to have had in view" (p. 77). Lord Kinnear, after explaining that the term had no fixed meaning, said at p. 80 "Words of this kind must vary in their signification with the particular objects to which the language is directed" and continued, at p. 80:

A  "... it may be necessary to prove the relation of the document to facts; and I take it to be sound doctrine that for this purpose evidence may be given to prove any fact to which it refers, or may probably refer..."

And Lord Dunedin, at p. 82:

B  "... in order to construe a contract the court is always entitled to be so far instructed by evidence as to be able to place itself in thought in the same position as the parties to the contract were placed, in fact, when they made it—or, as it is sometimes phrased, to be informed as to the surrounding circumstances."

C  I think that all of their Lordships are saying, in different words, the same thing—what the court must do must be to place itself in thought in the same factual matrix as that in which the parties were. All of these opinions seem to me implicitly to recognise that, in the search for the relevant background, there may be facts which form part of the circumstances in which the parties contract in which one, or both, may take no particular interest, their minds being addressed to or concentrated on other facts so that if asked they would assert that they did not have

D  these facts in the forefront of their mind, but that will not prevent those facts from forming part of an objective setting in which the contract is to be construed. I shall show that this is so in the present case.

So I ask what was the commercial purpose of these charterparties and what was the factual background against which they were made? The purpose is clear: it was to make available to (1) Hansen-Tangen

E  and (2) to Reardon Smith a medium-sized tanker suitable for use as such, this tanker not being in existence, or even under construction at the date of either charter, and, at the date of the intermediate charter not even the subject of contracts made by the supplying company. The vessel was to be constructed in a Japanese yard and made available on charter to Sanko as part of a programme. At the date of the sub-charter the vessel was identified in contracts for its construction in Japan

F  and had a serial number. In order to ensure that the tanker was suitable for its purpose a detailed specification was drawn up—by way of a warranted description with which of course the vessel must strictly comply.

In addition, since at the time of either charterparty the vessel was not in existence or under construction, some means had to be agreed upon for identifying the particular vessel—one out of a programme—which would

G  form the subject matter of the charters. This was indispensable so as to enable those committing themselves to hire the vessel, to sub-hire it, if they wished, and if necessary to arrange finance. This necessary identification was to be effected by nomination, by Sanko in the first place and then by Hansen-Tangen.

The text of the charterparties confirms beyond doubt that this was what was intended and done. The preamble, in the Shelltime 3 form, provides

H  for the insertion of a name—" being owners of the good ... tank vessel called...." The box insertion in the subcharter was made in this place—" called Yard No. 354 at Osaka Zosen." The intermediate charter, entered into before Sanko had nominated any vessel, provided in its preamble—instead of " called ..." for declaration by the owners together with the Hull number, and the addendum, entered into after Sanko had nominated, provided " to be built by Osaka Shipbuilding Co. Ltd. and known as Hull No. 354 until named." What is vital about each of these insertions

is that they were simple substitutes for a name, serving no purpose but to provide a means whereby the charterers could identify the ship. At the dates when these insertions were made no importance could have been attached to the matters now said to be so significant—they were not a matter of negotiation, but of unilateral declaration. What is now sought is to elevate them into strict contractual terms in the nature of " conditions."

The appellants sought, necessarily, to give to the box and the corresponding provision in the intermediate charter contractual effect. They argued that these words formed part of the " description " of the future goods contracted to be provided, that, by analogy with contracts for the sale of goods, any departure from the description entitled the other party to reject, that there were departures in that the vessel was not built by Osaka Shipbuilding Co. Ltd., and was not Hull No. 354. I shall attempt to deal with each of these contentions.

