Ira G. Greenberg
Vincent J. Vitkowsky
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendants
750 Lexington Avenue, 8th Floor
New York, New York 10022
(212) 308-4411

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEATON INSURANCE COMPANY and STONEWALL INSURANCE COMPANY<br>Plaintiffs,<br><br>vs.<br><br>CAVELL USA INC. f/k/a KEN RANDALL AMERICA, INC. f/k/a EASTGATE, INC. and KEN RANDALL, individually<br>Defendants. | Case No. 1:07-CV-0732(RMB)<br><br>**DECLARATION OF STEPHEN M. HOFMEYR IN CONNECTION WITH DEFENDANTS' MOTION TO DISMISS** |

STEPHEN M. HOFMEYR QC declares as follows:

1. I am a barrister in independent practice in London. I was called to the Bar of England and Wales in 1982. Since 1987 I have practiced as a barrister from chambers at 7 King's Bench Walk, Temple, London EC4Y 7DS. In 2000 I was appointed Queen's Counsel. I specialise in international commercial disputes, and in particular insurance and reinsurance.

2. From 1974 to 1978 I attended the University of Cape Town, being awarded a Bachelor of Commerce (B.Com) in 1976 and a Bachelor of Laws (LL.B) in 1978.

From 1979 to 1981 I read law at University College Oxford and was awarded a MA in Jurisprudence by the University of Oxford. Between 1982 and 1986 I practised as an attorney in Cape Town.

3. The Defendants, Cavell USA, Inc. and Ken Randall, with whom I have consulted previously on issues arising in connection with the business, commercial and contractual arrangements between the Plaintiffs and the Defendants, have asked that I provide expert opinion on certain questions that may arise under the law of England and Wales (for brevity, "English law") for consideration in the above matter in the United States District Court for the Southern District of New York. In particular I have been asked to provide an expert opinion on

   (1) the principles of English law that govern the interpretation of contracts and, in particular, jurisdiction clauses;

   (2) the conclusion of Mr Andrew Lydiard QC at paragraph 32 of his Statement dated 20 November 2007 that "*an English court would conclude ... that the claims advanced in the present proceedings continued to be subject to the same ... jurisdiction as applied prior to the execution of the Term Sheet*";

   (3) how an English court would approach a foreign law issue of construction; and

   (4) whether there is an English law principle of fraudulent concealment.

4. Among the documents which I have been shown are

   (1) the Term Sheet;

   (2) the Complaint;

   (3) the Defendants' Motion to Dismiss;

   (4) the Declaration of Pamela S. Hoelsken, with exhibits;

   (5) the Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint;

   (6) the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint;

   (7) the Statement of Andrew Lydiard QC;

   (8) the Collaboration Agreement; and

   (9) the Administration Agreements.

**(1) Principles of Interpretation**

5. I agree with paragraphs 4 to 7 (inclusive) of Mr Lydiard's statement.

6. The principles which govern the interpretation of jurisdiction clauses are no different.

7. There is no reported decision of an English court, so far as I am aware, in which the meaning of the words in the jurisdiction clause in the Term Sheet (*"the parties submit to the exclusive jurisdiction of the English courts"*) has been considered.

8. Authoritative further guidance on the applicable principles in the context of a dispute over the meaning of a jurisdiction clause has been provided very recently in the speeches (i.e. opinions) of Lords Hoffmann[1] and Hope of Craighead[2], and in the judgment of the Court of Appeal, in <u>Premium Nafta Products Limited and others v Fili Shipping Company Limited and others</u>, reported at [2007] UKHL 40 and [2007] 2 Lloyd's Rep. 267, respectively. The further guidance is to the effect that any jurisdiction clause in an international commercial contract (of which an arbitration clause is an example[3]) should henceforth be liberally construed. One reason given for a liberal construction is the legal certainty it promotes, underlining the presumption or "golden rule" that the jurisdiction has been chosen as a one-stop method of adjudication for the determination of all disputes arising out of the relationship into which the parties have entered or purported to enter. Any jurisdiction clause should therefore be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded.

---

[1] Each of the other members of the Judicial Committee of the House of Lords agreed with the speeches of Lord Hoffmann.

