Exhibit D

HOUSE OF LORDS

SESSION 2006–07
**[2007] UKHL 40**

*on appeal from: [2007] EWCA Civ 20*

# OPINIONS

## OF THE LORDS OF APPEAL

## FOR JUDGMENT IN THE CAUSE

### Premium Nafta Products Limited (20th Defendant) and others (Respondents)

*v.*

### Fili Shipping Company Limited (14th Claimant) and others (Appellants)

### Appellate Committee

### Lord Hoffmann
### Lord Hope of Craighead
### Lord Scott of Foscote
### Lord Walker of Gestingthorpe
### Lord Brown of Eaton-under-Heywood

Counsel

*Appellants*:
Christopher Butcher QC
Philip Jones QC
(Instructed by Ince & Co)

*Respondents*:
Nicholas Hamblen QC
Vernon Flynn
(Instructed by Lax & Co)

*Hearing dates:*
30 and 31 July 2007

ON
WEDNESDAY 17 OCTOBER 2007

## HOUSE OF LORDS

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT IN THE CAUSE

### Premium Nafta Products Limited (20th Defendant) and others (Respondents) *v.* Fili Shipping Company Limited (14th Claimant) and others (Appellants)

### [2007] UKHL 40

## LORD HOFFMANN

My Lords,

1.      This appeal concerns the scope and effect of arbitration clauses in eight charterparties in Shelltime 4 form made between eight companies forming part of the Sovcomflot group of companies (which is owned by the Russian state) and eight charterers. It is alleged by the owners that the charters were procured by the bribery of senior officers of the Sovcomflot group by a Mr Nikitin, who controlled or was associated with the charterer companies. It is unnecessary to set out the details of these allegations because it is not disputed that the owners have an arguable case. They have purported to rescind the charters on this ground and the question is whether the issue of whether they were entitled to do so should be determined by arbitration or by a court. The owners have commenced court proceedings for a declaration that the charters have been validly rescinded and the charterers have applied for a stay under section 9 of the Arbitration Act 1996. Morison J [2007] 1 All ER (Comm) 81 refused a stay but the Court of Appeal (Tuckey, Arden and Longmore LJJ) [2007] Bus LR 686 allowed the appeal and granted it.

2.      The case has been argued on the basis that there are two issues: first, whether, as a matter of construction, the arbitration clause is apt to cover the question of whether the contract was procured by bribery and secondly, whether it is possible for a party to be bound by submission to arbitration when he alleges that, but for the bribery, he would never have entered into the contract containing the arbitration clause. It seems to me, however, that for the reasons I shall explain, these questions are very closely connected.

3.    I start by setting out the arbitration clause in the Shelltime 4 form:

> "41.(a)    This charter shall be construed and the relations between the parties determined in accordance with the laws of England.
>
> (b)    Any dispute arising under this charter shall be decided by the English courts to whose jurisdiction the parties hereby agree.
>
> (c)    Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred . . . . to arbitration in London, one arbitrator to be nominated by Owners and the other by Charterers, and in case the arbitrators shall not agree to the decision of an umpire, whose decision shall be final and binding upon both parties. Arbitration shall take place in London in accordance with the London Maritime Association of Arbitrators, in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.
>
> (i)    A party shall lose its right to make such an election only if:
>
> (a)    it receives from the other party a written notice of dispute which –
>
> (1)    states expressly that a dispute has arisen out of this charter;
>
> (2)    specifies the nature of the dispute; and
>
> (3)    refers expressly to this clause 41(c)
>
> And
>
> (b)    it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute … "

4.    It will be observed that clause 41(b) is a jurisdiction clause in respect of "any dispute arising under this charter" which is then incorporated by reference (by the words "any such dispute") in the arbitration clause in 41(c). So the first question is whether clause 41(b) refers the question of whether the charters were procured by bribery to

the jurisdiction of the English court. If it does, then a party may elect under clause 41(c) to have that question referred to arbitration. But I shall for the sake of convenience discuss the clause as if it was a simple arbitration clause. The owners say that for two reasons it does not apply. The first is that, as a matter of construction, the question is not a dispute arising under the charter.   The second is that the jurisdiction and arbitration clause is liable to be rescinded and therefore not binding upon them.

5.    Both of these defences raise the same fundamental question about the attitude of the courts to arbitration.   Arbitration is consensual.   It depends upon the intention of the parties as expressed in their agreement.  Only the agreement can tell you what kind of disputes they intended to submit to arbitration.   But the meaning which parties intended to express by the words which they used will be affected by the commercial background and the reader's understanding of the purpose for which the agreement was made. Businessmen in particular are assumed to have entered into agreements to achieve some rational commercial purpose and an understanding of this purpose will influence the way in which one interprets their language.

6.    In approaching the question of construction, it is therefore necessary to inquire into the purpose of the arbitration clause. As to this, I think there can be no doubt.   The parties have entered into a relationship, an agreement or what is alleged to be an agreement or what appears on its face to be an agreement, which may give rise to disputes. They want those disputes decided by a tribunal which they have chosen, commonly on the grounds of such matters as its neutrality, expertise and privacy, the availability of legal services at the seat of the arbitration and the unobtrusive efficiency of its supervisory law.   Particularly in the case of international contracts, they want a quick and efficient adjudication and do not want to take the risks of delay and, in too many cases, partiality, in proceedings before a national jurisdiction.

7.    If one accepts that this is the purpose of an arbitration clause, its construction must be influenced by whether the parties, as rational businessmen, were likely to have intended that only some of the questions arising out of their relationship were to be submitted to arbitration and others were to be decided by national courts.  Could they have intended that the question of whether the contract was repudiated should be decided by arbitration but the question of whether it was induced by misrepresentation should be decided by a court?  If, as appears to be generally accepted, there is no rational basis upon which

businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention.

8.    A proper approach to construction therefore requires the court to give effect, so far as the language used by the parties will permit, to the commercial purpose of the arbitration clause. But the same policy of giving effect to the commercial purpose also drives the approach of the courts (and the legislature) to the second question raised in this appeal, namely, whether there is any conceptual reason why parties who have agreed to submit the question of the validity of the contract to arbitration should not be allowed to do so.

9.    There was for some time a view that arbitrators could never have jurisdiction to decide whether a contract was valid. If the contract was invalid, so was the arbitration clause. In *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep 63, 66 Evans J said that this rule "owes as much to logic as it does to authority". But the logic of the proposition was denied by the Court of Appeal in *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* [1993] QB 701 and the question was put beyond doubt by section 7 of the Arbitration Act 1996:

> "Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement."

10.    This section shows a recognition by Parliament that, for the reasons I have given in discussing the approach to construction, businessmen frequently do want the question of whether their contract was valid, or came into existence, or has become ineffective, submitted to arbitration and that the law should not place conceptual obstacles in their way.

4

11.    With that background, I turn to the question of construction. Your Lordships were referred to a number of cases in which various forms of words in arbitration clauses have been considered. Some of them draw a distinction between disputes "arising under" and "arising out of" the agreement. In *Heyman v Darwins Ltd* [1942 ] AC 356, 399 Lord Porter said that the former had a narrower meaning than the latter but in *Union of India v E B Aaby's Rederi A/S* [1975] AC 797 Viscount Dihorne, at p. 814, and Lord Salmon, at p. 817, said that they could not see the difference between them.    Nevertheless, in *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988]  2 Lloyd's Rep 63, 67, Evans J said that there was a broad distinction between clauses which referred "only those disputes which may arise regarding the rights and obligations which are created by the contract itself" and those which "show an intention to refer some wider class or classes of disputes."    The former may be said to arise "under" the contract while the latter would arise "in relation to" or "in connection with" the contract.  In *Fillite (Runcorn) Ltd v Aqua-Lift* (1989)  26 Con LR 66, 76 Slade LJ said that the phrase "under a contract" was not wide enough to include disputes which did not concern obligations created by or incorporated in the contract.  Nourse LJ gave a judgment to the same effect.  The court does not seem to have been referred to *Mackender v Feldia AG* [1967]  2 QB 590, in which a court which included Lord Denning MR and Diplock LJ decided that a clause in an insurance policy submitting disputes "arising thereunder" to a foreign jurisdiction was wide enough to cover  the question of whether the contract could be avoided for non-disclosure.

