Exhibit E

COURT OF APPEAL

Mar. 10, 2005

———————

KING

v.

BRANDYWINE REINSURANCE CO.

[2005] EWCA Civ 235

Before Lord Justice WALLER,
Lord Justice RIX and
Sir Martin NOURSE

**Reinsurance - General Corporate Excess policy by Exxon and affiliates - Oil pollution following grounding of Exxon Valdez - Assureds incurring clean-up costs and liability - Settlement of claims by insurers - Whether insurers proving liability at law - Law applicable to GCE policy - Effect of arbitration and service of suit clauses - Whether oil spill amounted to "debris" - Effect of "notwithstanding" clause.**

The Exxon Valdez went hard aground on Bligh Reef in Prince William Sound, Alaska, at 00 04 on Friday Mar. 24, 1989 loaded with 1,264,155 barrels of North Slope crude oil. The grounding led to the spillage of some 11 m. gallons of that oil. At the time of the grounding, Exxon Valdez was owned by ESC, a wholly owned subsidiary of Exxon. Exxon was the owner of the cargo on board at the time. The spill resulted in crude oil flowing into the waters of Prince William Sound, and the oil then spread westwards so that by May 18, 1989 some oil had reached 470 miles away in the Gulf of Alaska. Some of the oil washed ashore. By September, 1989 790 miles of shoreline within Prince William Sound had been identified as having been oiled, and in Western Alaska more than 2,400 miles of shoreline were found to be oiled.

ESC (until August, 1989) and Exxon proceeded to take steps to contain the spill, and to clean-up the polluted shoreline. These included: the lightering of the Exxon Valdez; the skimming of oil from the surface of the water; booming off sensitive areas of shoreline; burning of oil on the surface of the water; washing the shoreline, by cold water and subsequently warm water flushing, coupled with the skimming of oil washed off the shoreline into the sea; moving rocks/pebbles etc into the tidal zone to allow natural tidal flushing; bioremediation, whereby compounds were added to the environment to assist in the natural process in which bacteria and other micro organisms altered the organic molecules in oil into other substances; and the cleaning up of animals, including otters and birds. The costs of these measures were U.S.$1.25 billion for Exxon and U.S.$885 m. for ESC.

In addition to these costs, Exxon and ESC were the subject of a number of claims against them. These were: claims against Exxon and ESC by both the US Federal Government and the State of Alaska, leading to

an agreed payment of some U.S.$900 m. by Exxon on Oct. 8, 1991; claims against Exxon by commercial fishermen for lost income due to fish stock damages, by Alaska Natives for lost harvest foods, by seafood processors, seafood processor employees and some other organisations for lost income, and by private landowners for damage to their land as a result of oil fouling, settled for about U.S.$267 m.; and consolidated claims by some 30,000 plaintiffs (fishermen, processors, Alaska Natives, landowners and others) which produced a jury award of U.S.$287 m. compensatory damages, and U.S.$5 billion in punitive damages, the latter figure subsequently reduced by the District Court to U.S.$4.5 billion.

Exxon and its affiliates were insured under three primary policies, the largest of which was the Exxon Global Corporate Excess (GCE) Policy. The GCE Policy had three different sections:

(i) Section I in respect of loss of or damage to property, covering U.S.$600 m. per loss occurrence in excess of U.S.$400 m. annual aggregate deductible in excess of U.S.$10 m. per occurrence deductible.

(ii) Section IIIA in respect of Marine Liabilities. This was in three layers: U.S.$100 m. any one loss in excess of U.S.$200 m. annual aggregate deductible in excess of U.S.$10 m. per occurrence; U.S.$100 m. per loss occurrence and in the annual aggregate in excess of U.S.$300 m. and U.S.$10 m. per loss occurrence deductible; and U.S.$50 m. excess of U.S.$400 m. in the aggregate with a U.S.$10 m. deductible.

(iii) Section IIIB in respect of Public and Third Party Liability. This was also in three excess layers of U.S.$200 m. in the annual aggregate and were all also in excess of a U.S.$10 m. per occurrence deductible. Each of the three layers was of the same amount of cover as for s. IIIB.

The GCE Policy contained Service of Suit clauses under which in the case of a dispute relating to payment the insurers agreed to submit to the jurisdiction of any Court of competent jurisdiction within the State of New York or (under s. IIIB) in the United States and all matters were to be determined in accordance with the law and practice of the relevant court. The three sections also each contained an arbitration clause. That under ss. I and IIIA provided that any difference could, upon the agreement of the parties, be referred to arbitration, and the arbitrators could abstain from following strictly the rules of law although to the extent the arbitrators follow the rules of law they were to apply New York law. The arbitration clause under s. IIIB stated that any dispute was to be referred to arbitration at the request of either party and was otherwise the same although there was no reference to New York law.

The relevant provisions of the policies were as follows. art. VII, par. 4(b) of s. I (property damage) covered:

Removal of or attempted removal of debris or wreck of property and/or residual structure covered hereunder.

Article VIII (2)(b) of s. I provided that:

[2005] Vol. 1
C.A.

## LLOYD'S LAW REPORTS
### King v. Brandywine Reinsurance Co.

656

recovery shall also include costs of preserving and forwarding the property, as well as costs and expenses in respect of general average, sue and labour, salvage, salvage charges and expenses incurred in removal or attempted removal of debris or wreck or property even if incurred solely as the result of governmental or other authoritative order and the amount of the reasonable extra cost of temporary repair or of expediting the repair, including overtime and the extra cost of express or other rapid means of transportation.

Section I also contained "Notwithstanding" provisions under which:

Notwithstanding anything contained as above there shall be no recovery hereon for liabilities as described under the insured's Liabilities Policy(ies).

Article IX.3 of s. I excluded coverage in respect of

Loss of, or damage to property, liability for which is imposed upon the Insured by Law, other than such property as may be included under the terms of this policy.

Article VI.4 of s. I was as follows

Whenever the insured has information from which it may reasonably be concluded that a loss occurrence covered hereunder is likely to exceed the deductible(s) under this policy, notice shall be sent to the brokers who negotiated this insurance, who shall promptly inform insurers and assign adjusters on behalf of insurers as may be agreed. Failure to notify the brokers of any occurrence which, at the time of its happening did not appear to involve this policy but which, at a later date, would have given rise to claims hereunder, shall not prejudice such claims.

Liability cover was provided by ss. IIIA and IIIB. As far as s. IIIA was concerned, cl. 1(c) covered liability for "pollution and/or contamination", and cl. 2(g) extended coverage under cl. 1(c) to "any costs and/or expenses incurred in respect of general average, salvage, salvage charges, and sue and labour". Clause 10 was a suing and labouring clause under which, if it was lawful and necessary for the insured to incur expense in the defence, safeguard and recovery of the property insured, the expense would be borne by the insurers. Clause 14 was a "control of claims" clause which entitled the insured to to take whatever immediate steps they considered appropriate to mitigate any liability or anticipated or potential liability to third parties without the prior approval of insurers and without prejudice to the insured's right to recover under the policy.

As regards s. IIIB, art. 1.1 provided Exxon with an indemnity for damages with respect to liability for personal injury and property damage

caused by or arising out of each loss occurrence during the policy period, anywhere worldwide in respect of all offshore and/or inshore and/or onshore drilling, production, exploration operations and all transportation activities including all terminal and pipeline operations and including automobile, aircraft, and aircraft refueling activities and onshore fire and explosion, also including general average, salvage, salvage charges, sue and labour in connection therewith.

Cover under s. IIIB was extended, under a "Seepage, Pollution and Contamination Coverage Endorsement", to

(a) All sums which the insured shall be legally liable to pay as damages for personal injury (fatal or non-fatal) and/or loss of, damage to or loss of use of tangible property caused by or alleged to have been caused directly or indirectly by seepage, pollution or contamination arising out of the operations of the Insured.

(b) The cost of removing, containing, neutralizing or cleaning up seeping, polluting, or contaminating substances emanating from the operations of the insured: but not to cover repairing, replacing, redesigning or modifying the offending facility.

In August, 1993 Exxon commenced proceedings in Texas under s. IIIA of the policy, and in 1996 Exxon was awarded U.S.$238,473,752.50 plus interest of U.S.$161,106,406.87 and fees and costs of over U.S.$10 m. Also on Mar. 15, 1996 there was a settlement of all claims under the s. I policy for U.S.$300 m. In January, 1997 all of Exxon's claims under the s. IIIA and IIIB policies (including the claims in the Texas judgment) were settled for U.S.$480 m. The agreement did not apportion the payment between s. IIIA and IIIB.

Exxon's insurers had reinsured their liabilities with the claimant reinsurers and the defendants were the retrocessionaires of the claimants. It was common ground that under the terms of the retrocessions the claimants had to prove that the losses were covered by the primary policies as well as being within the terms of the outward retrocessions. The retrocessions contained loss provisions which stated that the claimants could recover the sum actually paid in settlement of claims, liability, damage or expense. All the retrocession contracts, except certain of the Lloyd's policies, included the following term:

This contract excludes any loss arising from seepage, pollution or contamination on land unless such risks are insured solely on a sudden and accidental basis.

The exclusion did not apply to liability under the Offshore Pollution Liability Agreement, 1986.

The issue for the Court was whether Exxon had been entitled to recover under s. I or s. IIIB. If they were not, the payments under s. I could not be brought into the calculation of the ultimate net loss in the retrocession agreement, and no part of the s. IIIA and IIIB settlement could be apportioned to s. IIIB for the purposes of calculation of the ultimate net loss as between the claimants and defendants. A further issue was whether ESC could recover from the s. I primary insurers and, if so, whether there had been a settlement of the insurers' liability to ESC. There was also an issue as to whether, on the proper construction of the retrocession, the defendants were entitled to rely upon exclusion of liability under a Seepage and Pollution clause.

At first instance Mr. Justice Colman held as follows:

(i) The governing law of the GCE was English law and not New York law. The Service of Suit and the arbitration clauses did not operate as an express

choice of New York law, and the pointers towards an implication of English law - in that the policies were placed and issued in London, the wording was London market wording and notification had to be given to brokers in London - outweighed the pointers towards New York law.

(ii) As a matter of English law, there was no cover under s. I of the GCE because, the phrase "removal of debris of property" in s. I, arts. VII and VIII did not cover pollution clean-up costs. By its origins and dictionary meanings, "debris" was not a word which normally comprehended liquids. Even though the oil reacted with the seawater to form a viscous sludge and it became transformed into a "mousse" and tar balls, this last condition was the nearest that some of it got to a solid condition.

(iii) Had the GCE been governed by New York law, s. I would have been construed as covering pollution clean-up costs.

(iv) Neither under English nor New York law would cover for clean-up costs have been excluded from s. I by reason of cl. IX.3 alone. s. I was confined to first party losses due to the loss of or damage to the insured's property and was not concerned with liability for damage to third parties. The contractual function of cl. IX.3 was to insulate cover under s. I from liability to third parties in respect of property not owned by the insured. Damage or the threat of damage to a third party's property was an inherent risk associated with the dissemination of debris, and it could not have been the intended effect of the art. IX.3 exclusion that recoverable debris removal expenses would be confined to removal the need for which was not occasioned by damage or the threat of damage to third parties' property if the debris were not removed.

(v) Under English and New York law even if there would otherwise have been cover for clean-up costs under s. I, there was no cover because of the provisions of the Notwithstanding clauses. The function of the Notwithstanding clauses was to prevent coverage overlap between s. I and ss. IIIA and IIIB.

(vi) The claimants could not recover on the basis of ESC's putative claim under s. I. While ESC was an insured person as an affiliate, and possessed the necessary insurable interest by reason of its custody of the oil, there had been no settlement of ESC's notional claim and as a result the claimants could not claim under the Outwards Reinsurances in respect of any liability to ESC. Further, any claim by ESC was time-barred by the date of the March, 1996 settlement, as its cause of action arose when expenditure was first incurred, in May, 1989.

(vii) As a matter of English law, there was no cover for clean-up costs under s. IIIB of the GCE. That s. was designed to protect Exxon against third party liabilities of a non-marine nature. Marine liabilities were covered under s. IIIA, and the two sections were mutually exclusive.

(viii) As a matter of New York law there would have been cover for clean-up costs under s. IIIB of the GCE.

(ix) The seepage and pollution exclusion which appeared in most of the Outwards Retrocessions excluded liability on the part of the defendants to indemnify the claimants in respect of clean-up costs, even if they were covered under the GCE. The exclusion referred to seepage, pollution or contamination which affected land, whether it originated on land or offshore.

Exxon appealed.

-Held, by C.A. (WALLER and RIX, L.JJ. and Sir Martin Nourse) that the appeal would be dismissed.

(1) The GCE was governed by New York law and not English law.

(a) If the arbitration and service of suit clauses were viewed as a whole, and in isolation from the surrounding factors, it was beyond doubt that they pointed to an inferred choice of New York law as the proper law of the GCE. There was nothing in them which pointed to English law (see par. 48).

(b) Those clauses displaced the consequences of the major placement in the London market, the location there of the leading insurers and so forth. The key provision was the New York arbitration clause in s. IIIB. It was difficult, if not impossible, to infer a choice of English law as the law to govern a contract, a substantial part of which provided for any difference between the parties (if either requested it) necessarily to be determined by an arbitration to which the law of New York applied. That view of the contract was a whole was consistent with the New York arbitration clauses in ss. I and IIIA, even though in those sections the agreement of both parties was required. It was also consistent with the service of suit clauses in those sections. Moreover, it was not inconsistent with the service of suit clause in s. IIIB (see par. 48);

-Du Pont v. Agnew, [1987] 2 Lloyd's Rep. 585, distinguished; Citadel Insurance Co. v. Atlantic Union Insurance Co. S.A. [1982] 2 Lloyd's Rep. 543, The Stolt Marmaro [1985] 2 Lloyd's Rep. 428, Tiernan v. The Magen Insurance Co. Ltd., [2000] I.L. Pr. 517, referred to.

(2) The words "removal of debris in s. I of the GCE did not cover clean-up costs.

(a) The New York court would, particularly in the area of marine insurance, have found decisions of the English Court persuasive. If the position was that under New York law the decision of an English Court as a matter of English law on the terms of this policy would have some persuasive effect, it would seem unreal to ignore that decision in reaching a view as to what New York law would hold. It was also important to remember that the role of an expert was to prove the rules of construction of the foreign law, and it was then for the court to interpret the contract in accordance with those rules. That again pointed to the Court of Appeal being entitled to review a question of construction simply being guided by the rules of construction of the foreign law including that court's attitude to persuasive authorities (see pars. 67 and 68);

-Parkasho v. Singh, [1968] P. 233, Dalmia Dairy Industries Ltd. v. National Bank of Pakistan, [1978] 2 Lloyd's Rep. 223, Bumper Development Corp. v. Commissioner of Police of the Metropolis, [1991] I

W.L.R. 1362, applied. *Antilles Steamship Co. Ltd. v. The Members of the American Hull Insurance Syndicate*, 733 F 2d 195, referred to.

(b) It was difficult to accept that a New York court and English Court would have reached a different conclusion on the construction of a policy negotiated as this one was between organizations well-versed in what they were seeking to cover and well-versed in the risks that were likely to materialize from the business being carried on by the various assureds. Both systems of law sought to identify what the parties agreed, and both systems of law used similar pointers to ascertaining their intention (*see* pars. 34 and 116).

(c) Debris was not the natural way in which to describe "spilled oil" or pollution from spilled oil, and it would need some significant feature or other provision of the policies if it was to have that meaning in this policy. Oil spilt onto a beach could not be described as "debris" (*see* par. 117);

-*Lexington Insurance Co. v. Ryder System Inc.*, 142 Ga App 36, 234 SE 2d 839, distinguished.

(3) It was unnecessary to explore in detail the meanng of either art. IX.3 of the Notwithstanding clauses. If clean-up costs had been specifically included as part of the cover under s. I, the argument that such cover should not be removed either by virtue of art. IX.3 or by virtue of one of the Notwithstanding clauses, would be powerful (*see* par. 120).

(4) The appeal under s. IIIB failed. The position was the same under both New York law and English law. The generic reference to "all transportation activities" was to those activities incidental to drilling, production, exploration, terminal and pipeline operations. Marine transport, even if, it formed part of a chain of transportation between rig or well and terminal, was nevertheless considered for the purposes of ss. IIIA and IIIB as a matter of marine, and not non-marine, liabilities and as being something separate and apart and not incidental to those physically located operations expressly mentioned in art. I of s. IIIB (*see* par. 141).

(5) No issue arose as to the Seepage, Pollution and Contamination Exclusion, in the retrocession, excluding liability for pollution "on land", as there was no liability under the direct policy (*see* par. 143).

-*Per* Waller L.J. and Sir Martin Nourse: The answer to the question, where did the seepage, pollution or contamination occur, on land or at sea, was "at sea", with the result that the exclusion did not apply. There were two linguistic indications inherent in that question: one was the concept of seepage, which was suggestive of a source as well as a location of seeping material; the other was the preposition "on" in the expression "on land", which was to be contrasted with the alternative which might have been found "of land". "On land" suggested the place where the active process of contamination was taking place, which in the case of seaborne pollution did not occur on land but at sea (*see* par. 150);

-*Per* Rix L.J.: If there was a source of seepage, pollution or contamination offshore, it was likely to wash ashore and show up on land. Therefore, the draftsman had been anxious to differentiate between the

source of seepage, pollution and contamination, leaving offshore sources within the cover and only excluding onshore sources, then he would have concentrated in his language on distinguishing the source of loss, which this draftsman had failed to do (*see* par. 150).

