Exhibit F

[Vol. 2

had been
The plain
tion. In
nes called
, I think
intention
trust for
ent being
common
either on
s able to
idication,
means of
Thus the
irchaser's
was urged
rs of the
udicated,
ence was
ectuating
from this
it is the
1th Edn.,
idication.
he same
for the
s alleged
y are set

ce or the
recedent
ne bears

idents to

e & Co.

-at-Law.]

# BRADFORD THIRD EQUITABLE BENEFIT BUILDING SOCIETY v. BORDERS.

[HOUSE OF LORDS (Viscount Maugham, Lord Russell of Killowen, Lord Wright, Lord Romer and Lord Porter), **February 10, 13, 14, 17, May 9, 1941.**]

*Misrepresentation—Fraud—Builders' brochure—Builders having pool agreement with building society—Whether co-adventurers—Liability of society.*

The builders of houses on a building estate issued a brochure to an intending purchaser containing assertions, contrary to the truth, that the houses were, or would be, particularly well built, and that a leading building society was prepared to advance no less than 95 per cent. of the purchase price of the houses because they were so well built. The appellant building society in Mar., 1934, entered into a pool agreement with the builders. It was proved that the respondent had received the brochure in Feb., 1934, and subsequently purchased a house, and that the appellant society had been in correspondence with the builders since the beginning of that year and an officer of the society had seen a copy of the brochure. At the trial, it was sought to be proved that a representative of the appellant society was present at an interview with the respondent when the statements in the brochure were discussed, but the judge held that this was not proved. On appeal the Court of Appeal allowed the pleadings to be amended to include an allegation that the statements in the brochure were false to the knowledge of the appellant society and were made with the authority of the society and that such authority was to be found in, or inferred from, the correspondence :—

HELD : (i) there were no facts to support a charge of fraud against the appellant society.

(ii) the amendment of the pleadings was wrongly allowed by the Court of Appeal, as the party charged had not had the opportunity of defending himself by giving evidence specially directed to the charge made in the amended pleading.

(iii) the relationship between a builder and a building society with whom he has a pool agreement is not that of co-adventurers or principal and agent. Each is an independent person acting in his own interest, and the builder is not an agent of the building society to obtain agreements for loans.

*Decision of the Court of Appeal ([1940] 1 All E.R. 302) reversed as to the counterclaim.*

[**EDITORIAL NOTE.** Although this case has lost much of its legal interest in the course of its journey to the House of Lords, the decision here reported is still of considerable importance. As the position stood after judgment in the Court of Appeal, it seemed that building societies would require to consider very carefully what puffs were being issued by builders whom they were, in effect, financing by means of a pool agreement. The House of Lords, however, apart from deciding the issue of fraud raised on the particular facts of this case, have made observations on the general position of the societies in such a case. It is decided that the builder and the society are independent parties, and, therefore, unless the officers of the society in some way make themselves parties to any extravagant statements in a puff, the societies in general will not be in any danger of an action based on fraud. The facts of this case are very special, and, perhaps, not likely to recur, but the case has given an opportunity for the general position in this now very extensive business to be reviewed. The exercise of the discretion of the Court of Appeal in allowing an amendment to the pleadings where fraud is alleged is discussed by their Lordships, and they are all of the opinion that it was here wrongly exercised,

AS TO LIABILITY IN FRAUD, see HALSBURY, Hailsham Edn., Vol. 23, pp. 69, 70, paras. 97, 98 ; and FOR CASES, see DIGEST, Vol. 35, p. 51, Nos. 457-461.]

Cases referred to :

(1) *New Brunswick & Canada Railway & Land Co.* v. *Conybeare* (1862), 9 H.L. Cas. 711 ; 35 Digest 10, *34* ; 31 L.J.Ch. 297 ; 6 L.T. 109 ; *revsg* (1860), 1 De G. F. & J. 578.

(2) *Peek* v. *Gurney* (1873), L.R. 6 H.L. 377 ; 35 Digest 21, *119* ; 43 L.J.Ch. 19 ; *affg.* (1871), L.R. 13 Eq. 79.

(3) *Arkwright* v. *Newbold* (1881), 17 Ch. D.301 ; 35 Digest 20, *114* ; 50 L.J.Ch. 372 ; 44 L.T. 393.

(4) *Derry* v. *Peek* (1889), 14 App. Cas. 337 ; 35 Digest 27, *185* ; 58 L.J.Ch. 864 ; 61 L.T. 265 ; *revsg.* (1887), 37 Ch.D. 541.

(5) *Nocton* v. *Ashburton (Lord)*, [1914] A.C. 932 ; 35 Digest 55, *493* ; 83 L.J.Ch. 784 ; 111 L.T. 641.

(6) *Smith* v. *Chadwick* (1884), 9 App.Cas. 187 ; 35 Digest 18, *106* ; 53 L.J.Ch. 873 ; 50 L.T. 697.

(7) *Clarke* v. *Dickson* (1859), 6 C.B.N.S. 453 ; 35 Digest 18, *100* ; 28 L.J.C.P. 225,; 33 L.T.O.S. 136.

(8) *Lloyd* v. *Grace, Smith & Co.*, [1912] A.C. 716 ; 34 Digest 129, *991* ; 81 L.J.K.B. 1140 ; 107 L.T. 531 ; *revsg.*, [1911] 2 K.B. 489.

(9) *Whitechurch (George), Ltd.* v. *Cavanagh*, [1902] A.C. 117 ; 9 Digest 382, *2419* ; 71 L.J.K.B. 400 ; 85 L.T. 349 ; *revsg.* (1900), 16 T.L.R. 303.

(10) *With* v. *O'Flanagan*, [1936] Ch. 575 ; [1936] 1 All E.R. 727 ; Digest Supp. ; 105 L.J.Ch. 247 ; 154 L.T. 634.

APPEAL by the building society, the respondents in the Court of Appeal, from a judgment of the Court of Appeal (SIR WILFRID GREENE, M.R., SCOTT and CLAUSON, L.JJ.), dated Jan. 29, 1940 and reported [1940] 1 All E.R. 302, where the facts are fully set out, varying a judgment of BENNETT, J., dated Feb. 13, 1939, and reported [1939] 1 All E.R. 481. This appeal is restricted to the counterclaim for fraudulent misrepresentation.

*H. J. Wallington, K.C.*, and *Robert Fortune* for the appellants.
*A. S. Comyns Carr, K.C.*, and *C. H. A. Lewes* for the respondent.

VISCOUNT MAUGHAM : My Lords, this appeal from the Court of Appeal (SIR WILFRID GREENE, M.R., SCOTT and CLAUSON, L.JJ.) raises a question of considerable importance. By their order, dated Jan. 29, 1940, the court reversed the judgment of the trial judge (BENNETT, J.) so far as the matter under appeal to your Lordships is concerned and directed a number of inquiries framed in order to determine the amount due to the respondent Mrs. Borders by way of damages for false and fraudulent representations by the appellants. By this fraud it is alleged that she was induced to purchase a house and premises from certain builders and to obtain the necessary funds from the appellants by means of a loan of £693, the loan being secured by a mortgage in favour of the appellants, dated Sept. 18, 1934. This matter was raised by a counterclaim by the respondent. The trial judge in a very careful judgment had held that the respondent had failed to prove that the appellants " were in any way responsible for the representations made to her." He had heard the witnesses and considered their evidence,

. [Vol. 2

pp. 69,
1.]

9 H.L.
(1860),

Ch. 19; A

L.J.Ch.

h. 864;

L.J.Ch. B

L.J.Ch.

..J.C.P.

..J.K.B. C

., 2419;

Supp.;

Appeal, D

. M.R.,

[1940]

nent of

R. 481.

srepre- E

nt.

Court F

L.JJ.)

dated

judge

hips is

deter- G

amages

ly this

remises

ellants

favour H

t by a

careful

at the

made

idence,

and it can only be in very exceptional circumstances that the view of the trial judge in such a case ought to be overruled.

