Exhibit G

Case 1:07-cv-07032-RMB-KNF Document 22-5 Filed 11/30/2007 Page 2 of 39



WILLIAM PEEK . . . . . . . . . . . APPELLANT;

AND

J. H. GURNEY, H. E. GURNEY, ROBERT BIRKBECK, H. F. BARCLAY, H. G. GORDON, W. RENNIE, T. J. GIBB AND J. D. GIBB, THE OVEREND & GURNEY COMPANY AND W. TURQUAND, AND R. P. HARDING, THE LIQUIDATORS . . . . . RESPONDENTS.

1873
June 19, 20, 24, 26, 27; July 10, 31.

*Company—Prospectus—Allottee—Purchaser of Shares.*

The proper purpose of a prospectus of an intended company is to invite persons to become allottees of the shares, or original shareholders in the company. When it has performed this office it is exhausted.

A prospectus of an intended company ought not to misrepresent actual and material facts, or to conceal facts material to be known, the misrepresentation or concealment of which may improperly influence and mislead the mind of the reader, for if he is thereby deceived into becoming an allottee of shares, and, in consequence, suffers loss, he is entitled to proceed against those who had thus misled him. But the responsibility of directors who issue a prospectus for an intended company misrepresenting actual and material facts, or concealing facts material to be known, does not, as of course, follow the shares on their transfer from an allottee to his vendee. In order that this third person, the vendee, should be enabled to maintain any proceeding at Law, or in Equity, against the directors in respect of losses occasioned by his belief in the prospectus and his consequent procurement of shares, he must shew some direct connection between them and himself in the communication of the prospectus, and its influence upon his conduct in becoming an allottee: *Seymour* v. *Bagshaw* (1) and *Bedford* v. *Bagshaw* (2) overruled. *Scott* v. *Dixon* (3) and *Gerhard* v. *Bates* (4) explained and adopted.

The rule as to delay in seeking for compensation for losses thus occasioned is, in Common Law proceedings, that which is prescribed by the *Statute of Limitations*, and the rule in Equity follows by analogy that of the Law. Where, therefore, a person became possessed of shares in October, 1865, and the company was ordered in June, 1866, to be wound up, and he contested his liability to be made a contributory, but was, in July, 1867, declared liable as such, and in March, 1868, filed his bill against the directors to be indemnified by them:—

*Held*, that delay could not be set up as an answer to the suit.

The proceeding in such a case is like an action at law for deceit (the

(1) 18 C. B. 903; 29 L. J. (Ex.) 62, n.
(2) 4 H. & N. 538; 29 L. J. (Ex.) 59.
(3) 29 L. J. (Ex.) 62, n.
(4) 2 El. & Bl. 476.

1873

PEEK v. GURNEY.

same principle being applicable in such a matter both at Law and in Equity), and is therefore of a personal character, and the estate of a deceased director not being alleged and proved to have received benefit from the deceit, his executors cannot be made liable to compensate the person who asserts that he has been injured by it.

One of the projectors of a company, a partner of the old firm which sold its business to the company, set up as a defence that he had not taken part in preparing or issuing the prospectus; he knew, however, all that the other directors knew, consented to become a director of the company, signed the memorandum and articles of association, and shares were appropriated to him:

*Held*, that under these circumstances he could not avail himself of this defence.

*Per* LORD CAIRNS:—Mere non-disclosure of facts, unless such non-disclosure had the effect of making the disclosed facts absolutely false, would not be sufficient to sustain a proceeding which was really in the nature of an action for misrepresentation.

A prospectus for an intended company was prepared by the projectors (the directors of the company), and issued by them to the public: it contained misrepresentations of facts, facts known to those who issued it, and it also concealed the existence of a deed, which was material to be known, and which, if known, would, in all probability, have prevented the formation of the company. Being addressed to the whole public, any one might take up the prospectus and appropriate to himself its representations, by applying for an allotment of shares:—

*Held*, that when the allotment was completed the office of the prospectus was exhausted, and that a person who had not become an allottee, but was only a subsequent purchaser of shares in the market, was not so connected with the prospectus as to render those who had issued it liable to indemnify him against the losses which he had suffered in consequence of his purchase.

THIS was an appeal against a decree of the Master of the Rolls, by which the Appellant's bill had been dismissed with costs (1).

The Appellant, when the *Overend & Gurney Company* was ordered to be wound up, was the holder therein of 2000 shares, in respect of which he was placed on the list of contributories, and his liability to be so was confirmed by a decision of this House (2).

The history of the company has already been fully given in the previous reports of this case. The following brief summary of the facts is all that is now necessary to be stated.

The company was formed in July, 1865, and the prospectus then issued. The business was begun on the 1st of August, 1865. The Appellant was not an original allottee, but purchased his shares in the market in the months of October and December of that year.

(1) Law Rep. 13 Eq. 79. (2) Law Rep. 2 H. L. 325.

On the 10th of May, 1866, the company stopped payment. On the 11th of June a resolution was passed to have a voluntary winding-up, and on the 22nd of June the usual order for such winding-up, under supervision of the Court, was made. The Appellant who had been by this House, in July, 1867, declared to be liable as a contributory, and had paid nearly £100,000 on his shares under this winding-up, filed his bill in March, 1868, against the then directors, and against the executors of *Thomas Augustus Gibb*, who had been a director at the time of issuing the prospectus, but had died in November, 1866. The bill alleged misrepresentation of facts and concealment of facts on the part of the directors in the prospectus they issued, by which the Appellant had been induced to purchase shares and had been damnified, and he sought indemnity from the estates of the directors.

The Master of the Rolls had held that if he had been an original allottee, and had come in due time, he would have been entitled to such indemnity, but that he was debarred of his remedy on the grounds, first, that he was in no better position than the allottee from whom he had bought, and secondly, that he had come too late for relief. His bill was therefore dismissed with costs (1). Against that dismissal this appeal was brought.

Mr. *Kay*, Q.C., and Mr. *Swanston*, Q.C. (Mr. *Jolliffe* was with them), for the Appellant:—

Fraud is clearly established by the evidence in this case; but actual fraud is not necessary in order to give a ground for relief in Equity. The statements in the prospectus were not only calculated, but were intended, to deceive. These statements were made, and meant, to have effect on all who should read the prospectus, and there was no thought of limiting the effect of that prospectus within a certain time, or of confining it to a certain class of readers. The object of those who framed it was the reverse. The allottees would, of course, be those who were first deceived by it, but the intention to deceive was not confined to them alone. Those who

(1) The facts of the case and the arguments are so fully stated in the report in the Court below, that it has been deemed only necessary here to give them in a very abridged form, the more so as the judgment related principally to the rights of a purchaser from an allottee.

1873
PEEK
v.
GURNEY.

purchased from these first allottees would be persons who, like them, were deceived by the misrepresentations in the prospectus, the circulation of which, so far from being confined to the first allottees, was never for one moment suspended, but was pertinaciously kept up. The evidence here shewed not merely concealment of what ought to have been stated, but wilful misrepresentation of what was the actual state of facts.

There could be no doubt about the intention of the parties when it was recollected that there had been a very careful concealment of one of the deeds, which deed, deemed by the concoctors of the scheme to be absolutely necessary to enable them to carry the scheme into effect, had it been known to the public, would have prevented entirely the formation of the company. The mischief done was like that occasioned by a person throwing a lighted squib into a crowd, not one particular person but any or all might suffer from it; it was therefore an act for which, wherever it occasioned mischief, the wrongdoer was by law held responsible to the person injured. That was the rule of Law, and the same rule must exist in Equity. And Equity has clearly authority in such a case to afford relief to the injured party.

As to *Barclay*, he was as well informed as any one else on the facts of the case, and with that full information, though he might not have joined in actually preparing the prospectus, he joined in doing all that was required for getting up this company, and selling the insolvent business of the partnership to the company as a solvent business, and in fraudulently representing it to be a flourishing business. This was done when those who concocted the whole scheme knew it to be hopelessly insolvent.

As to *Gibb*, this was not like a case of a mere personal wrong, an assault for instance, it was a matter relating to property, and *Gibb* having by his conduct, assisted in occasioning a loss of property to the Plaintiff, his estate was bound to assist in compensating him.

There had been no wrongful delay in this case. As soon as the real nature of the matter and of the Appellant's liability were known the bill was filed to seek indemnity.

