Exhibit H

588

Neill L.J.          Reg. v. Merseyside Coroner, Ex p. Carr (D.C.)          [1994]

In coroners' courts, however, it has been the practice to empanel a jury in    A
excess of the minimum number who are required to return a verdict.
Accordingly, I see no reason in principle why the discharge of a juror
necessarily requires the coroner to start the proceedings again with a
freshly empanelled jury. It is, however, unnecessary to reach a final
decision on this matter.

I would grant the application for judicial review and invite argument    B
as to the precise form of order.

MANTELL J.    I agree and have nothing to add.

> Certiorari to quash coroner's decision
>   of 9 April 1992.
> Declaration that proceedings before    C
>   jury empanelled on 26 February 1991
>   were a nullity.
> Fresh inquest to be held before different
>   coroner and a new jury.
> No order for costs.

*Solicitors: Jack Thornley, Ashton under Lyne; Deputy City Solicitor,*    D
*Liverpool City Council, Liverpool.*

[Reported by ALISON SYLVESTER, Barrister]

E

―――――

[COURT OF APPEAL]

F

*CONTINENTAL BANK N.A. v. AEAKOS COMPANIA
NAVIERA S.A. AND OTHERS

1993  Nov. 9, 10          Sir Stephen Brown P., Steyn and Kennedy L.JJ.

*Practice—Stay of proceedings—Jurisdiction under European Convention—
Loan agreement requiring borrowers to submit to jurisdiction of    G
English courts—Whether English courts having exclusive jurisdiction
over disputes concerning agreement—Whether injunction available
to restrain borrowers' action in Greek court against lender—Civil
Jurisdiction and Judgments Act 1982 (c. 27), Sch. 1, arts. 17, 21,
22*

The plaintiff American bank granted a loan facility to the    H
Greek defendants under an agreement which provided that each
defendant "irrevocably submits to the jurisdiction of the English
courts . . . but the bank reserves the right to proceed under this
agreement in the court of any other country claiming or having
jurisdiction in respect thereof." The defendants commenced an
action in a Greek court claiming damages against the bank on
the ground of a wrong exercise of rights under the loan agreement.
The bank issued a writ in England claiming an injunction to
restrain the defendants from continuing the Greek proceedings in

The Weekly Law Reports 22 April 1994

589

1 W.L.R.                    Continental Bank v. Aeakos S.A. (C.A.)

A   breach of the jurisdiction agreement. The judge refused the
    defendants' application to strike out the English action, or to stay
    it under article 21 or 22 of the Brussels Convention on Jurisdiction
    and the Enforcement of Judgments in Civil and Commercial
    Matters, as set out in Schedule 1 to the Civil Jurisdiction and
    Judgments Act 1982[1] and he granted the injunction as sought.
        On the defendants' appeal:—
        *Held*, dismissing the appeal, that the jurisdiction agreement on
B   its true construction obliged the defendants to submit disputes
    concerning the loan agreement to the English courts; that by
    virtue of article 17 of the Brussels Convention the English courts
    had exclusive jurisdiction over any such dispute and, therefore,
    the question of a stay under article 21 or 22 of the Convention
    did not arise; and that, on the facts, the judge properly exercised
    his discretion in granting the injunction as being the only effective
C   remedy for the defendants' breach of contract (post, pp. 596E–G,
    597H–598A).
        Decision of Gatehouse J. affirmed.


    The following cases are referred to in the judgment of the court:

    *Anonima Petroli Italiana S.P.A. v. West of England Shipowners Mutual
D       Insurance Association (London) Ltd.* (unreported), 9 April 1990, Saville J.
    *Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985] A.C. 191;
        [1984] 3 W.L.R. 592; [1984] 3 All E.R. 229, H.L.(E.)
    *Ashville Investments Ltd. v. Elmer Contractors Ltd.* [1989] Q.B. 488; [1988]
        3 W.L.R. 867; [1988] 2 All E.R. 577, C.A.
    *Austrian Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd.* [1903]
        1 K.B. 249
    *British Aerospace Plc. v. Dee Howard Co.* [1993] 1 Lloyd's Rep. 368
E   *Cannon Screen Entertainment v. Handmade Films* (unreported), 20 July 1989,
        Hobhouse J.
    *Empresa Exportadora de Azucar v. Industria Azucarera Nacional S.A.* [1983] 2
        Lloyd's Rep. 171, C.A.
    *Harbour Assurance Co. (U.K.) Ltd. v. Kansa General International Insurance
        Co. Ltd.* [1993] Q.B. 701; [1993] 3 W.L.R. 42; [1993] 3 All E.R. 897, C.A.
    *I.P. Metal Ltd. v. Ruote O.Z. S.p.A.* [1993] 2 Lloyd's Rep. 60
F   *Kloeckner & Co. A.G. v. Gatoil Overseas Inc.* [1990] 1 Lloyd's Rep. 177
    *Kurz v. Stella Musical Veranstaltungs G.m.b.H.* [1992] Ch. 196; [1991]
        3 W.L.R. 1046; [1992] 1 All E.R. 630
    *Société Nationale Industrielle Aerospatiale v. Lee Kui Jak* [1987] A.C. 871;
        [1987] 3 W.L.R. 59; [1987] 3 All E.R. 510, P.C.
    *Sohio Supply Co. v. Gatoil (U.S.A.) Inc.* [1989] 1 Lloyd's Rep. 588, C.A.


