Exhibit I

488

[1989]

[COURT OF APPEAL]    A

## ASHVILLE INVESTMENTS LTD. v. ELMER CONTRACTORS LTD.

## ELMER CONTRACTORS LTD. v. ASHVILLE INVESTMENTS LTD.    B

[1986 A. No. 1860]
[1986 E. No. 1499]

1987  April 1, 2;    May, Balcombe and Bingham L.JJ.
    May 20

*Arbitration—Arbitrator—Jurisdiction—Arbitration clause covering*   C
*disputes "in connection with" contract—Claim to rectify contract*
*on ground of mistake at time of execution of contract—Whether*
*jurisdiction to determine dispute*

*Arbitration—Arbitration clause in contract—Ambit—Order that arbitra-*
*tion agreement cease to have effect—Points of claim alleging*
*fraudulent misrepresentation—Allegation expressly abandoned in*
*court—Points of claim later amended to omit allegation—Whether*   D
*jurisdiction to make order in absence of concrete and specific*
*issue of fraud—Arbitration Act 1950 (14 & 15 Geo. 6, c. 27),*
*s. 24(2)*

    The owners accepted a tender from the building contractors
to construct six warehouse units. An agreement was executed in
standard form which included an arbitration clause providing
that   E
    "in the case of any dispute or difference . . . as to the
    construction of this contract or as to any matter or thing of
    whatsoever nature arising thereunder or in connection
    therewith . . . such dispute or difference shall be and is
    hereby referred to the arbitration and final decision of . . ."
Subsequently the contractors alleged that there were differences
between the specifications on which they had tendered and
those incorporated into the building contract and that they had   F
been unaware of the differences until after the works had been
started. The owners claimed that the differences had been
brought to the contractors' attention at a meeting before the
contract was executed. The contractors sought arbitration under
the contract, claiming rectification of the contract on the
ground of mistake and damages for innocent or fraudulent
misrepresentation and negligent mis-statement by the owners
which induced them to enter into the contract. In their points of   G
defence, the owners raised questions as to the jurisdiction of the
arbitrator to order rectification or any relief in respect of the
misrepresentation pleaded, and later issued an originating
summons seeking corresponding declarations and also, as the
contractors had raised the issue of fraud, an order under section
24(2) of the Arbitration Act 1950[1] so that that issue could be

  H

---

[1] Arbitration Act 1950, s. 24: "(2) Where an agreement . . . provides that disputes
which may arise . . . shall be referred to arbitration, and a dispute which so arises involves
the question whether . . . any . . . party has been guilty of fraud, the High Court shall, so
far as may be necessary to enable that question to be determined by the High Court, have
power to order that the agreement should cease to have effect . . ."

A    determined by the court. The contractors also issued an
originating summons, seeking declarations that the arbitrator
had power to determine all issues in the pleadings and to grant
the relief claimed. At the hearing they expressly abandoned the
allegation of fraud. The judge dismissed the owners' summons
in January 1987 and granted the declarations sought by the
contractors, who in March amended their points of claim to
remove the allegation of fraud.

B          On the owners' appeal:—
*Held,* dismissing the appeal, (1) that disputes between parties
based upon an allegation of mistake at the time they entered
into the contract and upon an allegation of misrepresentation or
negligent mis-statement were disputes which arose "in connection
with" the contract and were accordingly within the scope of the
arbitration clause; and that nothing in that clause precluded an
C    arbitrator from granting rectification or awarding damages if
such allegations were made out (post, pp. 496A–B, 499D–E,
502E–F, 503C–E, 505E–G, 509E–F, 517C–F).
*Printing Machinery Co. Ltd. v. Linotype and Machinery Ltd.*
[1912] 1 Ch. 566; *Monro v. Bognor Urban District Council*
[1915] 3 K.B. 167, C.A. and *Crane v. Hegeman-Harris Co. Inc.*
[1939] 4 All E.R. 68, C.A. distinguished.
(2) That, although the particulars in the points of claim were
D    not formally amended until after the hearing at first instance, at
the hearing the contractors abandoned any allegation of
fraudulent misrepresentation; and that in the absence of any
concrete and specific issue of fraud the jurisdiction of the court
under section 24(2) of the Arbitration Act 1950 could not be
exercised (post, pp. 501E–F, 506A–C, 517G).
Decision of Sir Neil Lawson sitting as a judge of the Queen's
Bench Division affirmed.
E

The following cases are referred to in the judgments:

*Blue Circle Industries Plc. v. Holland Dredging Co. (U.K.) Ltd.* (unreported),
27 February 1987; Court of Appeal (Civil Division) Transcript No. 167
of 1987
*Camilla Cotton Oil Co. v. Granadex S.A.* [1976] 2 Lloyd's Rep. 10,
H.L.(E.)
F    *Crane v. Hegeman-Harris Co. Inc.* [1971] 1 W.L.R. 1390 (*Note*); [1939] 1
All E.R. 662; [1939] 4 All E.R. 68, C.A.
*Drennan v. Pickett* [1983] 1 Qd. R. 445
*Esmil Ltd. v. Fairclough Civil Engineering Ltd.* (1981) 19 B.L.R. 134, C.A.
*Heyman v. Darwins Ltd.* [1942] A.C. 356; [1942] 1 All E.R. 337, H.L.(E.).
*Kathmer Investments Pty. Ltd. v. Woolworths Pty. Ltd.* 1970 (2) S.A. 498
*Monro v. Bognor Urban District Council* [1915] 3 K.B. 167, C.A.
G    *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.*
[1984] Q.B. 644; [1984] 2 W.L.R. 676; [1984] 2 All E.R. 175, C.A.
*Printing Machinery Co. Ltd. v. Linotype and Machinery Ltd.* [1912] 1 Ch.
566
*Roose Industries Ltd. v. Ready Mixed Concrete Ltd.* [1974] 2 N.Z.L.R. 246
*Willcock v. Pickfords Removals Ltd.* [1979] 1 Lloyd's Rep. 244, C.A.

H    APPEAL from Sir Neil Lawson sitting as a judge of the Queen's
Bench Division.
Ashville Investments Ltd. (Ashville) appealed on 24 February 1987
to the Court of Appeal from the decision of Sir Neil Lawson, sitting as a

490

judge of the Queen's Bench Division, on 29 January 1987 in which he  A
dismissed Ashville's originating summons for declarations that the
arbitrator had no jurisdiction to hear and determine issues as to mistake
and misrepresentation and had no power to grant rectification and
damages claimed in relation thereto, and for an order under section
24(2) of the Arbitration Act 1950. Ashville's grounds of appeal were
that (1) the judge had misdirected himself in deciding that it was an
error to approach the question of the arbitrator's jurisdiction on the  B
basis that because the terms "mistake" and "misrepresentation" were
applied to claims there could be no jurisdiction; (2) he had misdirected
himself in concluding that the disputes could be reduced to the
proposition of how much Elmer Contractors Ltd. ("Elmer") were
entitled to be paid; (3) he was wrong in law and misdirected himself in
deciding that he should adopt a broad and liberal approach to the  C
construction of an arbitration clause; (4) he was wrong in law in finding
the disputes were matters arising under the contract: see *Printing
Machinery Co. Ltd. v. Linotype and Machinery Ltd.* [1912] 1 Ch. 566,
approved in *Crane v. Hegeman-Harris Co. Inc.* [1939] 4 All E.R. 68; (5)
he was wrong in law in finding that the disputes were matters in
connection with the contract: see *Monro v. Bognor Urban District
Council* [1915] 3 K.B. 167; and (6) in relation to the question of an  D
order under section 24(2) of the Arbitration Act 1950 (a) he misdirected
himself in regarding the question as academic after the removal of the
word "fraudulent" from Elmer's pleadings, and (b) in giving his reasons
as to his hypothetical exercise of discretion he misdirected himself in
counting delay in issuing the application under section 24(2) against
Ashville, and misapprehended the extent of his powers under section  E
24(2).

Elmer delivered a respondent's notice under R.S.C., Ord. 59,
r. 6(1)(*b*) on 31 March 1987 (seeking an extension of time for its
service) contending that the decision of Sir Neil Lawson should be
affirmed on the additional ground that the claims for rectification of the
contract were disputes and differences between Elmer and Ashville as to
the construction of the contract, and that those claims therefore fell  F
within the disputes and differences to be referred to the arbitrator under
the arbitration clause in the contract.

The facts are set out in the judgment of May L.J.


*Richard Gray* for Ashville Investments Ltd.
*Humphrey Lloyd Q.C.* and *Peter Coulson* for Elmer Contractors  G
Ltd.

*Cur. adv. vult.*


20 May 1987. The following judgments were read.


MAY L.J.  In this appeal the parties are respectively the buildings  H
owners ("Ashville") and the contractors ("Elmer") for the construction
of six warehouse units in Wokingham. The contract between them was
in the J.C.T. standard form (July 1977 revision) under seal and was

1 Q.B.                 Ashville Investments v. Elmer Ltd. (C.A.)                May L.J.

A   dated 22 December 1982. Negotiations for the work began in April 1982. Ultimately Ashville invited Elmer to tender on the basis of a specification dated 9 December and drawings dated 16 December 1982. On this basis Elmer quoted a price for the building works on 21 December 1982. A meeting then took place between the parties' representatives on 22 December at the end of which the contract under seal of that date was entered into for the building work to be done for

B   £715,000, which had been Elmer's tendered price. Appended to the sealed document was an amended version of the conditions forming part of the J.C.T. form together with initialled drawings and specifications relating to the work which was to be done.

    It is, however, an undisputed fact that there were substantial differences between the specifications and drawings upon which Elmer

C   tendered and those which were initialled on 22 December 1982 and incorporated into the building contract. It is Elmer's contention that they were unaware of these differences until well after the works had begun. The evidence filed on behalf of Ashville is to the effect that the differences were specifically drawn to the attention of Elmer's representatives at the meeting on 22 December 1982. Those representatives then considered the cost implications of such differences but

D   decided not to change their tender price. It was only there after that the contract was executed.

    Further, condition 1(1) of the contract conditions provided:

> "The contractors shall upon and subject to these conditions and those contained within the specification carry out and complete *the design* and the works shown upon the contract drawings . . ."

