# EXHIBIT 1

*→ Now SeAToN*

**DATED  March 31, 1999**

(1)  UNIGARD SECURITY INSURANCE COMPANY

(2)  EASTGATE, INC.

<hr>

## AGREEMENT RELATING TO ADMINISTRATION
## OF RUN-OFF BUSINESS

<hr>



20646729.11

Date:          March 31, 1999

Parties:

(1)    UNIGARD SECURITY INSURANCE COMPANY, a property/casualty insurance
       company organized under the laws of the State of Washington ("the Company"); and

(2)    EASTGATE, INC., a corporation organized under the laws of the State of Delaware
       ("Eastgate").

Recitals:

(A)    The Company is authorized by Regulatory Authorities to transact various classes of
       insurance and reinsurance business in accordance with applicable law and has ceased
       underwriting in respect of the Business (as defined below).

(B)    Eastgate carries on the business, inter alia, of administration in respect of insurance and
       reinsurance companies,

(C)    The Company now wishes to appoint Eastgate to provide certain administrative
       services in respect of the run-off of the Business.

Operative Provisions:

1.     Interpretation

1.1    In this Agreement, the following definitions shall have the following meanings:

       "Accounting Period"         means, unless otherwise stated, a calendar year;

       "Affiliate"                 means, with respect to any Person, a Person who
                                   directly, or indirectly through one or more
                                   intermediaries, controls, or is controlled by, or is under
                                   common control with, such Person;

       "Agents"                    means those parties under the direct instruction of the
                                   Board providing services in connection with the
                                   Business;

20646729.11

| | |
|---|---|
| "Agreement" | means this Agreement and the Schedules attached hereto; |
| "Board" | means the board of directors of the Company; |
| "Business" | means the business of the Company at the Effective Date including, without limitation, the Run-Off Business and such other activities as may be required by law or otherwise to facilitate the proper conduct of the Run-Off Business; |
| "Business Day" | means a day on which banks generally are open in the City of New York for the transaction of normal banking business (other than a Saturday); |
| "Claims" | means those claims arising on the Run-Off Business; |
| "Company Representative" | means the individual notified in writing by the Company to Eastgate from time to time as being authorized to give instructions to Eastgate, the first such individual being named in Schedule 2; |
| "Data" | means all data of the Business belonging to the Company which is processed by or stored on the System; |
| "Effective Date" | means the date on which the closing occurs under that certain Stock Purchase Agreement, dated as of November 20, 1998, between Dukes Place Holdings, L.P. and The John Hancock Property & Casualty Holding Company, as the same may from time to time be hereafter amended or amended and restated; |
| "Force Majeure" | means circumstances beyond the reasonable control of a party; |
| "Regulatory Authorities" | means the insurance regulatory authorities having responsibility for the supervision of insurance business of the Company in the United States and Canada; |

2

| | |
|---|---|
| **"Person"** | includes an individual, firm, corporation, partnership, limited liability company, trust, association, unincorporated association or other body of persons; |
| **"Reinsurance Agreements"** | means (i) the Aggregate Retrocession of Loss Portfolio Agreement No. RA - 1321, between the Company and National Indemnity Company, and (ii) the First Aggregate Excess Retrocession of Loss Portfolio Agreement No. RA - 1322, between the Company and National Indemnity Company. |
| **"Records"** | means the books and records received or subsequently held by Eastgate in the performance of its obligations under this Agreement, including the Data; |
| **"Run-Off Business"** | means the run-off of Claims, rights and obligations under all insurance policies and reinsurance contracts underwritten or ceded by the Company, except for all such policies and contracts which the Company has ceded to Unigard Insurance Company pursuant to the Quota Share Reinsurance Agreement, dated December 10, 1993, effective as of July 1, 1993, between the Company and both Unigard Insurance Company and Unigard Indemnity Company; |
| **"Services"** | means the services provided by Eastgate specified in Schedule 1; |
| **"System"** | means the computer systems on which the Business/Run-Off Business is currently processed. |

1.2    Words denoting the singular number only include the plural and vice versa.

1.3    References to a statute or statutory provision include a reference to it as from time to time amended, extended or re-enacted, provided that such amendment or extension or re-enactment shall not increase the liability of a party to this Agreement.

