**EXHIBIT 2**

<u>DATED  September 29, 2000</u>

(1) STONEWALL INSURANCE COMPANY

(2) EASTGATE, INC.

---

## AGREEMENT RELATING TO ADMINISTRATION OF RUN-OFF BUSINESS

---



MICHAEL FRIEDMAN, CSR

NO.: 28

DATE: 3 16 107

| | |
|---|---|
| "Agreement" | means this Agreement and the Schedules attached hereto; |
| "Board" | means the Board of Directors of the Company; |
| "Business" | means the business of the Company at the Effective Date including, without limitation, the Run-Off Business and such other activities as may be required by law or otherwise to facilitate the proper conduct of the Run-Off Business; |
| "Business Day" | means a day on which banks generally are open in the City of New York for the transaction of normal banking business (other than a Saturday); |
| "Claims" | means those claims arising on the Run-Off Business; |
| "Company Representative" | means the individual designated by the Company by means of written notice to Eastgate from time to time as being authorized to give instructions to Eastgate, the first such individual being named in Schedule 2; |
| "Data" means all data of the Business belonging to the Company which is processed by or stored on the System; | |
| "Effective Date" | means the date on which the closing occurs under that certain Stock Purchase Agreement, dated as of May 3, 2000, between Dukes Place Holdings, L.P. and Great American Insurance Company, as the same may from time to time be hereafter amended or amended and restated; |
| "Force Majeure" | means circumstances beyond the reasonable control of a party; |
| "Regulatory Authorities" | means the insurance regulatory authorities having responsibility for the supervision of insurance business of the Company in the United States; |

2

20943008.5

| | |
|---|---|
| "Person" | includes an individual, firm, corporation, partnership, limited liability company, trust, association, unincorporated association or other entity or body of persons; |
| "Reinsurance Agreement" | means the Aggregate Reinsurance Agreement, dated as of May 5, 2000, between the Company and National Indemnity Company, as amended ("NIC"); |
| "Records" | means the books and records received or subsequently held by Eastgate in the performance of its obligations under this Agreement, including the Data; |
| "Run-Off Business" | means the run-off of Claims, rights and obligations under all insurance policies and reinsurance contracts underwritten or ceded by the Company; |
| "Services" | means the services provided by Eastgate specified in Schedule 1; |
| "System" | means the computer systems on which the Business is currently processed. |

1.2  Words denoting the singular number include the plural and vice versa.

1.3  References to a statute or statutory provision include a reference to it as from time to time amended, extended or re-enacted, provided that such amendment or extension or re-enactment shall not increase the liability of a party to this Agreement.

1.4  Headings to clauses are for the purpose of general identification only and shall not be construed as forming part of this Agreement.

2.  **Provision of Services**

2.1  The Company appoints and authorizes Eastgate from the Effective Date to provide the Services in respect of the Business. Eastgate shall perform the Services with reasonable care and skill in a professional and efficient manner.

3

2.2 The Company appoints and authorizes Eastgate from the Effective Date to administer the Reinsurance Agreement. A complete and correct copy of the Reinsurance Agreement is attached hereto as Exhibit A. Eastgate warrants that it has read the Reinsurance Agreement in its entirety, that the Reinsurance Agreement creates various rights and obligations with respect to the Run-Off Business between the Company, on the one hand, and NIC, on the other. Eastgate agrees to administer the Reinsurance Agreement consistent with the Company's rights and obligations under the Reinsurance Agreement.

2.3 Eastgate will assist the Company in complying with Article 9 (Access to Records) of the Reinsurance Agreement.

2.4 The Company shall act in good faith when dealing with Eastgate or its Affiliates and shall be responsible for the regular review and setting of its strategy.

2.5 Both parties shall comply with all applicable laws, rules and regulations in respect of all activities conducted under this Agreement.

2.6 To the extent not otherwise provided in this Agreement, including, but not limited to, Schedule 1, all claims services provided by Eastgate to the Company under this Agreement are to be based upon the written criteria, standards and guidelines to be issued by the Company which are not inconsistent with the terms and conditions of this Agreement. However, the Company shall have the ultimate and final authority over decisions and policies, including, but not limited to, the payment or non-payment of claims.

2.7 Notwithstanding any other provision of this Agreement, it is understood that the business and affairs of the Company shall be managed by the Board and, to the extent delegated by the Board, by the Company's appropriately designated officers.

3. Records and System

3.1 The Company shall deliver or cause to be delivered to Eastgate all books and records constituting the Records, as well as any other relevant information.

