**EXHIBIT 3**

9.18.03

(1) NATIONAL INDEMNITY COMPANY

(2) KEN RANDALL AMERICA INC

(3) NATIONAL FIRE & MARINE INSURANCE COMPANY

Claims
Seh/C

---

COLLABORATION AGREEMENT

---

MICHAEL FRIEDMAN, CSR
NO.: 27
DATE: 3/6/07

THIS AGREEMENT is made on 8 August 2001 and amended with effect from 20 June 2003.

BETWEEN:

1. NATIONAL INDEMNITY COMPANY, a Nebraska stock insurance company whose principal place of business is at 3024 Harney Street, Omaha, Nebraska 68131 ("NIC" which expression shall include NF&M unless expressly stated otherwise); and

2. KEN RANDALL AMERICA INC, a Delaware corporation whose principal place of business is at 2 Central Square, Cambridge, MA 02139-3311 ("Randall America"); and with effect from 20 June 2003

3. NATIONAL FIRE & MARINE INSURANCE COMPANY, a Nebraska stock insurance company whose administrative offices are at 3024 Harney Street, Omaha, Nebraska 68131 ("NF&M").

WHEREAS:

*CGU*

(A) By an agreement ("the Potomac Reinsurance Agreement") dated as of 14 March 2001 between Potomac Insurance Company ("Potomac") and NIC, Potomac agreed to cede and NIC agreed to reinsure the Reinsured Risks as therein defined subject to the terms and conditions of the Potomac Reinsurance Agreement.

(B) By an agreement ("the Administrative Services Agreement") dated as of 13 April 2001 between NIC, Potomac and CGU Insurance Company to be renamed OneBeacon Insurance Company ("CGU"), NIC agreed to provide certain services (including but not limited to claims handling) to Potomac and CGU, and CGU agreed to provide certain services and the use of premises in Boston, Massachusetts, to NIC, all in relation to the Reinsured Risks subject to the terms and conditions of the Administrative Services Agreement. Under Article 4.4 of the Administrative Services Agreement, NIC is entitled to employ sub-agents and contractors to perform or co-operate in performing any of the Run-Off Functions (as therein defined) and is also entitled to delegate any of its duties to be performed and powers to be exercised thereunder. For the purposes of this Agreement "CGU" shall be deemed to refer to all insurance entities which are Affiliates of CGU, including Potomac Insurance Company and all other Affiliates of CGU which are included within the definition of "Reinsured" under the Potomac Reinsurance Agreement.

*Seaton*

(C) By agreements ("Agreement RA1321" and "Agreement RA 1322" and collectively "the Seaton Reinsurance Agreements") dated 20 November 1998 and 31 March 1999 respectively between NIC and Seaton Insurance Company (formerly Unigard Security Insurance Company) ("Seaton") subject to the terms and conditions of the Seaton

1

    Reinsurance Agreements, Seaton agreed to cede and NIC agreed to reinsure Seaton against its Ultimate Net Loss as defined in the Seaton Reinsurance Agreements. Under Article 11.A of Agreements RA1321 and 1322, NIC is entitled to associate in the adjustment of all Underlying Claims (as therein defined).

(D)   By an agreement ("the Seaton Administration Agreement") dated 31 March 1999 between Seaton and Randall America, Randall America agreed to provide certain services (including but not limited to claims handling) to Seaton in relation to the business of Seaton subject to the terms and conditions of the Seaton Administration Agreement. Under Clause 2.3 of the Seaton Administration Agreement, Randall America is obliged to allow the NIC representative (as therein defined) to monitor the payment of claims and to assist Randall America and Seaton in the settlement of such claims; under Clause 8.2, Randall America is entitled to delegate to any person such functions as it deems necessary for the performance of its obligations thereunder.

*Stonewall*

(E)   By an agreement ("the Stonewall Reinsurance Agreement") dated 9 May 2001 between NIC and Stonewall Insurance Company ("Stonewall"). Stonewall agreed to cede and NIC agreed to reinsure Stonewall against its Ultimate Net Loss as therein defined subject to the terms and conditions of the Stonewall Reinsurance Agreement. Under Article 12.A, NIC is entitled to associate in the adjustment of all Underlying Claims (as therein defined).

(F)   By an agreement ("the Stonewall Administration Agreement") dated 29 September 2000 between Stonewall and Randall America, Randall America agreed to provide certain services (including but not limited to claims handling) to Stonewall in relation to the business of Stonewall subject to the terms and conditions of the Stonewall Administration Agreement. Under Clause 8.2, Randall America is entitled to delegate to any person such functions as it deems necessary for the performance of its obligations thereunder.

*Collaboration Agreement as of 8 August 2001*

(G)   NIC and Randall America now wish to collaborate, on the terms and subject to the conditions of this Agreement, with the intent that (i) NIC will be responsible for the management of all Schedule 4 Services (as herein defined) in relation to Potomac, Seaton and Stonewall and (ii) Randall America will provide all Schedule 1 Services (as herein defined), which are required to be performed by NIC pursuant to the Administration Services Agreement. For the avoidance of doubt, Randall America will continue to provide all services other than claims handling which it is obliged to provide pursuant to the Seaton Adminstration Agreement and the Stonewall Administration Agreement.

