appointed by the claimant, choose an umpire as provided in Clause 14.3 above.

14.5    Any arbitration instituted pursuant to this Clause 14 shall be held in New York, New York.

14.6    Unless otherwise extended by the arbitration panel, or agreed to by the parties, each party shall submit its case to the panel within 30 days after the selection of an umpire.

14.7    All proceedings before the arbitration panel shall be informal and the panel shall not be bound by the rules of evidence. The panel shall have the power to fix all procedural rules relating to the arbitration proceeding. In reaching any decision, the panel shall give due consideration to the custom and usage of the insurance and reinsurance business and the mutual intention of the parties as reflected in this Agreement.

14.8    The arbitration panel shall render an award in writing within 60 days after termination of the proceeding. The decision of the majority of the panel shall be final and binding on the parties to the proceeding.

14.9    Unless otherwise allocated by the panel, each party shall bear the expense of its own arbitrator and its own witnesses and shall jointly and equally bear with the other party the expense of the umpire and the arbitration.

14.10   The arbitration panel may not authorise any punitive damage awards between the parties.

15.     NOTICES

15.1    Notices, statements and other communications hereunder shall be in writing and shall be served at the addresses listed below (or to such address as is notified in writing by one party to the other from time to time) by hand, by certified or registered mail (return receipt requested), by facsimile or by overnight delivery service (providing for delivery receipt):

NIC:            3024 Harney Street
                Omaha, Nebraska 68131
Attention:      General Counsel
Facsimile:      (402) 536 3265

With a copy to: General Counsel, Reinsurance Division
                National Indemnity Company
                100 First Stamford Place
                Stamford, Connecticut 06902


Randall America:  2 Central Square
                  Cambridge, MA 02139

Attention:     Pam Hoelsken
Facsimile:     (617) 234 3871

With a copy to:     Ken Randall
Facsimile:     (44-1732) 872 683

15.2    Notices shall be deemed served:

15.2.1    when delivered by hand, certified or registered mail or by overnight delivery service, at the time of delivery;

15.2.2    when sent by facsimile, at the time of a fully complete transmission, as documented by receipt of confirmation generated by the sender's or recipient's facsimile equipment, provided that a facsimile sent outside normal business hours on a Business Day at the place of receipt shall be deemed sent at the opening of normal business hours on the next Business Day.

15.3    Either party may change the notification instructions in this Clause 15 upon fifteen days advance notice to the other party.

## 16.    FORCE MAJEURE

16.1    If a party's performance obligations under this Agreement are affected by Force Majeure, it shall immediately notify the other party.

16.2    A party shall not be in breach of this Agreement by reason of the failure or delay in performance of any obligations to the extent that such failure or delay is caused by Force Majeure, and the time for performance shall be extended accordingly provided nothing herein shall be construed to alter Clause 9.

16.3    If a party's performance obligations are affected by Force Majeure for a continuous period in excess of 30 days, the parties shall enter into bona fide discussions with a view to alleviating the situation or to agreeing upon such alternative arrangements as may be fair and reasonable. If the parties fail to agree upon a course of action within a further period of 30 days, then either party may immediately terminate this Agreement by giving written notice to the other subject to the right of the other party to contest through arbitration such termination. The 30 days shall be tolled during said arbitration.

## 17.    MISCELLANEOUS PROVISIONS

17.1    No term of this Agreement is enforceable by a person who is not a party to this Agreement, nor shall any person not a party to this Agreement have any rights hereunder or be a beneficiary of this Agreement.

17.2    Whenever under the terms of this Agreement the consent, approval or specification of a party is required, each party agrees that such consent, approval or specification will not be unreasonably withheld or delayed unless specifically provided otherwise in this

Agreement.

17.3  Each party agrees that in carrying out its obligations under this Agreement it will adhere to all applicable laws, regulations and rulings.

17.4  Each party agrees from time to time to provide such information and assistance to each other, to do all such acts and to execute and deliver all such instruments as may be required or reasonably requested by the other party to establish, maintain or protect the rights and remedies of the other party and to carry out and effect the intent and purpose of this Agreement.

17.5  The parties intend that every provision of this Agreement shall be and remain valid and enforceable to the fullest extent permitted by law. If any such provision is or at any time becomes to any extent invalid, illegal or unenforceable under any enactment or rule of law:

17.5.1  the enforceability of the remainder of this Agreement shall not be affected; and

17.5.2  the parties shall make such amendments as are required to give lawful effect to the intentions of the parties immediately prior to the date of this Agreement.

