**EXHIBIT K**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SEATON INSURANCE COMPANY, | : |
| Plaintiff, | : |
| | :     Civil No. 3:07-cv-356 (AHN) |
| v. | : |
| | : |
| CAVELL USA, INC., f/k/a KEN RANDALL AMERICA, INC., f/k/a EASTGATE, INC., KEN E. RANDALL, and PAMELA HOELSKEN | : |
| | : |
| Defendants. | : |
| | : |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF AND IN SUPPORT OF DEFENDANTS' MOTION TO QUASH SUBPOENAS

EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendants

By: /s/ Charles F. Gfeller
Charles F. Gfeller (Fed. Bar No. 18119)
Michael P. Thompson (Fed. Bar No. 09634)
cgfeller@eapdlaw.com
mthompson@eapdlaw.com
Three Stamford Plaza
301 Tresser Boulevard
Stamford, CT 06901
(203) 975-7505
(203) 975-7180 (fax)

## INTRODUCTION

Defendants (1) Cavell USA Inc., f/k/a Ken Randall America, Inc. f/k/a Eastgate, Inc. ("Cavell US"), (2) Ken E. Randall ("Mr. Randall") and (3) Pamela Hoelsken ("Ms. Hoelsken") submit this Memorandum of Law in Opposition to the application of Plaintiff Seaton Insurance Company ("Seaton") for preliminary injunctive relief and in support of Defendants' motion to quash subpoenas duces tecum and ad testificandum.

This motion arises in connection with an arbitration (the "Arbitration") between Plaintiff Seaton and National Indemnity Company ("NICO"). (NICO has moved for leave to intervene as a party plaintiff.) That Arbitration arises under a reinsurance agreement between Seaton and NICO entitled Aggregate Retrocession of Loss Portfolio Agreement (the "Retrocession Agreement"). The Retrocession Agreement requires that disputes between Seaton and NICO be submitted to arbitration, and provides that "the seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Retrocession."

Defendants are not parties to the Retrocession Agreement, and are thus not bound to participate in any arbitration thereunder, except to the extent required by the Federal Arbitration Act ("FAA") and the Federal Rules of Civil Procedure ("FRCP").

Seaton attempts to compel the production of documents from Cavell US, and to compel testimony from Mr. Randall and Ms. Hoelsken, purportedly in connection with the Arbitration. In broad terms, this attempt is defective for two reasons.

First, the FAA, the FRCP, and the controlling authority in the Second Circuit do not permit arbitrations to compel nonparties located more than 100 miles from the seat of the

arbitration to produce documents or provide testimony at any stage in the arbitration.  Cavell US
is a Delaware corporation having its principal place of business in Cambridge, Massachusetts.
*See* Declaration of Susan E. Grondine sworn to on March 19, 2007 (Grondine Dec."), ¶ 2.  Ms.
Hoelsken is the chief operating officer of Cavell US.  She regularly transacts business in
Cambridge, Massachusetts and resides in Quincy, Massachusetts.  (Grondine Dec., ¶ 3.)
Mr. Randall is not an officer of Cavell US, but rather is Chairman of the Board.  He regularly
transacts business in London, England and resides in East Malling, Kent, England.  (Grondine
Dec., ¶ 4.)

In this case, the seat of the Arbitration is New York City.  Cavell US is located in
Cambridge, Massachusetts, which is more than 100 miles from New York City.  To circumvent
this limitation, Seaton has purported to construct an artificial reality, by proposing to have the
Arbitration Panel physically relocate to Hartford, Connecticut, for the sole purpose of attempting
to impose obligations on nonparties.  There is no statutory or case authority to support the fiction
of a moving, floating or roving arbitration panel, free to pursue nonparties whenever and
wherever the arbitrating parties direct.  Thus, this attempt should fail because all the Defendants
are beyond the subpoena power of the Arbitration Panel.  It follows that this Court should have
never been burdened with the task of deciding this motion in the first place.

Second, as to Seaton, the true object of the subpoenas is not to obtain documents or
testimony for use in the Arbitration.  Rather, the object is to obtain information to attempt to
manufacture claims by Seaton against Cavell US in other proceedings.  Seaton has and continues
to assert such claims and to threaten actions against Cavell US, even though Seaton previously
agreed such claims would be subject to English law and the exclusive jurisdiction of the English
courts.

This Court should not allow Seaton to subvert the subpoena process by using it to avoid English law and jurisdiction.

## FACTUAL BACKGROUND

To understand the issues implicated by the present motion, it is necessary to review the relationships among the parties, as well as the transactions underlying the dispute.

Insurance companies that are no longer issuing new policies, but rather merely administering and paying claims on policies already issued, are referred to as being "in run-off." Cavell US provides run-off services to such companies and their owners.

In 1999, Seaton (then known as Unigard Insurance Company) was in run-off. Seaton was acquired by Dukes Place Holdings LP ("Dukes Place"). Seaton entered into an Agreement Relating to the Administration of Run-Off Business with Cavell US (then known as Eastgate, Inc.). This Agreement was dated March 31, 1999 (the "Cavell US Run-Off Agreement"). (This Agreement is attached as Exhibit C to the Declaration of Karl Wall sworn to on March 6, 2007, submitted by Plaintiff in support of its motion ("Wall Dec.")). In connection with the run-off, Seaton also entered into the Retrocession Agreement with NICO (Exhibit A to the Wall Dec.).

In the second half of 2005, Dukes Place wished to sell Seaton to Castlewood, Inc. ("Castlewood"), a company that is part of a group which purchases and manages insurance companies in run-off. Castlewood wished to purchase Seaton, but only if it could take over the claims management of the run-off of Seaton. However, this was precluded by the Cavell US Run-Off Agreement and by provisions in the Retrocession Agreement.

- 3 -

In 2006, Cavell US learned the following: in January 2006, Seaton signed a run-off administration contract with Castlewood, that was in direct violation of the Cavell US Run-Off Agreement and provisions of the Retrocession Agreement; thereafter, Castlewood informed various third parties that it was assuming the administration of the run-off of Seaton; and Castlewood and Dukes Place agreed that the purchase of Seaton would be effective only if the rights of Cavell US and NICO in respect of the Seaton run-off were terminated or surrendered. (Grondine Dec., ¶ 7.)

