**EXHIBIT 2**

**Claimants**
**Jonathan Jacob Sacher**
**First**
**11 March 2008**
**Exhibit "JJS1"**

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N:**

**(1) CAVELL USA INC**

**(2) KENNETH EDWARD RANDALL**

**Claimants**

- and –

**(1) SEATON INSURANCE COMPANY**

**(2) STONEWALL INSURANCE COMPANY**

**Defendants**

---

**WITNESS STATEMENT OF JONATHAN JACOB SACHER**

---

I, JONATHAN JACOB SACHER, of Berwin Leighton Paisner LLP Adelaide House London Bridge London EC4R 9HA, WILL SAY AS FOLLOWS:

**Introduction**

1   I am a solicitor of the Supreme Court of England and Wales and a partner in the firm of Berwin Leighton Paisner LLP ("BLP"), the solicitors for the Claimants. I am the supervising partner in this matter and I am duly authorised to make this statement on the Claimants' behalf.

2 The facts and matters to which I refer in this witness statement are within my knowledge and derived from my conduct of this case; insofar as they are not within my own knowledge, they derive from the documents which I have read on behalf of the Claimants and from information I have received from Mr Randall, the Second Claimant and principal of the First Claimant, and from Ira Greenberg and Vincent Vitkowsky of the Claimants' New York attorneys, Edwards, Angell, Palmer and Dodge LLP. Where the facts and matters set out are within my own knowledge, they are true; otherwise they are true to the best of my knowledge, information and belief.

3 I attach to this witness statement an Exhibit marked "JJS1" containing a paginated bundle of copy documents to which I refer in this witness statement. References in square brackets in this witness statement are to page numbers in "JJS1".

4 I make this witness statement in support of the Claimants' application dated 11 March 2008 to:

(i) set aside the order of Mr Justice Field made on paper in response to the Defendants' application for a stay of these proceedings; and to

(ii) dismiss that application for a stay.

**Summary**

5 The grounds for the application are, in very brief summary, as follows.

6 The Defendants filed a paper application (under section F4 of the Commercial Court Guide ("CCG")) on 15 February 2008 seeking an Order staying these proceedings or, alternatively, an extension of the time limit for the filing of an application to contest jurisdiction, until 28 days after the determination of a Motion to Dismiss in proceedings between the same parties in New York (the "Defendants' application", full copy at pages 21-42).

7 My firm wrote to the court in response to the Defendants' application, on behalf of the Claimants, on 19 February 2008 (pages 43-47). This letter stated that the Claimants did not consider that the application could appropriately be disposed of by way of a paper application and requested that the court direct that the application proceed by way of the procedure set out for "heavy" applications in section F6 of the Commercial Court Guide ("CCG").

8      On 4 March 2008, Mr Justice Field made an order granting the Defendants' application ("the Order"). On making inquiries, my firm learned from Mr Justice Field's clerk that the Judge made the Order without the benefit of having seen our letter of 19 February 2008 (page 57).

9      On 7 March 2008 my firm wrote to Mr Justice Field (pages 59-62) asking him to set aside his Order on the ground that it was granted without the court hearing the Claimants' response on the application and was therefore made in breach of the principles of natural justice. Mr Justice Field declined to set the Order aside (see page 63), and directed that the Claimants should make an application to do so which would be heard orally. This is that application.

10      The Claimants ask the Court to set aside the Order dated 4 March 2008 because it was made in breach of the principles of natural justice.

11      So far as the merits of the Defendants' application for a stay are concerned, it is the Claimants' case that a stay of these proceedings ought not to be granted. This is the case in particular because – on any view – there are matters within this Court's exclusive jurisdiction, involving issues of English law, which only this Court can determine, and most of which do not arise in the New York proceedings. This Court ought to hear those matters, and ought not to put the Claimants to the (considerable) expense of fighting the New York proceedings in the face of a jurisdiction agreement conferring exclusive jurisdiction on this Court. What is more, and as I explain further below, there is one issue in particular which this Court can and (I respectfully submit) should try as a preliminary issue; by doing so it will be actively assisting the New York court.