In the first place, I am not prepared to accept that authorities as to " description " in sale of goods cases are to be extended, or applied, to such a contract as we have here. Some of these cases either in themselves (*In re Moore and Co. and Landauer and Co.* [1921] 2 K.B. 519) or as they have been interpreted (e.g. *Behn* v. *Burness* (1863) 3 B. & S. 751) I find to be excessively technical and due for fresh examination in this House. Even if a strict and technical view must be taken as regards the description of unascertained future goods (e.g., commodities) as to which each detail of the description must be assumed to be vital, it may be, and in my opinion is, right to treat other contracts of sale of goods in a similar manner to other contracts generally so as to ask whether a particular item in a description constitutes a substantial ingredient of the " identity " of the thing sold, and only if it does to treat it as a condition (see *Couchman* v. *Hill* [1947] K.B. 554, 559, *per* Scott L.J.). I would respectfully endorse what was recently said by Roskill L.J. in *Cehave N.V.* v. *Bremer Handelsgesellschaft m.b.H.* [1976] Q.B. 44, 71:

> " In principle it is not easy to see why the law relating to contracts for the sale of goods should be different from the law relating to the performance of other contractual obligations, whether charterparties or other types of contract. Sale of goods law is but one branch of the general law of contract. It is desirable that the same legal principles should apply to the law of contract as a whole and that different legal principles should not apply to different branches of that law,"

and similarly by Devlin J. in *Cargo Ships " El-Yam " Ltd.* v. *Invoer-en Transport Onderneming " Invotra " N.V.* [1958] 1 Lloyd's Rep. 39, 52. The general law of contract has developed, along much more rational lines (e.g., *Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2 Q.B. 26), in attending to the nature and gravity of a breach or departure rather than in accepting rigid categories which do or do not automatically give a right to rescind, and if the choice were between extending cases under the Sale of Goods Act 1893 into other fields, or allowing more modern doctrine to infect those cases, my preference would be clear. The importance of this line of argument is that Mocatta J. and Lord Denning M.R. used it in the present case so as to reject the appellants' argument on " description " and I agree with them. But in case it does not appeal to this House, I am also satisfied that the appellants fail to bring the present case within the strictest rules as to " description."

A   In my opinion the fatal defect in their argument consists in their use of the words "identity" or "identification" to bridge two meanings. It is one thing to say of given words that their purpose is to state (identify) an essential part of the description of the goods. It is another to say that they provide one party with a specific indication (identification) of the goods so that he can find them and if he wishes sub-dispose of them. The appellants wish to say of words which "identify" the goods

B   in the second sense, that they describe them in the first. I have already given reasons why I can only read the words in the second sense.

   The difference is vital. If the words are read in the first sense, then, unless I am right in the legal argument above, each element in them has to be given contractual force. The vessel must, as a matter of contract, and as an essential term, be built by Osaka and must bear their Yard

C   No. 354—if not the description is not complied with and the vessel tendered is not that contracted for.

   If in the second sense, the only question is whether the words provide a means of identifying the vessel. If they fairly do this, they have fulfilled their function. It follows that if the second sense is correct, the words used can be construed much more liberally than they would have to be construed if they were providing essential elements of the description.

D   The two significant elements (whether in the box, or in the intermediate charter) are (i) the Yard No. 354, (ii) the expression "built by Osaka Shipbuilding Co. Ltd." [These words do not appear in the box but I will assume, very much in the appellants' favour, that the box has the same meaning as if the word "built" were used.] The appellants at one time placed great stress on the yard no. provision. They

E   contended that by using it the "owners" assumed an obligation that the vessel should bear a number which would indicate that it would be constructed in the yard, where that number was appropriate, in sequence after vessels bearing earlier yard numbers (350–353). But this argument broke down in face of the fact, certainly known to Sanko which used and introduced the number into the charterparties, that the sequence through 354 was the sequence used at Osaka Shipbuilding Company's yard at

F   Osaka, which yard could not construct the vessel. Thus the use of the yard no. for the contracted vessel must have had some other purpose than indicating construction at a particular yard. This turns the argument against the appellants—for it shows the words to be "labelling" words rather than words creating an obligation.

   So the question becomes simply whether, as a matter of fact, it can

G   fairly be said that—as a means of identification—the vessel was Yard No. 354 at Osaka Zosen or "built by Osaka Shipping Co. Ltd. and known as Hull No. 354 until named." To answer this, regard may be had to the actual arrangements for building the vessel and numbering it before named.