[2] Lord Brown of Eaton-under-Heywood agreed with the speeches of Lord Hope of Craighead.

[3] In this context, arbitration clauses and other jurisdiction clauses are treated in the same way.

9. The Premium Nafta case concerned the scope and effect of a jurisdiction clause in eight specific transactions. The clause provided that *"any dispute arising under this* [transaction] *shall be decided by ..."*. One party to the transactions alleged that the transactions had been procured by bribery and had purported to rescind the transactions on this ground. The question before the court was whether, in circumstances where the validity of the transactions was being impugned, this party's entitlement to rescind the transactions should nevertheless be determined by the tribunal specified in the jurisdiction clause in the transactions – an arbitral tribunal – or by the court. It was held that this question was a matter for the chosen tribunal since the presumption of one-stop adjudication applied.

10. It may be said that the Premium Nafta is distinguishable from the present case on the ground that the interpretation of the jurisdiction clause was considered in relation to a dispute which arose in connection with the eight transactions and the making of these transactions. In contrast, the present case concerns the interpretation of the second half of clause 29 of the Term Sheet (*"the parties submit to the jurisdiction of the English Courts"*) in relation to disputes which may arise in connection with the Term Sheet and the making of the Term Sheet, as well as disputes which may arise in connection with the existing commercial relationship between the parties i.e. the agreement regulates conduct in the context of existing relationships as well as in the context of the new relationship.

11. However, such a point of distinction is flawed. The applicable principles set out in the <u>Premium Nafta</u> case are not restricted to the particular fact that the transactions in that case regulated conduct in the context of a new relationship. Rather, the specific transactions into which the parties had entered were relevant to the commercial background and purpose of the agreement which had to be considered to ascertain the purpose of the jurisdiction clause. The commercial purpose of the jurisdiction clause then educated its construction.

12. The Term Sheet's purpose is stated in the preamble: to document the agreement between the parties "*with respect to the orderly termination of the contractual and other relationships amongst them and the orderly handover ... of run-off management and other services in connection with* [identified insurance companies] *having regard to the regulatory responsibilities of* [stated entities] *and the interests of policyholders of* [the identified insurance companies]". This stated purpose means that the Term Sheet is similar to the transactions in the <u>Premium Nafta</u> case in that it is an agreement which has an identified purpose. Thus the purpose of the jurisdiction clause can be determined and the principles of construction stated in the <u>Premium Nafta</u> case apply.

**(2) Application of the principles**

13. Regrettably, I do not agree with the conclusion stated by Mr Lydiard at paragraph 32 of his Statement that an English court would conclude that the claims advanced

in the present proceedings are to be subject to the jurisdiction which applied prior to the execution of the Term Sheet. Five points are made:

14. First, the construction of a jurisdiction clause in an international commercial contract should start from the sensible commercial presumption that the parties, as reasonable businessmen, did not intend the inconvenience of having possible disputes from their transaction being heard in two or more places. See <u>Premium Nafta Products Limited and others v Fili Shipping Company Limited and others</u> [2007] UKHL 40 at paragraphs 13 (per Lord Hoffmann) and 31 (per Lord Hope of Craighead). If one adopts this approach, it is readily apparent that the language of the jurisdiction clause in the Term Sheet contains nothing to exclude disputes which arise out of the existing commercial relationship between the parties in which it is alleged that there has been *"fraud on the part of Randall"* and one is led to conclude that the jurisdiction clause applies to such disputes. It is a sensible commercial presumption that these parties did not intend the inconvenience of having disputes left unresolved by the orderly termination of their commercial relationship being heard in a multiplicity of jurisdictions.

15. If Mr Lydiard is right, the parties must be taken to have intended that disputes left unresolved by the Term Sheet might be determined in, amongst other jurisdictions, the English courts (under the jurisdiction clauses in the CIC and Unione Management Agreements), the New York Courts (under the non-exclusive jurisdiction clause in the Seaton Management Agreement), arbitration in

New York (under the jurisdiction clause in the Stonewall Management Agreement) and the courts of the Islands of Bermuda (under the DP Advisory Agreement). In the absence of clear language to the contrary in the jurisdiction clause in the Term Sheet, it is to be presumed that the parties, as rational businessmen, are unlikely to have had this intention.