12.    I do not propose to analyse these and other such cases any further because in my opinion the distinctions which they make reflect no credit upon English commercial law. It may be a great disappointment to the judges who explained so carefully the effects of the various linguistic nuances if they could learn that the draftsman of so widely used a standard form as Shelltime 4 obviously regarded the expressions "arising under this charter" in clause 41(b) and "arisen out of this charter" in clause  41(c)(1)(a)(i) as mutually interchangeable.    So I applaud the opinion expressed by Longmore LJ in the Court of Appeal (at paragraph 17) that the time has come to draw a line under the authorities to date and make a fresh start.  I think that a fresh start is justified by the developments which have occurred in this branch of the law in recent years and in particular by the adoption of the principle of separability by Parliament in section 7 of the 1996 Act.  That section was obviously intended to enable the courts to give effect to the reasonable commercial expectations of the parties about the questions which they intended to be decided by arbitration. But section 7 will not achieve its purpose if the courts adopt an approach to construction

which is likely in many cases to defeat those expectations. The approach to construction therefore needs to be re-examined.

13.    In my opinion the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction.    As Longmore LJ remarked, at para 17: "if any businessman did want to exclude disputes about the validity of a contract, it would be comparatively easy to say so."

14.    This appears to be the approach adopted in Germany: see the *Bundesgerichtshof's Decision of 27 February 1970* (1990) Arbitration International, vol 6, No 1, p 79:

> "There is every reason to presume that reasonable parties will wish to have the relationships created by their contract and the claims arising therefrom, irrespective of whether their contract is effective or not, decided by the same tribunal and not by two different tribunals."

15.    If one adopts this approach, the language of clause 41 of Shelltime 4 contains nothing to exclude disputes about the validity of the contract, whether on the grounds that it was procured by fraud, bribery, misrepresentation or anything else. In my opinion it therefore applies to the present dispute.

16.    The next question is whether, in view of the allegation of bribery, the clause is binding upon the owners. They say that if they are right about the bribery, they were entitled to rescind the whole contract, including the arbitration clause. The arbitrator therefore has no jurisdiction and the dispute should be decided by the court.

17.    The principle of separability enacted in section 7 means that the invalidity or rescission of the main contract does not necessarily entail the invalidity or rescission of the arbitration agreement. The arbitration agreement must be treated as a "distinct agreement" and can be void or voidable only on grounds which relate directly to the arbitration agreement.    Of course there may be cases in which the ground upon

which the main agreement is invalid is identical with the ground upon which the arbitration agreement is invalid. For example, if the main agreement and the arbitration agreement are contained in the same document and one of the parties claims that he never agreed to anything in the document and that his signature was forged, that will be an attack on the validity of the arbitration agreement. But the ground of attack is not that the main agreement was invalid. It is that the signature to the arbitration agreement, as a "distinct agreement", was forged. Similarly, if a party alleges that someone who purported to sign as agent on his behalf had no authority whatever to conclude any agreement on his behalf, that is an attack on both the main agreement and the arbitration agreement.

18.    On the other hand, if (as in this case) the allegation is that the agent exceeded his authority by entering into a main agreement in terms which were not authorized or for improper reasons, that is not necessarily an attack on the arbitration agreement. It would have to be shown that whatever the terms of the main agreement or the reasons for which the agent concluded it, he would have had no authority to enter into an arbitration agreement. Even if the allegation is that there was no concluded agreement (for example, that terms of the main agreement remained to be agreed) that is not necessarily an attack on the arbitration agreement. If the arbitration clause has been agreed, the parties will be presumed to have intended the question of whether there was a concluded main agreement to be decided by arbitration.

19.    In the present case, it is alleged that the main agreement was in uncommercial terms which, together with other surrounding circumstances, give rise to the inference that an agent acting for the owners was bribed to consent to it. But that does not show that he was bribed to enter into the arbitration agreement. It would have been remarkable for him to enter into any charter without an arbitration agreement, whatever its other terms had been. Mr Butcher QC, who appeared for the owners, said that but for the bribery, the owners would not have entered into any charter with the charterers and therefore would not have entered into an arbitration agreement. But that is in my opinion exactly the kind of argument which section 7 was intended to prevent. It amounts to saying that because the main agreement and the arbitration agreement were bound up with each other, the invalidity of the main agreement should result in the invalidity of the arbitration agreement. The one should fall with the other because they would never have been separately concluded. But section 7 in my opinion means that they must be treated as having been separately concluded and the arbitration agreement can be invalidated only on a ground which relates to the

arbitration agreement and is not merely a consequence of the invalidity of the main agreement.

20.    Mr Butcher submitted that the approach to construction and separability adopted by the Court of Appeal infringed the owners' right of access to a court for the resolution of their civil disputes, contrary to article 6 of the European Convention on Human Rights. I do not think there is anything in this point. The European Convention was not intended to destroy arbitration. Arbitration is based upon agreement and the parties can by agreement waive the right to a court. If it appears upon a fair construction of the charter that they have agreed to the arbitration of a particular dispute, there is no infringement of their Convention right.

21.    For these reasons, which are substantially the same as those given by Longmore LJ in the Court of Appeal, I would hold that the charterers are entitled to a stay of the proceedings to rescind the charters and dismiss the appeal.

## LORD HOPE OF CRAIGHEAD

My Lords,

22.    I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hoffmann. I entirely agree with it, and for the reasons he gives I too would dismiss the appeal. I wish to add only a few brief comments.

23.    There are, as my noble and learned friend has said, two issues in this appeal. The first is an issue of construction: whether the appellants' claims that the charterparties have been validly rescinded are disputes which arise under, or out of, the charterparties within the meaning of clause 41. The second is an issue of separability: whether, assuming that the appellants have an arguable case that the charterparties have been validly rescinded, they also have an arguable case that the arbitration agreements in clause 41 have been rescinded as well. The appellants submit that they were entitled to rescind the charterparties, including the arbitration agreements, because the charterparties were induced by bribery. The allegations of bribery are directed to the terms on which the charters were entered into by the Sovcomflot group of companies as owners with Mr Nikitin's chartering companies. They are

said to have been uncommercial and unbelievably generous. The bribes are said to impeach not only the charters themselves but also the arbitration clause. The argument is essentially one of causation. It is that the charters would not have been entered into in the absence of these bribes or other benefits, and that but for the agreement to enter into them there would have been no agreement to go to arbitration. Had it not been for the bribes provided by Mr Nikitin to their director-general, Mr Skarga, Sovcomflot would not have done business with Mr Nikitin's companies at all.

24.    On the first issue, the appellants say that it is highly unlikely that the parties, in agreeing to an arbitration provision, intended it to cover disputes as to whether the contract itself was induced by bribery, as to which it must be assumed one party would be entirely ignorant. The clear trend of recent authorities, they say, is to give a narrow meaning to the words used in the arbitration agreement to identify the disputes that are referred by it. They must be taken to have informed any decision to use the clause which is set out in the Shelltime 4 standard forms. I think that there are two answers to this argument. One is to be found in the wording of clause 41 itself. The other is to be found by considering whether its consequences make sense in the international commercial context within which these standard forms are designed to operate.

25.    As for the wording, contracts negotiated between parties in the international market are commonly based upon standard forms the terms of which are well known. Because they have a well-understood meaning, they enable contracts to be entered into quickly and efficiently. The Shelltime 4 standard form is a good example of this practice. It has been in frequent use since at least 1984, and it is still in use. But it must be appreciated that the various clauses in these forms serve various functions. In some a high degree of precision is necessary. Terms which define the parties' mutual obligations in relation to price and performance lie at the heart of every business transaction. They fall into that category. In others, where the overall purpose is clear, the parties are unlikely to linger over the words which are used to express it.

26.    Clause 41 falls into the latter category. No contract of this kind is complete without a clause which identifies the law to be applied and the methods to be used for the determination of disputes. Its purpose is to avoid the expense and delay of having to argue about these matters later. It is the kind of clause to which ordinary businessmen readily give their agreement so long as its general meaning is clear. They are unlikely to trouble themselves too much about its precise language or to wish to

9

explore the way it has been interpreted in the numerous authorities, not all of which speak with one voice. Of course, the court must do what it can to provide charterers and shipowners with legal certainty at the negotiation stage as to what they are agreeing to. But there is no conflict between that proposition and the guidance which Longmore LJ gave in paras 17 - 19 of the Court of Appeal's judgment about the interpretation of jurisdiction and arbitration clauses in international commercial contracts. The proposition that any jurisdiction or arbitration clause in an international commercial contract should be liberally construed promotes legal certainty. It serves to underline the golden rule that if the parties wish to have issues as to the validity of their contract decided by one tribunal and issues as to its meaning or performance decided by another, they must say so expressly. Otherwise they will be taken to have agreed on a single tribunal for the resolution of all such disputes.