-*Commercial Union plc v. NRG Victory Reinsurance Ltd.*, [1998] 1 Lloyd's Rep. 80, referred to.

-*Per* C.A.: any argument based on redundancy of express words was often of doubtful cogency (*see* par. 150).

(6) ESC had no claim under s. I for removal of debris, whether under English or New York law. Accordingly the appeal relating to ESC was moot (*see* par. 157).

---

The following cases were referred to in the judgment:

Armadora Occidental S.A. v. Horace Mann Insurance Co., [1977] 1 W.L.R. 520;

Antilles Steamship Co. Ltd. v. The Members of the American Hull Insurance Syndicate, 733 F 2d 195;

Avondale Industries Inc. v. Travelers Indemnity Company, 697 F Supp 314 (SDNY 1988), aff'd 887 F 2d 1200 (Cir 1989);

Banker's Trust Co. v. Hartford Accident & Indemnity Co., 518 F.Supp 371;

Bell Power Systems Inc. v. Hartford Fire Insurance Co., 1995 Conn Super Lexis 448;

Bradley v. Eagle Star Insurance Co. Ltd., (H.L.) [1989] 1 Lloyd's Rep. 465;

Bumper Development Corp. v. Commissioner of Police of the Metropolis, (C.A.) [1982] 2 Lloyd's Rep. 543;

Citadel Insurance Co. v. Atlantic Union Insurance Co. S.A., (C.A.) [1982] 2 Lloyd's Rep. 543;

Commercial Union Assurance v. NRG Victory Reinsurance, [1998] 1 Lloyd's Rep. 80, reversed [1998] 2 Lloyd's Rep. 600 (C.A.);

Compass v. Cravens Dargan, 748 P 2d 724;

Dalmia Dairy Industries Ltd. v. National Bank of Pakistan, (C.A.) [1978] 2 Lloyd's Rep. 223;

Du Pont v. Agnew, (C.A.) [1987] 2 Lloyd's Rep. 585;

Earl Nelson v. Lord Bridport, (1845) 8 Beav 527;

Eberhard v. Aetna Insurance Co., 134 Misc 386; 235 NYS 445;

ECDC Environmental LC v. New York Marine & General Insurance Co, 1999 US Dist Lexis 9836;

Kutsher's Country Club Corp. v. Lincoln Insurance Company, 119 Misc 2d 889, 465 NYS 2d 136;

Lazard Bros. & Co. v. Midland Bank Ltd., (H.L.) [1933] A.C. 289;

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

659
Waller, L.J.

Lexington Insurance Co. v. Ryder System Inc., 142 Ga App 36, 234 SE 2d 839;

Olin Corporation v. Insurance Co. of North America, 221 F 3d 307;

Parkasho v. Singh, [1968] P. 233;

Post Office v. Norwich Union Fire Insurance Society, (C.A.) [1967] 1 Lloyd's Rep. 216;

Seaboard Surety Co. v. Gillette Co., 64 NY 2d 304, 486 NY 2d 873;

*Stolt Marmaro*, The (C.A.) [1985] 2 Lloyd's Rep. 428;

Sussex Peerage Case (1844) 11 Cl. & F. 85;

Tiernan v. The Magen Insurance Co. Ltd., [2000] I.L. Pr. 517;

Yorkshire Water v. Sun Alliance, (C.A.) [1997] 2 Lloyd's Rep. 21.

---

This was an appeal and cross-appeal against the decision of Mr. Justice Colman, [2004] Lloyd's Rep. I.R. 554, on a number of issues relating to the scope of primary insurance policies and a retrocession contract, in respect of a claim by the claimant reinsurers against the defendant retrocessionaires.

Colin Edelman, Q.C., David Joseph, Q.C. and Neil Hart, instructed by CMS Cameron McKenna, for the claimants; Christopher Butcher, Q.C. and Richard Slade, instructed by Holman Fenwick & Willan for the defendants.

The further facts are stated in the judgment of Lord Justice Waller.

Thursday, Mar. 10, 2005

---

**JUDGMENT**

**Lord Justice WALLER:**

This is a judgment of the Court to which all members have contributed.

*Introduction*

1. This is an appeal from the judgment of Mr. Justice Colman dated May 10, 2004. It relates to excess of loss claims arising from the Exxon Valdez disaster. Colman J found that the respondent reinsurers (the "defendants") were not liable under their Excess of Loss reinsurance contracts to indemnify the reinsureds in respect of settlements reached with the underlying insured, Exxon Corporation ("Exxon"). If the Judge is right the case demonstrates the perils of settling under primary insurance when the reinsurance is not subject to a full follow the settlements clause. The main thrust

of this appeal is the appellant reinsureds' (the "claimants") challenge to his ruling, although, in so far as the Judge was against them on certain points, the defendants also challenge those aspects of the Judge's judgment.

*The basic facts*

2. We are indebted to the full skeletons of both parties. There is no issue as to the facts, and in our view much of the full background set out in the defendants' skeleton is important in considering the questions which arise on the appeal. We accordingly gratefully adopt in large measure their summary of the facts and background.

3. The Exxon Valdez went hard aground on Bligh Reef in Prince William Sound, Alaska, at 00 04 on Good Friday (Mar. 24), 1989 loaded with 1,264,155 barrels of North Slope crude oil. The grounding led to the spillage of some 11 m. gallons of that oil. At the time of the grounding, Exxon Valdez was owned by Exxon Shipping Corp. ("ESC"), a wholly owned subsidiary of Exxon. Exxon was the owner of the cargo on board at the time. The spill resulted in crude oil flowing into the waters of Prince William Sound, and the oil then spread westwards so that by May 18, 1989 some oil had reached 470 miles away in the Gulf of Alaska. Some of the oil washed ashore. By September, 1989 790 miles of shoreline within Prince William Sound had been identified as having been oiled, and in Western Alaska more than 2,400 miles of shoreline were found to be oiled.

4. ESC (until August, 1989) and Exxon proceeded (under the supervision and direction of the Federal and State On Scene Coordinators, or "FOSC" and "SOSC") to take steps to contain the spill, and to clean-up the polluted shoreline. The steps taken included:

(i) The lightering of the Exxon Valdez;

(ii) The skimming of oil from the surface of the water;

(iii) Booming off sensitive areas of shoreline (for example to protect fish hatcheries);

(iv) Burning of oil on the surface of the water;

(v) Washing the shoreline, by cold water and subsequently warm water flushing, coupled with the skimming of oil washed off the shoreline into the sea;

(vi) Moving rocks/pebbles etc into the tidal zone to allow natural tidal flushing;

(vii) Bioremediation (whereby compounds are added to the environment to assist in the natural process in which bacteria and other micro organisms alter the organic molecules in oil into other

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

660
Waller, L.J.

substances such as fatty acids and carbon dioxide);

(viii) The cleaning up of animals, including otters and birds.

5. The costs of all these containment and clean-up measures were calculated by Exxon as having been U.S.$ 1.25 billion in the case of Exxon itself, and U.S.$ 885 m. in the case of ESC.

6. In addition to the costs of these various containment and cleanup operations, Exxon Corp. and ESC were also the subject of a number of claims against them. In particular:

(i) Claims were made against Exxon and ESC by both the United States of America (Federal Government) and the State of Alaska, in respect of the losses which they had suffered. These led to the payment of some U.S.$900 m. by Exxon, pursuant to an Agreement and Consent Decree, approved on Oct. 8, 1991.

(ii) Sums were claimed from and paid by Exxon (about U.S.$267 m.) to commercial fishermen for lost income due to fish stock damages, to Alaska Natives for lost harvest foods, to seafood processors, seafood processor employees and some other organisations for lost income, and to private landowners for damage to their land as a result of oil fouling.

(iii) Proceedings were brought in the US District Court for the District of Alaska and in the State of Alaska courts by some 30,000 plaintiffs (fishermen, processors, Alaska Natives, landowners and others). These proceedings were consolidated. After a jury trial in Alaska, the claimants were awarded U.S.$287 m. compensatory damages, and U.S.$5 billion in punitive damages. After appeals and remands the District Court has recently reduced the punitive damages element to U.S.$4.5 billion.

*Insurance*

*(a) ITIA*

7. At the time of the casualty, the Exxon Valdez was entered with the International Tanker Indemnity Association Ltd. ("ITIA"). ITIA is a mutual P&I insurer which was set up in the aftermath of the Torrey Canyon disaster of 1967, specifically to cover oil pollution risks. Specifically, ITIA provides cover for liabilities assumed under TOVALOP (Tanker Owners' Voluntary Agreement Concerning Liability for Oil Pollution). TOVALOP is an agreement which was made in 1969 between major tanker owners (including Exxon). Under TOVALOP it was agreed that tanker owners should assume certain liabilities for pollution damage including responsibilities for clean-up. ITIA was

set up in large measure to insure liabilities assumed under this agreement.

8. In 1989, at the time of the Exxon Valdez casualty, the ITIA Rules provided, in part, as follows (judgment par. 98):

24(A) The liabilities, costs and expenses in respect whereof owners and co-assureds shall be insured by the association in respect of their interest in the entered tanker. . .are limited to the following:

(i) Those for which the owner may, as a party to [TOVALOP] be liable.

(ii) Those for which the owner or co-assured may be legally liable under statute or otherwise. . .by reason of the discharge or threatened discharge of oil, other than any damage, except pollution damage, caused directly or indirectly by fire or explosion . . .

9. In 1989 the limit of cover provided by ITIA for "all oil pollution risks" was U.S.$ 400 m. each incident or occurrence. ESC as the owner of the Exxon Valdez, made a claim for and recovered the full amount of that U.S.$400 m. cover in respect of its clean-up costs in relation to the Alaskan oil spill.

*(b) The GCE*

10. In addition, at the time of the casualty, Exxon and affiliates had cover under the policy which is central to the present appeal and which is referred to in the judgment below and herein as the GCE (Global Corporate Excess). This covered various different types of risk, worldwide. Exxon had long placed such insurance in the London market. At the time of the casualty, the policy in force covered the period Nov. 1, 1988 to Nov. 1, 1989.

11. The GCE had a number of different sections, viz ss. I, IIIA and IIIB.

(i) Section I provided property insurance. Its essence was the cover of loss or damage to the property of the insured. It provided U.S.$600 m. cover above U.S.$410 m. of aggregate deductibles. It was given a separate policy no. of "03-0364B-88" and gave rise to a separate premium.

(ii) Section IIIA provided coverage for an array of marine risks, including in particular third party liabilities of vessel owners and operators. It was placed in three layers, which together provided cover of U.S.$250 m. per occurrence above aggregate deductibles of U.S.$210 m.

(iii) Section IIIB was placed in the same layers as s. IIIA, and also provided cover of U.S.$250 m. per occurrence above aggregate deductibles

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

661
Waller, L.J.

of U.S.$210 m. It provided general third party liability coverage. ss. IIIA and IIIB had their own (joint) policy number, viz "03-0366B-88" and gave rise to their own separate premium.

12. Sections I, IIIA and IIIB were the subject of two placements. There was a London placement, placed by Bowrings, and led by Richard Youell of the Janson Green Syndicate. In addition there was a smaller Scandinavian-led placement. As the Judge found, the policy language approved by Messrs Youell and Compton-Rickett of Janson Green was largely adhered to by the underwriters in the Scandinavian market.

13. The London placement took 70.83 per cent. of s. I, and the Scandinavian-led placement 29.17 per cent. In relation to ss. IIIA and IIIB, these were placed in layers of U.S.$100 m. (above the aggregate deductibles), U.S.$100 m. above that, and U.S.$50 m. above that. The first of these layers was a Scandinavian-led layer; the second and third layers were London layers. The Scandinavian layer was as Mr. Edelman put it an "enduring layer" since it was simply subject to a deductible of U.S.$10 m. each and every claim, whereas the London layers covered simply U.S.$100 m. in aggregate.

14. As the judgment records (par. 33(2)), it was common ground and is to be assumed that ss. I, IIIA and IIIB were presented by the placing brokers to the participants on both the London and Scandinavian markets as a single package and during a very short period of time. We refer to the original insurers under the GCE as "Underwriters".

*Claims on the GCE*

15. ESC did not make a claim under the GCE. In August, 1989 Exxon confirmed that it was considering making a claim under cl. 1(c) of s. IIIA for the amounts it had by then expended on the clean-up, on the basis that Exxon, as cargo owner, was exposed to claims for damages under the Alaskan Statute [viz. 46.03.822] and/or that the sums it was expending by way of clean-up costs were sums expended to "mitigate/neutralise their exposure to claims for damages under Statute". By fax of Sept. 7, 1989, Exxon indicated a firm intention to file a claim for liabilities, under s. III of the GCE.

16. No claim was made under s. I at that stage. Nearly two years after the grounding, by a letter dated Mar. 19, 1991, a claim under s. I was indicated. In that letter it was suggested that the words "removal of debris" in s. I provided cover to Exxon. As ultimately particularized for the purposes of this case, that claim related to the aspects described in (iv) to (vii) of par. 4 above, which Mr. Edelman submitted could be described as activities

under which oil was removed, and thus fell within the words "removal of debris". Those words are found in art. VII (Interest and Coverage) at 4.(b) and in art. VIII (Basis of Recovery) at 2.(b), as follows:

Article VII

For each loss occurrence covered by this policy the insurers agree with the insured to pay or to pay on their behalf subject to the Basis of Recovery art. (VIII) . . .

4. All sums which the insured pays or incurs as costs or expenses on account of . . .

(b) Removal of or attempted removal of debris or wreck of property and/or residual structure covered hereunder.

Article VIII

2, Cargo and Stock . . .

(b). . .recovery shall also include costs and expenses incurred in defending, safeguarding, recovering, preserving and forwarding the property, as well as costs and expenses in respect of general average, sue and labour, salvage, salvage charges and expenses incurred in removal or attempted removal of debris or wreck of property even if incurred solely as the result of governmental or other authoritative order and the amount of the reasonable extra cost of temporary repair or of expediting the repair, including overtime and the extra cost of express or other rapid means of transportation. This shall include but not by way of limitation, any costs and expenses incurred in respect of fighting a fire endangering or involving property insured hereunder.

*Litigation and arbitration of Exxon's claims*

17. Exxon commenced proceedings in respect of its claims under each of ss. I, IIIA and IIIB. It brought its claims in relation to ss. I and III in the District Court of Harris County, Texas, in an action begun in August, 1993.

18. The Underwriters countered with an action in the Federal Court in New York, seeking a declaration that they were not liable to Exxon under the GCE, and asking the court to compel arbitration of the claim under s. IIIB. Exxon accepted that the claim under s. IIIB should be arbitrated in New York but applied to have the declaratory judgment action dismissed. That application eventually failed in January, 1996.

19. The proceedings in the Texas State Court, which as was Exxon's entitlement involved trial by jury, moved towards trial. In early, 1996, however, the Underwriters settled the s. I claim. As the

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

662
Waller, L.J.

judgment records (par. 27) by a Settlement Agreement and Release, dated Mar. 15, 1996, the Underwriters agreed to pay a sum of U.S.$300 m. and Exxon agreed to the dismissal of the s. I claim from both the Texas and New York proceedings.

20. In an Affidavit subsequently sworn by the leading lawyer representing Underwriters, Mr. Harry Reasoner, the settlement was explained as follows:

13.. . .liability under s. I of the [GCE] was not going to turn simply upon construction of the policy language in light of the factual matrix. Rather, the outcome of the claim depended upon an interpretation of the parties' intentions as to the meaning of the policy language, as determined by a Texas jury directed by a non-specialist Judge.. . .Jurors are often unfavourable to insurers and biased against them when insurers are arguing for a limitation of cover . . .

14. In these circumstances, I recommended to Underwriters the payment of U.S.$300 m. This settlement was about 30 per cent. of the coverage plus interest. in settlement of Exxon Corporation's s. I claim.

. . .

16. Underwriters' denial of Exxon Corporation's s. I claim, when viewed purely as a matter of construction in the commercial context, was certainly reasonable, and based upon reasonable and credible arguments. However, in my judgment, a jury verdict on Exxon Corporation's s. I claim in the District Court in Houston, 189th Judicial District, was going to depend in large part on wider factors.

21. In relation to Exxon's claim under s. IIIA, Underwriters did not settle. This claim proceeded to a trial in Texas in April-June 1996. The jury returned verdicts against the Underwriters, finding them liable for the s. IIIA limit of U.S.$ 238 m., plus interest, fees and costs. Judgment was entered against Underwriters on July 3, 1996, in the sum of approximately U.S.$410 m. Underwriters filed a notice of appeal in relation to that judgment. The Texas judgment was confined to s. IIIA.

22. On Jan. 23, 1997 Underwriters entered into another settlement, this time of all claims under s. III (both ss. IIIA the subject of the Texan proceedings and s. IIIB the subject of the arbitration) and agreed to pay U.S.$480 m. (which was in addition to the U.S.$300 m. paid pursuant to the s. I settlement reached in March, 1996). As the judgment records at par. 28, this settlement agreement did not apportion the payment between ss. IIIA and IIIB.

23. These payments have given rise to numerous disputes in the insurance and reinsurance markets,

with certain reinsurers contending that they are not liable for all the sums paid by their reinsureds under those settlements.