    The claim of the respondent for damages for fraud had been amended in the course of a protracted trial, but the Court of Appeal in the course of the hearing permitted yet another amendment to be made, as will

**A**  appear later. This again is very unusual in a case based on fraud. The necessity for accurate pleadings in such a case was explained in forcible terms by Lord Westbury, L.C., in *New Brunswick & Canada Railway & Land Co.* v. *Conybeare* (1) at p. 724, and it is plain that an amendment after the witnesses have given their evidence may lead to grave injustice.

**B**  *The respondent, however, had not been represented by counsel at the trial, though she was in the Court of Appeal.* At the trial, she was no doubt allowed considerable latitude as regards the statement of her case, and was not held strictly bound by her pleadings, but I doubt the wisdom of the course taken by the Court of Appeal in allowing her a further

**C**  amendment of her pleadings in a case of fraud. I must make two further remarks. The first is that I do not understand the grounds for the judgment of the Court of Appeal to be those stated in the final amendment of the respondent's claim. The second is that, if, in a case based on fraud, an amendment is permitted in the Court of Appeal, the court must be

**D**  exceedingly careful not to draw inferences of dishonest conduct against a witness or a party which have not been suggested in the court below, for they might have been capable of an explanation by the witness in the box, if the amended charge of fraud had been distinctly made at the trial.

    It should be explained that the action and the counterclaim covered

**E**  several important matters which were not before your Lordships on this appeal. I propose to confine my remarks to the case involved in the appeal as regards the counterclaim and to state only the facts relating to it, but *it will be necessary to trouble your Lordships at some length* with those facts, for the case is not free from complexity, and I am

**F**  desirous of showing why it is that I feel compelled to differ from the decision of the Court of Appeal and to accept that of Bennett, J.

    The appellants were established as long ago as 1854, and were incorporated in 1875 under the provisions of the Building Societies Act, 1874. In 1934, a firm of builders, who were carrying on business as

**G**  Morrell (Builders) Ltd. (it will be convenient to call them Morrells), were engaged in developing a building estate known as the Coneyhall Estate, West Wickham, in Kent. The houses were to be sold at prices varying from £530 to £795, and it is plain that the great majority of them were intended to be purchased with the assistance of a building society,

**H**  who would advance the greater part of the money in the usual way. Morrells in 1933 and the early part of 1934 were advertising the houses by means of a printed brochure and in other ways. The brochure consisted of 24 large pages, the first 20 of which contained very attractive pictures of the locality and of the various types of houses erected or to be erected on the estate. There were a number of puffing statements, but

nothing which is relied on as a misrepresentation till the last two pages of the brochure. On those pages there are to be found the following statements :

> Incidentally, however, the fact that a leading building society makes a more generous advance over a longer period than to any other estate in Great Britain speaks volumes for the construction of the houses.
> All building is carried out under the strictest supervision of the local authorities, and you will be reassured to learn that, before your home has grown even so far as the damp-course—the double-course of fine slate which ensures the dryness of the house—it has been inspected no less than four times !
> BUILDING SOCIETY.
> MORRELL (Builders), LTD., are the only builders in Great Britain who can offer, by special arrangement with a leading building society, a 95 per cent. MORTGAGE advance over a period of 24 years at 5 per cent. interest.
> This proves without a shadow of doubt, the amazing value of Morrell homes.

At the trial, the claim for damages for fraudulent misrepresentation was based on parol statements made to the respondent on Feb. 9, 1934, at Morrells' offices at Bromley. Several persons were present, and one Feldmar, who was managing the business for Morrells and who was also a managing clerk of their solicitors at Bromley, Messrs. Trotter, Leaf and Pitcairn, made the misrepresentations knowing that they were false. Some of them were to the same effect as the extracts from the brochure. That brochure had been handed to the respondent or her husband at a previous interview at the same offices on Feb. 1, 1934, and was discussed at length on Feb. 9. It was used apparently to support the misrepresentations then made on behalf of Morrells. The respondent's case at the trial was that a representative of the appellants was present on Feb. 9, took part in the discussions, and supported Feldmar's statements. It was, however, proved to the satisfaction of the judge that no representative of the appellants was in fact present, and the counterclaim was, therefore, dismissed. It may be explained that no misrepresentation by the appellants at any time other than at the interview of Feb. 9 was alleged at the trial.

In the Court of Appeal, the claim for damages for deceit against the appellants was based on very different grounds. It was sought to show that the appellants had in some way made or affirmed fraudulent misrepresentations to the respondent in the brochure. The statements in that document above set forth no doubt amounted to an assertion, contrary to the truth, that the houses on the estate either had been, or would be, particularly well built, and also that a leading building society was prepared to advance no less than 95 per cent. of the contract price of houses built on the estate by Morrells because they were so well built.

It is here necessary to notice a point of some importance. The leading building society there referred to was clearly not the appellants, but was a Huddersfield building society with whom Morrells had an agreement. The appellants had no arrangement or agreement with Morrells till a later date. The house bought by the respondent had been built, except perhaps as to some details of completion, before Feb. 9, and had been viewed by the respondent and her husband. The statements in the

brochure to the effect that the house had been well built were no doubt fraudulently untrue. The statement in that brochure as to the willingness of the leading building society to advance 95 per cent. of the contract price of each house on the estate built by Morrells may or may not have been true. No evidence was given as to the arrangements of the

A  Huddersfield society with Morrells. It is true that a person with experience in these matters can make a probable conjecture as to the truth of the statement, but that would, of course, not be a sufficient justification for a charge of fraud.

If the respondent was to succeed in the Court of Appeal on the claim

B  for damages, it was necessary to amend the pleadings, a course which, as already stated, was allowed by the court. The amended pleading stated that the appellants " falsely and fraudently represented to the " respondent in the brochure a number of facts as to the respondent's house which were untrue, and that each of the representations was made

C  by the appellants knowing that the same was false, or recklessly not caring whether the same was true or false. According to the new pleading, the representations were first made :

> . . . to the respondent by Morrells with the authority of the appellants handing the brochure to the respondent on or about Feb. 1, and were in continuous operation
D  until after Sept. 18, 1934.

The authority is to be found in, or inferred from, a number of letters between Morrells or their solicitors and the appellants and their solicitors and between the appellants and their surveyors, Douglas Young & Co. The letters bear date from Dec. 20, 1933, to Mar. 6, 1934. No events

E  after that date seem to be relied on. I must say at once that I do not understand how the respondent could support this pleading as it stands, and I do not know that the Court of Appeal thought otherwise. It may be pointed out that the amended pleading bases the claim for damages on an alleged authority given by the appellants to Morrells to hand the

F  brochure to her to be found or inferred from certain letters. Your Lordships have heard these letters read more than once, and there is not a vestige of ground for thinking that Morrells had—and they clearly did not need—any such authority. The brochure was their document printed long before the appellants had appeared on the scene, and I

G  repeat that Morrells had no agreement with the appellants till Mar. 3.

It is indeed true that the secretary of the appellants, one Clough, in the course of the negotiations with Morrells above mentioned had obtained a copy of the brochure as early as Jan. 3, 1933. He was called as a witness at the trial and was cross-examined. No suggestion was

H  made to him that he had anything to do with the handing of the brochure to the respondent or authorised them to make any of the statements in it above set forth. Nor was it put to him that he knew that they were false. The root and essence of the matter was that the respondent's house was badly built, that (as found by the judge) the house was damp, the roof badly constructed, the roof timbers inadequate in size, the

foundations insufficient, and, in a word, that the house was badly built with bad materials. The defects were concealed, and it has never been alleged that Clough knew of them at the time or had the opportunity of doing so.