The cases cited in argument for the Appellant were the following *New Brunswick and Canada Railway Company* v. *Muggeridge* (1),

(1) 1 Dr. & Sm. 363, 381.

where Vice-Chancellor *Kindersley* laid down the rule as to the duty of those who issued a prospectus inviting the public to take shares on the faith of representations therein made, that such representations must be made "with strict and scrupulous accuracy," a rule which Vice-Chancellor *Wood*, in *Henderson* v. *Lacon* (1), described as "a golden legacy" left to the public, and which was expressly adopted by Lord Chancellor *Chelmsford*, in the *Venezuela Company* v. *Kisch* (2). The principle thus stated had been both before and since recognised in *Oakes* v. *Turquand* and *Peek* v. *Turquand, In re Overend & Gurney* (3); *Pasley* v. *Freeman* (4); *Burnes* v. *Pennell* (5); *Evans* v. *Bicknell* (6); *Burrowes* v. *Lock* (7); *Slim* v. *Croucher* (8); *Rawlins* v. *Wickham* (9); *Colt* v. *Woollaston* (10); *Barry* v. *Croskey* (11); *Ramshire* v. *Bolton* (12); *Ogilvie* v. *Currie* (13); *Clarke* v. *Dickson* (14); *Tapp* v. *Lee* (15); *Foster* v. *Charles* (16); *Chandelor* v. *Lopus* (17); *Ingram* v. *Thorp* (18); *Barwick* v. *English Joint Stock Bank* (19); *Bedford* v. *Bagshaw* (20); *Bagshaw* v. *Seymour* (21); *Duranty's Case* (22); *Gerhard* v. *Bates* (23); *Blain* v. *Agar* (24); *The Western Bank of Scotland* v. *Addie* (25); *Walsham* v. *Stainton* (26); *Davidson* v. *Tulloch* (27); *Scott* v. *Dixon* (28); *Levy* v. *Langridge* (29).

The *Solicitor-General* (Sir *G. Jessel*), Mr. *Macnaghten*, and Mr. *C. S. Medd*, appeared for *Rennie*.

(1) Law Rep. 5 Eq. 249, 262.
(2) Law Rep. 2 H. L. 99–113.
(3) Ibid. 325.
(4) 3 T. R. 51.
(5) 2 H. L. C. 497.
(6) 6 Ves. 174.
(7) 10 Ves. 470.
(8) 1 De G. F. & J. 518.
(9) 3 De G. & J. 304.
(10) 2 P. Wms. 154.
(11) 2 J. & H. 1.
(12) Law Rep. 8 Eq. 294.
(13) 37 L. J. (Ch.) 541.
(14) El. Bl. & El. 148; and again, 6 C. B. (N.S.) 453.
(15) 3 Bos. & Pul. 367.
(16) 6 Bing. 396; and again, 7 Id. 105.
(17) Cro. Jac. 4; 1 Sm. L. C. 140, and n.
(18) 7 Hare, 67.
(19) Law Rep. 2 Ex. 259.
(20) 4 H. & N. 538; 29 L. J. (Ex), 59.
(21) 18 C. B. 903; 29 L. J. (Ex.), 62, n.
(22) 26 Beav. 268.
(23) 2 El. & Bl. 476.
(24) 1 Sim. 37; 2 Sim. 289.
(25) Law Rep. 1 H. L., Sc. 145.
(26) 1 D. J. & S. 678.
(27) 3 Macq. Sc. Ap. 783.
(28) 29 L. J. (Ex.) 62, n.
(29) 4 M. & W. 337.

Mr. *Roxburgh*, Q.C., Mr. *Lindley*, Q.C., and Mr. *Graham Hastings*, for *J. H. Gurney*, *H. E. Gurney*, and *R. Birkbeck*.

Mr. *Fry*, Q.C., Mr. *Jackson*, Q.C., and Mr. *Sayer*, were for *H. F. Barclay*.

Mr. *Fooks*, Q.C., and Mr. *W. Fooks*, were for *H. G. Gordon*.

Sir *R. Baggallay*, Q.C., and Mr. *Macnaghten*, were for the executors of *Gibb* (1):—

The relief sought in this case can only be granted on the ground of fraud, and there was no fraud here.

Misrepresentation is denied. The statements made were fair, and the belief expressed on the prospectus, though ultimately disappointed, was, at the time, truly entertained. But even assuming that there had been misrepresentation, there had been none made to the Appellant. There had been no communication between him and the directors. He had not taken shares on the faith of the statements made in the prospectus—he, acting no doubt upon general opinion, bought them in the open market a long time after the prospectus had been issued, and its direct operation had come to an end. There was, indeed, nothing to connect his purchase with the prospectus, or with those who issued it. Whatever, therefore, might have been alleged by an original allottee against the representations in the prospectus (which, however, the Respondents insisted to have been fair and proper), they could not be put forward as those on which the Appellant had been induced to purchase shares. Under these circumstances he could not have maintained on this prospectus an action at law for deceit; for he could not have connected himself with the prospectus or with those who issued it, nor could he shew that he had been deceived by anything they had done. If so, then it was quite clear that he could not come into equity to ask for what the very principles of the law—not its mere forms of procedure—would not allow him to obtain. No representation whatever had been made by the directors to this Appellant, who consequently had no title whatever to

(1) The arguments for the Respondents were, on the general question of the right of the Appellant to claim relief, similar in each case, except as to the executors of Mr. *Gibb*, who insisted that his estate, in their hands, was not liable. The argument as to delay was not pressed.

come against them for compensation. The bill asked for relief on the ground of fraud; no fraud had been substantiated, and therefore no relief on any other ground could now be asked.

As to *Gibb*, the demand for relief could not be supported. Even if wrong had been committed by the whole body of directors, of which he was only an individual member, his estate could not be made liable. If there had been any fraud, then the commission of it was a personal act of wrong, for which he who committed it would be liable during his life, but the liability would not descend to his representatives, who were wholly innocent of it. And here, too, there was not a pretence for saying that, supposing the wrong to have been committed, there had been any benefit whatever accruing to the estate of him who had committed it. The estate, therefore, could not be made liable.

As to *Barclay*, he had not taken any part in issuing the prospectus, and therefore, could not be made liable for any losses that it might be alleged to have produced.

The cases cited for the Appellant were commented on and sought to be distinguished, and the following cases were, in addition, referred to by the Respondent's counsel: *Kerr* on Frauds (1), shewing that the *caveat emptor* principle applied here; *Ship* v. *Croskill* (2); *The Land Credit Company of Ireland* v. *Lord Fermoy*, on appeal (3); *Houlton's Case* (4); *Powell* v. *Aiken* (5); *Davidson* v. *Tulloch* (6); *Lansdowne* v. *Lansdowne* (7); *Moore* v. *Burke* (8); *Cullen* v. *Thomson* (9); *Keates* v. *Cadogan* (10); *Hambly* v. *Trott* (11); *Bishop of Winchester* v. *Knight* (12); *Joint Stock Discount Company* v. *Brown* (13).

Mr. *Kay* replied.

LORD CHELMSFORD :—

This is an appeal from a decree of the Master of the Rolls, in a suit in which the Appellant was Plaintiff and the Respon-

(1) Page 274.
(2) Law Rep. 10 Eq. 73.
(3) Law Rep. 5 Ch. Ap. 763.
(4) 1 Mer. 616.
(5) 4 K. & J. 343, 352.
(6) 3 Macq. Sc. Ap. 783.
(7) 1 Madd. 116.
(8) 4 F. & F. 258.
(9) 4 Macq. Sc. Ap. 424.
(10) 10 C. B. 591; 20 L. J. (C.P.) 76.
(11) Cowp. 371.
(12) 1 P. Wms. 406.
(13) Law Rep. 8 Eq. 381.

1873

PEEK v. GURNEY.

dents were Defendants, dismissing the Appellant's bill without costs.

The bill prayed in substance that the Respondents, the directors of the company called the *Overend & Gurney Company*, and the Respondents, the Messrs. *Gibb*, the executors of a deceased director, might be decreed to make good to the Appellant or indemnify him against the loss which he had sustained by reason of his having become the purchaser of 2000 shares in the company, and having been, as he alleged, deceived and misled by a prospectus put forth by the Respondents and the deceased director, containing several misrepresentations and suppressions of material and important facts, with a view to deceive and mislead the public, and the Appellant as one of the public.

The Master of the Rolls dismissed the Appellant's bill, solely on the ground of his delay in instituting proceedings; but he dismissed it without costs, because in his opinion "the directors were guilty of gross misconduct in concealing the insolvency of the old firm" (1) of *Overend & Gurney*.

Upon the argument of this appeal, the Respondents very properly declined to insist upon the point of delay as an answer to the Appellant's suit. The Master of the Rolls proceeded upon the principle, established by many decided cases, that an allottee, or purchaser of shares in a company, who seeks to divest himself of his shares upon the ground of having been induced to purchase them by misrepresentation, cannot be relieved if he has continued to hold the shares without objection after knowledge, or with the full means of knowledge, of the falsehood by which he has been drawn in to acquire them. These cases proceeded upon the ground of acquiescence, and on the application of a more general principle that an agreement induced by fraud is not absolutely void, but that it is entirely in the option of the person defrauded whether he will be bound by it or not. The suit in the present case is not for the rescission of the contract, but is founded upon the loss the Appellant has sustained, and may sustain, in consequence of his being bound by the contract he has entered into. It is a proceeding similar to an action at law for deceit; and the only amount of delay which could be a bar to relief is fixed by the *Statute of*

(1) Law Rep. 13 Eq. 121.

*Limitations*, by analogy to which equity generally proceeds in questions of laches.