G   The following additional cases were cited in argument:

    *Barclays Bank Plc. v. Homan* (1993) B.C.L.C. 680, C.A.
    *Berisford (S. & W.) Plc. v. New Hampshire Insurance Co.* [1990] 2 Q.B. 631;
        [1990] 3 W.L.R. 688
    *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3 W.L.R.
        413; [1984] 3 All E.R. 39, H.L.(E.)
H   *Bushby v. Munday* (1821) 5 Madd. 297
    *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; [1980] 3 W.L.R. 991;
        [1981] 1 All E.R. 143, H.L.(E.)
    *Man (E.D. & F.) (Sugar) Ltd. v. Yani Haryanto (No. 2)* [1991] 1 Lloyd's
        Rep. 429, C.A.

    [1] Civil Jurisdiction and Judgments Act 1982, Sch. 1, art. 17: see post, p. 595A–C.
    Art. 21: see post, p. 595C–D.
    Art. 22: see post, p. 595D–F.

590

Continental Bank v. Aeakos S.A. (C.A.)    [1994]

*Overseas Union Insurance Ltd. v. New Hampshire Insurance Co.* (Case    A
  C 351/89) [1992] Q.B. 434; [1992] 2 W.L.R. 586; [1992] 2 All E.R. 138,
  E.C.J.
*Owens Bank Ltd. v. Bracco* [1992] 2 A.C. 443; [1992] 2 W.L.R. 621; [1992]
  2 All E.R. 193, H.L.(E.)
*South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien"
  N.V.* [1987] A.C. 24; [1986] 3 W.L.R. 398; [1986] 3 All E.R. 487, H.L.(E.)

                                                                      B
APPEAL from Gatehouse J.
   By a loan agreement dated 20 May 1981 the plaintiff, Continental
Bank N.A., an American bank, granted a loan facility to the first to
fifteenth defendants, one-ship companies managed by Aegis Shipping Co.
Ltd. of Athens. Georgios Papalios, Nicolaos Papalios and Theodora
Papalios, respectively the sixteenth to eighteenth defendants, were the
guarantors of the loan. The agreement contained a clause stating that the    C
borrowers submitted irrevocably to the jurisdiction of the English court.
The defendants commenced an action in the Multi-membered First
Instance Court, Athens claiming damages against the bank on the ground
that the bank had exercised rights under the loan agreement contrary to
article 919 of the Greek Civil Code. By a summons dated 1 June 1991 the
bank sought an injunction requiring the defendants to take no further    D
steps in the Greek proceedings. By a summons of 23 July 1991 the
defendants sought an order that the bank's writ and points of claim be
struck out or that the action be stayed under articles 21 or 22 of the
Brussels Convention. Gatehouse J. granted final injunctions restraining
the defendants from taking any further steps in the Greek proceedings.
   By a notice of appeal dated 26 September 1991 the defendants appealed
on the grounds, inter alia, that (1) the judge was wrong in holding that it    E
was a breach of their agreements with the plaintiff for the defendants to
launch proceedings in the Athens court; (2) the judge was wrong to grant
the injunctions and to refuse the relief sought by the defendants; (3) the
judge erred in not giving any or any sufficient weight to the fact that
the Greek court, which was a Community Court, was already seised of
the matter and would, unless the injunctions were issued, decide for itself    F
whether it had jurisdiction to hear the Greek proceedings; and (4) that to
issue the injunctions was to interfere, albeit indirectly, with the workings
of another Community court.
   The facts are stated in the judgment.