E   Elmer's representatives appreciated that on its face this clause imposed a potentially wide obligation upon them. The question of the extent of Elmer's design responsibility was one of those which was discussed at the meeting on 22 December 1982. Again, there is a dispute between the parties as to what was agreed. Nevertheless Ashville's architects prepared a minute of that meeting, the relevant parts of which for this

F   present issue read:

> "At a meeting on 22 December 1982 . . . a contract was entered into between Ashville Investments Ltd. and Elmer Contractors Ltd. for the above building project in respect of which the parties reached the following agreement for the interpretation of various contract and specification clauses as follows—Contract clause 1.1.—

G   This is a reference to heating, plumbing and electrical installations . . ."

    On this point, Elmer's contention is that the minute correctly records the scope of the agreement on the design question reached at the meeting on 22 December. Ashville's contention apparently is that the minute was in no way contractual and that the obligations undertaken by

H   Elmer were those set out in the contract documents, properly construed.

    The work began in the middle of February 1983. Completion date was 1 August 1983, later extended to 12 August 1983. However the contract was not actually completed until 8 December 1983. Elmer then

492
May L.J.          Ashville Investments v. Elmer Ltd. (C.A.)          [1989]

complained to Ashville that a sum in excess of £150,000 was due to    A
them, first, as they had done work additional to that provided for by the
contract documents pursuant to the architects' instructions and, secondly,
that a substantial part of the delay in completion was attributable to this
additional work, which meant that Ashville were not entitled to much of
the liquidated damages which had been deducted from moneys otherwise
payable to Elmer; indeed, the latter contended that by reason of the    B
delay so caused they were entitled to additional remuneration under the
contract. Elmer then claimed arbitration under the arbitration clause in
the contract, to which I shall refer in more detail hereafter. An
arbitrator has now been appointed. Elmer delivered their points of claim
on 31 January 1985.

The basis of Elmer's claim in the arbitration put shortly is that the
work which they agreed to carry out for the tender figure was that which    C
was contained in the specification and drawings upon which they
tendered: further, that their design liability under the contract was
limited as set out in the minute of the meeting on 22 December 1982
which I have already quoted. In these circumstances, if the written
contract must be taken as providing otherwise, then Elmer's contention
is that it does not represent what was truly agreed between themselves
and Ashville. Consequently in their points of claim Elmer seek, inter    D
alia, rectification of the contract on the ground that it was entered into
between themselves and Ashville as a result of either a mutual, or
alternatively a unilateral, mistake. Elmer also seek damages allegedly
sustained by them as a result of an innocent misrepresentation and/or a
negligent mis-statement made to them by Ashville's representatives
which induced them to enter into the contract about which they now    E
complain.

Points of defence were served on 27 June 1985. Paragraph 8 of these
denied that the arbitrator had any power under the arbitration clause in
the building contract to order rectification of it. Paragraph 9 in its turn
denied that the arbitrator had power under the same arbitration clause
to grant any relief in respect of the misrepresentation pleaded in the
points of claim. I should say at this stage that the points of claim    F
originally alleged in the alternative that Ashville's misrepresentation had
been innocent or fraudulent. After Ashville had taken the jurisdictional
objections in their points of defence, on 31 March 1986 they suggested
that these should be referred to the Commercial Court for decision.
Elmer did not agree so Ashville issued an originating summons on 14
May 1986 seeking declarations, first, that the arbitrator did not have    G
jurisdiction under the relevant arbitration clause to hear and determine
issues which had arisen in that arbitration involving mutual mistake,
innocent misrepresentation and fraudulent misrepresentation; and,
secondly, that the arbitrator had no power under the agreement to grant
the relief claimed in respect of those issues, namely rectification and
damages. The originating summons also claimed an appropriate order
under section 24(2) of the Arbitration Act 1950, having regard to the    H
allegation of fraud that there then was in the points of claim. On 11 July
1986, Elmer issued a corresponding originating summons for declarations
that the arbitrator did have jurisdiction to hear and determine all issues

A  which had arisen in the pleadings in the arbitration and that the arbitrator had power to grant all the relief claimed in the points of claim.

These two summonses came before Sir Neil Lawson sitting as a judge of the Queen's Bench Division on 21 January 1987. After hearing argument, he delivered a reserved judgment on 29 January 1987. I should say that, mindful no doubt of the clear provisions of section 24(2)

B  of the Act of 1950, before the hearing before the judge Elmer had made it clear that they were not proceeding with the allegation of fraud against Ashville and expressly abandoned it at the hearing. The points of claim were duly amended to give effect to this on 9 March 1987.

In the event, the judge dismissed Ashville's originating summons and granted Elmer the declarations asked in theirs. Ashville now appeal

C  asking that the judge's decision on each originating summons should be reversed.

It is convenient at this point to set out the arbitration clause in the relevant building contract. In so far as is relevant for present purposes it was in these terms:

D  "Provided always that in case any dispute or difference shall arise between the employer or the architect on his behalf and the contractor . . . as to the construction of this contract or as to any matter or thing of whatsoever nature arising thereunder or in connection therewith . . . then such dispute or difference shall be and is hereby referred to the arbitration and final decision of a person to be agreed between the parties, or failing agreement . . .

E  appointed . . . by the President or Vice President for the time being of the Royal Institute of Chartered Surveyors."

The judge held that the extent of the arbitrator's jurisdiction and whether he had the power to grant the relief sought depended upon the proper construction of the arbitration clause. He expressed the view that the dispute or difference between the parties about the alleged disparity

F  between the tender documents and the sealed contract documents was not one "as to the construction of the contract." On the other hand, in relation to the issue involving the minutes of the meeting on 22 December 1982, he thought that there was much more doubt whether or not that was "as to the construction of the contract." However, he found it unnecessary to decide this particular point because he held that both

G  these issues constituted disputes or differences arising "in connection with" the contract. He had been referred to certain observations by Viscount Simon L.C. in *Heyman v. Darwins Ltd.* [1942] A.C. 356 upon which Ashville relied, but he held that these were obiter and in any event pointed out that the wording of the arbitration submission in *Heyman's* case was far less wide than the wording of the arbitration clause in the instant case. In any event the judge expressed the view, as

H  he put it in his judgment, "That the climate has grown milder in relation to arbitrations during the last 45 years" and that it was thus right to adopt a broad and liberal approach to the construction of arbitration clauses rather than too narrow and legalistic an approach.

On this latter point Mr. Gray for Ashville before us submitted that   A
the judge had misdirected himself. He accepted that the question was
one of construction of the relevant arbitration submission, but contended
that its proper construction could not depend on the nature of the
approach of the relevant tribunal. He argued that the correct approach
was to ask whether on its proper construction, that is to say on the
ordinary and natural meaning of the words used, the arbitration clause
either did or did not cover the disputes or differences in issue.   B

On this point I respectfully agree. In seeking to construe a clause in
a contract, there is no scope for adopting either a liberal or a narrow
approach, whatever that may mean. The exercise which has to be
undertaken is to determine what the words used mean. It can happen
that in doing so one is driven to the conclusion that that clause is
ambiguous, that it has two possible meanings. In those circumstances the   C
court has to prefer one above the other in accordance with settled
principles. If one meaning is more in accord with what the court
considers to be the underlying purpose and intent of the contract, or
part of it, than the other, then the court will choose the former rather
than the latter. In some circumstances the court may reach its conclusion
on construction by applying the contra proferentem rule. These are,
however, well recognised principles of construction; they are not the   D
consequences or examples of adopting any particular approach to the
question of construction, save to ascertain the true intention of the
parties and the correct meaning of the words used.

On this question of the construction of the arbitration clause, counsel
for Ashville referred us to at least three decided cases which, he
submitted, constituted authority binding on us and requiring us to decide   E
that neither the issues between the parties in this case nor the relief
claimed by Elmer of rectification and damages arose "in connection with
the contract." On this basis he contended that the judge must have been
wrong and that this appeal should be allowed.

In these circumstances I think that it is necessary carefully to consider
the role of precedent and the doctrine of stare decisis in a case such as
this, in which a question of construction is in truth the fundamental issue   F
between the parties. In my opinion the doctrine of precedent only
involves this: that when a case has been decided in a court it is only the
legal principle or principles upon which that court has so decided that
bind courts of concurrent or lower jurisdictions and require them to
follow and adopt them when they are relevant to the decision in later
cases before those courts. The ratio decidendi of a prior case, the reason   G
why it was decided as it was, is in my view only to be understood in this
somewhat limited sense.

Thus, in the present context it has been decided and is a principle of
law that an arbitrator does not have jurisdiction, nor can the arbitration
agreement be construed to give him jurisdiction to rule upon the initial
existence of the contract. On the other hand, given an appropriate
arbitration clause, an arbitrator does in general have jurisdiction to rule   H
upon the continued existence of the contract; see *Heyman v. Darwins
Ltd.* [1942] A.C. 356 and *Mustill & Boyd, Commercial Arbitration,*
(1982), pp. 78 *et seq.*

495
1 Q.B.          Ashville Investments v. Elmer Ltd. (C.A.)          May L.J.

A    Similarly, it is a principle of law that the scope of an arbitrator's jurisdiction and powers in a given case depend fundamentally upon the terms of the arbitration agreement, that is to say upon its proper construction in all the circumstances. However, I do not think that there is any principle of law to the effect that the meaning of certain specific words in one arbitration clause in one contract is immutable and that those same specific words in another arbitration clause in other

B    circumstances in another contract must be construed in the same way. This is not to say that the earlier decision on a given form of words will not be persuasive, to a degree dependent on the extent of the similarity between the contracts and surrounding circumstances in the two cases. In the interests of certainty and clarity a court may well think it right to construe words in an arbitration agreement, or indeed in a particular

C    type of contract, in the same way as those same words have earlier been construed in another case involving an arbitration clause by another court. But in my opinion the subsequent court is not bound by the doctrine of stare decisis to do so.

    If I were wrong, then in any event it must be necessary to compare the surrounding circumstances in each case to ensure that those in the latter case did not require one to construe albeit the same words

D    differently when used in the different context.

    However, before turning to the authorities upon which counsel for Ashville particularly relied, there are in my opinion some further important considerations to bear in mind. First, it is trite law that the answer to the question whether a particular dispute falls within an agreement to arbitrate depends primarily upon the proper construction

E    of that agreement. Further, given that a dispute is, on that proper construction, within the jurisdiction of the arbitrator, then the latter is not only entitled but bound to grant such relief to one party or the other as and to the extent that the law permits for the resolution of that dispute, provided that the arbitration agreement does not exclude that particular relief. In addition, as this court made clear in *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984]

F    Q.B. 644, an arbitrator may well be empowered by the terms of the arbitration agreement to grant wider relief to one party or another than might be available at law.