1.4    Headings to clauses are for the purpose of general identification only and shall not be construed as forming part of this Agreement.

3

20646729.11

2.    **Provision of Services**

2.1    The Company appoints and authorizes Eastgate from the Effective Date to provide the Services in respect of the Business. Eastgate shall perform the Services with reasonable care and skill in a professional and efficient manner.

2.2    The Company warrants that it has full power under the Reinsurance Agreements, or will obtain such power, to delegate to Eastgate the run-off obligations which it owes to the Principals. Complete and correct copies of each Reinsurance Agreements are attached hereto as Exhibits A and B, respectively. Eastgate warrants that it has read the Reinsurance Agreements in their entirety, that the Reinsurance Agreements create various rights and obligations with respect to the Run-Off Business between the Company, on the one hand, and National Indemnity Company ("NIC"), on the other, and that Eastgate will at all times cause the services to be performed in a manner consistent with the Company's rights and obligations under the Reinsurance Agreements.

2.3    Eastgate will provide a representative of NIC with full time access to the Company's offices and records and to allow such representative to monitor the payment of claims and to assist Eastgate and the Company in the settlement of such claims. In addition, Eastgate will pay NIC for all salary, benefits and like costs and expenses associated with such representative, but not more than $100,000 per annum.

2.4    The Company shall act in good faith when dealing with Eastgate or its Affiliates and shall be responsible for the regular review and setting of its strategy.

2.5    Both parties shall comply with all applicable laws, rules and regulations in respect of all activities conducted under this Agreement.

3.    **Records and System**

3.1    The Company shall deliver or cause to be delivered to Eastgate all books and records constituting the Records, as well as any other relevant information.

3.2    The Company Representative and Regulatory Authorities shall at reasonable times and on reasonable written notice have access to and the right to examine the Records. Representatives of Eastgate shall be made available, subject to reasonable written notice, to assist the Company Representative and Regulatory Authorities in the examination of the Records.

4

3.3    Except as provided for in this Agreement, it is understood that the Records maintained by Eastgate shall remain the property of the Company.

3.4    Eastgate shall be responsible for the storage of Records delivered into its control. Eastgate will protect Data from unauthorized access and will take all reasonable steps to ensure that, once on the System, Data is kept free from any computer viruses, corruption or inaccuracies.

3.5    Prior to the Effective Date, the Company will license or undertake to have licensed to Eastgate the systems currently employed by or on behalf of the Company in connection with the Business. The property rights to any such systems licensed to Eastgate by the Company shall remain vested in the Company. Any specific programming or systems developments carried out by or on behalf of Eastgate in providing the Services, whether or not connected with the System, shall be the property of the Company.

3.6    If the Company requires Eastgate to utilize software owned by a third party, then the Company undertakes (at its expense) to obtain in advance a licence on normal commercial terms authorizing Eastgate to use such software and will keep Eastgate fully informed as to its terms and any relevant restrictions.

4.    **Duration**

4.1    This Agreement shall commence on the Effective Date and shall continue thereafter unless terminated in accordance with clause 5.

5.    **Termination**

5.1    Subject to clause 5.2, this Agreement may be terminated by at least six months' prior written notice given by either party to expire on the March 31 of any year, but no earlier than March 31, 2004.

5.2    This Agreement may be terminated immediately by notice served on the other party if the other party shall at any time:

    5.2.1    commit a material breach of any of the material provisions of this Agreement and, in the case of any such material breach capable of remedy, fail to remedy this within thirty days after receipt of a notice giving reasonable particulars of the breach and requiring it to be remedied;

5

5.2.2   become insolvent or suspend payment of its debts or enter into any arrangement with its creditors or convene a meeting of its creditors or cease or threaten to cease to carry on its business;

5.2.3   enter into bankruptcy, liquidation or rehabilitation (whether voluntarily or otherwise) or have a receiver, liquidator and rehabilitator appointed; or

5.2.4   shall have willfully committed a material act of fraud in performing its obligations hereunder.

5.3   During any period of notice:

5.3.1   the Company shall continue to perform its obligations in accordance with the terms of this Agreement; and

5.3.2   Eastgate shall continue to perform its obligations in accordance with the terms of this Agreement but only in so far as they are capable of completion on or before the termination date.