3.2 The Company Representative and Regulatory Authorities shall at reasonable times and on reasonable written notice have access to and the right to examine the Records. Representatives of Eastgate shall be made available, subject to reasonable written notice,

4

to assist the Company Representative and Regulatory Authorities in the examination of the Records.

3.3   Except as provided for in this Agreement, it is understood that the Records maintained by Eastgate shall remain the property of the Company.

3.4   Eastgate shall be responsible for the storage of Records delivered into its control. Eastgate will protect Data from unauthorized access and will take all reasonable steps to ensure that, once on the System, Data is kept free from any computer viruses, corruption or inaccuracies.

3.5   Prior to the Effective Date, the Company will license or undertake to have licensed to Eastgate the systems currently employed by or on behalf of the Company in connection with the Business. The property rights to any such systems licensed to Eastgate by the Company shall remain vested in the Company. Any specific programming or systems developments carried out by or on behalf of Eastgate in providing the Services, whether or not connected with the System, shall be the property of the Company.

3.6   If the Company requires Eastgate to utilize software owned by a third party, then the Company undertakes (at its expense) to obtain in advance a licence on normal commercial terms authorizing Eastgate to use such software and will keep Eastgate fully informed as to its terms and any relevant restrictions.

4.    Duration

4.1   This Agreement shall commence on the Effective Date and shall continue thereafter unless terminated in accordance with clause 5.

5.    Termination

5.1   It is the intent of the parties that this Agreement shall remain in force for a period of five (5) years from the date of inception, provided, however, that, without limiting the provisions of clause 5.2 below, this Agreement may be terminated by either party on an anniversary of the Effective Date upon at least six months prior written notice given to the other party.

5

20943080.6

5.2   This Agreement may be terminated immediately by notice served on the other party if the other party shall at any time:

    5.2.1   commit a material breach of any of the material provisions of this Agreement and, in the case of any such material breach capable of remedy, fail to remedy such breach within thirty days after receipt of a notice giving reasonable particulars of the breach and requiring it to be remedied;

    5.2.2   become insolvent or suspend payment of its debts or enter into any arrangement with its creditors or convene a meeting of its creditors or cease or threaten to cease to carry on its business;

    5.2.3   enter into bankruptcy, liquidation or rehabilitation (whether voluntarily or otherwise) or have a receiver, liquidator or rehabilitator appointed; or

    5.2.4   shall have willfully committed a material act of fraud in performing its obligations hereunder.

5.3   During any period of notice:

    5.3.1   the Company shall continue to perform its obligations in accordance with the terms of this Agreement; and

    5.3.2   Eastgate shall continue to perform its obligations in accordance with the terms of this Agreement but only in so far as they are capable of completion on or before the termination date.

5.4   Termination in accordance with the above provisions, or howsoever effected, shall take effect without prejudice to the rights and obligations of the parties which have accrued at the date of termination or which may subsequently accrue.

6.   Post-termination

6.1   Upon proper termination of this Agreement and subject to a right of set off in respect of money owed or capable of being owed to Eastgate under this Agreement, all sums held by Eastgate on behalf of the Company pursuant to clause 7 of Schedule 1 shall be returned to

6

the Company or its designee on receipt of a written instruction from the Company Representative.

6.2   Within thirty days of the termination of this Agreement, the Company Representative shall be entitled to require Eastgate to carry out one or more of the following:

6.2.1   deliver to the Company all the Records relating to the Business including any off-line storage and security copies of the Data;

6.2.2   store on magnetic, optical or other media all or any of the information then stored on-line relating the Business and to deliver such media to the Company;

6.2.3   make and deliver to the Company such printouts of information relating to the Business as the Company may reasonably require,

provided that no outstanding sums are due to Eastgate and that all reasonable costs incurred by Eastgate in complying with these obligations are reimbursed by the Company to Eastgate in full upon demand.

6.3   Any work incurred by Eastgate at the request of the Company after the termination date, regardless of the reason for the termination, shall be reimbursed by the Company in accordance with clause 2 of Schedule 3.

6.4   Any work performed by Eastgate after the termination date shall not constitute the waiver of any rights or remedies which have accrued or may accrue in favor of Eastgate in consequence of a breach of any of the provisions of this Agreement or to which Eastgate is entitled at law or howsoever arising, nor shall it defeat the prior termination of this Agreement by either party.