*NICMA and NF&M*

(H)   By an agreement ("the Kemper Reinsurance Agreement") dated as of 31 December 2001 between Lumbermens Mutual Casualty Company and others (together, "Kemper") and NF&M, Kemper agreed to cede and NF&M agreed to reinsure certain

2

   insurance business as therein defined subject to the terms and conditions of the Kemper Reinsurance Agreement.

(I) By an agreement ("the Claims Administration Agreement") dated as of 31 December 2001 between Kemper, National Indemnity Company of Mid-America ("NICMA") and NF&M, NICMA agreed to provide certain services (including but not limited to claims handling) in relation to the Business Covered as defined therein. Under Article III.G.1 of the Claims Administration Agreement, NICMA was entitled to employ sub-agents and contractors to perform or co-operate in performing any of its obligations under the Claims Administration Agreement and was also entitled to delegate any of its duties to be performed and powers to be exercised thereunder. Between 1 January 2002 and 20 June 2003, Randall America performed services for NICMA in connection with the Claims Administration Agreement.

(J) On 20 June 2003, the Claims Administration Agreement was terminated and Kemper and NF&M entered into an agreement ("the Kemper Administration Agreement"), whereby NF&M agreed to provide certain services (including but not limited to claims handling) in relation to the Business Covered as defined therein. Under Article III.G.1 of the Kemper Administration Agreement, NF&M is entitled to employ sub-agents and contractors to perform or co-operate in performing any of its obligations under the Kemper Administration Agreement and is also entitled to delegate any of its duties to be performed and powers to be exercised thereunder.

*Collaboration Agreement as of 20 June 2003*

(K) NF&M now wishes to appoint Randall America to provide certain services which are required to be performed by NF&M pursuant to the Kemper Administration Agreement and accordingly the parties hereto wish to join NF&M as a party to this Agreement and to make certain amendments to the same with effect from 20 June 2003.

IT IS HEREBY AGREED as follows:

1. DEFINITIONS AND INTERPRETATION

1.1 In this Agreement, the following definitions shall have the following meanings:

| | |
|---|---|
| "Accounting Period" | means, unless otherwise stated, a calendar year |
| "Affiliate(s)" | means, with respect to any person, another person who directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with that first person |
| "Business" | means (a) in relation to CGU and Potomac, the Business Covered as defined in the Potomac Reinsurance Agreement; (b) in relation to Seaton and Stonewall, the Business of either of them, as defined in the Seaton Administration Agreement |

3

|  |  |
|---|---|
|  | or the Stonewall Administration Agreement as the case may be; and (c) in relation to Kemper, the Business Covered as defined in the Kemper Administration Agreement |
| "Business Day" | means a day, other than (a) Saturday, (b) Sunday or (c) a holiday in which the banks in Boston, Massachusetts are closed |
| "CGU System" | means the systems, databases, spreadsheets and software used to administer the Business of CGU including the following: Loss Master File, PACES/SAPIENS, PMS and ACTS |
| "Claims Handling Staff" | means those individuals whose names and functions are set out in Schedule 7 as amended from time to time |
| "Company Representative" | means that person notified by any party to the other party from time to time as being authorised to give or receive instructions to or from the other party, the first such persons being named in Schedule 5 below |
| "Data" | means all data of the Business belonging to CGU, Kemper, Seaton or Stonewall as the case may be which is processed by or stored on the System but which does not form part of the System |
| "Effective Date" | means 1 August 2001 in respect of CGU, Seaton and Stonewall and 20 June 2003 in respect of Kemper |
| "Force Majeure" | means circumstances beyond the reasonable control of a party |
| "Kemper System" | meaning the systems, databases, spreadsheets and software used to administer the Business of Kemper |
| "RA System" | means the system being developed by Randall America which is more fully described in Schedule 2 |
| "Records" | means (a) in relation to CGU or Potomac the Relevant Business Records as defined in the Administration Services Agreement; (b) in relation to Seaton or Stonewall, the Records as |

4

|  |  |
|---|---|
|  | defined in the Seaton Administration Agreement or the Stonewall Administration Agreement, as the case may be; and (c) in relation to Kemper, the records relating to claims which are referred to in Article IV.C of the Kemper Administration Agreement but, for the avoidance of doubt, not including any software |
| "Schedule 1 Services" | means the services to be provided by Randall America as set out in Schedule 1 |
| "Schedule 4 Services" | means the services for which NIC is to assume responsibility as identified in Schedule 4 |
| "System" | means the CGU System, the Kemper System and/or the RA System as the case may be. |

1.2 References to a "person" shall be deemed to include a natural person, firm, partnership, company, corporation, association, organisation, government, state, foundation or trust (in each case whether or not having separate legal personality).

1.3 Except where the context otherwise requires, words denoting the singular include the plural and vice versa and words denoting any one gender include all genders.