17.6  This Agreement constitutes the entire agreement between the parties in relation to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties. There are no general or specific warranties, representations or other agreements by or among the parties in connection with the entering into of this Agreement or the subject matter hereof except as specifically set forth or contemplated herein.

17.7  Each of the parties acknowledges that it has not relied upon or been induced to enter into this Agreement by any representation other than a representation expressly set out in this Agreement and neither party shall be liable to the other in equity, contract, tort or in any other way for any representation not expressly set out in this Agreement.

17.8  No consent or waiver, express or implied, by any party of any breach or default by the other party in the performance by such other party of its obligations hereunder shall be deemed or construed to be a consent or waiver of any other breach or default in the performance of obligations hereunder by such other party hereunder.

17.9  Each party hereto shall have the right to offset amounts due the other party by amounts due from that other party whether under this Agreement or any other agreement.

17.10  This Agreement may be executed in counterparts all of which together shall constitute one and the same instrument and all counterparts shall be deemed to be originals.

17.11  No purported variation or amendment of this Agreement shall be effective unless it is in writing and is duly executed by each party to this Agreement.

17.12  Each party shall be responsible for its respective legal and other costs incurred in

relation to the negotiation, preparation and completion of this Agreement.

17.13   Nothing in this Agreement shall be construed to amend any of the Agreements referred to in Recitals A through F and (H) through (I), which Agreements remain in full force and effect.

## 18.   GOVERNING LAW

18.1   This Agreement shall be interpreted and governed by the laws of the State of New York, without regard to its rules with respect to conflicts of law.

[SIGNATURE PAGE FOLLOWS[

IN WITNESS of which this Agreement has been entered into on 18 September 2003

SIGNED BY :


Forrest N. Krutter
Senior Vice President and Secretary

The duly authorised representative of
NATIONAL INDEMNITY COMPANY



SIGNED BY :


Kenneth Edward Randall
Chairman

The duly authorised representative of
KEN RANDALL AMERICA INC



SIGNED BY :


Forrest N. Krutter
Senior Vice President and Secretary

The duly authorised representative of
NATIONAL FIRE & MARINE INSURANCE COMPANY

22

## SCHEDULE 1

### Schedule 1 Services

A.    The Schedule 1 Services to be provided by Randall America are as follows:

1.    Information Technology

- office systems
- network service
- claims system support
- reinsurance collections support as outlined in Schedule 2

2.    Reporting and Accounting

3.    Reinsurance Processing, Billing and Collections

4.    Regulatory Compliance and Reporting

5.    Corporate Services

- human resources
- employee benefit program administration
- recruitment
- facilities planning
- mail
- purchasing
- storage
- filing room services

6.    Maintenance of Non-Claims Records

B.    The following matters are excluded from the Schedule 1 Services:

1.    Claims management

2.    Commutations and settlements of inwards claims

3.    Commutations and settlements of ceded reinsurance

4.    Debt recovery from recalcitrant reinsurers.

## SCHEDULE 2

### The RA System

The RA System will provide a single computer system for running all of the client portfolios. The RA System is designed on a modular basis, with a group of core modules that are being augmented with future modules.

Core System:  target date for availability is 31 March 2002

- Claims - supports the Claims management function from initial loss notification to closing of file

- Reinsurance - supports the Reinsurance management function from initial notice to receipt of payment. Note that this module will not cede Paid claims/reserves to the appropriate reinsurance contracts, but it will do all accounting at a reinsurer level once the contract-level cession is input

- Support (Contracts, Diary, Directory) - various modules whose purpose is to gather non-transactional data or perform certain administrative or managerial tasks.

All modules have a full suite of reports to meet client, management, operational, and statutory requirements. Reporting is enabled at various 'levels', so that information can be gathered anywhere from individual transactions up to the Holding Company level.

Future modules:

- Automatic reinsurance cessions

- Legal case management

- London Market processing

- Underwriting.

**SCHEDULE 3**

**Remuneration for Schedule 1 and Schedule 4 Services**

A.    Costs of CGU, Kemper, Seaton and Stonewall Operations

1.    Randall America will employ the CGU staff (subject to certain individual exceptions as determined by NIC) with effect from dates set by NIC with respect to each individual and the intention of the parties is that Randall America and NIC will then share the costs of providing the Run-Off Functions to Potomac under and as defined in the Administrative Services Agreement ("the CGU Operation"), the Claims Services under the Kemper Administration Agreement ("the Kemper Operation") and the claims-related Services under the Seaton and Stonewall Administration Agreements ("the Seaton" and "Stonewall Operations" respectively) on the following basis:

1.1    Claims Handling Staff: -salaries to be charged fully to NIC, together with employment related costs (payroll taxes, 401K contributions, health and dental premiums, short term disability and workers compensation premiums) on an actual basis. Randall America shall have no liability for salaries or benefits of Claims Handling Staff who remain employed by CGU. NIC will also pay the cost of any annual bonus to members of the Claims Handling Staff as provided in Clause 3.1.