Seaton, Dukes Place and Castlewood have attempted to exert pressure on Cavell US and NICO to relinquish their rights under the Cavell US Run-Off Agreement and the Retrocession Agreement. Among other things, they threatened or commenced various actions. The counterclaims in this Arbitration are one such action. This is seen in its request that the panel issue an order "appointing Seaton its own Claims Servicer." (Exh. B, p. 2 to the Declaration of Michael O'Donnell sworn to March 6, 2007, submitted by Seaton.)

In early 2006, Seaton and Cavell US agreed to a commercial disengagement pursuant to a document described as the Term Sheet (Grondine Dec., ¶ 6, Exh. A). The parties to the Term Sheet were as follows: (1) on the one side, Dukes Place, Seaton and others; and (2) on the other side, Randall & Quilter Investment Holdings Limited, Cavell US, and others. Under the Term Sheet, the parties agreed, among other things, that: (1) the Cavell US Run-Off Agreement would terminate on March 31, 2006 by mutual consent and without cause (Exh. A, ¶ 12); (2) Seaton would release and discharge Cavell US of all claims and demands arising out of their commercial relations (including the Cavell US Run-Off Agreement), "save in the case of fraud on the part of [Cavell US]" (Exh. A, ¶ 13); and (3) the Term Sheet "shall be governed by and

construed in accordance with English law and the parties submit to the exclusive jurisdiction of the English courts" (Exh. A, ¶ 29).

The Term Sheet also provided that Cavell US would cooperate in an orderly transition of the management of Seaton to Seaton or its representative, Castlewood US Inc., including the transfer of all books and records of Seaton. (Exh. A, ¶ 15.) This transition was completed, and representatives of Castlewood were actively involved in the transfer of documents and information during the transition. If Seaton/Castlewood required any other documents or information from Cavell US, they could have raised the subject at that time. (Grondine Dec., ¶ 6.)

In its attempts to exert pressure, Seaton has pretended to lack knowledge of the Collaboration Agreement entered into between Cavell US and NICO related to the Seaton run-off. In fact, Seaton has long had full knowledge of the matters it now complains about. This knowledge took many forms, but for present purposes it is sufficient to discuss the roles of four individuals, Robert Barclay, Mark Shepherd, Robert Hamwee, and Mayur Patel. Messrs. Barclay and Shepherd were technically employed by a company within the Randall & Quilter Group of companies (the "R&Q Group), which is based in England, and which also owns Cavell US. However, their employment costs were borne by Dukes Place (the owner of Seaton), they reported directly to Dukes Place, and they were dedicated solely to the interests of Dukes Place in respect of Seaton. (Grondine Dec., ¶ 11.)

Mr. Barclay was President and director of Seaton. He was aware of the Collaboration Agreement and the roles of NICO and Cavell US in respect of the Seaton run-off. He conducted extensive supervision of Cavell US and NICO. In addition, he attended quarterly meetings at

Cavell US with NICO and Cavell US claims handlers to discuss claims strategy, and approved all major claims settlements. (Grondine Dec., ¶ 9.) Pursuant to the Term Sheet, he was to continue to serve as a director of Seaton after the agreed termination of Cavell US (Grondine Dec., Exh. A, ¶ 21.)

Mr. Shepherd worked closely with and reported directly to Mr. Barclay in support of Mr. Barclay's duties in connection with Seaton. He too had full knowledge of the Collaboration Agreement and the roles of NICO and Cavell US in respect of the Seaton run-off. (Grondine Dec., ¶ 10.)

Mr. Hamwee was a director of Seaton. As a representative of Dukes Place (the owner of Seaton and a stockholder in Cavell US), he signed a stockholder resolution ratifying the actions of Cavell US in respect of the period of time encompassing the Collaboration Agreement. (Grondine Dec., ¶ 12.)

Mr. Patel was a director of both Seaton and Cavell US in 2002. He attended the May 2002 Board meeting of Cavell US at which the Collaboration Agreement was ratified. (Grondine Dec., ¶ 13.)

With the benefit of this background, it becomes clear that the Wall Dec., submitted by Seaton in support of its motion, is materially misleading. The Wall Dec. provides in relevant part as follows:

> "2.    Attached hereto are true and complete copies of the following:
>
> A. Attached hereto as **Exhibit A** is a true and correct copy of the Aggregate Retrocession of Loss Portfolio Agreement entered into between

Unigard Security Insurance Company, as predecessor to Seaton, and NICO countersigned on November 20, 1998 (the "Seaton Reinsurance Agreement").

B.   Attached here to as **Exhibit B** is a true and correct copy of Amendment No. 1 to the Seaton Reinsurance Agreement

3.      At or near the same time, Seaton retained Cavell to act as Seaton's run-off agent and to manage Seaton's underlying claims. Attached hereto as **Exhibit C** is a true and correct copy of the Agreement relating to Administration of Run-Off Business.

4.      Subsequently, Cavell entered into a "Collaboration Agreement" with NICO and delegated to NICO functions it was paid to perform for Seaton.

5.      As a byproduct of this Collaboration Agreement between NICO and Cavell, NICO secured the ability to control the outflow of all claims and expense payments made by Seaton to maximize the investment income generated by NICO on the $191 million reinsurance premium.

6.      Upon learning of Cavell's actions, Seaton terminated Cavell as its run-off manager in January 2006.

7.      The documents and testimony requested by the subpoenas are critical to Seaton's counter-claims respecting the Collaboration Agreement and NICO's management of the Company's claims.

8.      Ken E. Randall is the President and Chairman of Defendant Cavell. He is uniquely suited to testify as to the circumstances leading to Cavell's agreement to relinquish control over Seaton's claims to NICO.

9.      Pamela Hoelsken is the Treasurer and Chief Financial Officer of Cavell. She has personal knowledge of the Collaboration Agreement and the manner in which NICO wielded control over Seaton's claims to the company's detriment.

10.      The panel's subpoena to Cavell's document custodian seeks to ensure that Seaton receives all documents under the control of its former agent which relate to Seaton's claims and defenses in the arbitration."