12      I deal below with the following matters in turn:

         (a)     The factual background;

         (b)     The present proceedings;

         (c)     Progress of the New York proceedings;

         (d)     The Defendants' application for a stay;

         (e)     The Claimants' application;

         (f)     The way forward.

(a) **The factual background**

13   I attach at pages 68-81 the witness statement of Mr Randall which was prepared in support of the application for permission to serve the Claim Form outside of the jurisdiction. (I do not attach the exhibits to that statement, though these can be made available to the Court if required.) Mr Randall describes the background of the relationship between the parties at paragraphs 5 - 16 of his witness statement.

14   Mr Randall also explains the background to the claims and demands brought by the Defendants against the Claimants at paragraphs 17 - 22 of his witness statement. In particular, Mr Randall describes allegations made by the Defendants which have ultimately resulted in their issuing proceedings against the Claimants in the United States District Court for the Southern District of New York with index number 07-CV-7032 (the "New York proceedings"). A copy of the First Amended Complaint filed in these proceedings is attached at pages 82-106 (the "New York Complaint").

15   In summary, the First Claimant, Cavell USA Inc ("Cavell"), carries on business in the United States as a provider of claims handling and management services to insurance companies in run-off. The Second Claimant, Mr Randall, is the principal shareholder of the English public listed company, Randall and Quilter Investment Holdings Plc ("RQIH") (formerly Randall & Quilter Investment Holdings Limited). RQIH is the ultimate parent company of Cavell USA, Inc ("Cavell"). Mr Randall is also Chairman of the Board of Directors of Cavell and RQIH.

16   Cavell (then known as Eastgate Inc) entered into an administration agreement for the run-off of the First Defendant, Seaton Insurance Company ("Seaton") (then known as Unigard Security Insurance Company) on 31 March 1999 (the "Seaton Run-Off Management Agreement" at pages 107-133). Cavell managed the run-off of Seaton for the 7 year period between 31 March 1999 and 31 March 2006.

17   Cavell also entered into an administration agreement for the run-off of the Second Defendant, Stonewall Insurance Company ("Stonewall") on 29 September 2000 (the "Stonewall Run-Off Management Agreement" at pages 134-162). Cavell managed the run-off of Stonewall for the period between 29 September 2000 and 31 March 2006.

18   The Seaton and Stonewall Run-off Management Agreements were terminated with effect from 31 March 2006 by mutual agreement. The orderly termination of the Seaton and Stonewall Run-off Management Agreements were provided for in the Term Sheet entered into by Dukes Place Holdings LP ("Dukes Place") a Bermudan

Partnership (for itself and on behalf of its associated companies including Seaton and Stonewall) and RQIH (for itself and on behalf of its associated companies, entities and persons including Cavell and Mr Randall (together defined as "Randall")) (pages 163-171).

19   In entering into the Term Sheet, the parties agreed that Cavell received a release from Dukes Place on the following terms:

> "13   Dukes Place hereby releases and forever discharges Randall of and from all actions, causes of action, suits, claims and demands whatsoever, whether at law or equity, whether unknown or known, suspected or unsuspected, disclosed or undisclosed, fixed or contingent, accrued or unaccrued, asserted or unasserted, which Dukes Place ever had, now has or hereafter can, shall or may have against Randall for, upon, or by reason of any matter, cause or thing whatsoever arising out of or in connection with any business, commercial, contractual or other arrangements between or involving either of them as at the date of this Term Sheet, save (i) in respect of any obligations expressly set out in this Term Sheet, (ii) in respect of any actions, causes of actions, suits, claims, and demands arising from any breach by Randall of any provision of this Term Sheet, and (iii) in the case of fraud on the part of Randall. ..."

20   In other words, Randall, as defined, was released by Dukes Place from all pre-existing claims save in the case of fraud on the part of Randall. No release was provided in the Term Sheet by Randall to Dukes Place.