   My Lords, I have no doubt, for the reasons given by the Court of Appeal, that an affirmative answer must be given. I shall not set out the evidence which clearly makes this good. The fact is that the vessel

H   always was Osaka Hull No. 354—though also Oshima No. 4—and equally it can fairly be said to have been "built" by Osaka Shipbuilding Co. Ltd. as the company which planned, organised and directed the building and contractually engaged with Sculptor to build it, though also it could be said to have been built by Oshima Shipbuilding Co. Ltd. For the purpose of the identificatory clause, the words used are quite sufficient to cover the facts. No other vessel could be referred to: the reference fits the vessel in question.

There are other facts not to be overlooked. (1) So long as the charterers could identify the nominated vessel they had not the slightest interest in whatever contracting or sub-contracting arrangements were made in the course of the building, a fact which no doubt explains the looseness of the language used in the box. (2) In making the arrangements they did for building the vessel Osaka acted in a perfectly straightforward and open manner. They cannot be said to be substituting one vessel for another; they have not provided any ground upon which the charterers can claim that their bargain has not been fulfilled. The contracts all down the chain were closely and appropriately knitted into what Osaka did. (3) If the market had risen instead of fallen, it would have been quite impossible for Osaka or Sculptor, or Sanko, to refuse to tender the vessel in accordance with the charters on the ground that it did not correspond with that contracted for. No more on a falling market is there, in my opinion, any ground on which the charterers can reject the vessel. In the end I find this a simple and clear case.

I would dismiss both appeals. Hansen-Tangen must pay the costs of the second appeal and Reardon Smith must pay the costs of the first appeal including the costs which Hansen-Tangen has to pay to Sanko under the second appeal.

VISCOUNT DILHORNE. My Lords, I have had the advantage of reading in advance the speech of my noble and learned friend, Lord Wilberforce and I only desire to add a few observations.

I agree with him in thinking that the appellants have failed to bring the case within the present rules as to " description " in connection with the sale of goods. I think that the material words of the " sub-charter " and the " intermediate charter " strongly support that conclusion.

The preamble to the sub-charter says

"the good Japanese flag (subject to clause 41) newbuilding motor tank vessel called Yard No. 354 at Osaka Zosen (hereinafter described as the vessel) described as per clause 24 hereof . . ."

The use of the word " called " followed by the words " described as per clause 24 " is to my mind a clear indication that the words " Yard No. 354 " were not and were never intended to be part of the description of the vessel but only a means of identifying it.

The intermediate charter also distinguished between the identity of the vessel and its description. It made provision for it to be identified at a later date and separately described the vessel. The addendum to the policy provided the identification, stating the vessel was " to be built by Osaka Shipbuilding Co. Ltd. and known as Hull No. 354."

Again I regard the use of the word " known " as significant. I, too, do not take the reference to the ship being built by Osaka as involving any contractual obligation but as a part of its identification.

In these circumstances I do not find it necessary to consider whether the present rules as to " description " in relation to the sale of goods require to be reconsidered and whether they should be treated as applicable to other contracts. Even if they can be, they cannot in my opinion apply to these charters. Strong arguments can no doubt be advanced for not altering rules which have stood for so long and for not now restricting the right of a purchaser of goods to reject goods which do not answer the description of those he agreed to buy. It may be that strong arguments, too, can be advanced for saying that the hirer of an article should have a

A   similar right of rejection when the article does not comply with the description given to him and on the basis of which he agreed to hire. But I now express no opinion thereon.

In my opinion these appeals should be dismissed.

LORD SIMON OF GLAISDALE. My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend on the
B   Woolsack. I agree with it. It would be odd were the law to elevate a matter obviously immaterial to the parties at the time of contracting into a matter of fundamental obligation. I agree that the cases on the sale of goods may call for reconsideration on this basis.

I would dismiss these appeals.