16. Second, the purpose of the Term Sheet directs the reasonable reader to the same conclusion. As I have already stated, the purpose of the Term Sheet is to be derived from its preamble. In essence, the Term Sheet is a divorce settlement. It provides how the commercial relationship between the parties is to be untangled and terminated and unresolved disputes determined.

17. A central feature of the divorce settlement is the release set out at paragraph 13. With three exceptions, the release is self-evidently designed to put an end to all squabbles between the parties *"arising out of or in connection with any business, commercial, contractual or other arrangements between or involving either of them"* as at the date of the Term Sheet. The three exceptions are (1) that obligations expressly set out in the Term Sheet are binding, (2) that claims arising from any breach by Randall of the Term Sheet can be pursued and (3) that Randall is not to be released from any "fraud" on his/its part. The *"obligations expressly set out in the Term Sheet"* include obligations to continue to perform specified existing contracts – see, for example, paragraphs 2, 7 and 23 – and, in

some instances, the terms of the existing contracts are varied by the Term Sheet – see, for example, paragraphs 5, 10, 20 and 22.

18. Other features of the divorce settlement are that, except as expressly set out in the Term Sheet, no compensation is to be paid by either party to the other and that the Term Sheet is to be governed by and construed in accordance with English law. Perhaps of most significance for present purposes, the parties made provision for the method to be used for the determination of disputes. It is an express term of the divorce settlement that *"the parties submit to the exclusive jurisdiction of the English Courts"*.

19. A natural reading of this clause, in context, directs the reader to conclude that the parties have chosen the English courts as a one-stop tribunal for the adjudication of all disputes arising out of the termination of the commercial relationship between them which are left unresolved by the Term Sheet.

20. Third, Mr Lydiard's construction has surprising consequences which a reasonable reader would consider cannot have been intended.

   (1) It has the surprising consequence that disputes in connection with the loose-ends (i.e. the few matters intentionally left unresolved by the Term Sheet) will potentially be fought and determined in a multitude of different jurisdictions. The consequence is surprising because there is no rational basis upon which businessmen would be likely to have intended the

*"forensic nightmare"*[4] of overlapping disputes in different jurisdictions. As Lord Justice Bingham[5] said in <u>Ashville Investments Ltd v Elmer Contractors Ltd</u> [1989] Q.B. 488, at page 517E-F, one should be *"very slow to attribute to reasonable parties an intention that there should in any foreseeable eventuality be two sets of proceedings"*. The point was repeated by Lord Hope of Craighead at paragraph 28 of his speech in <u>Premium Nafta</u>: *"if the parties have confidence in their chosen jurisdiction for one purpose, why should they not have confidence in it for the other? Why, having chosen their jurisdiction for one purpose, should they leave the question which court is to have jurisdiction for the other purpose unspoken, with all the risks that this may give rise to? For them, everything is to be gained by avoiding litigation in two different jurisdictions."* Practical examples serve to illustrate the point.

(a) It is beyond argument that the parties agreed that a dispute as to the meaning of the word *"fraud"* in clause 13 of the Term Sheet is an issue of English law to be determined by the English courts to the exclusion of all others. It is equally beyond argument that the parties agreed that a dispute as to the scope of the third saving from the

---

[4] The language of Lord Justice Steyn (subsequently to become Lord Steyn) delivering the judgement of the Court of Appeal in <u>Continental Bank v Aeakos</u> [1994] 1 W.L.R. 588, at 593D. See below.

[5] Now Lord Bingham of Cornhill, the senior judge in the House of Lords.

release at paragraph 13 of the Term Sheet ("*in the case of fraud on the part of Randall*") is an issue of English law to be determined exclusively by the English courts. It would be surprising therefore if the parties had not also intended that a dispute as to the substance of an allegation of "*fraud on the part of Randall*" within the meaning of these words in the Term Sheet should also be determined exclusively by the English courts[6].