27.    The overall purpose of clause 41 is identified in the two opening paragraphs. These are the choice of law and jurisdiction clauses. There is no sign here – leaving aside the question of arbitration for a moment – that the parties intended that the disputes which were to be determined in accordance with the laws of England and be decided by the English courts were not to include disputes about the charter's validity. The simplicity of the wording is a plain indication to the contrary. The arbitration clause which follows is to be read in that context. It indicates to the reader that he need not trouble himself with fussy distinctions as to what the words "arising under" and "arising out of" may mean. Taken overall, the wording indicates that arbitration may be chosen as a one-stop method of adjudication for the determination of all disputes. Disputes about validity, after all, are no less appropriate for determination by an arbitrator than any other kind of dispute that may arise. So I do not think that there is anything in the appellants' point that it must be assumed that when the charters were entered into one party was entirely ignorant that they were induced by bribery. The purpose of the clause is to provide for the determination of disputes of all kinds, whether or not they were foreseen at the time when the contract was entered into.

28.    Then there are consequences that would follow, if the appellants are right. It is not just that the parties would be deprived of the benefit of having all their disputes decided in one forum. The jurisdiction clause does not say where disputes about the validity of the contract are to be determined, if this is not to be in the forum which is expressly mentioned. The default position is that such claims would have to be brought in the jurisdiction where their opponents were incorporated,

wherever and however unreliable that might be, while claims for breach of contract have to be brought in England. But why, it may be asked, would any sensible businessmen have wished to agree to this? As Bingham LJ said in *Ashville Investments Ltd v Elmer Contractors Ltd* [1989] QB 488, 517, one should be slow to attribute to reasonable parties an intention that there should in any foreseeable eventuality be two sets of proceedings. If the parties have confidence in their chosen jurisdiction for one purpose, why should they not have confidence in it for the other? Why, having chosen their jurisdiction for one purpose, should they leave the question which court is to have jurisdiction for the other purpose unspoken, with all the risks that this may give rise to? For them, everything is to be gained by avoiding litigation in two different jurisdictions. The same approach applies to the arbitration clause

29.    The Court of Appeal said that the time had come for a fresh start to be made, at any rate for cases arising in an international commercial context. It has indeed been clear for many years that the trend of recent authority has risked isolating the approach that English law takes to the wording of such clauses from that which is taken internationally. It makes sense in the context of international commerce for decisions about their effect to be informed by what has been decided elsewhere.

30.    The Bundesgerichtshof's Decision of 27 February 1970 to which Lord Hoffmann has referred makes two points that are relevant to this issue. The first is that haphazard interpretations should be avoided and a rule of construction established which presumes, in cases of doubt, that reasonable parties will wish to have the claims arising from their contract decided by the same tribunal irrespective of whether their contract is effective or not. The second is that experience shows that as soon as a dispute of any kind arises from a contract, objections are very often also raised against its validity. As the Bundesgerichtshof said, entrusting the assessment of the facts of the case to different tribunals according to the approach that is taken to the issues between them is unlikely to occur to the contracting parties.

31.    In *AT & T Technologies Inc v Communications Workers of America*, 475 US 643 (1986), 650, the United States Supreme Court said that, in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration could prevail. In *Threlkeld & Co Inc v Metallgesellschaft Ltd (London)*, 923 F 2d 245 (2d Cir 1991), the court observed that federal arbitration policy required that any doubts

concerning the scope of arbitral issues should be resolved in favour of arbitration and that arbitration clauses should be construed as broadly as possible. In *Comandate Marine Corp v Pan Australia Shipping Pty Ltd* [2006] FCAFC 192, para 165 the Federal Court of Australia said that a liberal approach to the words chosen by the parties was underpinned by the sensible commercial presumption that the parties did not intend the inconvenience of having possible disputes from their transaction being heard in two places, particularly when they were operating in a truly international market. This approach to the issue of construction is now firmly embedded as part of the law of international commerce. I agree with the Court of Appeal that it must now be accepted as part of our law too.

32.    It is in the light of these observations that the issue of severability should be viewed also.    Section 7 of the Arbitration Act 1996 reproduces in English law the principle that was laid down by section 4 of the United States Arbitration Act 1925. That section provides that, on being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration. Section 7 uses slightly different language, but it is to the same effect. The validity, existence or effectiveness of the arbitration agreement is not dependent upon the effectiveness, existence or validity of the underlying substantive contract unless the parties have agreed to this. The purpose of these provisions, as the United States Supreme Court observed in *Prima Paint Corpn v Flood & Conklin Mfg Co*, 388 US 395 (1967), 404, is that the arbitration procedure, when selected by the parties to a contract, should be speedy and not subject to delay and obstruction in the courts. The statutory language, it said, did not permit the court to consider claims of fraud in the inducement of the contract generally. It could consider only issues relating to the making and performance of the agreement to arbitrate. Dicey, Morris and Collins, *The Conflict of Laws*, 14th ed (2006), vol 1, para 12-099, acknowledge that there are excellent reasons of policy to support this approach.

33.    The appellants' case is that, as there was no real consent to the charterparties because they were induced by bribery, there was no real consent to the arbitration clauses. They submit that a line does not have to be drawn between matters which might impeach the arbitration clause and those which affect the main contract. What is needed is an analysis of whether the matters that affect the main contract are also matters which affect the validity of the arbitration clause. As the respondents point out, this is a causation argument. The appellants say that no substantive distinction can be drawn between various situations where

the complaint is made that there was no real consent to the transaction. It would be contrary to the policy of the law, which is to deter bribery, that acts of the person who is alleged to have been bribed should deprive the innocent party of access to a court for determination of the issue whether the contract was induced by bribery.

34.    But, as Longmore LJ said in para 21 of the Court of Appeal's judgment, this case is different from a dispute as to whether there was ever a contract at all. As everyone knows, an arbitral award possesses no binding force except that which is derived from the joint mandate of the contracting parties. Everything depends on their contract, and if there was no contract to go to arbitration at all an arbitrator's award can have no validity. So, where the arbitration agreement is set out in the same document as the main contract, the issue whether there was an agreement at all may indeed affect all parts of it. Issues as to whether the entire agreement was procured by impersonation or by forgery, for example, are unlikely to be severable from the arbitration clause.

35.    That is not this case, however. The appellants' argument was not that there was no contract at all, but that they were entitled to rescind the contract including the arbitration agreement because the contract was induced by bribery. Allegations of that kind, if sound, may affect the validity of the main agreement. But they do not undermine the validity of the arbitration agreement as a distinct agreement. The doctrine of separability requires direct impeachment of the arbitration agreement before it can be set aside. This is an exacting test. The argument must be based on facts which are specific to the arbitration agreement. Allegations that are parasitical to a challenge to the validity to the main agreement will not do.    That being the situation in this case, the agreement to go to arbitration must be given effect.

## LORD SCOTT OF FOSCOTE

My Lords,

36.    I have had the advantage of reading in advance the opinion of my noble and learned friend Lord Hoffmann and find myself in complete agreement with the conclusion he has reached and his reasons for that conclusion. I cannot improve upon those reasons and shall not try to do so. I, too, would dismiss this appeal.

## LORD WALKER OF GESTINGTHORPE

My Lords,

37.    I have had the privilege of reading in draft the opinion of my noble and learned friend Lord Hoffmann. I am in full agreement with it. It gives full effect to the legislative purpose of section 7 of the Arbitration Act 1996. It marks a fresh start, leaving behind some fine verbal distinctions (on the language of particular arbitration clauses) which few commercial men would regard as significant.  For these reasons I too would dismiss this appeal.

## LORD BROWN OF EATON-UNDER-HEYWOOD

My Lords,

38.    For the reasons given in the speeches prepared by my noble and learned friends, Lord Hoffmann and Lord Hope of Craighead, with which I am in full agreement, I too would dismiss this appeal.

## COURT OF APPEAL

19, 20 December; 24 January 2007

---

### FIONA TRUST & HOLDING CORPORATION AND OTHERS

v

### PRIVALOV AND OTHERS

[2007] EWCA Civ 20

Before Lord Justice TUCKEY,
Lady Justice ARDEN, and
Lord Justice LONGMORE

**Arbitration - Charterparty providing that "Any dispute arising under this charter" should be referred to London arbitration - Shipowners bringing court proceedings claiming rescission of charterparties for bribery and fraud - Whether arbitration clause covered dispute - Whether charterers entitled to stay of proceedings under Arbitration Act 1996, section 9.**

Disputes arose between the parties to eight charterparties on the Shelltime 4 form. The owners asserted that the charterparties were procured by bribery, and they brought proceedings in England claiming damages for the tort of conspiracy, restitution, and an account of profits. The owners also claimed that the charterparties had been validly rescinded for bribery.