*Commercial Union v. NRG Victory Reinsurance Ltd.*

24. Two of those disputes led to the decision of the Court of Appeal in *Commercial Union Assurance v. NRG Victory Reinsurance*, [1998] 2 Lloyd's Rep. 600. That was an appeal from a judgment of Mr. Justice Clarke, in which he had given summary judgment in favour of the plaintiffs. That decision was reversed on appeal.

25. In that case, insurers had claimed against reinsurers in respect of sums paid under the s. I settlement. The reinsurances were on the terms of the Joint Excess of Loss Committee ("JELC") Excess Loss clauses, cl. 1.3 of which provides that:

It is a condition precedent to liability under the contract that settlement by the re-assured shall be in accordance with the terms and conditions of the original policies or contracts.

26. On this basis it was common ground that the Court should not give summary judgment if there was an arguable case that the Underwriters subscribing to the GCE had not been liable to Exxon under that policy.

27. The argument of the plaintiffs was that there was no such arguable case. They relied on Mr. Reasoner's affidavit, referred to above, which was not contradicted. They contended that that showed that Underwriters would have been found liable by a court of competent jurisdiction (namely the Texan State Court), and that was sufficient.

28. The Court of Appeal concluded that that was not right. It accepted that, if there has actually been a judgment of a court of competent jurisdiction against the direct insurers, that will, as a matter of a term to be implied into the reinsurance contract, establish the reinsurers' liability to the reinsured, save in very exceptional circumstances. In the absence of such a judgment it was for the Judge to have formed his own view as to whether there was an arguable defence that the plaintiffs had not been liable to Exxon under the applicable law. Lord Justice Potter concluded (at 611 RHC) as follows:

It seems to me that, had the Judge sought to embark upon the question of whether the insurers were indeed liable to Exxon under s. 1, he could not have failed to find that there were at least strong arguments that they were not. However, he never did embark upon that task.

29. Lord Justice Potter did not consider in detail whether there was any cover under s. I of the GCE by reason of the "removal of debris" language. He

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

663
Waller, L.J.

did, however, give some consideration to terms found in s. I which have been labelled the "Notwithstanding clauses", and said (at 603)

. . .on the face of it at least, the policy intended that losses sustained which might otherwise fall within the wording of s. I, but which were recoverable under s. 3, should not also be recoverable under s. I.

30. It perhaps gives some indication of the complexity of the points which arise on this appeal to record that: (1) in *NRG* before Mr. Justice Clarke at first instance there was argument as to whether New York or English law was the applicable law, and Mr. Justice Clarke thought that it was likely that New York was the proper law, but there was no evidence that the two were materially different. Whereas after full argument in this action Mr. Justice Colman found that English law was the proper law and that under English law there was no liability under s. I, but said that he would have found there was liability under s. I but for other clauses shown as the "Notwithstanding clauses" if New York law was the proper law. (2) In *NRG* Mr. Justice Clarke would have held that a "seepage and pollution" exclusion clause in certain of the reinsurances in relation to pollution damage would not have assisted reinsurers in the position of the defendants, but Mr. Justice Colman has held that it does on the basis that certain aspects of the very clause could not have been drawn to the attention of Mr. Justice Clarke by leading counsel then appearing.

31. In the present case, there is no dispute that the defendants are liable under the Excess of Loss policies for such sum as the Underwriters have ultimately agreed to pay under s. IIIA of the GCE. At first in the course of argument it seemed that Mr. Butcher was inclined to accept that liability, not on the basis that Exxon should have succeeded as a matter of construction of s. IIIA, but simply on the basis that Exxon had obtained a judgment in the Texan court for U.S.$238 m. under that section. But ultimately, as will appear in greater detail below, he accepted that as a matter of construction of s. IIIA Exxon were entitled to succeed. The essential dispute is broadly whether Exxon have further coverage under s. I and/or s. IIIB.

32. The key issues before the Judge and before this Court on appeal are:

1. Did the Underwriters of s. I of the GCE have and meet a liability to Exxon for the costs incurred under items (iv) to (vii) of par. 4 above? That question involves consideration of the language of s. I and in particular whether the words "Removal of Debris" cover Exxon for those costs. It further involves consideration of clauses known as the "Notwithstanding clauses" in s. I

by virtue of which it is suggested by the defendants that if there was coverage under s. IIIA and IIIB, there would not be coverage under s. I. It also involves consideration of art. IX(3) of s. I which the defendants suggest is a free standing provision which excludes liability for such costs under s. I.

2. Did the Underwriters of s. I have and meet a liability to ESC? In this instance, although the Judge was with the claimants on certain aspects, they face one difficulty on which the Judge was against them, on which we have already indicated at the hearing we are against them. It was not ESC which made the settlement; thus the Underwriters under the GCE never met any liability of ESC.

3. Did the Underwriters of s. IIIB have and meet any liability to Exxon for the third party liabilities summarised in par. 5 above?

4. Does the seepage and pollution exclusion in certain of the reinsurance policies exclude liability for the costs and liabilities to third parties?

5. There is also a critical question as to proper law - English or New York?

*The judgment below in summary*

33. In summary the judgment decided the issues as follows:

(i) That, in accordance with the defendants' case, the governing law of the GCE was English law. The Judge rejected the claimants' submission that the GCE was governed by New York law (judgment pars. 33-66).

(ii) That, as a matter of English law, there was no cover under s. I of the GCE because, on its true construction, it did not cover pollution clean-up costs (pars. 86-116).

(iii) That had the GCE been governed by New York law, s. I would have been construed as covering pollution clean-up costs (judgment par. 257).

(iv) That neither under English nor New York law would cover for clean-up costs have been excluded from s. I by reason of cl. IX(3) (judgment pars. 154-159), but subject to the Notwithstanding clauses.

(v) That under English and New York law even if there would otherwise have been cover for clean-up costs under s. I, there was no cover because of the provisions of the Notwithstanding clauses (judgment pars. 118-153; 258-259).

(vi) That the claimants cannot recover on the basis of ESC's putative claim under s. I. The Judge found that there had been no settlement of ESC's notional claim, and that as a result the claimants could not claim under the Outwards

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

664
Waller, L.J.

Reinsurances in respect of any liability to ESC (judgment pars. 160-203).

(vii) That as a matter of English law, there was no cover for clean-up costs under s. IIIB of the GCE (judgment pars. 204-236).

(viii) That as a matter of New York law there would have been cover for clean-up costs under s. IIIB of the GCE (judgment pars. 260-261).

(ix) That the seepage and pollution exclusion which appeared in most of the Outwards Retrocessions excluded liability on the part of the defendants to indemnify the claimants in respect of clean-up costs, even if they were covered under the GCE (judgment pars. 237-248).

34. We should say that we are immediately struck by the following thoughts in relation to the above findings. First, can it really be true that the terms of an insurance contract placed in the London market could have a different meaning depending on whether it is being construed by a Court in England under English law or a court in New York under New York law? We would not have expected the approach to construction to be so different in the two places and we would have expected that authorities persuasive in one court would also be persuasive in the other. We would expect both to reach the same conclusion about the intentions of the parties to be ascertained from the written document. Second we would have expected the real issue in this case concerned with pollution of this calibre to be whether it was within the terms of the coverage sections of the GCE; and whereas the "Notwithstanding clauses" and even an exclusion clause might assist in defining the coverage, we find more difficulty in contemplating that if something of this nature is expressly covered, some other general limiting provision will have excluded it.

*The proper law of the GCE*

35. As we have hinted and as will appear, we are of the opinion that it does not in the end matter whether the proper law of the GCE was that of England or New York. Nevertheless, this question having been fully argued before us, it is appropriate that we should express our view on it, albeit relatively briefly.

36. The Judge noted (par. 33) three matters of common ground, of which the first two were these:

(1) The question was to be determined by an application of English conflict of laws principles.

(2) It was to be assumed that ss. I, IIIA and IIIB were presented by the placing brokers to the participants on both the London and Scandi-

navian markets as a single package and during a very short period of time.

Each side has accepted throughout that all three sections should be treated as governed by the same proper law.

37. In seeking to support the Judge's conclusion that a choice of English law was to be inferred, Mr. Butcher, Q.C., for the defendants, relied primarily on the following factors: first, that the cover was in respect of Exxon's operations worldwide; second, that the brokers for the lead placement in London were Bowrings, a London subsidiary of a United States company, Marsh; third, that the smaller Scandinavian-led placement was very international; fourth, that the policy terms and coverage were essentially negotiated between Bowrings and Mr. Youell and Mr. Compton-Rickett of the Janson Green syndicate in London; fifth, that the policies were issued and were stated to be issued in London. Mr. Butcher submitted that the common law has always paid great attention to the market in which the insurance is placed and the location of the leading insurers. As illustrations of that principle, he cited the decisions of this court in *Citadel Insurance Co. v. Atlantic Union Insurance Co. S.A.*, [1982] 2 Lloyd's Rep. 543, *The Stolt Marmaro*, [1985] 2 Lloyd's Rep. 428 and *Du Pont v. Agnew*, [1987] 2 Lloyd's Rep. 585 and of Mr. Justice Longmore in *Tiernan v. The Magen Insurance Co. Ltd.*, [2000] I.L. Pr. 517.

38. On the other side, Mr. Edelman, Q.C., for the claimants, while recognizing the significance of the principle and authorities relied on by Mr. Butcher, distinguished them primarily by focusing on the arbitration and service of suit clauses, which appear in all three sections. In ss. I and IIIA these clauses are in identical terms (cll. 11 and 12 in s. I and cll. 21 and 22 in s. IIIA). In s. IIIB each of the cll. (clauses 10 and 11 of art. IX) was in a different form from the corresponding clause in ss. I and IIIA. The relevant clauses in ss. I and IIIB are set out in full in appendix A to this judgment.

39. It is convenient to start with s. IIIB. Here the arbitration clause provides that any "difference" arising between the insured and the insurers "shall at the request of either party" be referred to three arbitrators, one chosen by each of the insured and the insurers and the third by both of them; in case of no agreement the third arbitrator is to be chosen by an acting senior Judge of the United States District Court for the State of New York. It was also provided that any arbitration should take place in New York (unless otherwise agreed), and that the arbitrators might abstain from jurisdictional formality and from following strictly the rules of law.

40. So the arbitration clause in s. IIIB provided for compulsory arbitration in New York, should

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

665
Waller, L.J.

either party request it, with the third arbitrator, should it be necessary, being chosen by a Judge of the Federal Court in that State. It seems clear from those provisions that, though the arbitrators might abstain from following strictly the rules of law, the law, if applied, would necessarily be that of New York. This points to the law of New York as being the proper law.

41. The service of suit clause in s. IIIB provided that, in the event of the failure of the insurers to pay any amount claimed to be due thereunder, the insurers would, at the request of the insured, "submit to the jurisdiction of any court of competent jurisdiction within the United States", and so that "all matters arising hereunder shall be determined in accordance with the law and practice of such court". It was further provided that service of process might be made upon Mendes and Mount at an address in New York, further or alternatively on any officer specified by a United States statute as a person upon whom process might be served, such officer being appointed as the insurers' attorney for that purpose.

42. So the service of suit clause in s. IIIB provided for the insurers, at the request of the insured, to submit to the jurisdiction of any court of competent jurisdiction within the United States, not simply within the State of New York. It could therefore be argued that that provision pointed to a proper law other than the law of New York. Had the competition been between the laws of New York and some other American State, we would have seen force in that point. But where the competition is between the laws of England and New York we cannot see that the service of suit clause detracts significantly from the effect of the arbitration clause, which points to the law of New York rather than to the law of England.

43. We turn to the arbitration and service of suit clauses in ss. I and IIIA. Here the arbitration clauses provide that any "difference" arising between the insured and the insurers "may upon the agreement of the parties" be referred to three arbitrators to be chosen in the same manner as in s. IIIB, with similar provisions for any arbitration to take place in New York (unless otherwise agreed) and for abstention from jurisdictional formality and from following strictly the rules of law. However, the following sentence was added to the arbitration clauses:

To the extent the arbitrators follow the rules of law, such law shall be that of the State of New York to the exclusion of all other laws.

44. So the arbitration clauses in ss. I and IIIA were in the same form as the arbitration clause in s. IIIB, except firstly, that arbitration, if requested by either party, was not compulsory (it had to be

agreed to by both parties) and, secondly, that there was express (as opposed to implied) provision for the arbitrators, to the extent that they followed the rules of law, to follow New York law to the exclusion of all other laws.

45. The service of suit clauses in ss. I and IIIA provided that, in the event of the failure of the insurers to pay any amount claimed to be due thereunder, the insurers would, at the request of the insured, "submit to the jurisdiction of any court of competent jurisdiction within the State of New York", and that "all matters arising hereunder shall be determined in accordance with the law and practice of such court". It was further provided that service of process might again be made upon Mendes and Mount at the same address in New York, further or alternatively on an officer specified by a New York statute as a person upon whom process might be served, such officer again being appointed as the insurers' attorney for that purpose.

46. So the service of suit clauses in ss. I and IIIA were in the same form as the service of suit clauses in s. IIIB, except that provision was made for submission to the jurisdiction of a New York court (not of any court within the United States), with a corresponding variation in the provision for service of process on an officer specified by a New York statute.

47. If the arbitration and service of suit clauses are viewed as a whole, and in isolation from the factors relied on by Mr. Butcher, it seems to be beyond doubt that they point to an inferred choice of New York law as the proper law of the GCE. Certainly, there is nothing in them which points to English law. The question is whether there is enough in those clauses to displace the consequences of the major placement in the London market, the location there of the leading insurers and so forth. In our opinion the key provision is that with which we started, i.e. the New York arbitration clause in s. IIIB. It is difficult, if not impossible, to infer a choice of English law as the law to govern a contract, a substantial part of which provides for any difference between the parties (if either requests it) necessarily to be determined by an arbitration to which the law of New York applies. That view of the contract as a whole is consistent with the New York arbitration clauses in ss. I and IIIA, even though in those sections the agreement of both parties is required. It is also consistent with the service of suit clauses in those sections. Moreover, as we have already observed, it is not inconsistent with the service of suit clause in s. IIIB.

48. We do not think it helpful to embark upon an extensive review of the authorities, each of which depends in the end on the particular circumstances

[2005] Vol. I
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

666
Walter, L.J.

and the particular wording of the policy. Perhaps the nearest case on the facts is *Du Pont v. Agnew*, where Bingham Lord Justice said [1987] 2 Lloyd's Rep., at p. 592:

I think it plain, almost beyond argument, that the proper law of that policy is English. It was a Lloyd's policy, negotiated by Lloyd's brokers and issued by the Lloyd's Policy Signing Office in London. Notice of potential claims was to be given to Lloyd's brokers. The policy was for world-wide cover. Unless displaced, the inference that English law was intended to govern is in my view overwhelming.

One of the factors relied on as displacing that inference was a service of suit clause in much the same form as that found in s. IIIB of the GCE. As to that provision, Bingham Lord Justice said, at p. 592:

The service of suit clause did contain a reference to New York, which is the proper law for which the insurers contend. There are three points to be made. First, a clause of this type is not inconsistent with an English proper law, where that is otherwise to be inferred: see *Armadora Occidental S.A. v. Horace Mann Insurance Co.*, [1977] 1 W.L.R. 520. . .. Third, the intended effect of this clause, providing for determination of disputes in accordance with the law of the Court in which the insurer is sued, does not suggest that the law of any State of the Union is already the proper law. Certainly the provision for service on New York agents does not support that inference, because service may be made upon them no matter in which State the suit is brought.

49. While that was no doubt an entirely correct view of the proper law of the policy in that case, it appears that there were no arbitration provisions, compulsory or otherwise, which fell to be considered. Further, there was nothing comparable with the New York service of suit clauses in ss. I and IIIA of the GCE. In our view *Du Pont v. Agnew* is clearly distinguishable from the present case. Differing from the Judge, we conclude that the proper law of the GCE was that of New York.

*Section I coverage - Removal of debris*

50. As we have indicated it will be important to consider the policy as a whole and we have accordingly set out in Appendix B hereto all the relevant clauses of ss. I, IIIA and IIIB. Indeed we believe it is important to look at all the different points that arise on the construction of s. I before reaching any conclusion on the individual points that arise. The critical issue on this aspect of the case is what coverage is provided by the words in art. VII(4)(b) "Removal of or attempted removal of debris or

wreck of property and/or residual structure covered hereunder", and in particular what is covered under art. VIII (which describes the Basis of Recovery) under 2. ("Cargo and Stock") which under (b) provides that recovery shall also include charges and expenses incurred in "removal or attempted removal of debris or wreck of property even if incurred solely as the result of governmental or other authoritative order". [The words are "or property" but it is now common ground that "or" is a misprint for "of".]

51. Mr. Edelman's arguments are encapsulated in the following summary in his skeleton:

The fundamental error made by the Judge was in failing to construe the words "removal of debris" in the context in which they appeared in art. VIII(2)(b) of s. I. That context was as follows:"

(a) The policy was a high level catastrophe cover to protect the Exxon Group.

(b) The Exxon Group was engaged in the business of the production and transportation of oil and refined oil products.

(c) The first party loss cover conferred by the policy included cover for the cost of the recovery of cargo and the cost of the removal of debris of cargo.

(d) Such cover was conferred not only in the general context of the business of the Exxon Group as described above, but also in the particular context that the only types of cargo expressly identified in the relevant clause were crude oil and refined or in-process products.

(e) Such cover was further conferred even if the expenditure was incurred solely as the result of governmental or other authoritative order, thus making it clear that the cover was to encompass the cost of a clean-up required by a government of other authoritative body."