My Lords, I am very anxious to do justice to the grounds on which the Court of Appeal reversed the decision of the trial judge. They are contained in the following passage from the judgment of the Court of Appeal delivered by CLAUSON, L.J. After referring to the circumstance that the judge had succeeded in obtaining the disclosure during the trial of certain correspondence, CLAUSON, L.J., said, at p. 311 :

> . . . having regard to the correspondence, we are satisfied that the judge ought to have held, and that we are bound to hold, for the defendant [the respondent] on this issue of fraud. It is true that at the interviews of Feb. 1 and Feb. 9, at which the crucial misrepresentations were made, they were made by Morrells, and not directly by the plaintiffs [the appellants], but the plaintiffs associated themselves with the fraud, and are, therefore, responsible for it, for they had knowledge of the false representations, and of their falsity, and they must have known that it was under the influence and through the inducement of the false representations that the defendant, having originally entered into the contracts with Morrells, was proceeding to complete those contracts, and, as an integral and indispensable part of that completion, accept the obligations of a borrower towards the plaintiffs. It appears to us to result quite clearly that the plaintiffs thus became liable, as participators in the fraud, for any damage which the defendant had suffered thereby.

This is further explained by the statement, at pp. 312, 313 :

> It is obvious, in our judgment, that her [the respondent's] action was induced, and that they [the Appellants] must be taken to have known that it was induced, by the misrepresentations in the brochure which the plaintiffs [the appellants] knew to be false . . . In our view, the judge ought to have proceeded to the conclusion which appears to us to follow quite plainly—namely, that on these facts the plaintiffs [the appellants] cannot escape liability for the fraud to which, by their action, they made themselves parties.

I have some difficulty in understanding the precise meaning of the repeated phrase that the appellants " associated themselves with the fraud," which must plainly refer to the fraud of Morrells. It should be noted in this connection that the only fraud suggested in the judgment was " the vital misrepresentation put forward in the paragraph quoted from the brochure "—namely, that Morrells were the only builders in Great Britain who could offer, by special arrangement with a leading building society, a 95 per cent. advance over a period of 24 years at 5 per cent. interest, and that these facts proved beyond a shadow of doubt the amazing value of Morrells' houses.

The judgment under consideration proceeds to ask what it was that induced the respondent to carry out the contracts which bound her to buy the house and to become a party to the advance of £693 to enable her to carry out those contracts. The Court of Appeal answer, at pp. 312, 313, that, in their judgment, it was obvious that her action was induced by the misrepresentations in the brochure which the appellants knew to be false. My Lords, I must say that I should give a very different answer—namely, that the respondent was clearly " induced " to carry out the contracts and to obtain the advance by the circumstance that the

contracts (if binding) compelled her so to do, and that she had apparently
no suspicion that she could get rid of her obligations to Morrells on
the ground of their fraud.   What else was necessary to cause her to do
what she did ?   Apart, however, from this, I am unable to find any
evidence to establish that the appellants knew that the statements in
the brochure were untrue.

My Lords, we are dealing here with a common law action of deceit,
which requires four things to be established.   First, there must be a
representation of fact made by words, or, it may be, by conduct.   The
phrase will include a case where the defendant has manifestly approved
and adopted a representation made by some third person.   On the
other hand, mere silence, however morally wrong, will not support an
action of deceit : *Peek* v. *Gurney* (2), at p. 390 *per* LORD CHELMSFORD,
and at p. 403, *per* LORD CAIRNS, and *Arkwright* v. *Newbold* (3), at p.
318.   Secondly, the representation must be made with a knowledge
that it is false.   It must be wilfully false, or at least made in the absence
of any genuine belief that it is true : *Derry* v. *Peek* (4) and *Nocton* v.
*Ashburton (Lord)* (5).   Thirdly, it must be made with the intention
that it should be acted upon by the plaintiff, or by a class of persons
which will include the plaintiff, in the manner which resulted in damage
to him : *Peek* v. *Gurney* (2) and *Smith* v. *Chadwick* (6), at p. 201.   If,
however, fraud be established, it is immaterial that there was no intention
to cheat or injure the person to whom the false statement was made :
*Derry* v. *Peek* (4), at p. 374, and *Peek* v. *Gurney* (2), at p. 409.   Fourthly,
it must be proved that the plaintiff has acted upon the false statement
and has sustained damage by so doing : *Clarke* v. *Dickson* (7).   I am not,
of course, attempting to make a complete statement of the law of deceit,
but only to state the main facts which a plaintiff must establish.   The
statement that the appellants associated themselves with Morrells'
fraud must be understood as meaning that all these facts have been
proved in regard to the appellants or their agents, and, since in this
case, as the Court of Appeal states, the honesty of the directors of the
appellants is not in question, for there is no evidence that they ever
saw the brochure, the case must be rested on a fraud perpetrated by an
official or other agent of the society.   A corporation, which must act
through its agents, is as responsible as any other principal for any wrongful
act committed by an agent whilst acting within the scope of his employ-
ment, and not the less that the wrongful act is a fraud by the agent for
his own advantage : *Lloyd* v. *Grace, Smith & Co.* (8).   Whether the act is
within the scope of the agent's authority should be tested, if he has a
permanent employment, by reference to the ordinary duties of that
employment, which he clearly cannot extend by a fraudulent act.   If
it is an agency authorising a special act, the agent will not bind the
principal to an extent beyond that which is reasonably to be inferred
from the nature of that special employment and the duties incident to
it.   A very striking example of a fraudulent act by an agent (the secretary)

Case 1:07-cv-07032-RMB-KNF    Document 22-4    Filed 11/30/2007    Page 9 of 26

of a company is to be found in the well-known case in this House of *Whitechurch (George), Ltd.* v. *Cavanagh* (9).

The judgment of the Court of Appeal appears to rely only on the correspondence as establishing the fact that the plaintiffs associated themselves with the fraudulent representations contained in the brochure. The parol evidence was not referred to during the hearing or in the judgment. In dealing with this correspondence, it will be remembered that the brochure was a brochure printed at a time when a Huddersfield building society was making the advances on the Coneyhall estate. No evidence was given to show that the alleged misrepresentations, in so far as they related to a society other than the appellants, were untrue at the time when the respondent was given a copy of the brochure. As already stated, the respondent's case at the trial was based on parol representations made in the presence, and with the approval, of a representative of the appellants, and that case had failed. It is true, of course, that the appellants and Morrells entered into a pooling agreement on or about Mar. 3, and that, if Morrells after that date used the brochure with its references to a leading building society as being a reference to the appellants, they would be making a false representation. It must, then, be considered whether there is any evidence in the letters to justify the conclusion that the appellants in some way either authorised such a statement or approved its use by words or conduct. The letters relied on are enumerated in the final amendment of the respondent's claim, and the last letters are dated Mar. 6, 1934.

The correspondence passing in 1933 can fairly be dealt with in the way in which the judgment of the Court of Appeal dealt with it, at p. 312 :

In December, 1932, Morrells inquired of the plaintiffs [appellants] on what terms the plaintiffs would make 90 per cent. advances in respect of certain named building estates which were under development by Morrells. The Coneyhall Estate, of which the house now in question formed part, is not among the estates named. It appears from this letter that Morrells had a very large pool with a leading building society, and would be willing to create a similar pool with the plaintiffs. It should be explained that this refers to the device of arranging for a personalty fund to be put up as a general collateral security against loss by the building society on any individual mortgage, a device which enables the building society with a reasonable degree of safety to advance on each transaction a sum very nearly approximating to the valuation. Negotiations as to the terms on which Morrells would be prepared to give the plaintiffs the business of thus financing purchasers on Morrells' estates continued through 1933. About the end of 1933, the brochure relating to the Coneyhall Estate was in the plaintiffs' hands, as appears from a letter from them to Morrells, dated Jan. 1934.

The plaintiffs, by a letter written by Clough, criticised some of the statements in it relating to building society advances, but did not mention or refer to the alleged misrepresentations, in particular to the passage as to the special arrangement with " a leading building society " which, it was said, enabled Morrells to offer a 95 per cent. mortgage advance at 5 per cent. interest. The letter said with regard to the brochure that there had been an opportunity of "giving some consideration to the Coneyhall Estate brochure." This letter and the subsequent letter

of Jan. 9 showed clearly that the brochure would require alteration if the appellants began to make advances to purchasers of houses on this estate. The judgment of the Court of Appeal continues as follows, at p. 312 :

A    In the course of that month [January], the negotiations between Morrells and the plaintiffs reached the stage of the preparation of a draft agreement, and, from a letter of Jan. 12, 1934, from the plaintiffs to their surveyors, it appears that the Coneyhal Estate was one of the estates to which the arrangements were to apply. The abstract of title to that estate was sent to the plaintiffs' solicitors on Feb. 6, 1934.