The questions to be determined upon this appeal are,

Firstly, whether the Respondents ought to be decreed to indemnify the Appellant for the loss he has sustained upon the shares he was induced to purchase by reason of their misrepresentation or concealment of facts material to be known? Secondly, supposing the directors to be liable, whether the remedy of the Appellant extends to the executors of the deceased director, Mr. *Gibb*? Thirdly, whether, as the Appellant was not an original allottee, but a purchaser of shares in the market, any injury he has sustained by becoming a holder of the shares is not too remote to entitle him to relief against the Respondents?

In dealing with the first question, it will not be necessary to enter into a minute detail of the affairs of the firm of *Overend & Gurney*, who had for many years carried on a most extensive business as bill brokers and money dealers, with the highest credit and reputation in the commercial world.

With the exception of the panic year, 1857, their business had, prior to the year 1860, been carried on profitably; but from 1861 to 1865 no profits were divided. This is attributed to a departure from the legitimate business (as it is called) of the firm, by making advances to various persons upon securities of a speculative and uncertain character, these doubtful advances amounting to upwards of £4,000,000 sterling. But even upon bills discounted in the regular course of the legitimate business of the firm during the above four years, there had been losses averaged at £32,532 per annum, but which is said to have included one year (1864) of very unusual pressure. This state of things occasioned great anxiety, and led to a careful investigation of the affairs of the firm; when it appeared from the books that there were outstanding debit balances to the above amount of £4,000,000 and upwards: but it was estimated that of this sum £1,082,000 would be realized; leaving a sum of upwards of £3,000,000 to be provided for. No doubt the firm was in a hazardous condition. Possibly, by care and circumspection in the future management of the business, the affairs might have been brought round. But the partners, as it is said, "after mature deliberation, considered it desirable that the

1873
PEEK
v.
GURNEY.

business should be strengthened by the introduction of fresh capital, and in the result it was determined that such object should be accomplished by the formation of a joint stock company."

It cannot be denied that if the condition of the firm of *Overend & Gurney* had been disclosed the result must have been their stoppage, and no hope could have been entertained of establishing a joint stock company upon the basis of a concern in such a state. The foundation of the projected company was therefore necessarily laid in concealment; and to render the scheme attractive to the public the promoters were not only compelled to hide the truth, but to give such a colour to the statements put forth in the prospectus as to render them (though perhaps literally true), yet, in the sense in which they must have known the statements would be understood by the public, really false.

The arrangement for the establishment of the company was carried out by two deeds, both dated and executed on the 27th of July, 1865, though only one of them was referred to in the prospectus issued on the 12th of July as "the deed of covenant" which might be inspected at the offices of the solicitors of the company.

By this deed the firm of *Overend & Gurney* agreed to sell, and the limited company agreed to purchase, the business of bill brokers and money dealers, for the sum of £500,000; the sum of £250,000, one moiety, to be paid or treated as paid, by being brought into account as being paid, in cash on the day of completion, and the other moiety to be paid, or treated as paid, by the limited company issuing to the firm of *Overend & Gurney* 16,666 shares of £50 each, on which £15 per share were to be treated as paid up, and allowed on account between the vendors and purchasers. And it was agreed that the limited company should be entitled to have the price or sum of £500,000 applied and made available by way of material guarantie in aid of and for the purpose of ensuring the performance of the covenants of the vendors.

The other deed, called the deed of arrangement, was never made known to the public, but was alleged in argument by the Appellant's Counsel to have been studiously concealed. By this deed it was arranged that during a period, called the "suspense period," from the 31st of July, 1865, to the 31st of December, 1868, a

suspense and guarantie account should be opened and debited with the balance of the excepted accounts (meaning the outstanding accounts, debts, liabilities, transactions, matters, affairs, and things connected with the business of the old firm), which the directors of the limited company should deem it desirable or expedient to be wound up, settled, or arranged by the old firm itself.

This suspense and guarantie account was to be credited with £250,000, the moiety of the sum to be paid for the transfer to the limited company of the business of the old firm, and also with the dividends payable in respect of the 16,666 shares, and with all sums of money received upon the sale of any of these shares.

By this deed the complete liquidation of the excepted accounts, which were to be wound up by the old firm, was limited to a period of three and a half years.

In these circumstances, where so much was to be concealed and so much varnished over to tempt the public to join the proposed company, the prospectus was prepared. It was drawn up by *John Henry Gurney*, and discussed and considered by all the persons who were afterwards directors, except Mr. *Barclay*.

It is unnecessary to consider in detail the alterations which were made in the original draft; but one of them appears to me to deserve some attention. In the proposed prospectus there was a statement that the existing liabilities of the old firm which might be taken over by the company would be "most amply and satisfactorily guaranteed." It was suggested that these latter words should be omitted, and their place supplied by the words "under the guarantie of the vendors." And the prospectus accordingly runs thus: "The vendors guaranteeing the company against any loss on the assets and liabilities transferred." This seems to be an indication of the opinion of the intended directors, who knew all the facts, and who, I assume, were desirous of making the statements in the prospectus as conformable to the truth as possible, that they could not truly represent the guarantie of the old firm to be an ample and satisfactory one. It is, however, sufficient to remark that the prospectus was not framed, in the terms in which it was issued, carelessly or inconsiderately, but designedly and after deliberation.

It does not appear that the old firm had at this time lost any of

its estimation with the public, and the well-known name in capitals at the head of the prospectus was likely to possess no inconsiderable attraction.

The prospectus is ushered in with the following statement: "The company is formed for the purpose of carrying into effect an arrangement which has been made for the purchase from Messrs. *Overend, Gurney, & Co.* of their long-established business as bill-brokers and money dealers, and of the premises in which the business is conducted, the consideration for the goodwill being £500,000, one half being paid in cash, and the remainder in shares of the company, with £15 per share credited thereon, terms which, in the opinion of the directors, cannot fail to ensure a highly remunerative return to the shareholders." This is followed by the statement already adverted to of "the vendors guaranteeing the company against any loss on the assets and liabilities transferred."

Now, what would be understood by any person reading these representations? Unquestionably that the old firm was a sufficiently flourishing concern for the goodwill of the business to be worth half a million, and that the proposed company, being guaranteed against any loss on the assets and liabilities transferred, the terms agreed upon for the transfer of the business could not fail to ensure a highly remunerative return to the purchasers. At this time the old firm was insolvent to the extent of £3,000,000, and the goodwill of the business was really not worth one farthing.

It is said that every statement in the prospectus is, literally, true; that the sum of £500,000 was actually the sum agreed to be paid as the consideration of the transfer of the business of the old firm; and that the company had really the guarantie of the vendors against any loss on the assets and liabilities of the firm. I am compelled, however, to question even the literal truth of the representation that the consideration for the goodwill was £500,000, one half being paid in cash, and the remainder in shares of the company. This imports, of course, that payment of the £250,000 was to be really made to the partners in the old firm, and the shares to be delivered to them for their own benefit. But so far was this from being the case, that under the deed of arrangement (the deed not referred to in the prospectus), instead of the £250,000 being paid to the partners, it was to be paid to the

limited company, and the suspense and guarantie account was to be credited with that amount in discharge of so much of the liabilities of the old firm; and with regard to the shares (the other moiety of the consideration), all benefit derived from them by the partners in the old firm was to be carried to the credit of the same account. Upon these facts was it true, even in a literal sense, that the consideration for the business was to be paid to the old firm of *Overend & Gurney*, one half in cash and the remainder in shares? If not, then undoubtedly there was a misrepresentation, for which the Respondents would be liable.

But the case must be examined with reference to the charge which is made against the Respondents of having concealed material facts, by which the Appellant alleges that he was deceived and drawn in to the purchase of his shares in the company. It was argued on his behalf that the concealment of material facts which a person is bound to communicate may be the ground of an action for deceit and of a suit for relief in equity. The concealment in the present case was of the all-important fact of the true state of the affairs of the old firm, which, if they had been disclosed, the wildest speculator would have turned away from a proposal to build a company on such a foundation. That there was a moral obligation upon the Respondents not to put forward a scheme which depended for its success upon keeping the public in ignorance, of what ought in fairness to have been made known to them, no one can doubt. It is said that the directors entertained a *bonâ fide* belief that the company would be a prosperous and profitable undertaking, and they evinced the sincerity of their belief by all of them becoming holders of shares to a considerable amount; but they knew that the company could not possibly be upheld without the introduction of fresh capital, and that this fresh capital could only be obtained by concealing the real condition of the old firm; and however they might be convinced that, with additional capital and a careful and prudent management, the affairs of *Overend & Gurney* might be brought round, and afterwards a profitable business be carried on, yet as this was an experiment which was to be made with the money of other persons as well as their own, they were bound to give all those other persons such information as they themselves possessed, to enable a competent

1873
PEEK
v.
GURNEY.

judgment to be formed as to the prudence of joining the proposed company.

The question, however, is not as to the moral obligation of the Respondents, but whether their intentional concealment, from whatever motive, of a fact so material that if it had been made known no company could have been formed, renders them liable to an action for damages, or to the analogous proceeding in equity, by the Appellant, who was led by it to purchase shares in the company, by which he has been subjected to a most serious loss.