   *Barbara Dohmann Q.C.* and *T. A. G. Beazley* for the defendants.
   *Christopher Clarke Q.C.* and *Mark Hapgood* for the bank.    G

   STEYN L.J. delivered the following judgment of the court. The central
question is whether Continental Bank N.A. is entitled, by virtue of an
exclusive jurisdiction agreement, to an injunction restraining a group of
borrowers and guarantors from bringing legal proceedings against the
bank in Greece.
   Continental Bank N.A. is an American bank. The bank had a branch    H
in Greece. The first to fifteenth defendants are one-ship companies
registered in Panama and Liberia. They are managed as a group by Aegis
Shipping Co. Ltd. of Athens. By a loan agreement dated 20 May 1981 as
subsequently amended the bank, through its Athens branch, granted to
the first to fifteenth defendants a secured floating interest rate loan facility
of U.S.$56m. As security each borrower granted to the bank as assignment
of freights and other earnings, and a mortgage over the vessel owned by

A    it. The bank also obtained guarantees, dated 3 June 1981, from three individual members of the Papalios family who were beneficially interested in the corporate borrowers. The guarantors are the sixteenth to eighteenth defendants. $29·8m. of the facility was used to pay off the previous mortgagee, the Bank of America, which had a mortgage over six of the vessels, and the balance was used to refinance the purchase of vessels by nine other companies.

B        The borrowers defaulted within a year of the grant of the loan facility. The last quarterly instalment was paid in December 1981. As early as mid-1981 there had been a downturn in the shipping cycle. By 1984 freight rates and the price of vessels had dropped markedly. The shipping cycle had entered a phase of recession. The borrowers were substantially in arrears. On 24 December 1984 the bank and the defendants entered into a

C    rescheduling agreement. Pursuant to this agreement the bank agreed to waive certain amounts of interest, to reschedule repayment of outstanding principal and to limit the liabilities of the guarantors. It is the bank's case that conditions precedent of the rescheduling agreement were never fulfilled, and that it therefore never became effective. But, the bank argues, this issue is unimportant because the borrowers failed to repay the second and subsequent rescheduled payments of principal, and therefore, if the

D    rescheduling agreement became effective, the bank became restored to its original rights. The bank contends that it is owed the sum of $32,855,311 and interest.

         On 4 October 1991 the bank issued a writ in an English action against the defendants. But on 20 November 1990 the defendants had commenced an action against the bank in the Multi-membered First Instance Court of

E    Athens. The borrowers claimed damages against the bank totalling about $63m. and a declaration that the guarantors had been released. The cause of action was based on article 919 of the Greek Civil Code, which provides:

         "Whoever intentionally in a manner which violates the commands of morality, causes damages to another is bound to make reparation to the other for any damage this caused."

F    The thrust of the defendants' claim is that the bank exercised its rights under the loan agreement contrary to business morality. The judgment under appeal records that the defendants "expressly disavowed any reliance on any breach of contract on the part of the bank." Miss Dohmann, appearing on behalf of the defendants, told us that the true position is more complex. She said the claim was principally in tort

G    but it had contractual aspects. So be it.

         In March 1991, in Chicago, the complaint in the Greek proceedings was served on the bank. The bank's response was to issue a writ in an English action on 7 April 1991. In the English action the bank sought an injunction to restrain the defendants from continuing the Greek proceedings in breach of various jurisdiction agreements which, in the

H    bank's submission, conferred exclusive jurisdiction on the English courts to try the relevant disputes. Clause 21 of the loan agreement provides:

         "21.01 This agreement shall be governed by and construed in accordance with English law.
         "21.02 Each of the borrowers ... hereby irrevocably submits to the jurisdiction of the English courts and hereby irrevocably nominates Messrs. Aegis (London) Ltd., of 197, Knightsbridge, London, S.W.7, England, to receive service of proceedings in such courts on its behalf

592

**Continental Bank v. Aeakos S.A. (C.A.)**                    [1994]

but the bank reserves the right to proceed under this agreement in the    A
courts of any other country claiming or having jurisdiction in respect
thereof."

The jurisdiction agreements contained in the amending agreements, the
rescheduling agreement and the guarantees are in somewhat different
terms. It is, however, agreed that it is only necessary for us to consider
the interpretation and effect of clause 21.02.                    B

By a summons dated 3 June 1991 the bank sought a permanent
injunction against the defendants to restrain them from taking further
steps in the Greek proceedings, or, alternatively, the bank sought an
interim injunction to the same effect until trial or further order. The
defendants took out a cross-summons dated 23 July 1991. The defendants
sought an order that the bank's writ and points of claim be struck out
under R.S.C., Ord. 18, r. 19 or under the court's inherent jurisdiction, or    C
that the action be stayed under article 21 or 22 of the Convention on
Jurisdiction and the Enforcement of Judgments in Civil and Commercial
Matters signed at Brussels on 27 September 1968. On 30 July 1991 the
rival summonses came before Gatehouse J. for hearing. Broadly speaking
there were three issues before the judge. (1) Were the defendants in breach
of contract by suing in Greece? (2) If so, do articles 21 and 22 of the    D
Brussels Convention require the English court to stay the proceedings?
(3) If not, ought the English court nevertheless as a matter of discretion
under English law to stay the English proceedings or, in any event, to
refuse to grant an injunction? In a reserved judgment, given on 23 August
1991, the judge decided all three issues in favour of the bank and granted
final injunctions restraining the defendants from taking any further steps
in the Greek proceedings. On this appeal the issues can conveniently be    E
considered under the three broad headings which we have identified.