    Secondly, therefore, there is no reason in principle why an arbitrator cannot make an order for the rectification of a contract, provided that this is justified at law and by the arbitration agreement, nor why he

G    cannot award damages for misrepresentation or a negligent mis-statement, subject to the same proviso. In so far as rectification is concerned, however, there are as I have said a number of decided cases in which on the proper construction of the arbitration clause the courts have held that such a remedy was not open to an arbitrator. I shall refer to these a little later in this judgment.

    Thirdly, this court also pointed out in the *Northern Regional Health

H    Authority* case that not only are the powers and duties of the architect, the agent of the building owner, under the J.C.T. forms of contract wide indeed, but it is quite clear that the supervisory powers of the arbitrator are (and are intended to be) wider still. In construing the latter

496

therefore, I have no doubt that it would be wrong to restrict those    A
powers but in law desirable to hold that they are as wide as the actual
wording of the arbitration clause permits.

With these points made, unless precedent requires me to decide
otherwise, I have no doubt that disputes between the parties based upon
alleged mistake at the time this contract was entered into, and upon an
alleged misrepresentation or negligent mis-statement, are ones "arising
in connection" with that contract and thus within the scope of the    B
arbitration clause in this case. Further, there is in my opinion nothing in
that clause which would preclude an arbitrator from granting rectification
or awarding damages if he finds such allegations made out. Subject to
what follows, therefore, I would respectfully agree with the decision to
which Sir Neil Lawson came on the originating summonses which came
before him.    C

However, counsel for Ashville referred us first to *Printing Machinery
Co. Ltd. v. Linotype and Machinery Ltd.* [1912] 1 Ch. 566. In that case
the relevant part of the arbitration clause in the deed under consideration
provided:

> "Any dispute difference or question which may at any time arise
> between all or any of the parties hereto touching the construction    D
> meaning or effect of these presents or any clause or thing herein
> contained or the rights or liabilities of the said parties respectively
> or any of them under these presents or otherwise howsoever in
> relation to these presents shall be referred" to arbitration.

A dispute arose between the parties as to the meaning and effect of an
option to purchase contained in the deed in respect of which one party,    E
if the proper construction of the option were to produce a result other
than that for which that party contended, sought rectification of the
deed. Warrington J. held that that particular aspect of the dispute and
that particular remedy fell within the arbitration clause in these terms, at
pp. 572–573:

> "But then comes a further question. The plaintiff company further    F
> submits that, at all events, one of the questions is one that does not
> come within the arbitration clause, not because the defendant
> company was not a party to the deed of 1901, but because it does
> not come within the description of the questions referred to
> arbitration. That particular question is the claim for rectification;
> and there, I think, the plaintiff company is right. It seems to me
> that a claim for rectification is not a claim in relation to the deed    G
> which it is sought to rectify. It is a claim which may result in dealing
> in a particular way with the deed; but it is a claim which is founded
> upon and has relation to an agreement not expressed in the piece of
> paper or parchment on which the parties have sought to express the
> terms arrived at. It seems to me that it is not a question 'touching
> the construction of these presents,' nor touching the rights or
> liabilities of the parties 'under these presents.' Nor, in my judgment,    H
> is it a question 'in relation to these presents.' It seems to me that it
> is a question in relation to something outside 'these presents,' as the
> result of determining which something may have to be done to

A      'these presents.' But that is merely incidental to the determination
       of the question; it refers to something outside of these presents. In
       my judgment, therefore, the claim for rectification of the deed itself
       is not one which falls within the arbitration clause."

       The judge's approach in the *Printing Machinery* case [1912] 1 Ch.
       566 was approved by this court in *Crane v. Hegeman-Harris Co. Inc.*
B      [1939] 4 All E.R. 68. Nevertheless, for the reasons I have already given,
       I do not think that either decision constitutes a precedent binding on us
       in the instant appeal.
       In any event the facts of the *Printing Machinery* case and in particular
       the words of the arbitration clause can clearly be distinguished from
       those in our case. In my opinion the repeated reference to "these
       presents" in the earlier case was to the deed in issue as it had been
C      executed and as it then was before the court. A dispute involving a
       claim to rectification, that is to say leading to a contract different from
       that contained in the deed, does not easily fall within the phrase "in
       relation to these presents." On the other hand such a dispute can in my
       opinion be described as one "in connection with" the contract as in the
       arbitration clause in the instant appeal.
D      In *Crane v. Hegeman-Harris Co. Inc.* [1939] 4 All E.R. 68 contractors
       agreed to construct two exhibition buildings. By a supplemental
       agreement Crane was appointed architect for the job and the contractors
       agreed to pay his fees in accordance with a formula set out in that
       agreement. Disputes arose between the contractors and the architect
       about the meaning and effect of that formula. These were referred to
       arbitration under a separate submission agreement which provided [1939]
E      4 All E.R. 68, 70–71:

           "That all such disputes questions and matters of difference between
           the parties hereto and all other matters in difference between the
           parties arising out of or relating to the said agreement or the
           subject matter thereof or as to the rights duties or liabilities of
           either of the parties in connection with the premises are hereby
F          referred to the award and final determination of [a named
           arbitrator]."

       Before the arbitrator, the contractors submitted that the supplemental
       agreement had a particular meaning. When a consultative case ultimately
       reached this court, it was decided that it did not, and the arbitrator
       made an award accordingly. In an action to enforce the award the
G      contractors counterclaimed for rescission. The defence to the counterclaim
       was that this could have been raised before the arbitrator but had not
       been, thus it could not be raised subsequently. However it was held by
       Simonds J. at first instance and by this court that the rectification issue
       could not have been raised before the arbitrator on a true construction
       of the separate specific submission agreement. In his judgment, with
       which the other members of the Court of Appeal agreed, Sir Wilfrid
H      Greene M.R. dealt with the argument raised on a defence to the
       counterclaim in this way, at pp. 71–72:

           "It is sufficient in answer to that argument to say that, in my
           opinion, it is based upon a misconstruction of the terms of the

submission itself. The submission relates to disputes which had    A
arisen at its date with regard to a particular written document
specified and identified in it, and the jurisdiction of the arbitrator
under that submission was, in my opinion, confined to whatever
matters relating to that document as an agreement between the
parties fell within the description in the submission. The issue raised
by the claim for rectification is an issue of a totally different    B
description. It is an issue of fact which does not arise out of the
particular written agreement in question, but which seeks to
substitute for that particular document another agreement in terms
different from those set out in the written document. Once that fact
is appreciated, it appears to me to be clear, beyond argument, that
any attempt by the respondents in the proceedings before the
learned arbitrator to raise the issue of rectification could not have    C
been successful without some further agreement by both parties to
submit that particular matter of dispute, which lay outside the
actual submission that was before him. That conclusion appears to
me to follow quite clearly from the clear language of the submission
itself, but I am fortified in the view that I take and the reasons
adopted when I find that Warrington J., as he then was, in the case
of *Printing Machinery Co. Ltd. v. Linotype and Machinery Ltd.*    D
[1912] 1 Ch. 566 adopted similar reasoning in a case before him. I
do not propose to read the passage which begins at the bottom of
p. 572 but it is based upon the view that the references in the
submission there to the agreement and so forth were references to
the particular written document unrectified, and not to a different
document which might result from a successful claim for rectification."    E

    Counsel for Ashville relied strongly on this passage from the
judgment, particularly as the submission to arbitration contained the
words "in connection with the premises [namely the supplemental
agreement]" which are much the same as the relevant words in the
arbitration clause in the instant case.
    However, again for the reason I have already mentioned, I do not    F
think that *Crane's* case can properly be said to be a precedent which we
are bound to follow. In any event, so soon as the facts and the course of
the litigation in *Crane's* case are appreciated, the basis of Sir Wilfrid
Greene M.R.'s reasoning in the passage from his judgment which I have
quoted is clear. When the submission agreement was made, the disputes
between the parties had arisen and their nature was known in detail. It    G
was those then existing disputes, under the supplemental agreement
which had been entered into, which were referred to arbitration. Clearly
the submission could not have been construed to cover a dispute,
namely that the supplemental agreement did not represent what had
been the true remuneration agreement between the parties, which had
not arisen when the submission agreement was made. In these
circumstances, even if these construction cases can be considered to be    H
precedents to some extent or for some purpose, the arbitration clause
with which we are concerned and the facts of this case can be clearly
distinguished from those in *Crane's* case.

A    In so far as the claim for damages for misrepresentation is concerned, we were referred to *Monro v. Bognor Urban District Council* [1915] 3 K.B. 167. In a contract for the construction of certain sewerage works the arbitration clause referred to disputes which might arise between the parties "upon or in relation to or in connection with the contract." The question which came before this court was whether an action for damages for fraudulent misrepresentation should be stayed on the

B    ground that it was within the scope of the arbitration clause. Pickford L.J. held that there should be no stay on the basis that as a matter of construction the action brought was neither on the contract, nor in relation to or in connection with it. Bankes L.J., whilst agreeing with Pickford L.J. in the result, so decided on this basis, at p. 172:

C    "but the essence of the claim is that the plaintiff is asserting that he was induced by fraud to enter into the contract, and that as a consequence the contract never was binding."

In other words if the claim based on fraud had been left to the arbitrator he would have been asked in reality to adjudicate upon his own jurisdiction, which is never permissible, as *Heyman v. Darwins Ltd.* [1942] A.C. 356 makes clear. In these circumstances, if *Monro's* case

D    could be relied upon as supplying any precedent in the present case, I would respectfully prefer the ratio of Bankes L.J. and decline to follow that of Pickford L.J.

On this analysis of these three decided cases to which our attention was drawn, even if they are to be treated as precedents so far as they go, I would in any event conclude that none of them requires me to

E    hold that the arbitration clause before us is to be construed differently from the way in which, without binding authority to the contrary, I am quite satisfied it should be understood to give effect to the clear intention of the parties.