5.4   Termination in accordance with the above provisions, or howsoever effected, shall take effect without prejudice to the rights and obligations of the parties which have accrued at the date of termination or which may subsequently accrue.

6.   **Post-termination**

6.1   Upon proper termination of this Agreement and subject to a right of set off in respect of money owed or capable of being owed to Eastgate under this Agreement, all sums held by Eastgate on behalf of the Company pursuant to paragraph 7 of Schedule 1 shall be returned to the Company or its designee on receipt of a written instruction from the Company Representative.

6.2   Within thirty days of the termination of this Agreement, the Company Representative shall be entitled to require Eastgate to carry out one or more of the following:

6.2.1   deliver to the Company all the Records relating to the Business including any off-line storage and security copies of the Data;

6.2.2   store on magnetic, optical or other media all or any of the information then stored on-line relating the Business and to deliver such media to the Company;

6

6.2.3   make and deliver to the Company such printouts of information relating to the Business as the Company may reasonably require,

provided that no outstanding sums are due to Eastgate and that all reasonable costs incurred by Eastgate in complying with these obligations are reimbursed by the Company to Eastgate in full upon demand.

6.3   Any work incurred by Eastgate at the request of the Company after the termination date, regardless of the reason for the termination, shall be reimbursed by the Company in accordance with paragraph 2 of Schedule 3.

6.4   Any work performed by Eastgate after the termination date shall not constitute the waiver of any rights or remedies which have accrued or may accrue in favor of Eastgate in consequence of a breach of any of the provisions of this Agreement or to which Eastgate is entitled at law or howsoever arising, nor shall it defeat the prior termination of this Agreement by either party.

6.5   Upon termination of this Agreement for whatever reason (other than by the Company pursuant to clauses 5.1, 5.2 or by Eastgate pursuant to clause 5.1) the Company shall, in addition to any other sums due to Eastgate under this Agreement, reimburse to Eastgate all reasonable costs and expenses directly and necessarily incurred by Eastgate in consequence of such termination including (without limitation):

6.5.1   the net amount of any redundancy package (if any) settled with employees of Eastgate or its Affiliates employed wholly or substantially in connection with the administration of the Run-Off Business who, within 6 months after the date of such termination shall be dismissed by reason of redundancy as a consequence of such termination;

6.5.2   any penalties or termination charges properly payable by Eastgate to third parties under contracts reasonably entered into by Eastgate for the performance of the Business and canceled in consequence of such termination; and

6.5.3   the cost to Eastgate of any office accommodation reasonably acquired and used wholly or substantially in connection with the administration of the Business or otherwise which becomes surplus to requirements (or a fair proportion if such use was not wholly in connection with the administration of the Business),

7

20646729.11

provided that Eastgate shall use all reasonable endeavors to mitigate such costs and expenses and shall be entitled to take all necessary professional advice for the purpose of ascertaining and mitigating such costs and expenses the reasonable fees of which shall be reimbursed to Eastgate by the Company on presentation of a statement evidencing such fees.

6.6    For the avoidance of doubt, the provisions of this clause 6 and clauses 3.2, 7, 10, 11, 15.6 and 15.7 shall survive the termination of this Agreement and continue in full force and effect.

7.    **Confidentiality and non-solicitation**

7.1    Confidentiality. Each of the Company and Eastgate shall keep confidential and not use or disclose any information previously or hereafter obtained by it pursuant to this Agreement (the party receiving such information is hereinafter referred to as the "Receiving Party") with respect to the other or such other's parents, subsidiaries, Affiliates or other related entities (the party, or such party's parents, subsidiaries, Affiliates or other related entities, with respect to which the information relates is hereinafter referred to as the "Disclosing Party") in connection with this Agreement and the negotiations preceding this Agreement (such information is hereinafter referred to as the "Confidential Information"), and the Receiving Party will use such Confidential Information solely in connection with the transactions contemplated by this Agreement, and if the transactions contemplated hereby are not consummated for any reason, the Receiving Party shall either return to the Disclosing Party, without retaining a copy thereof, or destroy any schedules, documents or other written or electronically stored information constituting Confidential Information (or prepared based upon such Confidential Information) in connection with this Agreement and the transactions contemplated hereby and the negotiations preceding this Agreement. Without limiting the generality of the foregoing, the Receiving Party shall be permitted to disclose any Confidential Information to such of its Affiliates, officers, directors, employees, agents, lenders and representatives (collectively, "Representatives") as have a need to know such Confidential Information, provided such Representatives shall be informed that disclosure of such Confidential Information by such Representatives would be in contravention hereof and the Receiving Party shall be responsible for any disclosure prohibited hereby by any of its Representatives. Notwithstanding the foregoing, the Receiving Party shall not be required to keep confidential or return any information which (i) is known or available through other lawful sources, not bound by a confidentiality agreement with the Disclosing Party, or (ii) is or becomes publicly known other than as a result of the disclosure by the Receiving Party or its Representatives or (iii) is required to be disclosed pursuant to an order or request of