6.5   Upon termination of this Agreement for whatever reason (other than by the Company pursuing to clause 5.1 (after the fifth anniversary of the Effective Date) of 5.2 or by Eastgate pursuant to clause 5.1) the Company shall, in addition to any other sums due to Eastgate under this Agreement, reimburse to Eastgate all reasonable costs and expenses directly and necessarily incurred by Eastgate in consequence of such termination including (without limitation):

6.5.1   the net amount of any redundancy package (if any) settled with employees of Eastgate or its Affiliates employed wholly or substantially in connection with the

7

administration of the Run-Off Business who, within 6 months after the date of such termination shall be dismissed by reason of redundancy as a consequence of such termination;

6.5.2    any penalties or termination charges properly payable by Eastgate to third parties under contracts reasonably entered into by Eastgate for the performance of the Business and cancelled in consequence of such termination; and

6.5.3    the cost to Eastgate of any office accommodation reasonably acquired and used wholly or substantially in connection with the administration of the Business or otherwise which becomes surplus to requirements (or a fair proportion if such use was not wholly in connection with the administration of the Business),

provided that Eastgate shall use all reasonable endeavours to mitigate such costs and expenses and shall be entitled to take all necessary professional advice for the purpose of ascertaining and mitigating such costs and expenses the reasonable fees of which shall be reimbursed to Eastgate by the Company on presentation of a statement evidencing such fees.

6.6    Upon termination of this Agreement by the Company for whatever reason before the fifth anniversary of the Effective Date (other than pursuant to clause 5.2), the Company shall, in addition to any other sums due to Eastgate under this Agreement, compensate Eastgate for the time expended on the Services by Eastgate's directors and officers from the Effective Date to the termination at their standard charging rates during that period, subject to the following reductions:

6.6.1    if termination occurs at the first or second anniversary of the Effective Date, the compensation shall be reduced by $75,000; and

6.6.2    if termination occurs at the third or fourth anniversary of the Effective Date, the compensation shall be reduced by $150,000; and

For avoidance of doubt, this clause 6.6 is not applicable if NIC validly withdraws its consent to Eastgate's continuation as "Claims Servicer" (as defined in the Reinsurance Agreement) pursuant to Article 11(D) of the Reinsurance Agreement.

6.7    The total amount payable by the Company under clauses 6.5 and 6.6 shall not exceed $250,000, after the reductions set out in sub-clauses 6.6.1 and 6.6.2.

8

209-43096.6

6.8    For the avoidance of doubt, the provisions of this Section 6 and Sections and clauses 3.2, 7, 10, 11, 15.6 and 15.7 shall survive the termination of this Agreement and continue in full force and effect.

7.    Confidentiality and non-solicitation

7.1    <u>Confidentiality</u>. Each of the Company and Eastgate shall keep confidential and not use or disclose any information previously or hereafter obtained by it pursuant to this Agreement (the party receiving such information is hereinafter referred to as the "<u>Receiving Party</u>") with respect to the other or such other's parents, subsidiaries, Affiliates or other related entities (the party, or such party's parents, subsidiaries, Affiliates or other related entities, with respect to which the information relates is hereinafter referred to as the "<u>Disclosing Party</u>") in connection with this Agreement and the negotiations preceding this Agreement (such information is hereinafter referred to as the "<u>Confidential Information</u>"), and the Receiving Party will use such Confidential Information solely in connection with the transactions contemplated by this Agreement, and if the transactions contemplated hereby are not consummated for any reason, the Receiving Party shall either return to the Disclosing Party, without retaining a copy thereof, or destroy, any schedules, documents or other written or electronically stored information constituting Confidential Information (or prepared based upon such Confidential Information) in connection with this Agreement and the transactions contemplated hereby and the negotiations preceding this Agreement. Without limiting the generality of the foregoing, the Receiving Party shall be permitted to disclose any Confidential Information to such of its Affiliates, officers, directors, employees, agents, lenders and representatives (collectively, "<u>Representatives</u>") as have a need to know such Confidential Information, provided such Representatives shall be informed that disclosure of such Confidential Information by such Representatives would be in contravention hereof and the Receiving Party shall be responsible for any disclosure prohibited hereby by any of its Representatives. Notwithstanding the foregoing, the Receiving Party shall not be required to keep confidential or return any information which (i) is known or available through other lawful sources, not bound by a confidentiality agreement with the Disclosing Party, or (ii) is or becomes publicly known other than as a result of the disclosure by the Receiving Party or its Representatives, or (iii) is required to be disclosed pursuant to an order or request of a judicial or governmental authority, an arbitrator or arbitration panel or a self-regulatory body or pursuant to any law or regulation in any jurisdiction (provided that the Disclosing Party, to the extent permitted by law, is given reasonable prior written

9

notice); or (iv) is developed by the Receiving Party independently of, and is not based upon, the Confidential Information.