1.4 A reference to a Recital, Clause or Schedule is to the relevant Recital, Clause or Schedule of or to this Agreement unless another agreement is specifically referenced.

1.5 The Schedules to this Agreement form part of this Agreement and take effect as if set out in this Agreement.

1.6 Headings are for the purpose of general identification only and shall not be construed as forming part of this Agreement.

1.7 The words and phrases "other", "including" and "in particular" shall not limit the generality of any preceding words nor be construed as being limited to the same class as the preceding words where a wider construction is possible.

1.8 Whenever the word "dollars" or the "$" sign appears in this Agreement, they shall be construed to mean United States Dollars and all transactions under this Agreement shall be in United States Dollars.

2. **APPOINTMENT OF RANDALL AMERICA IN RELATION TO CGU AND KEMPER**

2.1 Pursuant to Article 4.4 of the Administrative Services Agreement and III.G of the Kemper Administration Agreement, NIC hereby appoints Randall America to provide the Schedule 1 Services to Kemper, Potomac and CGU subject to NIC's instructions.

2.2 Randall America shall be authorised for the purposes of carrying out its obligations

5

under Clause 2.1 above to exercise all such powers as may be exercised by NIC under the Administrative Services Agreement and the Kemper Administration Agreement.

2.3   In carrying out its obligations under Clause 2.1 above, Randall America shall perform to the professional standards reasonably to be expected from a professional provider of an equivalent service.

2.4   NIC undertakes to respond promptly to all requests for instruction from Randall America and agrees that any instruction given to Randall America by the NIC Representative shall be deemed to be an instruction of NIC.

2.5   In consideration for providing the Schedule 1 Services, Randall America shall be remunerated in accordance with Schedule 3.

2.6   Both parties acknowledge that there will be a transitional phase (a) in which it will be necessary for CGU to continue to provide some or all of the Run-Off Services as set out in Article V of the Administrative Services Agreement and (b) during which Randall America will be engaged in assuming responsibility for the CGU Operation as defined in Schedule 3 below. Randall America and NIC will work together with a view to facilitating as soon and as cost-effectively as practicable the release of CGU from the obligation to provide Run-Off Services and the transfer of responsibility for the Schedule 1 Services to Randall America. The costs associated with the transitional phase will be paid in accordance with Schedule 3.

2.7   Randall America agrees that it shall not employ any person whose costs are to be charged in whole to NIC without the prior consent of NIC. Randall America further agrees that it shall not employ any person whose costs are to be charged in part to NIC where the allocation of such person's costs to NIC exceeds $25,000 per annum without the prior consent of NIC. For the avoidance of doubt, NIC consents to the employment by Randall America of employees on Randall America's payroll at the Effective Date. Randall America further agrees that should Pam Hoelsken (or her successor) cease for any reason to serve in her current capacity at Randall America then Randall America and NIC shall jointly agree upon her replacement and the terms and conditions of employment of such replacement.

3.   RESPONSIBILITY FOR CLAIMS HANDLING IN RELATION TO SEATON AND STONEWALL

3.1   Pursuant to Article 11.A of Agreements RA 1321 and 1322 and Article 12.A of the Stonewall Administration Agreement, Clauses 2.3 and 8.2 of the Seaton Administration Agreement and Clause 8.2 of the Stonewall Administration Agreement, ~~Randall America hereby delegates to NIC and NIC accepts responsibility for the management of claims in respect of Seaton and Stonewall and NIC undertakes to provide the Schedule 4 Services on Randall America's behalf.~~ In particular, Randall America authorises and requires NIC to direct the Claims Handling Staff in the performance of their duties. The salary and bonus of all Claims Handling Staff shall be set by NIC. NIC shall set the salary and bonus for each member of the Claims Handling Staff in NIC's discretion after discussion with the Chairman of Randall America or such person as he may determine, provided nothing in this Agreement

6

shall be construed to require NIC to pay any bonus. Randall America agrees that it shall not add any feature to the employee benefit structure for any member of the Claims Handling Staff that increases the total cost of benefits for that individual without prior approval of NIC. For the avoidance of doubt NIC agrees the salaries of all Claims Handling Staff employed by Randall America at the Effective Date but any subsequent increases in salary shall be set by NIC. NIC shall have the right to require Randall America to redeploy any member of the Claims Handling Staff and cease to levy any charge to NIC in respect of such person if in the reasonable opinion of NIC such person is no longer suitable or is no longer required for the purpose of performing the Schedule 4 Services. For the avoidance of doubt, NIC retains all authorities to supervise and control claims handling and reinsurance collections as are provided in each of the agreements referenced in Recitals (A) through (F)

3.2  NIC shall be authorised for the purposes of carrying out its obligations under Clause 3.1 above to exercise all such powers as may be exercised by Randall America under the Seaton and Stonewall Administration Agreements.

3.3  In carrying out its obligations under Clause 3.1 above, NIC shall perform to the professional standards reasonably to be expected from a professional provider of an equivalent service.