1.2    Other staff: -salaries and employment related costs to be allocated according to time spent

1.3    Staff training and attendance at conferences: -to be allocated to specific employee and then charged according to 1.1 and 1.2 above.

1.4    Premises (rent, electricity, property insurance and taxes):

   • storage to be allocated according to actual usage
   • balance to be allocated according to headcount

1.5    Offsite storage: allocated according to actual usage

1.6    Computer and system costs:

   • System: operating costs to be allocated on the basis of headcount unless a particular cost is identifiable as being specifically for the benefit of either Seaton, Stonewall, Kemper or CGU and further identifiable as benefiting the Accounting function or the Claims Handling function. Such a cost shall be allocated directly to the appropriate book of business and to the appropriate function.
   • office systems, network service and claims system support: allocated according to headcount
   • computer hardware including depreciation: desktop equipment according to headcount, other equipment according to headcount unless a particular cost is

identifiable as being specifically for the benefit of either Seaton, Stonewall, or CGU and further identifiable as an benefiting the Accounting function or the Claims Handling function. Such a cost shall be allocated directly to the appropriate book of business and to the appropriate function.

- other costs (eg maintenance, third party software costs and computer lines). according to headcount.

1.7    Office supplies, photocopying, courier charges and telephone charges to be allocated according to headcount

1.8    Postage: to be charged on separate meters for the CGU Operation

1.9    Travel and associated employee expenses: to be allocated to specific employee and charged according to 1.1 and 1.2 above

1.10   Stationery and printing: large items to be allocated specifically, otherwise according to headcount

1.11   Miscellaneous:

- NIC to bear the full cost of any measures required to be taken by Randall America in order to satisfy the compliance obligations set out in paragraphs A and B of Article IV of the Kemper Administration Agreement.

- NIC to bear two-thirds of the salary and employment-related costs for the time being of Pam Hoelsken

- according to headcount: corporate legal matters, food and drink (other than business entertainment of third parties which shall be allocated to relevant party), subscriptions, sundry expenses, office equipment depreciation, payroll processing

- depreciation of capitalised insurance software: to be allocated according to usage

- banking services, cheque production and associated fees: actual costs allocated to relevant party

1.12   Any other costs to be charged on a fair and equitable basis. Headcount allocations are to be made by average headcount in the applicable calendar month. Nothing in this Agreement shall affect the payment or allocation of indemnity, loss and allocated loss adjustment expenses.

2.     On or before 30 September in each year, Randall America shall submit to NIC a budget for the next following calendar year ("the Proposed Annual Budget") estimating the proposed expenditure for the CGU, Seaton and Stonewall Operations to at least the level of detail set out in the Indicative Budget in Schedule 6.

3.     NIC shall discuss the Proposed Annual Budget with Randall America and shall by 31 October in each year confirm whether it accepts the Proposed Annual Budget as the

same may have been amended by Randall America in the course of its discussions with NIC.

4.  Immediately upon NIC confirming its acceptance of the Proposed Annual Budget or agreement between NIC and Randall America on a revised Proposed Annual Budget, it shall become the Annual Budget for the calendar year in question and Randall America shall not be entitled to incur an expenditure charged to NIC in excess of $25,000 in the aggregate not provided for in the Annual Budget in respect of the CGU, Seaton or Stonewall Operations without the prior approval of NIC.

5.  NIC shall pay to Randall America the expenditure set out in the Annual Budget in twelve equal monthly instalments in advance on the first day of each month of the calendar year to which the Annual Budget relates.

6.  Randall America shall account to NIC in relation to the costs of the CGU, Seaton and Stonewall Operations as follows:

6.1  on or before 31 July in each calendar year, Randall America shall submit accounts to NIC setting out, in respect of the immediately preceding six-month period ending on 30 June, the actual expenditure incurred and comparing it with the estimated expenditure for the same period as set out in the Annual Budget; and

6.2  on or before 31 January after the end of each calendar year, Randall America shall submit accounts to NIC setting out, in respect of the calendar year ending the immediately preceding 31 December, the actual expenditure incurred and comparing it with the estimated expenditure for the same period as set out in the Annual Budget.