Wall Dec., pp. 1-2.

The misleading nature of this Declaration becomes most apparent upon examination of

paragraph 6, which states that "upon learning of Cavell's actions, Seaton terminated Cavell as its

run-off manager in January 2006." This is an artfully crafted, deliberately vague, and utterly

misleading sentence. It leads the reader to conclude (1) that there were actions by Cavell which

somehow gave grounds to terminate that were not fully known to Seaton at the time they took

place, and (2) that these provide basis for a termination that occurred in January 2006. That is

not accurate.

Paragraph 6 begins: "upon learning of Cavell's actions." Yet the only Cavell action

referred to in the Declaration is in paragraph 4, which states that "Cavell entered into a

Collaboration Agreement with NICO and delegated to NICO functions it was paid to perform for

Seaton."

In fact, the delegation of functions by Cavell US was contemplated by the Cavell US

Run-Off Agreement, and is expressly permitted in paragraph 8.1 thereto (Exh. C to Wall Dec.).

This Agreement was signed on page 15 by Mr. Barclay, as President of Seaton.

The Collaboration Agreement itself was no surprise to Seaton. The Cavell US Run-Off

Agreement expressly referred to the Retrocession Agreement between NICO and Seaton, and

under the Retrocession Agreement, NICO maintained substantial control over Seaton's

substantial claims activities in any event. (Exh. A to Wall Dec., Art. 11).

The Collaboration Agreement was not entered at a time close to January 2006, as implied

in the Wall Dec. Rather, it was entered into on August 8, 2001. Importantly, as set forth above

on pages 5-6, Seaton, through its President and directors, was fully aware of the Collaboration

Agreement and its operation years ago.

Again, paragraph 6 of the Wall. Dec. states that "upon learning of Cavell's actions, Seaton terminated Cavell as its run-off manager in January 2006." As just demonstrated, there was nothing for Seaton to "learn of." Further, the suggestion of a causal or temporal connection between "Cavell's actions" and the termination is false. As described above at page 4, the termination of Cavell was made "by mutual consent and without cause" pursuant to the Term Sheet. Even the date of January 2006 is incorrect. The Term Sheet was executed in February 2006, and the termination was effective March 31, 2006.

The true facts are important because they reveal Seaton's actual agenda in making the motion to compel. The documents and testimony sought have only the most remote connection to the Arbitration. Instead, the motion to compel is designed to attempt to manufacture claims against Cavell in another forum.

Seaton has already indicated its intention to impose such claims against Cavell US. In July, 2006, the attorneys for Seaton forwarded to Cavell US a draft complaint styled *Seaton Insurance Company vs. Cavell USA Inc. f/k/a Ken Randall America Inc. f/k/a Eastgate Inc.*, to be filed in the United States District Court for the District of Massachusetts. (Grondine Dec., ¶ 15.) To attempt to avoid the releases in the Term Sheet, the draft complaint purported to sound in fraud, but it entirely failed to meet the specific pleading requirements necessary to support a fraud claim. It is also baseless. No complaint has yet been filed, but in an exchange of correspondence with the English counsel for Cavell US, by letter dated August 31, 2006, the attorneys for Seaton expressly declined to confirm that Seaton would not file a complaint in the Massachusetts Court in breach of the release in the Term Sheet. (Grondine Dec., ¶ 16, Exh. B).

NYC_Defendants Memorandum of Law in Opposition to Plaintiffs Application for Preliminary Injunctive Relief and In Support of Defendants Motion to Quash Subpoenas

In sum, Seaton has not revealed the true facts, and has an agenda that has nothing to do with providing evidence to the Arbitration Panel.

## **LEGAL ARGUMENT**

A preliminary injunction is an "extraordinary remedy" that should not be granted unless the movant establishes both (1) irreparable injury and (2) either (a) a likelihood of success on the merits or (b) the existence of sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in favor of the moving party requesting the temporary relief. *Diversified Mortgage Investors v. U.S. Life Title Ins. Co.*, 544 F.2d 571, 576 (2d Cir. 1976). The Second Circuit has characterized this type of injunctive relief as "drastic" and "one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consolidated Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005).

Where the enforcement of a preliminary injunction will alter, rather than maintain, the status quo, the moving party must show a "clear" or "substantial" likelihood of success on the merits in order to prevail. *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). Here, the injunctive relief sought by Seaton would require Cavell US to produce documents and testimony in an arbitration in which it is not a party and in which it has not participated. As such, to demonstrate that the Court should enforce the nonparty subpoenas, Seaton must establish a clear and substantial likelihood of success on the merits.

Moreover, the mere "possibility" of irreparable harm is insufficient to justify the drastic relief sought by Seaton. Rather, the movant must clearly establish that the alleged harm is "imminent or certain." *Jayaraj v. Scappini*, 66 F.3d 36, 38-39 (2d Cir. 1995); *Borey v. National Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991). This Court should not take the

extraordinary step of granting Seaton's preliminary injunction unless Seaton can prove that it

will suffer actual, rather than speculative harm if the subpoenas are not enforced.

### POINT I

### SEATON CANNOT PROVE A LIKELIHOOD OF SUCCESS ON THE MERITS

The nonparty subpoenas that Seaton seeks to have this Court enforce against Cavell US,

Ms. Hoelsken and Mr. Randall are deficient in several respects.

First, the subpoenas were issued by an arbitration panel that, at the direction of those

arbitration parties, has undertaken to "sit" in a different state than the state that is the situs of the

Arbitration.  This was done for the sole purpose of designating a court outside the district in

which the Arbitration is taking place to enforce the subpoenas.  There is no support for this

procedural maneuver under the FAA, the FRCP or case law.  Indeed, the maneuver is a blatant

attempt to evade precedential law in the Second Circuit regarding the jurisdictional limits of an

arbitrator's subpoena power under the FAA.

Next, even if the Court were to endorse this end-run, the subpoenas issued to Mr. Randall

must be quashed because (a) a panel sitting in Connecticut does not have the authority to issue a

subpoena to Mr. Randall, a citizen of the United Kingdom, under the territorial limitations of the

FAA and Rule 45 of the FRCP and (b) Seaton has failed to properly serve Mr. Randall with the

subpoena.