21   The Term Sheet also provides that:

> "29   This Term Sheet shall be governed by and construed in accordance with English law and the parties submit to the exclusive jurisdiction of the English court."

22   The New York Complaint was issued on 6 August 2007 and served on Mr Randall by FedEx on 22 August 2007. It contains what purport to be allegations of "fraud" against Cavell and Mr Randall personally, arising out of the conclusion by the First Claimant of a Collaboration Agreement with the Defendants' reinsurers (as described at paragraphs 17-22 of Mr Randall's witness statement). It is the Claimants' case that the facts relied upon in the Complaint were all known to Dukes Place when they entered into the Term Sheet. In the circumstances, and in any event, the New York Complaint appears to be a blatant attempt to bypass the release which Cavell and Mr Randall received as a result of the settlement in the Term Sheet with, amongst others, Seaton and Stonewall. Further, the New York Complaint appears to me to attempt to elevate allegations of breach of fiduciary duty and innocent misrepresentation and non-disclosure into allegations of "fraud" in order to circumvent the release contained in clause 13 of the Term Sheet. It is

the Claimants' case that the claim in the New York proceedings are brought in breach of clause 29 of the Term Sheet.

23  In the New York Complaint, the Defendants claim that the New York court has jurisdiction over the dispute on the basis that there is a diversity of citizenship, the claim amount exceeds US$75,000; they also refer to a non-exclusive New York jurisdiction clause in the Seaton Run-Off Management Agreement. The Stonewall Run-Off Management Agreement does not contain the same jurisdiction clause but instead compels the parties to arbitration in New York. In any event, the Term Sheet terminates the Seaton and Stonewall Run Off Management Agreements. The New York proceedings have not therefore been issued on the basis of any exclusive jurisdiction agreement between the parties.

**(b)  The present proceedings**

24  On 20 November 2007, the Claimants issued these proceedings, claiming:

(1)  A declaration that all of the claims advanced by the Defendants in the New York Complaint have been fully compromised and/or released pursuant to clause 13 of the Term Sheet;

(2)  A declaration that by virtue of clause 13 of the Term Sheet, alternatively in any event, the Claimants have no liability to the Defendants in respect of the claims contained in the Complaint; and

(3)  Damages for breach of the Term Sheet by: (i) serving third-party document subpoenas on Cavell; (ii) filing a motion with the Connecticut District Court to enforce Cavell's compliance with the third-party subpoenas; and (iii) the bringing of the New York Complaint.

25  On 13 November 2007, the Claimants applied for permission to serve the Claim Form on the Defendants out of the jurisdiction; as already stated, that application was supported by the witness statement of Mr Randall. Permission was granted by Mr Justice Flaux on 20 November 2007. Service was effected on 10 January 2008, and on 31 January 2008 Cadwalader, Wickersham & Taft LLP filed acknowledgments of service on behalf of the Defendants indicating that they intended to contest the jurisdiction of this Court.

**(c)    Progress of the New York proceedings**

26    As Mr Randall explains at paragraph 22 of his witness statement, on 19 December 2007 the Defendants filed a Motion with the New York court to dismiss the New York Complaint (the "Motion to Dismiss"). The basis for the Motion to Dismiss is that the New York court does not have jurisdiction to hear the New York Complaint due to the English court having exclusive jurisdiction over disputes between the parties by virtue of clause 29 of the Term Sheet. Alternatively, the Motion to Dismiss seeks dismissal of the New York Complaint on the grounds that it fails to state a claim upon which relief can be granted and for lack of subject matter jurisdiction.

27    The Motion to Dismiss was fully briefed on 11 January 2008 in that all written submissions were filed at the court. It is now awaiting determination by the New York court. In the meantime, the New York court has ordered that the parties should carry out full document and deposition discovery. Document production was completed on 31 January 2008. Fact witness depositions occurred during February 2008. The deposition of expert witnesses is currently scheduled to be completed by mid-May 2008.

28    The Defendants' solicitors have asserted in their letter of 15 February 2008 to which I refer further below that "*a decision on the Motion to Dismiss is imminent*" (page 28). I do not believe this to be an accurate characterisation of the position.