C   LORD KILBRANDON. My Lords, I have had the advantage of reading the draft prepared by my noble and learned friend, Lord Wilberforce. I so entirely agree with it, not only as to the conclusions which have to be drawn from the facts, but also from the consequences which in law ought to follow therefrom, that I have not thought it desirable to add any words of my own. I wish, however, to emphasise my express agreement with his analysis and criticism of the older authorities relating to description, and
D   to hope that the more modern tendencies towards a business-like content of that word may in time cover its use in relation to contracts of sale. I would accordingly dismiss these appeals.

LORD RUSSELL OF KILLOWEN. My Lords, in my opinion the question in this appeal is one of identity: was the *Diana Prosperity* when built the
E   vessel identified by the sub-charter as its future subject matter? The words, and the only words, of identification in the sub-charter are "Newbuilding motor tank vessel called Yard No. 354 at Osaka Zosen": the sub-charter of course contained a very full specification of the vessel and its equipment and fittings, but without the words quoted there were no means by which it could ever be said of any completed vessel that it was the vessel the subject of the sub-charter.

F   There is in my opinion one matter of certainty to be extracted from the short and somewhat obscure quoted phrase; that is that the Osaka Shipbuilding Co. Ltd. had entered into a contract for the building of a relevant tanker and on entering into that contract had allotted in its books to the vessel to be built thereunder the yard or hull No. 354. Find the vessel built pursuant to such contract, and you find the vessel the subject
G   of the sub-charter. (We were told by counsel that shipbuilders sometimes build a ship without a contract, hoping to find a purchaser for it when completed: but it was not suggested that this was conceivable in the case of a vessel of this size.)

Once it is concluded, as I conclude, that the essence of the identification of the vessel in the sub-charter lies in necessary assumption of a shipbuilding contract to which Osaka was party there is no difficulty in identify-
H   ing the *Diana Prosperity* as the vessel subject to the sub-charter: and it is not necessary to attribute to the sub-charterers Reardon Smith any knowledge of a Japanese practice of 100 per cent. sub-contracting whether by failure to inquire or otherwise. On December 18, 1972, by an Export Building Contract S.S.K. [a member of the Sumitomo Group] (as seller) contracted with Sculptor: the contract contained these words ". . . the seller, sub-contracting with Osaka . . . (hereinafter called 'the builder') agrees to build, launch and complete at the shipyard of the builder <u>or its</u>

sub-contractor hereinafter called 'the shipyard') . . ." the vessel therein specified: in article I it was provided that "The vessel shall have the builder's Hull No. 354." Osaka though not a party thereto subscribed that contract "We . . . undertake the due performance as the builder in accordance with the terms and conditions specified in this contract." The underlining in the first quotation is mine.

On the same date S.S.K. and Osaka entered into the domestic contract: that recited the export contract (calling it the original contract) and that pursuant thereto S.S.K. had placed an order with Osaka for the construction of the vessel the subject of the original contract. Article I of the domestic contract provided that "Osaka shall construct the vessel in accordance with the terms of the original contract . . . ," which as indicated envisaged in terms that that construction might be through a sub-contractor. Article III provided that Osaka should carry out the construction of the vessel at its Oshima Yard under the supervision of S.S.K. and [Sculptor]: and further that the hull number should be No. 354 of Osaka which number should be shown on all documents relating to the vessel that should at any time be submitted to S.S.K. and Sculptor by Osaka.

The vital point, in my opinion, is that under the domestic contract, which was the Osaka contract necessarily referred to as identification in the sub-charter, Osaka was plainly entitled to sub-contract the whole construction of the vessel, and this Osaka did to Oshima when Oshima was formed. The vessel nevertheless remained the vessel identified as that which was the outcome of the proper carrying out of the domestic contract: and the vessel was the *Diana Prosperity*. Accordingly, in my judgment Reardon Smith having sub-chartered a vessel identified as the product of, in the event, the domestic contract, was not entitled to refuse to accept the *Diana Prosperity*, and its appeal against Hansen-Tangen fails. The fall-back appeal of Hansen-Tangen under the intermediate charter becomes in those circumstances in practice irrelevant, for the latter is under no obligation to Reardon Smith to reject the *Diana Prosperity* even if they were entitled to do so, and will naturally not do so, since the sub-charter was on more favourable terms to Hansen-Tangen than the intermediate charter.