(b) In the event of an allegation of "*fraud on the part of Randall*" which it was said pre-existed the Term Sheet and which it was also said had induced the Term Sheet, it would be a consequence of Mr Lydiard's construction that the merits of the allegation could fall to be determined in two jurisdictions. Rational businessmen cannot have intended this forensic nightmare, particularly when the wording of the jurisdiction clause itself does not require such an interpretation. (A similar example was considered by Lord Justice Steyn in Continental Bank v Aeakos [1994] 1 W.L.R. 588. The jurisdiction clause in that case provided that "*each of the borrowers ... hereby irrevocably submits to the jurisdiction of the English courts ...*" It was argued that the jurisdiction clause could not be construed as extending to a

---

[6] It is not clear why Mr Lydiard has framed the question posed at paragraph 26 of his statement to include reference to English law. Clause 29 of the Term Sheet states expressly that it is "*This Term Sheet*" that is to be governed by and construed in accordance with English law.

claim in tort. Lord Justice Steyn stated that, if this were right, it would mean that a claim for damages for a negligent misrepresentation inducing the contract would be outside the clause but a claim seeking rescission of the contract on the ground of the same misrepresentation would be covered by it. This could mean that the two claims would be tried in different jurisdictions. Lord Justice Steyn stated that this would be a *"forensic nightmare"*. The application of the one-stop principle when construing the jurisdiction clause prevented such a nightmare.)

(2) If Mr Lydiard is right, there is the further surprising consequence that the jurisdiction clause in the Term Sheet does not say where disputes in respect of claims not falling within any of the jurisdiction clauses in the various pre-Term Sheet contracts between the parties which are left unresolved by the Term Sheet are to be determined.

21. Fourth, the contrast in clause 29 between the first and second parts undermines rather than supports Mr Lydiard. In the first part of clause 29, it is the Term Sheet which the parties agree is to be governed by and construed in accordance with English law. The second part is not similarly restricted. In the second part the parties do not limit the disputes which they have agreed to submit to the exclusive jurisdiction of the English courts to those arising out of the Term Sheet. Mr Lydiard's interpretation necessitates reading into the second part of clause 29

words which the parties have not expressed (namely, *"disputes arising from the Term Sheet"*). The implication of these words is unwarranted.

22. Fifth, as the purpose of the Term Sheet was to achieve a divorce, by providing for the orderly termination of commercial relations between the parties as at the date of the Term Sheet, it is unsurprising that the jurisdiction provision in the Term Sheet has the effect of varying the jurisdiction provisions in all of the relevant pre-Term Sheet contracts. (The question whether the jurisdiction provision in the Term Sheet has this effect is of course itself a question which the parties have submitted to the exclusive jurisdiction of the English courts to be determined in accordance with English law.) It will be remembered that a number of other provisions in pre-existing contracts are also varied by the Term Sheet.

(2) **Foreign law issue of construction**

23. The function of the expert witness in an English court in relation to the construction of a foreign law contract is merely to provide the foreign rules of construction. In the light of these rules, it is then for the English court to determine the meaning of the foreign law contract. See the decision of the Court of Appeal delivered by Lord Justice Waller in King v Brandywine Reinsurance Co. [2005] 1 Lloyd's Rep. 655, at paragraph 68 on page 670 rhc.

**(3) Fraudulent concealment**

24. Subject to qualifications which I do not understand to be applicable here, to found an action in fraud (i.e. the tort of deceit), the plaintiff must show that the defendant made a clear misrepresentation of present fact or law (either express or implied from conduct), knowing it to be untrue or being reckless as to its truth, with the intention that the claimant should act in reliance on it, and that he (the claimant) has acted in reliance upon it and suffered loss as a consequence. The general rule is that a positive act of representation is required: mere silence, however morally wrong, will not support an action of deceit. Lord Maugham in <u>Bradford Third Equitable Benefit Building Society v Borders</u> [1941] 2 All E.R. 205, at 211. See also Lords Chelmsford and Cairns in <u>Peek v Gurney</u> (1873) LR 6 HL 377, at pages 390 and 403, respectively. Further, there is no general duty on a party to a contract to disclose facts to the other however dishonest such non-disclosure may be in particular circumstances.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at   London   }

this 30th day of November 2007   }

}

}

*(signature)*
STEPHEN M. HOFMEYR QC