The charterparties all contained an English jurisdiction clause, and conferred a right on either party to elect to refer disputes "arising under this charter" and "out of this charter" to London arbitration.

On 25 April 2006 the charterers commenced London arbitration proceedings. They asked the arbitrator *inter alia* to determine the effectiveness of the owners' rescission of the charters.

On 12 June 2006 the owners applied to the court under section 72 of the Arbitration Act 1996 to restrain the arbitration proceedings, on the basis that there was no valid arbitration agreement since the charterparties, and therefore the arbitration agreements, had been rescinded for bribery.

On 12 July 2006 the charterers applied under section 9 of the Act for a stay of the owners' rescission claims and any further time charter claims.

At first instance, Morison J declined to stay the owners' rescission claims. He held that the bribery arguments, if sustainable, impeached the whole contract and did not arise "out of" or "under" the contract. Even if that were wrong, the existence or otherwise of the arbitration agreement was best decided once, and by the court. He granted interim injunctions to restrain the arbitration proceedings pending the trial of the action.

The charterers appealed.

-*Held*, by CA (TUCKEY, ARDEN and LONGMORE LJJ) that the appeal would be allowed.

(1) Jurisdiction or arbitration clauses in international commercial contracts were to be liberally construed.

The words "arising out of" covered every dispute except a dispute as to whether there was ever a contract at all. Although in the past the words "arising under the contract" had sometimes been given a narrower meaning, that should no longer continue to be so. A dispute whether the contract could be set aside or rescinded for alleged bribery fell within the arbitration clause on its true construction (*see* paras 18 and 21).

-*Makender v Feldia AG* [1966] 2 Lloyd's Rep. 449; [1967] 2 QB 590 considered.

(2) An arbitration clause was a separate contract which survived the destruction or other termination of the main contract. An allegation of invalidity of a contract did not prevent the invalidity question being determined by an arbitration tribunal pursuant to the separate arbitration agreement. It was only if the arbitration agreement was itself directly impeached for some specific reason that the tribunal would be prevented from deciding the disputes that related to the main contact (*see* para 23).

-*Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* [1993] 1 Lloyd's Rep. 455 considered.

(3) The question in the present case was whether the assertion of invalidity went to the validity of the arbitration clause as opposed to the validity of the charterparties as a whole of which the arbitration agreements were a part. It was not enough to say that the contract as a whole was impeachable. There had to be something more than that to impeach the arbitration clause. That extra element was missing in the present case (*see* para 25).

(4) Since the arbitration clauses in the present case were wide enough to comprise the relevant dispute, and were not directly impeached by whatever ground was used to attack the invalidity of the contract in which the arbitration clause was contained, there was a valid arbitration agreement and section 72 of the Act accordingly had no application. The owners' claims for rescission would be stayed pursuant to section 9(4) of the Act, and their application under section 72 dismissed (*see* paras 35 and 41).

-*Per curiam*: Although section 72 provides that a party who takes no part in arbitration proceedings should be entitled in court to "question whether there is a valid arbitration agreement" the arbitrators should, in general, be the first tribunal to consider whether there is a valid arbitration agreement and whether the arbitrators have jurisdiction to determine the dispute. Where a party who denied the existence of a valid arbitration agreement had himself instituted court proceedings, and the party who relied on the arbitration clause had applied for a stay, the application for a stay was the primary matter which needed to be decided.

---

The following cases were referred to in the judgment:

*Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* (CA) [1995] 1 Lloyd's Rep. 87;

[2007] Vol. 2
CA

**LLOYD'S LAW REPORTS**
Fiona Trust & Holding Corp v Privalov

268
Longmore LJ

*Ahmed Al-Naimi v Islamic Press Agency Inc* (CA) [2000] 1 Lloyd's Rep. 522;

*Ashville Investments Ltd v Elmer Contractors Ltd* (CA) [1988] 2 Lloyd's Rep. 73; [1989] QB 488;

*Benincasa v Dentalkit Srl* Case C-269/95 [1997] ECR I-3767;

*Birse Construction Ltd v St David Ltd* [1999] BLR 194;

*Chimimport plc v D'Alesio (The Paola D'Alesio)* [1994] 2 Lloyd's Rep. 366;

*Credit Suisse First Boston (Europe) Ltd v Seagate Trading Co Ltd* [1999] 1 Lloyd's Rep. 784;

*Delos, The* [2001] 1 Lloyd's Rep. 703;

*E B Aaby's Rederi AS v The Union of India (The Evje)* (HL) [1974] 2 Lloyd's Rep. 57; [1975] AC 797;

*Empresa Exportadora De Azucar v Industria Azucarera Nacional SA (The Playa Larga and Marble Islands)* (CA) [1983] 2 Lloyd's Rep. 171;

*Ethiopian Oilseeds & Pulses Export Corporation v Rio del Mar Foods Inc* [1990] 1 Lloyd's Rep. 86;

*Fillite (Runcorn) Ltd v Aqua-Lift* (CA) (1989) 26 Const LR 66;

*Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* [1992] 1 Lloyd's Rep 81; (CA) [1993] 1 Lloyd's Rep. 455; [1993] QB 701;

*Heyman v Darwins Ltd* (HL) (1942) 72 Ll L Rep 65; [1942] AC 356;

*Law Debenture Trust Corporation plc v Elektrim Finance BV* [2005] 2 Lloyd's Rep. 755;

*Logicrose Ltd v Southend United Football Club* [1988] 1 WLR 1256;

*Mackender v Feldia AG* (CA) [1966] 2 Lloyd's Rep. 449; [1967] 2 QB 590;

*Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep. 63;

*Prima Paint Corporation v Flood & Conklin* (1967) 388 US 395;

*Samick Lines Co Ltd v Owners of the Ship "Antonis P Lemos (The Antonis P Lemos)* (HL) [1985] 1 Lloyd's Rep. 283; [1985] AC 711;

*Ulysses Compania Naviera SA v Huntingdon Petroleum Services Ltd (The Ermoupolis)* [1990] 1 Lloyd's Rep. 160.

This was an appeal by defendant charterers from the decision of Morison J [2006] EWHC 2583 (Comm) refusing to stay the owners' claims for rescission of the charterparties on the ground of bribery, and granting injunctions restraining arbitration proceedings commenced by the charterers until the trial of the action.

Nicholas Hamblen QC and Vernon Flynn, instructed by Lawrence Graham LLP, for the charterers; Christopher Butcher QC and Philip Jones QC, instructed by Ince & Co, for the owners.

The further facts are stated in the judgment of Longmore LJ.

Judgment was reserved.

Wednesday, 24 January 2007

———————

**JUDGMENT**

**Lord Justice LONGMORE:**

1. This is the judgment of the court.

*Introduction*

2. This appeal raises, apparently for the first time, the question whether, if there is a plausible argument that contracts have been induced by bribery and have been rescinded on discovery of the bribery, that constitutes a dispute which can (and should be) determined by arbitration in the context of a common form of arbitration clause.

3. The relevant contracts are eight charterparties made by eight one-ship companies in the Russian Sovcomflot group of companies as owners, with three separate chartering companies between February 2001 and September 2003 on the Shelltime 4 form. It is, however, important to appreciate that these eight charter disputes form a small part only of an overall dispute between Sovcomflot and its numerous subsidiaries or sub-subsidiaries on the one hand and a Mr Nikitin who is alleged to have successfully bribed one or more directors or employees of Sovcomflot and their associated companies. It is said that the charterparties with which this appeal is concerned and numerous other contracts were procured by this bribery and contained terms highly favourable to the charterers. But it is also said, *inter alia*, that: (1) vast sums were paid by way of commission to companies nominated by Mr Nikitin on ship purchases and both new and existing ship building business; (2) Sovcomflot interests were deceived into making an enormous payment to acquire a debt owed to a Russian bank; (3) uncommercial sale and leaseback transactions were made for the benefit of Mr Nikitin's companies; (4) shipbuilding options and shares in Sovcomflot companies were traded at a gross undervalue; and (5) a fictitious service contract was entered into designed to injure owners' financial and commercial interests.

**LLOYD'S LAW REPORTS**  
Fiona Trust & Holding Corp v Privalov

4. An intricate and complex action has therefore been instituted in England by a large number of claimants seeking damages for the tort of conspiracy and making claims by way of damages or restitution as a result of the payment of bribes and a claim for compensation or an account of profits in respect of what is said to be a breach of fiduciary duty by those who have entered into the charterparties. There is also a claim that the eight charterparties which are the subject matter of these proceedings have been validly rescinded and that restitution of benefits should be made.