52. He continued:

The learned Judge further erred in his reasoning in the following four respects:

a. the natural meaning of the word "debris";

b. the inference to be drawn from the annual aggregate deductible and amount of cover provided by s. I;

c. the distinction in the policy between "removal of debris" and pollution;

d. the commercial environment in which the GCE Policy was negotiated.

53. Mr. Butcher's arguments can be summarized as follows. He submitted that pollution clean-up is a serious and well-known risk, and the natural expectation would be to see express reference to

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

667
Waller, L.J.

such a risk. He submitted the words "removal of debris" do not naturally describe the clean-up operations described in (iv) to (vii) in par. 4 above, both because "debris" does not naturally describe "oil", and because "removal" does not naturally describe the full exercise envisaged by (iv) to (vii). He submitted that the structure of the three policies supported the view that oil pollution risks were covered by s. III, and not s. I.

*Mr. Edelman's submissions in more detail*

54. Mr. Edelman commenced his submissions from a New York law perspective. He argued that the approach of the New York courts was less neutral than that of the English Courts, being, he suggested, inclined to favour the insured on points of construction. He referred us to his skeleton pars. 111 to 117 and the authorities there referred to. It is sufficient to quote part of par. 111:

In *Avondale Industries Inc. v. Travelers Indemnity Company*, 697 F. Supp. 314 (S.D.N.Y. 1988), aff'd 887 F.2d 1200 (Cir. 1989), [C1/119.146-155, 156-168] U.S.D.J. Conboy had to decide whether clean-up costs incurred pursuant to a requirement to clean-up under administrative proceedings commenced by a state fell within the ambit of "damages" for the purposes of a policy provision imposing on the insurer the duty to defend any suit against the insured "seeking damages" on account of property damage. He held as follows:

"The average businessman does not differentiate between "damages" and "restitution"; in either case money comes from his pocket and goes to third parties. See *United States Fidelity & Guarantee Co.*, 683 F Supp at 1168 ("the insured ought to be able to rely on the common sense expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely the rights of third parties"). The average businessman would consider himself covered for clean-up expenditures applicable to others' properties. Cases such as *Armco Inc.*, which apply a "legal, technical meaning" to the word "damages", see id. at 1352, are inapposite to this case, to which New York law, mandating construction according to "the reasonable expectation and purpose of the ordinary businessman", applies.

55. He then referred us to the two authorities on which the Judge relied when ruling that if New York was the proper law he would have been in Mr. Edelman's favour on the construction of the words "removal of debris". The more important case is *Lexington Insurance Co. v. Ryder System Inc.*, 142

Ga App 36, 234 SE 2d 839, a decision of the Court of Appeals of Georgia. The case concerned an all-risk policy which covered the insured's property, including its stores of oil. The policy extended to cover "the cost of. . .removal of debris formerly an insured part of the property and no longer suitable for the purpose for which it was intended". A substantial quantity of oil leaked out of the insured's underground storage tanks and contaminated the surrounding earth. The insured claimed for the cost of removing the oil from the ground and the insurer contended that it was not liable for the removal for reasons which included the contention that what was being removed was not "debris". The court held that the oil was part of the insured property, that it was obviously no longer suitable for the purpose intended and that it was debris because the word "debris" may mean merely waste material resulting from the destruction of some article.

56. The second authority was *Antilles Steamship Co. Ltd. v. The Members of the American Hull Insurance Syndicate*, 733 F 2d 195. The U.S. Court of Appeals described the remains of a liquid cargo, which had polymerized so as to create remains which covered the spectrum from solid to liquid as being the debris of the cargo. There was, however, no issue in that case as to the meaning of "debris" or its removal.

57. He next referred us to a case not cited by the Judge but relied on by the defendants for its criticism of the reasoning in Lexington. It is an unreported decision of the Superior Court of Connecticut, *Bell Power Systems Inc. v. Hartford Fire Insurance Co.*, 1995 Conn Super Lexis 448. Hartford were first party insurers. Bell Power were seeking to recover the costs of the clean-up of oil which had leaked from a tank including removing contaminated soil. The main issues were whether the tank and/or oil were insured property which the court ruled they were not but in the course of considering the "Debris Removal provisions" of the policy the court made the following observation following reference to Lexington and reference to the holding in that case that "the escaped oil which had contaminated the surrounding earth is debris, and its removal is compensable because as oil in storage it was insured":

The court in *Lexington* defined "debris" as meaning "merely waste material resulting from the destruction of some article." Debris is generally understood to be "remains of something broken down or destroyed." *Webster's Ninth New Collegiate Dictionary*, p. 328. The oil at issue in *Lexington* had not been destroyed, it had merely escaped. Therefore, it is difficult to fully understand the ruling of the court in that case. In any event, *Lexington* is clearly distinguishable from

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

668
Waller, L.J.

the present case. Here oil in pipes is not covered property under the policies in question and the oil at issue was not the debris, that is, the destroyed remains, of any covered property. Therefore, the Debris Removal portion of the policies does not provide coverage for the plaintiff's losses.

58. Mr. Edelman suggested that although there was criticism of the reasoning in Lexington, the court was not suggesting that the remains of oil could never be debris.

59. He then turned to the terms of the policy. First he submitted the "removal of debris" was clearly an important part of the cover. He referred us to the slip, and the recognition in the general words that "Removal of Debris" was part of the cover. He later recognized the problems there might be with reliance on the slip to support his construction of the policy but both he and Mr. Butcher appreciated that the same point could be made by reference to the Addendum to the Bowring policy [D2 page 165]. Mr. Butcher, it should be said, did not contest that "removal of debris" was an important element of the policy although he suggested that the main focus was on rigs where sub-limits are provided for under art. VIII(1)(f). But Mr. Edelman emphasized that the reference in art. VIII(2)(b) under cargo and stock demonstrated it was also an important part of the cover so far as cargo was concerned, and he emphasized that art. VIII(2)(b) followed art. VIII(2)(a) where cargo in the case of the insureds under s. I is recognized in the main to be oil.

60. A key aspect of Mr. Edelman's submissions was that art. VIII(2)(b) clearly covered so far as solid cargoes were concerned (1) the recovery and preservation of the same and (2) the removal of debris of the same where they had been destroyed. It also covered the recovery and preservation of oil in so far as it was possible to recover and preserve the same. Why then, asked Mr. Edelman rhetorically, was it not intended that the "removal" of liquid cargoes, and in particular cargoes of oil which had been destroyed, should not be covered?

61. Mr. Edelman submitted that it was clear that the words "removal of debris" were concerned with a pollution risk in the broad sense i.e. in the sense that the words provided cover for removal made with the objective of protecting the insured's liability to third parties and not simply the property of the insured. His point was that s. I was at least to that extent not concerned simply with covering the property of the insured. This point he suggested was emphasized by the coverage in art. VIII(2)(b) applying "even if incurred solely as the result of governmental or other authoritative order. . .". Mr. Edelman was critical of the Judge for not dealing

with this point, but we did not understand Mr. Butcher to contest this point so far as it went. Mr. Edelman's submission however was to build on the above and argue that since "removal of debris" was concerned with mitigating possible liability to third parties from pollution, it followed that a court should construe "debris" as including what remained of a cargo of oil just as it included what remained of a solid cargo or an oil rig or a vessel. He submitted that the ordinary meaning of debris was "something broken down or destroyed", and that the definition of "destroy" included "render useless". He submitted that the oil spill had rendered the oil useless and destroyed it, and in the context of this policy and in particular in art. VIII(2) which contemplated oil as the main cargo debris included oil that had been rendered useless or destroyed.

62. Mr. Edelman also sought to rely on the fact that the defendants admitted that Exxon had cover for liabilities to third parties for compensatory damages under s. IIIA. Mr. Edelman argued that that fact demonstrated that it was not possible for the defendants to argue that all pollution cover was provided under the ITIA rules and excluded from the GCE. In his skeleton and before the Judge, Mr. Edelman had been inclined to argue that if oil pollution costs were not included within s. I it would be practicably impossible for the annual aggregate deductible of U.S.$400 m. to be exhausted, let alone for the cover of U.S.$600 m. to be engaged (see par. 52). His argument was that thus it must be inferred that it was intended to include this cover within s. I. Orally he did not pursue this argument recognizing as we would understand it that the annual deductible was an aggregate deductible and thus could be eroded by any number of losses, and that in any event as pointed out in Mr. Butcher's skeleton par. 105 there was a potential for losses e.g. the cost of a fire at one of Exxon's oil refineries, which even on its own would engage the cover. There was therefore no basis for drawing any inference that the parties actually intended to cover clean-up costs of an oil spill by s. I. He also recognized that if the extrinsic evidence referred to by the Judge in pars. 111 to 114 was admissible it showed that neither party intended s. I to provide such cover. Mr. Edelman preferred to argue that even if it could be demonstrated that the Underwriters had intended not to provide cover for oil pollution under the GCE, the admission that Exxon were entitled to recover under s. IIIA (see par. 31 above) demonstrated that it was possible, by virtue of the language used, for cover to have been granted unintentionally.

63. These points he could make with some forensic skill on the following basis. At one stage it seemed that Mr. Butcher might try to sustain an

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

669
Waller, L.J.

argument that on the proper construction of the GCE policy all oil pollution was excluded on the basis that it was covered by the ITIA rules. He was prepared to admit his client's liability to indemnify the underwriters of the GCE policy for the payment to Exxon for liabilities to third parties under s. IIIA but simply on the basis that the point had been lost in the Texas litigation and that his clients were bound by that judgment (see Lord Justice Potter in NRG (supra)). His suggestion was that on the actual terms of the policy there was a strong argument that the ITIA exclusion [1.(c) of s. IIIA (page 61 of D1)] did apply to Exxon the cargo owner, as much as to ESC, the ship-owner. If that were right, that would support the argument that it was the intention of the Underwriters under the GCE to exclude from the cover they were providing liabilities for clean-up or pollution from an oil spill altogether, on the basis that such cover as the insured had for that aspect was provided by the ITIA rules. That indeed was the extrinsic evidence of the underwriters, the brokers and of a representative from Exxon at the Texas trial where, in answer to a charge that the underwriters were refusing in bad faith to meet Exxon's claim, the underwriters, the brokers and a representative from Exxon had given evidence to that effect. But it was that argument that the underwriters of the GCE had run unsuccessfully in the Texas litigation, and on which the Judge had ruled against them.

64. Mr. Butcher ultimately conceded that on the true construction of s. IIIA the ITIA exclusion did not apply to Exxon, thus it was that Mr. Edelman could say (1) so far as the insureds were concerned under the GCE they were getting cover for oil pollution beyond such cover as ESC was obtaining from the ITIA rules, and (2) extrinsic evidence of an intention not to grant cover was unpersuasive because despite that intention cover had in fact been granted. Mr. Edelman was, it should be said, in any event critical of the weight that the Judge gave to the commercial background summarized in pars. 111 to 114 of his judgment (see par. 68 below).

65. Thus Mr. Edelman submitted on the proper construction the GCE under New York law, removal of debris included removal of the remains of oil. As to construction as a matter of English law (if it were relevant) he submitted that the same conclusion should be reached.

*Evidence of New York law*

66. We should add that Mr. Edelman suggested that as far as New York law was concerned the Judge had made a finding of fact as to the proper construction of the policy and as to the approach of the New York court in particular as to its approach to the decision of the court in Georgia in Lexington.

He said that the Judge had clearly on this aspect preferred the evidence of Mr. Woods (the claimants' expert) to Mr. Kimball (expert for the defendants). So he argued the Court of Appeal should be slow to interfere with those findings of fact. We raised during the hearing the possibility that the Court of Appeal had on some previous occasion stated that foreign law was a rather special finding of fact. The authorities we had in mind are: *Dalmia Dairy Industries*, [1978] 2 Lloyd's Rep. 223 at 286, and *Bumper Development Corp.*, [1991] 1 W.L.R. 1362 a

where the Court of Appeal on two occasions approved the statement of Mr. Justice Cairns in the Divisional Court in *Parkasho v. Singh*, [1968] P. 233 at 250. It is only necessary to cite the passage in Lord Justice Purchas judgment in *Bumper*:

(3) The Court of Appeal, whilst slow to interfere as in all cases where the decision involves findings of fact, may in appropriate cases be somewhat more ready to question the trial Judge's conclusions than in normal cases: see *Parkasho v. Singh*, [1968] P. 233, per Mr. Justice Cairns giving the leading judgment:

"We are asked by the appellant wife here to say that the decision was wrong; that the justices were wrong in their interpretation of the foreign law. The question of foreign law being a question of fact in our courts, must this court regard itself as bound by the findings of the justices on this matter? In my view the question of foreign law, although a question of fact, is a question of fact of a peculiar kind and the same considerations do not apply in considering whether and to what extent this court should interfere with the decision of the magistrates, as in the case of the ordinary questions of fact which come before a magistrates' court. It is not, I think, inappropriate to bear in mind that under the provisions of s. 102 of the Supreme Court of Judicature (Consolidation) Act, 1925, it is provided that an issue of foreign law in a case which is being tried by a jury is a question of fact for the Judge and not the jury. And bearing that in mind, and bearing also in mind the provisions of rule 73(7) of the Matrimonial Causes Rules, 1957 (S.I. 1957 No. 619) which enable this court to draw any inference of fact which might have been drawn in the justices' court, I think it is our duty in this case to examine the evidence of foreign law which was before the justices and to decide for ourselves whether that evidence justifies the conclusion to which they came."

Later in his judgment Mr. Justice Cairns [1968] P. 233, 250 referred to the speech of Lord Wright in *Lazard Bros. & Co. v. Midland Bank Ltd.*, [1933] A.C. 289, 298, where reference is made to the *Sussex Peerage Case*, (1844) 11 Cl. & F. 85,

[2005] Vol. 1
C.A.

**LLOYD'S LAW REPORTS**
King v. Brandywine Reinsurance Co.

670

Waller, L.J.

116, and then to the passage from the judgment of Lord Langdale MR in *Earl Nelson v. Lord Bridport* (1845) 8 Beav. 527, 537 cited above.

The approach of the Divisional Court in *Parkasho v. Singh* was approved in the Court of Appeal in *Dalmia Dairy Industries Ltd. v. National Bank of Pakistan*, [1978] 2 Lloyd's Rep. 223, 286, per Lord Justice Megaw:

"But a finding of fact on an issue of foreign law is a finding of fact of a very different character from the normal issue of fact: we would adopt as correct the observations of Mr. Justice Cairns (as he then was) in *Parkasho v. Singh*, [1986] P. 233, 250 as to the position of an Appellate Court on a matter of this kind. An Appellate Court must not by uncritical acceptance of a trial Judge's conclusions of fact shirk its function of considering the evidence afresh and forming its own view of the cogency of the rival contentions, whilst of course always remembering that the trial Judge had the undoubted initial advantage of having seen and heard the witnesses."

67. We confirm that although foreign law is a question of fact, it is in our view rather different from other findings of fact. Indeed there is as it seems to us a special feature of a case such as the present. It is to be noted that in *Antilles (supra)* part of the headnote reads:

To extent that no New York precedent existed on issue of which of costs incurred by shipowner to remove chemical debris from damaged cargo tanks following shipboard explosion and to clean and repair tanks were chargeable to hull insurer, maritime nature of marine hull and machinery insurance policy dictated that federal district court anticipate that New York state courts would look to English law in view of special reasons for keeping in harmony with marine insurance laws of England, a great field of such business.

68. This was a matter to which Mr. Kimball in his report drew attention in par. 61. The New York court in other words would, particularly in the area of marine insurance, find decisions of the English Court persuasive. We further suspect that although it may be possible to say that different courts in different states and indeed different courts in different parts of the world will enjoy different ranges of respect, most courts will ultimately be most influenced by the reasoning of "persuasive" decisions which attract it most. If the position is that under New York law the decision of an English Court as a matter of English law on the terms of this policy would have some persuasive effect, it would seem unreal to ignore that decision in reaching a view as to what New York law would hold. It is perhaps also important to remember that the role of an

expert, unless the court is concerned with special meanings, is to prove the rules of construction of the foreign law, and it is then for the court to interpret the contract in accordance with those rules. In other words the view of the expert as to the meaning which would be given to the word "debris" is not admissible evidence unless he is saying that it has a special meaning under New York law [see Dicey & Morris 13th ed., 32-189]. That again points to the Court of Appeal being entitled to review a question of construction simply being guided by the rules of construction of the foreign law including that court's attitude to persuasive authorities.

*Notwithstanding clauses*

69. Mr. Edelman's argument then turned to the Notwithstanding clauses. At the end of the day the proper construction of this clause is only relevant if Mr. Edelman has succeeded in persuading the court that "removal of debris" in s. I would on the ordinary meaning of those words include the clean-up costs, but he recognized as did Mr. Butcher that the proper meaning to be given to these clauses, and indeed to other terms of the GCE in other sections, could influence the proper construction of the words "removal of debris".