B    It will be remembered that the respondent and her husband had the first interview with Morrells at their Bromley office. A copy of the brochure was then handed to her, as already stated. She paid a sum of £1 as :

. . . an initial deposit for the freehold of plot No. 187, Kingsway, Coneyhall, at the price of £690 subject to contract.

C    There followed, as already stated (on Feb. 9), the interview between the respondent and her husband at which the misrepresentations were made by Morrells. Induced by these false and fraudulent statements, the respondent signed two printed forms of contract. The first was for the purchase for £100 of a plot of land on the estate called 187, Kingsway, and the second was for the erection by Morrells for the respondent of a dwelling-house on the plot for the sum of £595. In fact, the house was almost complete on Feb. 1. The appellants had nothing to do with these transactions. According to the finding of BENNETT, J., they had no contractual relationship with Morrells till Mar. 3, 1934, though negotiations with them had been in progress for some months.

At some date after Feb. 9 the respondent signed an application for a loan addressed to the appellants. It was forwarded to them some days later and was granted by the board on Feb. 25, after the appellants' surveyors, Douglas Young & Co., had made a written valuation of the house, putting upon it a value equal to the contract price, namely, £690. Before Mar. 2 the respondent agreed with Morrells for the latter to build a garage on the plot of land at an additional cost of £40, and on that date Messrs. Trotter, Leaf & Pitcairn, solicitors for Morrells, wrote to the appellants asking for an advance of £692 to the respondent on the footing that the total purchase price was now £730. On Mar. 3 the respondent paid Morrells the sum of £33 on account of the purchase price, and she was then given possession of the house, and she and her husband have lived there ever since. On Mar. 12, the appellants asked for and obtained spare copies of the brochure.

The respondent made complaints to Morrells as to various defects in the house, and they agreed to put these matters right. The garage was completed by June 30, and the surveyors, Douglas Young & Co., wrote on that date to the appellants that they had again inspected the house, and that, the garage being completed, £40 could be added to the

Case 1:07-cv-07032-RMB-KNF     Document 22-4     Filed 11/30/2007     Page 11 of 26

value, making the total valuation £730. They also mentioned, without any details, the defects complained of, and stated that Morrells had promised to rectify them.

On July 2, 1934, Messrs. Read, Eaton & Co., the appellants' solicitors in Bradford, requested Messrs. Trotter, Leaf & Pitcairn, Morrells' solicitors in Bromley, to obtain the signature of the respondent to the mortgage of the premises by her to the appellants, and they enclosed the engrossment for that purpose. The respondent, however, refused to sign it, because the defects complained of had not been remedied, and the judge found that on Sept. 18 she had written and sent to the appellants a letter stating her reasons for not signing the mortgage. I do not think it necessary to take up your Lordships' time by a detailed statement of the subsequent events. It is sufficient to say that the respondent alleges that she executed a mortgage on the house in consideration of £693 advanced by the appellants to her at 5 per cent., repayable by subscriptions on shares in the society of £4 4s. per calendar month, but she alleges, and the judge held, that she executed this deed as an escrow dependent on the performance by Morrells of the promise to make good the defects in the house. Nothing turns on this, and counsel for the respondent admitted to your Lordships that the deed was now effective. The respondent paid various sums to the appellants amounting to £121 16s., but she then allowed her subscriptions to get more than three months in arrear. The appellants, after negotiations, commenced proceedings claiming possession of the premises on June 23, 1937. They produced a mortgage purporting to be executed by the respondent on Oct. 10, 1934, but the respondent denied the execution of the document produced, and the appellants failed to prove that she did execute it. The judge therefore dismissed the action for possession. As already mentioned, the issues which your Lordships are now considering were raised by a counterclaim, which was also dismissed by BENNETT, J., on the simple ground that the respondent had failed to prove that the appellants were in any way responsible for the representations made to her. It should be mentioned that the Court of Appeal pointed out that rescission was out of the question in the circumstances, and that the respondent could not, therefore, escape liability for £693 and interest, less any amounts paid by her to the appellants. She at present owns the house and premises subject to the mortgage. The inquiries directed by the Court of Appeal were designed in effect to reduce, by way of damages for deceit, the amount of her liability under the mortgage which she admits that she executed, though it has not been produced.

I must now ask the question whether the essentials of an action of deceit have been established. First, who made the representations of fact so as to bind the appellants? The only possible agent, so far as I can see, was Clough, the secretary of the appellants. In the correspondence, I can find nothing to suggest that he ever said or did anything

[Vol. 2

without
ills had

olicitors
olicitors
ortgage
ngross-
sign it,
nd the
pellants
t think
tement
ondent
tion of
able by
month,
d as an
o make
for the
ffective.
ounting
to get
iations,
ises on
to be
denied
iled to
action
rdships
as also
ondent
ible for
at the
tion in
escape
to the
to the
esigned
of her
though

tion of
itations
far as
corres-
ything

to make the respondent believe that the material statement in the brochure in reference to "the leading building society," or, indeed, any other statement in the brochure, was true. Secondly, there is not a word in the correspondence to show that he knew that the statement was untrue. There is no evidence that that particular statement was untrue, and nothing to show that it was repeated after Mar. 3 so as to make the statement applicable with the substitution of the appellants for the Huddersfield society. Moreover, Clough was called as a witness and cross-examined at length by the respondent. It was not suggested to him that he ever was guilty of a fraudulent statement to the respondent, and no question attributing to him a fraudulent mind was ever asked. No inference of dishonest conduct on his part ought to be drawn by an appellate court in these circumstances, and I think it only fair to Clough to say that I can see no ground for any such inference. It is a striking circumstance that there is no evidence whatever that Clough knew before the trial that the respondent had ever seen the brochure, or that she had had any verbal misrepresentations made to her on Feb. 9 or at any other date by Morrells or anyone else.

It does not seem to be possible to examine the further question whether any statement or conduct by Clough caused the respondent to execute the mortgage unless the approximate date of such statement or conduct is stated with reasonable certainty. It seems to me to be sufficient to say that there is no evidence to justify a court in holding that Clough by words or conduct ever represented to the respondent that the statements in the brochure were true. Even if the view is taken that Clough at some date after Mar. 3 ought to have required Morrells to withdraw the brochure, or to have altered it so as to make it accurate as regards the appellants, it does not seem to me that this would justify anything more than a charge of negligence against him and the appellants. It certainly would not justify an action for false representation. I express no opinion as to whether such a view would have supported an action for rescission or whether such a proceeding could possibly have benefited the respondent.

In an exhaustive and careful argument, counsel for the respondent sought to rely on some other points which had not apparently found favour with the Court of Appeal. He attempted to show that Morrells were the agents of the appellants to make the false representations on Feb. 9, or, alternatively, that Messrs. Trotter Leaf & Pitcairn, having been employed to obtain the execution of the mortgage by the respondent, became the agents of the appellants, and that the statements of their managing clerk, Feldmar, were thus binding on the appellants, or, thirdly, that there was a species of "joint adventure" between the appellants and Morrells which had the effect of making the former liable for the latter's frauds. My Lords, it is within my knowledge that some of your Lordships will deal with these points in sufficient detail, and I will content myself with saying that, like the rest of your Lordships;

H.L.

I am of opinion that they were not well-founded. My Lords, my conclusion is that the action for deceit must fail, and that the judgment of BENNETT, J., on this matter was right on the ground which he gave. I have therefore to move your Lordships that the judgment appealed from be reversed and that the counterclaim be dismissed with costs, and that the respondent do pay the costs in the Court of Appeal and in this House.