This case is entirely different from suits instituted either to be relieved from, or for the enforcement of, contracts induced by the fraudulent concealment of facts which ought to have been disclosed; nor does it resemble such cases as *Burrowes* v. *Lock* (1) and *Slim* v. *Croucher* (2), where a person making an untrue representation to another, about to deal in a matter of interest upon the faith of that representation, has been compelled to make good his representation, whether he knew it to be false, or made it through forgetfulness of the fact. It is a suit instituted to recover damages from the Respondents for the injury the Appellant has sustained by having been deceived and misled, by their misrepresentations and suppression of facts, to become a shareholder in the proposed company, of which they were the promoters. It is precisely analogous to the common law action for deceit. There can be no doubt that Equity exercises a concurrent jurisdiction in cases of this description, and the same principles applicable to them must prevail both at Law and in Equity.

I am not aware of any case in which an action at law has been maintained against a person for an alleged deceit, charging merely his concealment of a material fact which he was morally but not legally bound to disclose. The case of *Keates* v. *Earl Cadogan* (3) may be mentioned as an authority to the contrary. There it was held upon demurrer that an action for deceit would not lie against the owner of a house, who knew it to be in a ruinous and unsafe condition, for not disclosing the fact to a proposed tenant, who wanted the house for immediate occupation. In the course of the argument a case of *Hill* v. *Gray* (4) was cited, where the agent for

(1) 10 Ves. 470.
(2) 1 De G. F. & J. 518.
(3) 10 C. B. 591.
(4) 1 Stark. 434.

the sale of a picture, knowing that the vendee laboured under a delusion (as it is called) that the picture was the property of Sir *Felix Agar*, did not remove it, and Mr. *Gray*, under this misapprehension, purchased the picture. Lord *Ellenborough*, upon proof of these facts, said: "The case has arrived at its termination, since it appears that the purchaser laboured under a deception, in which the agent permitted him to remain, on a point which he thought material to influence his judgment." It is to be observed that *Hill* v. *Gray* was not an action for deceit, but was brought by the owner of the picture against the purchaser upon the contract; and Chief Justice *Jervis*, in his judgment in *Keates* v. *Earl Cadogan* (1), took some pains to shew that there was something more in the case than mere concealment, and what amounted (as he called it) to aggressive deceit on the part of the agent of the seller. After quoting the following words of Lord *Ellenborough*: "The agent ought not to have let in a suspicion on the part of the purchaser which he knew enhanced the price; he saw that the Defendant had fallen into a delusion in supposing the picture to be Sir *Felix Agar's*, and yet he did not remove it," he added, "That shews something like an act done." It may be questionable whether this effect could properly be given to the silence of the agent; but the attempted explanation shews the anxiety of Chief Justice *Jervis* to reconcile *Hill* v. *Gray* with the judgment of the Court in the case before it—that the mere non-disclosure, by the owner of the house, of its ruinous state was no ground for an action for deceit.

Assuming that mere concealment will not be sufficient to give a right of action to a person who, if the real facts had been known to him, would never have entered into a contract, but that there must be something actively done to deceive him and draw him in to deal with the person withholding the truth from him, it appears to me that this additional element exists in the present case. The concealment of the insolvent state of the old firm of *Overend & Gurney* was absolutely essential towards the formation of the limited company, and the Respondents not merely were silent as to this important fact, but actively represented that the firm was in such a flourishing condition that the goodwill of the business was worth half a million. It is said that the prospectus is true as

(1) 10 C. B. 591, 600.

far as it goes, but half a truth will sometimes amount to a real falsehood; and I go farther and say, that to my mind it contains a positive misrepresentation. The language of the prospectus must be read in the sense in which the Respondents must have known it would be understood. In that sense it is not true (as already observed) that the sum of £500,000, the consideration for the business, was paid to the old firm in cash and in shares; for the whole of it was to be applied in liquidation of the enormous debt of that firm, the existence of which was designedly kept from the public, to whom the prospectus was addressed. I cannot doubt that there was, beyond the passive concealment of the state of the affairs of the old firm, an active misrepresentation of the truth by the Respondents, for which they were answerable either at Law or in Equity.

It is hardly necessary to consider the separate case of Mr. *Henry Ford Barclay*, which was disposed of by the observations made in the course of the argument on his behalf. It was contended that he was not liable for any misrepresentations in the prospectus, as he never took any part in preparing or issuing it, or gave any express authority to prepare or issue it, and never saw the prospectus till after it was issued and sent to him, or read it till after the stoppage of the company.

But the short answer to his defence is, that he was acquainted with all that the other directors knew; he consented to become a director knowing that a prospectus would, as a matter of course, be issued; he signed the memorandum and articles of association referred to in the prospectus; and upon receipt of the prospectus he filled up and signed the form of application for shares, printed with and forming part of the prospectus. Can he, upon these facts, be heard to say that he did not authorize the prospectus or sanction its publication?

The second question is, whether if the Appellant is entitled to maintain his suit against the Respondents, his remedy extends to the executors of the deceased director, Mr. *Gibbs*? On their behalf it is contended that this is a proceeding to recover damages for a wrong done, and that the maxim *actio personalis moritur cum personâ* applies.

There can be no doubt that if an action at law had been brought

1873
PEEK
v.
GURNEY.

by the Appellant instead of this proceeding in equity, the executors could not have been made liable; and in the exercise of a concurrent jurisdiction by Courts of Law and Equity, both Courts (as already intimated) ought to proceed upon the same principles.

Now this is not like the cases referred to in argument of the *Bishop of Winchester* v. *Knight* (1) and the *Marquis of Lansdowne* v. *Marchioness of Lansdowne* (2), where the wrong complained of benefited the estate of the testator, and on that account the executors were made liable. The same liability arises and on the same ground in Courts of Law. As Lord *Mansfield* said in *Hambly* v. *Trott* (3): "Where property is acquired which benefits the testator, there an action for the value of the property shall survive against the executor. As, for instance, the executor shall not be chargeable for the injury done by his testator in cutting down another man's trees, but for the benefit arising to his testator for the value or sale of the trees, he shall."

Mr. *Gibbs*' estate derived no benefit from the misrepresentation to which he was a party, and therefore his executors, who can only be answerable for his acts in respect of his estate, cannot be made liable for the wrong done to the Appellant.

The learned counsel for the Appellant was asked in the course of the argument whether there was any case in which equity had made personal representatives liable for damages, for a personal wrong, which might have been obtained against their testator. To which no satisfactory answer was given.

The cases mentioned in argument, where executors were made answerable for the acts of their testator out of his estate, were, none of them, simply questions of damages. *Ingram* v. *Thorp* (4) was a case like *Burrowes* v. *Locke* (5) and *Slim* v. *Croucher* (6), where the testator was party to an agreement charging certain property to the extent of £1500 for the benefit of the Plaintiff, and had represented that the property was an ample security in value, whereas the property was heavily incumbered and insufficient; and Vice-Chancellor *Wigram* held that the Plaintiff

(1) 1 P. Wms. 407.
(2) 1 Madd. 116.
(3) Cowp. 376.
(4) 7 Hare, 67.
(5) 10 Ves. 470.
(6) 1 De G. F. & J. 518.

was entitled to say to the owner of the property: If I pay £1500 upon a representation falsely made by you, that the estate you gave as a security for it is worth £2500 more than it was in truth worth, you shall make good your representation out of the property, so far as it will extend, and if it shall be insufficient, then out of your other assets." So that the executor may be said to have taken the estate with the liability to make good his testator's representation out of it.

*Walsham* v. *Stainton* (1) was a case which proceeded upon a different principle. There *Joseph Stainton* and *Henry Stainton*, who were the confidential agents of a partnership, combined together to obtain for themselves the shares of the partners in the concern at an under value by keeping the accounts of the partnership fraudulently, so as to conceal from the partners the true value of the shares. *Joseph* was a party to the fraud, but the whole benefit of it accrued to *Henry*. The suit was instituted against the personal representatives of both *Joseph* and *Henry*. The executor of *Joseph* demurred to the bill for want of equity, but the Lords Justices held that both *Joseph* and *Henry* stood in a fiduciary position to the partnership, and that both having concurred in a breach of duty, although only one of them derived benefit from the fraud, the other was liable in equity for the benefit so derived, and that consequently the liability attached to his personal representative as if his own estate had been benefited (2).

The case of *Rawlins* v. *Wickham* (3) was not a suit to obtain damages from executors, but was brought against them to set aside, on the ground of fraudulent misrepresentation, a contract of partnership entered into between the Plaintiff and *James Wickham*, the testator, and to obtain a decree for the Defendants to indemnify the Plaintiff against the liabilities of the firm. An action at law had been brought against *Wickham* and *Bailey*, on the ground of the fraudulent misrepresentation. *Wickham* died before the declaration was delivered. The action proceeded against *Bailey* alone, and the Plaintiff obtained a verdict. The damages were referred

(1) 1 De G. J. & S. 678.

(2) *See Imperial Mercantile Credit Association* v. *Coleman & Knight*, Law Rep. 6 H. L. 189.