*The alleged breach of the jurisdiction agreements*

Miss Dohmann challenges the judge's construction of clause 21.02 on
two fronts. First, she submits, the Greek proceedings fall outside the scope
of clause 21.02. Secondly, she submits that even if the Greek proceedings    F
fall within the scope of clause 21.02, it is not an exclusive jurisdiction
clause. If either submission is right, the appeal must succeed.

Is clause 21.02 wide enough to cover the Greek proceedings? It is
common ground that not only the loan agreement, as amended, but also
the separate jurisdiction agreements are governed by English law. And the
construction of clause 21.02 is, of course, a question of law. Clause 21.02
is undoubtedly elliptical. It simply provides that the borrowers and    G
guarantors submit "to the jurisdiction of the English courts . . ." In our
judgment the clause should be read in a transitive sense: see *Austrian
Lloyd Steamship Co. v. Gresham Life Assurance Society Ltd.* [1903] 1 K.B.
249. It contemplates the submission of disputes to the English courts. The
correctness of this construction is reinforced by the fact that the clause
contemplates service of proceedings. But what disputes does it cover? The
answer is not to be found in the niceties of the language of clause 21.02.    H
It is to be found in a common sense view of the purpose of the clause. We
are emboldened to adopt this approach by the observation of Lord
Diplock in *Antaios Compania Naviera S.A. v. Salen Rederierna A.B.* [1985]
A.C. 191, 201E:

"if detailed semantic and syntactical analysis of words in a commercial
contract is going to lead to a conclusion that flouts business common
sense, it must be made to yield to business common sense."

The Weekly Law Reports 22 April 1994

593

1 W.L.R.          Continental Bank v. Aeakos S.A. (C.A.)

A    The only sensible construction of clause 21.02 is that it is a submission of disputes in connection with the loan facility to the jurisdiction of the English courts.

. Prima facie, therefore, clause 21.02 covers the Greek proceedings. But Miss Dohmann submits that the clause cannot be construed as extending to a claim in tort. It seems to us to be useful on this point to consider the approach adopted nowadays in the closely analogous field of arbitration

B    clauses. In *Empresa Exportadora de Azucar v. Industria Azucarera Nacional S.A.* [1983] 2 Lloyd's Rep. 171 the arbitration clause covered "any dispute arising out of this contract." The question was whether it covered only contractual claims or also a claim in conversion. In giving the judgment of the court·Ackner L.J. concluded, at p. 183:

C    "the contractual and tortious disputes were so closely knitted together on the facts, that the agreement to arbitrate on one can properly be construed as covering the other."

Moreover, if Miss Dohmann is right, it would mean that a claim for damages for a negligent misrepresentation inducing the contract (a tort) would be outside clause 21.02, but a claim seeking rescission of the contract on the ground of the same misrepresentation (a contractual

D    claim) would be covered by it. If the defendants' contention is accepted, it follows that the two claims might have to be tried in different jurisdictions. That would be a forensic nightmare. Again, in the field of the construction of arbitration clauses the modern approach provides helpful guidance. In *Ashville Investments Ltd. v. Elmer Contractors Ltd.* [1989] Q.B. 488, 517, Bingham L.J. said: "I would be very slow to attribute to reasonable parties

E    an intention that there should in any foreseeable eventuality be two sets of proceedings." In the same case Balcombe L.J. adopted a similar approach. He said, at p. 503:

"(1) It may be presumed that the parties intended to refer all the disputes arising out of this particular transaction to arbitration. (2) It may also be presumed that the parties intended that all disputes should be determined finally by the same tribunal."

F

In *Harbour Assurance Co. (U.K.) Ltd. v. Kansa General International Assurance Co. Ltd.* [1993] Q.B. 701, Hoffmann L.J. adopted the same approach and vividly described it as "the presumption in favour of one-stop adjudication." We are in respectful agreement with these observations, and there is no conceivable reason why the same approach should not

G    apply to the construction of jurisdiction agreements.