For the reasons which I have given, I am also driven respectfully to differ from the obiter dictum of Purchas L.J. in *Blue Circle Industries Plc. v. Holland Dredging Co. (U.K.) Ltd.* (unreported), 27 February

F    1987; Court of Appeal (Civil Division) Transcript No. 167 of 1987, that claims for damages for misrepresentation and negligence do not arise "in connection with" a contract. I note that the ground upon which Purchas L.J. expressed his opinion was that "to refer such matters to an arbitrator would in effect be inviting him to adjudicate upon his own jurisdiction." In some cases this may be so and be objectionable for that

G    reason, but it is not so in the instant case and the Misrepresentation Act 1967 preserves or provides a cause of action in damages for an innocent party to whom an innocent misrepresentation has been made in lieu of rescission, that is to say without striking down the contract so induced.

Again, counsel for Ashville referred us to a particular passage in the speech of Viscount Simon L.C. in *Heyman v. Darwins Ltd.* [1942] A.C. 356, 366:

H    "An arbitration clause is a written submission, agreed to by the parties to the contract, and, like other written submissions to arbitration, must be construed according to its language and in the light of the circumstances in which it is made. If the dispute is

500

A

whether the contract which contains the clause has ever been
entered into at all, that issue cannot go to arbitration under the
clause, for the party who denies that he has ever entered into the
contract is thereby denying that he has ever joined in the submission.
Similarly, if one party to the alleged contract is contending that it is
void ab initio (because, for example, the making of such a contract
is illegal), the arbitration clause cannot operate, for on this view the
clause itself also is void."

B

By an analogous argument counsel submitted that, where the parties
are not agreed on the complete contractual terms of a contract, there
cannot be a dispute or difference arising "in connection" with the
contract. It is a dispute, it was suggested, about what the contract was,
not about the parties' rights thereunder. I cannot accept this. In the first
place the dispute in the instant case is not whether the contract was ever
entered into at all, nor whether it was void ab initio: the parties accept
that they entered into a building contract, the dispute is about what each
in truth agreed should be their respective obligations thereunder. I think
that this can and should properly be described as one "in connection
with" the contract. I do not think that Lord Simon's dictum in any way
requires me to construe the arbitration clause in the present case
differently. In any event, I agree with Sir Neil Lawson below that the
dictum was obiter, although it is quite clear that in *Heyman's* case the
House of Lords were intending to give general guidance on the scope of
arbitration clauses where the dispute was whether the contract was ever
made or whether it had come to an end as a result of an accepted
repudiation. In those circumstances I would not lightly decline to follow
such guidance, even though strictly obiter, if I thought it were applicable
to our case. On questions of construction, however, one needs to be
very careful where an authority relied on was concerned with a clause in
a contract in not precisely the same terms and I also agree with the
judge below that the wording of the arbitration clause in our present
case is wider than the clause under consideration in *Heyman's* case.

The approach of the English courts in *Printing Machinery Co. Ltd. v.
Linotype and Machinery Ltd.* [1912] 1 Ch. 566 and *Crane v. Hegeman-
Harris Co. Inc.* [1939] 4 All E.R. 68 has not been followed in
comparable cases in South Africa, New Zealand and Australia. In
*Kathmer Investments Pty. Ltd v. Woolworths Pty. Ltd.* 1970 (2) S.A.
498, in the Appellate Division of the Supreme Court of South Africa,
Rumpff J.A. pointed out that ex hypothesi in a rectification case when
the parties executed the agreement in writing between them, they must
have believed that it contained what they had in fact agreed upon, that
is to say their real agreement. Consequently, if the parties intended by
the arbitration clause in the agreement to deal with disputes arising out
of or concerning their real agreement, it followed that a dispute about
what any term of that agreement was, was a dispute which arose out of
the agreement or concerned it, and was therefore referable to arbitration
under an arbitration clause in much the same terms as that in our instant
case. The Appellate Division allowed an appeal from the lower court
which had followed the English cases.

C

D

E

F

G

H

501

1 Q.B.                    Ashville Investments v. Elmer Ltd. (C.A.)                 May L.J.

A  In *Roose Industries Ltd. v. Ready Mixed Concrete Ltd.* [1974] 2 N.Z.L.R. 246 the Court of Appeal of New Zealand also declined to follow the *Printing Machinery* and *Crane's* cases. The arbitration clause under consideration in that case was, if anything, wider than in our instant case, but by no means decisively so. In the course of his judgment, McCarthy P. said, at pp. 248–249:

B      "It is true that in both the cases I have just quoted [i.e. *Printing Machinery* and *Crane*] the specific clauses were of a wider character but it so happened that in each the court construed the express words in a way which limited the disputes to those arising out of the written document. If we were so to restrict the arbitration clause in [this] case, then the *Printing Machinery Co.* case and *Crane v. Hegeman-Harris Co. Inc.* would doubtless be good authority for
C      reaching the same conclusion as did the judge in the Supreme Court. But why should it be so limited? In our view the court should restrict the operation of such a wide clause no further than necessary, and on that reasoning should exclude, in the words of Asquith L.J. in *Woolf v. Collis Removal Service* [1948] 1 K.B. 11, 18, only claims which are entirely unrelated to the commercial
D      transaction covered by the contract."

       Then in *Drennan v. Pickett* [1983] 1 Qd. R. 445, Thomas J. sitting in the Supreme Court of Queensland preferred the decision in the *Kathmer Investments* case to that in the English cases. As he said, "The question is truly one of construction of the arbitration clause"; and he then held that a claim for rectification was within the scope of an arbitration clause
E  which referred to "any dispute or difference . . . as to the construction of the contract or as to any matter . . . arising under or out of this contract or in any way in connection therewith."
       Finally, I must refer to the argument raised by counsel for Ashville under section 24(2) of the Arbitration Act 1950. He submitted that, even though Elmer had abandoned any allegation of fraudulent misrepresentation, nevertheless the particulars in the points of claim
F  remained unaltered and thus it was unreal not to treat Elmer's case as in effect continuing to allege fraud on Ashville's part. For my part, I cannot agree. Lord Wilberforce made it clear in *Camilla Cotton Oil Co. v. Granadex S.A.* [1976] 2 Lloyd's Rep. 10, 16, that the jurisdiction under section 24(2) of the Act of 1950 can only be exercised where a concrete and specific issue of fraud has been raised. In any event, in his
G  judgment below Sir Neil Lawson said that even if section 24(2) of the Act could apply in the circumstances of the instant case, he would not in the exercise of his discretion make any order thereunder. In my opinion, in giving his reasons for reaching this conclusion, the judge neither misdirected himself nor could we say that his conclusion was plainly wrong. Indeed were the discretion mine to exercise, I would take the same view as the judge and thus avoid concurrent legal and arbitration
H  proceedings.
       For all the reasons I respectfully think that Sir Neil Lawson came to the correct decision on the originating summonses which were before him. I would therefore dismiss this appeal.

502

BALCOMBE L.J. The facts of this case are set out in the judgment of    A
May L.J. and I do not need to repeat them, save only to stress that
some of the disputes between the parties are of a kind which only an
arbitrator appointed under the arbitration clause in question has power
to determine. I refer in particular to his power, under clause 35(3) of
the conditions to which the contract between the parties was subject:

> "to open up, review and revise any certificate, opinion, decision,    B
> requirement or notice and to determine all matters in dispute which
> shall be submitted to him in the same manner as if no such
> certificate, opinion, decision, requirement or notice had been
> given. . ."

and to the decision of this court in *Northern Regional Health Authority
v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644 that the court    C
has no such power. Ashville concede that, should they succeed on their
appeal, two sets of proceedings will be inevitable: one before the court
and one before the arbitrator.

The issues between the parties are (1) does the arbitration clause
empower the arbitrator to deal with the following questions; (a) mutual
mistake, or unilateral mistake on the part of Elmer of which Ashville
took advantage, so as to entitle Elmer to rectification of the written    D
contract; (b) innocent misrepresentation by Ashville which induced
Elmer to enter into the contract, so as to entitle Elmer to damages
under the Misrepresentation Act 1967; (c) negligent mis-statement by
Ashville in consequence of which Elmer entered into the contract, so as
to entitle Elmer to damages in tort. (2) Does the dispute between the
parties involve the question whether Ashville have been guilty of fraud    E
and, if so, is this a case for relief under section 24(2) of the Arbitration
Act 1950?

I now consider them separately.

*The arbitration clause*

Mr. Gray, for Ashville, accepts that there is no reason why, as a    F
matter of principle, an arbitrator should not be empowered to deal with
issues of rectification for mistake, or damages for misrepresentation.
However, he submits that the particular clause here in question does not
give the arbitrator the necessary powers. So I turn to consider the
arbitration clause in this particular contract. Clause 35(1) of the
conditions is in the following terms:

> "in case any dispute or difference shall arise between the employer    G
> . . . and the contractor . . . as to the construction of this contract or
> as to any matter or thing of whatsoever nature arising thereunder or
> in connection therewith . . . then such dispute or difference shall be
> and is hereby referred to . . . arbitration . . ."

Thus there are referred to arbitration: (i) any dispute or difference as to
the *construction* of the contract; (ii) any dispute or difference as to any    H
matter or thing of whatsoever nature arising *under* the contract; and (iii)
any dispute or difference as to any matter or thing of whatsoever nature
arising *in connection with* the contract.

503

1 Q.B.                Ashville Investments v. Elmer Ltd. (C.A.)           Balcombe L.J.

A    Simply as a matter of the wording of the clause, the following points appear to me to be clear. (i) "This contract" means the written agreement between the parties, of which the conditions form part. (ii) A dispute between the parties as to whether a mistake (whether mutual or unilateral) can give one party a right to the rectification of the written agreement so as to accord with a pre-existing oral agreement is not a "dispute or difference . . . as to the construction of this contract." Mr.

B Lloyd, for Elmer, sought to rely on a passage from the judgment of Donaldson L.J. in *Esmil Ltd. v. Fairclough Civil Engineering Ltd.* (1981) 19 B.L.R. 134, 137, in support of a submission that rectification of a contract is a matter of construction within the meaning of "construction" as used in clause 35(1). I need only say that I do not read this passage as supporting so remarkable a proposition. (iii) Such a

C dispute (i.e. a dispute about mistake leading to rectificatoin) is not as to "any matter or thing . . . arising" *under* the contract. (iv) Similarly, a dispute between the parties as to whether an innocent misrepresentation, or negligent mis-statement, which led Elmer to enter into the contract, gives a right to damages, is neither a dispute as to the construction of the contract, nor a dispute as to any matter arising *under* the contract.