8

a judicial or governmental authority, an arbitrator or arbitration panel or a self-regulatory body or pursuant to any law or regulation in any jurisdiction (provided the Disclosing Party, to the extent permitted by law, is given reasonable prior written notice), or (iv) is developed by the Receiving Party independently of, and is not based upon, the Confidential Information.

7.2   For the avoidance of doubt, all methodologies, strategic and business plans drawn up by Eastgate for and in the performance of this Agreement shall remain the sole property of Eastgate and nothing shall be construed as granting the Company a licence to use such information in any form, after the termination of this Agreement without the consent of Eastgate.

7.3   Eastgate shall be authorized to refer to the Company as a client in its marketing literature.

7.4   Subject to the following proviso, both during and for a period of twelve months after any termination of this Agreement, the Company shall not solicit in any way the employment of, or induce (or assist any other Person to so solicit or induce) any officer or employee of Eastgate to cease to be such an officer or employee, it being understood that this clause 7.5 shall not apply in the event of any termination of this Agreement pursuant to Section 5.1 or by the Company pursuant to Section 5.2.

## 8.   Assignment and delegation

8.1   Neither party shall assign or deal in any other manner with any of their rights or obligations under this Agreement without the prior written consent of the other, such consent not to be unreasonably withheld or delayed, provided that, subject to clause 10.2, Eastgate shall have the authority to delegate to any person such functions as it deems necessary for the performance of its obligations under this Agreement.

## 9.   Remuneration of Eastgate

9.1   In consideration for providing the Services Eastgate shall be remunerated by the Company in accordance with the terms set out in Schedule 3.

9

20646729.11

**10.    Indemnification and Limitation of Liability**

10.1    The Company shall indemnify Eastgate against any liability which Eastgate may reasonably incur as a result of performing its obligations under this Agreement; provided, however, that such indemnity shall not apply to any liability to the extent such liability has been finally adjudicated by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of Eastgate (including any consultants, independent contractors or other third parties engaged by it) or material breach of this Agreement by Eastgate.

10.2    Eastgate shall indemnify the Company against any liability which the Company may reasonably incur to the extent such liability has been finally adjudicated by a court of competent jurisdiction to have resulted from (i) any material breach of this Agreement by Eastgate, (ii) any gross negligence or willful misconduct by Eastgate in the performance of its obligations under this Agreement, and (iii) any material breach of this Agreement by gross negligence or willful misconduct attributable to any consultants, independent contractors or any third party engaged by Eastgate under clause 8 hereof.

10.3    Eastgate shall at all times maintain errors and omissions insurance for its actions hereunder with such third-party insurers and in such amounts (including as to deductibles and caps) as are approved from time to time by the Company (such approval not to be unreasonably withheld).

10.4    In the case of any claim asserted by a third party against a party entitled to indemnification under this Agreement (the "Indemnified Party"), notice shall be given by the Indemnified Party to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and the Indemnified Party shall permit the Indemnifying Party (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom, provided that (i) the counsel for the Indemnifying Party who shall conduct the defense of such claim or litigation shall be reasonably satisfactory to the Indemnified Party, (ii) the Indemnified Party may participate in such defense at such Indemnified Party's expense and (iii) the failure by any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that such omission results in a failure of actual notice to the Indemnifying Party and such Indemnifying Party is materially damaged as a result of such failure to give notice.  Except with the prior written consent of the Indemnified Party, no Indemnifying Party in the defense of any such claim or litigation, shall consent to entry of any judgment or order, interim or otherwise, or enter into any settlement that

10

provides for injunctive or other nonmonetary relief affecting the Indemnified Party or that does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of a release from all liability with respect to such claim or litigation.  In the event that the Indemnifying Party does not accept the defense of any matter as above provided, the Indemnified Party shall have the full right to defend against any such claim or demand and shall be entitled to settle or agree to pay in full such claim or demand. Notwithstanding the foregoing, the Indemnifying Party shall still provide indemnification to the Indemnified Party as provided in paragraph 10.2 and 10.3 of this Article 10.  In any event, the Indemnifying Party and the Indemnified Party shall cooperate in the defense of any claim or litigation subject to this Article 10 and the records of each shall be available to the other with respect to such defense.