7.2    For the avoidance of doubt, all methodologies, strategic and business plans drawn up by Eastgate for and in the performance of this Agreement shall remain the sole property of Eastgate and nothing shall be construed as granting the Company a licence to use such information in any form after the termination of this Agreement without the consent of Eastgate.

7.3    Eastgate shall be authorized to refer to the Company as a client in its marketing literature.

7.4    Subject to the following proviso, both during and for a period of twelve months after any termination of this Agreement, the Company shall not solicit in any way the employment of, or induce (or assist any other Person to so solicit or induce) any officer or employee of Eastgate to cease to be such an officer or employee, it being understood that this clause 7.4 shall not apply in the event of any termination of this Agreement pursuant to Section 5.1 or by the Company pursuant to Section 5.2.

8.    Assignment and delegation

8.1    Neither party shall assign or deal in any similar manner with any of their rights or obligations under this Agreement without the prior written consent of the other, such consent not to be unreasonably withheld or delayed, provided that, subject to clause 10.2, Eastgate shall have the authority to delegate to any person such functions as it deems necessary for the performance of its obligations under this Agreement.

9.    Remuneration of Eastgate

9.1    In consideration for providing the Services Eastgate shall be remunerated by the Company in accordance with the terms set out in Schedule 3.

10.    Indemnification and Limitation of Liability

10.1    The Company shall indemnify Eastgate against any liability which Eastgate may reasonably incur as a result of performing its obligations under this Agreement provided, however, that

10

such indemnity shall not apply to any liability to the extent such liability has been finally adjudicated by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of Eastgate (including any consultants, independent contractors or other third parties engaged by it) or material breach of this Agreement by Eastgate.

10.2 Eastgate shall indemnify the Company against any liability which the Company may reasonably incur to the extent such liability has been finally adjudicated by a court of competent jurisdiction to have resulted from (i) any material breach of this Agreement by Eastgate, (ii) any gross negligence or willful misconduct by Eastgate in the performance of its obligations under this Agreement, and (iii) any material breach of this Agreement by gross negligence or willful misconduct attributable to any consultants, independent contractors or any third party engaged by Eastgate as permitted by Section 3 hereof.

10.3 Eastgate shall at all times maintain errors and omissions insurance for its actions hereunder with such third-party insurers and in such amounts (including as to deductibles and caps) as are approved from time to time by the Company (such approval not to be unreasonably withheld).

10.4 In the case of any claim asserted by a third party against a party entitled to indemnification under this Agreement (the "Indemnified Party"), notice shall be given by the Indemnified Party to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and the Indemnified Party shall permit the Indemnifying Party (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom, provided that (i) the counsel for the Indemnifying Party who shall conduct the defense of such claim or litigation shall be reasonably satisfactory to the Indemnified Party, (ii) the Indemnified Party may participate in such defense at such Indemnified Party's expense and (iii) the failure by any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that such omission results in a failure of actual notice to the Indemnifying Party and such Indemnifying Party is materially damaged as a result of such failure to give notice. Except with the prior written consent of the Indemnified Party, no Indemnifying Party in the defense of any such claim or litigation shall consent to entry of any judgment or order, interim or otherwise, or enter into any settlement that provides for injunctive or other nonmonetary relief affecting the Indemnified Party or that does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of a release from all liability with respect to such claim or litigation. In the event that the Indemnifying Party does not accept the defense of any matter as above provided, the

11

Indemnified Party shall have the full right to defend against any such claim at the Indemnifying Party's expense or demand and shall be entitled to settle or agree to pay in full such claim or demand. Notwithstanding the foregoing, the Indemnifying Party shall still provide indemnification to the Indemnified Party as provided in clause 10.1 and 10.2 of this Article 10. In any event, the Indemnifying Party and the Indemnified Party shall cooperate in the defense of any claim or litigation subject to this Article 10 and the records of each shall be available to the other with respect to such defense.

10.5    Eastgate shall not be liable to the Company in respect of any breach of contract for loss of profits or revenue, loss of goodwill, loss of anticipated savings or for any type of special, indirect or consequential loss even if such loss was reasonably foreseeable or Eastgate had been advised of the possibility of the Company incurring the same.