3.4  In consideration for accepting responsibility as set out in Clause 3.1 above, NIC shall be entitled to share in the fees received by Randall America from Seaton and Stonewall respectively as set out in Schedule 3. For the avoidance of doubt, NIC retains the rights to all claims supervision fees provided for under agreements other than this Agreement, in addition to the share of fees referenced in this Clause 3.4.

3.5  NIC shall not, on its own initiative, change the methods used by Seaton or Stonewall to establish reserves. Nothing contained herein shall be construed to require either Seaton or Stonewall to adopt NIC's reserving methodologies or vice versa. Each party shall establish its reserves in respect of the liabilities reinsured under the Seaton Reinsurance Agreements and the Stonewall Reinsurance Agreement respectively.

4.  **RECORDS**

4.1  Randall America agrees to do all such acts as are reasonable in order to enable NIC to comply with its obligations to CGU pursuant to Article X of the Potomac Reinsurance Agreement and to Kemper pursuant to Article IV.C of the Kemper Administration Agreement.

4.2  NIC agrees to do all such acts as are reasonable in order to enable Randall America to comply with its obligations to Seaton and Stonewall pursuant to Clause 3 of the Seaton and Stonewall Administration Agreements.

4.3  Each party agrees to procure for the other party such access to the Records of CGU, Potomac, Kemper, Seaton and Stonewall as the case may be as is necessary to enable the other party to carry out its obligations under this Agreement.

4.4  Nothing in this Agreement shall be deemed to result in a transfer of the ownership of

7

any records from one party to the other nor shall this Agreement create any right or lien by either party against records owned by the other party or which are the property of any insurance company whose business is administered pursuant to this Agreement.

5.  SYSTEMS

5.1 In light of the cost of the various systems which comprise the CGU System, both parties acknowledge the desirability of migrating data from the CGU System to the RA System as soon as practicable but recognise that the CGU Operation will continue to require access to the CGU System for a period of time. Likewise, both Randall America and NIC will require access to the Kemper System for a period of time. Accordingly, NIC will procure at its own cost that the CGU System and the Kemper System are made available to Randall America as required to enable Randall America to carry out its obligations under this Agreement.

5.2 Randall America will make the RA System available to NIC for use in relation to the CGU Operation and any other portfolio of insurance or reinsurance in which NIC has an interest and to which Randall America is appointed by NIC to provide services similar to Schedule 1 Services. The target date for availability of the RA System is 31 March 2002 and once the RA System is available (but not before) Randall America will be entitled to charge NIC the System Fee in accordance with Schedule 3.

5.3 The costs of data cleansing, conversion and migration of data from the CGU System and, at NIC's option, the Kemper System to the RA System will be charged separately and will be met by NIC, provided that NIC has given its prior approval to such costs in accordance with Schedule 3.

6.  PREMISES, EQUIPMENT AND OTHER FACILITIES

6.1 Randall America will provide NIC with access to such premises, equipment and other facilities as the parties may agree are appropriate in order for each of them to carry out their respective obligations under this Agreement. Randall America and NIC will agree on the cost, location and standard of such premises, equipment and facilities. The costs of such premises, equipment and facilities will be allocated in accordance with Schedule 3.

6.2 NIC undertakes to provide E&O insurance to Randall America with effect from 31 January 2002 covering Randall America's activities in relation to CGU, Potomac, Seaton ( AXA Re Property and Casualty Insurance Company, Stonewall and Kemper either by issuing a policy itself or arranging for a policy to be issued by an affiliate of NIC at an annual premium of GB£28,000. A summary of the terms of the cover is set out in Schedule 8.

7.  CONFIDENTIALITY

7.1 Save for any information in the public domain or any confidential information which subsequently comes into the public domain other than by a breach of this clause, any confidential information relating to CGU, Potomac, Kemper, Seaton or Stonewall as the case may be or to their financial, trading or business affairs or trade secrets which

8

has, or shall become known to either of the parties pursuant to, during the course of or in negotiating this Agreement, shall be kept confidential, shall be used solely for the purposes of this Agreement and shall not be disclosed to any person during or after the termination of this Agreement without the prior written consent of the person to whom the information belongs other than for:

7.1.1 the proper performance of the disclosing party's obligations under this Agreement and then only under appropriate obligations of confidentiality approved by the other party; or

7.1.2 where either party is required to disclose such confidential information by operation of law, or by any order of a securities exchange, regulatory or governmental body (provided that the disclosing party, to the extent permitted by law, gives reasonable prior written notice to the other party). Either party may disclose such confidential information as it deems appropriate to directors and employees of that party and its Affiliates, its auditors, legal counsel, insurance departments of any State and taxation authorities. The existence and terms of this Agreement may be disclosed to other parties to the extent necessary to allow either party to carry out its obligations under this Agreement or any of the Agreements referenced in Recitals (A) through (F).

7.2 Both during and after termination of this Agreement, each party shall at all times keep confidential any confidential information that it acquires relating to the other party or to its Affiliates or their financial, trading or business affairs or trade secrets and the non-disclosure requirements in Clause 7.1 shall apply mutatis mutandis to this Clause. This Clause will expire three years after the termination of this Agreement.