7.  Any adjustments are to be paid within 30 days of the accounting set out in paragraph 6 above.

8.  In the event that NIC and Randall America fail to agree an Annual Budget for a calendar year, the Annual Budget for the preceding calendar year shall be adopted as the Annual Budget for the calendar year in question.

9.  To the extent that all or part of the services provided for in this Agreement are provided on space leased by NIC, then Randall America shall pay NIC (either by actual payment or offset) the portion of the rent, property tax, property insurance, cleaning, utility and other payments related to such space which are allocated to Randall America in accordance with this Schedule 3.

B.  System Costs

1.  NIC shall pay to Randall America an amount of $300,000 (the "System Fee") in respect of the development and use of the RA System.

2.  The System Fee shall be payable as to $100,000 on the first day of the calendar month in which the RA System is made available and thereafter $100,000 annually in advance on 1 January of each calendar year for the next two years.

3.     NIC shall pay such data cleansing, conversion and migration costs as shall be agreed in advance by the parties.

C.     General Overhead

1.     NIC shall pay to Randall America an amount of $110,000 per annum (the "Overhead Contribution") by way of a contribution to Randall America's general overhead costs.

2.     The Overhead Contribution shall be payable annually in advance on 1 January in each calendar year. Immediately upon the signing of this Agreement, the sum of $41,667 shall become payable by NIC to Randall America representing the proportionate amount of the annual Overhead Contribution payable for the year 2001. If the Agreement is terminated in the middle of a calendar year, Randall America shall repay NIC the proportionate amount of the annual Overhead Contribution for the portion of the year after the Effective Date of the termination on the first day of the month after which the termination is effective.

D.     Seaton and Stonewall Fees

1.     In calculating any amounts due by NIC to Randall America under this Agreement, NIC shall be entitled to receive credit for the following amounts:

| Period | | | Amount of credit ($) |
|--------|----|------------------|---------|
| 2001 | Q3 | pro rata share of | 365,000 |
|      | Q4 |                  | 340,000 |
| 2002 | Q1 |                  | 340,000 |
|      | Q2 |                  | 340,000 |
|      | Q3 |                  | 340,000 |
|      | Q4 |                  | 330,000 |
| 2003 | Q1 |                  | 330,000 |
|      | Q2 |                  | 330,000 |
|      | Q3 |                  | 330,000 |
|      | Q4 |                  | 310,000 |
| 2004 | Q1 |                  | 310,000 |

2.     NIC and Randall America agree to negotiate in good faith to calculate the appropriate amounts for credit in respect of periods ending after 31 March 2004. Recognising the terms on which the Seaton and Stonewall Administration Agreement may be renewed or extended, the amount for credit in respect of periods after 31 March 2004 will be equivalent to the reasonable costs of providing the Schedule 4 Services for Seaton and Stonewall.

E.     Transitional Costs

1.  Costs incurred by Randall America in relation to the provision of Schedule 1 and Schedule 4 Services from the Effective Date until 1 January 2002 (other than general overhead) will be billed to NIC and paid for as incurred.

2.  NIC will contribute on a fair and equitable basis to:

2.1  any capital expenditure required for office fit-out, purchase of furniture, equipment, etc.

2.2  the costs of relocation from Bulfinch Place.

3.  NIC will pay the costs of termination or assignment, at NIC's option, of Randall America's existing lease at Bulfinch Place.

4.  Transitional cost items in excess of $25,000 shall require the advance approval of NIC.

F.  General Provision

4.  All amounts set out in this Agreement are expressed to be exclusive of any sales taxes, value added taxes or other similar taxes which may be applicable.

# SCHEDULE 4

## Schedule 4 Services

A.    Seaton

All such services as are set out in paragraphs 3 and 4 of Schedule 1 of the Seaton Administration Agreement, together with such assistance as is required to enable Randall America to comply with its obligations under paragraphs 5 and 6 thereof.

B.    Stonewall

All such services as are set out in paragraphs 3 and 4 of Schedule 1 of the Stonewall Administration Agreement, together with such assistance as is required to enable Randall America to comply with its obligations under paragraphs 5 and 6 thereof.

## SCHEDULE 5

### Company Representatives

A.   The NIC Company Representative and the NF&M Company Representative shall be Forrest Krutter.

B.   The Randall America Company Representative shall be Pam Hoelsken.

Either party may change the name of its Representative upon fifteen days notice to the other party pursuant to Clause 15.