Next, Seaton's motion is precluded by the Term Sheet, pursuant to which Seaton has

already released Cavell US from all actions, claims and demands relating to the Cavell US Run-

Off Agreement, and agreed that the Term Sheet should be governed by English law and that the

parties submit to the exclusive jurisdiction of the English courts.

- 11 -

Finally, the nonparty subpoenas are excessive, seek information related to documents that are already in the possession of Seaton and/or NICO, have already been produced to those parties or are otherwise available to them, or are simply irrelevant to the Arbitration. Enforcing the subpoenas would impose an undue burden on nonparties to the underlying Arbitration. The motivation behind Seaton's "fishing expedition" is to attempt to uncover information that might assist it in asserting some other action against Cavell US. For these reasons, the nonparty subpoenas must be quashed and injunctive relief denied.

**A.     The Panel Cannot "Sit" in Connecticut For the Sole Purpose of Issuing Nonparty Subpoenas**

There is no basis under the FAA for the arbitrating parties and the Panel to ignore the express language of the Retrocession Agreement, which states that the "seat" of the Arbitration shall be in New York City, and create a procedure by which the Panel "moves," "floats" or "sits" in Connecticut for the sole purpose of creating rights against nonparties that do not otherwise exist.

Article 14 of the Retrocession Agreement provides as follows:

> The seat of the Arbitration shall be in New York, New York and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Retrocession.

Wall Dec., Exh. A at p.8. Pursuant to Article 14, Seaton, NICO and the Panel have been proceeding in New York City.

Section 7 of the FAA states that an arbitral subpoena "shall be served in the same manner as subpoenas to appear and testify before the court." 9 U.S.C. § 7. FRCP 45 governs the service an enforcement of subpoenas, including subpoenas issued by an arbitration panel.

Seaton is well aware that FRCP 45, and thus Section 7 of the FAA, places limitations on the geographic reach of nonparty subpoenas. Specifically, it provides that the subpoena be served "within the district" of the court enforcing the subpoena or "within 100 miles of the place of deposition, hearing, trial, production or inspection specified in the subpoena...." In *Dynegy Midstream Services, LP v. Trammochem*, 451 F.3d 89, 94-95 (2d Cir. 2006), the Second Circuit strictly enforced these limits, and rejected an attempt to serve a subpoena on a nonparty that was not located within 100 miles of the place where the panel was sitting. The court stated that the FAA does "not contemplate nationwide service of process or enforcement; instead, both service and enforcement proceedings have clear territorial limitations." *Id.* at 94-95. *See also Legion Ins. Co. v. John Hancock Mutual Life Ins. Co.*, 33 Fed. Appx. 26 (3d Cir. 2002) (holding that a panel sitting in a Philadelphia arbitration could not subpoena a non-party in Florida to produce certain documents and employee testimony, as the territorial limits of FRCP 45 limited an arbitrator's subpoena power); *Price Waterhouse LLP v. First American Corp.*, 182 F.R.D. 56, 61-63 (S.D.N.Y. 1998) (quashing a nonparty subpoena served on New York branch of accounting partnership seeking testimony from employees of that corporation residing in the United Kingdom). In short, an arbitrator's subpoena power can reach no farther than the territorial limits of the court that can compel its enforcement.

Had the subpoenas been issued by the Panel from the location in which the Panel is actually "sitting", New York City, the subpoenas would be invalid since the Massachusetts office of Cavell US is outside the 100-mile barrier. For this reason, the arbitrating parties have attempted to evade this precedent by having the Panel pack up camp, and move to "sit" in Connecticut, for the sole purpose of issuing nonparty subpoenas to Cavell US within the 100-mile limit.

Seaton has not cited to a single case that supports a position that an arbitration panel may move, float, change where it "sits," or otherwise rove the countryside in search of nonparties. Although the Second Circuit has not yet had the opportunity to address the precise meaning of "sit," there is strong precedent from other federal courts that a panel is "sitting" in the location where the underlying arbitration is actually taking place. *See, e.g., Thompson v. Zavin*, 607 F.Supp. 780 (D.C. Cal. 1984). In *Thompson*, the District of California addressed whether it had the authority to compel arbitrators to issue subpoenas pursuant to Section 7 of the FAA. While the District Court ultimately decided the issue on other grounds, it noted that the <u>only</u> federal court that would have the power to enforce or issue the subpoena would be the Southern District of New York, since that was the district in which the arbitrators were "sitting." *Id.* at 782-83, n.5. The arbitration clause at issue stated that the arbitration would occur in New York City and the arbitration was being conducted in New York. Thus, because the situs of the arbitration was New York, the court recognized that only the district of New York had authority to enforce compliance. *See also Gresham v. Norris*, 304 F.Supp.2d 795 (E.D. Va. 2004) ("a district court maintains jurisdiction over such a petition [to enforce a subpoena under 9 U.S.C. § 7] if the situs of the pending arbitration is within its jurisdiction").

Seaton relies upon the Second Circuit's decision in *Stolt-Nielsen SA v. Celanese AG*, 430 F.3d 567 (2d Cir. 2005) to support the general proposition that a panel has the authority to require a nonparty to testify before them and produce documents at a hearing. *Stolt-Nielsen SA*, however, is readily distinguishable from the facts of this case, since the subpoenas at issue in *Stolt-Nielsen* directed a nonparty to testify and produce documents at a hearing in New York, which was the <u>situs of the underlying arbitration and the contractually chosen venue for the parties to resolve their disputes</u>. *Id.* at 570, n.2. Thus, in *Stolt-Nielsen SA*, the Southern District

of New York had authority to enforce the subpoena because the arbitration was being conducted in New York—where the panel was "sitting."

As stated by the Second Circuit in *Dynegy Midstream Services*, "the parties to the arbitration here chose to arbitrate in New York…and should not be permitted to stretch the law beyond the text of Section 7 and Rule 45 to inconvenience witnesses." 451 F.3d at 96. Seaton should not be rewarded for its transparent attempt to evade the law of this Circuit.