29    The Claimants were initially told by their New York attorneys that they could expect that a decision on the Motion to Dismiss would take 3-12 months (i.e. April 2008 - January 2009). It has recently been suggested to me by the Claimants' New York attorneys that they do not anticipate that the New York court will consider the Motion to Dismiss until, at the earliest, some time after discovery has been completed in May 2008. It is, therefore, not in my view appropriate to describe a decision on the Motion to Dismiss to be "*imminent*".

**(d)    The Defendants' application for a stay**

30    The time for the Defendants to bring an application challenging the jurisdiction of this Court was due to expire on 28 February 2008. However, on 15 February 2008 the Defendants' solicitors wrote to the Court making their paper application to stay these proceedings. BLP received a copy of the Defendants' application at 4.51pm on Friday 15 February 2008 (pages 1-19). A page of the Defendants' solicitors'

letter was missing and a full copy of the application was subsequently received by email at 5.25pm on 15 February 2008 (pages 21-42).

31  The Defendants' application sought an Order staying the proceedings or, alternatively, an extension of the time limit for the filing of an application to contest jurisdiction, until the determination of the Motion to Dismiss in the New York proceedings (pages 30-31). The Defendants' application was made by letter seeking to utilise the procedure for paper applications under section F4 of the Commercial Court Guide ("CCG").

32  For reasons more fully explained below, I did not and do not consider that an application to stay substantial commercial proceedings is an application of the kind which this court would normally determine on paper.

33  I ask the court to note that the Defendants' application was made by way of a six page letter which would have taken the Defendants' solicitors a considerable period of time to prepare. That letter only attached inter-solicitor correspondence, but referred to a number of important documents, such as the Term Sheet, which were not specifically provided for the court's consideration.

34  Given the nature of the application made, my firm was simply not able to provide a fully reasoned and detailed response within two days of the application. However, we were careful to notify the court that the Claimants were opposed to the matter being dealt with on paper within the two clear days required by paragraph F4.2(c)(iv) of the CCG. As the Defendants' application was received after close of business on 15 February 2008, we had until close of business on Wednesday, 20 February 2008 to respond. In the event, we faxed a letter on behalf of the Claimants to the court at 4.22pm on Tuesday, 19 February 2008 (pages 43-47).

35  Our letter of 19 February 2008 expressly stated that:

(i)  The Claimants contested the Defendants' application;

(ii) The Claimants did not consent to the Defendants' application being disposed of on paper without an oral hearing;

(iii) Paragraphs 4.1(a) and (c) of the CCG gave clear guidance that the application was not appropriate for determination on paper;

|     |     |
| --- | --- |
| (iv) | The Claimants' leading Counsel had estimated that the Defendants' application required an oral hearing of one half to one day, and the application should be listed as such; |
| (v)  | However, in the event that the court was minded to dispose of the application on paper, the Claimants reserved their rights to respond to the merits of the Defendants' application. |

36  On Thursday, 21 February 2008 Andrew Simpson, an associate solicitor employed by my firm, called the Commercial Court Registry to ask whether the Defendants' application had been considered. The Registry informed Mr Simpson that it had, but that the Court could not divulge any further information in connection with the application, which could only be obtained from the Defendants. I am informed by Mr Simpson and believe that he rang Mr Ian McKim of the Defendants' solicitors to ascertain whether the Defendants' solicitors had obtained a copy of the Order. He left a message with Mr McKim's secretary asking that Mr McKim return his call, but he did not receive a return call.

37  Accordingly, Ms Sarah Verblow, a trainee from this firm, attended on the Commercial Court Registry on Friday 22 February 2008 to ascertain what order had been made. I am informed by Ms Verblow that she was told that the Defendants' draft Order had been initialled by a Judge, but that an Order had not yet been drawn up. The Registry official also confirmed that the Judge dealing with the application had been provided with a copy of our letter dated 19 February 2008, and would have taken it into account when considering whether to grant the Order. The Commercial Court Registry could not confirm when the final Order would be available.