Thus far, my Lords, I have construed the sub-charter in isolation, despite evidence that Reardon Smith had previously inspected the intermediate charter and that the sub-charter was intended to be "back to back" with it. I incline to the view that this is the correct approach. But it was argued that the reference in the sub-charter to Hansen-Tangen as "disponent owners" indicates that the latter were themselves charterers of the vessel in question, and so, in search of identity, involved the intermediate charter in the inquiry, with the result (it was argued) that the inquiry thus extended showed that it was a term of the contracts that the vessel should be one built by Osaka, which (at least in a narrower sense) *Diana Prosperity* was not.

The intermediate charter dated August 15, 1972, was by Sanko "being owners or disponent owners to be declared on delivery" to Hansen-Tangen of "newbuilding motor tank vessel (see clauses 41 and 42)." The specifications of the vessel I need not rehearse. Clause 41 provided that the charter was "for a motor tank vessel to be built at a yard in Japan to be declared by [Sanko] together with the applicable hull number within June 30, 1973, . . ." Thus it was a matter of indifference to the intermediate charterers and entirely at the option of Sanko by what shipbuilders and at what yards in Japan the vessel was to be built. On August 10, 1973, there

A  was an agreement in part varying the intermediate charter and also identifying the vessel under clause 41: this by addendum No. 1 provided that "the vessel to perform this charter is to be built by Osaka Shipbuilding Co. Ltd. and known as Hull No. 354 until named. . . ." It is argued that here is a contractual obligation that the vessel shall be built by Osaka: that the *Diana Prosperity* was built by Oshima, which alone was licensed under Japanese law to build her: and that the phrase which I have quoted

B  as the phrase of identification from the sub-charter should therefore be construed as involving a contractual obligation or requirement of description of the vessel that she be built by Osaka. I observe at once that it is strange that if that were intended by the parties to the sub-charter they should have elected to reject the wording of the amended intermediate charter in favour of the quite different language of the sub-charter. Rather

C  does this change suggest to me, particularly in the context that Sanko was entirely free to nominate the provenance of the vessel, that "to be built by Osaka" was to be broadly construed and in a manner which would embrace that which was already clearly envisaged under the export contract, the domestic contract and the head charter by Sculptor to Sanko. Indeed, if the reference in the sub-charter to Hansen-Tangen as disponent owners in the sub-charter is justification for construing that charter in the light of

D  the intermediate charter, so also should the reference in the latter to Sanko as "owners or disponent owners" be justification for construing the intermediate charter in the light of what had gone before. On that basis the whole genesis is opened up, and *Diana Prosperity* is the undoubted outcome.

I have not rehearsed the details of the formation of Oshima under the

E  inspiration of Osaka in partnership with other Japanese interests, nor the preponderant contribution by Osaka to Oshima of management and other staff, which may well justify a conclusion that in a broad sense *Diana Prosperity* was built by Osaka. I do not find it necessary to decide this appeal on that ground, though it may serve to underline the fact that Reardon Smith and (by way of fall-back) Hansen-Tangen seek to avoid the sub-charter and intermediate charter on very technical grounds. I prefer

F  to decide the appeal upon the grounds which I have stated, which I trust are not an over-simplification of the complicated and sometimes tortuous arguments so lucidly presented to your Lordships' House.

Accordingly, I would dismiss the appeal of Reardon Smith, and the fall-back appeal of Hansen-Tangen, with the consequence that the former should pay the costs of the latter and of Sanko of these appeals.

G
*Appeals dismissed.*

Solicitors: *Norton, Rose, Botterell & Roche; Sinclair, Roche & Temperley; Ince & Co.*

J. A. G.

H