5. Each of the charterparties contains what is called a "Law and Litigation" clause which provides for any dispute under the charter to be decided in England and confers on either party the right to elect to have any such dispute referred to arbitration in accordance with rules of the London Maritime Arbitrators' Association. That clause is in the following terms:

41. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.

(b) Any dispute arising under this charter shall be decided by the English courts to whose jurisdiction the parties hereby agree.

(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred. . . to arbitration in London, one arbitrator to be nominated by owners and the other by charterers, and in case the arbitrators shall not agree to the decision of an umpire, whose decision shall be final and binding upon both parties. Arbitration shall take place in London in accordance with the London Maritime association of arbitrators in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.

(i) A party shall lose its right to make such an election only if:

(a) it receives from the other party a written notice of dispute which:

(1) states expressly that a dispute has arisen out of this charter;

(2) specifies the nature of the dispute; and

(3) refers expressly to this clause 41(c)

and

(b) it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute.

6. The charterers named in each of the eight charterparties have sought to enforce their rights in arbitration and have appointed Mr Mark Hamsher as sole arbitrator. On 12 June 2006 owners made an arbitration application pursuant to section 72 of the Arbitration Act 1996 ("the 1996 Act") seeking to restrain the arbitration proceedings on the basis that they (the owners) have rescinded both the charterparties and the arbitration agreements contained in them for bribery and that there can be no arbitration. The charterers responded on 12 July 2006 by seeking a stay from the court under section 9 of the Act of the owners' rescission claims, as well as of any further time charter claims by the owners as explained in paras 5(3) and (4) of the judgment.

7. Morison J has declined to stay the claims for rescission and has granted interlocutory injunctions to restrain the arbitration proceedings pending the trial of the action. That trial has as yet no fixed date and it is not easy to predict when it may be concluded.

8. The submissions of the parties can be most conveniently grouped under the following headings:

(1) Construction of the arbitration clause or (in other words) does a claim that the charters have been rescinded for bribery come within the arbitration clause?

(2) Separability of the arbitration clause.

(3) Procedural matters *viz* the relationship (if any) between sections 9 and 72 of the 1996 Act.

*Construction*

9. For the charterers Mr Hamblen QC addressed us first on the question of the separability of the arbitration clause from the rest of the agreement. Mr Butcher QC for the shipowners said that logically one must first decide what disputes are governed by the arbitration clause before considering the extent to which the arbitration agreement (whatever it meant) was separable from the main charter agreement. To that extent we agree with Mr Butcher. Counsel agreed that, since the clause referred both to the expression "any dispute arising under this charter" and (in sub-clause c(i)(a)(1) for the purpose of describing the requirements of a notice of dispute which may lead to the consequence that a party has lost his right to arbitrate) to the expression "a dispute has arisen out of this charter", the parties drew no distinction between disputes arising "under" and "out of" the charterparty. That was the limit of their agreement. Mr Hamblen submitted that "out of" was a wider phrase than "under" and that the parties therefore intended a wide meaning to be given to the clause.

Mr Butcher submitted that "under" had a narrow meaning, was the primary word in the clause and that "out of", since it appeared only second and in a sub-sub-clause, must take its meaning from the meaning of "under". In any event he said that "out of" itself had a narrow meaning. We were referred to numerous authorities which Mr Butcher said supported his submission that the arbitration clause did not apply to a dispute about rescission for bribery.

10. The appellate authorities to which we were referred on this point were *Heyman v Darwins Ltd* [1942] AC 356, *Mackender v Feldia* [1966] 2 Lloyd's Rep. 449; [1967] 2 QB 590, *The Evje* [1974] 2 Lloyd's Rep. 57; [1975] AC 797, *The Playa Larga* [1983] 2 Lloyd's Rep. 171, *Antonis P Lemos* [1985] 1 Lloyd's Rep. 283; [1985] AC 711, *Ashville Investments Ltd v Elmer Contractors Ltd* [1988] 2 Lloyd's Rep. 73; [1989] QB 488, *Fillite (Runcorn) v Aqua-Lift* (1989) 26 Const LR 66, *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance* [1992] 1 Lloyd's Rep. 81; [1993] QB 701 and *The Angelic Grace* [1995] 1 Lloyd's Rep. 87. In *Heyman v Darwins* both Lord Wright (page 385) and Lord Porter (page 399) said that "arising out of" had a wider meaning than "arising under". In *The Evje* both Viscount Dilhorne ([1975] AC page 814H) and Lord Salmon (page 817A) said they could not discern any difference in the meaning in the two phrases. As to this difference of view Lord Brandon of Oakwood in the *Antonis P Lemos* at page 728B said:

I do not doubt that, in some contexts, such as an arbitration clause in a commercial contract, it would be right to treat the first of these two expressions as the equivalent of the second.

He continued that it would not be right to do so in the context of domestic statutes intended to give effect to an international convention "which require. . . a broad and liberal construction". Mr Butcher laid considerable emphasis on this passage but did not explain why on the facts of this particular case, words in a well-known form of agreement likely to be made between two parties of different nations should be construed less broadly and less liberally than a statute giving effect to international obligations.

11. In *The Playa Larga* the Court of Appeal decided, in relation to the words "arising out of" that, where a claim in tort was closely knitted together with a contractual claim on the facts, an agreement to arbitrate the contractual claim could properly be construed as covering the tortious claim: see page 182. This decision was followed in *The Angelic Grace*.

12. The clause that fell for consideration in *Mackender v Feldia* was a jurisdiction clause rather

than an arbitration clause but there can hardly be any difference between the two clauses as a matter of construction. The clause provided that an insurance policy should be governed by Belgian law and

any disputes arising thereunder shall be exclusively subject to Belgian jurisdiction.

The underwriters avoided the contract for non-disclosure of material facts and submitted that the jurisdiction clause could no longer apply because there

is no contract and there was no contract when the Belgian proceedings were started. So the relations between the parties are no longer governed by the contract at all (per Mr R A MacCrindle QC at page 593).

Lord Denning MR described the argument as being

. . . owing to the non-disclosure there was no true contract - no real consent by the underwriters - and that, on this basis, the contract itself falls down, including even the jurisdiction clause.

This court rejected the argument on the grounds that there was a contract until avoidance and that the case was not like a case of "*non est factum*" when the foreign jurisdiction clause might not apply at all (see page 598C per Lord Denning MR and page 603 per Diplock LJ). It is clear that a claim for innocent misrepresentation would have also been regarded as falling within the words "any dispute arising thereunder" (pages 603 and 604 per Diplock LJ).

13. In *Ashville Investments v Elmer Contractors*, where this court held that a claim for rectification fell within a clause referring to arbitration:

any dispute or difference. . . as to the construction of this contract or as to any matter or thing of whatsoever nature arising thereunder or in connection therewith . . .

Balcombe LJ said (page 503C) that a dispute about a mistake leading to rectification was not a matter "arising" under the contract but also said (page 503G) that all words should as far as possible be given a meaning. In that case the clause used two different phrases which were intended to have different meanings; their use in the instant clause, however, shows, as is common ground, that the phrases "arising under" and "arising out of" are intended to have the same meaning. Bingham LJ said (page 508H) disputes "arising under the contract" would not include claims in tort but left undecided the question whether claims for restitution or rectification would be covered because such claims would be covered by the subsequent wording.

14. *Fillite (Runcorn) v Aqua-Lift* decided that claims for negligent misrepresentation (whether in tort or in contract under the Misrepresentation Act 1967) or for breach of a collateral contract did not fall within an arbitration clause referring any dispute "arising under these heads of agreement". Slade LJ held (page 76) that the phrase "disputes arising under a contract" was not wide enough to include disputes which do not concern obligations created by or incorporated in that contract. He approved the dicta of Evans J in *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep. 63 at page 67 drawing a distinction between clauses relating to disputes about rights created by the contract itself and clauses showing an intention to refer some wider class of dispute. Nourse LJ agreed saying that the word "under" meant "as a result of and with reference to". Hollings J agreed with both judgments. *Mackender v Feldia* was not cited; nor was *The Playa Larga*. It is difficult to think that if they had been cited the judgments would have been expressed in the terms they were. The contract was moreover a specially negotiated contract for services and was not a common form of commercial agreement.