70. The Notwithstanding clauses appear in two places in s. I - in art. IV(3) and at the end of art. VII. The wording is slightly different but nothing turns on that and we can quote from art. IV(3):

Notwithstanding anything else contained herein to the contrary there shall be no recovery hereon for liabilities as described under Assured Liability Policy(ies) (as more fully defined and as covered under Policy No. 03-0366-88 and HA127188) or for "Directors and Officers" and "Fidelity" coverage. However, in respect of liabilities as described under Assured Liability Policy(ies) (as more fully defined and as covered under Policy No. 03-0366-88) it is agreed subject to the deductible as defined in art. IV par. 2 that losses up to a further U.S.$200,000,000 in the aggregate annually may contribute to exhaust this policy aggregate(s) hereon. Further, in respect of "Directors and Officers" and "Fidelity" coverage it is agreed subject to the deductible as defined in art. IV par. 2 that losses up to a further U.S.$90,000,000 any one occurrence and in the aggregate in respect of "Directors & Officers" may contribute to exhaust this policy aggregate(s) deductible(s) hereon.

71. Mr. Edelman recognised that at first blush what the clause appeared to be saying was that if a liability was covered by either of the other two sections of the GCE, s. IIIA or s. IIIB, then it was not covered by s. I. He further appreciated because

[2005] Vol. 1  
C.A.

LLOYD'S LAW REPORTS  
King v. Brandywine Reinsurance Co.

671  
Waller, L.J.

of the different levels at which ss. IIIA and IIIB provided cover as compared with s. I, that, for the clause to have any meaning, it was contemplating "covered" in the sense of "to be found described in", as opposed to covered in the sense that "payment would be received". But he pointed out that if the clause was construed literally as above it would have certain unexpected consequences. In a forceful reply he emphasised the clearest example of that unexpected consequence which he had set out in his skeleton in the following terms:

76. The extent to which it would be commercially illogical for the word "liabilities" in the Notwithstanding clause to be given the wide meaning preferred by the learned Judge (i.e. such as to include first party costs and expenses) is illustrated by s. IIIA, art. 1(a)(ii). That article provides, so far as is relevant:

"It is further agreed that this insurance is extended to also cover any loss sustained by the insured or indemnify or pay on behalf of the insured any sum or sums which the insured may be obliged to pay or agrees to pay or incurs as expenses, on account of removal of debris or wreck of vessels and/or craft as per schedule contained in Endorsement No. 1 even if incurred solely as the result of governmental or other authoritative order."

77. Article 1(a)(ii) thus expressly contemplates cover for first party expenses incurred in the removal of debris. The article applies to the long list of vessels which appear under the heading "Vessels not entered in ITIA" on page 69 of the Policy. It may be seen from s. I, art. 8(1)(d), on page 21 of the Policy, that the same cover is extended to all of Exxon's vessels, including Exxon's oil tankers. If the learned Judge's conclusion were right, the cover which was given in this way by the Policy would immediately be withdrawn in respect of non-ITIA vessels by reason of the Notwithstanding clause; the costs and expenses would be recoverable only under s. I, and for that reason would, given the Notwithstanding clause, be irrecoverable under s. I. It would, on the learned Judge's approach, mean that if the liabilities covered by s. IIIA arising from the incident were such as themselves to exhaust cover under s. IIIA, the additional first party loss would not be recoverable at all, despite the clear effect of the insuring clauses in s. I. This cannot have been how the parties intended the Notwithstanding clauses to operate.

72. In his skeleton he also deals with another unexpected consequence. It is accepted that ESC has no claim under s. IIIA for clean-up costs by virtue of the ITIA exclusion clause. Exxon however

does have such a claim as is now admitted. So, Mr. Edelman's argument runs, it would be surprising if as a result of ESC having no claim under s. IIIA, it thereby had a claim under s. I, whereas Exxon because it had a claim up to U.S.$250 m. under s. IIIA did not have the claim for the further losses under s. I. So, Mr. Edelman argued, if the words "removal of debris" did include the clean-up of oil pollution when used in s. I, and if therefore it had been intended to grant that cover at the level at which s. I operated, i.e. in excess of £400 m., it would be an unexpected result for that same cover to be removed simply because the cover can be found described in s. IIIA.

73. Mr. Edelman had various arguments by which he suggested the unexpected consequences could be avoided. First he argued that in fact the clause was concerned only to ensure that such liability cover as there might be under s. I (e.g. Collision Cover as per American Institute Hull Clauses - see art. VII(5)) was not provided under s. I if it was covered by ss. IIIA and IIIB. Second he argued that if that were not right, then the clause was only concerned with "liabilities" covered by ss. IIIA and B. He drew attention to the language:

...there shall be no recovery hereon for liabilities as described under the assureds Liabilities Policies (as more fully defined and as covered under Policy Numbers 8KM52362 and 03-0366-88 as applicable) or for "Directors and Officers" and "Fidelity" coverage (form to be advised).

He suggested that it was deliberate to refer to "coverage" in relation to directors and officers, and to "liabilities" under the s. III policies.

74. As regards s. IIIA he argued (a) clean-up costs were not covered by s. IIIA at all; or (b) if they were, they were not paid pursuant to a liability. On (a) the argument was that Exxon simply incurred the costs because they thought they ought to and not because they were under any liability to third parties. On (b) the argument was first that it was ESC who were a under a statutory liability under the law of Alaska and not Exxon; alternatively Exxon had to rely on the sue and labour provision. On that Mr. Edelman had two points: first, the general condition 10 providing cover for sue and labour in s. IIIA referred to safeguarding and recovering "property insured" and seemed inapplicable to suing and labouring to mitigate liabilities. He had to accept however that a broader construction could be given to cl. 2(g) "Basis of Recovery". His second point was that such a provision simply provided a basis for recovering such costs, and did not affect the question whether the insurers were under a liability. He submitted that although there may have been a threat of being

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

672
Waller, L.J.

made liable, that was not as a matter of either English law or New York law sufficient to constitute a "liability". As regards English law his submission was that cll. 2(e) and (g) did not confer or extend cover but simply made provision for the basis of recovery. The reference to "liability" in cl. 2(e) must be to liability in the sense in which the word is used in *Post Office v. Norwich Union Fire Insurance Society*, [1967] 1 Lloyd's Rep. 216; *Bradley v. Eagle Star Insurance Co. Ltd.*, [1989] 1 Lloyd's Rep. 465, i.e. a liability to a third party which has been established by a judgment, settlement or award. It cannot mean the costs of mitigating a liability. He further submitted that the position as a matter of English law is clear and settled as a result of the decision of the Court of Appeal in *Yorkshire Water v. Sun Alliance*, [1997] 2 Lloyd's Rep. 21. The Court of Appeal in *Yorkshire Water* considered and rejected the relevance of the "imminent peril" cases. The imminent peril line of cases was not considered to be of relevance to cover under a liability policy. The Court of Appeal also held that the costs of avoiding or minimizing a liability were not recoverable under a liability policy, absent express provision permitting such a recovery. Exxon' clean-up costs cannot therefore, he submitted, be characterized as a liability under s. IIIA.

75. As regards New York law he referred to the following authorities.

*Kutsher's Country Club Corp. v. Lincoln Insurance Company*, 119 Misc 2d 889, 465 NYS 2d 136 [C1/119.242-119.246]:

*Banker's Trust Co. v. Hartford Accident & Indemnity Co.*, 518 F.Supp 371 [C1/119.181-119.185]:

*Olin Corporation v. Insurance Co. of North America*, 221 F 3d 307 [C1/119.206-119.238]:

*ECDC Environmental LC v. New York Marine & General Insurance Co.*, 1999 U.S. Dist Lexis 9836 [C1/119.186-119.205]:

He submitted that the following points emerged from the above cases:

(i) They all involved only the question of whether there was cover under a liability policy. They did not concern first party cover at all or the interaction of first party and third party cover.

(ii) All of the cases had proceeded on the premise, without it being argued or decided, that clean-up costs were capable of being covered under a liability policy; none of the cases involved consideration of what is within the ambit of a "liability" for the purposes of a liability policy, and all of the cases were concerned with other policy points.

(iii) In each case, there was a liability, in the sense of a legal obligation, to clean-up either

because of a specific order, decree or direction to clean-up or because of a specific statutory obligation to clean-up.

(iv) The recovery of the clean-up costs in each case was not based on a mitigation of liability to third parties but on the basis that the sums were paid out in complying with an order, decree, direction or statutory obligation requiring the clean-up.

(v) In the only case (*Olin*) in which the insured did try to justify the recovery of clean-up costs on the basis that they avoided a liability, the insured failed on the basis that the clean-up costs could only be attributed to the discharge of the order under which the insured was required to carry out the clean-up.

76. He emphasized in relation to each of the above points that Mr. Kimball the expert called by the respondents agreed with the propositions. He further submitted that there is no New York authority for the proposition that, under New York law, there is coverage under a liability policy for expenses incurred in response to a governmental order to clean-up.

77. Under s. IIIB the argument was slightly different in that there was damage to property but Mr. Edelman argued again that a recovery pursuant to the sue and labour provision was not on the basis of a "liability". The clause was simply a provision, which provided a basis for recovery of costs incurred in suing and labouring.

78. Mr. Edelman's arguments were on any view complex and in many respects legalistic and in attempting to summarize them we are sure that we have not done them full justice, but (and this seems to us to be the important point) they all started from the premise that it was necessary to be so legalistic because "removal of debris" in s. I did include clean-up of an oil spill. If they did, then it was his argument that the Notwithstanding clauses should not be a bar. We accept that if "removal of debris" was intended to cover oil spill clean-up costs, a court would examine very carefully whether cover expressly provided had then by some other provision been excluded. It was in this context that Mr. Edelman was critical of the Judge in his consideration of the Notwithstanding clauses which the Judge held would have excluded liability as a matter of New York law even if as a matter of New York law "removal of debris" did include clean-up costs. He went to the authorities dealing with the New York court's attitude to exclusion clauses. Under New York law, he submitted that the courts would consider the clause to be exclusionary in effect (i.e. seeking to exclude or cut down cover expressly otherwise granted). In those circumstances the courts would require there to be clear

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

673
Waller, L.J.

and unmistakeable language before concluding that the clause prevented Exxon from making recovery for its first party loss under s. I: *Seaboard Surety Co. v. Gillette Co.*, 64 NY 2d 304, 311; 486 NY 2d 873, 876. Both experts agreed that the above represented a correct statement of the law of New York, although Mr. Kimball suggested that the rationale for the rule was that a policy would be construed against the insurer who drafted it.

79. Whether one applies the New York cases or an English law approach, it would clearly be a powerful argument that where cover is expressly provided under the cover schedule, the court should lean against excluding that cover by reference to an exclusion clause, and if in this instance it was expressly provided that clean-up costs should be covered by s. I, it would be fair as we understand New York law and English law, both of which would have regard to the substance rather than labels, to describe the Notwithstanding clauses as exclusion clauses. Mr. Kimball's evidence was that the New York court would say that this is "the sort of situation the parties have agreed where to allocate risks under the policy. They would not view it as an exclusion." That line of reasoning assists to support the view that it was not intended that the words "removal of debris" would provide cover for clean-up costs, but the premise for all these arguments is that "removal of debris" does expressly provide cover for clean-up costs, and in that context the taking away of cover expressly provided would seem in substance to be an exclusion clause.

80. The fundamental question comes back in our view to whether "removal of debris" was providing cover for clean-up costs of an oil spill, and in this context it is relevant to note that no part of Mr. Edelman's argument actually added any pointer to "removal of debris" being intended to cover an oil spill.

*Article IX(3)*

81. This provision in s. I provided an exclusion in the following terms:

This policy does not cover:- . .3. Loss of or damage to property, liability for which is imposed upon the insured by law, other than such property as may be included under the terms of this policy.

82. If "removal of debris" included clean-up costs the Judge was in Mr. Edelman's favour that this exclusion would not have applied so as to exclude liability. The Judge phrased his conclusion in the following terms.

s. I is expressly confined to first party losses due to loss of or damage to the insured's property. It is not concerned with liability for damage to third parties caused by the loss of or damage to

their property. The contractual function of art. IX(3) is obviously to insulate cover under s. I from liability to third parties in respect of property now owned by the insured. However, s. I cover includes the expense of removing debris of the insured property. Clearly that debris may have come to rest on the property of third parties. For example, damaged drums of noxious chemicals may have been deposited in private harbours or on private beaches as a result of insured perils in circumstances where the cargo owners are obliged by law to remove them or to pay for the owners of the endangered property to do so. In other words, damage or the threat of damage to a third party's property is an inherent risk associated with the dissemination of debris. For this reason it cannot have been the intended effect of the art. IX(3) exclusion that debris removal expenses under arts. VII(4)(b) and VIII(2)(b) would be confined to removal the need for which was not occasioned by damage or the threat of damage to third parties' property if the debris were not removed.

In my judgment, therefore, the exclusion would not operate to prevent recovery of clean-up costs if the words of art. VIII(2)(b) covered oil pollution clean-up.

83. Mr. Edelman relied on this reasoning as supporting his argument that "removal of debris" did include clean-up costs. It does he submitted support the construction of the policy which enables the insured to "remove debris" so as to avoid liability to third parties.

84. That is not contested by Mr. Butcher. But Mr. Edelman wished to take it a stage further and suggest that it did not exclude the remedying of damage to property caused by an oil spill. Once again Mr. Edelman's arguments do not add any pointer to the meaning of the words "removal of debris". His argument is simply that if "removal of debris" includes clean-up costs then it would be possible to construe art. IX(3) as the Judge did, so as not to nullify the cover given.

*Mr. Butcher's submissions*

85. He approached construction first from an English law prospective although his ultimate submission was that since the approach to construction of the two systems of law was not in reality very different, it mattered not which law was applied. He began by stressing the serious nature of the risk involved with oil pollution and the enormous costs of the clean-up. He questioned whether it would be likely that such a risk would be covered by the three words "removal of debris" in a sub-clause of a policy concerned with the insurance of property. He questioned whether it was likely that there was

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

674
Waller, L.J.

being added to the cover for the value of the oil (some U.S.$2 m.) a liability for costs of the clean-up of U.S.$600 m. He pointed out that the most obvious candidates for where removal of debris might become important would be the oil rigs and in their case so far as removal of debris was concerned caps were placed on the sums recoverable by art. VIII(1)(f).

Major North Sea Platforms as scheduled in Endorsement No. 5 are subject to sub-limit for Removal of Debris $255,000,000 (100%) each unit except ODIN which $131,000,000, STATFJORD A which $430,000,000 and STATFJORD B and C which $151,000,000 (10%).

86. Was it, he asked rhetorically, likely that unlimited cover over and above that recoverable under the ITIA rules up to U.S.$600 m. would be granted for clean-up costs? He pointed out that Mr. Edelman did not seem to be pursuing the argument made before the Judge that in some way the extent of the cover was such that it could be inferred that the parties must have intended pollution to be included.

87. He then took us to what he submitted was important background as summarised in his skeleton in the following terms:

As the Judge was aware, and was shown, the GCE, its terminology, and its treatment of pollution cover, were not made in a vacuum. In particular, the contract was made against a background in which oil pollution was a particular, recognised problem, and oil clean-up costs were the subject of specific and explicit treatment in international agreements and insurance arrangements.

(i) Thus, it has been recognized, at least since the Torrey Canyon disaster in 1967, that oil spills from ocean going tankers give rise to unique problems by reason of the widespread pollution which they can cause, potentially affecting vast areas, large quantities of wildlife, and causing disruption to many communities.

(ii) As a result there have been international treaties and a great deal of national legislation which deals with responsibility for oil pollution.

(iii) In particular, there has been the 1969 International Convention on Civil Liability for Oil Pollution Damage, made at Brussels, and implemented in the U.K. by the Merchant Shipping (Oil Pollution) Act, 1971; and the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage. Each of these refers to "Pollution Damage", and defines this as "loss or damage caused outside

the ship carrying oil by contamination resulting from the escape or discharge of oil from the ship. . .and includes the costs of preventive measures and further loss or damage caused by preventive measures".

(iv) This national and international legislation has been supplemented by action taken by the major tanker owners (including Exxon), in agreeing TOVALOP. As already indicated, under TOVALOP participating owners assume liability for "pollution damage caused by oil which has escaped or which has been discharged from a tanker, and the cost of threat removal measures taken as a result of the incident. "Pollution damage" means "loss or damage caused outside the tanker by contamination resulting from the escape or discharge of oil from the tanker. . .and includes the costs of preventive measures, wherever taken. . ."; and "preventive measures" means "any reasonable measures taken by any person after an incident has occurred to prevent or minimize pollution damage".

(v) The raison d'etre of ITIA was to deal with the insurance implications of liability for oil pollution. In particular, ITIA insured against the obligations assumed under TOVALOP, including liability for the costs of preventive measures (see ITIA coverage quoted in par. 98 of the judgment [Core 133]).

(vi) In addition to TOVALOP, oil companies (commencing in 1971) agreed CRISTAL, the Contract Regarding a Supplement to Tanker Liability for Oil Pollution. It provided supplemental compensation to persons who had sustained "pollution damage". "Pollution damage" includes both "physical loss or damage caused outside the tanker by contamination resulting from the escape or discharge of oil from the tanker" and costs incurred in taking measures "to restore or replace natural resources".

(vii) Exxon, as the largest oil company in the world, was obviously well aware of all these matters, and intimately involved in them. It was a member of TOVALOP. Its tankers, including the Exxon Valdez, were entered in ITIA. Exxon was a member of CRISTAL. Within the Exxon organization, the issue of oil pollution was, unsurprisingly, so-called, and characterised in the same way as in these various international conventions and agreements. To demonstrate this one need look no further than the terms of art. 15 of the Contract of Affreightment between Exxon Corp. and ESC which regulated the very carriage during which the Exxon Valdez grounded.