LORD RUSSELL OF KILLOWEN [read by LORD WRIGHT] : My Lords, I agree with the opinion of VISCOUNT MAUGHAM, but, since we are differing from the Court of Appeal, I desire to add some observations of my own. This case came under our consideration in strange circumstances. The only matter argued before us was a claim by the defendant to recover damages for the alleged fraud of the plaintiffs. All other questions in dispute between the parties have been decided, and from those decisions there has been no appeal. By the counterclaim, at the trial the defendant alleged that the plaintiffs had fraudulently misled her into believing that the house, 81 Kingsway, West Wickham, was built of good materials and in an efficient and workmanlike manner, and that she had thereby been induced to accept a conveyance of that house. At the trial before BENNETT, J., she alleged that she had been so fraudulently misled by oral representations (supported by the brochure) made to her on Feb. 9, 1934, by a person who was introduced to her as an agent of the plaintiffs. The judge held that it had been proved that no representative of the plaintiffs was present at the interview, and that the case for damages for fraud failed because, to quote his words, at p. 500 :

... she [the defendant] has failed to prove that they [the plaintiffs] were responsible for the representations made to her.

Normally, one would expect that such a finding by the judge who had seen and heard all the witnesses would have relieved the plaintiffs from all further imputations of fraud. This expectation has not been realised. On appeal, the defendant was allowed to amend her counterclaim for the purpose of raising a charge of fraud against the plaintiffs based on entirely different allegations. It was then alleged that the fraudulent representations were made, not by the plaintiffs through an agent of theirs present at the interview of Feb. 9, 1934, but in the brochure which was handed to the defendant by Morrells, the builders, on Feb. 1, 1934, with the authority of the plaintiffs. It was further stated that this alleged authority of the plaintiffs was to be found in, or inferred from, certain specified correspondence. The Court of Appeal thought that, since this correspondence had been discussed before the trial judge, they might properly allow the pleadings to be amended and the claim raised. Personally I would not have taken this course. To make a charge of fraud is a serious thing, and, before people make it, they should be clear as to the grounds and facts upon which they rely

as the basis of their charge. If they fail at the trial in establishing the chosen basis of their allegation, they should not (except in very rare and special circumstances) be allowed, on appeal, to present a fresh case which has never been put to the witnesses, and upon which the trial judge has never been called upon to express a view.

Having read and considered the correspondence relied upon as establishing the allegation that the builders were authorised by the plaintiffs to make the fraudulent misrepresentations contained in the brochure, I have failed to find any justification for the allegation. There is nothing in the correspondence from which I can either find or infer the alleged authority. As a result, the case of fraud as pleaded in the latest edition of the counterclaim must necessarily fail.

The Court of Appeal, however, have granted relief to the defendant by way of damages for the fraud of the plaintiffs. The ground of this decision needs to be examined. They relied upon the statement in the brochure as to a 95 per cent. mortgage advance, and treated it (I think rightly) as a representation to the effect that the house was particularly well built. They held that, on the correspondence, it was proved that the plaintiffs knew that the statement was untrue. The plaintiffs, therefore, in allowing the defendant to borrow money from them, knowing that she had been induced to apply for the loan by the fraudulent misrepresentation of the builders " associated themselves with the fraud [of the builders] and are, therefore, responsible for it," and became liable as " participators in the fraud " of the builders for any damage which the defendant had suffered thereby.

My Lords, even if I agreed, which I do not, that the legal proposition flowed from the stated facts, I cannot accept the facts as stated. It must be remembered that negotiations were still in progress between the builders and the plaintiffs, and that the brochure related to a time when the plaintiffs were not making loans to purchasers from the builders. In my opinion, neither the correspondence nor the evidence establishes that Clough knew either (i) that the statement in the old brochure was untrue as to the advances made by the building society to which the old brochure in fact referred, or (ii) that the old brochure was ever shown to the plaintiff or to any other then-intending purchaser. Indeed, there is evidence which indicates that Clough thought that, during the time when the builders and the plaintiffs were negotiating as to the pooling agreement, a revised brochure was in use, for on Mar. 12, 1934, he wrote asking for copies of the latest brochure, to which, he says, applicants were continually making reference.

The Court of Appeal state in their judgment that the amendment which they sanctioned covered a claim based upon the lines of their judgment. I cannot agree. The two claims are essentially different. The amended claim is based on a misrepresentation authorised by the plaintiffs, *i.e.*, on a misrepresentation made by the plaintiffs through the mouth of another. The judgment of the Court of Appeal is founded

upon a misrepresentation made by a third party quite independently of the plaintiffs, and on subsequent knowledge by the plaintiffs of the misrepresentation having been made. It is indeed hard on a litigant who has destroyed one basis of a charge of fraud before the trial judge to have an amended basis sanctioned on appeal, and ultimately to be held liable on a different ground altogether, but, as I have indicated, the plaintiffs in the present case cannot be held liable on either of these fresh grounds.

It remains to consider an additional argument advanced in this House by counsel for the plaintiffs. He contended that the builders and the plaintiffs were engaged in a joint adventure, in which the builders were the agents of the plaintiffs to obtain applicants for loans, and were authorised to make representations on their behalf, with the result that the builders were authorised to make on behalf of the plaintiffs the statements in the brochure. Even if sound, this argument should not be listened to, for it is not covered by the sanctioned amendment which pleads that the authority is to be found in the specified correspondence. However, the contention is unsound. It completely misapprehends the position existing between the builders and the plaintiffs. There was no joint adventure. There were, when pooling agreements became binding, separate and concurrent enterprises, each no doubt to some extent dependent on the success of the other, but the builders were in no sense the agents of the plaintiffs. Moreover, even if it could be said that they were such agents as suggested, while they would have authority to make, on behalf of their principal, statements in regard to the amount which the lender was prepared to advance, I do not understand how they could have authority to make any statement as to the value of the property which the borrower offered as security for the loan.

LORD WRIGHT : My Lords, my noble and learned friend VISCOUNT MAUGHAM has fully dealt with the facts in this appeal which is limited to the counterclaim. I do not desire to add to his recapitulation of those facts. Indeed, I should not have delivered a separate opinion if it had not been that the House is differing from a careful opinion of the Court of Appeal. I venture to think that the error into which, with all respect, the court have fallen is due to their failure to recognise the importance of the established rule that fraud must be precisely alleged and strictly proved, and the further rule that an amendment alleging fraud should not be allowed in the appellate court unless the party charged has had the opportunity of defending himself, not merely by arguments of counsel on the appeal, but by giving evidence in his own defence specially directed to the charge made in the amended pleading.

This House would only with the greatest reluctance interfere with, or even criticise, the exercise by the Court of Appeal of its discretionary jurisdiction to allow a pleading to be amended ; but, where fraud has

Case 1:07-cv-07032-RMB-KNF    Document 22-4    Filed 11/30/2007    Page 16 of 26

been alleged in the pleading and the party has been held guiltless of the charge as so framed, after a trial in which evidence has been directed to the charge so particularised, it would be most unusual to reopen the case by trying in the Court of Appeal, on the evidence given below, an amended case of fraud, based on different circumstances. I do not wish to say that such a course can never be justified ; but it must almost necessarily involve that the party whose honesty is attacked has no real opportunity of being heard in his own defence. He has not been enabled to lead evidence directed to the specific particulars of fraud alleged in the amendment. He has directed his evidence in the court below to the original charges made. He is entitled to have his honesty in regard to the new particulars specifically challenged, and to have an opportunity, in examination or cross-examination, or both, of answering the charge personally. Where there is any danger of this right being denied by an amendment in the Court of Appeal, the court should, in my opinion, in the interests of justice and fair play, allow the amendment only on the terms that the new case should be dealt with by a fresh hearing directed to the new issue, unless the party waives the opportunity of having the new issue properly ventilated by new evidence, or perhaps, in very special cases, where no fresh evidence is possible. However, I find it difficult to think of any case in which a party charged with fraud should not have the chance of clearing his character by his personal oral evidence.