(3) 3 De G. & J. 304.

to arbitration, and the arbitrator awarded a sum of £11,800, but owing to *Bailey's* circumstances only a sum of £300 was obtained. It may be doubted whether, looking to the nature of the suit, the rule of *actio personalis*, &c., applied. At all events the question was never raised, and the Lords Justices held that the action brought against *Bailey*, which was urged as an objection to the suit, did not free the estate of the deceased from its liability in equity, where alone the estate could be reached, but that whatever might be obtained under the judgment in the action against *Bailey* should go in relief of *Wickham's* estate.

No case has been produced, and I assume that none can be found, in which, upon a claim against a testator *ex delicto*, executors have been held liable in Equity to answer for it in damages. And it appears to me that it would be contrary to principle to hold that an action which in a Court of Law would be held to die with a testator, should be maintainable against executors in a Court of Equity of concurrent jurisdiction. In my opinion whatever might be the case as to the other Respondents, the executors of Mr. *Gibb* could not have been made liable in the present suit.

The last question to be considered is, whether the Appellant, who alleges that he purchased his shares upon the faith of the prospectus, has a remedy against the Respondents for the misrepresentations which it contains. The Appellant contends that the prospectus being addressed to the public for the purpose of inducing them to join the proposed company, any one of the public who is led by it to take shares, whether originally as an allottee, or by purchase of allotted shares upon the market, is entitled to relief against the persons who issued the prospectus. The Respondents on the other hand insist that the prospectus, not being an invitation to the public ultimately to become holders of shares, but to join the company at once by obtaining allotments of shares, those only who were drawn in by the misrepresentations in the prospectus to become allottees, can have a remedy against the Respondents.

There can be no doubt that the prospectus was issued with the object alleged by the Respondents. It is addressed from the temporary offices of the company for allotment and registration of shares. It states how much is to be paid upon application for

shares, and how much upon allotment, and how and where the application for shares is to be made; and it gives the form of payment to the bankers and of the receipt to be given by them to the applicant for shares to be allotted.

But the learned counsel for the Appellant, not denying the original purpose of the prospectus, contended, upon the authority of decided cases, that the prospectus, having reached the hands of the Appellant, and he, relying upon the truth of the statement it contained, having been induced to purchase shares, the Respondents were liable as for a misrepresentation made to him personally. I must, therefore, examine shortly the authorities relied upon.

*Bedford* v. *Bagshaw* (1) is a case where the Defendant and others, forming the board of management of a joint stock company, for the purpose of getting the shares of the company inserted in the official list of the *Stock Exchange*, untruly represented that two thirds of the scrip had been paid upon. The shares being in consequence of that representation inserted in the official list, the Plaintiff, knowing the requirements of the *Stock Exchange*, on the faith that two-thirds of the scrip had been paid upon, purchased shares in the company. The jury found that the representation was made fraudulently. The Court of Exchequer held that the Defendant was liable to the damages sustained by the Plaintiff, although the representation was not made to him directly. Two of the learned Judges, Barons *Martin* and *Bramwell*, considered the case to be concluded by a former decision in a case of *Seymour* v. *Bagshawe* (2) against the same Defendant. The proceedings in that case, however, hardly appear to recommend it as an authority. The action was tried by Lord Chief Justice *Jervis*, who told the jury that if the Plaintiff was induced, by seeing the shares quoted in the official list of the *Stock Exchange*, to purchase them, and if they believed that the insertion of the shares in the list was procured by the false and fraudulent representation of the Defendant, the Plaintiff was entitled to recover. A bill of exceptions was tendered to the Chief Justice's ruling. In the Exchequer

(1) 4 H. & N. 538; 29 L. J. (Ex.) 59, in a note to which (p. 62, n.) latter report is to be found the only report of the case of *Scott* v. *Dixon* (Q. B., H. T. 1859).

(2) 18 C. B. 903; 29 L. J. (Ex.) 62, n.

Chamber judgment was pronounced by consent without argument, for the purpose of going at once to the House of Lords. This is stated in the Common Bench Reports (1), but Baron *Bramwell*, in the Exchequer Reports, says (2) that the judgment in the Exchequer Chamber did not pass *sub silentio* (3). No other trace, however, of the manner in which the case was disposed of is to be found, except in the short notice of it in the Common Bench Reports. On the case being called on in the House of Lords, the counsel for *Bagshaw*, the Plaintiff in Error, said he did not think he could usefully occupy the time of the House by arguing it, and he at once submitted to a judgment for the Defendant in Error. How, under these circumstances, this case could be considered as a conclusive authority by the Judges who decided *Bedford* v. *Bagshaw* it is hard to understand. But the cases themselves cannot, in my opinion, be supported. The actions were brought upon the allegation of a false representation made to the Plaintiff. But no representation at all was made which reached either his eyes or his ears. From his knowing the rules of the *Stock Exchange* he assumed that a certain representation had been made, and acted upon it. According to the judgment, it was his knowledge of the rules which led him to appropriate the representation to himself, and therefore it could not be taken to be made to any one who was ignorant of these rules. The decisions, and the grounds on which they proceeded, appear to me to be extraordinary, and I cannot bring my mind to agree with them.

In *Scott* v. *Dixon* (4), which is to be found in the note to the case of *Bedford* v. *Bagshaw*, an action was brought against a director of a banking company for falsely, fraudulently, and deceitfully publishing and representing to the Plaintiffs that a dividend was about to be paid out of the profits, which were sufficient for

(1) 18 C. B. 903.

(2) 4 H. & N. 547–8.

(3) But see the fuller report in 29 L. J. (Ex.) 64, where the words of the learned Baron are: "*I have got a very strong impression upon my mind* that the judgment of the Court of Exchequer did not pass *sub silentio*." Baron *Martin* had previously said that the "parties did not think fit to argue it, and therefore the judgment was affirmed." The apparent difference probably arose thus, the Counsel did not argue the question, but the Judges, among themselves, might have discussed it.

(4) 29 L. J. (Ex.) 62, n., to the case of *Bedford* v. *Bagshaw*.

1873
PEEK
v.
GURNEY.

payment of the dividend, and that the shares were a safe investment for the money. The Plaintiffs bought their shares upon the faith of a report made by the directors to the shareholders which contained the false representations. Copies of this report were left at the bank, and were to be had by sharebrokers or any persons applying for it, who were desirous of information with regard to the affairs of the bank, with a view to the purchase of shares. The Plaintiffs purchased at the bank, through their broker, a copy of the report. The Court of Queen's Bench held that there being positive evidence that the report was to be bought by any person who thought of becoming a purchaser of shares, and that it came into the hands of the Plaintiffs in this manner, and by the perusal of it they were induced to buy shares in the bank, there was a publication to the Plaintiff in the sense of the declaration. I do not doubt the propriety of this decision. The report, though originally made to the shareholders, was intended for the information of all persons who were disposed to deal in shares; and the representation must be regarded as having been made not indirectly, but directly to each person who obtained the report from the bank where it was publicly announced it was to be bought, in the same manner as if it had been personally delivered to him by the director.

*Gerhard* v. *Bates* (1) is supposed to be an authority in support of the argument, that a prospectus containing untrue representations may be made the ground of an action by a purchaser of shares, who has been deceived and induced by the representations to become a shareholder. That case, however, establishes no such proposition, but rather, as I read it, the contrary. The question arose upon a demurrer to a declaration, upon which of course all the facts alleged were, for the purpose of the argument, taken to be true. The second count of the declaration, which was founded upon the deceitful representation by the Defendant, alleged that the Defendant and others had formed a company with 96,000 shares, of which 12,000 were to be appropriated to the public at 12*s*. 6*d*. per share, free from farther calls; that the Defendant being the promoter and managing director of the company, intending to defraud, deceive, and injure the public who might become pur-

(1) 2 El. & Bl. 476, 489–490.

chasers of the 12,000 shares, and to induce them to become purchasers, falsely, &c., caused it to be publicly advertised, by a prospectus issued by the Defendant as such director, that the promoters did not hesitate to guarantee to the bearers of the 12,000 shares a minimum annual dividend of 33 per cent., &c., and that the Defendant by means of false, &c., pretences and representations, wrongfully and fraudulently induced the Plaintiff to become, and the Plaintiff by reason thereof actually became, purchaser and bearer of 2500 of the 12,000 shares at 12*s.* 6*d.* per share; whereas the statement was false and fraudulent to the knowledge of the Defendant; and the Defendant had no ground for offering such guarantie to the public. Lord *Campbell*, in giving judgment for the Plaintiff, said: "Had it been alleged that the Defendant meaning to deceive and injure the Plaintiff, and to induce him to purchase shares in the company under the belief that it was a safe and profitable undertaking, fraudulently delivered to the Plaintiff the prospectus containing the false representation, whereby the Plaintiff was induced to purchase the shares, there can be no doubt that the count would have been sufficient. The allegations which it does contain appear to us to be equivalent." And he afterwards adds, "if the Plaintiff had only averred that having seen the prospectus he was induced to purchase the shares, objection might have been made that a connection did not sufficiently appear between the act of the Defendant and the act of the Plaintiff from which the loss arose;" a remark which has a direct application to the present case.