The complaint in the Greek proceedings makes clear that the thrust of the defendants' case is that the bank performed the loan agreement in a manner which was contrary to business morality. The issue in the Greek proceedings is inextricably interwoven with the contractual rights and duties of the parties. In our judgment the judge rightly concluded that all disputes in connection with the loan facility are covered by the jurisdiction

H    clause, and so construed clause 21.02 is apt to cover the disputes in the Greek proceedings.

Does clause 21.02 contain an exclusive jurisdiction clause? Clause 21.02 does not expressly make clear that the jurisdiction agreement is an exclusive one. *Dicey & Morris, The Conflict of Laws*, 12th ed. (1993), vol. 1, p. 422, submits that the question is simply whether on its true construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word "exclusive" is used. In *Sohio*

594

Continental Bank v. Aeakos S.A. (C.A.)    [1994]

*Supply Co. v. Gatoil (U.S.A.) Inc.* [1989] 1 Lloyd's Rep. 588, 591, the    A
Court of Appeal approved this submission as contained in *Dicey & Morris*,
11th ed. (1987). In our judgment it would be a surrender to formalism to
require a jurisdiction clause to provide in express terms that the chosen
court is to be the exclusive forum.

We have already explained why we interpret clause 21.02 in a transitive
sense as involving an agreement by the defendants to submit disputes in    B
connection with the loan facility to the jurisdiction of the English courts.
That does not necessarily mean that clause 21.02 is an exclusive jurisdiction
agreement. Mr. Clarke submits that where there is an agreement to submit
disputes to the jurisdiction of a particular country, the parties are taken
to have intended the chosen court's jurisdiction to be exclusive unless
there are unusual or particular circumstances which indicate otherwise. He
finds some comfort in *Austrian Lloyd Steamship Co. v. Gresham Life*    C
*Assurance Society Ltd.* [1903] 1 K.B. 249, 251–252; *Sohio Supply Co. v.*
*Gatoil (U.S.A.) Inc.* and *British Aerospace Plc. v. Dee Howard Co.* [1993]
1 Lloyd's Rep. 368. See, however, *Cannon Screen Entertainment v.*
*Handmade Films* (unreported), 20 July 1989. We find it unnecessary to
explore this line of authority or to express any view on Mr. Clarke's
submission. We say that because clause 21.02 (the only jurisdiction    D
agreement that we are asked to consider) does not contain a submission
to English jurisdiction simpliciter. We regard the concluding words as
significant: "but the bank reserves the right to proceed under this
agreement in the courts of any other country claiming or having
jurisdiction in respect thereof." The juxtaposition of a submission by the
defendants to the jurisdiction of the English courts and the option reserved
in favour of the bank to sue elsewhere brings into play the expressio unius    E
exclusio alterius canon of construction. It suggests that a similar option in
favour of the defendants was deliberately omitted. In our judgment the
language of clause 21.02 evinces a clear intention that the defendants, but
not the bank, would be obliged to submit disputes in connection with the
loan facility to the English courts.

In view of this conclusion it is unnecessary to consider an alternative
argument which the bank was ready to advance. It is right, however, that    F
we should identify it. Relying on the judgment of Hoffmann J. in *Kurz v.*
*Stella Musical Veranstaltungs G.m.b.H.* [1992] Ch. 196, 203D–H, the bank's
case was that, if clause 21.02 was not an exclusive jurisdiction clause,
article 17 of the Brussels Convention nevertheless applied to it. Eminent
writers are in disagreement on the correctness of the decision in the *Kurz*
case: see *Cheshire and North, Private International Law*, 12th ed. (1992),    G
pp. 316–317; *Dicey & Morris, The Conflict of Laws*, 12th ed., vol. 1, p. 431
and Richard Fentiman "Jurisdiction—When Non-Exclusive Means
Exclusive" [1992] C.L.J. 234. Since we heard no argument on the point we
express no view on it.

*The impact of the Brussels Convention*    H

The defendants submit that the provisions of article 21 or article 22 of
the Convention required the judge to refuse to grant an injunction and to
stay the English action. That submission is based on the undoubted fact
that the proceedings in Greece were commenced before the proceedings in
England. Given that we have concluded that an exclusive jurisdiction
agreement obliged the defendants to sue in England, and that the
defendants acted in breach of that agreement, it is necessary to consider

The Weekly Law Reports 22 April 1994

595

I W.L.R.                    Continental Bank v. Aeakos S.A. (C.A.)