D    On the other hand, simply as a matter of the words used, which are of the widest import, I can see no reason why both these disputes, viz. as to mistake leading to rectification and as to misrepresentation or mis-statement leading to damages, should not in each case be a dispute as to "any matter or thing of whatsoever nature arising . . . *in connection therewith*" the contract. As on any question of construction the issue is incapable of much elaboration: it is a matter of how the words strike the

E reader. However, I find that the meaning which I give the words as a matter of first impression is supported by the approach to the arbitration clause which Mr. Lloyd submits, correctly in my view, that we should adopt. That approach is summarised in the following propositions. (1) It may be presumed that the parties intended to refer all the disputes arising out of this particular transaction to arbitration. (2) It may also be presumed that the parties intended that all disputes should be determined

F finally by the same tribunal. (3) As a result of the decision in *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644, it is clear that an arbitrator may have powers which are not available to the court; therefore he should at least have those powers which are available to the court.

G    There is one further principle of construction that in my judgment supports the meaning which I attribute to this clause, viz. that all the words used should, so far as possible, be given a meaning. Disputes as to the construction of the contract, or as to matters arising under the contract, are covered by the opening words of the clause. So disputes as to matters arising in connection with the contract must be taken to refer to disputes other than about questions of construction, or as to matters arising under the contract. Asked to suggest a dispute that arose in

H connection with the contract, which was neither a matter of construction nor arose under the contract, Mr. Gray was only able to suggest a question whether the contract had been frustrated by some supervening event. I can see no reason why the words should be limited only to

matters that arose after the making of the contract, and should not
include matters which happened before the making of the contract,
provided that they are connected with the contract.

Thus far I have approached this question as if it were free from
authority: unfortunately it is not. In *Printing Machinery Co. Ltd. v.
Linotype and Machinery Ltd.* [1912] 1 Ch. 566, Warrington J. held that
a question as to the rectification of a lease did not fall within the
arbitration clause in the lease. The relevant words in that arbitration
clause were "any dispute difference or question which may at any time
arise . . . otherwise howsoever in relation to these presents."
Warrington J. said, at pp. 572–573:

> "It seems to me that a claim for rectification is not a claim in
> relation to the deed which it is sought to rectify. It is a claim which
> may result in dealing in a particular way with the deed; but it is a
> claim which is founded upon and has relation to an agreement not
> expressed in the piece of paper or parchment on which the parties
> have sought to express the terms arrived at. It seems to me that it is
> not a question 'touching the construction of these presents,' nor
> touching the rights or liabilities of the parties 'under these presents.'
> Nor, in my judgment, is it a question 'in relation to these presents.'
> It seems to me that it is a question in relation to something outside
> 'these presents,' as the result of determining which something may
> have to be done to 'these presents.' But that is merely incidental to
> the determination of the question; it refers to something outside of
> 'these presents.' In my judgment, therefore, the claim for rectification
> of the deed itself is not one which falls within the arbitration
> clause."

In *Monro v. Bognor Urban District Council* [1915] 3 K.B. 167, the
plaintiff, a contractor, alleged that he had been induced to enter into a
building contract by fraudulent misrepresentation and he brought an
action to recover damages for the alleged misrepresentations and to
have the contract declared void. The defendants applied to stay the
proceedings and to refer the dispute to arbitration under the arbitration
clause in the contract, which was a wide one and embraced disputes
"upon or in relation to or in connection with the contract." The Court
of Appeal held that the defendants were not entitled to have the
proceedings stayed. Pickford L.J. in his judgment said that the claim for
damages for fraudulent misrepresentation was not in relation to or in
connection with the contract, within the meaning of the arbitration
clause. With that opinion I must respectfully disagree. However,
Bankes L.J. said, at p. 172:

> "the essence of the claim is that the plaintiff is asserting that he was
> induced by fraud to enter into the contract, and that as a
> consequence the contract never was binding."

These last words indicate a ratio for the decision which is clearly right:
an arbitrator cannot have jurisdiction to decide that the contract under
which he is appointed is void or voidable, since by so doing he would be
destroying the very basis of his own position. Accordingly, I need
consider this case no further.

505

1 Q.B.            Ashville Investments v. Elmer Ltd. (C.A.)            Balcombe L.J.

A    The passage cited above from the judgment of Warrington J. in the *Printing Machinery* case was approved by Sir Wilfrid Greene M.R., delivering the leading judgment of this court in *Crane v. Hegeman-Harris Co. Inc.* [1939] 4 All E.R. 68, 72. That was a case of a formal agreement to submit disputes that had already arisen under a contract to arbitration, and the court held that a claim for rectification of the original contract was not within the powers conferred upon the arbitrator
B    by the submission.

The approach of these cases to arbitration clauses in similar, although not identical, terms has not been followed by courts in South Africa, New Zealand and Australia. In *Kathmer Investments Pty. Ltd. v. Woolworths Pty. Ltd.* 1970 (2) S.A. 498, the Appellate Division of the Supreme Court of South Africa held that an arbitration clause in a lease
C    was wide enough to cover a claim for rectification of the lease. The court reversed the decision of the Cape Provincial Division, which had affirmed a decision of Watermeyer J., who had referred to the English cases and followed the *Printing Machinery Co. Ltd. v. Linotype and Machinery Ltd.* [1912] 1 Ch. 566. Similarly, in *Roose Industries Ltd. v. Ready Mixed Concrete Ltd.* [1974] 2 N.Z.L.R. 246, the Court of Appeal of New Zealand refused to follow the approach of the *Printing Machinery*
D    case and *Crane v. Hegeman-Harris Co. Inc.* Finally, in *Drennan v. Pickett* [1983] 1 Qd. R. 445, Thomas J. sitting in the Supreme Court of Queensland followed the decision of the South African Supreme Court in *Kathmer Investments* in preference to the English cases.

If this court were bound by *Crane v. Hegeman-Harris Co. Inc.* [1939] 4 All E.R. 68 to reach the same decision in the present case as the court
E    did in that case, and as Warrington J. did in the *Printing Machinery* case [1912] 1 Ch. 566, I would, however reluctantly, have followed that course. However, I do not understand that the doctrine of judicial precedent requires me to come to a conclusion which I find so unattractive. If these decisions had related to an arbitration clause in terms identical with the clause in the present case then, unless there were some other valid reason for distinguishing these cases, I would
F    have felt bound to follow them. But any question of construction must be decided by a consideration of the particular words used. I am fully alive to the desirability of avoiding narrow distinctions, and of following the reasoning behind a particular decision wherever possible, even though not technically bound so to do; but that approach is not to be stretched to following a line which one is convinced is wrong.
G    Accordingly, I find nothing in the English cases which requires me to reach a conclusion the opposite of that to which my reading of the language of the clause leads me, and I derive considerable support from the overseas cases to which I have referred.

It follows from what I have said above that I am also unwilling to follow the dictum of Purchas L.J. in *Blue Circle Industries Plc. v. Holland Dredging Co. (U.K.) Ltd.,* Court of Appeal (Civil Division)
H    Transcript No. 167 of 1987, to the effect that claims for damages for misrepresentation and negligence do not arise "in connection with" a contract so as to be within the scope of the arbitration clause in that case.

506

Balcombe L.J.    Ashville Investments v. Elmer Ltd. (C.A.)    [1989]

*Fraud and section 24(2) of the Arbitration Act 1950*    A

The points of claim by Elmer originally alleged a fraudulent
misrepresentation on the part of Ashville. These have been amended so
as to delete the allegation of fraud. Nevertheless the basic facts pleaded
remain unaltered. So, submitted Mr. Gray, there is still in effect a
question whether Ashville has been guilty of fraud. I do not agree. In
order to invoke the jurisdiction under section 24(2) of the Arbitration    B
Act 1950 it is necessary that a concrete and specific issue of fraud must
be raised: see *Camilla Cotton Oil Co. v. Granadex S.A.* [1976] 2 Lloyd's
Rep. 10, 16, *per* Lord Wilberforce. Once the points of claim had been
amended, a concrete and specific issue of fraud was no longer raised.
But even if there had been a question of fraud in issue, in my judgment
the proposed exercise by Sir Neil Lawson of his discretion under section
24(2), had it become exercisable, in refusing to make an order under    C
that subsection could not have been effectively challenged in this court,
since it is quite impossible to say that the judge misdirected himself or
came to a decision which would have been plainly wrong. In so far as it
is relevant, had the discretion been mine, I would have exercised it in
the same way as the judge would have done, had the question arisen, so
as to avoid two sets of proceedings.    D

I would dismiss this appeal.

BINGHAM L.J. A non-statutory arbitrator derives his jurisdiction from
the agreement of the parties at whose instance he is appointed. He has
such jurisdiction as they agree to give him and none that they do not.
The only inherent limitation is that he cannot make a binding award as
to the initial existence of the agreement from which his jurisdiction is    E
said to derive. When a question arises, as it does here, whether a certain
dispute falls within an arbitrator's jurisdiction the court's task is in
principle a simple one: it is to consider the dispute in question, to elicit
from the arbitration agreement the parties' intentions concerning the
jurisdiction to be conferred on the arbitrator, and to decide whether the
parties did or did not intend a dispute of the kind in question to be    F
resolved by the arbitrator. As Viscount Simon L.C. succinctly put it in
*Heyman v. Darwins Ltd.* [1942] A.C. 356, 360:

"The answer to the question whether a dispute falls within an
arbitration clause in a contract must depend on (a) what is the
dispute and (b) what disputes the arbitration clause covers."

May L.J. has very helpfully identified the claims which Elmer wish to    G
advance in this arbitration and which Ashville contend the arbitrator has
no jurisdiction to entertain. I shall call these "Elmer's disputed claims."
There is nothing I can usefully add on this aspect so I turn to the
question of construction. But before considering the detailed terms of
clause 35 of the 1963 J.C.T. standard form (private edition without
quantities) (July 1977 revision) it is, I think, necessary to pause in order
to take account of the contractual relationship of which this agreement    H
to arbitrate forms a small part.