10.5    Eastgate shall not be liable to the Company in respect of any breach of contract for loss of profits or revenue, loss of goodwill, loss of anticipated savings or for any type of special, indirect or consequential loss even if such loss was reasonably foreseeable or Eastgate had been advised of the possibility of the Company incurring the same.

10.6    Eastgate's entire liability to the Company or its Affiliates in respect of any breach of this Agreement or any tortious act or omission in connection with this Agreement shall be limited to damages of an amount not exceeding $4,000,000.

10.7    If a number of breaches of this Agreement or tortious acts or omissions give rise to substantially the same loss, then they shall be regarded as giving rise to only one claim under this Agreement and such claim shall be limited to damages of an amount not exceeding $4,000,000.

10.8    If a number of breaches of this Agreement and/or tortious acts or omissions give rise to claims for damages then the damages payable by Eastgate in respect of those claims shall not in aggregate exceed $4,000,000.

**11.    Force Majeure**

11.1    If a party's performance obligations under this Agreement are affected by Force Majeure, it shall immediately notify the other party.

11.2    A party shall not be in breach of this Agreement by reason of the failure or delay in performance of any obligations to the extent that such failure or delay is caused by Force Majeure, and the time for performance shall be extended accordingly.

11

20646729.11

11.3 If a party's performance obligations are affected by Force Majeure for a continuous period in excess of thirty days, the parties shall enter into bona fide discussions with a view to alleviating the situation or to agreeing upon such alternative arrangements as may be fair and reasonable. If the parties fail to agree upon a course of action within a further period of thirty days, then either may immediately terminate this Agreement by serving notice on the other.

## 12.  Instructions

12.1 The Company undertakes to respond promptly to all requests for instructions from Eastgate.

12.2 Any written instructions given to Eastgate by the Company Representative shall be deemed to be instructions of the Company. Furthermore, any matter referred to the Company Representative shall be deemed properly communicated to the Company.

## 13.  Notices

13.1 Notices, statements and other communications under this Agreement shall be in writing and shall be served at the addresses listed below (or to such address as is notified in writing by one party to the other from time to time) by hand, facsimile, recorded delivery or by first class post:

Company:            Unigard Security Insurance Company
                    c/o GSCP, Inc.
                    388 Greenwich Street
                    36th Floor
                    New York, New York 10013

Attention:          Robert A. Hamwee
Facsimile:          (212) 816-0166

With a copy to the Company Representative.

12

| Eastgate: | Eastgate, Inc.<br>44 Wall Street<br>New York, New York 10005 |
|---|---|
| Attention:<br>Facsimile: | President<br>(212) 425-4564 |

13.2    Notices shall be deemed served:

    13.2.1    when delivered by hand, at the time of delivery;

    13.2.2    when sent by facsimile, at the time of a fully complete transmission, as documented by receipt of confirmation generated by the sender's or recipient's facsimile equipment; provided that a facsimile sent outside normal business hours on a business day at the place of receipt will be deemed sent at the opening of normal business hours on the next business day;

    13.2.3    when sent by recorded delivery or first class post, at the expiration of 48 hours from despatch.

**14.    Further assurance and good faith**

14.1    Each party agrees from time to time to do all such acts and to execute and deliver all such instruments as may be required or reasonably requested by the other party to establish, maintain and protect the rights and remedies of the other party and to carry out and effect the intent and purpose of this Agreement. Each of the parties agrees with the other that it will at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith.

**15.    General**

15.1    This Agreement sets out the entire understanding of the parties with respect to the matters with which it deals and may be amended or modified only by written instrument duly executed by each party.