10.6    Eastgate's entire liability to the Company or its Affiliates in respect of any breach of this Agreement or any tortious act or omission in connection with this Agreement shall be limited to damages of an amount not exceeding $9,000,000.

10.7    If a number of breaches of this Agreement or tortious acts or omissions give rise to substantially the same loss, then they shall be regarded as giving rise to only one claim under this Agreement and such claim shall be limited to damages of an amount not exceeding $9,000,000.

10.8    If a number of breaches of this Agreement and/or tortious acts or omissions give rise to claims for damages then the damages payable by Eastgate in respect of those claims shall not in aggregate exceed $9,000,000.

10.9    Eastgate shall at all times maintain a fidelity bond or fidelity insurance coverage inuring to the benefit of the Company with a penal sum or limit of liability, as the case may be, of at least $1,000,000.

11.    **Force Majeure**

11.1    If a party's performance obligations under this Agreement are affected by Force Majeure, it shall immediately notify the other party.

12

11.2    A party shall not be in breach of this Agreement by reason of the failure or delay in performance of any obligations to the extent that such failure or delay is caused by Force Majeure, and the time for performance shall be extended accordingly.

11.3    If a party's performance obligations are affected by Force Majeure for a continuous period in excess of thirty days, the parties shall enter into bona fide discussions with a view to alleviating the situation or to agreeing upon such alternative arrangements as may be fair and reasonable. If the parties fail to agree upon a course of action within a further period of thirty days, then either may immediately terminate this Agreement by serving notice on the other.

## 12.    Instructions

12.1    The Company undertakes to respond promptly to all requests for instructions from Eastgate.

12.2    Any written instructions given to Eastgate by the Company Representative shall be deemed to be instructions of the Company. Furthermore, any matter referred to the Company Representative shall be deemed properly communicated to the Company.

## 13.    Notices

13.1    Notices, statements and other communications under this Agreement shall be in writing and shall be served at the addresses listed below (or to such address as is notified in writing by one party to the other from time to time) by hand, facsimile, recorded delivery or by first class post:

Company:            Stonewall Insurance Company
                    c/o GSCP, Inc.
                    12 East 49th Street
                    Suite 3200
                    New York, New York 10017

Attention:          Robert A. Hamwee
Facsimile:          (212) 816-0166

With a copy to the Company Representative.

13

Eastgate:                Eastgate, Inc.
                         50 Broadway, 35th Floor
                         New York, New York 10004

Attention:               President
Facsimile:               (212) 425-4564

13.2    Notices shall be deemed served:

    13.2.1    when delivered by hand, at the time of delivery;

    13.2.2    when sent by facsimile, at the time of a fully complete transmission, as documented by receipt of confirmation generated by the sender's or recipient's facsimile equipment; provided that a facsimile sent outside normal business hours on a business day at the place of receipt will be deemed sent at the opening of normal business hours on the next business day;

    13.2.3    when sent by recorded delivery or first class post, at the expiration of 48 hours from despatch.

14.    Further assurance and good faith

14.1   Each party agrees from time to time to do all such acts and to execute and deliver all such instruments as may be required or reasonably requested by the other party to establish, maintain and protect the rights and remedies of the other party and to carry out and effect the intent and purpose of this Agreement. Each of the parties agrees with the other that it will at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith.

15.    General

15.1   This Agreement sets out the entire understanding of the parties with respect to the matters with which it deals and may be amended or modified only by written instrument duly executed by each party.

14

15.2    Each party acknowledges that it has not relied upon or been induced to enter into this Agreement by any representation other than a representation expressly set out in this Agreement and neither party shall be liable to the other in equity, contract, tort or in any other way for any representation not expressly set out in this Agreement.

15.3    If any provision of this Agreement shall in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that provision or part shall to that extent be deemed not to form a part of this Agreement and the enforceability of the remainder of this Agreement shall not be affected.

15.4    The rights which each party has under this Agreement shall not be prejudiced or restricted by any indulgence or forbearance extended to the other party. No waiver by any party in respect of a breach shall operate as a waiver in respect of any other or subsequent breach.

15.5    This Agreement may be executed in counterparts all of which together shall constitute one and the same instrument and all counterparts shall be deemed to be originals.

15.6    This Agreement shall be governed by and construed in accordance with New York law without reference to that State's law concerning conflicts of law.