7.3 For the avoidance of doubt:

7.3.1 all methodologies, strategic and business plans drawn up by Randall America for and in the performance of this Agreement shall be confidential information and shall be and remain the property of Randall America and nothing shall be construed as granting any other person a licence to use such information in any form, after the termination of this Agreement, without the consent of Randall America; and

7.3.2 all methodologies, strategic and business plans drawn up by NIC for and in the performance of this Agreement shall be confidential information and shall be and remain the property of NIC and nothing shall be construed as granting any other person a licence to use such information in any form, after the termination of this Agreement, without the consent of NIC.

7.4 For the avoidance of doubt, Randall America shall be entitled to refer to NIC as a client in its marketing and documentation relating thereto, provided that it has first obtained the approval of NIC.

8. DURATION

8.1 This Agreement shall commence on the Effective Date and shall continue thereafter until terminated in accordance with Clause 9 below.

9

9. **TERMINATION**

9.1 NIC shall have the right to terminate this Agreement with immediate effect by written notice served on Randall America:

9.1.1 upon the termination of NIC's liability under the Potomac Reinsurance Agreement and the Administrative Services Agreement; or

9.1.2 upon the termination of Randall America's rights under both of the Seaton Administration Agreement and the Stonewall Administration Agreement; or

9.1.3 (to the extent only of Schedule 1 Services provided in relation to Kemper) upon the termination of NIC's liability under the Kemper Reinsurance Agreement and the Kemper Administration Agreement; or

9.1.4 in the event that Kenneth Edward Randall ceases directly or indirectly to control the affairs of Randall America.

9.2 Either party may terminate this Agreement with immediate effect by written notice served on the other party in the event that:

9.2.1 a voluntary or involuntary proceeding is commenced in any state, any court in the United States or in the United Kingdom by or against the other party for the purpose of conserving, rehabilitating or liquidating the other party;

9.2.2 the other party enters into bankruptcy proceedings (whether voluntary or otherwise) or otherwise ceases to continue in business as a legal entity;

9.2.3 there is a material breach by the other party of any term or condition of this Agreement that is not cured within 90 days of receipt of written notice of such breach or act; provided that in the event of a dispute between the parties as to whether there is a material breach, the running of said 90 days shall be suspended from the time of a demand for arbitration until issuance of the final award of an arbitration panel;

9.2.4 the other party is unable to perform the services required under this Agreement for a period of 90 consecutive days for any reason other than force majeure provided that in the event of a dispute between the parties as to whether the other party is unable to perform the services, the running of said 90 days shall be suspended from the time of a demand for arbitration until issuance of the final award of an arbitration panel;

9.2.5 as required by a final order of any state insurance department having jurisdiction over CGU Insurance Company, Seaton Insurance Company or Stonewall Insurance Company and (in respect only of services provided in relation to Kemper) as required by a final order of any state insurance department having jurisdiction over Kemper provided both parties have had opportunity to contest such order to the extent permitted by applicable law.

9.3 This Agreement may be terminated at any time upon the mutual written consent of the parties hereto, which writing shall be effective at the date of termination specified

10

therein.

9.4 This Agreement may be terminated pursuant to Clause 16.3 below.

9.5 This Agreement may be terminated by either party by giving no less than 12 months' written notice to the other party with termination to be effective on or after 31 July 2005.

9.6 During any period of notice, both parties shall continue to perform their obligations in accordance with the terms of this Agreement.

9.7 Termination in accordance with this Clause 9 howsoever effected shall take effect without prejudice to the rights and obligations of the parties which have accrued at the date of termination or which may subsequently accrue.

10. CONSEQUENCES OF TERMINATION

10.1 Upon proper termination of this Agreement for whatever reason, and subject to a right of set-off in respect of money owed to either party under this Agreement, all sums held by either party on behalf of the other party or on behalf of CGU, Potomac, Kemper, Seaton or Stonewall, if any, shall be returned to that person or its designee on receipt of a written instruction from the Company Representative.

10.2 Following proper termination of this Agreement, within 30 days of either party's request, NIC or Randall America, as the case may be, shall be entitled to obtain access to the Records and, at its election, to do and/or require the other party to do any one or more of the following:

10.2.1 to deliver to it all the Records relating to the Business including all or any off-line storage and security copies of the Company Data;

10.2.2 to store on magnetic, optical or other media in a form reasonably accessible to the other party all or any of the information then stored on-line relating the Business and to deliver such media to it;

10.2.3 to make and deliver to it such printouts of information relating to the Business as it shall reasonably require

provided that all reasonable costs incurred by the other party in complying with these obligations shall be reimbursed by it to the other party in full upon demand and any such action under this Clause will not defeat the termination of this Agreement nor waive any rights or remedies which have accrued or may accrue to either party.

10.3 In the event that NIC wishes to continue to use the RA System following termination of this Agreement, Randall America agrees that it will continue to make it available to NIC, for use in relation to the CGU Operation and any other portfolio of insurance or reinsurance in which NIC has an interest and to which Randall America is appointed by NIC to provide services similar to Schedule 1 Services, in consideration of the payment to it of the reasonable operating costs of the RA System which the parties

11

will negotiate in good faith to establish subject to the parties' rights under Clause 14.