## SCHEDULE 6

## Indicative Budget[1]

#### Share of Annualized Costs at June 30, 2001

*All figures $000's*

**Staff Costs**

| | |
|---|---:|
| Seaton & Stonewall Claims | 1,335 |
| Share of Seaton & Stonewall Fees | (1,389) |
| CU Claims | 2,133 |
| CU Reinsurance | 310 |
| CU Accounting | 168 |
| CU Operations | 383 |
| Total | 2,940 |

**Overheads**

| | |
|---|---:|
| Rent (head count allocation) | 275 |
| Overhead re RA shared staff | 90 |
| Professional fees | 15 |
| Stationery & Supplies | 74 |
| Postage, etc. | 47 |
| Travel | 64 |
| Telephone | 92 |
| Systems: | |
|     Operations | 150 |
|     License Fees | 100 |
| Contribution to RA Central Overheads | 100 |
| | 3,947 |

ULAE vs. ALAE (to be determined)

*Notes:*
Excludes:
- Recruitment costs of new staff

- Build out new location
- Moving, furniture and equipment
- Attorney Fees
- Vacating the existing RA premises

### Notes To The Indicative Budget

### Year to 30 June 2002

---

[1] The Indicative Budget (including the Notes) is intended to be explanatory and does not provide for additional charges beyond those provided in Schedule 3. In the event of conflict between Schedule 3 and 6, Schedule 3 shall govern.

1.     **Objective**

1.1   The aim is to share costs and thereby allow both sides to benefit from the economies of scale.

1.2   Cost sharing objectives will be achieved by agreeing:

(i)     the basis of cost sharing

(ii)    a realistic annual budget. Randall America will seek to contain costs, within its control, within that budget (i.e., the budget is a guide to the year's expenditure and not an open invitation to spend the money).

(iii)   to discuss in advance with NIC any expenditure that has the effect of increasing by more than $25,000 per annum the amount to be charged to NIC.

1.3   Actual costs will be shared on the agreed basis. As noted in Schedule 3, Randall America will charge computer licensing fees (fixed at $100,000 p.a. for three years only) and $110,000 per annum towards central overheads such as insurances, human resources, company accounting and travelling and supervision by Ken Randall and David Wallis.

2.     **Annual Expenditure**

2.1   Schedule 1 attached sets out an annual budget for the year to 30 June 2001 on the theoretical premise that:

(i)     all transition costs have been previously spent

(ii)    the unit has been relocated to new premises

(iii)   the staffing needs identified by John Arendt have been recruited

(iv)    the Randall America computer system has been implemented and all data converted to that single system.

2.2   In reality, of course, these are indicative costs of the future and in practice:

(i)     not all positions will have been filled (indeed we hope that some positions will not need to be filled)

(ii)    Gray Associates are currently retained to undertake certain functions and their costs are higher than would be the case if in-house staff were to be used as assumed in the budget

(iii)   premises have been identified but the lease has not been agreed

(iv)    data is currently held on various CGU systems and needs to be converted to the RA system

(v)     Transitional and set-up costs will be incurred which have not been included such as:
- office relocation
- office furnishing
- additional office equipment which may be required (e.g., do we have enough PCs, copiers, fax machines, etc.)
- continuing charges from CGU pending takeover by Randall America

3.     **Commentary on Schedule 1**

3.1   Staffing

Assumptions have been made by John Arendt as to future staffing needs.

This staffing assessment has then been costed by Pam Hoelsken.

In practice the staff numbers may turn out differently from the assumptions but, overall, it is hoped that costs can be contained within the numbers indicated for the following reasons:-

(i)    the costings have not been reduced for unfilled vacancies. The Randall America claims team already has one vacancy and a second junior member is working out her notice. Some of the additional posts identified by John Arendt may take some time to fill even if a decision is made to go ahead with the recruitment

(ii)   further economies will be possible following the combination of the CGU, Seaton and Stonewall claims teams. At present only one of the CGU vacancies is assumed to be taken up by current Seaton and Stonewall staff

(iii)  it has been assumed that, once under the supervision of Pam Hoelsken, the existing CGU accounting personnel will be able to satisfy all requirements. It is possible that it will be necessary to recruit a qualified accountant but this should generate some redundancy from the existing team

(iv)   one filing clerk has been assumed, which is a big reduction from current staffing levels within CGU. Although such personnel are not an expensive item, we will need to keep the position under review.