**B.    This Court Lacks Authority to Enforce the Subpoenas**

Under paragraph 5 of the subpoenas, Seaton and NICO attempt to grant jurisdiction by fiat to the Connecticut courts: "[A]ctions to enforce compliance with any subpoena issued by the Panel while sitting in Connecticut may be brought in the state and federal courts of the State of Connecticut." This attempt is unavailing. Section 7 of the FAA provides that only the district court in the district in which the arbitrators are "sitting" may enforce such a subpoena "in the same manner provided by law for securing the attendance of witnesses…." 9 U.S.C. § 7.

Here, the only district court with authority to enforce the subpoenas is the Southern District of New York, since that is the district in which arbitration between NICO and Seaton is "sitting." Under the Second Circuit's decision in *Dynegy Midstream Services*, even a New York court would lack the authority to enforce the subpoenas, since Defendants were served outside the 100-mile geographical limits of FRCP 45.

**C.**    **Under Any Circumstances, the Court Lacks Jurisdiction**
          **to Enforce the Subpoenas Against Mr. Randall**

    **1.**    **Mr. Randall Resides, is Employed and Regularly Transacts**
          **Business In Person Outside the Geographic Limitations of the**
          **Panel's Subpoena Power**

Mr. Randall is not a party to the Retrocession Agreement between NICO and Seaton, nor is he a party to the underlying Arbitration. Accordingly, he is not bound by anything the Panel does, save for very narrow requirements imposed by the Section 7 of the FAA. That is, Mr. Randall can only be compelled to give testimony at a hearing if he "resides, is employed or regularly transacts business in person" within 100 miles from where the hearing is being held. Mr. Randall is a citizen of the United Kingdom, employed in England, and does not regularly transact business in the Massachusetts office of Cavell US in person. Thus, the Court lacks authority to enforce the subpoena purportedly issued to him.

It is settled law in the Second Circuit that an arbitration panel lacks the authority to issue a subpoena on a nonparty located outside the geographic boundaries specified in FRCP 45. *Dynegy Midstream Services*, 451 F.3d at 95-96. *See also Legion Ins. Co.*, 33 Fed. Appx. at 28 (in which the Third Circuit held that an arbitral subpoena cannot be served upon a nonparty for the production of documents and employee testimony outside of the territorial limits specified in FRCP 45).

This would be so even if the subpoenas directed to Mr. Randall might procure information or testimony relevant to the issues in the underlying Arbitration. *In re Application for Order Quashing Deposition Subpoenas*, 2002 WL 1870084 (S.D.N.Y., Aug. 14, 2002) ("*In Re Order*"); *Price Waterhouse LLP v. First American Corp.*, 182 F.R.D. 56, 61-63 (S.D.N.Y. 1998). As stated by the Second Circuit:

> [U]nless a person is a party to the litigation or an officer of
> a party, he cannot be compelled to travel more than 100
> miles from where he resides or works to be deposed....

*In Re Order*, 2002 WL 1870084, at *3 (citing *In Re Edelman*, 295 F.3d 171, 178 (2d Cir. 2001).

 *In Re Order* involved a nonparty subpoena issued by a court to a Japanese citizen, Takao

Sasaki ("Sasaki"), who was General Manager of the reinsurance department of Aioi Insurance

Company ("Aioi"), a Japanese insurer that had a New York office. The party seeking the

subpoena, Fortress Re, Inc. ("Fortress Re"), had served as a managing underwriting agent for

Aioi, as well as other Japanese insurers, and asserted that nonparty testimony from Sasaki was

relevant and necessary to develop the "core" issues in pending litigation between Fortress Re and

another insurer. *Id.* at *1. The Southern District of New York held that the subpoena was

invalid based on the territorial limits of FRCP 45, relying on case law in the Second Circuit. The

court further noted that even if authority did exist to enforce the subpoena under FRCP 45,

"prudential, international comity-based considerations" suggested that the court "should exercise

special vigilance to protect foreign litigants from the danger that unnecessary, or unduly

burdensome, discovery may place them in a disadvantageous position." *Id.* at *6.

 Similarly, in *Price Waterhouse LLP*, the Southern District of New York quashed a

subpoena served on Price Waterhouse-US ("PW-US") seeking nonparty witness testimony from

employees of Price Waterhouse-UK ("PW-UK") for use in a litigation occurring in the United

States. 182 F.R.D. at 61-63. The court noted that under FRCP 45, the "place" where PW-UK

and its partners and employees "reside" are "employed," or "regularly transact business in

person" is not New York, but rather England. *Id.* at 62. Therefore, the court held that the 100-

mile limitation prevented the court from enforcing the subpoena as to the employees of PW-UK,

- 17 -

even though the court held that it had jurisdiction over PW-UK by virtue of its doing business in New York through its agent, PW-US. *Id.* at 62-63.

Seaton has not cited any authority to support its position that an arbitration panel (or for that matter, a court) can compel a nonparty witness residing overseas to travel to the United States and provide testimony. The only decision cited by Seaton from this court, *Guyden v. Aetna Inc.*, 2006 U.S. Dist. LEXIS 73353 at *20 (D. Conn. 2006), does not discuss the limits of an arbitrator's subpoena power. It merely states that an arbitrator has the authority under the FAA to compel a witness to appear before the arbitrator and provide testimony. Indeed, the territorial limitations of FRCP 45 are uniformly recognized by District of Connecticut. *Charter Oak Fire Ins. Co. v. Broan-Nutone, L.L.C.*, 294 F.Supp.2d 218 (D. Conn. 2003) (in transferring venue from Connecticut to Tennessee, the court noted that it could not require witnesses from Tennessee who were not officers of a party to travel more than 100 miles to Connecticut to appear and give testimony); *Cavanaugh v. Bluebeard's Castle, Inc.*, 83 F.Supp.2d 284 (D. Conn. 1999) (in a transfer of venue action, the court noted that "if the case were to remain in Connecticut, the parties would be unable to compel the presence of these non-party witnesses because they reside more than 100 miles from the courthouse"). As such, the nonparty subpoena served on Mr. Randall must be quashed.