38  Not having heard anything further from the Commercial Court Registry or from the Defendants' solicitors, on Friday 29 February I asked Mr Andrew Callaghan, another trainee from this firm, to call again at the Commercial Court Registry for an up-date. Mr Callaghan was informed that the draft Order was still awaiting collection by the Defendants' solicitors so that a clean Order could be submitted to be sealed.

39  I am informed by Mr Simpson and believe that during the afternoon of Monday 3 March 2008, having still not heard from the Defendants' solicitors, Mr Simpson rang Mr McKim again and left a voicemail message requesting Mr McKim to call him back. At 12.05 pm on Tuesday 4 March 2008, Mr Simpson finally received a call from Mr McKim. Mr McKim confirmed that the Defendants' solicitors had picked up and

sealed the Order that morning. We subsequently received a copy of the sealed Order from the Defendants' solicitors by fax later that day (pages 48-50).

40  No explanation has been forthcoming as to why two weeks were allowed to elapse between the initialling of the draft Order and a copy of the sealed Order being provided to the Claimants.

41  On reviewing the Order, I was concerned to note that it made no reference to Mr. Justice Field having reviewed our letter of 19 February 2008. I was thus unsure as to whether it had been provided to him.

42  We therefore wrote immediately to the Clerk to the Commercial Court (pages 51-56) asking the Commercial Court to confirm if Mr Justice Field had made his Order with the benefit of:

(i)   Having reviewed our letter dated 19 February 2008;

(ii)  In the knowledge that the Claimants contested the Defendants' application; and

(iii) In the knowledge that the Claimants did not consent to the Defendants' application being determined without an oral hearing.

43  Mr Simpson received an email on 5 March 2008 from the Clerk to Mr Justice Field (pages 57-58). That e-mail stated as follows:

*"Mr Justice Field instructs me to inform you that in reference to your letter of 4 March 2008 to the Clerk to the Commercial Court it would appear: (i) from the fax receipt timings that Mr Justice Field did not have before him the letter of 19 February 2008 from your firm to the Commercial Court when the judge considered the papers on 20 February 2008 and made the order subsequently dated 4 March; and (ii) that the judge was aware that the claimants opposed any stay or extension but had not advanced any grounds in support of the position."*

44  The e-mail thus confirmed my concerns that Mr. Justice Field had not had sight of our letter, although the suggestion that it had been received by the Court out of time was not correct.

45  In the light of that e-mail, on 7 March 2008, we sent a letter to the Clerk to Mr Justice Field (pages 59-62) inviting the Judge to exercise his case management powers under CPR Part 3.1(7) to revoke his Order, on the ground that it was made other than in accordance with natural justice, and to give directions enabling the Defendants' application to be heard orally in the usual way.

46    By email later on 7 March 2008, the Clerk to Mr Justice Field emailed the parties (pages 63-64) confirming that Mr Justice Field had "decided not to proceed under CPR3.1(7)" and directing that, if the Claimants wanted the order to be set aside, they should issue a formal application to be determined at an oral hearing.

**(e)    The Claimants' application**

47    The Claimants apply to set aside the Order, and oppose the Defendants' application for a stay, on the grounds that:

(1)    the Order was made other than in accordance with natural justice, did not comply with the requirements of the CPR and ought in any event not to have been made on paper;

(2)    a stay is in any event wholly inappropriate in circumstances where the English court has, on any view, exclusive jurisdiction over some (and on the Claimants' case, all) matters between the parties, and in particular over the question of whether the effect of clause 29 of the Term Sheet is to require *all* disputes between the parties, including claims in fraud by Seaton and Stonewall against the Claimants, to be determined by this Court. That is a question of English law, being a question of construction of the Term Sheet; and it is one exclusively for this Court;

(3)    there are other reasons why a stay is not appropriate.

I expand on these points, and particularly points (2) and (3), further below.