15. *Harbour v Kansa*, to which we will have to return, was a case about the words "disputes or differences arising out of this agreement". It was there held that even a dispute about initial illegality, pursuant to which the contract would be void, was covered by those words. Ralph Gibson LJ said ([1993] QB page 714F):

The question whether all the promises contained in the agreement were rendered invalid and void at the time when the parties signed the document by the illegality of the agreement is, in my judgment, a dispute arising out of the agreement.

At page 726C Hoffmann LJ said that the words of the arbitration clause applied without difficulty to a dispute over whether the agreement which was admittedly concluded gave rise to any enforceable obligations.

16. We were also referred to numerous first-instance decisions including:

(1) *Ethiopian Oilseeds & Pulses Export Corporation v Rio del Mar Foods Inc* [1990] 1 Lloyd's Rep. 86 in which it was held that a dispute about rectification came within the words "any dispute arising out of or under this contract". Hirst J held that "out of" must add something to "under", even though the words "out of" were in fact the words which appeared first in the clause. He also said that the words "arising out of" were virtually synonymous with the words "arising in connection with". Mr

Butcher submitted that that was not right on the authorities but it seems to us that both *Antonis P Lemos* and *Harbour v Kansa* support Hirst J in relation to that;

(2) *Ulysses Compania Naviera SA v Huntingdon Petroleum Services Ltd (The Ermoupolis)* [1990] 1 Lloyd's Rep. 160 where it was held, following *The Playa Larga*, that a claim for the tort of conversion fell within the phrase

any dispute arising in any way whatsoever out of this bill of lading.

(3) *Harbour v Kansa* at first instance [1993] 1 Lloyd's Rep. 81 where Steyn J said (page 95) that older (pre *Heyman v Darwins Ltd*) authorities about the width of arbitration clauses had to be approached with some care and that the words "arising from the contract" have almost invariably been treated as "words of very wide import". He also said (page 91) that the inexorable logic of *Mackender v Feldia* required him to hold that a question of voidability for fraud is just as much capable of being referred to arbitration as an issue of avoidance for innocent misrepresentation.

(4) *Chimimport plc v D'Alesio* [1994] 2 Lloyd's Rep. 366 where Rix J said that "arising under" is narrower than "arising out of" and doubted whether a tortious claim could easily give rise to a dispute "under the contract".

(5) *The Delos* [2001] 1 Lloyd's Rep. 703 where Langley J held claims for breach of duty and bailment could be brought within the phrase "any disputes under" the relevant contract.

17. Not all these authorities are readily reconcilable but they are well-known in this field and some or all are invariably cited by counsel in cases such as this. Hearings and judgments get longer as new authorities have to be considered. For our part we consider that the time has now come for a line of some sort to be drawn and a fresh start made at any rate for cases arising in an international commercial context. Ordinary businessmen would be surprised at the nice distinctions drawn in the cases and the time taken up by argument in debating whether a particular case falls within one set of words or another very similar set of words. If businessmen go to the trouble of agreeing that their disputes be heard in the courts of a particular country or by a tribunal of their choice they do not expect (at any rate when they are making the contract in the first place) that time and expense will be taken in lengthy argument about the nature of particular causes of action and whether any particular cause of action comes within the meaning of the particular phrase they have chosen in their arbitration clause. If any businessman did want to exclude disputes

[2007] Vol. 2
CA

LLOYD'S LAW REPORTS
Fiona Trust & Holding Corp v Privalov

272
Longmore LJ

about the validity of a contract, it would be comparatively simple to say so.

18. As it seems to us any jurisdiction or arbitration clause in an international commercial contract should be liberally construed. The words "arising out of" should cover "every dispute except a dispute as to whether there was ever a contract at all": see Mustill and Boyd, *Commercial Arbitration*, 2nd Edition, page 120 (the debate, to which we were treated, about whether the authorities there cited support the proposition is, since *Harbour v Kansa*, both technical and sterile). Although in the past the words "arising under the contract" have sometimes been given a narrower meaning, that should no longer continue to be so. Since both phrases are used in the present case there is, in any event, no need here to differentiate between them but the proposition that the phrases "under" and "out of" should be widely construed is to my mind strongly supported by *Mackender v Feldia*. Mr Butcher submitted that times have moved on since that decision and that more recent decisions (particularly *Ashville v Elmer* and *Fillite v Aqua-Lift*) have emphasised the difference between the phrases "under" "out of" and "in connection with". We do not read *Ashville* in that way; *Fillite* can be so read but neither *Mackender* nor the *Playa Larga* were cited and that must detract from its weight as an authority. Even Mr Butcher did not submit that *Fillite* was an authority which bound us in relation to the particular clause before us.

19. One of the reasons given in the cases for a liberal construction of an arbitration clause is the presumption in favour of one-stop arbitration. It is not to be expected that any commercial man would knowingly create a system which required that the court should first decide whether the contract should be rectified or avoided or rescinded (as the case might be) and then, if the contract is held to be valid, required the arbitrator to resolve the issues that have arisen. This is indeed a powerful reason for a liberal construction. Mr Butcher was able to say that on the facts of the present case two adjudications were inevitable if the dispute as to rescission came within the clause because the question of bribery would still have to be resolved in the context of the High Court action for damages for conspiracy, bribery and breach of fiduciary duty against the very same (among many other) defendants who are now seeking to invoke the arbitration clause. That is, however, merely how things have happened in this particular case and cannot affect the true construction of the clause.

20. In the present case there is the further consideration that in the opening words of the clause the parties agree a choice of English jurisdiction. The logic of Mr Butcher's argument is that his claim for rescission for bribery cannot be brought in

England because it is not a claim "under the contract" since it is a claim to have the contract set aside. It cannot really be supposed that the businessmen negotiating these charterparties (however much they intended honest negotiations) intended that any claim suggesting the contract was invalid would have to be brought wherever the defending companies were incorporated (here the British Virgin Islands) while claims for breach of contract were brought in England. The fact that jurisdiction may have been established in England for other reasons against the three charterers who are applying for a stay cannot affect the oddity of the result of Mr Butcher's submissions on this aspect of the matter.

21. We would, therefore, conclude that a dispute whether the contract can be set aside or rescinded for alleged bribery does fall within the arbitration clause on its true construction. The case is different from a dispute "as to whether there were ever a contract at all", in the Mustill and Boyd sense.

*Separability*

22. Ever since *Heyman v Darwins Ltd* the English common law has been evolving towards a recognition that an arbitration clause is a separate contract which survives the destruction (or other termination) of the main contract. *Heyman v Darwins Ltd* itself was a case of termination by accepted repudiation. A major evolutionary step was taken in *Harbour v Kansa* in which it was decided that the arbitration clause applied to a dispute whether the agreement in which it was embedded was void for initial illegality. Section 7 of the 1996 Act now provides:

Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement.

23. This statutory principle codifies the principle that an allegation of invalidity of a contract does not prevent the invalidity question being determined by an arbitration tribunal pursuant to the (separate) arbitration agreement. It is only if the arbitration agreement is itself directly impeached for some specific reason that the tribunal will be prevented from deciding the disputes that relate to the main contact. Thus in *Harbour v Kansa* at first instance [1992] 1 Lloyd's Rep. 81, Steyn J, in a passage (at page 92) approved by the Court of Appeal said:

Once it became accepted that the arbitration clause is a separate agreement, ancillary to the

contract, the logical impediment to referring an issue of the invalidity of the contract to arbitration disappears. Provided that the arbitration clause itself is not directly impeached (eg by a *non est factum* plea), the arbitration agreement is as a matter of principled legal theory capable of surviving the invalidity of the contract.

The judge had already said (page 91) in relation to fraud and duress that Lord Macmillan's statement in *Heyman v Darwins Ltd* that a claim to set aside the contract on the ground of fraud or duress was not arbitrable was no longer the law. Likewise in responding to a submission that the separability doctrine cannot apply to any rule which prevents the contract from coming into existence or makes it void *ab initio* Hoffmann LJ said at pages 723F to 724C of *Harbour v Kansa*:

It seems to me impossible to accept so sweeping a proposition. There will obviously be cases in which a claim that no contract came into existence necessarily entails a denial that there was any agreement to arbitrate. Cases of *non est factum* or denial that there was a concluded agreement, or mistake as the identity of the other contracting party suggest themselves as examples. But there is no reason why every case of initial invalidity should have this consequence . . .

In every case it seems to me that the logical question is not whether the issue goes to the validity of the contract but whether it goes to the validity of the arbitration clause. The one may entail the other but. . . it may not. . . saying that arbitration clauses, because separable, are never affected by the illegality of the principal contract is as much a case of false logic as saying that they must be. As Ralph Gibson LJ has pointed out the same is true of allegations of fraud.