88. This is a background in which oil pollution was recognized as a particular problem, was so-called, and was the subject of elaborate national and international arrangements applicable to it. It is against this background that, he submitted, it is to be considered whether the parties intended, by the simple reference to "removal of debris or wreck of property and/or residual structure" to make any provision for the consequences of oil pollution and the notoriously difficult, complicated and expensive processes which may be involved in the clean-up of an oil spill.

89. He referred us to the contract of affreightment in this case, and how it deals with "pollution damage" [Bundle Q1 page 1173 and onwards].

90. He referred us to the various dictionary definitions.

(a) "wreckage; ruins; rubbish; a mass of rocky fragments" [The Chambers Dictionary];

(b) "The remains of anything broken down or destroyed, ruins, wreck" [OED];

(c) "broken or torn pieces of something larger" [Cambridge Advanced Learner's Dictionary];

(d) "a. The scattered remains of something broken or destroyed; rubble or wreckage. b. Carelessly discarded refuse; litter. 2. Geology. An accumulation of relatively large rock fragments." [American Heritage Dictionary of the English Language]

91. All he said favoured the view that debris meant bits of some larger solid which had broken into fragments. What, he submitted, was alighted on by Mr. Edelman was the one definition (b) which contained the word "destroyed". But he submitted it was illegitimate to argue because one definition contained the word destroyed, and because the oil in this case was destroyed therefore the destroyed oil was debris. In any event he submitted that the evidence was that the oil was not "destroyed".

92. He then referred to those parts of the GCE policy itself which he submitted indicated that if oil pollution was being referred to the language was not simply "removal of debris". The position is summarised in his skeleton in the following terms:

If one looks at the overall structure of the GCE, it is impossible to resist the conclusion that issues of oil pollution and its containment/mitigation/clean-up were intended to be dealt with in s. III and not in s. I. Thus:

(i) s. IIIA covers P&I risks. It has a specific exception in relation to ITIA-entered vessels. That is because, in relation to those vessels, potential liabilities will include oil pollution liabilities (under TOVALOP or international

legislation), which were insured by ITIA, the specialist pollution P&I club. Accordingly, the GCE (by s. IIIA Interest and Coverage Provision 1(a)(iv)) provided:

"In respect of any vessel insured under this policy which is a tanker as defined by the Rules of the International Tanker Indemnity Association Limited (hereafter ITIA) prevailing at the time of the loss, this insurance does not insure against:

Any liabilities, costs and expenses which are insured by the Indemnity Provisions of the ITIA Rules prevailing at the time of the loss, nor for any amount in excess of ITIA limits. . ."

(ii) Charterers' liability for oil pollution is the subject of the express provisions at s. IIIA, 1(c).

(iii) References to, and the relationship with, ITIA cover run through the whole of s. IIIA (see 1(a)(iv), 1(c), 1(e), 1(h)).

(iv) The issue of coverage for pollution emanating from onshore facilities is dealt with in s. IIIB. Again, there is clear provision, in the form of Endorsements 2 and 2A. This cover plainly embraces clean-up costs.

93. It is right to say in this context that Mr. Edelman in his skeleton relied on certain provisions in s. I as establishing that "pollution" was covered by that schedule. Thus:

Institute Pollution Hazard Clause:

Subject to the terms and conditions of this policy, this insurance covers loss of, or damage to the interests insured directly caused by any governmental authority acting under the powers vested in them to prevent or mitigate a pollution hazard, or threat thereof, resulting directly from damage to the interests insured for which the underwriters are liable under this policy, provided such act of governmental authority has not resulted from want of due diligence by the assured, the owners, or managers of the interests insured or any of them to prevent or mitigate such hazard or threat . . .

In art. VIII(4) there is the following coverage :

Well Control Costs, etc.: . . .

For the purposes of coverage hereunder, a well out of control shall be defined as a well from which and whilst there is a flow of drilling fluid, oil, gas or water which is uncontrollable and cannot be controlled by the blow out preventer or storm chokes or Christmas tree or other equipment generally considered prudent for the operation insured, *or any well that the assured is required by any Governmental and/or regulatory authority to control.* (Emphasis added)

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

676
Waller, L.J.

Article X, under the sub-heading "Cargo War Risk Insurance", includes the following:

10. While the property insured is on board a waterborne conveyance, loss of or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under the policy (subject to all of its terms, conditions and warranties) if the property insured would have sustained physical loss or damage as a result of such accident or occurrence.

94. Mr. Butcher submitted that in reality they too demonstrate that where pollution is contemplated it is described as pollution.

95. Mr. Butcher further submitted that if one examined what clean-up of oil pollution involved as described in par. 4(iv) to (vii) above the word removal was simply inappropriate - words such as "containing, neutralizing, cleaning up" would be the expected language.

96. In answer to the point that in art. VIII(2)(b) the main cargoes were oil, and a debris removal provision was repeated in that clause, he pointed out that solid cargoes were carried, and that the answer to Mr. Edelman's point as to why there should be differentiation between liquid cargo and solid cargo was simply the extent of the risk.

97. He argued that the structure of the GCE was to deal with pollution under s. IIIA. He ultimately accepted that he could not argue as had been argued in the Texas proceedings that it was the rules of the ITIA which covered oil pollution, and that by virtue of the ITIA exclusion the result was that oil pollution was excluded altogether from the GCE. He accepted that Exxon could recover for oil pollution under s. IIIA on the basis that the ITIA exclusion did not apply to them as cargo owners, but he argued that the fact that it had been right to hold that the words of s. IIIA covered oil pollution and right to hold that the words of the ITIA exclusion had not succeeded in excluding that liability altogether, gave no support to the notion that oil pollution was intended to be covered by s. I.

98. He submitted that the Judge was right to ignore the United States authorities when considering the question of construction from an English law stand point, but in any event he submitted that in reality the approach to construction of the New York court and the English Court would not be very different and that the Judge was in any event wrong in concluding that, as a matter of New York law, s. I

would be construed so as to cover clean-up of pollution.

99. He took us to the agreed joint statement of the experts on New York law which, so far as material, provided that:

(i) The Exxon policy is to be construed as a whole and to give effect to the parties' intended purpose (see Memorandum sub-par. (1)).

(ii) A New York court would look at the whole policy as a "package", and not just at one clause or a selection of clauses in isolation, to discern the intent of the parties in drafting a particular provision (see Memorandum sub-par. 2)).

(iii) In attempting to discern the meaning of the Exxon policy, a New York court would do so in the light of the reasonable expectations of a business person engaged in a similar line of business (see Memorandum sub-par. 3).

(iv) To the extent that a contract is unambiguous, a New York court will look to the plain meaning of the words used to determine the parties' intent (see Memorandum sub-par. (6)).

(v) If the policy or parts of the policy are determined by the court to be ambiguous because they are susceptible of two or more reasonable interpretations, then the New York court would consider extrinsic evidence to determine the proper interpretation (Memorandum sub-par. (8)).

100. It was common ground between the experts that if extrinsic evidence was admissible, any evidence which throws light on the parties' intentions, including evidence of their subjective intentions, can be admitted. The experts also agreed that if this extrinsic evidence did not resolve the question, a New York court would apply a construction, contra proferentem, against the drafter.

101. He submitted that the Judge was wrong, when he came to consider construction as a matter of New York law, to think that some assistance could be gained from Lexington. It, he submitted, was not a case involving marine insurance. It did not involve an insurance with different sections of cover for first party damage and liabilities. It involved a construction against the insurer as the supplier of the wording. It is quite plain that the Georgia court was not addressed with the same arguments as have been advanced by the defendant in this case. It was in any event a very thinly and questionably reasoned decision, which invented a definition of "debris" different from normal usage.

102. He referred us as had Mr. Edelman to *Bell Power Systems v. Hartford Fire Insurance Co.*, and to the fact that the Superior Court of Connecticut clearly had difficulty with the definition of debris

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

677
Waller, L.J.

and the reasoning of the Georgia court in Lexington.

103. He also referred us to *Compass v. Cravens Dargan*, 748 P 2d 724, a decision of the Supreme Court of Wyoming. In that case it was found that the costs of clean-up of neighbouring property damaged by an oil leak were the responsibility of liability insurers and not property insurers (notwithstanding that the property insurance included a "removal of debris" provision).

104. On any view he submitted the reliance by the Judge and the claimants on Antilles, which was simply a case in which the word debris had been used in a judgment to refer to the remains of a liquid chemical which had solidified and in its solidified state been dug out of the hold of a ship, was quite misplaced.

105. Mr. Butcher also submitted that the Judge having found as a matter of English law that the words "removal of debris" did not cover oil pollution clean-up costs, it was illogical to find the parties' presumed intention different as a matter of New York law, or at the very least he submitted he should have found as a matter of New York law that the phrase was ambiguous. On this basis the New York court would have examined the extrinsic evidence. That evidence was summarised in pars. 128 to 134 of Mr. Butcher's skeleton, and was unchallenged. Those pars. read:

128. In the first place, the underwriters gave evidence (on behalf of some of the claimant Syndicates, among others) which indicated that it had not been their intention to afford cover for oil clean-up costs under s. I.

(i) The leading underwriter, Richard Youell, who had enormous experience of the market, said ". . . one thing removal of debris is not, is pollution. Pollution is something quite different and quite separate."

(ii) Mr. Youell's assistant, Christopher Compton-Rickett, who took much of the responsibility for the underwriting of the property cover under s. 1 of the GCE, gave evidence as follows:

"Q. So removal of crude oil that's floating on the water would not be covered under removal of debris?

A. Oh, no. Not at all. That's clean-up and removal of pollution.

Q. What about removal of crude oil from - that washes ashore?

A. That's the same thing. . . Crude oil and other substances that pollute do not form the proper subject for removal of debris coverage, and always would be the subject of any pollution.

. . ."

129. Evidence from the other side of the contractual dividing line came from William Jueds who was President of Exxon Insurance Corp. from 1986-1993. That was the company which was responsible for arranging Exxon's insurances. . . .

Mr. Jueds gave evidence that his view was that the term "removal of debris" in s. I was not intended to cover oil pollution.

130. Entirely consistent with the absence of any intention on Exxon's part to insure oil clean-up costs under s. I is the following further evidence:

(i) Exxon had investigated the possibility of buying pollution coverage in excess of the U.S.$400 m. coverage under ITIA, before the Exxon Valdez spill. It obtained quotations for excess pollution coverage, but decided that the ITIA level was adequate and that the additional insurance would be too expensive.

(ii) At the time of the renewal of the GCE cover in August/September 1989, after the Exxon Valdez spill, Exxon had no idea that there would be a s. I claim for removal of debris. Exxon decided to pursue a removal of debris claim only in February 1991. The idea for that claim came from lawyers at Covington & Burling.

131. As to the brokers, the position is the same.

(i) The brokers had never, before the Exxon Valdez spill, heard it suggested that removal of debris covered oil pollution. . . .Mr. Tyndall gave evidence that he had been a broker for 28 years with Bowrings, specializing in placing marine and energy business. He had never heard anyone (including his major petrochemical clients) suggest that removal of debris covered marine oil pollution clean-up expenses. He was not aware of any situation where an insured obtained insurance for oil pollution clean-up expenses and it was called anything other than pollution.

(ii) Mr. Delach, managing director of Marsh & McLennan, stated that, in the marine insurance industry, an oil spill would always be described as pollution.

. . .

132. In addition to this evidence was the evidence that there simply was not cover of U.S.$600 m. excess of ITIA available in the market for pollution coverage.

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

678
Waller, L.J.

*Article IX.3*

106. He dealt next with the exclusion under art. IX(3). He submitted this supported the argument that it was not intended to cover by s. I damage to third party property. He submitted that clean-up was concerned with remedying damage to third party property and the exclusion thus supported the construction that "removal of debris" did not encompass clean-up costs.

*Notwithstanding clauses*

107. He relied on the dictum of Potter Lord Justice in *Commercial Union Assurance Co. plc v. NRG Victory Reinsurance Ltd.,* [1998] 2 Lloyd's Rep. 600 at 603 where he said (and Lord Woolf MR and Lord Justice May agreed with his judgment):

It is common ground that the specified policy numbers. . .were a reference to s. 3 of the GCE policy itself. Thus, on the face of it at least, the policy intended that losses sustained which might otherwise fall within the wording of s. 1, but which were recoverable under s. 3, should not also be recoverable under s. 1.

108. He suggested that the natural reading of the clause was that if a risk was covered by s. IIIA or IIIB, the sections covering "liability risks", then they were not to be covered by s. I. He submitted the Judge was right in his view that it was intended that there should not be an overlap between the different sections. Although the ss. covered different levels, and were not shoulder to shoulder, there was an area of cover i.e. U.S.$50 m. where, if recovery could be made under s. I and s. IIIA, the result would be an entitlement to recover under both ss. and that was an unlikely intention. The intention was that there should be a clear distinction between "property" cover under s. I and "liability cover " under ss. IIIA and IIIB, with the Notwithstanding clauses in the property cover providing primacy to the liability covers.

109. Mr. Butcher recognized that even if removal of debris meant debris from a solid object such as a vessel or solid cargo, it was possible to think of examples where prima facie there could be recovery under s. I which on the wording of the Notwithstanding clauses might become irrecoverable because of coverage under s. IIIA, but his submission was that to extrapolate from such examples was to allow the tail to wag the dog. In any event it lent no support for removal of debris having the wider meaning covering oil pollution.

110. He in any event suggested that as matter of English law the authorities relied on by Mr. Edelman *Post Office Norwich Union; Bradley v. Eagle Star*; and *Yorkshire Water v. Sun Alliance* did not demonstrate that where as here Exxon were actually remedying the damage, the insurers would not be liable. He further suggested that, if New York law was the appropriate law, the US authorities were clear that potential liability could equal liability. New York law he submitted considered "liability" in this context to be simply "amenability or responsibility"; it "expresses some form of obligation and when applied to contracts refers to legal responsibility" (*Eberhard v. Aetna Insurance Co.,* 134 Misc 386; 235 NYS 445 at 388, 448). He submitted that the New York authorities relied on by Mr. Edelman were cases where there was a liability as a result of a government order, but that they laid down no rule that there had to be such liability. Indeed Aetna was to the contrary.

*Judge's judgment*

111. He approached construction of s. I initially by reference to English law having held that to be the proper law of the policy. He reasoned on that basis as follows: (1) "debris" is not a word which normally comprehends liquids (par. 88); (2) he rejected Mr. Edelman's reliance on the extent of the cover pointing to the inclusion of removal of "liquid cargo" (90 to 95); (3) he relied on the terms of ss. I and IIIA and IIIB which he set out and to which Mr. Butcher has again drawn attention and concluded that the "policies treat removal of debris and liability for pollution as two distinct areas of cover"; (4) he considered the commercial environment or contractual matrix which he summarised in this way from par. 109 to 115:

109 The leading underwriters, Mr. Youell and the underwriter directly concerned, Mr. Christopher Compton-Rickett, of the Jansen Green Syndicate, Exxon Insurance Corporation, which was part of the Exxon group responsible for effecting Exxon's insurances in general and this policy in particular, and the London placing brokers, Bowrings, in particular Mr. Fortescue, Mr. Mead and Mr. Tyndall, were none of them strangers to Exxon's global insurance cover or to insurance against pollution risks.

110. This court has not heard oral evidence on market background or commercial matrix but it has had the benefit of transcripts of deposition evidence given in the Texas proceedings by a number of witnesses from the parties concerned with the placing. Hearsay notices were served in respect of passages from those transcripts and were not objected to save on the grounds of admissibility. Most of that evidence is not admissible because it is evidence of negotiations or the subjective understanding or intention of those concerned or of personal opinions after the event, but several of those involved were extremely experienced in the insurance industry and in particular in the insurance of oil producers and

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

679
Waller, L.J.

tanker operators and the evidence which they gave of their experience of the insurance industry background clearly is relevant to the issues of construction under s. I.

111. Mr. Anthony Fortescue, Chairman of Bowring Marine Ltd. said that in his 30 years experience of the marine insurance market he had never heard anyone suggest that pollution cleaning up expenses were encompassed within the term "removal of debris".

112. Mr. Roger Tyndall another very experienced broker at Bowrings who had been responsible for placing the 1988/89 policy for Exxon had not been instructed to obtain any form of pollution cover under the property damage policy.

113. Mr. Kettel had many years experience in the energy industry, including 16 years at Atlantic Richfield and nine years at Chevron, in both corporations responsible exclusively for insurance matters. He had for 18 years been a member of the Oil Insurance Group consisting of about 15 insurance managers from the major energy companies, including Exxon, who regularly met to discuss insurance problems. He was also a board member of ITIA - the International Tanker Insurance Association, from 1975 to 1994. In an affidavit which he swore for the purposes of the Texas proceedings he stated that after the grounding of the Torrey Canyon in 1967, which was the first major oil spill, giving rise to a major coastal pollution problem, it became apparent that the energy industry required as much insurance for tanker pollution as the market had the capacity to cover. From the outset, because of the objective of maximizing market capacity, it was essential that insurers should be able to identify clearly the sources of their exposure to pollution risks. Consequently it became the practice in the marine insurance market to cover tanker pollution costs, liabilities and expenses through specialized policies that expressly addressed the pollution risk. ITIA was set up as a P&I Club specializing in pollution cover. It was in turn reinsured on the London market by virtue of its membership of the International Group of P&I Clubs which was protected by reinsurance in respect of pollution risks, led by the Janson Green Syndicate. Thus ITIA's ability to provide pollution cover was limited by the extent of the reinsurance cover obtained by it from the London reinsurers. By 1989 that limit was $U.S.400 m. In the 1980s some insurers offered tanker pollution cover above the limits offered by ITIA but such insurance policies always specifically identified tanker pollution as the risk. By 1989 it was possible to purchase on the outside marine market for a very substantial premium up to

U.S.$200 m. cover in excess of the U.S.$400 m. available from ITIA but there was not sufficient market capacity to purchase as much as U.S.$600 m. pollution clean-up cover in excess of the ITIA cover.