In the present case, the directors of the appellant company had elected not to give evidence, but they were not personally implicated. If there was fraud on the part of the appellants, the person responsible can, so far as the evidence goes, only have been Clough, the officer of the appellants who on their behalf conducted the details of the negotiations between the respondent and the appellants. He did, indeed, give evidence, and was subjected to a prolonged cross-examination, which because latitude was naturally given to the respondent who conducted her case in person, roamed over a wide area, far beyond the limits of the pleaded case. That case was based on fraudulent representations made at an interview by the builders' agent or agents, but the case alleged was that the appellants were present by some representative, and were thus a party to the mis-statements which, it was alleged, they must have known to be false, and on which the whole transaction was based. That a fraud was perpetrated on the respondent by the builders, and that she was thereby induced to buy the house, has been found by the judge, and is not disputed. It is also clear that the most essential elements in the fraud were the false statements in the brochure, in particular the statement that the willingness of the appellants to advance 95 per cent. of the value was conclusive proof as to the excellence and value of the building. The judge held, however, that the appellants were not responsible for that fraud. The Court of Appeal have now held them responsible for the fraud on a view of the facts not even justified by the

Case 1:07-cv-07032-RMB-KNF     Document 22-4     Filed 11/30/2007     Page 17 of 26

amended pleading. The ground adopted is that the appellants [p. 311] "associated themselves with the fraud, and are, therefore, responsible for it," and became "participators in the fraud." This view seems to give the go-by to the amended pleading, which alleged that the crucial misrepresentations were made by the builders with the authority of the appellants. That charge completely failed. The judgment of the Court of Appeal proceeds, as I understand it, on a different ground. This seems to be that the representations made on Feb. 9 by the builders were never withdrawn, and were, therefore, in continuous operation on the mind of the respondent, and that the appellants must have known of the representations, of their falsity, and of their effect in inducing the respondent, not merely to buy the house from the builders, but to obtain the loan from the appellants, so that they were knowingly availing themselves of the builders' fraud and reaping its fruits.

I do not question that, if a person knowingly and deliberately profits by another's fraud, he may be properly held to have participated in the fraud and to be liable for the damage. This may happen where a continuing false representation has been made by a person, on the basis of which the transaction is concluded. I am prepared to assume here that, not only may that person be guilty of fraud (*With* v. *O'Flanagan* (10), at p. 584), but so also may any person who, though not a party to the fraudulent original representation, afterwards learns of it and deliberately and knowingly uses the delusion created by the fraud in the injured party's mind in order to profit by the fraud. Fraud involves deliberate intent, which is called *mens rea*. Nothing short of the wicked or guilty mind will serve, as this House held in most striking circumstances in *Derry* v. *Peek* (4), where the statement complained of was, to the knowledge of the directors, not true in fact, but they mistakenly thought that it was as good as true, whereas events completely falsified their expectation, to the damage of the plaintiffs. However, the directors were held not to be liable, because they were innocent of any intention to deceive. There, as here, there was no fiduciary relationship such as was found in *Nocton* v. *Ashburton* (*Lord*) (5). No case was raised, either in *Derry* v. *Peek* (4) or here, of a duty to give true information and a breach of that duty. There was no common adventure as between the builders and the appellants. The appellants and the respondent were at arm's length in a transaction which involved a borrowing by the respondent from the appellants, who actually advanced the cash.

The case against the appellants must, even as amended, depend on fraud, and nothing else. I fully agree that fraud may assume many disguises and wrappings, but the court will always look at the substance, and, if it finds the wicked intent and consequent damage, will give effect to its findings. As *Sir Horace Davey, Q.C.*, is reported to have said in his argument in *Derry* v. *Peek* (4), at p. 339:

Fraud never has been and never will be exhaustively defined, the forms which deceit may take being so many and various. There is a negative characteristic:

Case 1:07-cv-07032-RMB-KNF    Document 22-4    Filed 11/30/2007    Page 18 of 26

[Vol. 2

). 311]
nsible
seems
rucial
of the
f the
ound.
ilders
ration
known
lucing
out to
ailing

profits
in the
ere a
n the
ssume
*nagan*
party
t and
ud in
rolves
icked
ances
o the
ought
their
were
on to
sh as
oither
und a
ween
ident
g by
h.

d on
nany
ance,
give
said

which
istic :

it must be something which an honest man would not do ; not merely what a logical or clear-headed man would not do.

In the present case, the crucial question is whether Clough, for whose fraud, if there were fraud, the appellants would be liable, acted dishonestly. It is just there that the mischief of trying the amended case without a rehearing becomes so apparent. Clough was never asked whether he carried through the deal with the dishonest appreciation that the respondent was being deceived, or whether he deliberately associated with the builders in the fraud they were perpetrating. He was asked about the brochure, in particular about the crucial statement in it as to the willingness of the building society to advance 95 per cent., assuming that the statement applied to the appellants. He admitted that, if it was intended to apply to the appellants, it was not true. He was then asked :

You knew it was not true the whole time you were advancing on the Coneyhall Estate.

He answered :

If that statement appeared the whole time, it was not true at any time, but to say that I knew that it is wrong. I certainly knew it was there, but I certainly did not attach the importance to it that you attach to it.

This is the piece of evidence which seems to me to come most nearly to the point. If the case of guilty participation was to be made, Clough ought to have been closely pressed upon it and given an opportunity of explaining his position in detail. However, bearing in mind all the peculiar circumstances of the case, I see in those answers no sufficient ground for imputing fraud to Clough, or, through him, to the appellants. His evidence is fully consistent with honesty. He did not feel concerned about the brochure or attach importance to its statements. Before the alteration of the law by the Building Societies Act, 1939, particularly by sect. 9, such an attitude is not incomprehensible, though it is to be regretted. The only question in this case, however, is whether fraud is established against the appellants. I agree with all your Lordships that the correspondence relied upon by the Court of Appeal does not contain any evidence supporting a charge of fraud against the appellants in any form. The whole case seems to depend on the view taken of Clough. The judge regretted the absence from the witness box of the directors, but no case was pleaded for them to answer. As to Clough, the judge, who saw and heard him for a long time in the witness box, found no reason to comment adversely on his good faith. In my opinion, the judgment appealed from cannot be supported. I agree that the appeal should be allowed.

LORD ROMER [read by LORD PORTER] : My Lords, the facts of this case have already been stated by VISCOUNT MAUGHAM and I need not repeat them. From the facts so stated, it appears that the gist of the respondent's complaint is that, by reason of the statements contained in the brochure handed to her by Morrells on Feb. 1, 1934, she was

induced to believe, and to act on the belief, that the house and garage which she subsequently agreed to purchase from Morrells were worth the £730 which she paid for them. That the respondent was in this way defrauded by Morrells is no longer in dispute. It is plain that the premises in question were not worth £730, or anything like that sum, and that statements contained in the brochure designed to induce in the mind of the reader the contrary belief were untrue to Morrells' knowledge. The question to be decided upon this appeal, however, is whether any fraud has been practised upon the respondent by the appellant building society.

My Lords, the grounds upon which the respondent has based her charge of fraud against the appellants has varied from time to time in the course of the proceedings. At the trial before BENNETT, J., she alleged that the fraudulent representations as to the value of the house were [p. 499]:

... made to her orally by a number of persons on Feb. 9, 1934, and that one of such persons was introduced to her as an agent of the plaintiffs.