The case of *Gerhard* v. *Bates*, therefore, is no authority for holding that, upon a prospectus addressed to the public by the directors of a company, any one of the public who, at any time and under any circumstances, has been led to take shares upon the faith of the representations thus published can maintain an action against them. The observations of Lord *Campbell* rather indicate a contrary opinion. It appears to me that there must be something to connect the directors making the representation with the party complaining that he has been deceived and injured by it; as in *Scott* v. *Dixon*, by selling a report containing the misrepresentations complained of to a person who afterwards purchases shares upon the faith of it, or as suggested in *Gerhard* v. *Bates*, by delivering the fraudu-

1873
PEEK
v.
GURNEY.

lent prospectus to a person who thereupon becomes a purchaser of shares, or by making an allotment of shares to a person who has been induced by the prospectus to apply for such allotment. In all these cases the parties in one way or other are brought into direct communication; and in an action the misrepresentation would be properly alleged to have been made by the Defendant to the Plaintiff; but the purchaser of shares in the market upon the faith of a prospectus which he has not received from those who are answerable for it, cannot by action upon it so connect himself with them as to render them liable to him for the misrepresentations contained in it, as if it had been addressed personally to himself. I therefore think that the Appellant cannot make the Respondents responsible to him for the loss he has sustained by trusting to the prospectus issued by them inviting the public to apply for allotments of shares; and upon this ground only (being different from that on which the Master of the Rolls proceeded) I submit to your Lordships that the decree appealed from should be affirmed.

LORD COLONSAY:—

My Lords, I agree in the result at which my noble and learned friend has arrived. We must take this case upon the footing upon which it is presented to us, not of a guarantie, but of a transfer or purchase of shares; and we must look at the allegation of the purchaser, that he was misled by certain statements which were contained in the prospectus issued by the Respondents. Now, my Lords, I think with my noble and learned friend that this prospectus did suppress important matter, and if it did not contain any direct allegation of what was false, it was at least of a misleading character. It was a *suppressio veri*, which, if it did not amount to an *allegatio falsi*, at least amounted to a *suggestio falsi*, and I cannot see any grounds upon which I could justify it.

I think that there is very great difficulty in distinguishing the cases of the different Defendants, or Respondents, from each other Those who were concerned in issuing that prospectus can hardly be listened to when they say that they did not know what were the contents of it, or that they had not sufficiently examined into the

matter before putting it forth. That would be a reckless putting forth of statements which they did not know to be true, and which were calculated to induce people to subscribe.

But, my Lords, that does not solve this case. I agree in the view taken by the Respondents' counsel that the proper office of a prospectus is to invite persons to become original partners in a company, that is to say, allottees of shares; and I do not think that the responsibility towards those allottees which attached to the directors who issued the prospectus, followed the shares when they were transferred to any number of persons however distant from the allottees, persons who ultimately purchased those shares. I think that the office of the prospectus was fulfilled when the allottee got his shares as far as regarded those shares. I think farther, that in a case of this kind it is necessary to make out some direct connection between the directors and the party who alleges that he was deceived.

I do not find that any of the authorities that have been cited support the opposite view of the matter. I shall only notice one of those cases with which I happen to be familiar. I mean the case of *Cullen* v. *Thompson* (1). That was a case not at all in point with the present. In the first place, the question that came to this House in that case was a question whether the manager and the accountant of a bank, as being servants of the directors, were personally liable for the false allegations contained in a report. The Court below had been of opinion that the directors were responsible, but that there was not, in a very confused record, sufficient issuable matter to be sent to trial as against the officials. This House thought otherwise. We thought that there might be extracted from the record, confused as it was, sufficient issuable matter, and we sent back the case to the Court below accordingly. But what were the facts as regards Mr. *Cullen*, and what was the ground upon which that case proceeded? Mr. *Cullen* was an original proprietor and allottee of shares, and being, as such, a partner in the company, and being present at a meeting of the company to receive a report of the directors, that report was read to him and to others, and it was transmitted to him and to others who were shareholders. And, not only so, but upon some inquiry

(1) 4 Macq. Sc. Ap. 424.

1873
PEEK
v.
GURNEY.

of his there was a letter written and a circular sent to the shareholders containing all those misrepresentations and misstatements upon which he founded his case. In consequence of these misrepresentations, he purchased 170 additional shares, and afterwards brought his action against the directors for having communicated to him this false statement, and he claimed to hold them liable in damages for it. So far from that being in point with a case of a party having no such communication made to him, and yet making such a claim, it is the very reverse. It is the case of a party who had a most direct and positive representation made to him by the directors, against whom, therefore, he was entitled to institute proceedings.

I do not find, as I have said, that there is any case which supports the conclusion that the Appellant seeks to arrive at in this case, according to the very clear and very ingenious speech that was presented to us on his behalf. Therefore, my Lords, I concur in the judgment which has been proposed by my noble and learned friend.

LORD CAIRNS:—

My Lords, this case was argued at your Lordships' Bar very elaborately and with great ability; but the points of the case upon which the decision of your Lordships must, as it seems to me, turn, lie in a very small compass.

I agree with my noble and learned friends who have preceded me, that the delay in instituting this suit is not a ground upon which the judgment of the Master of the Rolls can be supported. The suit is in the nature of an action for damages for misrepresentation; it is in the nature of an action or proceeding *ex delicto*, and it appears to me that to such an action or proceeding there is no bar arising from delay, unless the delay be such as would bring the *Statute of Limitations* applicable to the case into operation.

The two questions, my Lords, which, as it appears to me, it is material to answer are these:—First, did the Respondents, in the prospectus issued as to the company, make representations which in point of fact were untrue? And, secondly, is the Appellant able to connect himself with these representations so as to enable

him to say that they were made to him, or were made to induce him to act on them, and that he did so act?

My Lords, I have limited the first question to the prospectus, because that is really the only matter to which your Lordships need direct your attention; nothing else is relied upon in the bill as a ground for relief. It is true that a good deal was said during the argument about the proceedings taken to obtain a settling-day on the *Stock Exchange;* but although the obtaining of a settling-day on the *Stock Exchange* is mentioned in the pleadings, it is not made any ground for relief. Your Lordships will observe, that in the 39th paragraph of the bill it is stated that "The Plaintiff made the purchases of shares and entered into the contracts of membership solely on the faith of the statements contained in the prospectus." That allegation excludes any reference to any other alleged misstatement. It is impossible to say, and it would be impossible to say, even though the pleadings had been different, that anything that passed with the committee of the *Stock Exchange* was, in this case, a representation either made to the Appellant or made for the purpose of being communicated to the Appellant.

This brings me, therefore, to the consideration of the prospectus; and before looking at the terms of it, I may say that I entirely agree with what has been stated by my noble and learned friends before me, that mere silence could not, in my opinion, be a sufficient foundation for this proceeding. Mere non-disclosure of material facts, however morally censurable, however that non-disclosure might be a ground in a proper proceeding at a proper time for setting aside an allotment or a purchase of shares, would in my opinion form no ground for an action in the nature of an action for misrepresentation. There must, in my opinion, be some active misstatement of fact, or, at all events, such a partial and fragmentary statement of fact, as that the withholding of that which is not stated makes that which is stated absolutely false.

Now, my Lords, this prospectus is certainly free from many of those extravagant terms and flattering descriptions which we are accustomed to see in documents of this kind. I will not dwell upon the words that the terms made, "in the opinion of the directors cannot fail to ensure a highly remunerative return to the

shareholders." That was a reference, not to fact, but to opinion; and, strange as it may appear to us now, looked at by the light of subsequent events, I am not satisfied that this statement as to the opinion of the directors was not perfectly consistent with the opinion which they really held. I do not dwell upon any of the later sentences in the prospectus, and the only two sentences to which I will direct your Lordships' attention are the first and the second.

The first sentence runs thus: "The company is formed for the purpose of carrying into effect an arrangement which has been made for the purchase from Messrs. *Overend, Gurney, & Co.* of their long-established business as bill brokers and money dealers, and of the premises in which the business is conducted; the consideration for the goodwill being £500,000, one half being paid in cash, and the remainder in shares of the company with £15 per share credited thereon." Now, it appears to me that any person reading that statement would be entitled to say, "Here is a company, with the name of which we are quite familiar, and here are new directors, persons of known wealth and character in the commercial world, joining that company for the purpose of making a new and limited partnership. They are independent of the old partnership, and able to form an independent judgment upon it; they are going to put in fresh capital themselves, and we understand from this statement that there is to be a transfer of the assets and liabilities of the old concern—the whole business as a going concern is to be taken over. We, the outside public, have no opportunity of looking into the accounts of the old concern, but these new directors have done so, and, having looked into the accounts and estimated the relative value of assets and liabilities, they think that the whole business upon this footing is worth a sum, for the goodwill of it, of half a million of money. One half of that amount is to be paid down and taken away by the old partnership; the other half is to be given by the old partnership as so much capital in the new concern." My Lords, in this point of view, which, as it appears to me, is the point of view in which, I repeat, any member of the outside public might regard and understand this statement, the payment of so large a sum for the goodwill of the concern, the actual payment of half, and the actual

assignment of the other half by way of capital, would become a material guarantie that the bargain was, at all events in the opinion of those who made it, a good and sound bargain.