A    the interaction of article 17 and articles 21 and 22. Article 17, so far as is
material, provides:

"If the parties, one or more of whom is domiciled in a contracting
state, have agreed that a court or the courts of a contracting state are
to have jurisdiction to settle any disputes which have arisen or which
may arise in connection with a particular legal relationship, that court
or those courts shall have exclusive jurisdiction. . . . Where such an
B    agreement is concluded by parties, none of whom is domiciled in a
contracting state, the courts of other contracting states shall have no
jurisdiction over their disputes unless the court or courts have declined
jurisdiction. If an agreement conferring jurisdiction was concluded for
the benefit of only one of the parties, that party shall retain the right
to bring proceedings in any other court which has jurisdiction by
C    virtue of this Convention."

Article 21 provides:

"Where proceedings involving the same cause of action and
between the same parties are brought in the court of different
contracting states, any court other than the court first seised shall of
its own motion decline jurisdiction in favour of that court. A court
D    which would be required to decline jurisdiction may stay its
proceedings if the jurisdiction of the other court is contested."

Article 22 provides:

"Where related actions are brought in the courts of different
contracting states, any court other than the court first seised may,
E    while the actions are pending at first instance, stay its proceedings. A
court other than the court first seised may also, on the application of
one of the parties, decline jurisdiction if the law of that court permits
the consolidation of related actions and the court first seised has
jurisdiction over both actions. For the purposes of this article, actions
are deemed to be related where they are so closely connected that it
is expedient to hear and determine them together to avoid the risk of
F    irreconcilable judgments resulting from separate proceedings."

Miss Dohmann submits that the Athens court was "the court first seised"
within the meaning of article 21 and article 22. She further submits "the
same cause of action" is involved in the Greek and English proceedings.
Accordingly, she submits, the judge was obliged under article 21 to stay
the English action. Alternatively, she submits that one is dealing with
G    "related actions" and the judge had a discretion to be exercised in
accordance with article 22, as interpreted in the jurisprudence governing
it, and that he was wrong not to stay the English action.
    The judge dealt with this point in commendably succinct terms. He
said:

"The defendants rely on articles 21 and/or 22. But in my judgment,
H    the defendants' action in the Athens court and the plaintiff's action
in this court do not involve the same causes of action for the purposes
of article 21, as interpreted in Gubisch Maschinenfabrik K.G. v.
Palumbo (Case 144/86) [1987] E.C.R. 4861. Nor are they "related
actions" for the purposes of article 22. The actions are totally
different, as appears from the respective pleadings and it is not
enough that one issue—jurisdiction—could arise in both actions. In
any case, the provisions of article 17 are conclusive. The corporate

596

Continental Bank v. Aeakos S.A. (C.A.)                    [1994]

defendants are all domiciled in Liberia or Panama; it may be arguable    A
that they are also domiciled in Greece, where they are all managed.
The individual defendants are either domiciled in Greece or England—
there is a dispute as to this, but their domicile is undoubtedly one or
the other, so it is immaterial which is correct. The bank, it is
admitted, is domiciled in Illinois. So either the opening sentence of
article 17 applies, or alternatively the third sentence. Clause 21.02    B
thus confirms the exclusive jurisdiction of the English courts for any
action brought by the defendants against the plaintiff bank. The
Brussels Convention, therefore, does not alter the position and the
bank is entitled to the injunction it seeks."

We do not propose to consider whether articles 21 or 22 would be
applicable if there was no exlusive jurisdiction clause. The fact is that    C
there is an exclusive jurisdiction agreement. And it is common ground
that article 17 applies to it.
    In construing the Brussels Convention it is important to put aside pre-
conceptions based on traditional English rules. The Convention is a
radical new regime governing the international legal relationships of the
contracting states. It is intended to eliminate obstacles to the functioning
of the common market and to further the evolution of a vast single    D
market: Jenard Report (Official Journal 1979 No. C. 59, p. 19). The
genesis of the Convention is the jurisprudence of the civil law rather than
the common law. Since the original states were all civil law countries, and
the United Kingdom played no role in the drafting of the Convention,
this is hardly surprising. Traditionally, English courts assert a discretion
to enjoin a party by injunction from pursuing foreign legal proceedings in    E
breach of an exclusive jurisdiction clause. The idea that a national court
has discretion in the exercise of its jurisdiction does not generally exist in
civilian systems: Schlosser Report (Official Journal 1979 No. C. 59, p. 97,
para. 76).
    Article 17 follows the civilian approach. Article 17 has mandatory
effect. When article 17 applies it follows that the jurisdiction agreement
prorogates (confers) jurisdiction on the courts of the contracting state    F
chosen by the parties, and that the jurisdiction agreement deprives the
courts of other contracting states of jurisdiction. Indeed, it is the duty of
the courts of other contracting states of their own motion to consider
whether article 17 applies and to decline jurisdiction if it does: Schlosser
Report (Official Journal 1979 No. C. 59, p. 81, para. 22). There is no
discretionary power *in the Convention itself* to override the conclusive
effect of an exclusive jurisdiction agreement which conforms with the    G
requirements of article 17. It follows that if article 17 applies its provisions
take precedence over the provisions of articles 21 and 22.
    The structure and logic of the Convention convincingly points to this
conclusion. The reasons supporting this conclusion are, however, not
formalistic. The consequences that would flow from the adoption of the
submission of Miss Dohmann are startling. Article 21 provides that there    H
shall be a mandatory stay of proceedings in favour of the court first
seised, if courts of different contracting states are seised of proceedings
involving "the same cause of action." If Miss Dohmann's submission is
correct, it follows that a party will be able to override an exclusive
jurisdiction agreement which is governed by article 17, by pre-emptively
suing in the courts of another contracting state. The courts of the latter
state which ex hypothesi have been deprived of jurisdiction would then be