In most commercial contracts the fundamental contract terms concern
the obligation to be performed, the period for performance and the

507

A    price. Usually these are stipulated with some particularity. But it is not unusual to find some element of fluidity. For instance, in a sale of goods contract one party often has the right to increase or decrease by a percentage the contract quantity or to stipulate (within limits) the quality to be delivered; the contractual period of performance may be extended in certain eventualities; and the price may be determined by reference to some index or market rate. I do not, however, think that there is any
B    class of contract in which the content of these fundamental terms is potentially as fluid as in the familiar forms of building and civil engineering contract. These contain terms which enable the contractor's work to be increased, decreased or varied, perhaps substantially, the period for performance to be extended, again substantially, and the contract price to be recalculated, upwards or downwards, in the light of
C    events during the currency of the contract. Authority to determine the work to be done, the length of the contract period and the price to be paid is vested in a professional agent (be he architect or engineer) nominated by the employer. As Sir John Donaldson M.R. pointed out in *Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644, 670:

D          "Despite the fact that the architect is subject to a duty to act fairly, these powers might be regarded as draconian and unacceptable if they were not subject to review and revision by a more independent individual. That process is provided for by the arbitration clause. It is, however, a rather special clause. Arbitration is usually no more and no less than litigation in the private sector. The arbitrator is called upon to find the facts, apply the law and grant relief to one
E          or other or both of the parties. Under a J.C.T. arbitration clause (clause 35), the arbitrator has these powers but he also has power to 'open up, review and revise any certificate, opinion, decision, requirement or notice.' This goes far further than merely entitling him to treat the arbitrator's certificates, opinions, decisions, requirements and notices as inconclusive in determining the rights of the parties. It enables, and in appropriate cases requires, him to
F          vary them and so create new rights, obligations and liabilities in the parties. This is not a power which is normally possessed by any court and again it has a strong element of personal judgment by an individual nominated in accordance with the agreement of the parties."

G    As a result, no doubt, of their subject matter and the fluidity to which I have referred, building and civil engineering contracts tend to be long and complex documents, often raising what most professional lawyers would regard as difficult problems of interpretation. Yet these contracts are ordinarily administered in the field by men whose qualifications are not as lawyers and in case of dispute the final decision is again entrusted to an architect, surveyor or engineer agreed between
H    the parties or nominated by the president of a professional institute to act as arbitrator. In the ordinary case such as the present where there are unresolved differences concerning extensions of time, liquidated damages, recovery of loss or expense, the valuation of variations and so

508
Bingham L.J.        Ashville Investments v. Elmer Ltd. (C.A.)        [1989]

on the arbitrator alone can finally decide. He has the same duty as any          A
other judicial tribunal to interpret the contract and make factual
decisions involving the assessment of recollection and credibility, the
evaluation of evidence and documents and the drawing of appropriate
inferences. In addition, as the passage which I have quoted from the
*Northern Regional Health Authority* case shows, he has an independent
professional judgment to exercise. This is the backdrop against which          B
the effect of the arbitration clause in this contract must be determined.
The intention of these parties cannot in my view be fairly assessed
without having regard to the situation in which the draftsmen of the
contract and the clause must have envisaged that they would find
themselves.

The language of clause 35(1) strongly suggests that the draftsman has
been at pains to define the arbitrator's jurisdiction in very wide terms.          C
The reference to "any dispute or difference" plainly contains no
limitation of any kind. The breadth of the clause is reflected in the lack
of any significant temporal limitation: such disputes and differences are
to be referred to the arbitrator whether they "arise during the progress
or after the completion or abandonment of the works." It is only
disputes and differences which arise between the date of contract and          D
the date when the works begin which may not be covered. But the
disputes and differences to be referred are, as one would expect,
restricted by reference to their subject matter. It is perhaps helpful to
dissect the relevant part of the clause. Disputes and differences are to be
referred if (a) they are "as to the construction of this contract" or (b)
they are "as to any matter or thing of whatsoever nature arising" under
the contract; or (c) they are "as to any matter or thing of whatsoever          E
nature arising . . . in connection" with the contract.

It was argued for Elmer, in reliance on observations of
Donaldson L.J. in *Esmil Ltd. v. Fairclough Civil Engineering Ltd.* 19
B.L.R. 134, 137, that "construction" meant not merely "construing" but
also "the action of framing, devising or forming" and that accordingly
Elmer's claim for rectification should be held to fall within head (a)
above. It is of course true that in its primary and everyday sense          F
"construction" relates to building works, but the reference here is to
construction of a contract and that makes it plain that the familiar legal
usage of the term is to be understood. Head (a) clearly establishes that
any dispute concerning the interpretation of the contract terms and
documents is to be referred to arbitration, but none of Elmer's disputed
claims now in issue falls within that description.          G

The opening reference in head (b) to "any matter or thing of
whatsoever nature" suggests an intention to embrace all disputes and
differences of every imaginable kind, but the apparent width of this
reference is restricted by the later requirement that they must arise
under the contract. Plainly, this head provides for the reference to
arbitration of all contractual claims arising under the contract as
executed. Equally plainly, as I think, this head does not cover claims in          H
tort. Whether it could be held to cover quasi-contractual or restitutionary
claims, or claims for rectification of the contract, it is not necessary for
present purposes to consider: the wording of head (c) is, I think, clearly

A  wider than that of head (b), and if Elmer cannot bring their disputed
claims within (c) they cannot be saved by (b); if, on the other hand,
they can bring their claims within (c), they do not need the help of (b).

Head (c) covers any dispute or difference between Ashville or the
architect and Elmer as to any matter or thing of whatsoever nature
arising in connection with the contract. I do not find this language either
vague or ambiguous. Any dispute or difference unconnected with the
B  parties' contractual relationship is not subject to the arbitration
agreement. Any other dispute or difference is. One could imagine
disputes which fell close to the line of demarcation and made it difficult
to decide whether or not they were as to matters arising in connection
with the contract. But the test to be applied to any dispute or difference
is a simple one: does this dispute or difference arise as to any matter or
C  thing in connection with the contract or does it not?

Applying that test to Elmer's claim for rectification, I think there is
only one possible answer. Whether one understands "this contract" as
meaning the deed as executed or the agreement between the parties,
Elmer's claim is intimately connected with it. As in any claim for
rectification Elmer's claim is that the real agreement or understanding
reached between the parties was not accurately expressed in the written
D  contract. Elmer's claim goes to the heart of the parties' contractual
relationship, because it challenges the instrument recording their
agreement and raises an issue as to what the parties in truth agreed or
intended. I do not see how this claim could plausibly be said not to be
as to a matter in connection with the deed and the agreement.

Elmer's claims in misrepresentation and negligent mis-statement are
founded upon the allegedly tortious conduct of Ashville said to have
E  induced Elmer to sign and execute the contract. Had the statements
complained of become terms of the contract, Elmer's claims for breach
would, it would seem, have fallen under head (b). It is not said that the
statements became terms of the contract, but that does not mean that
the claims arising from them are not connected with the contract. In my
view Elmer's claims in misrepresentation and negligent mis-statement
F  relate to statements made in connection with the contract in the very
real sense that they are said to have induced the making of it. Any other
conclusion would in my view introduce an unwelcome element of
artificiality into a very ordinary commercial transaction.

Looking at the matter more broadly, I find nothing surprising or
unattractive about these conclusions. In any case at all similar to this,
there are virtually bound to be claims which an arbitrator will have to
G  resolve because only he has power to do so. As I have tried to show, his
task is likely to be one of considerable difficulty, calling for great skill
and judgment in its effective discharge. I find it hard to suppose that any
informed and detached observer, untouched by the acrimony of this
case, would not think it sensible for Elmer's disputed claims to be
resolved by the same responsible arbitrator who was to investigate and
H  decide the rest of the case.

Counsel for Ashville was constrained to acknowledge the force of
some at least of these points, but he submitted that the approach I have
so far adopted was one denied to us by binding authority. This is a

510
**Bingham L.J.**        Ashville Investments v. Elmer Ltd. (C.A.)        [1989]

serious submission, not to be lightly dismissed, because the cases relied    A
on are of high authority and long standing. But it may, I think, be said
that the leading cases were decided at a time when both the general
attitude towards arbitration and the judicial approach towards arbitration
clauses were very different from what they are today. It is not without
significance that in recent years courts in South Africa, New Zealand
and Queensland have declined to follow the cases by which we are said    B
to be bound. But, of course, if the cases contain a ratio clearly binding
upon us we have no choice but to follow them, however different the
course which we might otherwise have followed. The line of authority
begins with *Printing Machinery Co. Ltd. v. Linotype and Machinery Ltd.*
[1912] 1 Ch. 566. The plaintiff company in that case had by deed leased
its undertaking, business and goodwill to another company, with an
option to purchase. The deed contained an arbitration clause in which    C
repeated reference was made to "these presents," meaning the deed.
The plaintiff issued a writ claiming an alternative declaration on the
method of calculating the option price, and alternatively claiming
rectification. Warrington J. held that the claim for rectification fell
outside the arbitration clause. He said, at pp. 572–573:

> "But then there comes a further question. The plaintiff company    D
> further submits that, at all events, one of the questions is one that
> does not come within the arbitration clause, not because the
> defendant company was not a party to the deed of 1901, but
> because it does not come within the description of the questions
> referred to arbitration. That particular question is the claim for
> rectification; and there, I think, the plaintiff company is right. It    E
> seems to me that a claim for rectification is not a claim in relation
> to the deed which it is sought to rectify. It is a claim which may
> result in dealing in a particular way with the deed; but it is a claim
> which is founded upon and has relation to an agreement not
> expressed in the piece of paper or parchment on which the parties
> have sought to express the terms arrived at. It seems to me that it is
> not a question 'touching the construction of these presents,' nor    F
> touching the rights or liabilities of the parties 'under these presents.'
> Nor, in my judgment, is it a question 'in relation to these presents.'
> It seems to me that it is a question in relation to something outside
> 'these presents,' as the result of determining which something may
> have to be done to 'these presents.' But that is merely incidental to
> the determination of the question; it refers to something outside of    G
> these presents. In my judgment, therefore, the claim for rectification
> of the deed itself is not one which falls within the arbitration
> clause."

It is evident that Warrington J. was much impressed by the repeated
reference to "these presents," concentrating attention on the deed itself.
I should myself have been inclined, even so, to conclude that the claim    H
for rectification was one "in relation to these presents," but the judge's
reasoning is certainly understandable and was later held by the Court of
Appeal to have been correct.