15.2    Each party acknowledges that it has not relied upon or been induced to enter into this Agreement by any representation other than a representation expressly set out in this Agreement and neither party shall be liable to the other in equity, contract, tort or in any other way for any representation not expressly set out in this Agreement.

13

20646729.11

15.3   If any provision of this Agreement shall in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that provision or part shall to that extent be deemed not to form a part of this Agreement and the enforceability of the remainder of this Agreement shall not be affected.

15.4   The rights which each party has under this Agreement shall not be prejudiced or restricted by any indulgence or forbearance extended to the other party. No waiver by any party in respect of a breach shall operate as a waiver in respect of any subsequent breach.

15.5   This Agreement may be executed in counterparts all of which together shall constitute one and the same instrument and all counterparts shall be deemed to be originals.

15.6   This Agreement shall be governed by and construed in accordance with New York law without reference to that State's law concerning conflicts of law, and any dispute arising in connection with this Agreement is subject to the non-exclusive jurisdiction of the New York courts.

15.7   Each of the parties hereto hereby irrevocably and unconditionally:

   15.7.1   submits for itself and its property in any legal action or proceeding relating to this Agreement or the transactions contemplated by this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York located in New York City, the Courts of the United States of America for the Southern District of New York and appellate courts from any thereof;

   15.7.2   consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

   15.7.3   agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail in accordance with clause 13.1 of this Agreement; and

   15.7.4   agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

14

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

UNIGARD SECURITY INSURANCE COMPANY

By: _____

Name: _____
Title: R.L. BARCLAY
President

EASTGATE, INC.

By: _____

Name: DAVID I WAHLIS.
Title: CEO.

15

# SCHEDULE 1

## The Services

Subject always to the Company Representative's direction, Eastgate shall be authorized to carry out the Services set out below.

1. **Processing and accounting services**

1.1    Processing of premiums and Claims.

1.2    Maintenance of Company ledgers.

1.3    Payment of balances to reinsurers and the recovery of amounts due from insurers, reinsurers, brokers and other insurance intermediaries.

1.4    Maintenance of a reinsurance credit control system.

2. **Management services**

2.1    Advising the Company on overall strategy.

2.2    Maintaining and giving instructions pursuant to the banking resolutions provided by the Company from time to time on bank accounts in the name of the Company at such banks as the Company may from time to time designate (all funds received and disbursed by Eastgate in carrying out the Business of the Company shall be deposited in or drawn from, as the case may be, such accounts).

2.3.    Submitting to Regulatory Authorities all relevant returns (including but not limited to statutory unaudited annual and quarterly statements and audited statutory annual statements) received in respect of the Company and dealing with any inquiries which arise.

2.4.    Advising the Company as soon as any legislative or regulatory proceedings or complaints or any other material matters relating to the Company come to the attention of Eastgate.

2.5    Provision of facility for meetings of the Board or shareholders of the Company.

16

20646729.11

2.6   Provision of information required by the Company's tax advisors for preparation of the Company's corporation tax returns.

2.7   Monitoring the Company's solvency.

3.    **Claims handling services**

3.1   Eastgate is authorized on the Company's behalf to:

- receive notice of Claims;

- participate in any scheme or arrangement designed to mitigate or avert Claims or increase salvage;

- exercise rights of subrogation against third parties in the name of the Company;

- carry out the review, handling and adjusting of Claims;

- carry out any ancillary Claims processing work relating to the Run-Off Business;

- admit, compromise and settle Claims including settlements involving "policy ex gratia payments" in accordance with the instructions referred to in paragraph 4 below;

- monitor and aggregate Claims, prepare reinsurance collections and advices, and keep the reinsurance arrangements of the Run-Off Business under review;

- liaise with professional advisers in respect of disputed Claims in terms of providing information, initial instructions and negotiating a budget;

- review the Company's outstanding Claims reserves and report its findings to the Board; and

- review and comment to the Board on the IBNR proposed by the Company's actuaries.

17

4.    **Claims settlement/underwriting authorities**

4.1   For all Claims where the Company's liability is clearly pledged, the Company shall grant to Eastgate a Claims settlement authority limit in respect of individual Claims for the Company's share of the maximum amount of settlement authority conferred on the Company under the Reinsurance Agreements.