15.7    In the event that any differences arising between the Company and Eastgate under this Agreement, such differences shall be submitted to arbitration. The Company and Eastgate shall each nominate an arbiter, and the arbiters shall then choose an umpire before they enter upon arbitration. In the event that either party fails to name its arbiter within thirty (30) days of the other party requesting it to do so, the latter shall name both arbiters, and both arbiters shall choose the umpire before entering upon arbitration. If the two arbitrators are unable to agree upon an umpire, the American Arbitration Association shall choose the umpire at the request of either party, but nothing herein shall be considered an election by the parties that the arbitration proceed in accordance with the rules or procedures of the American Arbitration Association, other than the rules and procedures applicable to appointment of the umpire. The arbiters shall then consider the differences, and failing to agree, shall submit only such questions upon which they disagree to the umpire. The arbiters and the umpire shall be active or retired disinterested executive officers of insurance or reinsurance companies authorized to transact business in the United States. The arbiters and the umpire are relieved from all judicial formalities and may abstain from following the strict rules of law. A decision of the majority in writing when filed with the Company and Eastgate, shall be final and binding upon both. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

15

Any arbitration shall take place in New York, New York. Each party shall bear the expense of its own arbiter, or one-half the expense of the two arbitrators if both are appointed by the requesting party as provided above, and shall jointly and equally bear the expense with the other the expense of the umpire.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

16

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

STONEWALL INSURANCE COMPANY

By_____
    Name:  Robert A. Hamwee
    Title:   Vice-President

EASTGATE, INC.

By_____
    Name:
    Title:

17

## SCHEDULE 1

### The Services

Subject always to the Company Representative's direction, Eastgate shall be authorized to carry out the Services set out below.

1.  **Processing and accounting services**

1.1  Processing of premiums and Claims.

1.2  Maintenance of Company ledgers.

1.3  Payment of balances and the recovery of amounts due from insureds, reinsurers, reinsured, brokers and other intermediaries.

1.4  Maintenance of a reinsurance credit control system.


2.  **Management services**

2.1  Advising the Company on overall strategy.

2.2  Maintaining and giving instructions pursuant to the banking resolutions provided by the Company from time to time on bank accounts in the name of the Company at such banks as the Company may from time to time designate (all funds received and disbursed by Eastgate in carrying out the Business of the Company shall be deposited in or drawn from, as the case may be, such accounts).

2.3.  Submitting to Regulatory Authorities all relevant returns (including but not limited to statutory unaudited annual and quarterly statements and audited statutory annual statements) received in respect of the Company and dealing with any inquiries which arise.

2.4.  Advising the Company as soon as any legislative or regulatory proceedings or complaints or any other material matters relating to the Company come to the attention of Eastgate.

2.5  Provision of facility for meetings of the Board or shareholders of the Company.

18

2.6   Provision of information required by the Company's tax advisors for preparation of the Company's corporation tax returns.

2.7   Monitoring the Company's solvency.

3.   Claims handling services

3.1   Eastgate is authorized on the Company's behalf to:

- receive notice of Claims;

- participate in any scheme or arrangement designed to mitigate or avert Claims or increase salvage;

- exercise rights of subrogation against third parties in the name of the Company;

- carry out the review, handling and adjusting of Claims;

- carry out any ancillary Claims processing work relating to the Run-Off Business;

- admit, compromise and settle Claims including settlements involving "policy ex gratia payments" in accordance with the instructions referred to in clause 4 below;

- monitor and aggregate Claims, prepare reinsurance collections and advices, and keep the reinsurance arrangements of the Run-Off Business under review;

- liaise with professional advisers in respect of disputed Claims in terms of providing information, initial instructions and negotiating a budget;

- review the Company's outstanding Claims reserves and report its findings to the Board; and

- review and comment to the Board on the IBNR proposed by the Company's actuaries.

19

209-13098.8

4.    Claims settlement/underwriting authorities

4.1    For all Claims where the Company's liability is clearly pledged, the Company hereby grants to Eastgate a Claims settlement authority limit of $1,000,000 in respect of individual Claims for the Company's share of any settlement.

4.2    For Claims:

- in excess of the above amounts;
- where the liability of the Company is in doubt or Eastgate proposes a course of action that differs significantly from that of the lead underwriter;
- involving litigation, dispute or arbitration; or
- which Eastgate recommends for commutation,

then the case shall be submitted to the Company Representative in writing for consideration and approval before further action is taken, provided that the Company shall respond promptly (and, in any event, within 30 days), failing which Eastgate shall be authorised to take such steps as it deems reasonably necessary to protect the Company's position.