10.4 Any and all work performed by either party on behalf of and at the request of the other party after the termination date, regardless of the reason for the termination shall be remunerated on a time and materials basis at that party's then commercially reasonable current rates of charge and any such work performed by either party after the termination date shall not constitute the waiver of any rights or remedies which have accrued or may accrue in favour of that party in consequence of a breach of any of the provisions of this Agreement or to which that party is entitled at law or howsoever arising, nor shall it defeat the prior termination of this Agreement by either party.

10.5 Upon termination of this Agreement for whatever reason (other than pursuant to Clause 9.1, by NIC pursuant to Clause 9.2 or by Randall America pursuant to Clause 9.4 or 9.5) NIC shall, in addition to any other sums due to Randall America under this Agreement, reimburse to Randall America all reasonable costs and expenses directly and necessarily incurred by Randall America in consequence of such termination including:

10.5.1 the net amount of any severance package (if any) approved by NIC and settled with employees of Randall America or its Affiliates employed wholly or substantially in connection with the provision of services to CGU, Potomac, Kemper, Seaton or Stonewall who, within 6 months after the date of such termination shall be dismissed as a consequence of such termination;

10.5.2 any penalties or termination charges properly payable by Randall America to third parties under contracts reasonably entered into by Randall America for the provision of services to CGU, Potomac, Kemper, Seaton or Stonewall and cancelled in consequence of such termination, provided NIC has agreed to any contract with a period in excess of one year;

10.5.3 the cost to Randall America of any office accommodation acquired with the consent of NIC and used wholly or substantially in connection with the provision of services to CGU, Potomac, Kemper, Seaton or Stonewall and which becomes surplus to requirements as a result of the termination (or a fair proportion if such use is less than wholly or mainly in connection with the said provision of services);

provided that Randall America shall use all reasonable endeavours to mitigate such costs and expenses and shall be entitled to take all necessary professional advice for the purpose of ascertaining and mitigating such costs and expenses the fees of which together with the costs incurred in mitigation shall be reimbursed to Randall America by NIC on presentation of a statement evidencing such fees. To mitigate such costs Randall America shall offer to NIC the opportunity to assume one or more of the contracts which result in costs or charges referenced in Clauses 10.5.2 or 10.5.3. In addition, to mitigate such costs under Clause 10.5.1, any employee of Randall America offered employment by NIC or an Affiliate under terms substantially similar to the terms under which that employee is employed by Randall America in the same metropolitan area as that employee is employed by Randall America who elects to decline such offer of employment shall not be included within the set of employees of Randall America referenced in Clause 10.5.1.

10.6 Nothing in this Agreement shall be construed as giving any employee of Randall America or NIC any right to any severance package.

10.7 The provisions of this Clause and Clauses 7, 11, 12, and 14 shall survive the termination of this Agreement and shall continue in full force and effect for a period of three years from the date on which the termination takes effect.

11. INDEMNITIES

11.1 Subject to Clause 12 below, each party agrees to indemnify and hold harmless the other party and any of its directors, officers, employees, agents or Affiliates (and the directors, officers, employees or agents of such Affiliates) from any and all losses, liabilities, costs, claims, demands, compensatory, extra contractual or punitive damages, fines, penalties and expenses (including reasonable attorneys' fees and expenses) (collectively, "Losses") arising out of or caused by:

11.1.1 fraud, theft or embezzlement by the directors, officers, employees or agents of the Indemnifying Party;

11.1.2 any act of negligence or wilful misconduct committed by the directors, officers, employees or agents of the Indemnifying Party provided that there was no contributing negligence or willful misconduct of the Indemnified Party; or

11.1.3 any failure on the part of the Indemnifying Party to comply with applicable laws, rules or regulations during the term of this Agreement other than a failure on its part caused by the action or inaction of the other party whether or not in compliance with the terms of this Agreement.

11.2 Nothing in this Agreement shall be construed to require either party to indemnify the other party with respect to any act or omission where the decision to take or omit such action was with the agreement of the other party.

11.3 In the event that either party hereto asserts a claim for indemnification whether under this Agreement or otherwise, such party seeking indemnification ("the Indemnified Party") shall give written notice to the other party ("the Indemnifying Party") specifying the facts constituting the basis for, and the amount, if known, of the claim asserted within 30 days of the date the claim is asserted against the Indemnified Party or within three months of the date on which it should have been known by the Indemnified Party.

11.4 If an Indemnified Party asserts, or may in the future seek to assert, a claim for indemnification whether under this Agreement or otherwise because of a claim or demand made, or an action, proceeding or investigation instituted, by any person not a party to this Agreement ("a Third Party Claimant") that may result in a Loss with respect to which a party is entitled to indemnification, (an "Asserted Liability"), the Indemnified Party shall so notify the Indemnifying Party as promptly as practicable but in no event later than 30 days after such Asserted Liability is actually known to the Indemnified Party. Failure to deliver notice with respect to an Asserted Liability in a

13

timely manner shall not be deemed a waiver of the Indemnified Party's right to indemnification for Losses but the amount of reimbursement to which the Indemnified Party is entitled shall be reduced by the amount, if any, by which the Indemnified Party's Losses would have been less had such notice been delivered in a timely fashion.