(v)    the full cost of a database manager has been allocated to CGU. Once the system is extended to other Randall America clients, the cost of this person will be shared. It has been assumed that Randall America's office systems staff will be sufficient to look after the additional CGU work stations, office networks etc.

3.2   Seaton and Stonewall claims

This item represents the staff cost of the existing claims function for Seaton and Stonewall. Credit is given for the fees received by Randall America from Seaton and Stonewall.

As claims staff are assigned to manage claims which impact more than one portfolio, it will be increasingly difficult to identify the cost of the Seaton and Stonewall claims unit. Randall America will charge for the actual cost of staff assigned to the overall claims work. The fees earned from Seaton and Stonewall reduce over time as the claims volumes are anticipated to decline. The current Seaton contract runs until March 31, 2004 and the Stonewall contract until September 30, 2005.

3.3   CGU Benefits

It has been assumed that the vast majority of staff will transfer to the Randall America payroll and enjoy the standard Randall America benefits which cost approximately

20% of basic pay. It has been assumed that a small number of CGU staff will continue to enjoy the (higher) CGU benefits package.

3.4     Rent

(i)     the budget is based on an appropriate share of the costs of new premises
(ii)    the budget assumes that the new premises can accommodate all CGU filing needs. If this proves not to be the case, a small amount will need to be added for off-site storage.

3.5     Systems

Assumes use of RA system:

- NIC will not be asked to pay until the system is operational.
- operations represents our best estimate of actual running costs and allows for an appropriate share of the costs of servers, communication links, networks, etc.
- in addition $100,000 per year has been included as a license fee to Randall America (being a contribution towards the development costs being incurred by Randall America).

3.6     Contribution to Randall America central overhead is a charge of $100,000 per year to contribute towards such things as:

- payroll
- human resources
- property and other insurance
- hotel, travel & supervision of Boston facility by Ken Randall, David Wallis, etc.

4.      Other Expenditure not included in Schedule 1

4.1     Transition Costs

- termination of lease for 7 Bulfinch (or sublet of Randall America space)
- CGU charges during transition (rent, systems, etc.)
- moving costs for CGU and Randall America

4.2     Capital/one off costs

- data conversion
- office equipment to be acquired from CGU.
- additional office equipment to be purchased (if any)

5.      Staff Profit Sharing

Randall America has a profit sharing plan that allows new staff to participate.   It has
been assumed that Claims Handling Staff will not participate in the Randall America
profit sharing plan.

## SCHEDULE 7

### Claims Handling Staff

| Last Name | First Name | Title |
|---|---|---|
| ANO Claims | | Claims Consultant |
| Apple | Kevin | A.V.P Claims |
| Barker | Anthony | Sr. Claims Cons. |
| Basile | Michael | Claims Consultant |
| Burns | Robert | V.P. Claims |
| Hugo | Alec | Claims Consultant |
| Jepsen | Erik | Claims Consultant |
| Koeppel | Thomas | Claims Specialist |
| Powers | Michael | A.V.P Claims |
| Proulx | Helene | Claims Asst. |
| Rankin | Diane | Claims Asst. |
| Reece | Portia | Claims Specialist |
| Shervington | Lemuel | A.V.P Claims |
| Zizza | Stacey | Claims Asst. |
| | | |
| Open | | Poll.Team Leader - OPEN |
| Albanese | Edward | Claims Handler/Poll. |
| Minnar | Peter | Claims Handler/Poll. |
| Open | | Claims Handler/Poll. |
| Magnus | Jon-Erik | Claims Handler/Poll. |
| Perkins | Bruce | Asbestos Team Leader |
| Dardis | Christopher | Claims Handler/Asbestos |
| Waymon | Eugene | Claims Handler/Asbestos |
| Woodcock | Jean | Claims Handler/Asbestos |
| Mckay | Stuart | Claims Handler/Asbestos |
| Damon | Thomas | Claims Handler/Lead |
| Mckay | James | Claims/Ceded |
| Drees | Brian | Claims/Ceded - Technical |
| Lamberecht | Paul | Claims/Ceded - Technical |
| Mitrano | Nancy | Admin-File/Setups |
| Garcia | Leslie | Secretary/Paralegal |
| Cohen | Martin | AVP Legal |
| Borre | Darlene | Assistant General Counsel |
| Open | | Coverage Attorney/OPEN |
| | | |
| | | Additional Positions - CU |
| | | |
| Open | | Assd. X/S Claims |
| Open | | Assd. X/S Claims |

**SCHEDULE 8**

Summary of E&O Cover