### 2.   Proper Service Has Not Been Effected on Mr. Randall

Contrary to the statement in the Wall Dec., Mr. Randall is not President and Chairman of Cavell US, or an employee of that company. Rather, he is Chairman of Cavell US, lives and works in the United Kingdom, and does not regularly transact business in person at Cavell US's Massachusetts office. Therefore, service of the subpoena at that location has not effected proper service upon Mr. Randall.

The FAA does not contemplate nationwide service of process, and arbitral subpoenas must be served in the same manner as subpoenas to appear and testify in federal court. *Dynegy Midstream Services*, 431 F.3d at 95. *See also Price Waterhouse LLP*, 182 F.R.D. at 62-63 (a nonparty subpoena served on U.S. branch of corporation would be quashed under FRCP 45 when it sought testimony from directors, officers or other employees of PW-UK who were outside the 100 mile limitation); *U.S. v. Afram Lines, Ltd.*, 159 F.R.D. 408, 413 (S.D.N.Y. 1994) (a corporate employee that is not an officer or director of a party should be subpoenaed pursuant to the Hague Convention or other applicable treaties that apply to witnesses who reside overseas).

In *Laker Airways Ltd. v. Pan American World Airways, et al.*, 607 F.Supp. 324 (S.D.N.Y. 1985), the court addressed whether proper service had been effected on the officers of a nonparty bank that worked in the United Kingdom, when a subpoena seeking testimony and documents was served on the bank's New York branch. *Id.* at 326. In quashing the subpoenas, the Southern District of New York held that (1) the subpoenas failed to meet the territorial limits of FRCP 45 and (2) the service of the subpoenas on the bank's New York office was nothing more than a "transparent attempt to circumvent the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters…which sets forth the agreed international procedures for seeking evidence in this Court from non-parties abroad." *Id.*

Clearly, service in Massachusetts on Mr. Randall, a foreign citizen who is not employed by Cavell US and does not regularly transact business in Cavell US's office in person, is improper.

### D.    The Subpoenas and this Motion Violate the Provisions of the Term Sheet

Seaton's motion for injunctive relief is a direct breach of Term Sheet described at pages 4-5.  There, Seaton agreed to release and forever discharge Cavell US from "all actions, causes of action, suits, claims and demands whatsoever, whether at law or equity, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, fixed or contingent, accrued or unaccrued, asserted or unasserted, which [Seaton] ever had, now has or hereafter can, shall or may have against [Cavell US] for, upon, or by reason of any matter, cause or thing whatsoever, arising out of or in connection with any business, commercial, contractual or other arrangements between or involving either of them [Cavell US and Seaton] as at the date of this Term Sheet…"  (Grondine Decl. at ¶ 6, Exh. A at ¶13).

The parties intended for the Term Sheet to be "legally binding" from the date in which the last of them signed it, which was February 22, 2006.  *Id.* at Exh. A at ¶25.  Seaton released Cavell US from any and all actions, claims and demands.  It agreed that the Term Sheet shall be governed by English law and that the parties submit to the exclusive jurisdiction of the English Courts.  These provisions were violated by the issuance of the subpoenas themselves.  They are further violated by the motion to compel enforcement in this Court.

### E.    The Subpoenas Are Unduly Burdensome

FRCP  45(c)(3) commands that a court may quash a subpoena if the subpoena "subjects a person to undue burden." *Travelers Indemnity Co. v. Metropolitan Life Ins. Co.*, 228 F.R.D. 111 (D. Conn. 2005).  Notably, courts give "special weight to the burden on non-parties of producing documents to parties involved in litigation." *Id.* at 113 ("[C]oncern for unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs"); *Concord Boat Corp., et al. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996).

Whether a subpoena imposes an "undue burden" depends upon "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Id.*

Even the most cursory glance at the subpoenas reveals the sheer breadth and lack of relevance of Seaton's discovery requests, and the undue burden that will be imposed upon Cavell US, Ms. Hoelsken and Mr. Randall if forced to comply.  For example, the subpoenas not only request documents in the custody and control of Ms. Hoelsken and Mr. Randall individually, but also documents that may be in the possession of their "agents, representatives, servants, employees, attorneys and those persons in active concern or participation with you." *See* Declaration of Michael R. O'Donnell, Esq. sworn on March 6, 2007 ("O'Donnell Dec."), Exh. D at pg. 5; Exh. E at pg. 5.  Similarly, the subpoenas seek documents from Cavell US and "its officers, directors, affiliates, subsidiaries, parents, shareholders, agents, representatives, servants, employees, attorneys and those persons in active concern or participation with it, and/or Kenneth Randall individually." *Id.* at Exh. C at pg. 5.  These requests encompass numerous entities and/or individuals that are also nonparties to this current proceeding or the underlying Arbitration, and are located all over the world.  Clearly, Cavell US would face an undue burden if ordered to comply with the subpoenas. *See Travelers Indemnity Co.*, 228 F.R.D. at 114 (subpoenas quashed that sought documents associated with numerous insurance policies that were kept in numerous offices, sub-offices and warehouses all over the United States).

As nonparties to the arbitration between NICO and Seaton, Cavell US, Ms. Hoelsken and Mr. Randall are entitled to even more protection from significant expense and inconvenience than if they were a party to the underlying dispute.  FRCP  45 (c)(2)(b); *Concord Boat Corp.,*

- 21 -

169 F.R.D. at 49. Enforcing the subpoenas would require Mr. Randall, a foreign citizen, to travel to the United States to provide testimony to the Panel in Connecticut. It would also require Ms. Hoelsken and a designated custodian of Cavell US to provide testimony in the underlying Arbitration, at great time and expense, and to search through thousands of documents from various entities in foreign countries to find a few, if any, that were responsive. Cavell US, Ms. Hoelsken and Mr. Randall would incur substantial and irreversible expense and inconvenience if Seaton's motion is granted, and thus are entitled to protection from this Court.