(1)    <u>Breach of natural justice/not appropriate for paper determination</u>

48    In the light of the procedural history as I have described it above, I hope this point will not need to be expanded. The Order was made without the Court having before it my firm's letter dated 19 February 2008. Nor did the Court have the opportunity to consider the Claimants' substantive objections to the application. In the circumstances, it would appear that Mr. Justice Field ought to have made a fresh order when he came to reconsider the matter on 7 March 2008, but he did not do so. The Order should be set aside on the ground that the Claimants' representations were not taken into consideration at all.

49    I would also add that the Order did not contain a statement of the right to make an application to have the order set aside, varied or stayed as required by CPR3.3(5)(b), and it thus appears that the Order was defective on this ground also.

50   So far as the appropriateness of a paper determination is concerned, this is not a case where the parties agreed as to the terms of the order sought, nor one where it was agreed that the Defendants' application should be determined on paper. Accordingly, by CPR 23.8 the Court was only entitled to determine the hearing on paper if it did not consider that a hearing would be appropriate.

51   By virtue of CPR 23.PD.11.2 , CPR3.3(4) and CPR3.3(5), I believe that in any event the Claimants are entitled to require the Court to reconsider the Defendants' application. They do so for the reasons set out below. I would add that the Defendants, by their application, have to all intents and purposes obtained an anti-suit injunction on paper. I do not believe that this can possibly be the sort of application which the Rules and the Guide contemplated as being suitable for determination as a paper application, particularly in substantial commercial litigation involving serious allegations (including an allegation of "fraud" made against an individual personally).

52   It is also worth mentioning in this context that by letter dated 29 January 2008, the Defendants asked the New York court for permission to file a motion for an injunction to enjoin the Claimants from proceeding with this action whilst the New York proceedings were pending (pages 172-176). The Claimants' US attorneys notified the New York court on 1 February 2008 that they did not believe that such an injunction would be proper and that they would oppose such a motion if it was made (pages 177-178). The Defendants filed a Motion with the New York court on 4 March 2008 (pages 179-340). It is noteworthy that the Defendants' Motion entirely skirts around the fact that clause 29 of the Term Sheet exists, let alone making any attempt to grapple with the issue of the scope of the exclusive jurisdiction agreement. From reading the Motion, one would have little idea that there was any jurisdiction agreement between the parties, let alone one conferring jurisdiction on another court.

53   The Claimants do not consider that the Defendants will be successful in persuading the New York court to restrain the Claimants from proceeding with the English proceedings. Yet the effect of the Order is that the Defendants have in effect obtained such relief from this Court – without a hearing.

(2)   <u>Stay inappropriate in view of exclusive jurisdiction agreement</u>

54   I have already set out above the material provisions from the Term Sheet (pages 163-171). As is apparent, the agreement contained in the Term Sheet included an

exclusive jurisdiction clause in very wide terms. It contained no limiting words which (for example) excluded particular types of dispute from its ambit.

55   As I have also observed above, the parties to the Term Sheet are RQIH and Dukes Place Holdings LP. Duke's Place Holdings LP is a Bermudan partnership and entered into the agreement on behalf of itself and its associated companies including Seaton and Stonewall. Since RQIH is a company incorporated according to the laws of England and Wales, it follows that clause 29 of the Term Sheet is an exclusive jurisdiction agreement between parties, at least one of whom is domiciled in a Contracting State for the purposes of EC Regulation 44/2001 ("the Regulation"), and therefore falls within Article 23 of the Regulation. In the light of the relevant authorities (to which reference will be made at the hearing of this application if necessary) I do not believe that this Court is entitled to decline jurisdiction over any claims that fall within clause 29 of the Term Sheet, whether on the ground of *forum non conveniens* or otherwise.