The reference to Ralph Gibson LJ's remarks on fraud is to page 712D where that learned Lord Justice said of Steyn J's reference to direct impeachment that it was

to distinguish an attack upon the clause otherwise than by the logical proposition that the clause falls within the containing contract. When it is said that the contract was induced by fraud it may well be clear that, if it was, the making of the arbitration clause was also induced by the fraud.

In similar vein Leggatt LJ (page 717E) referred to the judgment of Fortas J in *Prima Paint Corporation v Flood & Conklin* (1967) 388 US 395 to the effect that the court could adjudicate if the arbitration clause was itself induced by fraud but not if the contract was in general induced by fraud.

24. A good example of direct impeachment is the decision of Rix J in *Credit Suisse First Boston (Europe) Ltd v Seagate Trading Co Ltd* [1999] 1 Lloyd's Rep. 784 where an oral contract for the sale of Russian notes was followed by a trade confirmation with an English jurisdiction clause. Not only was it alleged that this document was fraudulently presented by Credit Suisse as a mere perfunctory confirmation (which it was not) but it was said that the oral contract was not with Credit Suisse Europe but with Credit Suisse US and that there was a specific agreement that the deal was to be centred in New York where Credit Suisse US had its centre of business. In those circumstances the English jurisdiction clause could not be relied on, whether or not the allegations of fraud were, in the event, made out.

25. So the question here is whether the assertion of invalidity goes to the validity of the arbitration clause as opposed to the validity of the charterparties as a whole of which the arbitration agreements are a part. Mr Butcher relied on Mr Shepherd's eighth witness statement in which he stated that the owners would not have made any contract at all with the charterers if they had been aware that their employees had been bribed by Mr Nikitin and then submitted that it was enough for the owners to say that whatever it was that impeached the main agreement also impeached the arbitration clause. But that is precisely the opposite of what the authorities on separability have laid down, viz that it is not enough to say that the contract as a whole is impeachable. There must be something more than that to impeach the arbitration clause. That extra element is missing in the present case. Counsel's comments in *Harbour v Kansa* at page 712B (that a party to a contract the making of which he says was induced by fraud would be surprised to be told that he is bound to have the issue tried by an arbitrator appointed under a clause in that contract) were as Ralph Gibson LJ said "no more than forceful comments". They did not carry the day. Bribery cannot be any different from fraud (indeed fraud is alleged in the present case although it is clear that the substantial allegation is one of bribery) and Mr Butcher's reliance on the "forcefulness" of that comment by counsel is, in our judgment, misplaced.

26. Mr Butcher further submitted that owners' case could equally well have been pleaded as a case of no contract by reason of lack of authority on the part of the owners' employees to accept bribes. On that analysis the owners would be entitled to treat the contract as void from inception rather than entitled, as Millett J put it in *Logicrose Ltd v Southend United Football Club* [1988] 1 WLR 1256, at page 1260,

to elect to rescind the transaction *ab initio*.

For this purpose Mr Butcher relied on article 23 of *Bowstead and Reynolds on Agency*, 18th edn, 2006:

> Unless otherwise agreed, authority to act as agent includes only authority to act for the benefit of the principal.

This is a new article in the latest edition of the work and no doubt Professor Reynolds is correct to observe there that a transaction such as a contract procured by bribery is, as regards the principal, void as being unauthorised. But that is no argument for saying that a separable arbitration clause cannot be invoked for the purpose of resolving the issue whether bribery occurred. In this connection an allegation of bribery is (and should be) no different from the allegation of initial illegality in *Harbour v Kansa*.

27. The way that Dicey, Morris and Collins, *Conflict of Laws*, 14th edn, deals with the matter in relation to jurisdiction clauses is to refer to the cases in which it has been held that arbitration clauses are severable from the contracts in which they are contained and to say (para 12-099):

> The Supreme Court of the United States has also held that a challenge to the existence of the jurisdiction agreement based on fraud or duress must be based on facts specific to the clause and cannot be sustained on the basis of a challenge on like grounds to the validity of the contract containing it. It is submitted that there are excellent reasons of policy to support such an approach, for the parties when they nominated a court with jurisdiction to settle their disputes may well have expected this court to have and exercise jurisdiction if the dispute were to concern the very validity of the contract.

Mr Butcher said that this statement of the law went beyond any existing authority but it seems to us to be amply supported by both *Mackender v Feldia* and *Harbour v Kansa*. Moreover the European Court of Justice has, in *Benincasa v Dentalkit Srl* Case C-269/95 [1997] ECR I-3767, come to the same conclusion in relation to a distribution agreement which contained an exclusive jurisdiction clause.

28. The judge dealt with this matter quite shortly by saying (para 21) that owners' case that they had not truly consented to the relevant charterparties by reason of bribery was no different from a case of *non est factum* or mistake; he distinguished *Harbour v Kansa* on the basis that the illegality there did not impeach the arbitration clause "whereas the bribery arguments, if sustainable, do impeach the whole contract". He concluded (para 25) that the question whether owners ever made the contracts was not a dispute arising out of or under the contract. He then said that the arbitrator did not

have jurisdiction to decide that issue, only the court did.

29. For the reasons we have given we cannot agree. If arbitrators can decide whether a contract is void for initial illegality, there is no reason why they should not decide whether a contract has been procured by bribery, just as much as they can decide whether a contract has been procured by misrepresentation or non-disclosure. Illegality is a stronger case than bribery which is not the same as *non est factum* or the sort of mistake which goes to the question whether there was any agreement ever reached. It is not enough to say that the bribery impeaches the whole contract unless there is some special reason for saying that the bribery impeaches the arbitration clause in particular. There is no such reason here.

30. The judge went on to say that, even if the arbitrator did have jurisdiction to decide the bribery issue, he would exercise his powers under section 72(1)(a) of the 1996 Act to grant an injunction to restrain the arbitration so that there could be a one-stop hearing of the issue and would not exercise his power to grant a stay of the claims to be entitled to rescind the charterparties or of the other time charter claims brought by owners.

31. This requires the court to decide what we consider to be essentially procedural matters pursuant to the 1996 Act but the judge's conclusions under this latter head are potentially far-reaching. If in a case where an arbitrator does have jurisdiction to decide a particular dispute, he is to be restrained from so doing and no stay of court proceedings is to be granted, there is likely to be a potential breach of the United Kingdom's international obligations in relation to commercial arbitrations under the New York Convention of 1957 as enshrined in the 1996 Act.

### Sections 9 and 72 of the Act

32. It will be convenient first to set out these sections:

9. Stay of legal proceedings

(1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.

. . .

(4) On an application under this section the court shall grant a stay unless satisfied that the

[2007] Vol. 2                          LLOYD'S LAW REPORTS                                      275
CA                       Fiona Trust & Holding Corp v Privalov                        Longmore LJ

arbitration agreement is null and void, inoperative, or incapable of being performed.

. . .

72. Saving for rights of person who takes no part in proceedings

(1) A person alleged to be a party to arbitral proceedings but who takes no part in the proceedings may question

(a) whether there is a valid arbitration agreement,

(b) whether the tribunal is properly constituted, or

(c) what matters have been submitted to arbitration in accordance with the arbitration agreement,

by proceedings in the court for a declaration or injunction or other appropriate relief.

(2) He also has the same right as a party to the arbitral proceedings to challenge an award

(a) by an application under section 67 on the ground of lack of substantive jurisdiction in relation to him.

33. The reference to section 67 in section 72 reminds the reader that once an award has been made an application to the court can be made challenging the award on jurisdictional grounds. It is also important to be aware that sections 30 to 32 of the 1996 Act relate to the jurisdiction of the arbitral tribunal. Section 30 provides that the arbitral tribunal may rule on its own substantive jurisdiction including (in the same words as used in section 72) the question whether there is a valid arbitration agreement. Section 31 provides that any objection as to jurisdiction must be taken before any step is taken to contest the merits of the matter and section 32 provides for the court to be able to determine a preliminary point of jurisdiction if all the parties agree in writing or the tribunal itself permits the court (for good reason) to do so.

34. This combination of sections shows, together with the prescriptive section 9(4), that it is contemplated by the Act that it will, in general, be right for the arbitrators to be the first tribunal to consider whether they have jurisdiction to determine the dispute. In these circumstances, although it is contemplated also by section 72 that a party who takes no part in arbitration proceedings should be entitled in court to "question whether there is a valid arbitration agreement", the court should, in the light of section 1(1) of the Act, be very cautious about agreeing that its process should be so utilised. If there is a valid arbitration agreement, proceedings cannot be launched under section 72(1)(a) at all.