114. It is true that Mr. Kettel's evidence was in one sense adduced as a market expert and that, although it was the subject of a hearsay notice, there was no order of this court permitting the calling of expert evidence other than that of New York law and Alaskan law. Nevertheless, that which I have summarized was not opinion evidence. Rather it was evidence of the state of the energy insurance industry in the years leading up to the time when this GCE policy was entered into. Most of this evidence is well-known to the Judges of this court by reason of that specialist background which is one of the main reasons why those involved in international commerce are so willing to refer their disputes to its jurisdiction. To ignore this historical background merely because it had not formally been the subject of a previous court order would therefore be quite unrealistic.

115. Having regard to the structural and linguistic features of the GCE Policy to which I have already referred and to the commercial background against which the risk was placed, including in particular the limited availability of market reinsurance cover for primary pollution clean-up risks, I have come to the firm conclusion that par. 4(b) of art. VII of s. I is not, on its proper construction to be understood as including the cost of clean-up of oil pollution. The provisions of art. VIII, par. 2 - "Cargo and Stock" - contain nothing which is to be construed as expanding the meaning of art. VII par. 4(b) to include oil pollution clean-up costs. Par. 2 does not apply exclusively to liquid cargoes: it covers also cargoes consisting of "materials, supplies, equipment, tools and all other cargoes" as indicated in par. 2(a)(iii). Matching the provisions in art. VIII, par. 1(d) and (f) which deal with cost of removal of debris of property in the context of insured property other than cargo and stock, art. VIII par. 2(b) deals with cost of removal of debris of cargo and stock. The fact that most of the cargo or stock may be in liquid form does not expand the meaning of debris, given that par. 2 expressly contemplates solid cargo.

112. He then considered the "Notwithstanding clauses" applying again English law. His conclusions are summarised accurately by Mr. Edelman as follows:

a. The effect of cl. 2(g) of s. IIIA is that if and to the extent that the insured, in its capacity as charterer or cargo owner, incurs expenses which are within the categories set out in 2(g) and

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

680
Waller, L.J.

connected with its legal or contractual liability as charterer or cargo owner for pollution or contamination, there will be cover under s. IIIA. [134]

b. The Notwithstanding clauses embrace costs and expense incurred pursuant to a sue and labour cl. [138]

c. The general principles applicable to sue and labour with regard to the insurance of property or ships are equally relevant to liability insurance. [145]

d. If (contrary to the Judge's conclusion on s. I) "removal of debris" does extend to oil pollution clean-up costs, those costs could only be recoverable under s. I if Exxon were not entitled to recover it under s. IIIA on the ground that Exxon incurred a liability to a third party (viz the State of Alaska) in respect of such clean-up or the cost of it or because the cost was a sue and labour expenditure in the sense expressed in cl. 2(g). [149]

e. The clean-up operation undertaken by Exxon was an expense of the character of sue and labour expenditure incurred to avoid an insured potential liability and therefore fell within the scope of clauses 2(e) and (g) of s. IIIA. [152]

f. On the hypothesis that the cost of removal of debris was covered under s. I, the Notwithstanding clauses exclude the right of Exxon to recover the actual expenditure incurred since such expenditure was recoverable under s. IIIA. [153]

113. In reaching those conclusions the Judge is, we believe, keeping overly separate and insulating from each other two aspects of what is ultimately a single overall problem of construction. One aspect is to ask whether "removal of debris" in s. I includes clean-up costs and for this purpose to consider what support is provided by the fact that clean-up costs are covered by s. IIIA. The second aspect is the question whether, if "removal of debris" does include clean-up costs, such costs are excluded by the Nothwithstanding clauses. This insulation is also apparent when he comes to deal with construction under New York law which he deals with very shortly in the final pars. of his judgment. He is of the view having regard to Lexington and Antilles and the weight which he considered a New York court would give to those authorities that "Exxon would thus have been covered under s. I unless such cover were excluded by the Notwithstanding clauses" and his conclusion on balance was that since the costs of clean-up were covered by s. IIIA, they would not be recoverable under s. I (pars. 258 and 259).

114. Both parties to the appeal have criticisms of this aspect of the judgment. First Mr. Butcher criticizes the conclusion that reliance on Lexington

and Antilles would have negatived all the points forcefully made when applying English law as to why on the proper construction of this particular policy "removal of debris" did not include clean-up costs. Mr. Edelman criticizes the Judge for finding that "removal of debris" would as a matter of New York law include clean-up costs but then failing to apply the law of New York relating to exclusion clauses or indeed even to mention that law while dealing with the Notwithstanding clauses.

115. These pars. came at the conclusion of a very long and detailed judgment, and were unnecessary to the decision. We think there is cogency in the submissions first that the Judge did not go back to consider the forceful points made when construing the phrase "removal of debris" as a matter of English law, and that he possibly failed to consider how the Notwithstanding clauses could support the construction he had placed on those words. If despite those points he had still concluded that it was intended that removal of debris would cover clean-up costs under s. I, then there is force in the point that on that basis the Notwithstanding clause would be an exclusion clause and special rules of construction might need to be applied to it.

*Discussion and conclusion on section I*

116. Our starting point is that we find it difficult to accept that a New York court and English Court would reach a different conclusion on the construction of a policy negotiated as this one was between organisations well-versed in what they were seeking to cover and well versed in the risks that were likely to materialize from the business being carried on by the various assureds. Both systems of law are seeking to identify what the parties agreed, and both systems of law use similar pointers to ascertaining that intention. On the Judge's findings it is simply *Lexington* and *Antilles*, neither a decision of the New York court, which he suggested would have convinced a New York court to find that removal of debris in s. I was intended to cover the clean-up costs of an oil spill, unless the Notwithstanding clauses excluded the same. As already indicated we believe he dealt with this aspect somewhat briefly. The Judge erred in not bringing in at this point of his judgment the compelling points which he had already accepted when considering what the parties intended as a matter of the construction of the policy on the basis that English law was the proper law.

117. The points which Mr. Butcher made on *Lexington* (see par. 98) above are in our judgment powerful. Since a New York court would have found the decision of an English Court considering the terms of this policy persuasive, it seems to us that logically the Judge should have compared his

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

681
Waller, L.J.

reasoning as a matter of English law of this very policy with the reasoning of *Lexington* relating to an entirely different policy and asked which he found the more persuasive. We think furthermore that his view as to the proper construction of the Notwithstanding clauses primarily reinforced his view that "removal of debris" in s. I was not intended to cover clean-up costs. The points made to the effect that removal of debris was not intended to provide cover for clean-up costs for an oil spill are too formidable to be displaced by the reasoning in *Lexington*. Debris is not the natural way in which to describe "spilled oil" or pollution from spilled oil, and it would need some significant feature or other provision of the policies if it was to have that meaning in this policy. It was significant that when during the course of argument Lord Justice Rix asked Mr. Edelman how he would describe oil spilt onto a beach, he could not reply and absolutely properly could not reply "debris".

118. Significantly, as there is more to clean-up than "removal", and where oil pollution is dealt with both in the conventions which form the background and in the policy itself, the words which describe the clean-up are not "removal of debris".

119. It follows that the starting point for consideration of the Notwithstanding clauses is that "removal of debris" does not cover clean-up costs for an oil spill, and whatever difficulties there may be in construing the Notwithstanding clauses, no point can be made which points to "removal of debris" acquiring some special meaning for the purposes of this policy.

120. We do not find it fruitful to explore in detail the meaning of either art. IX(3) or the Notwithstanding clauses on the basis that "removal of debris" does include clean-up costs. That would be an entirely different policy. We can see that if clean-up costs had been specifically included as part of the cover under s. I, the argument that such cover should not be removed either by virtue of art. IX(3) or by virtue of one of the Notwithstanding clauses, would be powerful, and indeed one can see any court in New York or in England seeking to find a solution which did not do so. What one can say however is that the meanings given to those clauses by Mr. Butcher do fit with the concepts (1) that removal of debris in s. I was not intended to cover clean-up costs; (2) that s. I was not designed to cover damage to third party property; and (3) that oil pollution and clean-up costs were the subject of the liability cover either under s. IIIA or depending on the answer to Mr. Butcher's argument on s. IIIB, s. IIIB.

121. We accordingly would uphold the Judge's construction of removal of debris simply on the

basis that under neither New York law nor if it be relevant English law do the words "removal of debris" in s. I of the GCE cover clean-up costs as described in par. 4(iv) to (vii) above.

*Section IIIB*

122. We now turn to consider Exxon's claim under s. IIIB, which the claimants seek to pass on in these proceedings to the defendants.

123. The argument put by Mr. Edelman on behalf of the claimants was essentially that Exxon's claim, whether under English or New York law, had been validly made by reference to art. I.I's reference to a loss occurrence in respect of "all transportation activities" and/or endorsement No. 2's reference in its par. (a) to liability for third party loss or damage "caused directly or indirectly by seepage, pollution or contamination arising out of the operations of the insured". Endorsement No. 2 is headed "Seepage, Pollution and Contamination Coverage Endorsements". Mr. Edelman said that Exxon's use, as cargo owner, of the Exxon Valdez for the transportation of its oil was a relevant "transportation activity" or "operation" for the purposes of those provisions.

124. On the other side, the argument put by Mr. Butcher on behalf of the defendants was that those references to transportation activities or operations were limited by their context to essentially non-marine activities and operations focussed on Exxon's drilling, production and exploration operations and the facilities involved in them, and did not encompass marine carriage in self-propelled vessels.

125. So far we have not had to say much about s. IIIB. At par. 11(iii) above we have referred to it, neutrally, as providing general third party liability cover. The Judge approached the issues under s. IIIB first by taking into consideration the structure of the GCE as a whole. He said (at par. 220):

   . . .it is necessary to keep in mind the overall coverage structure which, it is to be inferred, was mutually intended to be created as between the brokers and the underwriters. This involved (i) protection against property damage in respect of property owned by or held in trust or under responsibility by the insured and certain kinds of expenditure by the insured relating to such property (s. I); (ii) protection against marine liabilities of a P&I nature, including oil pollution if not covered by ITIA (s. IIIA); (iii) third party liabilities of a non-marine nature arising out of the insured's commercial activities in relation to the energy industry (s. IIIB). As I have already concluded. . .the expenditure on oil pollution clean-up was recoverable by Exxon as cargo owner under s. IIIA and not under s. I. That right

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

682
Waller, L.J.

of indemnity under s. IIIA arose from the fact that such policy provided cover to a cargo owner who, not being a shipowner or bareboat charterer, did not have the benefit of cover from ITIA. As cargo owner Exxon therefore had the benefit of a wider scope of cover in relation to P&I risks, including ocean carriage than ESC as shipowner. In as much as s. IIIB does not provide P&I cover, the question arises whether it is to be inferred from the terms of that section, against the background of the overall structure of the cover provided by the insurers, that Exxon, not being the owner or bareboat charterer, was to have the benefit of cover of a scope which overlapped with that already granted to it as cargo owner in respect of marine liability risks under s. IIIA.

126. Mr. Edelman does not we think take issue with the Judge's overall summary of the GCE's structure and his categorization of its constituent elements, even if it has been his contention that all its three sections in their various ways, possibly unintentionally, cover Exxon's pollution clean-up costs. What he says, however, is that Exxon's, as distinct from ESC's, liability is not a "marine operation" but a "transportation activity". He accepts that ESC, as shipowner, would have no claim within s. IIIB, but contrasts Exxon's position.

127. To understand the parties' submissions and the Judge's conclusions with respect to s. IIIB, it is necessary to set out the essential provisions, although we would refer to appendix B for completeness.

Article I

Insurers hereby agree, subject to the limitations, terms and conditions, hereinafter mentioned (including endorsements attached hereto).

1. To pay the insured or to pay on their behalf all sums which the insured shall be obligated to pay as damages or incur as expenses by reason of the liability. . .on account of. . .Property Damage" caused by or arising out of each loss occurrence. . .in respect of all offshore and/or inshore and/or onshore Drilling, Production, Exploration operations and all transportation activities including all Terminal and pipeline operations and including Automobile, Aircraft, and Aircraft refueling activities and onshore fire and explosion, also including General Average, Salvage, Salvage Charges, Sue and Labour in connection therewith.

Article II

Insurers' liability hereunder shall not exceed One Hundred Million Dollars

($100,000,000) for any one loss occurrence and in the aggregate in respect of all liability from onshore drilling, exploration and production and pollution and personal injury resulting from onshore fire and explosion and all transportation activities including pipelines and terminals but not including auto, aircraft and/or aircraft refueling liability.

Article VI

This policy does not insure: . . .

(f) Claims made against the insured arising out of the ownership or bareboat charter of any watercraft, it being understood and agreed that this exclusion shall not apply to the liability of the named insured for personal injury to their employees, unless such liability is more specifically excluded under this policy.

For the purpose of this policy the following shall not be deemed to be watercraft except whilst in transit:

An installation of any kind fixed or mobile which is used for the purpose of exploring for, producing, treating, storing or transporting oil or gas from the seabed or its subsoil, excluding any tank vessel used for storage of oil or gas commencing at the loading manifold thereof and excluding absolutely any self-propelled tank or Supply Vessel.

Endorsement No. 2

Seepage, Pollution and Contamination Coverage Endorsement

Notwithstanding anything contained in art. I, par. 1, of this Policy, all other terms and conditions of this Policy remaining unchanged and in the consideration of premium included, Insurers agree to indemnify the Insured or pay on behalf of the Insured:

(a) All sums which the insured shall be legally liable to pay as damages for personal injury (fatal or non-fatal) and/or loss of damage to or loss of use of tangible property caused by or alleged to have been caused directly or indirectly by seepage, pollution or contamination arising out of the operations of the Insured.

(b) The cost of removing, containing, neutralising or cleaning up seeping, polluting or contaminating substances emanating from the operations of the insured: but not to cover repairing, replacing, redesigning or modifying the offending facility.

128. Mr. Edelman submitted as follows. "[A]ll transportation activities" were quite general words. That they included marine activities was shown by the exclusions carved out under art. VI(f). Those

[2005] Vol. 1
C.A.
LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.
683
Waller, L.J.

exclusions only concerned the insured qua shipowner or bareboat charterer, not qua cargo owner; and even in the former capacity, there was no exclusion in respect of personal injury to employees. The width of the transportation activities was emphasised by the inclusion of reference to aircraft: which could involve a company jet on a flight which had nothing to do with industrial operations. Moreover reference to drilling, production, terminal, and pipeline operations demonstrated the all-inclusive nature of the transportation activities concerned. Thus the transport of crude oil from rig to refinery would typically involve a pipeline journey to some port, where the oil would be loaded on a tanker and carried by it to another port at or near a refinery, where it would enter another pipeline; and then the refined product would be carried through pipe, or by road or rail or again by sea to its ultimate destination. It did not make sense to carve out of this journey the carriage by ocean tanker alone. In any event, it was only the shipowner, not the cargo owner, that was engaged in marine transportation; the cargo owner was conducting a transportation activity.

129. So much for the primary cover under s. IIIB itself. Endorsement No. 2, par. (a) however, Mr. Edelman continued, extended cover quite generally to the "operations of the insured". The words, he submitted, were quite general. It may be true, as the Judge held, that par. (b) of the endorsement was more narrowly confined to substances "emanating" from operations at a particular site, as indicated by reference to "the offending facility". But the distinction between pars. (a) and (b) had to be observed: the former was dealing with third party loss and was quite general, whereas the latter was dealing with the insured's own, first party, loss and therefore the contaminating substances had to come from somewhere, viz the insured's own facilities. Endorsement No. 2A (see Appendix B), headed "Onshore Seepage, Pollution and Contamination Exclusion", begins "In respect of onshore seepage, pollution and contamination only", thereby emphasising that Endorsement No, 2 deals with both offshore as well as onshore pollution; while its function is to cut down the broad scope of Endorsement No 2.

130. Mr. Butcher, however, submitted that the Judge was right to limit the meaning of "transportation activities" in art. I.1 and of "operations" in Endorsement No. 2. The non-marine context of s. IIIB showed that both expressions had to take their meaning from their surroundings and context, namely Exxon's exploration and industrial operations. Thus "operations" in both pars. of Endorsement No. 2 had to mean the same, and had to be related to some identified location and facility. And Mr. Butcher went one step further and submitted that

the Judge had been wrong to reject his submission below that, even if these provisions did extend to Exxon's position as an owner of cargo at sea, the liability for the expenses in question only arose because of the intervening fault of ESC as shipowner and not because of Exxon's activities or operations.

131. The Judge accepted that the scope of cover under s. IIIB was very wide and that the language of "all transportation activities" was obviously capable of being read as extending to ocean carriage of oil cargo. However, he concluded that a construction which confined the meaning of those words "to carriage specifically associated with drilling, production or exploration" accorded more closely with the structure of the cover as a whole. He considered that the detailed provisions of art. VI(f) "strongly points towards a mutual purpose of excluding all liability cover in relation to marine transportation in self-propelled vessels". As for Endorsement No. 2, he concluded that the word "operations" had elsewhere been used with reference to drilling, production and exploration, and that this was consistent with its use in par. (b) with its reference to the offending facility, and that it ought to bear the same meaning in both pars. of the endorsement.