This allegation, however, was not supported by the evidence. It was proved, on the contrary, that no representative of the appellants was present at the interview in question. Accordingly, when the matter came before the Court of Appeal, the respondent changed her ground. Having obtained leave from that court to amend her pleading, she then alleged that the brochure containing the false and fraudulent representations was issued by Morrells to her with the authority of the appellants. The representations were first made to her, she alleged, by Morrells, with the authority of the appellants, handing the brochure to her on or about Feb. 1, 1934, and were in continuous operation until after Sept. 18, 1934. Any representations thus made would no doubt be deemed to be in continuous operation down to the completion of the mortgage of the house to the appellants; but, if the representations were first made on Feb. 1, 1934, they were also then lastly made, for the respondent does not appear to have had more than the one copy of the brochure which was handed to her by Morrells on that date. The respondent further alleged that the representations were untrue to the knowledge of the appellants, and that they induced her to enter into the contracts with Morrells for the purchase of the house and garage and to apply to the appellants for an advance upon those properties. These several allegations would have enabled the respondent to have succeeded in her counterclaim against the appellants founded upon their deceit had she been able to prove them. Whether or not they have been proved is a question which I will consider presently. It is sufficient for the moment to say that they do not appear to have been the ground upon which the Court of Appeal based their decision in the respondent's favour. I cannot discover in their judgment any finding that the brochure was handed to the respondent by Morrells as agents for, or with the authority of, the appellants. They appear rather to have based their decision upon

H.L.]    BRADFORD BLDG. SOCY. v. BORDERS (LORD ROMER)    223

garage
worth
in this
at the
t sum,
uce in
orrells'
ver, is
y the

d her
time
r, J.,
of the

at one

e. It
llants
natter
ound.
then
senta-
lants.
, with
about
t. 18,
emed
tgage
first
dent
chure
dent
ledge
racts
pply
veral
her
l she
is a
nent
the
. I
was
rity
pon

**A**

the ground that, when the appellants made the advance of £693 to the respondent upon the security of her house and garage, they did so with full knowledge that she had been induced to purchase the properties by the fraudulent representations of Morrells, and in that way " associated themselves " with, and were, therefore, responsible for, the fraud. CLAUSON, L.J., said, at p. 311 :

**A**

> . . . they must have known that it was under the influence, and through the inducement, of the false representations that the defendant, having originally entered into the contracts with Morrells, was proceeding to complete those contracts, and, as an integral and indispensable part of that completion, accept the obligations of a borrower towards the plaintiffs. It appears to us to result quite clearly that the plaintiffs thus became liable, as participators in the fraud, for any damage which the defendant has suffered thereby.

**B**

The appellants are a corporation, and any knowledge which they may have possessed of the fraud practised by Morrells upon the respondent must necessarily have been knowledge of one or more of their agents. CLAUSON, L.J., did not state in terms who these agents were, but counsel for the respondent said that they were Clough and Feldmar. Feldmar was the agent of the appellants (so far as this case is concerned) for the sole purpose of obtaining the execution by the respondent of the mortgage of Oct. 10, 1934, and, though he had knowledge of Morrells' fraud, he had not acquired this knowledge as agent of the appellants, and was under no duty to communicate such knowledge to them. The appellants cannot, therefore, be in any way affected by the knowledge of Feldmar. Clough no doubt stands in a different position, and any knowledge which he possessed of Morrells' fraud must have been acquired by him as the agent of the appellants. In truth, however, he had no such knowledge. He had seen the brochure of which a copy had been given by Morrells to Mrs. Borders on Feb. 1, 1934, but he did not know that any of the statements in it were untrue. If the appellants at that time had been the building society referred to in the brochure, Clough would have known that the statements in it referring to a building society were untrue, but the building society there referred to was an entirely different society, and there is no evidence that Clough knew that the statements referring to that society were untrue. Nor, indeed, is there any evidence that Clough knew that Mrs. Borders had ever seen the brochure. For these reasons, I find myself quite unable to arrive at the conclusion that, when the appellants advanced the £693 to the respondent, they did so with knowledge that she had been induced to purchase her house and garage from Morrells and accept the obligations of a borrower towards the appellants by Morrells' fraudulent representations.

It still remains to deal with the allegation, put forward by the respondent in the amendment of her defence, made with the leave of the Court of Appeal, that the brochure shown to her on Feb. 1, 1934, was issued to her by Morrells with the authority of the appellants. All I can say about this is that I cannot find the slightest evidence of any such authority ever having been given. Even if it be true that

Morrells were the agents of the appellants for the purpose of procuring applications for loans from them by persons who had agreed to purchase houses on the Coneyhall Estate, Morrells would have had no authority merely by reason of such agency to induce applications by making representations as to the value of such houses. It is not within the scope of the authority of an agent of an intending mortgagee to make representations as to the value of the property to the intending mortgagor, nor could any such representations, if made, in any way affect the mind of an applicant to the appellants for a loan. The fraudulent representations of Morrells would have fully accomplished their purpose when they had induced the contract of purchase. The purchaser would require no inducement whatsoever to apply for a loan of 95 per cent. of the purchase money. He would have been only too glad to get it. The truth of the matter is that, if the respondent is to succeed on this aspect of the case, she must show that Morrells were the agents of the appellants, not merely to obtain applications for loans from purchasers, but to induce as many persons as possible to become purchasers. I can find no scrap of evidence to indicate that any such agency as this was ever contemplated either by the appellants or by Morrells. In my opinion, the appeal should be allowed, and I concur in the motion before the House.

LORD PORTER : My Lords, this is an appeal from a decision of the Court of Appeal, who reversed the judgment of BENNETT, J., and held the appellants guilty of fraud and liable in damages. The facts have already been fully stated, and I do not propose to repeat them. The appellants' claim to possession having failed, the only question for your Lordships' consideration is the respondent's claim for damages for fraudulent misrepresentation. Before BENNETT, J., she relied upon the allegation that a representative of the appellants was present at the vital interview on Feb. 9, when, according to the evidence, she was not only shown a brochure, but was orally informed by Morrells' agent that Morrells were the only builders in Great Britain who could offer, by special arrangements with a leading building society, a 95 per cent. mortgage advance over a period of 24 years at 5 per cent. interest, that this fact proved beyond a shadow of doubt the amazing value of Morrells' homes, and that each house was individually inspected by the surveyor of the building society during the course of construction and again when the last coat of paint was finished. Both these allegations were found by BENNETT, J., to be false to the knowledge of Morrells, but in his opinion, the respondent failed in her claim against the appellants because she had failed to establish that any representative of the appellants was present at the interview.

In the Court of Appeal, an entirely new case was made on behalf of the respondent. It was suggested to, and accepted by, that court that the correspondence between the appellants and Morrells leading

up to the pooling agreement showed inevitably that the appellants through their agent Clough knew of, and appreciated, the falsity of the statements contained in the brochure, which had been in their hands since Dec. 1933, and, accordingly, were implicated in Morrells' fraud. The grounds of the decision were that those statements held out the appellants as being prepared to advance an unusually high proportion of the purchase price of Morrells' houses because they were particularly well built, that such a representation was untrue to the knowledge of the appellants, that, though it was originally put forward by Morrells alone, yet the appellants [p. 311] :

. . . associated themselves with the fraud, and are, therefore, responsible for it, for they had knowledge of the false representations, and of their falsity, and they must have known that it was under the influence, and through the inducement, of the false representations that the defendant [the respondent], having originally entered into the contracts with Morrells, was proceeding to complete those contracts, and, as an integral and indispensable part of that completion, accept the obligations of a borrower towards the plaintiffs [the appellants].

For the purpose of raising this point, the Court of Appeal allowed an amendment of the pleadings alleging that the brochure was issued with the authority of the appellants, that its representations were false, and made by the appellants with the knowledge that they were false, or reck-lessly not caring whether they were true or false, that the representations were first made by Morrells with the authority of the appellants on or about Feb. 1, and were in continuous operation until after Sept. 18, 1934, and that the authority is to be found in, or inferred from, the correspon-dence passing between the appellants and their agents and Morrells and their agents during the period from Dec., 1933, to Mar. 6, 1934, and from the brochure itself. They recognised that this claim was not covered by the original pleading, but considered that, as the correspon-dence was certainly discussed, no injustice was done by allowing the claim to be raised in the form adopted by the amended pleadings.

When the case was presented to your Lordships, the appellants argued, as they had argued below, that the letters were no evidence of partici-pation by them in the misrepresentations of Morrells, and that, indeed, there was nothing from which it was to be inferred (i) that Mrs. Borders had seen the brochure, or (ii) that the representations referred to the appellants, or (iii) that, even if the representations were intended by Morrells to refer to the appellants, the appellants knew that they were the building society referred to, or (iv) that in fact they were false at the time they were published, since they may have been true of another building society, or (v) that Clough must inevitably have interpreted them as meaning that his society had agreed to advance an exceptionally large proportion of the contract price on the security of the house alone, or (vi) that the appellants were under any duty to consider the truth or falsity of the statements inserted in the brochure by Morrells for the purpose of selling their houses.