But, my Lords, in order to understand the full meaning of this statement, your Lordships must take into account the second sentence in the prospectus also: "The business will be handed over to the new company on the 1st August next, the vendors guaranteeing the company against any loss on the assets and liabilities transferred." I read that again as meaning, consistently with the sentence which I read in the first instance, that there is to be a transfer of all the assets and all the liabilities; that the business (to use the expression I used before) is to be transferred as a going concern, and is to be transferred at a value which is placed at half a million of money, on the basis of all the assets and liabilities being made over, and a guarantie given, on the part of the old partners, that whatever valuation was put upon the assets and liabilities was a valuation which would be secured by them and made good by them; so that on the one hand the assets would not be deficient, and so that, on the other hand, the liabilities would not be excessive, as compared with the valuation which had been put upon both. In point of fact, the sentences which I have read to your Lordships appear to me to represent what I may term an out-and-out transaction; the business transferred, the money paid, and a sum assigned for the goodwill upon the footing of a transaction of that kind.

Now, my Lords, were these the facts of the case? I will contrast with this statement in the prospectus the statement of the real transaction, which I will take, for brevity, from the case of the Messrs. *Gurney*, now laid before this House. In the case of *Gurney and Birkbeck* (1) I find this statement, which is entirely in accordance with the evidence, and is in point of fact a summary of it: "Under these circumstances, the scheme of the proposed joint stock company was that it should purchase the goodwill of the bill broking and bill discounting business carried on by *Overend, Gurney & Co.*, which was of a most profitable character, for £500,000," Observe, my Lords, even in that sentence there is a complete alteration, a complete departure from the prospectus:

(1) Page 8 of that case.

1873
PEEK
v.
GURNEY.

"That it should purchase the goodwill of the bill broking and bill discounting business;" a distinction being drawn in those words between that portion of the business and the portion of the business which was not described as bill broking and bill discounting, as indeed the case goes on to explain: "That it should purchase the goodwill of the bill broking and bill discounting business carried on by *Overend, Gurney & Co.*, which was of a most profitable character, for £500,000, and that the doubtful accounts" (a matter altogether separate), "which made up the said sum of £4,194,000, should not be transferred, but should be excepted out of the assets made over to the company; and should be retained and wound up by the vendors, and that all sums of money received therefrom, and all other sums of money payable by the company to the vendors, (including the said sum of £500,000, which was payable half in cash and half in shares), should be applied towards the liquidation of the amount of the excepted accounts, with which the vendors were to be debited in the books of the company under the head of suspense and guarantie account." Here I may point out that that is a wholly different transaction. That is a transfer not of the business, but of a portion of the business which is described as a profitable part, namely, the bill broking and bill discounting. There is a separation from that portion of the business of other businesses which had resulted in doubtful accounts to the amount of £4,194,000, which doubtful accounts were not transferred to the new company, but made the subject of a separate piece of book-keeping, involving the non-transfer of them, and in that separate book-keeping the sum of £500,000 was applied on the opposite side of the account.

At another part of the case (1), your Lordships will find a succinct statement of the deed No. 2, which is the deed that gave effect to this part of the arrangement: The deed (No. 2) regulated the details of the arrangement contemplated by the 16th clause of the deed No. 1, and provided for the liquidation of the accounts which, by virtue of that arrangement, were excepted from the accounts of *Overend, Gurney & Co.* transferred to the limited company. It, in effect, provided that a separate account to be called "*Overend, Gurney & Co.'s* suspense and guarantie account"

(1) *Gurney and Birbeck's* Case, page 14.

should be opened in the books of the limited company, and should be debited with the total amount of the balance which, as struck on *the 31st of July, 1865, should appear to the debit of the accounts* specified in the schedule" (which I may say were the accounts amounting to upwards of four millions), and be credited with £250,000 (being one moiety of the price of the goodwill) and also with £45,000, the price of the business premises of the firm and the balances due to the partners on their private accounts, and the amount from time to time realized by the sale of the shares which were issued to the vendors as part of the said purchase-money. The *account was to be closed on the 31st of December, 1868,* when the balance, if on the credit side, was to be paid by the company to the members of the firm within a month, and if on the debit side to be deemed a debt due to the company from the firm. So that, I may say in passing, if by any accident, which was a most improbable contingency, these accounts had turned out, not hopeless, but accounts from which a larger sum than was expected should be realized, the benefit of it was to go, not to the new limited company, but to the old partners: It gave to the company a lien on the 16,666 shares to be issued in payment of one moiety of the purchase-money of £500,000, and on all property retained by the firm, to be applied in winding up the excepted accounts, and the company was to be entitled to have the shares and property made available, through the medium of a sale or otherwise, to secure the performance of the vendors' covenants and to indemnify the company.

Now, my Lords, to complete the narrative of this arrangement I must also read to your Lordships a statement with regard to it from the answer of Mr. *John Henry Gurney* (1). He says, in *paragraph 6: "In the investigation of the state of the affairs of Overend, Gurney, & Co.,* prior to the formation of the limited company, it appeared from their books that there were then outstanding various debit balances, which were considered to be of a doubtful nature, to the amount of £4,199,000, or thereabouts; but upon a careful estimation of the securities held in respect of them, and the probable winding-up of such of them as were not secured, it was estimated that of the total amount of £4,199,000 the sum

(1) *Joint Appendix, page 81.*

of £1,082,000 would be realized, leaving therefore the sum of £3,117,000 still to be provided for. At this period it was estimated that the balances to the credit of the partners, when made up in the private ledger, would amount to £940,000, and which balances had been calculated as liabilities of the firm; but, deducting the amount thereof from the balance of £3,117,000 so left unprovided for, there remained the sum of £2,177,000 still outstanding and to be provided for. Upon a careful examination and estimate of the private estates of the several partners comprising the firm of *Overend, Gurney, & Co.*, and of their interest in the banking business carried on in *Norfolk* and elsewhere, it was estimated that such several private estates would produce the farther aggregate sum of £2,320,000; and after taking credit for the £500,000 to be received for goodwill, and for £45,000 as the estimated value of the premises in *Lombard Street*, there would have remained a surplus of £688,000 in favour of the individual partners after providing for every liability of the firm of *Overend, Gurney, & Co.*"

My Lords, the result of these statements appears to me to be obvious. There was nothing paid for the goodwill of the firm; there was no transfer of assets and liabilities as something which, upon a proper valuation, were worth paying for in the shape of goodwill, with an independent guarantie from the old partners that those assets and liabilities would produce the amount at which they were valued. The principle of the valuation proceeded upon this—that if all the assets and all the liabilities were looked at there was an enormous deficiency. The mode in which that deficiency was made up was this: The accounts, amounting to upwards of £4,000,000, which caused the deficiency, were not really transferred; they were carried to a separate suspense account by themselves, and upon the other side of that account, or for the purpose of balancing the admittedly disastrous outcome of those accounts, there was taken into account the value of the private estates of the partners (upon which I must observe at the same time that no security whatever binding those estates was taken), and there was taken into account also the £500,000, the sum which had been fixed upon as the estimated value of the goodwill. In point of fact, therefore, your Lordships will observe that the use that was

made of the private estates and of the sum named for the goodwill was to fill up that vacuum of insolvency which was apparent on the mere statement of the figures to which I have referred, and that, so far from any sum being paid for goodwill, nothing was paid whatever, and so far from the sum named for the goodwill being a test of the excellence of the bargain, it was exactly the opposite, because, upon the same principle as this sum of £500,000 was appropriated in the manner that I have mentioned, had the insolvency been greater, had there been £500,000 more of insolvency, the value of the goodwill might have been estimated at a million, and the million might have been used in the same way that the £500,000 were used.

Now, my Lords, I have stated shortly the facts as they present themselves to my mind, and I am bound to say that, now that we know these facts, and now that we compare these facts with the statement in the first two sentences of the prospectus, I am unable to arrive at any other conclusion than this—that the statement in those two first sentences was a statement of that which was not justified by the facts of the case.

My Lords, we were pressed very much in argument with considerations as to the motives of those who made this statement, and it was pointed out with great accuracy that upon a trial in the nature of a criminal proceeding it had been held that they were not chargeable with that which was laid to their charge in that proceeding. My Lords, I must say that, so far as I understand the case, I entirely agree with the result at which the jury arrived in that proceeding; and, strange as it may appear, I think there is a great deal in the papers before your Lordships to shew that the gentlemen who formed this company were themselves, judging by the extent to which they embarked their means and continued their property in the concern, labouring under the impression that this transaction, disastrous as it ultimately turned out, had in it the elements of a profitable commercial undertaking; and so far as motive is concerned they may be absolved from any charge of a wilful design or motive to mislead or to defraud the public. But in a civil proceeding of this kind all that your Lordships have to examine is the question, Was there or was there not misrepresentation in point of fact? And if there was, however innocent the

motive may have been, your Lordships will be obliged to arrive at the consequences which properly would result from what was done.