597

1 W.L.R.            Continental Bank v. Aeakos S.A. (C.A.)

A  "the court first seised." The chosen court of the parties would then be
obliged to decline jurisdiction or, if the jurisdiction of the other court is
contested, to stay its proceedings. In this way a party who is in breach of
the contract will be able to set at naught an exclusive jurisdiction
agreement which is the product of the free will of the parties. The principle
of the autonomy of the parties, enshrined in article 17, cannot countenance
such a conclusion.

B      In coming to the same conclusion in *Kloeckner & Co. A.G. v. Gatoil
Overseas Inc.* [1990] 1 Lloyd's Rep. 175, 195–196, Hirst J. pointed to the
additional policy factor that in the Convention system the best placed
court to decide questions of exclusive jurisdiction is the court chosen by
the parties in their jurisdiction agreement. It is not altogether surprising
that in *Anonima Petroli Italiana S.p.A. v. West of England Shipowners
C  Mutual Insurance Association (London) Ltd.* (unreported), 9 April 1990,
Saville J. described an argument similar to the one addressed to us on
behalf of the defendants as entailing "ludicrous" consequences. With due
deference to the careful arguments of Miss Dohmann, we find ourselves
in agreement with Saville J. See, also *I.P. Metal Ltd. v. Ruote O.Z. S.p.A.*
[1993] 2 Lloyd's Rep. 60. The critical point is that there is nothing in the
Convention which is inconsistent with a power vesting in the English court
D  to grant an injunction the objective of which is to secure enforcement of
an exclusive jurisdiction agreement.
      For all these reasons we conclude that, since article 17 applies, the
question of a stay under articles 21 and 22 of the Convention does not
arise.

E  *The exercise of discretion under English Law*
      On the supposition that articles 21 and 22 of the Convention are
inapplicable, the defendants seek to invoke the inherent power of the
court to stay the English proceedings. They argue that the judge should
have granted a stay until the Greek court had decided whether or not it
had jurisdiction. In any event, the defendants submit, even if a stay was
inappropriate, the judge ought not to have granted an injunction. They
F  draw attention to the fact that, although a stay involves the regulation of
English legal proceedings, an injunction restraining foreign legal
proceedings involves indirect interference in the procedure of a foreign
court. Accordingly, the defendants submit, a court invited to grant such
an injunction ought to proceed with great caution and ought to grant such
an injunction only if the ends of justice require it: see *Société Nationale
Industrielle Aerospatiale v. Lee Kui Jak* [1987] A.C. 871, 891F–897A.
G  Miss Dohmann emphasised that the Greek court is the court first seised
with the substantive action. She said that it would be wrong for the
English court to decide that the Greek court does not have jurisdiction.
The question whether the Greek court has jurisdiction ought to be left to
the Greek court. The English court ought to trust the Greek court. The
injunction will operate as an indirect interference with the workings of a
H  Community court. Such an injunction should only be granted if the
pursuit of the remedy in the foreign court would be vexatious and
oppressive. That test is not satisfied. For these reasons, Miss Dohmann
submitted, the judge erred in not staying the English action, but, in any
event, she said, he plainly erred in exercising his discretion in favour of
the granting of an injunction.
      It is necessary to bear in mind that the proper construction of the
jurisdiction agreements is governed by English law. And, as a matter of

598

Continental Bank v. Aeakos S.A. (C.A.)                [1994]

English law, the jurisdiction agreements apply to the subject matter of the
Greek proceedings, and are exclusive jurisdiction agreements. It follows
that the English courts have exclusive jurisdiction. And by virtue of article
17 the Greek courts have been deprived of jurisdiction.