A    *Monro v. Bognor Urban District Council* [1915] 3 K.B. 167 concerned
a civil engineering contract. The contractor said that he had been
induced to make the contract by fraudulent misrepresentations in the
specification. He issued a writ claiming damages for fraudulent
misrepresentation, the price of work done and materials supplied upon a
quantum meruit and a declaration that the contract was void and should
be rescinded. The employer applied to stay the action, relying on an
B    arbitration clause which provided:

> "If at any time any question, dispute or difference shall arise
> between the council or their engineer and the contractor upon or in
> relation to or in connection with the contract the matter shall be
> referred . . ."

C    This clause was somewhat similar to the present, and not less wide. In
the Court of Appeal (Pickford and Bankes L.JJ.) the employer failed,
but the ratio of the decision is not altogether easy to discern. Pickford
L.J. said, at pp. 170–171:

> "The question was whether this action should be stayed, and this
> action is not, in my opinion, an action upon the contract in any
D    > sense of the word. It is an action for damages for fraudulent
> misrepresentation which induced the plaintiff to enter into the
> contract and it is also an action for an injunction to prevent the
> defendants from applying the clause of the contract to his plant and
> materials, and then, not expressed in the alternative but being really
> in the alternative, there is a claim for work and labour done upon a
> quantum meruit which he could not maintain if his contract were in
E    > existence, because he could then only sue for any instalments that
> might be due according to the terms of the contract. It is, therefore,
> in no sense an action on the contract at all. Nor do I think that it is
> an action in relation to or in connection with the contract. In one
> sense it is an action in relation to and in connection with the
> contract because if there had never been any contract there would
> never have been any cause of action, there would never have been
F    > any representation, and there would never have been any claim for
> damages. But it is not in relation to or in connection with the
> contract, in my opinion, within the meaning of the arbitration
> clause. That being so, I think the action is with reference to matter
> wholly outside the powers of the arbitrator, and with which he
> could not possibly deal."

G
I find this somewhat puzzling. Having accepted, as I think rightly,
that the claim was in one sense in connection with the contract, Pickford
L.J. went on to hold that the claim was not in relation to or in
connection with the contract within the meaning of the arbitration
clause. He does not explain why this should be so, and I do not think
that his conclusion can be regarded as more than an opinion formed on
H    the construction of the particular contract with which he was dealing.
Bankes L.J. put the matter somewhat differently, at pp. 172–173:

> "It is a claim for damages for fraudulent misrepresentation whereby
> the plaintiff was induced to enter into the contract, and there are

512

A claims for consequent relief. These are put in the form of a claim for work and labour done, but the essence of the claim is that the plaintiff is asserting that he was induced by fraud to enter into the contract, and that as a consequence the contract never was binding. If that is the nature of the claim, it seems to me plain that it does not come within the scope of the submission, and it is no answer to say that the plaintiff has mistaken his remedy and that he ought not B to have brought this form of claim, and that he cannot substantiate it, or that if you look into it you will find that he ought to have brought a different action altogether, and if he had it would have been plain that it came within the submission. It is no use saying that, as it seems to me. The only point is whether the claim which is brought—whether it is good, bad or indifferent—comes within the submission to arbitration."

C

Again, I do not find the reasoning of Bankes L.J. entirely easy to follow, but it may perhaps have been in his mind that an arbitrator could not have jurisdiction to decide a claim advanced by a party who challenged the existence of the contract from which the arbitrator's jurisdiction was said to derive. I do not think this case lays down any principle of law which we are bound to follow.

D The facts of *Crane v. Hegeman-Harris Co. Inc.* are a little involved, but they are summarised by Simonds J. in the note of his judgment at first instance which is to be found at [1971] 1 W.L.R. 1390. E, the owner, employed C, the contractors, to manage and supervise building works. Their written agreement, made in July 1935, provided that C should be paid the cost of the work plus a fixed fee of £140,000. But the agreement also stipulated a ceiling figure for the cost of the work and E provided that C should assume and pay any excess over that ceiling figure. It appears that the fee of £140,000 was intended as to £70,000 to cover C's expenses and as to the balance of £70,000 to provide their profit, but plainly their profit would be eroded if the cost of the works exceeded the ceiling figure. By a separate written agreement made in October 1935 C agreed with A, an architect, that he should provide F architectural services for the work. A was to receive a small fixed fee. In addition A was to receive a fraction of the second (profit) tranche of £70,000 payable by E to C, abated by any sum C might lose as a result of having to bear any excess over the ceiling figure. This last term, although understood between C and A, was not clearly expressed in their October agreement. Differences arose between C and A concerning G A's entitlement to reward, which were submitted to arbitration in April 1937. The arbitrator was asked to construe the October agreement, and following a consultative case which reached the Court of Appeal he found in favour of A's construction, which was not that summarised above. A then issued proceedings to enforce the award. C resisted, claiming that the October agreement should be rectified to express the H true agreement of the parties which, on the arbitrator's construction, had not been accurately expressed in the October agreement. A resisted this claim on a number of grounds, all of which Simonds J. rejected. He dismissed A's claim and allowed C's counterclaim to rectify the October

513

A agreement to the effect I have summarised. He dealt with the arbitrator's jurisdiction briefly, and without finding it necessary to quote or consider the terms of the submission to arbitration ([1971] 1 W.L.R. 1390, at pp. 1401–1402):

> "The position then is this. As I pointed out at the beginning of this
> B judgment, this is an action upon an award. It is, therefore, an
> action to enforce an agreement, for an action upon an award is an
> action to enforce an agreement implied in the submission, for the
> submission involves the implied promise of the parties that they will
> do that which the arbitrator awards; but it follows from what I have
> said that the agreement which was submitted to the arbitrator for
> his arbitration was not the agreement of the parties. It did not
> represent the true consensus of their minds. Accordingly the
> C submission was made under a fundamental mistake of fact common
> to them both. I must assume that they both submitted this agreement
> to the arbitration of the arbitrator upon the footing that it
> represented their minds, when it did not. Therefore the defence
> which the defendants put forward is a defence which both reduces
> the claim under the award to a nullity and at the same time entitles
> the defendants to have the agreement rectified so as to bring it into
> D conformity with the consensus of their minds."

A challenged the decision of Simonds J. before a very strong Court of Appeal (Sir Wilfrid Greene M.R., Clauson and Goddard L.JJ.), [1939] 4 All E.R. 68. From the judgment of Sir Wilfrid Greene M.R., with which both Clauson L.J. and Goddard L.J. agreed, it appears that E the October agreement between C and A contained an arbitration clause but that the further submission agreement was made in April 1937 to get the arbitration on foot. This submission recited that questions or differences had arisen and were then pending between the parties thereto touching the construction of the agreement and touching also the rights, duties and liabilities of the respective parties thereunder within the meaning of clause 4 (presumably the remuneration clause) of the F agreement. It recited an agreement to refer the said matter to arbitration, and in the operative part it was agreed, at pp. 70–71:

> "That all such disputes questions and matters of difference between
> the parties hereto and all other matters in difference between the
> parties arising out of or relating to the said agreement or the
> subject matter thereof or as to the rights duties or liabilities of
> G either of the parties in connection with the premises are hereby
> referred to the award and final determination of Mr. Roland
> Oliver."

With reference to this issue Sir Wilfrid Greene M.R. said, at pp. 71–72:

> "Two arguments on behalf of the present appellant were before
> Simonds J., and these arguments are before us. They were these.
> H First, that upon the facts of the case no case for rectification had
> been made out: secondly, that the matter in question, namely, the
> issue between the parties as to whether or not the agreement ought
> to be rectified was a matter which fell within the terms of the
> arbitration submission, which could have been raised before the

514
Bingham L.J.        Ashville Investments v. Elmer Ltd. (C.A.)        [1989]

arbitrator, and ought to have been raised before him, and could not $\quad$ A
be raised after he had issued his award and was functus officio.
There was a further agreement based on some sort of estoppel, or
to use Mr. Vos's word in his argument in the present appeal,
quiescence. Simonds J., in a judgment of conspicuous clarity,
rejected the appellant's argument on both points. He found that the
facts brought to his mind that high degree of conviction which
unquestionably is to be insisted upon in rectification cases. The $\quad$ B
other matter which was argued before Simonds J., and was also
argued before us, relates to the terms of the submission agreement.
It was said by Mr. Vos that it was open to the respondents, under
the terms of this submission, to raise the question of rectification
before the arbitrator and that had they done so the arbitrator would
have been entitled, and bound, to deal with that issue and that $\quad$ C
accordingly it is not competent to the court afterwards to listen to a
case which falls within the terms of the submission. It is sufficient in
answer to that argument to say that, in my opinion, it is based upon
a misconstruction of the terms of the submission itself. The
submission relates to disputes which had arisen at its date with
regard to a particular written document specified and identified in
it, and the jurisdiction of the arbitrator under that submission was, $\quad$ D
in my opinion, confined to whatever matters relating to that
document as an agreement between the parties fell within the
description of the submission.

"The issue raised by the claim for rectification is an issue of a
totally different description. It is an issue of fact which does not
arise out of the particular written agreement in question, but which $\quad$ E
seeks to substitute for that particular document another agreement
in terms different from those set out in the written document. Once
that fact is appreciated, it appears to me to be clear, beyond
argument, that any attempt by the respondents in the proceedings
before the learned arbitrator to raise the issue of rectification could
not have been successful without some further agreement by both
parties to submit the actual submission that was before him. That $\quad$ F
conclusion appears to me to follow quite clearly from the clear
language of the submission itself, but I am fortified in the view that
I take and the reasons adopted when I find that Warrington J., as
he then was, in the case of the *Printing Machinery Co. Ltd. v.
Linotype and Machinery Ltd.* [1912] 1 Ch. 566 adopted similar
reasoning in a case before him. I do not propose to read the $\quad$ G
passage which begins at the bottom of p. 572 but it is based upon
the view that the references in the submission there to the agreement
and so forth were references to the particular written document
unrectified, and not to a different document which might result
from a successful claim for rectification. . . . The issue of rectification
is a totally different issue. The only issue before the arbitrator $\quad$ H
related to the actual document . . ."