4.2   For Claims:

- in excess of the above amounts;
- where the liability of the Company is in doubt or Eastgate propose a course of action that differs significantly from that of the lead underwriter;
- involving litigation, dispute or arbitration; or
- which Eastgate recommends for commutation,

then the case shall be submitted to the Company Representative in writing for consideration and approval before further action is taken provided that the Company shall respond promptly (and, in any event, within 30 days), failing which Eastgate shall be authorized to take such steps as it deems reasonably necessary to protect the Company's position.

4.3   For the completion of contracts of insurance and reinsurance, Eastgate shall not:

- enter into any new contract;
- extend the periods of cover under existing contracts; or
- increase the limits of liability under existing contracts,

without the prior written approval of the Company Representative.

5.    **Commutations**

5.1   Identifying targets for commutation according to, inter alia, the following criteria:

- nature of cedent/assured;
- risk profile;
- reserve levels; and
- deterioration forecasts.

5.2   Presenting a schedule of targets and a commutations status report at each Board meeting.

18

20646729.11

5.3    Negotiation and drafting of commutation agreements to the extent permitted under the Reinsurance Agreements.

6.    **Reports to the Company**

6.1    Provision of statements, reports and accounts relating to the Business as follows:

| | Frequency | Service Level (Business Days after period ended) |
|---|---|---|
| Claims received, agreed, rejected | Quarterly | 30 |
| Commutations progress | Quarterly | 30 |
| Problematic reinsurance collections | Quarterly | 30 |
| Reinsurance recoveries submitted | Quarterly | 30 |
| Credit notes received | Quarterly | 30 |
| Cash received from reinsurers | Quarterly | 30 |
| Cashflow statement | Quarterly | 30 |
| Management accounts | Quarterly | 30 |
| Claims exception report | Quarterly | 30 |
| Details of new claims | Quarterly | 30 |
| Analysis of LMX reinsurance cover | Quarterly | 30 |
| Underwriting Development Statistics | Quarterly | 30 |
| Asbestosis and Environmental Pollution Analyses | Quarterly | 60 |
| Shareholder Report | Annually | 60 |
| IBNR recommendation | Annually | 60 |
| Unaudited and audited statutory annual statements | Annually | as required by law |
| Unaudited statutory quarterly statements | Quarterly | as required by law |

19

6.2 Eastgate shall also provide, on behalf of the Company, such statements, reports and accounts relating to the Business to National Indemnity Company ("NIC") as and when the same are required to be delivered to NIC by the Company pursuant to the terms of the Reinsurance Agreements.

6.3 The service levels are calculated on the following assumptions:

- that each monthly period will be closed on the last Friday of each calendar month; and

- that all Data is stored on the System.

## 7. Treasury and cash management functions

7.1 Liaison with bankers to ensure smooth running of account.

7.2 Carrying out monthly bank reconciliations.

7.3 Investment of Company funds on short term deposit (as directed by the Company).

## 8. Corporate functions

8.1 Liaison with the Regulatory Authorities on the Company's behalf in connection with the Business.

20

20646729.11

## SCHEDULE 2

### The Company Representative

The Company Representative shall be R.L. Barclay or such other individual as may be advised to Eastgate by the Company from time to time in writing.

20646729.11

# SCHEDULE 3

## Remuneration of Eastgate

1. **Annual fee**

1.1. In consideration for providing the Services under this Agreement, and subject to the terms of this Schedule, the Company shall pay to Eastgate an annual fee for the first five years of this Agreement as follows (all amounts are in $'s and thousands):

| Effective Date | - | March 31, 2000 | 2,750 |
| April 1, 2000 | - | March 31, 2001 | 2,700 |
| April 1, 2001 | - | March 31, 2002 | 2,650 |
| April 1, 2002 | - | March 31, 2003 | 2,600 |
| April 1, 2003 | - | March 31, 2004 | 2,550 |

1.2   In the event that there is a substantial change in the nature of the Business or the quantity of the Services provided by Eastgate, then each party will at the request of the other party seek in good faith to renegotiate the annual fee.

1.3   For periods subsequent to March 31, 2004, the annual fee shall be mutually agreed to by Eastgate and the Company.

2. **Work outside the scope of the Agreement**

2.1   If Eastgate carries out any work not covered by the Services, then the Company shall reimburse Eastgate for such work on a time and materials basis at its current rates (which shall be subject to variation from time to time). Eastgate shall be entitled to invoice the Company on a monthly basis and the Company agrees to pay such invoices within fifteen days of receiving each invoice.