4.3    For the completion of contracts of insurance and reinsurance, Eastgate shall not:

- enter into any new contract;
- extend the periods of cover under existing contracts; or
- increase the limits of liability under existing contracts,

without the prior written approval of the Company Representative.

5.    Commutations

5.1    Identifying targets for commutation according to, inter alia, the following criteria:

- nature of cedent/assured;
- risk profile;
- reserve levels; and
- deterioration forecasts.

5.2    Presenting a schedule of targets and a commutations status report at each Board meeting.

20943098.6

5.3    Negotiation and drafting of commutation agreements to the extent permitted under the Reinsurance Agreements.

6.     Reports to the Company

6.1    Provision of statements, reports and accounts relating to the Business as follows:

| | Frequency | Service Level (Business Days after period ended) |
|---|---|---|
| Claims received, agreed, rejected | Monthly | 45 |
| Commutations progress | Quarterly | 45 |
| Problematic reinsurance collections | Monthly | 45 |
| Reinsurance recoveries submitted | Quarterly | 45 |
| Credit notes received | Quarterly | 45 |
| Cash received from reinsurers | Monthly | 45 |
| Cashflow statement | Quarterly | 45 |
| Management accounts | Quarterly | 45 |
| Claims exception report | Monthly | 45 |
| Details of new claims | Monthly | 45 |
| Analysis of LMX reinsurance cover | Quarterly | 45 |
| Underwriting Development Statistics | Quarterly | 45 |
| Asbestosis and Environmental Pollution Analyses | Quarterly | 60 |
| Shareholder Report | Annually | 60 |
| IBNR recommendation | Annually | 60 |
| Unaudited and audited statutory annual statements | Annually | as required by law |
| Unaudited statutory quarterly statements | Quarterly | as required by law |

21

6.2    Eastgate shall also provide, on behalf of the Company, such statements, reports and accounts relating to the Business to National Indemnity Company ("NIC") as and when the same are required to be delivered to NIC by the Company pursuant to the terms of the Reinsurance Agreement.

6.3    The service levels are calculated on the following assumptions:

- that each monthly period will be closed on the last Friday of each calendar month; and

- that all Data is stored on the System.

7.    **Treasury and cash management functions**

7.1    Liaison with bankers to ensure smooth running of accounts.

7.2    Carrying out monthly bank reconciliations.

7.3    Investment of Company funds on short term deposit (as directed by the Company).

7.4    All bank or other funds of Company shall be maintained in a segregated account and not be commingled with funds of Eastgate or its other clients.

7.5    The Company Representative shall be authorized to access Company fund accounts.

7.6    Eastgate shall provide copies of all bank statements related to Company fund accounts.

8.    **Corporate functions**

8.1    Liaison with the Regulatory Authorities on the Company's behalf in connection with the Business.

8.2    Full company secretarial services, including the designation of a Company Secretary to be an officer of the Company, subject to approval by the Board.

22

## SCHEDULE 2

### The Company Representative

The Company Representative shall be R.L. Barclay or such other individual as may be advised to Eastgate by the Company from time to time in writing.

23

## SCHEDULE 3

### Remuneration of Eastgate

**1.    Annual fee**

1.1.   In consideration for providing the Services under this Agreement, and subject to the terms of this Schedule, the Company shall pay to Eastgate an annual fee for the first five years of this Agreement as follows (all amounts are in U.S. Dollars and thousands):

| | | | |
|---|---|---|---|
| First Year | - | 2,300 | Sept 30, 2000 - Sept 30, 2001 |
| Second Year | - | 1,950 | Oct 1, 2001 - Sept 30, 2002 |
| Third Year | - | 1,850 | Oct 1, 2002 - Sept 30, 2003 |
| Fourth Year | - | 1,750 | Oct 1, 2003 - Sept 30, 2004 |
| Fifth Year | - | 1,650 | Oct 1, 2004 - Sept 30, 2005 |

1.2    In the event that there is a substantial change in the nature of the Business or the quantity of the Services provided by Eastgate, then each party will at the request of the other party seek in good faith to renegotiate the annual fee.

1.3.   For periods subsequent to the fifth anniversary of the Effective Date, the annual fee shall be mutually agreed to by Eastgate and the Company.