11.5    The Indemnifying Party shall have the right, upon written notice to the Indemnified Party, to investigate, contest, defend, compromise or settle the Asserted Liability, provided that the Indemnified Party may, at its option and at its own expense, participate in the investigation, contesting, defense, compromise or settlement of any such Asserted Liability through representatives and counsel of its own choosing and at its own expense. The Indemnifying Party shall have the right to settle a claim against the Indemnified Party without the Indemnified Party's consent, provided such settlement does not impose any obligations (other than ministerial acts) upon the Indemnified Party.

11.6    The failure of the Indemnifying Party to respond in writing to proper notice of an Asserted Liability within 30 days after receipt thereof shall be deemed an election not to defend the same. Thereafter, unless and until the Indemnifying Party elects to defend, compromise or settle the Asserted Liability, the Indemnified Party shall have the right, at its option and at the Indemnifying Party's expense, to do so in such manner as it deems appropriate including settling such Asserted Liability (after giving notice of the settlement to the Indemnifying Party) on such terms as the Indemnified Party deems appropriate.

11.7    Except as provided in Clause 11.6 above, the Indemnified Party shall not settle or compromise any Asserted Liability for which it seeks indemnification whether under this Agreement or otherwise without the prior written consent of the Indemnifying Party during the 30-day period specified above or during the period Indemnifying Party is defending Indemnified Party.

11.8    The Indemnifying Party shall be entitled to participate in (but not to control) the defense of any Asserted Liability which it has elected, or is deemed to have elected, not to defend, with its own counsel and at its own expense.

11.9    Except as provided in Clause 11.5 above, the Indemnifying Party shall bear all reasonable costs of defending any Asserted Liability and shall indemnify and hold harmless the Indemnified Party from all costs, fees and expenses incurred in connection with defending such Asserted Liability after tender of the claim for indemnification.

11.10   The parties shall make mutually available to each other all relevant information in their possession or under their control relating to any Asserted Liability (except to the extent that such action would result in a loss of attorney-client privilege) and subject to Clause 11.3 above shall co-operate with each other in the defense thereof.

11.11   NIC agrees to indemnify and hold harmless Randall America and any of its directors, officers, employees, agents or Affiliates (and the directors, officers, employees or agents of such Affiliates) from any and all losses, liabilities, costs, claims, demands,

14

compensatory, extra-contractual or punitive claims, fines, penalties and expenses (including reasonable attorneys' fees and expenses) (collectively, "Kemper Losses") arising out of or caused by the establishment, operation or termination of the Loss Funding Account as defined in the Kemper Administration Agreement, provided always that Randall America shall have adhered in all material respects to any written guidelines provided by NIC to Randall America from time to time concerning the establishment, operation or termination of the Loss Funding Account and provided further that Randall America does not authorise or direct any payments from the Loss Funding Account without the prior written approval of NF&M.

11.12  The provisions of Clauses 11.3 through 11.10 shall apply to the Kemper Losses as if they were Losses for the purposes of those provisions.

11.13  The provisions of this Clause 11 shall survive termination of this Agreement for a period of three years. Termination of this Agreement shall not affect the application of this Clause 11 to claims tendered for indemnification during the term of this Agreement or for three years thereafter.

12.  **LIMITATIONS OF LIABILITY**

12.1  Randall America shall not be liable to NIC in respect of any default, breach of contract or tortious act or omission in connection with this Agreement, for any loss of profits or revenue or any other financial loss whatsoever (other than reasonable costs and expenses actually and necessarily incurred by NIC and otherwise recoverable for such default, breach of contract or tortious act or omission) or for any loss of goodwill or for any loss resulting from corruption of any software or data or other information or for any type of special indirect or consequential loss (including loss or damage suffered by NIC as a result of an action brought by a third party) other than the reasonable costs and expenses actually and necessarily incurred by NIC and otherwise recoverable for restoration of such software, data or other information even if such loss was reasonably foreseeable or Randall America had been advised of the possibility of its or their incurring the same.

12.2  Randall America's entire liability in respect of any default, breach of contract or tortious act or omission in connection with this Agreement shall be limited to damages of an amount not exceeding $5,000,000.

12.3  If a number of defaults, breaches of contract or tortious acts or omissions give rise to claims for damages in any one Accounting Period then the damages payable by Randall America in respect of those claims shall not in aggregate exceed $5,000,000.

12.4  Randall America shall have no liability to NIC in respect of any default, breach of contract or tortious act or omission unless NIC shall have served notice of the same upon Randall America within 6 calendar months of the date it becomes aware of the circumstances giving rise to the default, breach of contract or tortious act or omission or the date when it ought reasonably to have become so aware.