Moreover, the subpoenas are unduly burdensome since they seek discovery that is already in the possession of Seaton and/or NICO. Pursuant to the Term Sheet, Cavell US provided Seaton with "all books and records of Stonewall and Seaton, including documents in hard-copy as well as all electronic information..." (Grondine Dec., Exh. A at ¶15). This document transfer began on the date that Seaton signed the Term Sheet, which is February 22, 2006. Nonetheless, the subpoenas seek, among others, the following documents:

- Correspondence, e-mails and other documents between Cavell US, Mr. Randall and/or Ms. Hoelsken and either Seaton or NICO;
- Documents already in the possession of Seaton and/or NICO, including many documents exchanged with those parties in the regular course of business;
- Documents between Cavell US and NICO relating to Seaton;
- Documents related to NICO's claims handling;
- Correspondence, e-mails, legal bills and other documents between Cavell US and Seaton

*See* Cavell US subpoena at pp. 7-9, Mr. Randall subpoena at pp. 8-11, Ms. Hoelsken subpoena at pp. 8-10. These documents are readily available to NICO and Seaton through discovery in the underlying Arbitration, and it would unreasonably cumulative or duplicative for the Court to

require Cavell US, Ms. Hoelsken and Mr. Randall, as nonparties to that Arbitration, to comb

through thousands of document just to fill in any possible gaps. *Travelers Indemnity Co.*, 228

F.R.D. at 113-14 (a factor in whether a subpoena imposes an undue burden is the need of the

party for the documents and whether the discovery is otherwise available); *Nova Biomedical*

*Corp. v. I-STAT Corp.*, 182 F.R.D. 419 (S.D.N.Y. 1998) (Nonparty subpoenas that seek

documents already in possession of the requesting party are "unreasonably cumulative or

duplicative").  Pursuant to the Term Sheet, Cavell US has already gone through the laborious

task of providing Seaton with documents directly related to Seaton and Stonewall.  It should not

be required to do so again because Seaton and/or NICO have failed to conduct adequate

discovery from each other in their Arbitration.

It also bears mention that some of the documents which would arguably fall within the

scope of the subpoenas may be subject to conflicting claims of ownership or privilege.  Thus,

should the Court order that the subpoenas be enforced, there will be a need for further Court

orders addressing these conflicting claims.

For the reasons stated above, Seaton cannot show a clear or substantial likelihood of

success on the merits of its motion to enforce the nonparty subpoenas.  Therefore, the Court

should deny Seaton's motion for preliminary injunctive relief and quash the nonparty subpoenas.

## POINT II

## SEATON WILL NOT SUFFER IRREPERABLE HARM

**A.    The Alleged Harm is Merely Speculative and not Imminent or Certain**

In addition to proving a likelihood of success on the merits, Seaton must also establish by

a clear showing that it will suffer "irreparable harm" absent injunctive relief.  The Second Circuit

has held that the "mere possibility" of irreparable harm is insufficient and that the alleged

"harm" must be "imminent or certain, not merely speculative." *Jayaraj*, 66 F.3d at 39; *Borey*,

934 F.2d at 34. Further, monetary loss alone will generally not amount to irreparable harm.

*Borey*, 934 F.2d at 34.

To support its claim, Seaton relies on the misconception that neither Seaton nor NICO

has access to the information sought in the subpoenas. This allegation is contradicted by the

very language of the document requests, which indicates that many of the documents sought by

Seaton were provided to or shared with NICO or Seaton during the course of their business

relationship with Cavell US. These documents are already in NICO and/or Seaton's possession

and subject to discovery in the Arbitration between those parties. Cavell US, Ms. Hoelsken and

Mr. Randall, as nonparties to that Arbitration, should not be compelled to provide documents or

testimony as a non-essential supplement to the discovery process between Seaton and NICO.

*See Jayaraj*, 66 F.3d at 39 ("The possibility that…corrective relief will be available at a later

date, in the ordinary course of litigation, weights heavily against a claim of irreparable harm").

(emphasis added).

The subpoenas are also founded on speculation, rather than a clear showing of "imminent

or certain harm." Seaton merely "believes" that the documents and testimony sought by the

subpoenas will assist it in preparing its counterclaim in the Arbitration with NICO and that the

Court's failure to enforce the subpoenas could result in a less favorable arbitration award for

Seaton. This "alleged injury" falls well short of the "actual or imminent" harm sufficient to

justify injunctive relief. As stated by the Second Circuit in *Borey*, an alleged monetary loss "will

not suffice unless the movant provides evidence of damage that cannot be rectified by financial

compensation." *Borey*, 934 F.2d at 34. Seaton has not cited a single, concrete example of how

its claims against NICO will be altered or impacted if the Court fails to enforce the subpoenas, other than its naked allegation that it may suffer monetary harm if the subpoenas are not complied with.

Finally, the hearing in the underlying Arbitration is not scheduled until August 2007. Logic dictates that Seaton will not suffer imminent harm if the information is not provided to it by the date demanded by Seaton (March 27-30), which is several months before the ultimate hearing before the Panel. Therefore, Seaton has failed to meet its burden of clearly establishing that it will suffer actual or imminent harm if injunctive relief is not granted and the subpoenas should be quashed.

**B.     The Subpoenas are Nothing More Than an Attempt to
        <u>Obtain Information to Assert a Claim Against Cavell US</u>**

As set forth at page 9 above, Seaton has already threatened to assert certain claims against Cavell US in the District of Massachusetts. And the factual context strongly indicates that the subpoenas are designed to obtain information that could be used to manufacture such claims. The attempted use of the subpoenas for this purpose is wholly improper.

Courts in this Circuit have noted that in evaluating nonparty discovery under FRCP 45, "a court is not required to blind itself to the purpose for which the party seeks information." *Nicholas v. Poughkeepsie Savings Bank/FSB*, 1991 WL 113279, at *2 (S.D.N.Y., June 14, 1991) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353 n.17 (1978)). *See also Night Hawk Ltd v. Briarpatch Ltd., L.P.*, 2003 WL 23018833, at *8 (S.D.N.Y., Dec. 23, 2003). Thus, when the purpose of a nonparty subpoena is to gather information for use in proceedings other than the pending suit for which it is allegedly sought, discovery is properly denied. *Nicholas*, 1991 WL 113279, at *2 (noting that a nonparty subpoena should be quashed when the purpose of

the discovery request is to acquire information for use in another lawsuit); *Night Hawk Ltd*, 2003

WL 23018833, at *8 (quashing a nonparty subpoena for the same reasons).