56   There is a dispute between the parties as to whether clause 29 of the Term Sheet applies to claims in fraud that are "carved out" by clause 13 of the Term Sheet: In other words, whether claims in fraud against Randall (as defined) must be brought in the English courts, or whether they can be brought elsewhere. This is of course a matter for argument and not for evidence; but in very brief summary, it is the Claimants' case that such claims are within clause 29 and must be brought in England, for it is overwhelmingly likely that the parties intended that *all* outstanding disputes between them should be determined in a single forum. The arguments are set out in more detail in an affidavit sworn by Stephen Hofmeyr, Q.C., leading counsel instructed on behalf of the Claimants, for the purposes of the New York proceedings (pages 341-354).

57   However, and whether the Claimants are right or wrong (and I believe that they are right) what is clear beyond doubt is that that question – whether clause 29 of the Term Sheet applies to claims in fraud against (amongst others) the Claimants – is a question of construction of the Term Sheet, and that that question must itself fall within clause 29. It is an English law issue, and one in respect of which the English court has exclusive jurisdiction. Indeed, I believe that the Defendants themselves accept that it is a question of English law. I say this because they have filed evidence as to English law in the New York proceedings first, in relation to this very issue, in the form of an affidavit sworn by Andrew Lydiard, Q.C. (pages 355-363). If these proceedings are stayed now, what is the New York court to do? It is faced with an English law issue, that must be decided by the English court, and which is *a*

*priori* to other questions arising in the New York proceedings (e.g. whether the Claimants were guilty of the conduct complained of).

(3) <u>Stay inappropriate for other reasons</u>

(i) *Inappropriate for Claimants to be forced to await decision from New York court*

58  I have described above the progress of the New York proceedings, and explained that a decision on the Motion to Dismiss is not – contrary to what is said by the Defendants – imminent. Further, and as I have also described above, the Claimants are all the while being put to the trouble and expense of the discovery process; they have also incurred further costs in witness depositions and will shortly be obliged to incur further costs in instructing experts. It should also be borne in mind that the New York Complaint makes wholly unparticularised allegations of fraud not only against Cavell, but also against Mr Randall personally. Mr Randall is the Chairman of a publicly listed company on the London Alternative Investment Market ("AIM").

59  In these circumstances I do not believe that, having agreed a clause which confers exclusive jurisdiction on this Court, Mr Randall should be forced to wait for a decision from the New York court when the parties have agreed that all disputes between them will exclusively be resolved in the English courts – and have *on any view* agreed that disputes as to the proper construction of the Term Sheet will be determined here, and not in New York. I do not believe that the fact of those proceedings having been commenced (in breach of the Term Sheet, according to the Claimants) should carry any weight with this Court.

(ii) *Proceedings in New York and in this Court not co-extensive*

60  I would also draw the Court's attention to the fact that the issues in these proceedings and in the New York proceedings are by no means co-extensive. In particular, paragraph (3) of the Claim Form in these proceedings seeks damages resulting from steps taken by the Defendant in other, separate proceedings – also in breach of clause 29 of the Term Sheet. These matters are not in issue in the New York proceedings.

61  As explained by Mr Randall in paragraphs 9 and 10 of his witness statement, the Defendants had entered into reinsurance contracts with National Indemnity Company ("NICO"). The limit of the NICO reinsurances for Seaton and Stonewall was US$343 million and US$240 million respectively. Cavell's management of the

run-off of both Seaton and Stonewall was inextricably linked to the operation of these reinsurance contracts.

62   The Defendants each commenced their own separate US arbitration proceedings against NICO alleging that NICO had fraudulently colluded with Cavell to their ultimate detriment. Despite Cavell not being a party to these arbitrations, Mr Randall explains at paragraphs 17(6)-(9) of his witness statement that Cavell were served with three sets of third-party document and/or deposition subpoenas during the period October 2006 to February 2007. The first two sets of these subpoenas emanated from both the Seaton and Stonewall arbitrations with NICO. Cavell did not consider that they were under any obligation to respond to these subpoenas and informed Seaton and Stonewall's US Counsel of their position. The third set of these subpoenas were served on Cavell in relation to only the Seaton arbitration. The third set of subpoenas sought an extremely wide range of documents from Cavell relating to Cavell's previous management of Seaton's run-off. Again, Cavell notified Seaton that they did not consider that they were under an obligation to respond to this set of subpoenas and notified Seaton of their position accordingly.