35. That will be the situation where the arbitration agreement is wide enough to comprise the relevant dispute and the arbitration clause, being a severable agreement, is not directly impeached by whatever ground is used to attack the invalidity of the contract in which the arbitration clause is contained. That is this case. Section 72 has, accordingly, no application.

36. For our part, we would go further than this and say that, if the party who denies the existence of a valid arbitration agreement has himself (as the owners have here) instituted court proceedings and the party who relies on the arbitration clause has applied for a stay, the application for a stay is the primary matter which needs to be decided. It would only be if a stay were never applied for or were refused, but for some reason the party relying on the arbitration clause insisted on continuing with the arbitration that any question of an injunction should arise. Of course section 72 might well be applicable if the party denying the existence of an arbitration agreement had not started English proceedings and did not wish to do so. Such a party would then be entitled to apply under section 72 for a declaration that there was no valid arbitration agreement; even then an injunction would usually be necessary only if there was some indication that the other party was intending not to comply with any declaration which the court might make. This is all a long way from the present case in which court proceedings have been instituted and an application has been made to stay (some part of) those proceedings. Section 9 governs the position and for that section to apply there must be an arbitration agreement. If the existence of an arbitration agreement is in issue, that question will have to be decided under section 9 and there is no reason, at the moment at any rate, for any invocation of section 72 at all.

37. As HHJ Humphrey Lloyd pointed out in *Birse Construction Ltd v St David Ltd* [1999] BLR 194 there are four possible approaches to deciding whether an arbitration agreement exists to which section 9 applies:

(1) to determine on the evidence before the court that such an agreement does exist in which case (if the disputes fall within the terms of that agreement) a stay must be granted, in the light of the mandatory "shall" in section 9(4). It is this mandatory provision which is the statutory enactment of the relevant article of the New York Convention, to which the United Kingdom is a party;

(2) to stay the proceedings on the basis that it will be left to the arbitrators to determine their own jurisdiction pursuant to section 30 of the 1996 Act, taking into account the subsequent

[2007] Vol. 2
CA
LLOYD'S LAW REPORTS
Fiona Trust & Holding Corp v Privalov
276
Longmore LJ

provisions in the 1996 Act for challenge to any decision eventually made by the arbitrators;

(3) not to decide the issue but to make directions pursuant to what is now CPR Part 62.8 for an issue to be tried as to whether an arbitration agreement does indeed exist;

(4) to decide that no arbitration agreement exists and to dismiss the application to stay.

No question of the interrelation between section 72 and these approaches arose in that case but His Honour did proceed to give helpful guidance as to the circumstances in which it might be appropriate to adopt options (2) and (3) rather than (1) and (4). In this case it is, in our judgment, clear that option (1) is appropriate and that a stay should be granted.

38. The judge relied on *Ahmed Al-Naimi v Islamic Press Agency Inc* [2000] 1 Lloyd's Rep. 522 to decide as a matter of his discretion that it was more convenient for the court to decide the question whether the charterparties and the arbitration clause were invalidated by the alleged bribery of the owners' agents because it was best that the matter should be decided only once. If the matter were truly a matter of his discretion that exercise of it might well be difficult to criticise, but the discretion of the court only arises if there is truly a "question whether there is a valid arbitration agreement". As we have sought to explain, once the separability of the arbitration agreement is accepted, there cannot be any question but that there is a valid arbitration agreement. *Al Naimi* (in which Judge Lloyd's four options are all set out and approved) was different because in that case there was a real question as to whether any arbitration agreement had come into existence or (perhaps more accurately) whether the agreement that did exist under a preceding contract covered disputes that arose pursuant to a subsequent ad hoc contract. If there is a contest about whether an arbitration agreement had come into existence at all, the court would have a discretion as to whether to determine that issue itself but that will not be the case where there is an overall contract which is said for some reason to be invalid eg for illegality, misrepresentation or bribery and the arbitration agreement is merely part of that overall contract. In these circumstances it is not necessary to explore further the various options canvassed by Judge Humphrey Lloyd since we do not consider that the judge had the discretion which he thought he had.

39. Mr Butcher submitted more broadly that any party challenging the jurisdiction of the arbitrators was entitled to invoke section 72 of the Act which effectively precluded (or trumped) any application to stay proceedings under section 9 of the Act. We have already given reasons why that cannot be

correct but he relied on the first instance decision of *Law Debenture Trust Corporation plc v Elektrim Finance BV* [2005] 2 Lloyd's Rep. 755 as authority for his proposition. In that case there was a bond which contained an arbitration clause but this was subject to a clause which gave the claimant "the exclusive right at its option to apply to the courts of England to settle any disputes which may arise out of or in connection with these presents". The defendants started an arbitration challenging the claimant's assertion that events of default had occurred; the claimant then started proceedings to recover the full amount due under the bond to which it added a section 72 claim asking for an injunction to restrain the arbitration. The defendants retaliated with an application for a stay under section 9, CPR 62.8(3) and section 49(3) Supreme Court Act 1981. The judge rejected the general submission that the 1996 Act required the court to allow the arbitrators to decide whether they had jurisdiction. The claimant could therefore invoke section 72 (if it applied) to ask the court to decide the jurisdiction issue (para 16). He then went on to reject the defendants' arguments that the claimant could not bring itself within section 72 because, as he put it, once the claimant opted for litigation, there was no longer an arbitration agreement (para 20). The judge then dealt with the question of stay in paras 32 to 37. But he makes it clear that his decision was dependent upon his construction of the deed: if, as he found, the claimant was entitled to litigate then obviously he would not grant a stay and vice versa. Thus he said that the section 9 point "does not really arise as a contentious point" (para 32).

40. The judge had no need to consider the separability of the arbitration clause but only had to decide if the litigation option had been rightly exercised by the party seeking to litigate. He decided that it had been and that accordingly the section 72 application for a declaration and an injunction should be granted and the stay application should be dismissed. There is nothing in the judgment which suggests that section 72 "trumps" section 9. The judge correctly described the sections as mirror images of one another. The only minor qualification we would make to the approach of Mann J in that case is to repeat that, in a case where court proceedings have begun and there is an application that they be stayed, it is more consistent with this country's obligations under the New York Convention to consider that application first, rather than the section 72 application first. But the answer to either application will, as the judge pointed out, determine the answer to the other.

41. We would, therefore, reject the owners' arguments and hold that the arbitration clause is a separate (and unrescinded) agreement unimpeached

[2007] Vol. 2                      **LLOYD'S LAW REPORTS**                              277
CA                        Fiona Trust & Holding Corp v Privalov                   Longmore LJ

by the claim to set aside the charterparties and wide enough to determine whether the charterparties can indeed be set aside. The claim to rescission should be stayed and the application under section 72 of the 1996 Act should be dismissed.

*Defence to claims for rescission*

42. Mr Hamblen submitted that, even if the owners had been in theory entitled to rescind the relevant charterparties and the agreements to arbitrate contained in them, on account of the alleged bribery by or on behalf of Mr Nikitin, they were not in fact so entitled because three of the charterparties had been wholly performed and the remaining five partly performed so that *restitutio in integrum* was impossible and rescission therefore unavailable. He also had arguments about delay or acquiescence.

43. In the light of our conclusion that the arbitration agreements are separate contracts which remain in existence to resolve the dispute whether the charterparties can be rescinded for the alleged bribery, it is not necessary to consider these arguments. But their existence prompts us to wonder what relief the claim for rescission could give to the owners beyond what is already available to them under the heads of their claims for damages for

conspiracy, damages or restitution in respect of the bribes and for account of profits. As far as we can see a claim to have successfully rescinded the arbitration agreements would have as its only practical effect the result that the charterers would be prevented from arbitrating the claims that they have against the owners (eg claims for any balance of account alleged to be due from owners at the end of the charters and the claim which has resulted from the grounding of *Tropic Brilliance*). That is indeed the result of the order made by the judge.

44. For our part, we see no reason why the charterers should be prevented from arbitrating these claims; if the arbitration tribunal decides that the charters were indeed procured by bribery they will be able to decide what consequence that conclusion has on any claims which the charterers might otherwise legitimately have.

*Conclusion*

45. We would therefore allow this appeal, set aside paras 8 to 10 of the judge's order and substitute an order that the owners' claims for rescission of the charterparties be stayed pursuant to section 9(4) of the Act and that the applications made pursuant to section 72 of the Act be dismissed.