132. So much for the Judge's construction under English law (at pars. 220/230). However, he briefly came to the opposite conclusion under New York law (at pars. 260/261). On that basis he concluded that the language of art. I.1 (but not that of Endorsement No. 2) would be construed as wide enough to cover mere consignment on board an ocean tanker. He reasoned that the words would, in their context, be considered ambiguous and would thus let in the extrinsic evidence to which we have referred above. However, he then immediately went on to consider "whether the absence of any ambiguity" would preclude consideration of the overall matrix or setting of s. IIIB as part of a composite insurance package alongside ss. I and IIIA; and whether, if that consideration were not precluded a New York court would accord to such factors the same weight as a Judge in England would do. Ultimately he decided that it would not, but would give the overall structure of the GCE relatively less weight than an English Judge. He therefore concluded "on balance" that s. IIIB would be construed as encompassing marine transportation.

133. In our judgment, Mr. Justice Colman was right about the position under English law, but wrong to think that the position was different under New York law.

134. We have already concluded that under s. I, whether under English or New York law, Exxon's claim would have failed but that it would have

[2005] Vol. 1
C.A.
LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.
684
Waller, L.J.

succeeded under s. IIIA. Moreover, on the Judge's acceptance of ambiguity under New York law, the extrinsic evidence would once again have been admissible under New York law. For the reasons which we have given above (at pars. 68 and 116) for thinking that New York and English law would come to the same conclusion about the role of the Notwithstanding clauses for the purpose of the s. I claim, we are not persuaded of the Judge's decision for finding that English and New York law would have differed about s. IIIB. We think that the Judge's construction of art. I.1 and Endorsement No. 2 as a matter of English law is ultimately persuasive and we can see no sufficient reason for thinking that a New York court would have come to a different conclusion, a fortiori as that court would have had available to it not only the legitimate contractual matrix of the GCE but also the extrinsic evidence in question to the extent that it went further than matrix material.

135. As for the point of construction, we acknowledge, as the Judge did, that the language of art. I.1 is in one sense wide enough to encompass Mr. Edelman's submissions: but we are impressed by the contextual argument both as a matter of the overall structure of the GCE and its separate covers and as a matter of the language of s. IIIB itself. We agree with the Judge's analysis and would emphasize the following considerations.

136. It is not only the nature of the separate covers under ss. IIIA and IIIB (as well as under s. I) that underlies the question of construction. There is express reference in the opening "General Insuring Conditions" of s. IIIA to emphasize the distinction between the two sections. Thus condition 4 describes s. IIIA cover as "Protection and Indemnity Risks and Charterer's Liability and other Marine Liabilities etc., and etc" and condition 6, dealing with limits, expressly refers to s. IIIB as covering "Non-Marine Liabilities (s. IIIB)". Exxon's cover as a mere cargo owner or charterer (i.e. not owner nor bareboat charterer) for seepage, pollution and contamination liability is expressly covered under s. IIIA, but, as one would expect, is nowhere referred to expressly under s. IIIB.

137. If it were to be found anywhere, one would expect it to be made clear in s. IIIB's Endorsement No. 2 ("Seepage, Pollution and Contamination Coverage Endorsement"), whose express purpose it appears to be ("Notwithstanding anything contained in art. I, par. 1, of this Policy") to extend cover to take in seepage, pollution and contamination. It is true that Endorsement No. 2 clearly covers offshore as well as onshore pollution, because the closely allied Endorsement No. 2A ("Onshore Seepage, Pollution and Contamination Exclusion") is limited to the onshore. There is, however, nothing in either Endorsement No. 2 nor

Endorsement No. 2A which expressly gives any comfort to the concept that marine carriage falls within the cover. The only expression which is relied on as covering marine carriage is the word "operations" in par. (a): but (1) transportation itself has never previously been referred to as "operations" as distinct from "activities"; and (2) it is common ground that the word "operations" in par. (b) refers to operations conducted from an "offending facility". Although Mr. Edelman asks us to note the differences in cover between pars. (a) and (b), these do not in our judgment justify giving to the concept of "operations" within the endorsement an entirely different and extended flavour. If the present case does not come within Endorsement No. 2, it would seem strange to think that it would come within the more general cover of art. I.

138. Turning then to art. I, par. 1, we find that the primary focus of it is "Drilling, Production, Exploration operations", wherever they take place, offshore, inshore or onshore, and in this context "all transportation activities", and then there is a further inclusion of "all Terminal and pipeline operations". The focus of all of this is the named operations, which plainly take place from a facility of some kind. Transportation, however, is an activity: and although there could be much debate about the nature of operations and activities, the linguistic distinction is carried through into the reference to automobiles and aircraft, which are described as activities. It may be noted that, despite the reference to automobiles and aircraft, there is no reference to the important subject of marine transport activities within those provisions.

139. That subject matter however is picked up in the art. VI(f) exclusion. This is a complex provision which both excludes and includes. One of the things we are told by it is that s. IIIB is not concerned with claims arising out of the ownership (or bareboat charter) of any watercraft. That is of course consistent with the idea that "transportation activities" do not include the marine carriage of oil, but by itself the exclusion is both wider and narrower than answers the issue with which we are concerned: it is wider in that it relates so far to any form of watercraft, and it is narrower in that it does not relate to any claims which arise out of mere ownership of oil in transit on a watercraft. The other matter which is made quite explicit is that "For the purpose of this policy" i.e. s. IIIB, there is an "excluding absolutely any self-propelled tank or Supply Vessel". That absolute exclusion is said to be for the purpose of the policy as a whole and not merely for the purpose of the opening lines of art. VI(f). We recognise the argument that it could be limited to the former, but that is not what is said, and it would not make sense of the overall structure of ss. IIIA and IIIB. It makes no sense that Exxon's

liability for pollution arising out of marine transport as a shipowner is limited to s. IIIA, whereas its liability for pollution arsing out of marine transport as a mere cargo owner is not. Thus an installation in transit is a watercraft within the policy, but not if it is not in transit. However, a self-propelled tank or supply vessel is absolutely excluded and "shall not be deemed to be watercraft".

140. We recognize that there is specific inclusion of liability for personal injury to employees arising out of the ownership of watercraft: but that is a special case; and we are not concerned with the issue which might arise as to whether that would apply even in the case of self-propelled tank or supply vessels.

141. We therefore conclude, as did the Judge, that there is no cover under the generic reference to "all transportation activities" for liability arising out of the ownership of oil being carried in marine transport. We consider that the transportation activities being referred to are those incidental to drilling, production, exploration, terminal and pipeline operations: and that marine transport, even if, as Mr. Edelman cogently submits, it forms part of a chain of transportation between rig or well and terminal, or between terminal and end-user, nevertheless is considered for the purposes of ss. IIIA and IIIB as a matter of marine, and not non-marine, liabilities and as being something separate and apart and not incidental to those physically located operations expressly mentioned in art. I of s. IIIB.

142. For these purposes, however, we see no sufficient reason to distinguish, as the Judge did, between English and New York law. We say this for the same reasons as we have adopted above in relation to the issue under "removal of debris" under s. I. We are confident that if the Judge had concluded as we did about that issue under New York law, he would not have decided the s. IIIB issue as he did under New York law. In any event, it is not clear to us whether in doing so he gave proper weight to the extrinsic evidence which he accepted would have been admissible in a New York court. That evidence from the point of view of the interface between ss. I and s. IIIA has already been referred to above (at par. 105). So far as it specifically relates to the interface between ss. IIIA and IIIB, the matter was summarised (without challenge) in Mr. Butcher's skeleton at par. 237 as follows:

Thus:

(i) there was evidence from the underwriters that the parties did not intend s. IIIB to cover tanker pollution liability: Compton-Rickett at B2/292-299; Youell at B3/720-728;

(ii) there was evidence from the brokers that they did not believe that s. IIIB covered

contingent cargo pollution liability: Delach at B2/p.327 line 17 to 328 line 11;

(iii) there was evidence from Mr. Jueds of Exxon Insurance Services that the parties did not intend s. IIIB to cover tanker operations: Jueds at B3/533 line 20 - 535 line 8;

(iv) there is no extrinsic evidence that the parties intended s. IIIB to cover tanker pollution liabilities.

143. We therefore conclude that the claimants' appeal under s. IIIB fails.

*The seepage and pollution exclusion*

144. We now turn to an issue which arises under the retrocession policies, except certain of the Lloyd's policies, rather than under Exxon's GCE itself. It is common ground therefore that it arises only as a matter of English law. It is only relevant, however, to exclude liability under ss. I or IIIB. Since we have concluded that there is no relevant liability, the point is moot. We will therefore deal with it briefly.

145. The exclusion provides:

This contract excludes any loss arising from seepage, pollution or contamination on land unless such risks are insured solely on a sudden and accidental basis. This contract also excludes liability in respect of disposal or dumping of any waste materials or substances.

These exclusions shall not apply to coverage provided in respect of:

(a) control of well policies where such seepage, pollution or contamination follows a well out of control above the surface of the ground or waterbottom;

(b) liability under:

1. Offshore Pollution Liability Agreement

2. Outer Continental Shelf Lands Act, Federal Water Quality Improvement Act, Arctic Waters Pollution Protection Act,

3. Seepage, pollution or contamination covered by Protection and Indemnity policies,

4. Aviation policies subject to clauses no less restrictive than Aviation Seepage and Pollution Exclusion Clause (1988) amendment).

146. We have emphasised the words "on land", because that is what the issue under this exclusion is about. The defendants say that "on land" describes where the effect of the seepage, pollution or contamination is located. The claimants say that

[2005] Vol. 1
C.A.

LLOYD'S LAW REPORTS
King v. Brandywine Reinsurance Co.

686
Waller, L.J.

the expression describes where the seepage, pollution or contamination originates from. The defendants say that since almost the whole of the clean-up costs were directed to contamination of the land and not the sea, its potential liability, if any, did not even reach the deductible. The claimants say that since the contamination came from the sea and not the land, the exclusion is wholly inapplicable.

147. In *Commercial Union plc v. NRG Victory Reinsurance Ltd.*, [1998] 1 Lloyd's Rep. 80 at 89, Mr. Justice Clarke held that the exclusion referred only to a case where the source is on land. He was therefore in favour of the claimants' construction. He regarded the defendants' construction as unarguable. He said no more about it.

148. Mr. Justice Colman said he would have agreed, but for the argument arising from the disapplication of the exclusion in respect of liability under the Offshore Pollution Liability Agreement ("OPOL") which can only arise out of an escape or discharge into the sea from an "offshore facility" as there defined. A similar point arose from the disapplication in respect of liability under P&I policies. The Judge remarked on the fact that there is no sign that such an argument was presented to Mr. Justice Clarke, else he would have been bound to have mentioned and dealt with it, a fortiori in a judgment concerned with summary disposal. The Judge was persuaded that the disapplications favoured the defendants' construction, for otherwise they would have been entirely redundant.

149. The claimants riposte that the argument from redundancy is an unsafe basis for a decision on construction: since such redundancy is common in insurance policies (and other commercial documents) to drive home a point. Mr. Edelman gave as an example an exclusion for dishonesty in a liability policy where the insuring clause could only ever apply to negligence.

150. We are inclined to agree that the argument from redundancy is often of doubtful cogency. However, unlike Mr. Justice Clarke and Mr. Justice Colman, we find the defendants' most basic submission, as to the meaning of "seepage, pollution or contamination on land" irrespective of the argument from redundancy, to be less obvious than they appear to have done. There is nothing express in that phrase to determine whether what is being looked to is the source, as distinct from the physical presence, of the seepage, pollution or contamination. The question, therefore, is where does the seepage, pollution or contamination occur, on land or at sea? Two of us (Lord Justice Waller and Sir Martin Nourse) think that there are two linguistic indications inherent in that question, which derives from the wording of the exclusion, which point in

this case to the answer "at sea"; with the result that the exclusion does not apply. One is the concept of seepage, which is suggestive of a source as well as a location of seeping material. The other is the preposition "on" in the expression "on land", which to our mind is to be contrasted with the alternative which might have been found "of land". "On land" suggests to us the place where the active process of contamination is taking place, which in the case of seaborne pollution does not occur on land but at sea. The third of us, however, Lord Justice Rix, is doubtful about this, thinking that if you have a source of seepage, pollution or contamination offshore, it is likely to wash ashore and show up on land: and that if, therefore, you are anxious to differentiate between the source of seepage, pollution and contamination, leaving offshore sources within the cover and only excluding onshore sources, then the draftsman would concentrate in his language on distinguishing the source of loss, which this draftsman, he thinks, has failed to do.

151. Mr. Edelman, however, has a second point, to which the Judge did not allude in his judgment. This second point concentrates on the primary proviso "unless such risks are insured solely on a sudden or accidental basis". His submission is that the risks in question were insured solely on a sudden or accidental basis. As for s. I, for there to be cover for removal of debris, there has to be causative event, viz something sudden (and accidental). As for s. IIIB, Endorsement No. 2A itself excluded "onshore seepage, pollution and contamination" unless inter alia (a) the event could be described as "not being part of a continuous situation" and (b) "the event was accidental". Therefore, he submitted, for onshore seepage, pollution and contamination to be covered, it had to be both sudden and accidental.

152. Mr. Butcher, on the other hand, pointed out that the "loss occurrence" definition in s. I included the language: "an event or a continuous or repeated exposure to conditions". Whereas an "event" may be sudden, the same could not be said of the alternative "continuous or repeated exposure". Therefore, s. I liability was not insured "solely" on a sudden basis. As for s. IIIB, Mr. Butcher submitted that the reliance on Endorsement No. 2A was inconsistent with the claimants' basic position that s. IIIB cover was to be found under art. I.

153. The concept of insurance on a "sudden or accidental basis" appears to derive ultimately from United States jurisprudence where the issue has been well-litigated in connection with the clear-up of waste sites. We have not investigated this jurisprudence. On what is in any event a moot point, we would be reluctant to decide this issue on the relatively brief submissions which have been

addressed to us on it, especially where the Judge did not deal with it; and also because its consideration would we think involve a further exercise, not conducted by the parties, into how the expression "onshore" is used in the context of s. IIIB as a whole. We would merely say that we would remain to be persuaded that ss. I and IIIB, if, contrary to our decisions, they did cover the claims herein, insured those claims "only" on a sudden and accidental basis.

154. In the circumstances, while indicating above our opinion as to the meaning of "on land" in the Seepage, Pollution and Contamination Exclusion, we would prefer to leave the matter there.

*ESC*

155. This was the last claim addressed by Mr. Edelman in his skeleton argument, and we have therefore left it to last. ESC, as shipowner, as distinct from Exxon, never made a claim against the underwriters in any of the American proceedings. It is also common ground that ESC never had any possible claim under either s. IIIA or s. IIIB. Nevertheless, it was submitted to the Judge that ESC did have a potential claim under s. I for the costs of removal of debris, that such a claim could not have been excluded by the Notwithstanding clauses for the very reason that it had no cover under the other sections, and that such a claim was included in Exxon's March, 1996 settlement agreement with the underwriters, thus feeding into recovery under the retrocession policies.

156. The Judge of course held that under English law there was no cover in any event for ESC's or Exxon's clean-up expenses under s. I, but he also held that if the matter had to be judged under New York law there was cover, and thus at least a potential claim. He also held that although an English law claim would have been time barred by the time of the March, 1996 settlement agreement, it had not been proved that a New York law claim would also have been barred. He therefore went on to consider, as an obiter part of his judgment, whether it could be said that an ESC claim had figured as part of the settlement agreement and could be passed on to the defendants under the loss payable clauses of the retrocession policies. On these points he decided comprehensively against

the claimants. He held, first, as a matter of fact that the March, 1996 settlement was not made to settle any claim by ESC. He held, secondly, as a matter of law, by reference to the loss payable clauses in the retrocession policies, that payment under a judgment, award or agreement in respect of liability to ESC was a condition precedent to the defendants' liability. There had been neither.

157. On this appeal, Mr. Edelman, on the basis that there was liability to ESC (even if it had never made a claim) under s. I as a matter of New York law, submitted that the Judge had been wrong in these conclusions. Mr. Butcher submitted that the Judge was right, and also that it could be shown that the time bar limit had been reached under New York law as well as English law. We do not think it necessary to lengthen this judgment by exploring these issues. We are agreed that whether under English or New York law ESC never had a claim under s. I for removal of debris. In these circumstances the ESC issue is moot. As it is, it was not ESC which made the settlement, but Exxon, nor had ESC advanced any claim at that time either directly or through Exxon, nor was it made by the underwriters in payment of any claim advanced or that might be advanced by ESC.

*Summary of our conclusions*

158. (1) The proper law of the GCE was New York law, although in the end our opinion on that question does not matter;

(2) As a matter of New York law and English law, s. I of the GCE on its true construction did not cover pollution clean-up costs;

(3) The claimants cannot recover on the basis of ESC's putative claim under s. I;

(4) As a matter of New York law and English law s. III(B) of the GCE provides no cover for pollution clean-up costs;

(5) If it had arisen, (which on the above conclusions it does not) we would have had some doubts about the conclusion of the Judge as to the proper construction of the seepage and pollution exclusion in certain of the outward retrocessions, but prefer to express no concluded view;

(6) The appeal must accordingly be dismissed.