The respondent's representatives, in addition to supporting the judgment of the Court of Appeal, also put her case on a somewhat wider

basis. In their contention, first, Feldmar may have been the agent of the appellants acting within the scope of his authority when he obtained Mrs. Border's signature to a mortgage of the house on Sept. 18, 1934. He had originally discussed the brochure with the respondent, and knew that its statements were false, and that she relied upon them. He therefore knew that she ultimately authorised the advancement of the money and completion of the purchase on the strength of its fraudulent representations. This argument was not pressed, since it was recognised that Feldmar's only authority *vis-a-vis* the appellants was to obtain a signature to the mortgage, not to make or continue representations, and, in any case, knowledge gained by him as representative of Morrells could not be imputed to the appellants. On either view, it was obviously untenable. Secondly, it was argued that Morrells may have been the agents of the appellants acting within the scope of their authority when they induced the respondent on Feb. 9 to agree to purchase the house by false representations.

For the purpose of this argument the connection between Morrells and the appellants was put in a variety of ways. It was said that the business was obtained for both the builders and the appellants, that Morrells had authority to persuade those desiring to purchase houses to apply for loans, and that the forms of application were sent for this purpose, that Morrells were acting in the joint interest of themselves and of the appellants, and that it was a joint adventure. It did not, it was said, make any difference that, when the representations were made to the respondent, the pooling agreement had not been signed. The appellants authorised the obtaining of the applications. They might or might not accept them, but, if accepted, they were none the less obtained on the strength of the false representations in the brochure. I think all your Lordships are agreed that this argument cannot succeed. It depends on proof of Morrells' agency. To my mind, the relation of builder and building society is not that of co-adventurers or agent and principal. The builder desires to provide facilities to enable his clients to borrow part of the money required to complete their purchase. For this purpose, he approaches a building society in order to ascertain what amount they will advance, the security required, and the terms of repayment. The building society are not concerned with the inducements used to persuade the purchaser to buy. So far as the evidence goes, even after signing the agreement, the appellants were under no obligation to lend any money at all, and Morrells were under no duty to obtain business for them. Each was an independent person acting in his own interest. Morrells had not acted as the appellants' agent, but had arranged that their clients should be able to apply to the appellants for a loan on stated terms as to security and repayment, leaving it to the parties concerned to carry out the transactions if they wished. All that the appellants had done was to forward a set of forms so that Morrells' clients might, if they desired, apply to them for a loan

on the terms which had been arranged between Morrells and the appellants as terms upon which the latter would be willing to advance part of the price of the house to the buyer if in an individual case they decided to do so. No evidence was given from which it appeared either that

**A** Morrells were under an obligation to request their clients to apply to the appellants, or to the appellants in preference to any other society, or that the appellants were obliged to grant a loan if and when an application was made, nor were the appellants concerned to consider or inquire into the truth of any allegations made by the builders, or to analyse the

**B** statements in the brochure. Their part begins at a later stage. If a would-be purchaser, having satisfied himself as to what he was buying, came to them for a loan, they would then consider the advisability of making an advance to him, trusting to the security of the house as reported on by their surveyors, together with the pool and the personal

**C** liability of the borrower. They neither persuaded nor authorised Morrells to persuade her to buy. On this broad ground, I should reject the respondent's argument under this head, but I think that there is a narrower ground on which also your Lordships should refuse to accede to it. Even if, in a case where fraud is alleged, so drastic an amendment

**D** of the statement of claim as that allowed by the Court of Appeal is permissible, yet in the present case I doubt whether the conclusion reached in that court is covered by the pleading. I see no evidence to support the allegation that the brochure was issued by Morrells on Feb. 1 with the authority of the appellants.

**E** Thirdly, it was argued that, if neither Feldmar nor Morrells were agents of the appellants, the respondent, if she is to hold the judgment she has obtained, is thrown back on the argument which succeeded in the Court of Appeal—namely, that Clough knew that the representations had been made in order to induce Mrs. Borders to buy, knew

**F** that they were false and that she had been so induced, and that she would not have borrowed the money to complete the transaction had she known of the falsity. At that date there was no established relationship between the appellants and Morrells. They were merely negotiating. In such circumstances, I cannot see any ground for imputing

**G** to the appellants the giving of an authority to issue a book with which they were not then, and might never be, concerned. To this extent, the fact that the pooling agreement had not then been finally agreed or signed is important.

Whatever success might attend this argument if the necessary facts

**H** could be established, I think that it fails for want of proof. It has to be remembered that originally no claim was made on this basis, and, though the brochure and Clough's reactions to it were incidentally discussed in the course of the trial, his mind was not directed to such a point, nor was a charge of fraud made against him. Indeed, there is no reason for believing that BENNETT, J., considered him to be fraudulent. The brochure was printed and issued before the appellants came on the

scene. Its representations originally applied to another building society. It was not for the appellants to suspect its falsity with regard to that society, of whom it might have been true. Nor did the appellants know that it had been shown or representations similar to those contained in it made to the respondent. Even though, as was suggested on her behalf, Morrells had already determined to persuade her to use the facilities offered by the appellants, there was no evidence that the appellants, if they thought about the matter at all, had any reason to suppose that such representations had in fact been made or the brochure shown. However, assuming that Clough knew that Mrs. Borders had been shown the brochure, I do not think that he would necessarily think its statements false. The substantial complaint was that the building society referred to was willing to advance 95 per cent. of the balance of the purchase money on the security of the house alone because it was so well built. A lawyer interpreting the document would no doubt realise that that was its true construction, but I am not sure that a layman would do so, and I see no reason for supposing that a layman who was not directly concerned with the statements would so interpret them. When the exact wording was pointed out to Clough and its suggested application to his society brought to his mind, he saw its falsity at once, but, as I understand his evidence, he did not so interpret it until that time. Indeed, his evidence goes further. He never thought of his society in connection with the representations, or considered them at all. He neither recognised them as applying to the appellants nor thought of them as false or recklessly made, nor, indeed, regarded his society as putting them forward. The claim is for damages for fraudulent misrepresentation, not for recission. In such a case, proof of fraud is, of course, essential if the respondent is to succeed, and, as *Derry* v. *Peek* (4), shows it is not enough that a representation is in fact false when rightly understood. Its falsity must be apprehended by the party charged, if fraud is to be imputed to him.

For the reasons I have given, I think that the respondent must be considered to have failed in proving either that Clough was fraudulent or that the appellants were implicated in the fraud of Feldmar or Morrells. Her counterclaim accordingly fails, and, in my view, the appeal should be allowed. In reaching this conclusion, I have not found it necessary to determine what would be the result in a case where, in an action for damages for deceit, defendants who were accused of fraud had honestly made, either themselves or through agents, representations which they then believed to be true but which afterwards became false to their knowledge. The question has been touched upon by COLLINS and LINDLEY, L.JJ., in *Arkwright* v. *Newbold* (3), pp. 325, 329. It was not finally decided by them, and need not be decided here. Nor have I reached any conclusion upon the question whether the appellants would be under any liability if they had been proved to have become aware of Morrells' fraud before they advanced their loan. The solution of that

problem also may await another occasion. However, although the result is to reverse the decision of the Court of Appeal, the facts of the case do, I think, exemplify a danger to which purchasers of houses on building estates developed by speculative builders were exposed. However honest a building society, it is undesirable that representations affecting its loans should be made by dishonest builders, or even that purchasers should imagine without any representations that the granting of a large proportion of the price of the house on loan is evidence of its value. This danger, however, has now been met by the Building Societies Act, 1939, the provisions of which do much to decrease such risks as this case has disclosed.

*Appeal allowed with costs.   Counterclaim dismissed with costs.*

Solicitors : *H. Boustred & Sons*, agents for *J. Eaton & Co.*, Bradford (for the appellants) ; *W. H. Thompson* (for the respondent).

[*Reported by* C. St.J. Nicholson, Esq., *Barrister-at-Law.*]