But now, having answered the first question as I am obliged to answer it, I come to the second question in the case, namely, How does the Appellant connect himself with this statement? The prospectus was issued on the 12th or 13th of July, 1865, and a copy was received or was obtained by the Appellant. It is not proved from whom he obtained it. The object of the prospectus on the face of it is clearly to invite the public to take shares in the new company. The prospectus is, as is usual in such cases, an invitation, and there is appended to it a form of application for shares, which was to be filled up, and upon which form the invitation was to be answered. It is a prospectus in this shape, addressed to the whole of the public, no doubt, and any one of the public might take up the prospectus and appropriate it in that way to himself by answering it upon the form upon which it is intended by the prospectus that it should be answered. The Appellant, however, did not take up and did not appropriate the prospectus in this way. For reasons which it is unnecessary to inquire into he declined to take, or at all events he did not originally take any shares in the company. The allotment of shares began on the 24th of July; it appears to have been completed on the 28th of July; and it is stated that two or three times the number of shares to be had in the company were applied for. The allotment having been completed, the prospectus, as it seems to me, had done its work; it was exhausted. The share list was full; the directors had obtained from the company the money which they desired to obtain. The Appellant subsequently, upon the 17th of October, several months afterwards, bought 1000 shares at a premium of something over £7, and again, still later, on the 6th of December, he bought 1000 other shares at a premium of something over £6. He bought them on the *Stock Exchange*, and he, of course, did not know in the first instance from whom he bought them. In point of fact, it appears that as to the greater part of them they were shares which had originally been allotted to one of the old partners, *Samuel Gurney*, by whom they were transferred to a nominee for himself, in whose name they were registered; they were

then sold upon the market, and re-sold apparently several times, because the premium seems to have risen from a much smaller to a much larger sum, and ultimately they were sold, at the premium which I have stated, to the Appellant, and were registered in his name.

Now, my Lords, I ask the question, How can the directors of a company be liable, after the full original allotment of shares, for all the subsequent dealings which may take place with regard to those shares upon the *Stock Exchange?* If the argument of the Appellant is right, they must be liable *ad infinitum*, for I know no means of pointing out any time at which the liability would, in point of fact, cease. Not only so, but if the argument be right, they must be liable, no matter what the premium may be at which the shares may be sold. That premium may rise from time to time from circumstances altogether unconnected with the prospectus, and yet, if the argument be right, the Appellant would be entitled to call upon the directors to indemnify him up to the highest point at which the shares may be sold, for all that he may expend in buying the shares. My Lords, I ask, is there any authority for this proposition? I am aware of none.

During the course of the argument I took the liberty of putting to the learned counsel for the Appellant a case which I think was not answered, and to which, so far as I know, no answer can be given that would be favourable to the Appellant. I put the case of a person having built a house and desiring to sell it. He comes to me and wishes me to purchase it; he describes it as a highly advantageous purchase, and makes statements of fact to me with regard to the house which are untrue and are misrepresentations; but I decline to purchase, and our overtures come to an end. He subsequently sells it to some other person, upon what terms I know not. That other person completes the purchase, and that other person, desiring to raise money on mortgage, applies to me to lend him money. I lend him money upon a mortgage of the house. The facts stated to me originally turn out to be untrue, and are so material as that the house, not being as represented, becomes comparatively worthless. I then apply to the original vendor, remind him of what he told me, and complain to him that my money lent upon mortgage has been lost, and I commence an

1873
PEEK
v.
GURNEY.

action against him for damages to recover my loss. I ask, could such an action be maintained? I know of no authority for it, and I am of opinion that an action of that kind would not lie.

My Lords, I take the rule on this point to have been happily stated in some expressions of my noble and learned friend the late Lord Chancellor (Lord *Hatherley*), when he was Vice-Chancellor, in the case of *Barry* v. *Croskey* (1), in passages which I will take the liberty of reading to your Lordships. The first occurs during the argument. Upon a reference to the case of *Langridge* v. *Levy* (2), the Vice-Chancellor said: "I take the ground of that decision to have been, that the false representation was made by the Defendant with a view that it should be acted upon by the son in the manner that occasioned the injury. Mr. Baron *Parke* says: 'There is a false representation made by the Defendant, with a view that the Plaintiff should use the instrument in a dangerous way.' The father, acting upon the faith of that representation, put the gun into the hands of his son, who fired it off, when it burst and injured him. Suppose a stranger knowing nothing of what had passed between the father and the Defendant, to have found the gun, lying for instance at an inn. If a stranger so finding the gun had taken it up and fired it, and the gun had burst and injured him, would he have had his action against the Defendant upon the ground that *Nock's* name appeared upon the gun, and the Defendant had sold it with that name appearing upon it, and as a gun made by *Nock*." Again, in the course of the argument, the Vice-Chancellor, addressing Mr. *Rolt*, says: "Your argument would shew that every person who in consequence of *De Berenger's* frauds upon the *Stock Exchange* was induced to purchase stock at an advanced price, in reliance upon the false rumour he had circulated that peace was concluded, was entitled to maintain an action against *De Berenger* for the increase of price. Would not such consequences be too remote to form ground for an action?" Finally, in giving judgment, the Vice-Chancellor stated what he understood to be the principles applicable to such a case. First, that "every man must be held responsible for the consequences of a false representation made by him to another, upon which that other acts, and, so acting, is injured or damnified;

(1) 2 J. & H. 117-18-23. (2) 4 M. & W. 337.

Secondly, every man must be held responsible for the consequences of a false representation made by him to another, upon which a third person acts, and so acting, is injured or damnified, provided it appear that such false representation was made with the intent that it should be acted upon by such third person in the manner that occasions the injury or loss." And thirdly, he continues: "But to bring it within the principle, the injury, I apprehend, must be the immediate and not the remote consequence of the representation thus made. To render a man responsible for the consequences of a false representation made by him to another upon which a third person acts, and so acting is injured or damnified, it must appear that such false representation was made with the direct intent that it should be acted upon by such third person in the manner that occasions the injury or loss." And His Honour comments a second time on the case of *Levy* v. *Langridge* (1) as consistent with that principle.

My Lords, upon the grounds which I have mentioned, and upon the principles laid down in the case of *Barry* v. *Croskey* (2), which appear to me to be consistent with what is stated by all the authorities that might be referred to, I am of opinion that the Appellant in this case has entirely failed to connect himself with the representations made in the prospectus, of which in my opinion an original allottee might have complained, but of which the present Appellant cannot, I think, complain. On these grounds, therefore, I agree to the motion of my noble and learned friend that this appeal ought to be dismissed.

LORD CHELMSFORD:—My Lords, I wish to ask your Lordships whether you think that there is anything in this case that ought to take it out of the ordinary rule with regard to costs.

LORD CAIRNS:—Your Lordships have been in the habit, I think, of adhering very firmly to the rule that in this House the costs on the dismissal of an appeal should follow the result. I own that I see nothing in this case to make it an exception to that general rule. Your Lordships arrive at the conclusion which was arrived at by the Court below, although not on the same grounds; but if,

(1) 4 M. & W. 337. (2) 2 J. & H. 117–18–23.

1873
PEEK
v.
GURNEY.

by reason of the circumstance that the grounds are not the same, the costs were not to follow the result, this consequence would happen, that in every case in which the decision below is confirmed, if the grounds upon which the confirmation proceeds are not the same as the *ratio decidendi* of the Court below, the unsuccessful party must be absolved from paying the costs of his unsuccessful appeal.

*Order appealed from affirmed; and appeal dismissed with costs.*

*Lords' Journals*, 31st July, 1873.

Solicitor for the Appellant: *W. A. Downing.*

Solicitors for the various Respondents: *Young, Jones, Roberts, & Hale; Bevan & Whitting; Wilson, Bristows, & Carpmael; Young, Maples, Teesdale, Nelson, & Co.; Uptons, Johnson, Upton, & Budd.*

---

1873
July 10, 11, 14, 31.

CÆSAR LAMARE . . . . . . . . . . . . APPELLANT;

AND

THOMAS DIXON . . . . . . . . . . . . RESPONDENT.

*Agreement—Specific Performance—Acquiescence—Form of Decree—Costs.*

A decree for specific performance of a contract cannot be accompanied by directing an inquiry whether a matter which was a consideration for entering into the contract has been, or can be, properly performed.

Where a suit is instituted for specific performance of a contract, and the defence set up is, that the contract was made in consideration of certain promises which the Plaintiff had not fulfilled, a delay to defeat that defence must be such as amounts to an acquiescence in the nonfulfilment of the alleged promises.

Where the subject of the contract was an agreement to take the lease of a house, and the proposed tenant went into possession at once, and occupied for two years, but, while continuing in occupation, from time to time called on the landlord to fulfil promises which the tenant alleged to have been the inducement for the contract, and paid rent, but always paid it under protest:—

*Held*, that these circumstances did not amount to such acquiescence as to prevent the tenant from ultimately refusing to perform the contract, but