But Miss Dohmann submits that the English courts ought to defer to
the Greek courts on the interpretation and effect of the exclusive
jurisdiction agreement. She argues that we can safely leave it to the Greek
courts to decide the article 17 issue on its merits. That is not how we
understand the expert evidence on Greek law filed in this case. Mr. Soufias,
the bank's Greek lawyer, appears to say that the Greek court will assume
jurisdiction. Mr. Stephanakis, the defendants' Greek lawyer, says that the
Greek court will not consider a jurisdictional issue because the bank
co-operated at an early stage in asking for an adjournment. He says that
in Greece that will be regarded as a submission to jurisdiction. It does not
appear that the Greek court will consider the impact on its jurisdiction of
the exclusive jurisdiction agreement and article 17 of the Convention. But
we do not rest our judgment on this point.

Under the Greek rules of civil procedure a defendant is obliged to file
a defence on the merits at the same time as an objection to jurisdiction.
The bank cannot therefore in practice challenge the jurisdiction of the
Greek court without filing a detailed defence on the merits to the
defendants' complaint, which runs to 38 pages, and the bank will in
addition have to lodge at the same time all supporting documentary
evidence. Legal fees will apparently amount to about $120,000. And, in
addition, the bank would have to serve expert evidence from an English
lawyer on the effect of clause 21.02. Again, we do not rest our judgment
on this point.

In our view the decisive matter is that the bank applied for the
injunction to restrain the defendants' clear breach of contract. In the
circumstances, a claim for damages for breach of contract would be a
relatively ineffective remedy. An injunction is the only effective remedy
for the defendants' breach of contract. If the injunction is set aside, the
defendants will persist in their breach of contract, and the bank's legal
rights as enshrined in the jurisdiction agreements will prove to be valueless.
Given the total absence of special countervailing factors, this is the
paradigm case for the grant of an exclusive jurisdiction agreement. In our
judgment the continuance of the Greek proceedings amounts to vexatious
and oppressive conduct on the part of the defendants. The judge exercised
his discretion properly.

*Conclusion*

It follows that we would reject the submissions of the defendants under
all three headings. It is right to add, however, that in relation to the link
between articles 17 and 21 of the Convention, the defendants applied for
an order referring an appropriate question to the European Court of
Justice. It is true that, except for first instance decisions, there is apparently
no authority directly in point. The more obvious the answer to a question
the less authority there sometimes is on it. We entertain no doubt about
the answer to the proposed question. We would reject the application.

Somewhat tentatively, the defendants also asked for an order that the
following two questions be referred to the European Court of Justice:
(a) whether the Greek proceedings and the English proceedings involve
"the same cause of action" for the purposes of article 21 of the Convention

599

1 W.L.R.            Continental Bank v. Aeakos S.A. (C.A.)

A  and (b) whether the Greek proceedings and the English proceedings are
"related actions" for the purposes of article 22 of the Convention. In our
judgment there are no relevant questions of "interpretation" of the
Convention which arise in the present case. In our judgment no reference
is necessary. We would also reject the application in both parts.
    We would dismiss the appeal.

B                                        *Appeal dismissed with costs.
                                         Leave to appeal refused.*

    *Solicitors: Constant & Constant; Norton Rose.*

                                                    M. B. D.

C

                        _____

D

                [QUEEN'S BENCH DIVISION]

          *PRACTICE DIRECTION (ADMIRALTY: ASSESSORS'
                        REMUNERATION)

E  *Admiralty—Practice—Nautical and other assessors—Remuneration and
    expenses—Payment—R.S.C., Ord. 74*

    1. This practice direction is issued by direction of Lord Taylor of
Gosforth C.J. and Sir Thomas Bingham M.R.
    2. In the absence of special directions given in a particular case the
F  remuneration payable to Trinity Masters and nautical and other assessors
summoned to assist the Court of Appeal, the Admiralty Court on the trial
of an action, or a Divisional Court of the Queen's Bench Division hearing
an appeal under R.S.C., Ord. 74 shall be:

|  |  |
|---|---|
| (i) For each day of the hearing (except where (ii) or (iii) applies). | £300 |
| (ii) For a day on which the hearing finishes before the midday adjournment. | £150 |
| (iii) For a day on which the hearing commences after midday adjournment, the assessor not having attended, or having been engaged in another case, before such an adjournment. | £150 |
| (iv) For attending the court on a day on which the case is not heard. | £40 per hour |
| (v) For consultation with the court on a day on which the case is not heard. | £150 |
| (vi) For attending to hear reserved judgment (including any consultation with the court on the same day). | £75 |
| (vii) If notice of attendance is countermanded less than two days before the hearing. | £150 |