It must be remembered that the submission under consideration was
one made after differences had arisen. The parties' intention was to

A  submit those differences to arbitration. The differences at that stage concerned the proper construction of the October agreement but did not include any issue as to whether the October agreement accurately expressed the true agreement of the parties. Thus it could fairly be said that the April 1937 submission was not intended to embrace differences which had not then arisen. Plainly Sir Wilfrid Greene M.R. went further than that in his judgment, and no doubt he was right to interpret the

B  agreement before him as he did. It is not, however, argued that a suitably drafted arbitration clause cannot give an arbitrator jurisdiction to rectify an agreement. Indeed, Ashville expressly accept that the wording of an arbitration agreement may be wide enough to permit arbitration of any issue arising or to arise between the parties to that agreement. The Court of Appeal held that the clause they were

C  considering in that case was not wide enough to embrace a claim for rectification. That decision cannot in my view contain any rule of law binding on us when called upon to construe a different contract between different parties in entirely different circumstances.

Our attention was drawn to a recent decision of the Court of Appeal: *Blue Circle Industries Plc. v. Holland Dredging Co. (U.K.)*

D  *Ltd.,* Court of Appeal (Civil Division) Transcript No. 167 of 1987. The issue before the court was whether the agreement between the parties contained an arbitration clause. The court held that it did not. The court did, however, go on to consider whether, if the agreement had contained the arbitration clause contended for, which was in terms very similar to the present, claims for negligence and misrepresentation would have fallen within it. The court held that they would not:

E

"If it were not for the allegations of negligent advice or misrepresentation, if these are substantiated, there would never have been a contract and, therefore, there would not have been an agreement to arbitrate. To refer these matters to an arbitrator would in effect be inviting him to adjudicate upon his own jurisdiction and this is not in accordance with the authorities: see

F  *Monro v. Bognor Urban District Council* [1915] 3 K.B. 167 and *Willcock v. Pickfords Removals Ltd.* [1979] 1 Lloyd's Rep. 244."

I must confess that I do not find these observations, which were plainly obiter, persuasive. This was not a case in which the existence of the agreement assumed to contain the arbitration clause was being

G  challenged, and the arbitrator was not being invited to rule on his own jurisdiction. The court was, for purposes of this submission, assuming that there was an arbitration agreement, which was not the case in *Willcock v. Pickfords Removals Ltd.* [1979] 1 Lloyd's Rep. 244. Any cause of action in misrepresentation depends on the assertion that the agreement which was made would not have been made but for the misrepresentation alleged, but an arbitrator's power to award damages

H  in those circumstances is explicitly recognised in section 2(2) of the Misrepresentation Act 1967. This authority does not deter me from giving the arbitration clause in this case what I consider to be its true effect.

516
Bingham L.J.          Ashville Investments v. Elmer Ltd. (C.A.)          [1989]

The Court of Appeal's approach in *Crane v. Hegeman-Harris Co.*  A
*Inc.* [1939] 4 All E.R. 68 has not found favour abroad in recent years:
see *Kathmer Investments Pty. Ltd. v. Woolworths Pty. Ltd.* 1970 (2)
S.A. 498; *Roose Industries Ltd. v. Ready Mixed Concrete Ltd.* [1974] 2
N.Z.L.R. 246 and *Drennan v. Pickett* [1983] 1 Qd. R. 445. I need only
quote from the latest of these cases, which makes reference to the first.
*Drennan's* case concerned a building contract in which the arbitration
clause bore a strong affinity to clause 35. The builder initiated arbitration  B
proceedings and claimed certain sums due. The employer commenced
proceedings in court to rectify the contract and restrain further conduct
of the arbitration. The builder sought to stay the court proceedings so
that the rectification claim could be arbitrated. He succeeded. Thomas J.
said, at pp. 447–448:

"Similar questions have come before courts under various arbitration  C
clauses. The most notable of these are *Printing Machinery Co. Ltd.
v. Linotype and Machinery Ltd.* [1912] 1 Ch. 566, *Crane v.
Hegeman-Harris Co. Inc.* [1939] 4 All E.R. 68, *Roose Industries
Ltd. v. Ready Mixed Concrete Ltd.* [1974] 2 N.Z.L.R. 246 and an
unreported decision of Yeldham J. given on 28 June 1982, *Dowell
Australia Ltd. v. Triden Contractors Pty. Ltd.* In the first two  D
mentioned cases the decisions were to the effect that quite wide
arbitration clauses failed to refer to arbitration a claim for
rectification of the contract itself. The third and fourth cases also
dealt with wide arbitration clauses and reached the opposite view,
holding that such issues were themselves covered by the arbitration
clause.

"I do not think that I can usefully discuss the fine distinctions  E
that exist between the particular arbitrations in those four cases, or
satisfactorily reconcile the decisions on any particular principle.
Certainly there is nothing obnoxious in the concept of an arbitrator
giving effect to rectification of a party's contract if such an issue
has, by agreement of the parties, been left to him. The question is
truly one of construction of the arbitration clause.
"I have found considerable assistance in a decision of the  F
Appellate Division of the Supreme Court of South Africa in
*Kathmer Investments Pty. Ltd. v. Woolworths Pty. Ltd.* 1970 (2)
S.A. 498. The court took the view that when the parties agreed that
their contract be governed by an arbitration clause, they must have
believed (whether in error or not) that the document contained
their real agreement, and to have intended to refer to arbitration  G
such matters as arose out of or concerning such agreement. On that
basis, a dispute about what any term of that agreement was, was a
dispute which arose out of the agreement or which concerned the
agreement, and it was therefore referable to arbitration in terms of
the arbitration clause. At p. 504 the following passage occurs: 'If
the view is correct that a dispute about rectification must be
considered to be a dispute which does not arise from the agreement  H
as it stands, or that the dispute does not concern that agreement, it
would seem to follow that a dispute about a subsequent verbal or
separate written variation of the agreement or a dispute about a

A    subsequent release or estoppel or waiver or set-off in relation to
rights or obligations under the agreement, would also have to be
considered to be a dispute arising out of or concerning something
outside the document and therefore not referable to arbitration.
This result could hardly have been contemplated by the parties
when they agreed to clause 33, and it indicates, in my opinion, that
the intention of the parties was to deal with the dispute arising out

B    of or concerning their real agreement in existence at the time when
the dispute arises.'

    "The comment of the present author of *Hudson's Building and
Engineering Contracts,* 10th ed. (1st supplement), on this decision is
as follows: 'This outstanding decision injects, it is submitted, both
common sense and first principles into what had, in the English

C    cases, become a legalistic and unconsidered dogma leading to the
inconvenience and expense of separate proceedings in the courts, as
well as defeating the obvious intentions of the parties to the contract
as expressed in the language they had used in the arbitration clause.
It is unreservedly to be welcomed on both legal and practical
grounds.'

    "In my opinion, the question whether the builder can maintain

D    his claim for cost adjustment under whatever contract the parties
have entered into is a matter which they have agreed to refer to
arbitration. I see nothing objectionable in the arbitrator ascertaining
what are the terms of the contract which binds the parties. Such an
exercise is done every day in relation to variation and waiver, and I
can see no reason in principle why an issue of possible rectification

E    of such a contract should be excluded from the arbitrator's
consideration."

    I need only say that I respectfully agree. I would be very slow to
attribute to reasonable parties an intention that there should in any
foreseeable eventuality be two sets of proceedings. Rectification,
misrepresentation and negligent mis-statement are unlikely to raise

F    questions more difficult than those an arbitrator under this form of
contract must already resolve. The privacy of an arbitral tribunal is
likely to be more, not less, welcome than the publicity of proceedings in
court. I see no reason why the employer (or his architect) or the
contractor should flinch from the decision of these questions by an
experienced professional man duly agreed or appointed.

G    Sir Neil Lawson was urged to exercise his powers to order that the
arbitration agreement cease to have effect, wholly or in part, under
section 24(2) of the Arbitration Act 1950. For reasons which May and
Balcombe L.JJ. have given, I am satisfied that Elmer's claims in this
case do not fall within that subsection. Fraud means deceit, and section
24(2) cannot be invoked simply because (as frequently happens) the
proceedings involve allegations of unconscionable conduct. That makes

H    it unnecessary to review the judge's exercise of discretion. I would
simply make two observations. First, I do not think that Ashville are to
be criticised because, having challenged the arbitrator's jurisdiction in
their pleading, they delayed in bringing the challenge before the court.

518

Bingham L.J.        Ashville Investments v. Elmer Ltd. (C.A.)        [1989]

It would in my opinion have been open to them to wait until there was    A
an award and then seek to establish that it was made without jurisdiction
(see R.S.C., Ord., 73, r. 2(3)) or to resist an application to enforce the
award on the same ground. But, secondly, I have heard nothing which
suggests to me that the judge's discretion should have been exercised in
Ashville's favour. I have no doubt that I would have thought it
preferable for any allegation of fraud, if there were one, to be decided
by the arbitrator. Elmer have, however, expressly withdrawn any    B
allegation of fraud, and that should be clearly stated.

  I would dismiss this appeal.

*Appeal dismissed with costs.*

*Solicitors: Braby & Waller; McKenna & Co.*    C

[Reported by PAUL H. NIEKIRK ESQ., Barrister-at-Law.]

D

[COURT OF APPEAL]

REGINA v. KENSINGTON AND CHELSEA ROYAL LONDON
BOROUGH COUNCIL, *Ex parte* HAMMELL    E

1988  Aug. 2, 3, 4            Fox, Parker and Croom-Johnson L.JJ.

*Local Government—Homeless persons—Council's duty—Council not
  satisfied that applicant for accommodation homeless—No positive
  decision that applicant reasonably able to continue to occupy
  existing accommodation—Violence by former husband committed
  outside that accommodation treated as irrelevant—Application for    F
  judicial review of council's decision—Whether applicant entitled
  to be housed pending hearing of application—Jurisdiction in
  court to grant mandatory interlocutory injunction—Conditions for
  exercise—Housing Act 1985 (c. 68), ss. 58(1)(2)(a)(2A) (as
  inserted by Housing and Planning Act 1986 (c. 63), s. 14(1)(2)),
  (3)(b), 62(1), 64(1)(4)(a)[1]*

  The applicant was the tenant of a local housing authority flat    G
in Scotland. In January 1988, following alleged violence and
harassment by her former husband, who lived nearby, and
others, she left the flat and came, with her three young children,
to the area of the respondent council and stayed with her sister
in a one-bedroomed flat. Her sister having required her to
leave, she applied to the council for accommodation. The
council's officers formed the view that she might be homeless or    H

[1] Housing Act 1985, as amended, s. 58(1)(2)(a)(2A)(3)(b): see post, pp. 531F—532A.
S. 62(1): see post, p. 526B—C.
S. 64(1)(4)(a): see post, p. 526F—H.