2.2   Any such additional work shall be carried out on the terms set out in this Agreement, including for the avoidance of doubt clause 10.

22

3.   **Third party costs**

3.1   Fees include the staff and related costs of Eastgate in providing the Services. For the avoidance of doubt, Eastgate's fees do not include third party costs and expenses which will be met directly by the Company including but not limited to:

3.1.1   subscriptions and directors' fees;

3.1.2   legal, actuarial, audit and other third party professional fees;

3.1.3   loss adjustment and claims-related expenses paid to third parties;

3.1.4   overseas travel undertaken at the request of (or with the prior approval of) the Company Representative;

3.1.5   the costs of travel, subsistence and accommodation incurred by Eastgate personnel having to conduct work at the request of (or with the prior approval of) the Company Representative, away from their normal office locations.

3.1.6   the cost of the Company's triennial reviews.

4.   **VAT**

4.1   Fees and rates referred to in the Agreement do not include any VAT, sales tax or other tax which, if applicable, shall be payable by the Company and added to such fees at the rate in force at the time they become due.

5.   **Conditions of payment**

5.1   The annual fee is payable in advance annually on or before March 31, provided that if this Agreement is terminated for any reason during any year period with respect to which any such annual payment has previously been made, Eastgate shall, promptly following such termination, refund a pro-rata portion of such fee to the Company (based on the number of days elapsed/not-elapsed as of the effective date of such termination).

5.2   All fees payable to Eastgate under this Agreement shall be paid in U.S. dollars and are deemed to accrue from day to day.

20646729.11

5.3    Time for payment is of the essence.  Fees (or refunds) which are not paid by their respective due date shall accrue interest from day to day at a rate of 2% above the then current prime rate of Citibank N.A.

5.4    All such fees shall be payable at the address of Eastgate given for the purposes of notices under this Agreement or at such address as may be notified in writing by Eastgate to the Company from time to time.

24

20646729.11

AMENDMENT II

TO

AGREEMENT RELATING TO ADMINISTRATION OF RUN-OFF BUSINESS

SEATON INSURANCE COMPANY


AMENDMENT DATE:

January 16, 2004

PARTIES:

(1)    Seaton Insurance Company, a property/casualty insurance company (the "Company").

(2)    Ken Randall America, Inc, ("Randall") formerly known as Eastgate, Inc. The name change was effective November 6, 2000.


TERMINATION AMENDMENT – CLAUSE 5

Clause 5.1 is amended to read as follows: "Subject to clause 5.2, this Agreement may be terminated by at least 3 months prior written notice given by either party"

SCHEDULE 3 – REMUNERATION OF RANDALL – AMENDMENT

1.1    In consideration for providing the Services under this Agreement, and subject to the terms of this Schedule, the Company shall pay to Randall the fee as follows: (all amounts are in U.S. Dollars)


2004:

| | |
|---|---|
| January 1, 2004 | $400,000 |
| April 1, 2004 | $400,000 |
| July 1, 2004 | $273,750 |
| October 1, 2004 | $273,750 |
| | $1,347,500 |

2005:

Annual Fee of $1,925,000 to be paid in equal quarterly payments with dates as follows: January 1, 2005, April 1, 2005, July 1, 2005 and October 1, 2005.

2006:

Annual Fee of $1,865,000 to be paid in equal quarterly payments with dates as follows: January 1, 2006, April 1, 2006, July 1, 2006 and October 1, 2006.


KER/pl/AMENDMENT TO STONEWALL & SEATON AGREEMENTS.DOC

2007:

       Annual Fee of $1,810,000 to be paid in equal quarterly payments with dates as follows: January 1, 2007, April 1, 2007, July 1, 2007 and October 1, 2007.

2008:

       Annual Fee of $1,755,000 to be paid in equal quarterly payments with dates as follows: January 1, 2008, April 1, 2008, July 1, 2008 and October 1, 2008.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of January 16, 2004

                         SEATON INSURANCE COMPANY

                         By: _____

                         Name: R. L. BARCLAY
                         Title: PRESIDENT

                         KEN RANDALL AMERICA, INC

                         By: _____

                         Name: Ike Randall
                         Title: Director