**2.    Work outside the scope of the Agreement**

2.1    If Eastgate carries out any work not covered by the Services, then the Company shall reimburse Eastgate for such work on a time and materials basis at its current rates (which shall be subject to variation from time to time). Eastgate shall be entitled to invoice the Company on a monthly basis and the Company agrees to pay such invoices within fifteen days of receiving each invoice.

2.2    Any such additional work shall be carried out on the terms set out in this Agreement, including for the avoidance of doubt clause 10.

: i k.

200-13098.5

3.    Third party costs

3.1    Fees include the staff and related costs of Eastgate in providing the Services. For the avoidance of doubt, Eastgate's fees do not include third party costs and expenses which will be met directly by the Company including but not limited to:

   3.1.1    subscriptions and directors' fees;

   3.1.2    legal, actuarial, audit and other third party professional fees;

   3.1.3    loss adjustment and claims-related expenses paid to third parties;

   3.1.4    overseas travel undertaken at the request of (or with the prior approval of) the Company Representative;

   3.1.5    the costs of travel, subsistence and accommodation incurred by Eastgate personnel having to conduct work at the request of (or with the prior approval of) the Company Representative, away from their normal office locations.

   3.1.6    the cost of the Company's triennial reviews.

4.    VAT

4.1    Fees and rates referred to in the Agreement do not include any VAT, sales tax or other similar tax which, if applicable, shall be payable by the Company and added to such fees at the rate in force at the time they become due.

5.    Conditions of payment

5.1    The annual fee is payable in advance quarterly on or before the first business day of each quarter, starting with the first business day of the calendar month immediately following the Effective Date, provided that if this Agreement is terminated for any reason during any quarter with respect to which any such quarterly payment has previously been made, Eastgate shall, promptly following such termination, refund a pro-rata portion of such payment to the Company (based on the number of days elapsed/not-elapsed as of the effective date of such termination).

5.2    All fees payable to Eastgate under this Agreement shall be paid in U.S. dollars and are deemed to accrue from day to day.

5.3    Time for payment is of the essence.

5.4    All such fees shall be payable at the address of Eastgate given for the purposes of notices under this Agreement or at such address as may be notified in writing by Eastgate to the Company from time to time.

26

**AMENDMENT II**

**TO**

**AGREEMENT RELATING TO ADMINISTRATION OF RUN-OFF BUSINESS**

**STONEWALL INSURANCE COMPANY**

**AMENDMENT DATE:**

January 16, 2004

**PARTIES:**

(1)     Stonewall Insurance Company, a property/casualty Insurance company (the "Company").

(2)     Ken Randall America, Inc, ("Randall") formerly known as Eastgate, Inc.  The name change was effective November 6, 2000.

**TERMINATION AMENDMENT – CLAUSE 5**

Clause 5.1 is amended to read as follows: "Subject to clause 5.2, this Agreement may be terminated by at least 3 months prior written notice given by either party"

**SCHEDULE 3 – REMUNERATION OF RANDALL – AMENDMENT**

1.1     In consideration for providing the Services under this Agreement, and subject to the terms of this Schedule, the Company shall pay to Randall the fee as follows: (all amounts are in U.S. Dollars)

|  |  |  |
|---|---|---|
| 2004: |  |  |
| | January 1, 2004 | $737,500 |
| | April 1, 2004 | $737,500 |
| | July 1, 2004 | $282,500 |
| | October 1, 2004 | $282,500 |
| | | $2,040,000 |

2005:

    Annual Fee of $1,980,000 to be paid in equal quarterly payments with dates as follows: January 1, 2005, April 1, 2005, July 1, 2005 and October 1, 2005.

2006:

    Annual Fee of $1,920,000 to be paid in equal quarterly payments with dates as follows: January 1, 2006, April 1, 2006, July 1, 2006 and October 1, 2006.

KER/AMENDMENT TO STONEWALL & SEATON AGREEMENTS.DOC

Confidential Cavell016666

2007:

    Annual Fee of $1,865,000 to be paid in equal quarterly payments with dates as follows: January 1, 2007, April 1, 2007, July 1, 2007 and October 1, 2007.

2008:

    Annual Fee of $1,810,000 to be paid in equal quarterly payments with dates as follows: January 1, 2008, April 1, 2008, July 1, 2008 and October 1, 2008.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of January 16, 2004

STONEWALL INSURANCE COMPANY

By: _____

Name: R. L. BARCLAY

Title: PRESIDENT

KEN RANDALL AMERICA, INC

By: _____

Name: KE RANDALL

Title: DIRECTOR

Confidential Cavell016667