12.5  NIC shall not be liable to Randall America in respect of any default, breach of contract or tortious act or omission in connection with this Agreement, for any loss of

15

profits or revenue or any other financial loss whatsoever (other than reasonable costs and expenses actually and necessarily incurred by Randall America and otherwise recoverable for such default, breach of contract or tortious act or omission) or for any loss of goodwill or for any loss resulting from corruption of any software or data or other information or for any type of special indirect or consequential loss (including loss or damage suffered by Randall America as a result of an action brought by a third party) other than the reasonable costs and expenses actually and necessarily incurred by Randall America and otherwise recoverable for restoration of such software, data or other information even if such loss was reasonably foreseeable or NIC had been advised of the possibility of its or their incurring the same.

12.6  NIC's entire liability in respect of any default, breach of contract or tortious act or omission in connection with this Agreement other than pursuant to clause 11.11 shall be limited to damages of an amount not exceeding $5,000,000.

12.7  If a number of defaults, breaches of contract or tortious acts or omissions give rise to claims for damages in any one Accounting Period then the damages payable by NIC in respect of those claims shall not in aggregate other than pursuant to clause 11.11 exceed $5,000,000.

12.8  NIC shall have no liability to Randall America in respect of any default, breach of contract or tortious act or omission unless Randall America shall have served notice of the same upon NIC within 6 calendar months of the date it becomes aware of the circumstances giving rise to the default, breach of contract or tortious act or omission or the date when it ought reasonably to have become so aware.

12.8  If a number of defaults, breaches of contract or tortious acts or omissions give rise substantially to the same loss then they shall be regarded as giving rise to only one claim under this Agreement and other than pursuant to clause 11.11 such claim shall be limited to damages of an amount not exceeding $5,000,000.

13.  ASSIGNMENT

13.1  This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns approved pursuant to the following sentence and to their respective legal representatives. Neither this Agreement, nor any right hereunder, may be assigned by either party without the prior written consent of the other party which it may give or withhold in its sole discretion without giving any reasons therefor.

13.2  Neither party may delegate or sub-contract the performance of any of its obligations under this Agreement without the prior written consent of the other party, save that:

13.2.1  NIC may at its absolute discretion delegate any or all of its rights and obligations granted or imposed under this Agreement to any of its Affiliates provided that if any Affiliate to which rights or obligations are delegated as aforesaid ceases to be an Affiliate of NIC, the rights and obligations so delegated shall automatically revert to and be the responsibility of NIC;

16

13.2.2 Randall America may at its absolute discretion delegate any or all of its rights and obligations granted or imposed under this Agreement to any of its Affiliates provided that if any Affiliate to which rights or obligations are delegated as aforesaid ceases to be an Affiliate of Randall America, the rights and obligations so delegated shall automatically revert to and be the responsibility of Randall America; and

13.2.3 Randall America shall have the authority, subject to NIC's prior written approval, such approval not to be unreasonably withheld or delayed, to delegate to any third party such activities necessary to the performance of its obligations to NIC hereunder as would normally be delegated by a manager of the Business, provided that Randall America shall remain responsible to NIC for all such activities.

13.2.4 NIC shall have the authority, subject to Randall America's prior written approval, such approval not to be unreasonably withheld or delayed, to delegate to any third party such activities necessary to the performance of its obligations to Randall America hereunder as would normally be delegated by a manager of the Business, provided that NIC shall remain responsible to Randall America for all such activities.

14. ARBITRATION AGREEMENT

14.1 As a condition precedent to any right arising under this Agreement, any dispute between the parties arising out of the provisions of this Agreement or concerning its formation, interpretation or validity, whether arising before, during or after termination of this Agreement or pursuant to services performed pursuant to Clause 10, shall be submitted to arbitration in the manner set forth in this Clause 14. Either party may initiate arbitration of any such dispute by giving written notice to the other party of its intention to arbitrate and of its appointment of an arbitrator in accordance with Clause 14.3 below.

14.2 Unless the parties agree on a single arbitrator within 15 days after receipt of notice of the intention to arbitrate, all disputes shall be submitted to an arbitration panel composed of two arbitrators and an umpire, chosen in accordance with Clauses 14.3 and 14.4 below.

14.3 The members of the arbitration panel shall be chosen from persons who are current or retired executive officers of insurance or reinsurance companies. The party requesting arbitration ("the claimant") shall appoint an arbitrator and give written notice thereof to the other party ("the respondent") together with its notice of intention to arbitrate. Unless a single arbitrator is agreed upon within 15 days after the receipt of the notice of intention to arbitrate, the respondent shall, within 30 days after receiving such notice, also appoint an arbitrator and notify the claimant in a like manner. Before instituting a hearing, the two arbitrators so appointed shall choose an umpire. If, within 20 days after they are both appointed, the arbitrators fail to agree upon the appointment of an umpire, the umpire shall be appointed by the President of the American Arbitration Association.

14.4 If the respondent fails to appoint an arbitrator within 30 days after receiving notice of intention to arbitrate, such arbitrator shall be appointed by the President of the American Arbitration Association and shall then, together with the arbitrator

17