Here, many of Seaton's specific discovery requests relate to the allegations raised against

Seaton in the draft complaint it sent to Cavell US last year. The Court should not blind itself to

Seaton's motivation, and it should quash the nonparty subpoenas.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request entry of an order

denying Plaintiffs application for injunctive relief and quashing the subpoenas served upon

Defendants.

EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendants

By: /s/ Charles F. Gfeller
Charles F. Gfeller (Fed. Bar No. 18119)
Michael P. Thompson (Fed. Bar No. 09634)
cgfeller@eapdlaw.com
mthompson@eapdlaw.com
Three Stamford Plaza
301 Tresser Boulevard
Stamford, CT 06901
(203) 975-7505
(203) 975-7180 (fax)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... (ii)

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

LEGAL ARGUMENT.......................................................................................... 10

POINT I

SEATON CANNOT PROVE A LIKELIHOOD OF SUCCESS ON THE MERITS ................. 11

    A.    The Panel Cannot "Sit" in Connecticut For the Sole Purpose of Issuing
           Nonparty Subpoenas .................................................................. 12

    B.    This Court Lacks Authority to Enforce the Subpoenas ........................... 15

    C.    Under Any Circumstances, the Court Lacks Jurisdiction to Enforce the
           Subpoenas Against Mr. Randall.................................................... 16

           1.    Mr. Randall Resides, is Employed and Regularly Transacts Business In
                Person Outside the Geographic Limitations of the Panel's Subpoena Power .... 16

           2.    Proper Service Has Not Been Effected on Mr. Randall....................... 18

    D.    The Subpoenas and this Motion Violate the Provisions of the Term Sheet.............. 20

    E.    The Subpoenas Are Unduly Burdensome ........................................ 20

POINT II

SEATON WILL NOT SUFFER IRREPERABLE HARM ........................................... 23

    A.    The Alleged Harm is Merely Speculative and not Imminent or Certain ................... 23

    B.    The Subpoenas are Nothing More Than an Attempt to Obtain
           Information to Assert a Claim Against Cavell US ................................ 25

CONCLUSION.................................................................................................. 26

# TABLE OF AUTHORITIES

Page

**Cases**

*Borey v. National Union Fire Ins. Co.,*
  934 F.2d 30 (2d Cir. 1991)........................................................................................ 10, 24

*Cavanaugh v. Bluebeard's Castle, Inc.,*
  83 F.Supp.2d 284 (D. Conn. 1999).................................................................................. 18

*Charter Oak Fire Ins. Co. v. Broan-Nutone, L.L.C.,*
  294 F.Supp.2d 218 (D. Conn. 2003) ............................................................................... 18

*Concord Boat Corp., et al. v. Brunswick Corp.,*
  169 F.R.D. 44 (S.D.N.Y. 1996) ........................................................................... 20, 21, 22

*Diversified Mortgage Investors v. U.S. Life Title Ins. Co.,*
  544 F.2d 571 (2d Cir. 1976)............................................................................................ 10

*Dynegy Midstream Services, LP v. Trammochem,*
  451 F.3d 89 (2d Cir. 2006)......................................................................... 13, 15, 16, 19

*Gresham v. Norris,*
  304 F.Supp.2d 795 (E.D. Va. 2004) ............................................................................... 14

*Guyden v. Aetna Inc.,*
  2006 U.S. Dist. LEXIS 73353 at *20 (D. Conn. 2006) ...................................................... 18

*In re Application for Order Quashing Deposition Subpoenas,*
  2002 WL 1870084 (S.D.N.Y., Aug. 14, 2002) ................................................................. 16

*In Re Edelman,*
  295 F.3d 171 (2d Cir. 2001)........................................................................................... 17

*Jayaraj v. Scappini,*
  66 F.3d 36 (2d Cir. 1995)......................................................................................... 10, 24

*Laker Airways Ltd. v. Pan American World Airways, et al.,*
  607 F.Supp. 324 (S.D.N.Y. 1985).................................................................................... 19

*Legion Ins. Co. v. John Hancock Mutual Life Ins. Co.,*
  33 Fed. Appx. 26 (3d Cir. 2002) ..................................................................................... 13

*Moore v. Consolidated Edison Co.,*
  409 F.3d 506 (2d Cir. 2005)........................................................................................... 10

*Nicholas v. Poughkeepsie Savings Bank/FSB,*
  1991 WL 113279, at *2 (S.D.N.Y., June 14, 1991)........................................................... 25

*Night Hawk Ltd v. Briarpatch Ltd., L.P.,*
  2003 WL 23018833, at *8 (S.D.N.Y., Dec. 23, 2003) ................................................. 25, 26

*Nova Biomedical Corp. v. I-STAT Corp.,*
  182 F.R.D. 419 (S.D.N.Y. 1998) ..................................................................................... 23

*Price Waterhouse LLP v. First American Corp.,*
  182 F.R.D. 56, 61-63 (S.D.N.Y. 1998)................................................................... 13, 16-19

*Stolt-Nielsen SA v. Celanese AG,*
  430 F.3d 567 (2d Cir. 2005)........................................................................................... 14

*Sunward Electronics, Inc. v. McDonald,*
  362 F.3d 17 (2d Cir. 2004)............................................................................................. 10

*Thompson v. Zavin,*
  607 F.Supp. 780 (D.C. Cal. 1984) ................................................................................... 14

*Travelers Indemnity Co. v. Metropolitan Life Ins. Co.*,
  228 F.R.D. 111 (D. Conn. 2005)..................................................................... 20, 21, 23
U.S. v. Afram Lines, Ltd., 159 F.R.D. 408, 413 (S.D.N.Y. 1994) .............................................. 19

**Statutes**
9 U.S.C. § 7............................................................................................................. passim

**Rules**
Fed. R. Civ. P. 45.................................................................................................... passim

NYC_Defendants Memorandum of Law in Opposition to Plaintiffs Application for Preliminary Injunctive Relief and In Support of Defendants Motion to Quash
Subpoenas