63   Seaton subsequently filed an application in the United States District Court for the District of Connecticut. The Connecticut court issued a ruling granting Seaton's application insofar as document and deposition testimony were sought from Cavell and Pamela Hoelsken (Cavell's Chief Operating Officer) but denied Seaton's application insofar as it related to Mr Randall personally.

64   Cavell's compliance with the Connecticut court order caused it to incur considerable costs in terms of both management time expended and legal and other fees incurred. Seaton subsequently disputed its liability to pay Cavell any costs it had incurred or compensation for management time expended in this process, apart from minor document handling disbursements such as photocopying and scanning charges.

65   The Claimants' claim in these proceedings is that these third-party document and deposition subpoenas were brought by the Defendants in breach of the release contained in clause 13 of the Term Sheet which releases Cavell and Mr Randall from "*actions, causes of action, suits, claims and demands whatsoever, whether at law or equity*". Cavell claim damages arising out of these breaches of the Term Sheet.

(iii)   *Defendants' stance as set out in their application*

66  Lastly, I should refer to the fact that on page 5 of the Defendants' application under the heading "Conclusion", they assert that a stay is required because *"it is impossible to prepare a proper application to contest jurisdiction, as is [the Defendants'] right, while the Motion to Dismiss remains pending, and while the New York court is considering whether to restrain the Claimants from prosecuting this action"* (page 28). This assertion relies on the Defendants' representations that, dependent on the decision on the Motion to Dismiss in the ongoing New York proceedings, the *"basis on which the Defendants might be willing or able to bring their challenge may change drastically"* (top of page 28). I do not consider that the outcome of the Motion to Dismiss will in practice have any effect on the Defendants' application to contest jurisdiction. As I have already observed above, clause 29 of the Term Sheet is an exclusive jurisdiction clause within Article 23 of the Regulation. It is for this Court to determine whether particular claims fall within or outside it.

**(f)  The way forward**

67  For the reasons set out above, I respectfully ask the Court to set aside Mr. Justice Field's Order of 4 March 2008, and to dismiss the Defendants' application for a stay of these proceedings.

68  The Claimants propose that the Court thereafter proceeds as follows. The Claimants will ask the Court to direct the hearing, as soon as possible, of a preliminary issue in these proceedings. The issue is that which has been identified above: whether, on a proper construction of the Term Sheet, claims in fraud against Cavell and Mr Randall are within clause 29 of the Term Sheet and thus subject to the exclusive jurisdiction of the English courts. This firm is presently in the course of preparing a draft application that directions be given for the trial of that issue. Although it will not be possible for the application formally to be issued, in view of the stay presently in place, I will, as soon as it is complete, provide it to the Court under cover of a further witness statement. The Claimants also intend to make a further application for an interim anti-suit injunction, restraining the Defendants from pursuing the New York proceedings until after determination of this issue

69  I believe that if this Court adopts the course proposed by the Claimants, not only is this unlikely to offend the New York court, but it will actually assist it. As I have said, the issue identified above is one of English law, as the Defendants have themselves recognised. If this Court determines that issue, the New York court is

likely to be in a better position properly to assess the way forward in the proceedings before it.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

**Signed:** ...[signature]...          **Dated:** 11 Mar 2008

**Claimants**
Jonathan Jacob Sacher
**First**
**11 March 2008**
Exhibit "JJS1"

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E E N:

(1) CAVELL USA INC.

(2) KENNETH EDWARD RANDALL

<u>**Claimants**</u>

– and –

(1) SEATON INSURANCE COMPANY & ANOR

(2) STONEWALL INSURANCE COMPANY

---

**WITNESS STATEMENT OF JONATHAN JACOB SACHER**

---

\*berwin leighton paisner

Berwin Leighton Paisner LLP
Adelaide House London Bridge London EC4R 9HA
tel +44 (0)20 7760 1000  fax +44 (0)20 7760 1111